# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

JEFFREY J. THOMPKINS,

   Plaintiff,

vs.

LIL' JOE RECORDS, INC., LIL' JOE WEIN
MUSIC, INC., JOSEPH WEINBERGER AND
JOHN DOE INDIVIDUALS AND
CORPORATIONS 1-5,

   Defendants.

_____/

Case No. 02-61161-CIV-MORENO

Magistrate Judge Garber

**APPENDIX TO DEFENDANTS' STATEMENT OF MATERIAL
FACTS, MOTION FOR PARTIAL SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT OF MOTION**

HINSHAW & CULBERTSON
P. O. Box 569009
9155 South Dadeland Boulevard
Suite 1600
Miami, FL 33256-9009
Tel. (305) 358-7747
Fax (305) 577-1063

By: _____
   MAUREEN PEARCY
   Florida Bar No. 0057932
   DAVID LEVITT
   Illinois Bar No. 3125349
   Admitted *Pro Hac Vice*
   Attorneys for Defendants

Case No. 02-61161-CIV-MORENO
Magistrate Judge Garber

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by mail September 26, 2003, to: to: John C. Carey, Esq., Stroock & Stroock & Lavan LLP, Co-counsel for Plaintiff/Counterclaim-Defendant Jeffrey J. Thompkins, 200 South Biscayne Boulevard, Suite 3160, Miami, Florida  33131; Philip M. Walden, Esq., Leon S. Jones, Esq., Jones & Walden, Co-counsel for Plaintiff/Counterclaim-Defendant, Jeffrey J. Thompkins, LLC, 83 Walton Street, Atlanta, Georgia  30303; Terry D. Jackson, Esq., Terry D. Jackson, P.C., Co-counsel for Plaintiff/Counterclaim-Defendant, Jeffrey J. Thompkins, 600 Edgewood Avenue, Atlanta, Georgia 30303;  and  Kevin J. O'Grady, Ruden, McClosky, Smith, Schuster & Russell, P.A., Co-counsel for Lil' Joe Records, Inc., Lil' Joe Wein Music, Inc. and Joseph Weinberger, 200 East Broward Boulevard, Fort Lauderdale, Florida 33302.

MAUREEN G. PEARCY

Case No. 02-61161-CIV-MORENO
Magistrate Judge Garber

## APPENDIX

| Appendix No. | Description |
|---|---|
| 1 | Amended Complaint |
| 2 | Employment Agreement between Luther Campbell and Luke Records, Inc., and Joseph Weinberger (May 1, 1991) |
| 3 | Letter from Luther Campbell regarding termination of employment of Joseph Weinberger (December 28, 1994) |
| 4 | May 1989 Exclusive Recording Agreement between Effect Records and Jeffrey Thompkins and Patrick Watler |
| 5 | Deposition of Jeffrey Thompkins (August 28, 2003) |
| 6 | State of Florida Division of Corporations documentation regarding incorporation of Pac Jam |
| 7 | February 1992 Addendum to May 1989 Exclusive Recording Agreement |
| 8 | Agreement between Luther Campbell, Pac Jam Publishing, Skyywalker Records and Jeffrey Thompkins and Patrick Watler regarding musical compositions (March 30, 1990) |
| 9 | Standard Songwriter's Contract for the composition Clans Ralley (February 4, 1992) |
| 10 | Standard Songwriter's Contract for the composition Action (February 4, 1992) |
| 11 | Standard Songwriter's Contract for the composition All They Good 4 (February 4, 1992) |
| 12 | Standard Songwriter's Contract for the composition Fugetive (February 4, 1992) |
| 13 | Standard Songwriter's Contract for the composition Groove With the Poison Clan (February 4, 1992) |
| 14 | Standard Songwriter's Contract for the composition Hoe Stories (February 4, 1992) |
| 15 | Standard Songwriter's Contract for the composition I Hate Hoe's (February 4, 1992) |

Case No. 02-61161-CIV-MORENO
Magistrate Judge Garber

| | |
|---|---|
| 16 | Standard Songwriter's Contract for the composition Livin In the City (February 4, 1992) |
| 17 | Standard Songwriter's Contract for the composition Rough Nigga Gettin Busy (February 4 1992) |
| 18 | Standard Songwriter's Contract for the composition Some Shit I Used To Do (February 4, 1992) |
| 19 | Standard Songwriter's Contract for the composition Shake What Your Mama Gave Ya (February 4, 1992) |
| 20 | Standard Songwriter's Contract for the composition Shout Outs (February 4, 1992) |
| 21 | Standard Songwriter's Contract for the composition Something 4 You Ragedy Ho's (February 4, 1992) |
| 22 | Standard Songwriter's Contract for multiple compositions (February 2, 1993) |
| 23 | Exclusive Recording Agreement between Ruff Town Productions on behalf of Poison Clan and Luke Records, Inc. (February 25, 1995) |
| 24 | Amendment to Ruff Town Exclusive Recording Agreement (March 2, 1995) |
| 25 | Amendment to February 25, 1995, Recording Agreement with Ruff Town (March 28, 1995) |
| 26 | In re: Luther R. Campbell, Notice of Commencement of Case Under Chapter 11 of the Bankruptcy Code, Meeting of Creditors and Fixing of Dates (June 12, 1995) |
| 27 | In re: Luke Records, Inc., Notice of Commencement of Case Under Chapter 11 of the Bankruptcy Code, Meeting of Creditors and Fixing of Dates (June 14, 1995) |
| 28 | Order on Debtor-in-Possession's Motion Pursuant to 11 U.S.C. § 365 to Determine Ability to Assume and Assign Executory Contracts; and to Determine Costs to Cure Defaults, If Any (March 21, 1996) |
| 29 | Order Setting Bar Date for Rejection of Claims Arising From Rejected Executory Contracts (March 30, 1996) |

Case No. 02-61161-CIV-MORENO
Magistrate Judge Garber

30        General Release and Hold Harmless and Indemnification Agreement between Joseph Weinberger and Lil' Joe Records, Inc. and Peter Jones and Richard Wolfe as Liquidating Trustee of the Luther Campbell bankruptcy estate (April 1996)

31        Proof of Claim filed by Jeffrey Thompkins in the Luke Records bankruptcy proceeding (November 21, 1995)

32        Joint Plan of Reorganization in the Luke Records and Luther Campbell jointly administered bankruptcy proceedings, including as Exhibit A the Letter of Intent (February 16, 1996)

33        Objections to Claims in the Luke Records bankruptcy proceeding (February 12, 1996)

34        Debtor In Possession's Motion to Determine Ability to Assume and Assign Executory Contracts in the Luke Records bankruptcy proceeding (February 16, 1996)

35        Order Confirming Joint Plan of Reorganization in the Luke Records and Luther Campbell bankruptcy proceedings (March 22, 1996)

36        Order Setting Bar Date for Rejection Claims Arising from Rejected Executory Contracts in the Luke Records bankruptcy proceeding (April 4, 1996)

37        Order Approving Settlement and Compromise of Claim and Authorizing Debtor to Enter Into Settlement Agreement in the Luke Records bankruptcy proceeding (February 13, 1996)

38        Copyright Assignment from Luke Records and Pac Jam to Lil' Joe Records (April 8, 1996)

39        Bill of Sale for the master recordings from Luke Records to Lil' Joe Records

40        Bill of Sale for all assets of Pac Jam between Lil' Joe Records and Pac Jam Publishing (April 9, 1996)

41        General Release from Luther Campbell to Lil' Joe Records, Richard Wolfe, Peter Jones, Frank Terzo and George Tavares (April 8, 1996)

42        General Release and Hold Harmless and Indemnification Agreement from Frank Terzo as Liquidating Trustee of the Luke Records, Inc., Bankruptcy Estate, to Joseph Weinberger (April 9, 1996)

Case No. 02-61161-CIV-MORENO
Magistrate Judge Garber

| 43 | Excerpts from In re: Luther Campbell bankruptcy proceedings, Case No. 95-12785, United States Bankruptcy Court, Southern District of Florida |
| 44 | Excerpts from Plaintiff's Complaint (March 5, 2002) |
| 45 | Excerpts from In re: Luke Records, Inc. bankruptcy proceedings, Case No. 95-11447, United State Bankruptcy Court, Southern District of Florida |

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 02-CV-61161-Ferguson/Snow

JEFFREY J. THOMPKINS,

       Plaintiff,

vs.

LIL' JOE RECORDS, INC.,
LIL' JOE WEIN MUSIC, INC.,
JOSEPH WEINBERGER AND
JOHN DOE INDIVIDUALS AND
CORPORATIONS 1-5,

       Defendants.

_____/

### AMENDED COMPLAINT

COMES NOW Plaintiff, Jeffrey Thompkins, and files this Amended Complaint pursuant to F.R.C.P. 15(a), and shows the Court as follows:

### PARTIES, JURISDICTION & VENUE

1.

This lawsuit for damages, rescission and permanent injunctive relief is brought by Plaintiff, Jeffrey J. Thompkins, pursuant to the Copyright Act and Copyright Revision Act, 17 U.S.C. §§ 101 et seq. (hereinafter "Copyright Act"), and the common law and statutory law of the State of Florida. This action arises out of an ongoing pattern of copyright infringement by the Defendants, willful infringement upon Plaintiff's copyrights by Defendants, and Defendants' breach of various contracts and/or licenses between Plaintiff and Defendants.

1

2.

Defendants have unlawfully utilized the musical compositions and sound recordings authored by Plaintiff set forth in the Mandatory Disclosures (the "Plaintiff's Works") without the permission of Plaintiff and without paying royalties to Plaintiff. These copyrights are registered with the U.S. Copyright Office. Defendants have also materially breached the various contracts and/or licenses between Plaintiff and Defendants referenced herein. Accordingly, in this action Plaintiff seeks rescission of each and every contract between Plaintiff and Defendants and/or recovery of money damages resulting from the tortious, wrongful acts of Defendants and/or material breaches of contract by the Defendants, including but not limited to the maximum amount recoverable under the Copyright Act for willful infringement, treble damages, punitive damages, and all attorneys' fees and costs associated with the bringing of this lawsuit.

3.

Plaintiff Jeffrey Thompkins resides in the Northern District of Georgia.

4.

Defendant Joseph Weinberger (hereinafter "Weinberger") is a resident of Florida; he may be served personally with a copy of Plaintiff's Complaint and Summons at 6157 N.W. 167th Street, Suite F-17, Miami, Florida 33015.

5.

Defendants Lil' Joe Records, Inc. and Lil' Joe Wein Music, Inc. (hereinafter "Lil' Joe") are Florida corporations and may be served with a copy of Plaintiff's Complaint

2

and Summons by service on their registered agent, Joseph Weinberger at 6157 N.W.

167th Street, Suite F-17, Miami, Florida 33015.

6.

The infringement in violation of Plaintiff's copyrights and other contractual

violations occurred in the Southern District of Florida and other locations throughout the

United States.  Defendants derive substantial revenue from the sale, promotion, and

distribution of Plaintiff's Works in this jurisdiction.

7.

Jurisdiction and venue is proper in this court and is premised upon 28 U.S.C. §§

1331, 1132 & 1338(a) and 28 U.S.C. § 1400(a).  Plaintiff also requests that this court

exercise its supplemental jurisdiction over Plaintiff's state law contract and tort claims

pursuant to 28 U.S.C. § 1367.

8.

Plaintiff has also named John Doe individuals and corporations 1-5 as possible

Defendants in this lawsuit, if entities or individuals other than the named Defendants are

discovered to have also violated Plaintiff's valuable copyrights and other legal or

contractual rights, through or in conjunction with the named Defendants in this lawsuit.

9.

Personal jurisdiction over each of these Defendants is proper in this court because

Defendants: (1) reside and regularly conduct business in the Southern District of Florida

either by marketing, distributing, selling and/or licensing Plaintiff's Works in this district;

(2) Defendants derive substantial benefits and income from the marketing, distribution,

selling and licensing of Plaintiff's Works; and (3) Defendants infringe Plaintiff's

3

copyrights in the Southern District of Florida.  Venue is proper in the Southern District of

Florida pursuant to 28 U.S.C. §§ 1391 & 1400(a).

## OVERVIEW OF THE CASE

### 10.

Plaintiff is a recording artist and songwriter who recorded and performed under

the name "Poison Clan" and J.T. Money.  In the late 1980's Plaintiff entered into the first

of a series of agreements with various business entities owned or controlled by Luther

Campbell (hereinafter collectively "Luke"), wherein Plaintiff granted certain rights to

Luke related to the exploitation of Plaintiff's Works (all such agreements are collectively

referred to herein as the "Luke Agreements").  Under the terms of the Luke Agreements,

Plaintiff was to receive accountings and royalty payments reflecting his share of the

proceeds from such exploitation. Prior to the filing of the Luke bankruptcy, Defendant

Weinberger was in house counsel for Luke until December of 1994.  Weinberger, a

C.P.A. and an attorney  was responsible for the royalty accounting and contract

administration for Luke.

### 11.

In March 1995, the last of such agreements was entered into between Plaintiff and

Luke.  That same month Luke filed for bankruptcy. In the "Examiner's Report and

Recommendations" filed with the United States Bankruptcy Court for the Southern

District of Florida, the examiner noted that the accounting records, records purportedly

managed, controlled and supervised, by Weinberger, were in disarray.  In the 12 months

preceding the filing of the bankruptcy petition, Weinberger had taken over $620,073.24

in distributions from Luke, the debtor, without any explanation. This claim against

4

Weinberger was never pursued due to the fact that Weinberger subsequently purchased

the assets, apparently with the very same money he had received from the debtor in the

year prior to the bankruptcy. The examiner further stated that "[t]he vast majority of the

Debtor's [Luke] historical and current financial problems relate to the Debtor's inability

to effectively handle the financial, contract administration, and accounting aspects of its

business." (See Examiner's Report, pp. 1-11, attached hereto as Exhibit "A").  All these

business functions were the direct responsibility of Defendant Weinberger.

12.

Pursuant to the terms of the "Joint Plan of Re-Organization" and the Order

confirming the same, (attached hereto as Exhibit "B"), Luke conveyed certain assets to

Defendants, including Luke's interests in Plaintiff's Works.  After such purchase,

Defendants continued to exploit the Plaintiff's Works.  Defendants have never accounted

or paid <u>any</u> royalties to Plaintiff.  Furthermore, Defendants continue to exploit Plaintiff's

compositions without license or authority from or any payment to Plaintiff.

13.

Despite repeated requests to Defendants for an accounting of sales and royalties

due from such sales, none have been provided to Plaintiff.  Although Plaintiff maintains

that Defendant has and continues to exploit Plaintiff's Works without any license or

authority, on January 22, 2002, Plaintiff expressly terminated and revoked any and all

licenses, whether express or implied, that Defendants contend grant them any rights to

exploit Plaintiffs works due to Defendants total failure to honor the terms of any such

license agreements.

5

14.

On August 27, 2002, Plaintiff rescinded each of the Luke Agreements due to Defendants' material breach of the Luke Agreements and for complete failure of consideration.

FACTUAL BACKGROUND

THE 1989 AGREEMENT

15.

On or about May 1989, Plaintiff entered into a recording agreement with Effect Records, a division of Skyywalker Records, Inc. ("SRI") (the "1989 Agreement," attached hereto as Exhibit "C"). Under the terms of the 1989 Agreement, Plaintiff agreed to record and deliver sound recordings to SRI. In exchange, SRI agreed to pay Plaintiff a royalty based on its sale and exploitation of such sound recordings.

16.

SRI was required to account to Plaintiff quarterly for all royalties earned under the 1989 Agreement.

17.

The 1989 Agreement does not transfer any rights in any composition authored by Plaintiff other than a mechanical license for musical compositions recorded pursuant to such agreement.

18.

Plaintiff owns the copyrights in all compositions authored by him during the term of the 1989 Agreement.

6

## THE 1994 AGREEMENT

### 19.

On or about April 1994, Plaintiff entered into a second recording agreement with Luke Records, Inc. (hereinafter "LRI," as the successor to Skyywalker Records Inc. ) (the "1994 Agreement," attached hereto as Exhibit "D"). Under the terms of the 1994 Agreement, Plaintiff agreed to record and delivery sound recordings to LRI. In exchange, LRI agreed to pay Plaintiff a royalty based on its sale and exploitation of such sound recordings.

## THE 1995 AGREEMENT

### 20.

On or about February 1995, Plaintiff entered into yet another recording agreement with LRI (the "1995 Agreement" attached hereto as Exhibit "E"). Under the terms of the 1995 Agreement, Plaintiff agreed to record sound recordings for LRI. In exchange, LRI agreed to pay Plaintiff a royalty based on its sale and exploitation of such sound recordings.

## THE PUBLISHING AGREEMENTS

### 21.

After the original Complaint was filed in this action, Defendants produced various "songwriter's agreements" that were allegedly entered into between Plaintiff and a non-Pac Jam Music. ("PJM"). PJM did not exist as a legal entity on the date the Songwriter Agreements were allegedly executed by Plaintiff. Furthermore, no representative of PJM signed the Songwriter Agreements. Such Songwriter Agreements are attached hereto as

7

Exhibit "F" (the "Songwriter Agreements"). Plaintiff disputes the authenticity of the Songwriter Agreements.

22.

Upon information and belief the Songwriter Agreements are not genuine and have been altered to include compositions authored by Plaintiff and included on albums by Poison Clan delivered under the 1989 Agreement.

23.

No representative of PJM signed the "Songwriter Agreements."

## THE AMENDMENT

24

After the original Complaint in this case was filed, Defendants produced an additional document that they allege is an amendment to the 1989 Agreement which purportedly grants Defendants a 50% interest in the copyrights in the compositions also listed in the Songwriter Agreements (the "Amendment"). The Amendment is attached hereto as Exhibit "G". The Amendment was not executed by any representative of Luke.

25.

Plaintiff has never received any moneys, royalties, accountings or other consideration or any royalties due him pursuant to the terms of the Songwriter Agreements or the Amendment.

## THE LETTER AGREEMENTS

26.

In addition to writing compositions and creating sound recordings for the Poison

8

Clan, Plaintiff also wrote compositions and created sound recording for other artists signed to Luke, including Luther Campbell and H-town.

27.

Plaintiff granted Luke a non-exclusive license to exploit his performances on albums by "LUKE" and "H-Town" (the "Letter Agreements", attached hereto as Exhibit"H").

28.

Under the terms of the Letter Agreements, Plaintiff granted Luke the right to include Plaintiff's performances on certain sound recordings in exchange for a royalty based on sales of the applicable albums.

29.

Plaintiff has never received any monies,  royalties or other consideration due him pursuant to the Letter Agreements.

30.

None of the Letter Agreements transfer any of Plaintiff's ownerships interests in the copyright in either the sound recordings or the compositions to Luke.

THE JUDGMENT, BANKRUPTCY AND PURCHASE BY WEINBERGER

31.

On October 28, 1994, Peter Jones, an artist signed to Luke,  obtained a judgment against Luke for in excess of 1.5 Million Dollars (the "Pre- Bankruptcy Judgment," attached hereto as Exhibit "I").

32.

9

The Pre-Bankruptcy Judgment was a result of Luke's misrepresentations and underpayment of royalties, and included an award of punitive damages and attorney's fees due to Luke's willful, wanton conduct with reckless disregard to Peter Jones' rights. See Exhibit I, p. 15.

33.

In defense of the lawsuit, Luke presented a series of "Songwriter Agreements" which the Court declared unenforceable for a number of reasons, most notably because the purported signatures of Jones were neither genuine nor verified by Jones. See Exhibit I, pp 45.

34.

On or about March 28, 1995, Luke filed an involuntary petition under Chapter 7 of the United States Bankruptcy Code, which was subsequently converted to a Chapter 11 bankruptcy.

35.

Pursuant to the terms of the "Joint Plan of Re-Organization" and subsequent Order, Luke conveyed certain assets to Defendants. (See Exhibit "B"). Defendant Weinberger apparently used the $620,000.00 received from the debtor Luke prior to the filing of the bankruptcy to purchase these assets.

36.

After purchasing such assets from Luke, Defendants continue to exploit sound recordings and compositions previously delivered by Plaintiff to Luke under the terms of the Luke Agreements (see "'Lil' Joe" catalog attached hereto as Exhibit "J").

37.

10

Despite their ongoing exploitation of Plaintiff's property, Defendants have never paid Plaintiff any monies and have refused to provide Plaintiff with an accounting or any payment reflecting royalties earned from Defendants' exploitation of Plaintiff's Works.

38.

Defendants continue to exploit Plaintiff's compositions without any authority or license from Plaintiff or any payment to Plaintiff.

39.

Defendants and Defendants' predecessor in interest, Pac-Jam Publishing, Inc. ("Pac-Jam") have registered certain of Plaintiff's compositions in Defendants' and Pac Jam's name and claimed ownership is such compositions despite the fact that Plaintiff is the author and copyright owner of such compositions and that Plaintiff has never transferred such copyrights to either Defendants or Pac Jam.

40.

Plaintiff has been in regular contact with Defendants since on or about January 2000 and has repeatedly requested payment of monies owed and due for the exploitation Plaintiff's Work's for a statement of royalties earned from Defendants' exploitation of Plaintiff's compositions and sound recordings.

41.

After informing Defendants of this infringement and material breach, Defendants have taken the position that they have no duty to pay or account to Plaintiff.

42.

In bad faith and fraudulent breach of contract, and in violation of U.S. copyright laws, the Defendants have infringed Plaintiff's copyrights and have misappropriated the

11

rights of Plaintiff by engaging in the reproduction and use of these compositions and sound recordings as prohibited under U.S. Copyright law and under the contractual agreements between Plaintiff and Luke assumed by Defendants.

43.

Defendants continue to derive significant revenues from the use and exploitation of Plaintiff's copyrights, to their mutual benefit. Defendants continue to misrepresent, promote, and distribute the copyrighted works as if Plaintiff has no legal ownership of such works or any right to payment for such exploitation.

44.

Defendants have infringed and violated Plaintiff's copyrights protected and registered under U.S. law, and have otherwise violated Plaintiff's property rights to the copyrighted works under the Copyright Act, the Lanham Act, and under the state law of Florida and Georgia.

45.

Plaintiff has suffered damages at law due to these violations and is entitled to recover from the Defendants jointly and severally all such damages recoverable under federal and state law due to their intentional, willful, malicious conduct in knowing violation of Plaintiff's protected copyrights and contractual rights.

### FIRST CLAIM–VIOLATION OF COPYRIGHT ACT

46.

Plaintiff realleges and incorporates paragraphs 1 through 45 above.

12

47.

Plaintiff is the owner of copyrights for the compositions identified, copyrighted, and registered with the U.S. Copyright Office and Library of Congress as listed in Plaintiff's Mandatory Disclosures. The Defendants have copied, used, promoted, licensed and distributed in the Southern District of Florida and other locations throughout the United States Plaintiff's copyrighted materials without authority from Plaintiff, or accounting to Plaintiff for royalties and monies owed to Plaintiff. Defendants have intentionally failed obtain authorization or to pay or account to Plaintiff for such exploitation to their mutual benefit. Defendants distribute, promote, and sell Plaintiff's copyrights in albums, CDs, and other musical formats to their benefit. Defendants have copied, reproduced in whole or part Plaintiff's copyrights, including tortiously and illegally licensing those copyrights to other parties without authority, and have failed to account for such revenues to Plaintiff. Defendants have illegally and fraudulent attempted to license those copyrighted works to third persons. Plaintiff has not authorized any Defendants in this lawsuit to use its copyrighted works in any manner without payment.

48.

As a result of these violations by Defendants, Plaintiff has suffered actual damages and is entitled to recover from Defendants the greater of actual damages, statutory damages, attorney's fees and costs, and/or profits to the Defendants from the infringements measured by the gross revenue generated by the infringing Defendants. Plaintiff is entitled to punitive or exemplary damages without cap or limitation for these federal copyright torts as provided under Florida state law where Defendants have acted

13

willfully, wantonly, and intentionally, with specific intent to violate Plaintiff's copyrights, economic interests, and rights.

49.

Plaintiff is an artist engaged in the creation of copyrighted musical compositions and sound recordings in Florida, the United States, and throughout the world and Defendants have tortiously and illegally interfered with and attempted to usurp his legal rights. The injuries and damages sustained by Plaintiff that are outlined in this lawsuit are continuing and ongoing, and Defendants continue to ignore Plaintiff's copyrights to their joint mutual benefit.

SECOND CLAIM–VIOLATION OF THE LANHAM ACT

50.

Plaintiff realleges and incorporates paragraphs 1 through 49 above.

51.

The Defendants have used and continue to use in commerce Plaintiff's copyrighted works giving false designation of origin of the owners of such copyrighted works, have and continue to make false and misleading representation of fact which are likely to confuse, cause mistake, deceive as to ownership and affiliation such copyrighted works owned by Plaintiff, and as to the origin, sponsorship or approval for sale, distribution, use or approval of said copyrighted works of Plaintiff and other commercial uses of the copyrights by Plaintiff. Defendants, in industry, trade, and commercial advertising including the internet, have misrepresented the nature, characteristics, qualities, and ownership of the copyrights. Plaintiff's damages exceed $200,000, and Defendants are liable to Plaintiff for the greater of his actual treble damages, or treble

14

Defendants' profits, or a just award made by the court, plus reasonable attorney's fees and costs as provided by law.  Defendants have misrepresented to third parties that they possess a license to Plaintiff's copyrights or that the copyrights of Plaintiff belong to them exclusively, in violation of false origin provisions under the Lanham Act. Defendants' conduct in misappropriating Plaintiff's property to their mutual benefit constitutes unfair and deceptive trade practices in violation of the Lanham Act, 15 U.S.C. § 1125.

52.

Discovery will demonstrate that Defendants have copyrighted works owned by Plaintiff, and have illegally and wrongfully registered such copyrights to Plaintiff's exclusion as the rightful owner to such musical compositions.  Defendants have made misrepresentations to generate record sales for their benefit.  Consumer purchasers have been misled and deceived as to the legal owner and origin of Plaintiff's copyrighted works to the mutual benefit and enrichment of the Defendants through the sale of Plaintiff's copyrighted works by Defendants.

THIRD CLAIM–INJUNCTION

53.

Plaintiff realleges and incorporates paragraphs 1 through 52 above.

54.

The Defendants' use and misappropriation for commercial use and profit of Plaintiff's copyrights and sound recordings is ongoing, and Defendants continue to generate significant revenues from the sale of Plaintiff's Works in CD, album, and other formats.  No legal relief granted to Plaintiff in this complaint for damages can prevent or

15

compensate Plaintiff for such misappropriation by Defendants, and Plaintiff asks that this court enter appropriate injunctive relief to prevent further duplication, manufacture, distribution, license or sale of any product containing Plaintiff's compositions or sound recordings until further direction of this court. The injuries of Plaintiff in this case are ongoing, and only injunctive intervention by this court can prevent continuing injury.

FOURTH CLAIM–BREACH OF CONTRACT

55.

Plaintiff realleges and incorporates paragraphs 1 through 54 above.

56.

Plaintiff entered into various written contracts with Defendants predecessor in interest, Luke. Under the terms of such contracts, Plaintiff was entitled to a quarterly or semi-annual accounting of all royalties earned from the exploitation of his works. Defendants have never provided such an accounting or any payment of any kind.

57.

Plaintiff is entitled to recover all damages flowing from the breach of these contracts, including attorney's fees and costs for their bad faith and fraudulent breach of these contracts as provided under Georgia and Florida law.

FIFTH CLAIM–UNJUST ENRICHMENT

58.

Plaintiff realleges and incorporates paragraphs 1 through 57 above.

59.

Defendants have received the economic benefit of Plaintiff's copyrighted works and sound recordings and have been unjustly enriched by the receipt of profits and

16

monies owed and due Plaintiff from such works. As an alternative claim to the contract claims in this lawsuit, Plaintiff prays that he recover all monies owed and due to it from the benefit conferred on the Defendants from the misappropriation of Plaintiff's copyrighted works and sound recordings, and the unjust enrichment of Defendants from the misappropriation of monies owed and due Plaintiff for its copyrighted works.

60.

Plaintiff further prays that he recover his attorney's fees and costs for the Defendants' bad faith and fraudulent misappropriation of these monies for these claims as provided under Georgia and Florida law.

SIXTH CLAIM–PROMISSORY ESTOPPEL

61.

Plaintiff realleges and incorporates paragraphs 1 through 60 above.

62.

The Defendants have made written and oral contractual agreements with Plaintiff that if left unenforceable as a matter of law in Plaintiff's favor would act as a fraud and unjust enrichment to Defendants. Defendants have made promises to honor and pay for their exploitation of Plaintiff's sound recordings and copyrighted works. Defendants knew and expected that Plaintiff would rely on such promises regarding such use and exploitation, Plaintiff did in fact rely on these promises incurring significant cash outlays and other damages in reliance on those promises, and justice can only be found by enforcing the promises of Defendants to honor and pay for their exploitation of Plaintiff's Works.

SEVENTH CLAIM –RESCISSION AND RESTITUTION

17

63.

Plaintiff realleges and incorporates paragraphs 1 through 62 above.

64.

Plaintiff and Defendants entered into various agreements regarding the exploitation of Plaintiff's Works.

65.

Under the terms of such agreements Plaintiff granted Defendants rights in Plaintiff's Works in exchange for the payment of royalties and accounting of royalties earned for such exploitation.

66.

The receipt of such royalties and accounting due from Defendants constituted the purpose for which Plaintiff bargained under the agreement.

67.

Plaintiff's purpose has been frustrated by Defendant's failure of consideration. Plaintiff has no adequate relief at law; therefore, recission of each of the Luke Agreements and complete restitution to Plaintiff for all benefits conferred upon Defendants, is warranted.

68.

Defendants have completely recouped any benefits previously conferred upon Plaintiff, if any; therefore, no tender by Plaintiff is necessary.

EIGHT CLAIM-FRAUD

69.

Plaintiff realleges and incorporates paragraphs 1 through 68 above.

18

70.

Defendants have made material representation to Plaintiff and third parties that Defendants knew were untrue, for the purpose of misleading and deceiving Plaintiff. Plaintiff and third parties relied on such misrepresentation and were damaged as a result of such reliance.

71.

In order to induce Plaintiff to enter into the Luke Agreements, Luke and Weinberger represented to Plaintiff that Plaintiff would receive royalties and accountings from Luke. Defendants have further represented to Plaintiff and third parties that Defendants own 100% of the copyrights in Plaintiff's Works.

72.

Defendants have misrepresented to Plaintiff and third parties that Defendant's have no duty or obligation to account or pay royalties to Plaintiff.

73.

Defendants have represented to Plaintiff that the Songwriter Agreements are genuine and authentic documents.

74.

Defendants were aware that each of the above misrepresentations were untrue, and they made such misrepresentation for the sole purpose of defrauding Plaintiff and

19

preventing Plaintiff from receiving due compensation for Defendants' exploitation of Plaintiff's Works. As a result of such misrepresentation, Defendants have profited from the exploitation of Plaintiff's Works without compensating Plaintiff.

75.

Plaintiff justifiably relied on Defendants' misrepresentation to his detriment and is entitled to all damages flowing from Defendants' fraudulent conduct, including attorney's fees and punitive damages without limitation or cap, as provided under state and federal law.

## NINTH CLAIM–ATTORNEY'S FEES, COSTS & PUNITIVE DAMAGES

76.

Plaintiff realleges and incorporates paragraphs 1 through 75 above.

77.

Defendants' conduct outlined in this complaint demonstrates bad faith and intentional conduct with intent to cause harm, and other intentional, tortious conduct entitling Plaintiff to a recover of attorney's fees, costs, and punitive damages to be determined by a jury at trial in its fair and enlightened conscience. Defendants' conduct shows bad faith and intentional conduct entitling Plaintiff to a recovery of these damages as provided under Federal and Florida state law for their willful and malicious conduct.

## PRAYER FOR RELIEF:

78.

Plaintiff realleges and incorporates paragraphs 1 through 77 above.

20

79.

That this court enter appropriate declaratory and injunctive relief under both federal and state law that it deems appropriate under the circumstances and after hearing before the court;

80.

That Plaintiff recover all compensatory damages, including but not limited to treble damages that are appropriate on his contractual, copyright, and tort claims allowable in law without duplication of damages as provided by law, but not less than $500,000.00;

81.

That Plaintiff recovers appropriate attorney's fees and costs for Defendants' tortious, bad faith, and intentional conduct in violation of Plaintiff's copyrights and in breach of contracts in this case. Plaintiff's counsels' hourly fee rates in these litigation matters is $275.00 per hour.

82.

That each and every contract or license or agreement of any kind between Plaintiff and Defendants be deemed rescinded, and that Defendants be ordered to provide full restitution to Plaintiff.

83.

That a jury award and assess appropriate punitive damages against the Defendants for their willful, intentional, and malicious conduct demonstrated in this case;

21

84.

That this Court grants such other equitable and further relief as it deems just and

proper;

85.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO

TRIABLE.

22

This _____ day of November, 2002.

Respectfully submitted,

KILPATRICK STOCKTON LLP

John C. Carey
Florida Bar No.0078379
200 S. Biscayne Boulevard, Suite 2000
Miami, Florida  33131-2310
(786) 777-8033 (telephone)
(786) 777-8001 (facsimile)
jcarey@kilpatrickstockton.com

Attorneys for Plaintiff Counterclaim-
Defendant Jeffrey J. Thompkins

Co-counsel:

Terry D. Jackson
Georgia Bar No. 386003
TERRY D. JACKSON, P.C.
Suite 210, South Tower
1776 Peachtree Road, N.W.
Atlanta, Georgia  30309
(404) 875-6555 (telephone)

and

Philip M. Walden, Jr.
Georgia Bar No. 730550
JONES & WALDEN, LLC
83 Walton Street
Atlanta, Georgia  30303
(404) 954-6605 (telephone)

23

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing was served via U.S. Mail this ___7th___ day of November, 2002, to:

Elizabeth Ann Morgan, Esq.
Bradley Wayne Grout, Esq.
POWELL, GOLDSTEIN, FRAZIER
   & MURPHY LLP
191 Peachtree Street, N.E.
16th Floor
Atlanta, Georgia 30303-1736

Kevin J. O'Grady, Esq.
RUDEN, McCLOSKY, SMITH,
   SCHUSTER & RUSSELL, P.A.
200 East Broward Boulevard
15th Floor
Fort Lauderdale, Florida 33302

Ronald L. Kammer, Esq.
Maureen G. Pearcy, Esq.
HINSHAW & CULBERTSON
Dadeland Center
Suite 1600
9155 South Dadeland Boulevard
Miami, Florida 33156

John C. Carey

MIALIB01 16771 1

# EXHIBIT 2

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (hereinafter referred to as "AGREEMENT") is entered into this ____ day of _____, 1991 by and between LUTHER R. CAMPBELL (hereinafter referred to as "CAMPBELL") and LUKE RECORDS, INC. (hereinafter referred to as "EMPLOYER") and JOSEPH WEINBERGER (hereinafter referred to as "EMPLOYEE") (hereinafter collectively referred to as the "PARTIES").

In consideration of the mutual promises hereinafter set forth, and for other good and valuable consideration, the PARTIES agree as follows:

1.  __EMPLOYMENT__. EMPLOYER hereby employs the EMPLOYEE as its Chief Operating Officer and General Counsel and CAMPBELL employs EMPLOYEE as corporate and tax counsel for all entities owned and/or controlled by him, subject to the terms and conditions hereinafter set forth. EMPLOYEE shall commence full time work for CAMPBELL and EMPLOYER approximately three weeks from the date of the execution of this AGREEMENT. The PARTIES acknowledge that the EMPLOYEE is an attorney licensed to practice law in the State of Florida and it is contemplated that said attorney may practice law during the term of this AGREEMENT either individually, as a professional association, or as an attorney in a law firm as long as such practice is substantially on behalf of CAMPBELL. EMPLOYER and CAMPBELL shall indemnify and hold EMPLOYEE harmless from any losses and expenses occurring as a result of EMPLOYEE serving as Escrow Agent or Trustee for EMPLOYEE, CAMPBELL or entity controlled by CAMPBELL. EMPLOYEE shall be authorized to sign checks for CAMPBELL's entities to pay: all federal, state and local taxes; leases; license and administrative fees; and insurance and utility bills.

2.  __DUTIES__. EMPLOYEE's duties hereunder are to:

a. Serve as a member of the Executive Committee (if CAMPBELL elects additional directors to any of his companies, EMPLOYEE shall be added as a director) to provide input to establish the overall strategic goals of the business, corporate and organizational policies, and operating guidelines necessary for the effective operations of EMPLOYER and all entities controlled by CAMPBELL;

b. Assume full responsibility for all of CAMPBELL's operations through the establishment of profit goals, and monitor progress of operations to meet planned results;

c. Establish and maintain effective cost control programs through the establishment of control budgets and critical performance measurement of results versus plan;

d. Coordinate line and staff activities to ensure that the hiring/termination, compensation and financing decisions, legal and other tasks are properly discharged;

e. Assume responsibility to develop and execute a strategic business plan in conjunction with CAMPBELL and Independent Accountants;

f. Supervise the Independent Accounting Firm in functions assigned to them;

g. Perform those legal duties that EMPLOYEE is presently performing for CAMPBELL and CAMPBELL's controlled entities;

h. Hiring and firing legal, accounting, financial (banks, insurance and stock brokers) and other administrative and budget staff and personnel necessary for EMPLOYEE to perform his duties as contemplated herein, with prior approval from CAMPBELL to fire legal, accounting, and nonfinancial personnel of CAMPBELL;

It is contemplated that EMPLOYEE shall terminate and discharge EMPLOYER's current controller and the independent accounting firm for all of CAMPBELL's businesses except Paradise In South Beach, Inc.. Said controller and accountants shall be replaced with suitable personnel and accountants to be chosen by EMPLOYEE, with CAMPBELL's approval. EMPLOYEE shall be furnished with qualified secretarial assistance in order for him to satisfactorily perform his duties hereunder.

3. TERM. This AGREEMENT shall be for a term of fifteen (15) months and shall renew automatically for additional one (1) year periods unless EMPLOYER provides EMPLOYEE with ninety (90) days notice prior to the end of any term of this AGREEMENT of the nonrenewal of this AGREEMENT or unless EMPLOYEE's employment is terminated as herein provided. However, this AGREEMENT or employment hereunder may not be terminated by EMPLOYER until EMPLOYEE's obligation to pay all other salary and benefits here-under are fully satisfied through date of termination.

4. COMPENSATION.

4.01 Annual Base Compensation. EMPLOYER shall pay to EMPLOYEE, and EMPLOYEE agrees to accept from EMPLOYER, a minimum annual base salary of eighty five thousand dollars per annum ($85,000.00), payable in fifty-two (52) equal weekly payments or such other intervals (not less often than semi-monthly) as other employees of EMPLOYER are paid. EMPLOYER shall deduct and withhold from all such payments made to EMPLOYEE all social security, withholding taxes and other amounts required to be deducted or

withheld pursuant to the laws of the State of Florida and/or the United States.  After the first year, and in all subsequent years, the Annual Base Compensation shall be increased by a minimum Consumer Price Index.  The EMPLOYER shall review the salary of EMPLOYEE on at least an annual basis and shall make those additional increased adjustments it deems appropriate.

4.02  _Additional Compensation_.  EMPLOYER shall pay an annual bonus to EMPLOYEE.  EMPLOYEE shall have one month to identify areas of concern which need to be corrected and shall provide EMPLOYER and his independent accounting firm with a list of such concerns.  Thereafter, EMPLOYER, EMPLOYEE and the independent accounting firm shall work out a bonus plan within ~~thirty~~ days.  If a mutually satisfactory bonus plan is not worked out, the bonus shall be based upon a budget which shall be prepared by EMPLOYEE and approved by the Board of Directors.  The budget will encompass all entities controlled by CAMPBELL, including, but not limited to, the following entities of CAMPBELL:  Luke Records, Inc. (f/k/a/Skyywalker Records, Inc. and Luke Skyywalker Records, Inc.); Luke Records, Inc. Money Purchase Pension Plan and Trust; Luke Records, Inc. Profit Sharing Plan and Trust; Sports Production Management, XXI, Inc.; Luke Recording Studio, Inc.; Luke Development, Inc.; Florida Network Pool, Inc.; Strawberry's, Inc. n/k/a Pensacola Gold Club, Inc.; Strawberry's Too, Inc.; Pac-Jam Publishing, Inc.; Rockville Productions, Inc.; Luke, Inc.; Luke Records Fan Club, Inc.; Luther Campbell Charitable Foundation, Inc.; Entertainment Center, Inc. (f/k/a Luke I, Inc.); Luke/Urban Development Corp.; Effect Records, Inc.; Paradise In South Beach, Inc.; 2LC, Inc.; Luke Real Estate, Inc.; Luke Leasing; Inc.; Luke Mortgage, Inc.; and Luke Purchasing, Inc.. The budget will contain an after-tax profit which will exclude all extraordinary items of gain and loss, including but not limited to any gains or losses occurring from transactions which closed, incidents which occurred or from lawsuits which causes of action accrued prior to the execution of this AGREEMENT.  The bonus shall be computed as follows:

4.02.1  _If 100% of Budgeted Profit Achieved_.  EMPLOYEE is entitled to a bonus equal to twenty-five percent (25%) of his base annual salary.

4.02.2  _If Profit Below 100% of Budgeted Profit_.  EMPLOYEE entitled to a bonus if profit is:

Below 80% of Budget -- No Bonus
80-85% of Budget -- 5% of base annual salary
86-89% of Budget -- 10% of base annual salary
90-94% of Budget -- 15% of base annual salary
95-99% of Budget -- 20% of base annual salary

4.02.3  _If Profit Above 100% of Budgeted Profit_.  EMPLOYEE is entitled to a bonus equal to twenty-five percent (25%)

· 3

of EMPLOYEE's base annual salary plus one half the percentage above budget times EMPLOYEE's base annual salary.

4.03 <u>Malpractice Insurance and License Fees</u>. E M P L O Y E R shall pay its prorata share of legal malpractice insurance premiums on behalf of EMPLOYEE. In addition, EMPLOYER shall pay its prorata share of EMPLOYEE's city, county, state license fees, American Bar Association and Florida Bar dues. EMPLOYER shall pay a maximum of $2,000.00 towards the Malpractice Insurance.

5. <u>AUTOMOBILE</u>. EMPLOYER shall pay, as a partial reimbursement, to EMPLOYEE the sum of $~~400.00~~ per month to be used towards EMPLOYEE's automobile, including maintenance, repairs, insurance and all other costs incidental to the operation thereof.

6. <u>REIMBURSEMENT OF EXPENSES</u>. EMPLOYEE shall be entitled to receive reimbursement for all reasonable expenses (including, but not limited to cellular phone calls related to employer's business, travel and entertainment expenses) incurred by him, which are made with EMPLOYER's prior approval where possible and which approval shall not be unreasonably withheld, in connection with the performance of his duties. EMPLOYEE shall maintain adequate records and vouchers to support all expenses and shall deliver same to EMPLOYER.

7. <u>EMPLOYEE BENEFIT PLANS: FRINGE BENEFITS</u>. During the term of this AGREEMENT, EMPLOYER shall provide EMPLOYEE with the following benefits:

7.01 <u>General</u>. The payments to EMPLOYEE to be Made pursuant to the provisions of Paragraph 7 hereof shall be additional to any benefits which may accrue or be paid to or with respect to EMPLOYEE under any Employee Benefit Plan which is qualified and exempt under Sections 401(a) and 501(a) of the Internal Revenue Code of 1986, as amended or replaced from time to time (hereinafter referred to as the "CODE"), or any medical, disability, dental or hospitalization insurance program and any and all nontaxable or taxable fringe benefits which are now available to all other employees of the EMPLOYER, and any additional or modified benefits approved by EMPLOYER from time to time.

7.02 <u>Insurance</u>. EMPLOYER shall provide: (a) coverage for the EMPLOYEE (and his spouse, if any, and dependents) under one or more policies or plans of medical and dental insurance as may be selected from time to time by the EMPLOYER; and (b) EMPLOYEE shall be covered by one or more disability insurance policies in such amounts and for such intervals in which premiums dc not exceed $2,500 per year and EMPLOYEE shall be reimbursed by EMPLOYER. In

. 4

the event EMPLOYER provides life insurance benefits to any other employee, than EMPLOYEE shall receive similar coverage.

8.    VACATIONS, SICK, HOLIDAYS AND PERSONAL LEAVE. EMPLOYEE shall be entitled to three (3) weeks (not to be used all at one time) paid vacation (with prior approval of EMPLOYER, which approval shall not be unreasonably withheld) during each year of employment (accruing at the rate of 1.25 days per month), 12 sick days (accruing at 1 day per month) holidays given to other employees of EMPLOYER, all jewish holidays and personal leave which other employees receive from EMPLOYER. In addition, EMPLOYEE shall be entitled to 200 personal leave or "free" hours per calendar year not to exceed one and one half days per week without the prior permission of EMPLOYER. Each day of personal or "free" leave shall be the equivalent of 7 hours. EMPLOYEE's compensation shall be decreased by $75.00 per hour, as a reimbursement to EMPLOYER of monies to be paid to other legal counsel by EMPLOYER, for every hour of personal leave which exceeds 200 hours per year. Personal leave will accrue on a weekly basis.

9.    TERMINATION.

9.01   Death of EMPLOYEE. In the event of the death of EMPLOYEE, this AGREEMENT shall immediately terminate and the personal representative or trustee of EMPLOYEE shall be entitled to all compensation and benefits due and owing to EMPLOYEE up through the day of EMPLOYEE's death, including any accrued but unused vacation, sick and personal leave.

9.02   By Mutual Agreement. This AGREEMENT shall terminate in the event EMPLOYEE and EMPLOYER mutually agree, and EMPLOYEE shall be entitled to such compensation and benefits as the PARTIES shall agree. EMPLOYEE shall receive any accrued but unused vacation, sick and personal leave.

9.03   Disability of EMPLOYEE. If, during the term of this AGREEMENT, EMPLOYEE shall be unable to perform all his duties as a result of illness or other incapacity, and such illness or other incapacity shall continue consecutively for a period of three (3) months, EMPLOYER shall have the right to terminate EMPLOYEE's employment upon sixty (60) days' written notice. In such event, EMPLOYER shall be obligated to pay EMPLOYEE his salary and other benefits up to and through the date of termination. If EMPLOYEE shall resume any of his duties within sixty (60) days following the receipt of such notice, and shall perform such duties on a regular basis for at least two (2) consecutive months thereafter, this AGREEMENT and EMPLOYEE's employment hereunder shall continue in full force and EMPLOYER's notice of intention to terminate shall have no further force or validity. EMPLOYEE shall receive any accrued but unused vacation, sick and personal leave.

9.04  <u>Termination by EMPLOYER</u>.  EMPLOYER may terminate this AGREEMENT and discharge EMPLOYEE at any time by delivering reasonable written notice to EMPLOYEE.  EMPLOYEE agrees to remove himself from the premises on or before the date specified in the notice.  EMPLOYEE shall be allowed to remove all personal and legal files which are kept at EMPLOYER's offices.  Unless EMPLOYEE is terminated for cause (loss of license to practice law (disbarment); an act of dishonesty (ex. theft or embezzlement) leading to the conviction of a felony (conviction of, or entering into a plea of not guilty to a traffic violation which constitutes a misdemeanor shall be excluded), EMPLOYER shall be required to pay EMPLOYEE a sum equal to the greater of: the remaining amount due under the AGREEMENT or seventy-five percent (75%) of his full annual base salary.  Additionally, EMPLOYER shall maintain all insurance policies for the benefit of EMPLOYEE for nine (9) months following his date of termination.  EMPLOYEE shall receive any accrued but unused, vacation, sick and personal leave.  EMPLOYER agrees to advise EMPLOYEE in writing of the specific nature of any claimed breach and EMPLOYEE shall have thirty days to cure such claimed breach.

9.05  <u>Termination by EMPLOYEE</u>.  EMPLOYEE may terminate this Employment AGREEMENT by giving EMPLOYER at least three (3) months' written notice, upon the expiration of which this AGREEMENT shall become null and void.  EMPLOYEE shall be entitled to full salary and benefits through the date of actual termination, and EMPLOYER shall have the right to shorten the time within which EMPLOYEE's employment shall terminate, such that it may be less than the three (3) months' notice provided by EMPLOYEE.  EMPLOYEE shall receive any accrued but unused vacation, sick and personal leave.

10.  <u>REIMBURSEMENT OF DISALLOWED EXPENSES AND COMPENSATION</u>. In the event any expenses or salary paid to EMPLOYEE, shall upon audit or other examination of the income tax returns of CAMPBELL or EMPLOYER, bo determined not to be an allowed deduction from the gross income of CAMPBELL or EMPLOYER, and such determination shall be agreed to by EMPLOYER, or such determination shall be rendered final by the appropriate taxing authority, or a judgment of a court of competent jurisdiction, and no appeal shall be taken therefrom, or the applicable period for filing notice of appeal shall have expired, then in such event, EMPLOYEE shall repay to EMPLOYER and/or CAMPBELL the taxes, penalties and interest attributable to the disallowed expenses and salary of EMPLOYEE.  EMPLOYEE shall be given notice and shall participate in all such aforementioned proceedings.

11.  <u>EFFECT OF WAIVER</u>.  The waiver by any of the PARTIES to this AGREEMENT of a breach of any provision hereof shall not

. 6

operate as or be construed as a waiver of any subsequent breach hereof.

12. **NOTICES**. Any and all notices referred to herein shall be sufficient if furnished in writing sent by registered or certified mail to the respective PARTIES at the addresses set forth below their signatures to this AGREEMENT or such other addresses as they shall from time to time furnish to each other by written notice.

13. **ASSIGNMENT**.

13.01   **By EMPLOYER**. The rights and benefits of the EMPLOYER under this AGREEMENT shall be transferable to an entity which is controlled by CAMPBELL, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by or against its successors and assigns.

13.02   **By EMPLOYEE**. The rights and benefits of the EMPLOYEE under this AGREEMENT shall not be transferable and neither the EMPLOYEE, his heirs nor his personal representative shall have any right to anticipate, by pledge or otherwise, any payment provided to be made to any of them hereunder.

14. **ATTORNEY'S FEES AND COSTS**. If any action at law or in equity is necessary to enforce or interpret the terms of this AGREEMENT, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements and fees and costs in any appeal post-judgment or bankruptcy proceeding, in addition to any other relief to which he may be entitled.

15. **MODIFICATION**. No change or modification of this AGREEMENT shall be valid unless the same be in writing and signed by all of the PARTIES hereto.

16. **CONSTRUCTION**. This AGREEMENT and all amendments hereto shall be construed in accordance with Florida law.

17. **ENTIRE AGREEMENT**. This AGREEMENT sets forth the entire understanding of the PARTIES, and it may not be changed except by written document signed by all the PARTIES hereto.

18. **SEVERABILITY**. The invalidity or unenforceability of any particular provision of this AGREEMENT shall not affect the other

EMPLOYEE:

STATE OF FLORIDA )
) SS :
COUNTY OF DADE )

Before me, the undersigned authority, personally appeared Luther R. Campbell, individually and as President of Luke Records, Inc., who is personally known to me to be the same person whose name is subscribed to the foregoing instrument and acknowledged that he reviewed, signed and delivered the said instrument as his own free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 1991.

My commission expires:

_____

_____
NOTARY PUBLIC
State of Florida at Large

STATE OF FLORIDA )
) SS :
COUNTY OF DADE )

Before me, the undersigned authority, personally appeared Joseph Weinberger, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument and acknowledged that he reviewed, signed and delivered the said instrument as his own free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _____ day of _____, 1991.

My commission expires:

_____

_____
NOTARY PUBLIC
State of Florida at Large

9

provisions hereof and this AGREEMENT shall be construed in all respects as if such invalid or unenforceable provision was omitted.

19.  **BINDING EFFECT**.  This AGREEMENT shall be binding upon and shall operate for the benefit of the PARTIES hereto and their respective successors, assigns, personal representatives, beneficiaries and distributees.

20.  **GENDER**.  Wherever the context shall so require, all words herein in any gender shall be deemed to include the masculine, feminine or neuter gender; all singular words shall include the plural and all plural shall include the singular.

21.  **ADVICE TO SEEK INDEPENDENT LEGAL COUNSEL**.  CAMPBELL AND EMPLOYER ACKNOWLEDGE THAT EMPLOYEE HAS NOT REPRESENTED EITHER OF THEM IN THIS TRANSACTION AND THAT THEY HAVE BEEN ADVISED TO SEEK AND OBTAIN LEGAL COUNSEL TO REPRESENT THEM IN THIS TRANSACTION. PARTIES ACKNOWLEDGE THAT THEY ARE ENTERING INTO THIS AGREEMENT FREELY AND VOLUNTARILY; THAT THEY HAVE ASCERTAINED AND WEIGHED ALL OF THE FACTS AND CIRCUMSTANCES LIKELY TO INFLUENCE THEIR JUDGMENT HEREIN.

22.  **HEADINGS**.  The headings used in this AGREEMENT are used for reference purposes only and are not to be deemed controlling with respect to the contents thereof.

23.  **COUNTERPARTS**.  This AGREEMENT may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original.

IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT the day and year first above written.

WITNESS:                           EMPLOYER:
                                   Luke Records, Inc.

                                   By:

                                   CAMPBELL:

8

# EXHIBIT 3



8400 NORTHEAST 3ND AVENUE · MIAMI FLORIDA 33138
TELEPHONE (305) 757-1969 · FAX (305) 757-3455

December 28, 1994

To Whom It May Concern:

Joe Weinberger is no longer employed by Luke Records as of
December 27, 1994.

No further discussions or informational exchange is to take place
with Mr. Weinberger regarding Luke Records or Luther Campbell.

If you have any questions regarding your relationship with Luke
Records, please contact me or my assistant to arrange a
convenient time for us to have a discussion.

HAPPY NEW YEAR!

Sincerely

Luther Campbell
President/CEO

LC/nk

# EXHIBIT 4

<u>EXCLUSIVE RECORDING AGREEMENT</u>

This Agreement made and entered into as of this _____ day of May, 1989 by and between EFFECT RECORDS, a division of SKYYWALKER RECORDS, INC., of 3050 Biscayne Blvd, Suite 307, Miami, FL  33137 ("COMPANY") and JEFFREY J. THOMPKINS and PATRICK WATLER collectively known as "THE POISON CLAN" _____

("ARTIST").

In consideration of the mutual promises contained herein, it is hereby agreed as follows:

1.   (a)  COMPANY hereby engages ARTIST to record for COMPANY masters embodying the performances of ARTIST, and ARTIST hereby accepts such engagement and agrees to record masters embodying the performances of ARTIST exclusively for COMPANY during the term hereof and all extensions and renewals.

(b)  The rights herein granted to COMPANY and the obligations of ARTIST shall be for the world ("Territory").

2.   The term of this Agreement shall be for a period of one (1) year commencing on the date hereof ("Initial Period").  ARTIST hereby grants to COMPANY four (4) secutive separate options to extend the term for further periods of one (1) year each ("Option Periods"), each upon the same terms and conditions applicable to the Initial Period, except as otherwise hereinafter set forth.  The Initial Period and every Option Period for which Company has exercised its option are hereinafter sometimes referred to together as the "Term".  Each option shall be automatically exercised, unless written notice to the contrary is sent to ARTIST at least fifteen (15) days prior to the date that the Term would otherwise expire.

3.   During the Initial Period, ARTIST shall record masters the equivalent in playing time of one twelve (12) inch single, COMPANY and ARTIST hereby acknowledge that the masters listed on Schedule "A" annexed hereto and made a part hereof comprise the Twelve inch single required to be recorded during the Initial Period, with an option for one LP (hereinafter sometimes referred to as the "First LP"), and have been heretofore recorded by ARTIST.  Said masters are herein and hereby owned by COMPANY pursuant to all of the terms and conditions of this Agreement, particularly Paragraph 20 hereof and said masters shall be deemed recorded and delivered hereunder during the Initial term.

-1-

TTT.16(a).89/5-9

4.   (a)  During the Term, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY for distribution in the Territory and ARTIST shall not authorize the use of ARTIST's name, likeness, or other indentification for the purpose of distributing, selling, advertising or exploiting records for anyone other than COMPANY in the Territory.  It is agreed however, that individual members of ARTIST not to exceed two (2) may perform as instrumentalists, arrangers, producers or background singers on other recordings for other artists in a "sideman" capacity provided COMPANY receives credit, in the form of "Courtesy of Skyywalker Records".

(b)  ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY for distribution in the Territory (i) for a period of five (5) years after the initial date of release of the respective record containing such selection or (ii) for a period of two (2) years after the expiration or other termination of this Agreement, whichever is later ("Re-recording Restriction").

(c)  Should ARTIST make any sound recording during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any such purpose any selection recorded hereunder to which the Re-recording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes in the Territory.  ARTIST shall furnish to COMPANY a copy of the provisions of any such contract relating to the foregoing.

5.   All masters recorded by ARTIST during the Term from the inception of the recording thereof and all reproductions derived therefrom, together with the performances embodied thereon, shall be the property of COMPANY for the world free from any claims whatsoever by ARTIST or any person deriving any rights or interests from ARTIST.  Without limiting the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited right to all the results and proceeds of ARTIST's recording services rendered during the Term, including, but not limited to, the exclusive, unlimited and perpetual rights throughout the world:

(a)  To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, records embodying the masters recorded by ARTIST during the Term, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom;

-2-

LJWR0003

(b)  To use and publish and to permit others to use and publish ARTIST's name (including any professional name heretofore or hereafter adopted by ARTIST), photographs, likeness, and biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST and all Pictures produced during the Term; ARTIST consent will be requested, such consent may not be unreasonably witheld.

(c)  To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical com- positions embodied thereon) recorded by ARTIST during the Term, in COMPANY's name as owner and employer-for-hire of such sound recordings;

(d)  To release records derived from masters recorded by ARTIST during the Term under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect.  COMPANY agrees that the initial United States release during the Term hereof of records solely embodying masters recorded hereunder shall be by a distributor or distributors selected by COMPANY at COMPANY's sole discretion.

(e)  To perform such records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known.

6.  (a)  ARTIST acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon ARTIST.  Except as otherwise specifically set forth in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make, sell, license, or distribute records manufactured from masters delivered hereunder.

(b)  Provided that ARTIST is not in breach of this Agreement, and if COMPANY is in receipt of completed, fully edited and mixed commercialy satisfactory masters sufficient to comprise each newly-recorded required LP hereunder embodying ARTIST's newly-recorded required studio performan- ces of material not previously recorded by ARTIST ready for COMPANY's manufacture of records therefrom, together with all materials therefor, COMPANY agrees to commercially release each LP recorded and delivered hereunder within one hundred and twenty (120) days following completion of Artists recording for COMPANY.

(c)  It is understood and agreed that if COMPANY shall have failed to so release any such LP, ARTIST shall have the right to notify COMPANY in writing of COMPANY's such failure and of ARTIST's desire that the Term of this

-3-

LJWR0004

Agreement be terminated if COMPANY does not, within sixty (60) days after COMPANY receives such notice from ARTIST, commercially release the applicable LP in the World.  it is specifically understood and agreed that if COMPANY shall fails to fulfill any such release commitment, COMPANY shall have no liability whatsoever to ARTIST and ARTIST's only remedy shall be to terminate the Term of this Agreement by written notice to COMPANY within fifteen (15) days following the expiration of such sixty (60) day period.

7.    INTENTIONALLY DELETED

8.    (a)  (i)  Except as otherwise provided in sub-paragraph 8(a)(ii) hereof, COMPANY shall be solely respon-sible for and shall pay all recording costs, pressing and promotional costs incurred in the production and release of all masters subject to this Agreement.  All such costs paid by COMPANY shall be deducted from any and all monies becoming payable to ARTIST under this or any other agreement between the parties hereto.

(ii) Notwithstanding the provisions of sub-paragraph 8(a)(i) hereof, in the event that COMPANY elects to require ARTIST to record and deliver the Additional Masters, or if COMPANY wishes to re-mix any of the masters delivered in connection with the First LP, all costs so paid by COMPANY shall be advances against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pur-suant to this or any other agreement between the parties hereto.

(b)  COMPANY shall be solely responsible for and shall pay all monies becoming payable to ARTIST and all other parties rendering services or otherwise in respect of sales of recordings derived from masters subject to this Agreement.

9.    (a)  Each master recorded and delivered hereunder shall be produced by a producer selected by COMPANY. COMPANY shall be solely responsible for and shall pay all monies becoming payable to all producers.  All such sums so paid by COMPANY shall be deducted from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto (excluding any publishing agreements with Companies affiliate Publishing Companies).

(b)  As to any producers selected by COMPANY, COMPANY shall pay said producer or producers a royalty nego-tiated between COMPANY and said producer and shall not effect the royalty otherwise payable to ARTIST under this or any other agreement between the parties hereto.

10.  Conditioned upon ARTIST's full and faithful perfor-mance of all the material terms hereof, COMPANY shall pay

-4-

ARTIST the following royalties in respect of records subject to this Agreement:

(a)   Company shall credit Artist's Royalty Account pursuant to and in accordance with the following royalty schedule for records manufactured and sold in the United States:

| RECORDING PERIODS | MINIMUM SIDES | ROYALTY RATES |
|---|---|---|
| Initial Period | One 12 Inch & LP | 5% |
| 1st Option Period | One LP | 5% |
| 2nd Option Period | One LP | 5% |
| 3rd Option Period | One LP | 5% |
| 4th Option Period | One LP | 5% |

*Royalty Rate = Percentage times one-hundred (100%) percent of net records sold and for which Company has been paid times the retail price of records manufactured in the United States.  This rate shall also apply to 7" Singles and LP's.  (In the event Company's distributor is A&M Records or any other distributor that pays on the basis of ninety (90%) percent of retail, then company shall pay Artist on the basis of ninety (90%) percent of retail list price.)

(b)       (i)  With respect to retail sales outside the United States of all records derived from masters recorded and delivered during the Term, the royalty rate shall be based upon the U.S. rate and pro rated down at the percentage which COMPANY's royalty rate is reduced.

(ii) The royalty rate hereinabove set forth in subparagraph 10(b)(i) shall be hereinafter referred to as the "Basic Foreign Rate".

(iii) Notwithstanding anything to the contrary contained herein, with respect to records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of records sold in such territory(ies), the royalty rate payable to ARTIST hereunder in respect of sales of records in such territory(ies) shall equal the lesser of (A) the Basic Foreign Rate or (B) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to two (2%) percent of the retail list price and such monies as Company or its licensees shall be required to pay to all applicable union funds in respect of said sales.

(iv) Royalties in respect of sales of records outside the United States shall be computed in the

WR0004

TTT 30(a) 83/5-18

same national currency as COMPANY is accounted to be its
licensees and shall be paid to ARTIST at the same rate of
exchange as COMPANY is paid.  It is understood that such
royalties will not be due and payable until payment thereof
is received by or credited to COMPANY in the United States
governmental regulations, royalties therefor shall not be
credited to ARTIST's account during the continuance of such
inability except that (I) if any accounting rendered to
ARTIST hereunder during the continuance of such inability
shows ARTIST's account to be in a credit position, COMPANY
will, after ARTIST's request and at ARTIST's expense, if
COMPANY is able to do so, deposit such royalties to ARTIST's
credit in the applicable foreign currency in a foreign depo-
sitory, or (ii) if the royalties not credited to ARTIST's
account exceed the amount, if any, by which ARTIST's account
is in a debit position, then COMPANY will, after ARTIST
request and at ARTIST's expense, and if COMPANY is able to
do so, deposit such excess royalties to ARTIST's credit in
the applicable foreign currency in a foreign depository.
Deposit as aforesaid shall fulfill COMPANY's obligations
under this Agreement as to record sales to which such
royalty payments are applicable.

          (c)  With respect to records sold (i) through any
direct mail or mail order distribution method, including,
without limitation, record club distribution, (ii) by
distribution through retail outlets in conjunction with spe-
cial advertisements on radio or television or (iii) by any
combination of the methods set forth above, the royalty
payble in connection therewith shall be one-half (1/2) of
COMPANY's net earned royalty receipts in respect of reported
sales through such channels after COMPANY shall have first
deducted all third party payments for which COMPANY is
responsible.  No royalties shall be payable with respect to
records given away as "bonus" or "free" records as a result
of joining a record club or plan or of purchasing a required
number of records or with respect to records received by
members of any such club operation either in an introductory
offer in connection with joining such club or upon recom-
mending that another join such club operation.

          (d)  (i)  With respect to mid-priced LPs, the
royalty rate shall be two-thirds (2/3) of the Basic U.S. LP
Rate or Basic Foreign Rate, as the case may be, provided
that during the Term, COMPANY shall not release in the
United States any such mid-priced LP comprised solely of
masters delivered hereunder prior to nine (9) months
following COMPANY's initial United States release of such LP
as a full-priced record, unless ARTIST shall consent in writing.

          (ii) With respect to budget LPs, the royalty
rate shall be one-half (1/2) of the Basic U.S. LP Rate or
Basic Foreign Rate, as the case may be, provided that during
the Term, COMPANY shall not release in the United States any

-6-

LJWR0007

such budget LP comprised solely of masters delivered hereunder prior to eighteen (18) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent thereto.

(e)  With respect to EPs, the royalty rate shall be three-fourths (3/4) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

(f)  Notwithstanding anything to the contrary contained in this Agreement, in the event that Company (or its licensee(s)) shall in any country(ies) of the Territory adopt a policy applicable to the majority of LPs in COMPANY's (or its licensee(s)') then current catalogue pursuant to which the retail list price of an LP is reduced subsequent to its initial release, then the royalty rates otherwise payable to ARTIST under this Agreement shall be reduced in the proportion that such reduced retail list price of the applicable LP bears to the retail list price of such LP as initially released in the applicable country.

(g)  With respect to "compact-disc" LPs, the royalty rate shall be the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

(h)  In the event that COMPANY shall sell or license third parties to sell "records" via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, ARTIST shall be paid royalties with respect thereto at the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.  For the purposes of calculating royalties payable in connection with such sales, the retail list price of such "records" shall be deemed to be the then-current retail list price of tape copies of such records and in the case of records which have no tape equivalent, the corresponding price of the disc (but in the United States, eighty-five (85%) percent of the then current retail list price of such tape copies or corresponding disc), and the packaging deduction for such sales shall be made in accordance with subparagraph 10(s)(iii) of this Agreement.

(i)  The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be one-half (1/2) of the otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price where applicable) of such records.

(j)  The royalty rate payable for records sold as "premiums" shall be one-half (1/2) of the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, and the retail list price for such records shall be deemed to be COMPANY's actual sales price.  It is understood that COMPANY shall not use ARTIST's name or likeness in con-

-7-

LJWR0008

nection with any such "premium" record as an endorsement of any product or service.

(k)  The royalty rate payable for records sold in the form of pre-recorded tape (whether reel-to-reel or cartridge) or any other form (other than disc), shall be the applicable royalty rate otherwise payable, provided that if the retail list price of any record sold in pre-recorded tape form or any form other than disc) shall be less than the retail list price of the corresponding record in disc form, the royalty rate otherwise payable shall be reduced in the proportion that the retail list price of the applicable record in pre-recorded tape form (or such form other than disc) bears to the retail list price of such record in disc form.

(l)  COMPANY shall have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis.  COMPANY shall credit ARTIST's royalty account with fifty (50%) percent of the net amount received by COMPANY under each such license after COMPANY shall have first deducted all third party payments for which COMPANY is responsible.

(m)  As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to ARTIST hereunder with respect to sales of any such record shall be prorated by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivered hereunder embodied on such record and the denominator of which is the total number of masters embodied thereon.

(n)  As to masters embodying performances of ARTIST together with the performances of another artist or artists, the royalty rate otherwise payable hereunder with respect to sales of any record derived from any such master and the recording costs and/or advances otherwise payable by COMPANY hereunder with respect to any such master shall be prorated by multiplying such royalty rate or recording costs and/or advances by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such master.

(o)  COMPANY shall have the right to include or to license others to include any one or more of the masters in promotional records on which such masters and other recordings are included, which promotional records are designed for sale at a substantially lower price than the regular price of COMPANY's LPs.  No royalties shall be payable on sales of such promotional records.

(p)  No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, provided that such

-8-

TTT.23.89/5-9                                                    TTW 0009

records do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 200 non-royalty bearing LPs out of every 1,000 LPs distributed, and provided further that COMPANY shall have the right to exceed the aforesaid limitations for short term special promotions or marketing campaigns.  The number of records distributed on a no-charge basis shall not, for any such short term promotion or campaign exceed an additional ten (10%) percent of the total number of records distributed.  COMPANY shall use reasonable efforts to notify ARTIST of any such short term special promotion or campaign, but COMPANY's failure to do so shall not be a breach of this Agreement or in any manner affect COMPANY's right to distribute records on a non-royalty basis as aforesaid; (ii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewers, radio and television stations and networks, motion pictures companies, music publishers, COMPANY's employees, ARTIST, ARTIST or other customary recipients of promotional records or for use on transportation facilities; (iii) records sold as scrap, salvage, overstock or "cut-outs"; (iv) records sold below cost.  No royalties shall be payable on any sales by COMPANY's licensees until payment has been received by or credited to COMPANY in the United States.  This paragraph shall be governed by the agreement between COMPANY and it's distributor.  In the event that distributor adopts a different policy as to the contents of this paragraph, then said distributor's policy shall prevail as between COMPANY and ARTIST.

    (q)  As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, in lieu of the records given away or furnished on a "no-charge" basis as provided in sub-paragraph 10(p)(i) above, the applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price, provided that said reduction in the applicable royalty rate does not exceed the percentage limitations set forth in subparagraph 10(p)(i) above.

    (r)  The royalty rates provided for in this Paragraph 10 shall be applied against the retail list price (less COMPANY's container deductions, excise taxes, duties and other applicable taxes) for ninety (90%) percent of records sold which are paid for and not returned.  The term for "retail list price" as used in this Agreement shall mean (i) for records sold in the United States, the manufacturer's suggested retail price in the United States and (ii) for records sold outside the United States, the manufacturer's suggested retail price in the country of manufacture or sale, as COMPANY is paid.  In those countries where a manufacturer's suggested retail price is not utilized or permitted, the generally accepted retail price shall be utilized.  Notwithstanding the foregoing, (A) the retail list price for a "Disco-single" shall be deemed to be

TTT.24.89/5-9                                                    LJWR0010

the retail list price for a Single, except for Disco-Singles sold in the United States the retail list price therefor shall be deemed to be the lesser of one hundred fifty (150%) percent of the retail list price of a Single or the actual retail list price of such Disco-single and (B) the retail list price for a "compact-disc" shall be deemed to be the retail list price applicable to the initial release of the corresponding traditional 12" LP.  To the extent that the "compact-disc" does not have any equivalent in the form of a traditional 12" LP, then the retail list price of a "compact-disc" will be deemed to be the retail list price of a traditional 12" LP containing comparable repertoire.  In computing sales, COMPANY shall have the right to deduct all returns made at any time and for any reason. In the event COMPANY is paid on the basis of 100% of the retail list price then ARTIST will be paid on the same basis.

     (s)  COMPANY's container deductions shall be a sum equal to (i) ten (10%) percent of the retail list price for records in disc form (other than "compact-disc" records),

(ii) twelve and one-half (12-1/2%) percent of the retail list price for records in disc form in "double-fold" jackets or covers or in jackets which contain an insert or any other special elements, and (iii) twenty (20%) percent of the retail list price for pre-recorded tape, "compact-discs" and cartridge boxes or containers, or any other form of package, container or box other than as described herein.  In the event that the deduction for packaging charged by COMPANY's distributor is different then the amounts herein, then the amount deducted by COMPANY's distributor shall prevail.

     11.  Statements as to royalties payable hereunder shall be sent by COMPANY to ARTIST within sixty (60) days after the expiration of each calendar quarter for the preceding quarterly period ending February 28, May 31, August 31 or November 30.  Concurrently with the rendition of each state-ment, COMPANY shall pay ARTIST all royalties shown to be due by such statement, after deducting all recording costs paid by COMPANY, all payments made on behalf of ARTIST, and all advances made to ARTIST prior to the rendition of the state-ment.  No statements need be rendered by COMPANY for any such quarterly period after the expiration of the Term hereof for which there are no sales of records derived from masters hereunder.  All payments shall be made to the order of ARTIST and shall be sent to ARTIST at ARTIST's address first above written.  COMPANY shall be entitled to maintain a single account with respect to all recordings subject to this or any other agreement between the parties hereto. COMPANY may maintain reserves, however, COMPANY agrees that regarding such reserves: (i) with respect to LPs in disc form, each base reserve as initially established shall not exceed twenty (20%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to five (5%)

TTT.25.89/5-9                                                      LJWR0011

percent; (ii) with respect to LPs in tape form, each base reserve as initially established shall not exceed twenty-five (25%) percent of tapes shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent; and (iii) with respect to Singles, each base reserve as initially established shall not exceed thirty-five (35%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years form the date established, be reduced to ten (10%) percent.  COMPANY shall fully liquidate each base reserve within four (4) years from the date that such base reserve was established.  At such time as a reserve is liquidated, it shall be deemed to be a sale in the period in which it was liquidated.  ARTIST shall be deemed to have consented to all accountings rendered by COMPANY hereunder and said accountings shall be binding upon ARTIST and not subject to any objection by ARTIST for any reason unless specific objection, in writing, stating the basis thereof, is given to COMPANY within one (1) year after the date rendered, and after such written objection, unless suit is instituted within one (1) year after the date upon which COMPANY notifies ARTIST that it denies the validity of the objection.  In the event COMPANY's distributor shall pay COMPANY on a semi-annual basis, then COMPANY shall pay ARTIST on the same basis as COMPANY is paid.

12.   ARTIST shall have the right at ARTIST's sole cost and expense to appoint a Certified Public Accountant who is not then currently engaged in an outstanding audit of COMPANY to examine COMPANY's books and records as same pertain to sales of records subject hereto as to which royalties are payable hereunder, provided that any such examination shall be for a reasonable duration, shall take place at COMPANY's offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year.

13.   (a)  All notices to ARTIST may be served upon a principal or officer of ARTIST personally, by prepaid telegram, or by depositing the same, postage prepaid, in any mail box, chute, or other receptacle authorized by the United States Postal Service for mail, addressed to ARTIST at ARTIST' address first above written, with a courtesy copy to:

            (b)  All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to COMPANY's address first above written with a simultaneous copy sent in the same manner to:

            ALLEN L. JACOBI, ESQ.
            1313 N.E. 125th Street
            North Miami, FL  33161

LJWR0012

14.   (a)  All musical compositions or material recorded pursuant to this Agreement which are written or composed, in whole or in part by ARTIST or any producer of the masters

subject hereto, or which are owned or controlled, directly
or indirectly, in whole or in part, by ARTIST and/or Artist
or any producer of the masters subject hereto (herein called
"Controlled Compositions") shall be and are hereby licensed
to COMPANY for the United States at a royalty per selection
equal to seventy-five (75%) percent of the minimum statutory
per selection rate (without regard to playing time) effec-
tive on the earlier of (i) the date such masters are
required to be delivered hereunder or (ii) the date such
masters are delivered to COMPANY hereunder.  The aforesaid
seventy-five (75%) percent per selection rate shall
hereinafter sometimes be referred to as the "Per Selection
Rate."  Notwithstanding the foregoing, the maximum aggregate
mechanical royalty rate which COMPANY shall be required to
pay in respect of any Single, Disco-single or LP hereunder,
regardless of the total number of all compositions contained
therein, shall not exceed two (2) times, two (2) times, and
ten (10) times the Per Selection Rate, respectively and in
respect of any EP hereunder, regardless of the total number
of all compositions contained thereon, shall not exceed the
per Selection Rate times the total number of masters con-
tained therein.  In this connection, it is specifically
understood that in the event that any Single, Disco-Single,
EP or LP contains other compositions in addition to the
Controlled Compositions and the aggregate mechanical royalty
rate provided in this Paragraph 14, the aggregate rate for
the Controlled Compositions contained thereon shall be
reduced by the aforesaid excess over said applicable rate.
Additionally, COMPANY shall have the right with respect to
any Single, Disco-single, EP or LP, the aggregate mechanical
royalty rate for which exceeds the applicable rate provided
in this Paragraph 14 to deduct such excess payable thereon
from any and all monies payable to ARTIST pursuant to this
or any other agreement between the parties hereto.  All
mechanical royalties payable hereunder shall be paid on the
basis of net records sold hereunder for which royalties are
payable to ARTIST pursuant to this Agreement.
Notwithstanding anything to the contrary contained herein,
mechanical royalties payable in respect of Controlled
Compositions for sales of records for any use other than as
described in subparagraphs 10(a), (e), (g) and (k) hereof
shall be seventy-five (75%) percent of the otherwise appli-
cable Per Selection Rate.  Controlled Compositions which are
arranged versions of any musical compositions in the public
domain, when furnished by ARTIST for recording hereunder,
shall be free of administration of copyright in any
Controlled Composition shall be made subject to the provi-
sions hereof and any inconsistencies between the terms of
this Agreement and mechanical licenses issued to and
accepted by COMPANY shall be determined by the terms of this
Agreement.  If any Single, Disco-Single, EP or LP contains
other compositions in addition to the Controlled
Compositions, ARTIST will obtain for COMPANY'S benefit
mechanical licenses covering such composition on the same
terms and conditions applicable to Controlled Compositions
pursuant to this Paragraph 14.

LJWR0013

(b)   In respect of all Controlled Compositions performed in Pictures, COMPANY is hereby granted an irrevocable perpetual worldwide license to record and reproduce such Compositions in such Pictures and to distribute and perform such Pictures including, but not limited to, all Videoshows thereof, and to authorize others to do so.  COMPANY will not be required to make any payment in connection with those uses, and that license shall apply whether or not COMPANY receives any payment in connection with those Pictures. Simultaneously with ARTIST'S submission to COMPANY of the information required pursuant to subparagraph 21(c)(i) hereof, ARTIST shall furnish COMPANY with a written acknowledgment from the person(s) or entity(ies) controlling the copyright in each non-Controlled Compositions to be embodied on any Picture confirming the terms upon which said person(s) or entity(ies) to forthwith issue to COMPANY (and its designees) licenses containing said terms and such other terms and conditions as COMPANY (or its designees) may require.  Royalties in connection with licenses for the use of non-Controlled Compositions pertaining to Pictures and Videoshows are included in the royalties set forth in subparagraph 21(d) hereof, as described in subparagraph 21(d)(ii).  If the copyright in any Controlled Composition is owned or controlled by anyone else, ARTIST will cause that person, firm or corporation to grant COMPANY the same rights described in this Paragraph 14, on the same terms.

15.   (a)   In the event that ARTIST for any reason fails to timely fulfill any of its production and delivery commitments hereunder in accordance with all of the terms and conditions of this Agreement, then, in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST at any time prior to the expiration of the then current Period, (i) to terminate this Agreement without further obligation to ARTIST as to unrecorded or undelivered masters, (ii) to reduce the miniumum number of masters required to be recorded and delivered during the then current Period to the number which have been timely recorded and delivered during such Period, or (iii) such default plus one hundred and fifty (150) days with the times for the exercise by COMPANY of its options to extend the Term and the dates of commencement of subsequent Option Periods deemed extended accordingly.  It is specifically understood that COMPANY may exercise any of all of its rights pursuant to subparagraphs 15(a)(i), (ii) and (iii) hereof at any time(s) prior to the date the Term would otherwise expire.  COMPANY's obligations hereunder shall be suspended for the duration of any such default.  The provisions of this subparagraph shall not result in an extension of the Term for a period in excess of the period permitted by applicable law, if any, for the enforcement of personal services agreements.

(b)   Intentionally Omitted.

-13-

LJWR0014

(c)  COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable:  Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's control.  Any such suspension due to a labor controversy which involves only COMPANY shall be limited to a period of six (6) months.

(d)  If ARTIST's voice or voices should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability in connection with undelivered masters.

16.  ARTIST expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or threatened breach by ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury.  ARTIST expressly agrees that COMPANY shall be entitled to seek injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by ARTIST which relief shall be in addition to any other rights or remedies, for damages or otherwise available to COMPANY.

17.  (a)  ARTIST warrants and represents that neither ARTIST is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to ARTIST's right to execute this Agreement or ARTIST's right to perform its terms and conditions.  Without limiting the foregoing, ARTIST specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST, will interfere in any manner with the complete performance of this Agreement by COMPANY, ARTIST or with ARTIST's right to record any and all selections hereunder.  ARTIST warrants and represents that there are now in existence no prior unreleased masters embodying ARTIST's performances.

(b)  ARTIST warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party. "Materials", as used in this subparagraph 17(b) shall include: (i) all musical compositions and other material

-14-

contained on masters subject hereto, (ii) each name used by
ARTIST, in connection with masters recorded hereunder, and
(iii) all other materials, ideas, other intellectual proper-
ties, or elements furnished or selected by ARTIST and con-
tained in or used in connection with any masters recorded
hereunder or the packaging, sale, distribution, advertising,
publicizing or other exploitation thereof.

(c)  ARTIST agrees to and does hereby indemnify,
save and hold COMPANY harmless from any and all loss and
damage (including court costs and reasonable attorneys'
fees) arising out of, connected with or as a result of any
inconsistency with, failure or, or breach or threatened
breach by ARTIST of any warranty, representation, agreement,
undertaking or covenant contained in this Agreement
including, without limitation, any claim by any third party
in connection with the foregoing.  In addition to any other
rights or remedies COMPANY may have by reason of any such
inconsistency, failure, breach, threatened breach or claim,
ARTIST shall reimburse COMPANY, on demand, for any payment
made by COMPANY at any time after the date hereof with
respect to any loss, damage or liability resulting therefrom
and in addition thereto COMPANY shall have the right to
deduct from any and all monies otherwise payable to ARTIST
under this or any other agreement between the parties hereto
a sum(s) equal to such loss, and reasonable attorneys'
fees).  COMPANY shall give ARTIST notice of any third party
claim to which the foregoing indemnity applies and ARTIST
shall have the right to participate in the defense of any
such claim through counsel of ARTIST's own choice and at
ARTIST's expense.  Pending the determination of any such
claim, COMPANY may withhold payment of all monies under this
or any other agreement between the parties hereto in any
amount consistent with such claim.

18.  Wherever in this Agreement ARTIST's approval or
consent is required, such approval or consent shall not be
unreasonably witheld.  COMPANY may require ARTIST to for-
mally give or withhold such approval or consent by giving
ARTIST written notice requesting same and by furnishing
ARTIST with the information or material in respect of which
such approval or consent is sought.  ARTIST shall give
COMPANY written notice of approval or disapproval within
five (5) days after such notice.  ARTIST shall not hinder
nor delay the scheduled release of any record hereunder.  In
the event of disapproval or no consent, the reasons therefor
shall be stated.  Failure to give such notice to COMPANY as
aforesaid shall be deemed to be consent or approval.

19.  During the Term, ARTIST warrants and represents
that ARTIST shall become and remain a member in good
standing of any labor unions with which the COMPANY may at
any time have agreements lawfully requiring such union mem-
bership, including, but not limited to, the American
Federation of Musicians and the American Federation of

TTT.30.89/5-9                                           LJWR0016

COMPANY'S (or its designee's) name as employer-for-hire such copyrights and all renewals and extensions thereof, per-petually and throughout the Territory.

(b)  ARTIST will facilitate the Masters to COMPANY at its offices in Miami, Florida not later than simultaneously with the execution of this Agreement, unless said masters are already in the possession of COMPANY.

(c)  The Masters will be deemed to have been recorded under this Agreement during the Initial Period of the Term of this Agreement.

(d)  ARTIST hereby warrants and represents:

(i)  Intentionally Deleted

(ii) No records have been manufactured from the Masters by ARTIST or any other person, firm or cor-poration for distribution in the Territory, and neither ARTIST nor any other person, firm or corporation has or shall have the right to distribute, market and/or sell any records embodying the Masters in Territory, and none of the musical compositions performed in the Masters have been per-formed by ARTIST for the making of any other master recordings, other than those records already pressed.

(iii) ARTIST has not, nor has any other person, sold or assigned to any other party or otherwise disposed of any right, title or interest in or to the Masters.

(iv) (1)  Each person who rendered any service in connection with, or who otherwise contributed in any way to the making of the Masters, or who granted to ARTIST any of the rights referred to in this Agreement, had the full right, power, and authority to do so, and was not bound by any agreement which would restrict such person from ren-dering such services or granting such rights.

(2)  All recording costs and expenses with respect to the making of the Masters have been paid in full.

(3)  All necessary licenses for the recording of the compositions performed in the Masters have been obtained from the copyright owners, and all monies payable under such licenses or otherwise by reason of such recording have been paid.  The foregoing does not apply to any monies payable to such copyright owners in connection with the manufacture or sale or records derived from the Masters.

-16-

                                          LJWR0017

(3)  All necessary licenses for the recording of the compositions performed in the Masters have been obtained from the copyright owners, and all monies payable under such licenses or otherwise by reason of such recording have been paid.  The foregoing does not apply to any monies payable to such copyright owners in connection with the manufacture or sale or records derived from the Masters.

(4)  All the Masters were made in accordance with the rules and regulations of the American Federation of Musicians ("AFM"), the American Federation of Television and Radio Artists ("AFTRA") and all other unions having jurisdiction.

(v)  COMPANY shall have the sole and exclusive right to manufacture, advertise, distribute, sell and otherwise exploit and deal throughout the Territory in the Masters and records and other reproductions derived therefrom, free from any liability or obligation to make and payments therefor, except as expressly provided in this Agreement.

(vi) ARTIST will execute, acknowledge and deliver to COMPANY such further instruments and documents, and will otherwise cooperate with COMPANY as COMPANY shall request at any time, for the purpose of establishing or evidencing the rights granted to COMPANY herein, or otherwise to implement the intent of this Paragraph 20 COMPANY shall give ARTIST five day notice to sign such documentation and in the event that after said five days the documents are not signed then COMPANY may sign such documents in ARTIST'S name and make appropriate disposition of them.

(e)  It is understood and agreed that all of the provisions of this Paragraph 20 are of the essence of this Agreement.

21.  (a)  In addition to ARTIST's recording and ARTIST's recording commitments as set forth in Paragraph 3 of this Agreement, ARTIST shall comply with requests, if any, made by COMPANY in connection with the production of Pictures. In this connection, ARTIST shall appear on dates and at places requested by COMPANY for the filming, taping or other fixation of audio-visual recordings.  ARTIST shall perform services with respect thereto as COMPANY deems desirable in a timely and first-class manner.  ARTIST acknowledges that the production of Pictures, involves matters of judgment with respect to art and taste, which judgment shall be exercised by COMPANY and COMPANY'S decisions with respect thereto shall be final.  COMPANY will endeavor to consult with ARTIST as to the Production of pictures.

(b)  (i)  Each Picture produced during the Term of

-17-

this Agreement shall be owned by COMPANY (including the
worldwide copyrights therein and thereto and all extensions
and renewals thereof) to the same extent as COMPANY's rights
in master recordings made under this Agreement.

(ii) COMPANY will have the unlimited right to
manufacture Videoshows of the Picture to rent, sell, distri-
bute, transfer, sublicense or otherwise deal in such
Videoshows under any trademarks, tradenames and labels; to
exploit the Picture by any means now or hereafter known or
developed; or to refrain from any such exploitation,
throughout the world.

(c) (i)  COMPANY agrees to advance all costs
actually incurred in the production of Pictures made by
COMPANY.  COMPANY shall submit to ARTIST for ARTIST's reaso-
nable approval in writing, the following information:  (i)
the musical compositions and other material to be embodied
thereon; (ii) the general concept therefor and (iii) the
producer, director, and any other key personnel therefor.
Following COMPANY's receipt of ARTIST's approval of
said information, COMPANY shall commence production of the
Picture.

All sums paid by COMPANY in connection with each Picture
shall be an advance against and recoupable by COMPANY out of
all royalties becoming payable to ARTIST pursuant to this or
any other agreement between the parties hereto.

(ii) Each of the following sums, if any, paid
by COMPANY in connection with each Picture shall be an
advance against and recoupable by COMPANY out of all
royalties becoming payable to ARTIST pursuant to this or any
other agreement between the parties hereto.

(A)  All expenses incurred by COMPANY in
connection with the preparation and production of the
Picture and the conversion of the Picture to Video Masters
that are made to serve as prototypes for the duplication of
the Videoshows of the Picture;

(B)  All of COMPANY's direct out-of-
pocket costs (such as for rights, artists (including
ARTIST), other personnel, facilities, materials, services,
and the use of equipment) in connection with all steps in
the production of the Picture and the process leading to and
including the production of such Video Masters (including,
but not limited to, packaging costs and the costs of making
and delivering duplicate copies of such Video Masters); and

(C)  If in connection therewith COMPANY
furnishes any of its own facilities, materials, services or
equipment for which COMPANY has a standard rate, the amount
of such standard rate or if there is no standard rate, the
market value for the services or thing furnished.

-18-

(iii) All sums that COMPANY in its sole discretion deems necessary or advisable to pay in connection with the production of Pictures and the exploitation of COMPANY's rights therein in order to clear rights or to make any contractural payments that are due or may become due on the part of COMPANY, to ARTIST, ARTIST or any other person, firm or corporation by virtue of the exploitation of COMPANY's rights therein, in order to avoid, satisfy or make unnecessary any claims or demands by any person, firm or corporation claiming the right to payment therefor, including, but not limited to, any payment to an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged re-run fee, residual, royalty, license fee or otherwise shall constitute advances against and recoupable out of all royalties becoming payable to you pursuant to this or any other agreement between the parties hereto.  No payment pursuant to this subparagraph 21(c)(iii) shall constitute a waiver of any of ARTIST's express or implied warranties and representations.

(d)  (i)  Conditioned upon ARTIST full and faithful performance of all of the terms and conditions of this Agreement, COMPANY shall pay ARTIST royalties equal to fifty (50%) percent of COMPANY's Video Net Receipts with respect to COMPANY's exploitation of Pictures subject to this Agreement.  Monies earned and received by COMPANY from any licensee (rather than monies earned and received by the licensee) in respect of exploitation of Pictures shall be included in the computation of Video Net Receipts.

(ii) The royalties provided in subparagraph 21(d)(i) include any royalty obligations COMPANY may have to any other person, firm or corporation who supplied services or rights used in connection with Pictures, including, without limitation, producers, directors, extras, and music publishers, and any such royalties shall be deducted from the royalties otherwise payable to ARTIST.

(iii) With respect to audiovisual material embodying Pictures made hereunder together with other audiovisual material, royalties payable to ARTIST shall be computed by multiplying the royalties otherwise applicable by a fraction, the numerator of which is the amount of playing time in such audiovisual material of Pictures made hereunder and the denominator of which is the total playing time of such audiovisual material.

(iv) As to Pictures embodying performances of ARTIST together with the performances of another artist or artists, the royalties otherwise payable hereunder shall be prorated by multiplying such royalties by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such Pictures.

TTT.34.89/5-9                                              LJWR0020

(e)  COMPANY shall have the right to use and allow others to use each Picutre for advertising and promotional purposes with no payment to ARTIST.  As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY received no monetary consideration from licensees in excess of a reasonable amount as legal fees, administrative costs or similar type payments and as reim-bursement for transaction costs incurred by COMPANY in con-nection with such uses, such as tape, duplication costs, shipping, handling and insurance costs.

(f)  (i)  During the Term of this Agreement, no person, firm or corporation other than COMPANY will be authorized to make, sell, broadcast or otherwise exploit audio-visual materials unless: (A) ARTIST first notifies COMPANY of all of the material terms and conditions of the proposed agreement pursuant to which the audio-visual materials is to be made, sold, broadcast or otherwise exploited, including, but not limited to, the titles of the compositions covered by the proposed agreement, the format to be used, the manner of exploitation proposed and the indentities of all proposed parties to the agreement, and (B) ARTIST offers to enter into an agreement with COMPANY containing the same terms and conditions described in such notice and otherwise in the same form as this Agreement, but with payments to ARTIST that are ninety (90%) percent of the payments to ARTIST in such proposed agreement.  If COMPANY does not accept ARTIST's  offer within forty-five (45) days after COMPANY's receipt of same, ARTIST may then enter into that proposed agreement with the same parties mentioned in such notice, subject to subparagraph 21(f)(ii) hereof and provided that such agreement is consummated with those par-ties within thirty (30) days after the end of that sixty (60) day period upon the same financial terms and conditions set forth in ARTIST's notice and offer to COMPANY.  If that agreement is not consummated within the latter thirty (30) day period, no party except COMPANY will be authorized to make, sell, broadcast or otherwise exploit such audio-visual materials unless ARTIST first offers to enter into an agreement with COMPANY as provided in the first sen-tence of this subparagraph 21(f).  COMPANY will not be required, as a condition of accepting any offer made to COMPANY pursuant to this subparagraph 21(f), to agree to any terms or conditions which cannot be fulfilled by COMPANY as readily as by any other party (for example, but without limitation, the employment of a particular producer or director).

(ii) If COMPANY does not accept an offer made to it pursuant to this subparagraph 21(f), such non-acceptance shall not be considered a waiver of any of COMPANY's rights pursuant to this Agreement.  Such rights include, without limitation, the right to prevent

-20-

LJWR0021

TTT.35.89/5-9

authorizing any use of masters owned by or exclusively licensed to COMPANY unless COMPANY so agrees.  ARTIST shall not act in contravention of such rights.

(g)  In all other respects (e.g., the times for accountings to be rendered, and warranties and represen-tations made by ARTIST) Pictures and Video Masters shall be governed by the same terms and conditions as are applicable to masters subject to this Agreement.

22.  Intentionally deleted.

23.  COMPANY shall prepare the artwork for the album covers used in connection with the releases hereunder in the United States, during the Term of this Agreement, of each newly-recorded LP required to be recorded and delivered hereunder (hereinafter, the "Artwork"), upon prior written notice to COMPANY and only upon all of the following conditions:

(a)  Before preparation and the incurring of any expenses with connection with the album artwork, ARTIST may discuss completely with a representation of COMPANY's art department, the proposed artwork to be produced by COMPANY, all of which shall be subject to the decision of COMPANY's art department.  COMPANY will endeavor to consult with ARTIST as to the album artwork.

(b)  (i)  COMPANY will deliver all such Artwork prepared by COMPANY to ARTIST for ARTIST's reasonable appro-val, prior to the printing of said album cover.

24.  Intentionally deleted.

25.  For the purposes of this Agreement, the following definitions shall apply:

(a)  "Master" - The equivalent of a seven (7") inch 45 rpm single-sided recording of not less than 3-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b)  "Single" - A seven (7") inch 45 rpm double-sided record embodying thereon two (2) masters.  A "Disco-single" is a twelve (12") inch double-sided record embodying thereon not more than four (4) masters.

(c)  "EP" - A double-sided record embodying thereon either five (5) masters or six (6) masters.

(d)  "LP" - A twelve (12") inche 33-1/3 rpm double-sided long-playing record of not less than 35 minutes of playing time. Multiple sets which consist of more than one (1) LP intended to be released, packaged and sold together

-21-

L.IWR0022

for a single overall price, shall be deemed to be the equivalent of one (1) LP for the purposes of this Agreement, but shall not be recorded or delivered hereunder without COMPANY's prior written consent.

(e)  "Records", "phonograph records", "recordings" and "sound recording" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(f)  "Delivery", "deliver" or "delivered" - The actual receipt by COMPANY of completed, fully mixed, leadered and edited masters comprising each LP, commercially satisfactory to COMPANY and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions.

(g)  "Recording Costs" - Wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between COMPANY and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(h)  "mid-priced LP" - an LP which bears a suggested retail list price in the applicable country of the Territory of at least sixty-seven (67%) percent but not more than eighty (80%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's as applicable, then-current newly-released LPs.

(i)  "budget LP" - an LP which bears a suggested retail list price in the applicable country of the Territory or less than sixty-seven (67%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's, as applicable, then-current newly-released LPs.

(j)  "Pictures" - motion pictures and other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

-22-

(k)  "Videoshows" - Videocassetts, Videodiscs or any other devces, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(l)  "Videodisc" - a disc-type Videoshow that enable the Picture to be perceived visually, with or without sound, through a television-type playback system or device.

(m)  "Videocassette" - A Videoshow other than Videodisc (e.g., a Videoshow in the form of pre-recorded tape).

(n)  "Video Masters" - master Videoshows.

(o)  "Video Net Receipts" - monies earned and received by COMPANY from exploitation of Pictures less a twenty (20%) percent gross distribution fee, and less any out-of-pocket expenses, copyright, union and other third party payments, taxes and adjustments borne by COMPANY in connection with such exploitation and collection and receipt by COMPANY of such monies.

(p)  "any other agreement between the parties hereto" - any agreements between COMPANY on the one part, and ARTIST (or any other entity furnishing ARTIST's recordings or services) or ARTIST, on the other part, pertaining to ARTIST's recording services or recordings.

26.  COMPANY shall have the right to assign this Agreement in whole or in part.

27.  This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY.  A waiver by COMPANY of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  All of COMPANY's rights, options and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any remedy, option or right available to COMPANY.  Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein.  It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this Agreement.  No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30)

-23-

LJWR0024

days after ARTIST learns of such breach, ARTIST serves writ-
ten notice thereof on COMPANY specifying the nature thereof
and COMPANY fails to cure such breach, if any, within sixty
(60) days ( except thirty (30) days if such alleged breach
is the payment of monies hereunder) after receipt of such
notice.

    28.   This Agreement shall be deemed to have been made in
the State of Florida and its validity, construction, perfor-
mance and breach shall be governed by the laws of the State
of Florida applicable to agreements made and to be wholly
performed therein.  ARTIST agrees to submit itself to the
jurisdiction of the Federal or State courts located in Miami
in any action which may rise out of this agreement and said
courts shall have exclusive jurisdiction over all disputes
between COMPANY and ARTIST pertaining to this Agreement and
all matters related thereto.  In this regard, any process in
any action or proceeding commenced in the courts of the
State of Florida arising out of any claim, dispute or
disagreement under this Agreement may, among other methods,
be served upon ARTIST by delivering or mailing the same, via
registered or certified mail, addressed to ARTIST at the
address provided herein for notices to ARTIST; any such
delivery or mail service shall be deemed to have the same
force and effect as personal service within the State of
Florida. Nothing contained herein shall constitute a waiver
of any other remedies available to COMPANY.  Nothing con-
tained in this Paragraph 28 shall preclude COMPANY from
joining ARTIST in an action brought by a third party against
COMPANY in any jurisdiction, although COMPANY's failure to
join ARTIST in any such action in one instance shall not
consitute a waiver of any COMPANY's rights with respect
thereto, or with respect to any subsequent action brought by
a third party against COMPANY.

    29.   ARTIST hereby grants to COMPANY and its licenses
the exclusive right, throughout the world, to use and
authorize the use of ARTIST's name, portraits, pictures,
likeness, and biographical material, either alone or in con-
junction with other elements, in connection with the sale,
lease, licensing or other disposition of merchandising
rights.  For the rights granted by ARTIST to COMPANY in this
paragraph, COMPANY shall pay ARTIST a royalty of fifty (50%)
percent of COMPANY's net royalty receipts derived from the
exploitation of such rights, after deducting all costs and
third party payments relating thereto; and such royalty
shall be accounted to ARTIST in the manner otherwise pro-
vided herein.  Relative to any and all activities conducted
and contemplated by this paragraph, COMPANY agrees to regu-
larly and reasonably inform ARTIST, in writing, of progress
and current status of all such activities.  COMPANY agrees
to submit to ARTIST, within thirty (30) days of execution,
copies of all contracts entered into by COMPANY relative to
those activities provided for in this paragraph.

LJWR0025

TTT.39.89/5-9

30.  This Agreement shall not become effective until executed by all parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

WITNESSESS                          SKYYWALKER RECORDS

_____      BY: _____


_____      BY: _____
                                  JEFFREY J. THOMPKINS (Artist)

                             SS# 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
                             DOB_____September 14, 1972_____


_____      BY: _____
                                  BRENDA THOMPKINS (Guardian)


_____      BY: _____
                                  PATRICK WATLER (Artist)

                             SS#_____
                             DOB_____July 17, 1971_____


_____      BY: _____
                                  ANNIE WATLER (Guardian)

TTT.40(a).89/5-17                                    LJWR0026

30.  This Agreement shall not become effective until executed by all parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

WITNESSESS                         SKYYWALKER RECORDS

_____     BY:_____


_____     BY:_____
                                    JEFFREY J. THOMPKINS (Artist)


                                SS#_____
                                DOB_____September 14, 1972_____


_____     BY:_____
                                    BRENDA THOMPKINS  (Guardian)


_____     BY: *Patrick Watler*
                                    PATRICK WATLER (Artist)

                                SS# 065 - 62 - 1161
                                DOB_____July 17, 1971_____


_____     BY: *Annie Watler*
                                    ANNIE WATLER  (Guardian)

TTT.40(a).89/5-17                                    LJWR0027

# EXHIBIT 5

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

                                                          Page 1

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF FLORIDA
2          FORT LAUDERDALE DIVISION
3       CASE NO. 02-6161-CIV-FERGUSON/SNOW
4
5
JEFFREY  J. THOMPKINS,                    ORIGINAL
6
              Plaintiff,
7    vs.
8    LIL' JOE RECORDS, INC., LIL' JOE
     WEIN MUSIC, INC., JOSEPH
9    WEINBERGER AND JOHN DOE
     INDIVIDUALS AND CORPORATIONS
10   1-5,
11            Defendants.
     _____/
12
13
14                   200 So. Biscayne Blvd.
                     Miami, Florida
15                   August 28, 2003
                     Thursday, 9:29 A.M.
16
17
18
19              D E P O S I T I O N
20
                       OF
21
22            JEFFREY THOMPKINS
23
24
25       Taken on Behalf of the Defendants

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 2



Thompkins vs. Lil' Joe Records, Inc.                      8/28/2003

Page 3

```
 1                    A P P E A R A N C E S

 2

 3    On behalf of the Plaintiff:

 4    Terry D. Jackson, P.C.

      600 Edgewood Avenue

 5    Atlanta, Georgia 30303

      BY:  TERRY D. JACKSON, ESQ.

 6

 7    On behalf of the Defendants:

-8    Hinshaw & Culbertson

      9155 South Dadeland Boulevard

 9    Suite 1600

      Miami, Florida  33256

10    BY:  DAVID H. LEVITT, ESQ.

11

12    ALSO PRESENT:   Joseph Weinberger

13                    Ms. Gargiulo

14

15                       I N D E X

16    Witness          Direct   Cross   Redirect   Recross

17    JEFFREY THOMPKINS

18    (By Mr. Levitt)     4                 --

19    (By Mr. Jackson)           --                   --

20

21

22

23

24

25
```

Thompkins vs. Lil' Joe Records, Inc.

8/28/2003

Page 4

```
 1
 2                       E X H I B I T S
 3
 4    Defendant's Exhibit 1                          66
      Defendant's Exhibit 2                          72
 5    Defendant's Exhibit 3                         141
      Defendant's Exhibit 4                         152
 6    Defendant's Exhibit 5                         154
      Defendant's Exhibit 6                         156
 7    Defendant's Exhibit 7                         170
      Defendant's Exhibit 8                         183
 8    Defendant's Exhibit 9                         185
      Defendant's Exhibits 10-A through K and 11    197
 9    Defendant's Exhibit 12                        211
      Defendant's Exhibit 13                        217
10    Defendant's Exhibit 14                        220
      Defendant's Exhibit 15                        224
11    Defendant's Exhibit 17                        242
      Defendant's Exhibit 18                        249
12    Defendant's Exhibit 19                        259
      Defendant's Exhibit 20                        262
13    Defendant's Exhibit 21                        264
      Defendant's Exhibit 22                        269
14
15
16
17
18
19
20
21
22
23
24
25
```

Thompkins vs. Lil' Joe Records, Inc.          8/28/2003

Page 5

1    Thereupon:

2                    JEFFREY THOMPKINS

3    a witness named in the notice heretofore filed,

4    being of lawful age and having been first duly

5    sworn, testified on his oath as follows:

6                    DIRECT EXAMINATION

7    BY MR. LEVITT:

8        Q.   Would you please state and spell your full

9    name?

10       A.   My name is Jeffrey Thompkins,

11   J E F F R E Y, T H O M P K I N S.

12       Q.   Have you ever given a deposition before,

13   Mr. Thompkins?  Something like this where a lawyer

14   asks you questions under oath in a civil proceeding?

15       A.   Yes, I have.

16       Q.   How many times have you done that?

17       A.   Maybe once.

18       Q.   I'm going to be asking you questions

19   today.  The court reporters all love me because I

20   tend to talk very fast.  If I do or I'm not clear,

21   please let me know and I rephrase the question.

22       A.   Yes.

23       Q.   Please give the answers in words because

24   the court reporter can only take down words and not

25   anything else.  Also, if you would wait until I

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

```
1   finish the question before you begin to answer, I

2   will try, although I don't always succeed, to do the

3   same for you.

4           The court reporter will then get a clear

5   record of who is saying what when, okay?

6       A.   Yes.  Sure.

7       Q.   Are you known by any other name besides

8   Jeffrey Thompkins?

9       A.   JT Money.

10      Q.   Any others?

11      A.   It is a name, Bitchizer.

12      Q.   Could you spell it?

13      A.   B I T C H I Z E R.

14      Q.   Is that something that you use for

15  yourself or do others use it?

16      A.   Folks on the street who know me through

17  records, you know.  My music.

18      Q.   What names do you use professionally?

19      A.   JT Money.

20      Q.   Have you ever used "Jeffrey Thompkins"

21  profession5ally as a name as opposed to JT Money?

22      A.   What you mean professionally?  I mean --

23      Q.   On an album.  This album is by so and so.

24      A.   It always says by J -- Jeffrey "JT Money"

25  Thompkins.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 7

1       Q.    Is "JT Money" a nickname?

2       A.    Correct.  It is my initial, just my

3  initials.

4       Q.    Where do you live?

5       A.    Right now I'm living in Atlanta, Georgia.

6       Q.    What is your address there?

7       A.    2036 Kolb, K O L B, Ridge Court, Marietta,

8  Georgia.

9       Q.    We will do that a lot.

10      A.    Yeah.

11      Q.    How long have you lived there?

12      A.    Going on five years now.

13      Q.    Are you married or single?

14      A.    I live like I'm married.  I'm single.

15      Q.    Have you ever been married?

16      A.    Never.

17      Q.    Who do you live with at that address in

18  Georgia?

19      A.    My fianceÆ and my three sons.

20      Q.    What are their names?

21      A.    Jeffrey, Jordan and Justin.

22      Q.    And what is your fianceÆs name?

23      A.    Audrey.

24      Q.    Have you lived with them for the whole

25  five years you have been at that address in Georgia?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 8

```
 1        A.    Correct.

 2        Q.    Where did you live before you lived there?

 3        A.    Miami, Florida.

 4        Q.    What was your address, last address in

 5   Miami?

 6        A.    1321 Northwest 198th Street, Miami,

 7   Florida.

 8        Q.    How long did you live there?

 9        A.    Maybe 10, 12 years, approximately.  Since

10   about 11.

11        Q.    Since you were 11, you mean?

12        A.    Right.

13        Q.    Who did you live there with?

14        A.    My parents, my father and mother

15        Q.    What are their names?

16        A.    Brenda Thompkins and Sylvester Thompkins.

17        Q.    Are your parents currently married?

18        A.    Yeah, they are currently married.

19        Q.    Where do they live?

20        A.    My father still says in the house; my

21   mother has a condo.

22        Q.    So  your father still lives at that

23   address?

24        A.    Correct.

25        Q.    And your mother lives where?
```

25 S.E. Second Avenue          Taylor Jonovic White & Gendron          Ph: 305.358.9047
Miami, FL   33131                  www.myreporters.com                  Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 9

```
 1        A.    Not too far down Ives Dairy.  I don't know

 2   her address.

 3        Q.    Are they separated?

 4        A.    Yeah.

 5        Q.    How long has that been the case?

 6        A.    A year or two, maybe two years.

 7        Q.    Did you ever live at any other address in

 8   Miami besides the address that you have just

 9   mentioned?

10        A.    I used to stay at a chick of mine's house

11   when Audrey stayed down here before we moved up

12   there.

13        Q.    Audrey is the fianceÆ?

14        A.    Yeah.

15        Q.    What was her name?

16        A.    Neal, N E A L, Audrey Neal.

17        Q.    Do you still use the address of 1321

18   Northwest 198th Street for any reasons?

19        A.    Yes.

20        Q.    What?

21        A.    I still get mail there.  I still have some

22   business coming there.

23        Q.    What mail or business do you get there

24   generally?  Not every single --

25        A.    BMI statements, things like that.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 10

1       Q.    Anything else?

2       A.    Nothing else that really matters.  I get

3    all kind of junk mail, people trying to offer me

4    stuff to send me anything.

5       Q.    Do you use that address for any other

6    professional purposes other than the BMI?

7       A.    No.  That is it, really.  Everything else

8    coming directly to my house in Georgia.

9       Q.    What is your date of birth?

10      A.    09/14/72.

11      Q.    How old does that make you now, without

12   making me do the math?

13      A.    Thirty-one.

14      Q.    I'm sorry.  I --

15      A.    I will be 31 on the 14th of September.

16      Q.    Thank you.

17            What is your social security number?

18      A.    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.

19      Q.    Have you ever been convicted of a felony?

20      A.    Yes.

21      Q.    Would you please tell me about that?  What

22   they were and when it happened.

23      A.    Those were my juvenile years, adolescent

24   years.  I mean, I can't give you specifics.

25            I mean, what you need to know?

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 11

1      Q.    Well, tell me the first one.  What were

2   you convicted of?

3      A.    The first one.  I don't know.  Possession

4   of a firearm by a minor.

5      Q.    Possession of a?

6      A.    Firearm by a minor.

7      Q.    Firearm.

8            And what happened in relation to that?  In

9   other words, were you tried and convicted?  Did you

10  plead guilty?

11     A.    Yeah, I pleaded out.

12     Q.    And when was that, approximately?  Just

13  the best you can remember.

14     A.    I don't know.  15 years ago.

15     Q.    How old were you when it happened?

16     A.    About 15, 16.

17     Q.    And what was the consequence?  What

18  penalty, if any, did you sustain as a result of

19  that?

20     A.    Well, I did some jail time.  Got

21  probation.  Paid fines.  You know, the usual.

22     Q.    After that one, was there another one?

23     A.    Something else, you know.  Marijuana

24  possession or something.

25     Q.    Do you remember, was that something that

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 12

```
1    you were convicted of?

2         A.    These are all driving.  You know, you get

3    pulled over and they search your car and you have --

4    Yeah, that is pretty much how these cases -- It

5    wasn't like I was on highs or anything.

6         Q.    I just wanted to make sure I understood.

7         A.    Yeah.

8         Q.    Anything else besides that?

9         A.    Huh-huh.  Not to my knowledge.  No

10   convictions.

11        Q.    Was there ever a conviction for

12   trafficking cocaine?

13        A.    That is a whole another state.

14        Q.    I didn't mean just in Florida.

15        A.    South Carolina.

16        Q.    Will you tell me about that one?  When was

17   that?

18        A.    About '90, '91, I believe.

19        Q.    How did that come about?

20        A.    How?

21        Q.    Yeah.  It was in South Carolina?

22        A.    Right.  I took some coke up there on the

23   plane.

24        Q.    I'm sorry?

25        A.    I took some coke up there on the plane.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 13

```
 1          Q.    On an airplane on the way to South
 2   Carolina?
 3          A.    Yes.
 4          Q.    Was that going for a concert or for a
 5   visit?
 6          A.    No.   I have some more friends up there.
 7   They was in a situation.   I was just going to see
 8   about them, see what I could do to get them back to
 9   the crib.
10          Q.    I thought you said "career" for a second.
11          A.    No.
12          Q.    You understand that?
13          A.    I speak funny, too.   If you don't hear me,
14   ask me.
15          Q.    You might think I speak funny, too, so it
16   is only fair?
17          A.    Yeah, right.
18          Q.    Was there another possession of drugs
19   conviction besides that one?
20          A.    No.   That was -- I mean, that is the only
21   conviction.
22          Q.    Okay.   What about, was there one in 1995
23   for something called Ruffies?
24          A.    Oh, yeah, yeah, yeah, yeah, yeah.   Yeah,
25   that was it.   They found a pill in my pocket.   On a
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 14

1    routine traffic stop.

2         Q.    Have you ever spent any time in jail as a

3    result of a conviction?   Jail or prison?

4         A.    I mean, the time I spent there is the time

5    I spent, you know?   If I can bond out, I usually

6    bond out, beat the case or get probation or

7    something.   You know?   Never done no hard time or

8    nothing.

9         Q.    You never were sent to a penitentiary or

10   prison?   I don't mean waiting for trial?

11        A.    Almost for them.   I got convicted, then my

12   sentence was overturned and then I was released on

13   probation.

14             Let me turn my phone off before we start.

15        Q.    Now, do you have any businesses that you

16   operate?

17        A.    Well, I'm starting -- I started my own

18   record company, my own label.

19        Q.    What is it called?

20        A.    Crunk City Records.

21        Q.    Crunk?

22        A.    Crunk City Records.

23        Q.    Would you spell "Crunk"?

24        A.    C R U N K.

25        Q.    Is "city" spelled the normal way?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

                                                        Page 15

```
 1        A.   City, right.  Crunk City Records.

 2        Q.   When did you start that?

 3        A.   I guess about a year ago, year and a half

 4   ago.

 5        Q.   Is that a corporation?

 6        A.   Ah, JT Money, LLC is a corporation.

 7   Crunk -- I'm doing business as Crunk City Records.

 8   It is a d/b/a.  It is a division of my JT Money,

 9   LLC.

10        Q.   In addition to Crunk, you have a company,

11   JT?

12        A.   JT Money, LLC.  Crunk City Records.  Money

13   Man Music Publishing.  And that is it.

14        Q.   When did JT Money, LLC get formed?

15        A.   '99, 2000, maybe.  2000.

16        Q.   And what is the business of JT Money, LLC?

17        A.   Whatever the business of JT Money is, be

18   it performing or doing side artist record deals, you

19   know, what have you.  Anything relating to

20   entertainment.

21        Q.   JT Money is you as a person?

22        A.   Quite right.

23        Q.   How does JT Money relate to JT Money, LLC?

24   I mean, do you have --

25        A.   I'm the product.  JT Money, LLC is the
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 16

```
 1   company.  And if it is any business with this
 2   product, JT Money, LLC handles it.
 3        Q.   So, for example, if I'm wrong tell me --
 4        A.   For example --
 5        Q.   Well, go ahead.
 6        A.   If you want to do -- Let's say you want to
 7   do a deal with me.  You want me to do a record for
 8   your company or something.  You cut the check to JT
 9   Money, LLC.
10        Q.   And the contract between you and me, the
11   contract for you to do that would be between LLC and
12   me, if I were the person that wanted to have the
13   contract for you to perform?
14        A.   Correct.
15        Q.   And what is Money Man Music?
16        A.   That is my publishing company.
17        Q.   And how long has that been in place?
18        A.   I don't know.  '99.  It may have been
19   before that.  But, I mean, established as a -- Yeah,
20   I'm not even sure.  I mean, I have been trying to --
21   Well, it don't matter.  '99 is when it, I guess,
22   became official.
23        Q.   You were using the name "Money Man Music"
24   even before it became an official corporation for
25   summary purposes?
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 17

1          A.    No.   I may have started from '95, '96, as

2     I started sending in my songs.   My writer clearing

3     songs.   I may have been Money Man Music.   I didn't

4     have generate publishing until 1999 through Money

5     Man Music.

6          Q.    Does Money Man Music have any business

7     currently that it is doing?   Do you have things you

8     are publishing?

9          A.    All of JT Money music.

10         Q.    Okay.   Would you tell me about that?   What

11    JT Money music are you talking about?

12         A.    My last three albums.

13         Q.    When was the first of those three?

14         A.    The first album was 1990, Pimpin' On Wax.

15         Q.    Spell that for her.

16         A.    P I M P I N on Wax.

17         Q.    How long was that album in terms of the

18    number of songs or what?

19         A.    Eleven songs, I believe.   Twelve songs.

20    Eleven songs on that.

21         Q.    Is there like a --

22         A.    Who Dat? was the first single.

23         Q.    "Dat" is D A T?

24         A.    D A T, correct.

25         Q.    We will come back to that.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 18

```
 1              Then the next one after Pimpin' On Wax was
 2   what?
 3        A.    Blood Sweat and Years.
 4        Q.    Blood Sweat --
 5        A.    -- and Years.
 6        Q.    All spelled the normal ways?
 7              I mention it because she needs to get it.
 8        A.    Blood Sweat and Years.
 9        Q.    And when did that one come out?
10        A.    2001.
11        Q.    And how many songs are on that one?
12        A.    Twelve.
13        Q.    By the way, Pimpin' On Wax, did that go
14   out on a particular album or how did that get
15   actually distributed?
16        A.    That was on Freeworld Records distributed
17   by Capitol Records Priority, Capitol Priority.  It
18   was a joint venture deal.  Freeworld, Priority,
19   Capitol.
20        Q.    Okay.  And then the next one, Blood Sweat
21   and Years, that was --
22        A.    Same thing.
23        Q.    Same thing?
24        A.    Same label, same deal.
25        Q.    What was the third one?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 19

```
 1        A.    The one I have out now, Return of the
 2   B-izer.  That is my own label.
 3        Q.    B I A?
 4        A.    B - I Z E R.
 5        Q.    That was a nickname?
 6        A.    It is the return now.
 7        Q.    Why a return?
 8        A.    Because he was gone.  They haven't heard
 9   of him since '92.  I have been doing other things in
10   between.  So at this point of the game, I'm giving
11   them what they was asking for back then.  You know,
12   for my previous music.
13        Q.    You mean -- So on this latest return of
14   the B-izer album, is that some of the old songs
15   redone?
16        A.    No.  I just gave them a taste of that
17   vibe, that feel, that character.  Yeah.
18        Q.    The style you mean?
19        A.    The style.
20        Q.    But new songs?
21        A.    Yes, all new songs.
22        Q.    When you say the publishing business in
23   terms of your style of business, what kinds of
24   things get published?
25        A.    Movies.  You know, they want to do sound
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 20

```
 1    tracks for movies, license songs, license, you know

 2    they would do that business through Money Man Music,

 3    the publishing, you know, side of it.

 4         Q.    So the JT Money, LLC is for personal

 5    appearances type of things as opposed to somebody

 6    wanted to use something for a sound track.  I'm

 7    trying to get the difference between what JT Money,

 8    LLC does and what Money Man Music does.  They are

 9    separate, I take it?

10         A.    Yeah.

11         Q.    How do you determine whether something

12    goes from one to the other?

13         A.    Well, again, like any publishing relating

14    to, any publishing goes through Money Man Music.  If

15    it is just a feature artist or somebody wants me to

16    come through and JT LLC handles its own business as

17    far as anything relating to JT Money.  But the music

18    side, my songs is all Money Man Music.  You know.

19         Q.    So, for example, would there be a contract

20    on occasion between JT Money, LLC and Money Man

21    Music where you create --

22         A.    No.

23         Q.    How did you get involved in the music

24    business in the first place?

25         A.    Ah, David Hobbs from 2 Live.
```

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 21

```
 1        Q.    Hobbs?
 2        A.    H O B B S.   Correct.
 3        Q.    How did you get involved with that?   2
 4   Live Crew.
 5        A.    We was just at a club, Gong Show, talent
 6   show.  We won and he came to us, asked did we want
 7   to make a record.
 8        Q.    How old were you then?
 9        A.    Probably about 16, 17.
10        Q.    When you say "we," who was that?
11        A.    Myself and Patrick Watler.  The original
12   Poison Clan member.
13        Q.    Would you spell his last name?
14        A.    W A T L E R.
15        Q.    He was the same age?
16        A.    He was a year older.
17        Q.    David Hobbs and 2 Live Crew contacted you
18   while you were at this club during the concert and
19   said, would you like to make a record?
20        A.    Correct.
21        Q.    So what happened then?
22        A.    The record is history.  We hooked up.  We
23   exchanged numbers.  Called me the next day.
24   Probably in the studio the next week, you know.
25        Q.    Has the process by which a record gets
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 22

1    made, you know, you have an idea of a song, does

2    that change from when you first started doing that

3    one until even now?  The general process, that is?

4         A.   Um, I mean, the process, I mean, you do

5    what you have got to do.  You lay the track.  You

6    lay the vocals.  You put down the hook.  You mix it.

7    I don't think that will ever change.

8              But in that first album, you know, he

9    pretty much just laid out the beats for us.  All we

10   had to do is come with rhymes.  Like today, I set up

11   on the beats, the rhymes, the mixing, you know.  I

12   will wear all of the hats today.  You know.  So that

13   is the only thing that changed, the growth.

14        Q.   In some styles of music, which is

15   different from your style of music, there are other

16   processes.  For example, somebody has to write the

17   music.

18        A.   We still do.

19        Q.   Do you create sheet music for yourself?

20        A.   None of that.

21        Q.   That is why I'm asking.

22        A.   Right.  No.

23        Q.   I didn't think so.

24        A.   You don't right notes.  All that I write

25   my lyrics and put them to the beat.

Thompkins vs. Lil' Joe Records, Inc.                 8/28/2003

Page 23

1      Q.   So in that first album at least, Mr. Hobbs

2   or someone working for him, helped to put together

3   the beats that were already there?

4      A.   Hobbs did all of the beats and myself and

5   Debonair, Patrick Watler.

6      Q.   Deboanair?

7      A.   Yeah.  That was his stage name.  We did

8   all of the wraps, all of the vocals.

9      Q.   Were those written down ahead of time?

10      A.   Yeah.

11      Q.   Did you keep notes?

12      A.   I got all of my vocals.

13      Q.   Do you do them on the spot sometimes or

14   are they all pretty much written down ahead of time?

15      A.   Most of the time we have them, you know, a

16   certain beat you maybe -- like I got something that

17   fits this beat.  We will build a record around it

18   like that.  Or, you know, sometimes you could pull

19   up a fresh beat in the studio.  We write it right

20   there, writing it then and now.  Or we go in it

21   freestyle.

22      Q.   On that very first one, did you actually

23   do enough songs to make an album or was it just one

24   song?

25      A.   Yeah.  We did a whole album.  He gave us

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 24

1    12 beats.  We did 12 songs.  They choose 11 and we

2    went from there.

3         Q.   And when you say "beats," just so I

4    understand, are these like prerecorded --

5         A.   Production.

6         Q.   Tracks?

7         A.   Tracks.

8         Q.   That you do your song over?

9         A.   Right.

10         Q.   So they have the beat in that situation

11    already created?

12         A.   Right.

13         Q.   Which is consisting of what?  What is the

14    beat?  Is it musical instruments?

15         A.   Yeah.  Instruments, kick, snare drums.

16         Q.   Kick.  What is a kick?

17         A.   Kick drum.  Snare.

18         Q.   So some person has already put those

19    things down on a track?

20         A.   Like, instrumentals.  That is what I mean

21    when I say "beats," instrumentals.

22         Q.   What would you do?

23         A.   Vocals.

24         Q.   So that you would have ear phones on you

25    would hear, and they would have it playing maybe

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 25

```
 1    just over a speaking system and you would do your

 2    vocals with that in the background to do your song?

 3         A.    Right.

 4         Q.    With the beat in your head; is that

 5    correct?  Do I understand it correctly?

 6         A.    Yeah.  I mean, close enough, though.  I

 7    mean --

 8         Q.    I have never been there?

 9         A.    I just vibe.  It is like, if your words

10    was a beat right now, what you are saying to me, I

11    would be vibing to your conversation, making my

12    song, to tell it back to you.  You know?  Yeah.

13         Q.    Do you write it down sort of there on the

14    spot or do you come into the studio with some things

15    already written?

16         A.    I have stuff written.  I always got more

17    than enough material.  If I, you know, I look at my

18    books, if I see something that fits this, then, you

19    know, I try one of these.  If not, then I put that

20    to the side and I grab a blank pad and pen and start

21    creating.

22         Q.    Do you ever publish just the words sort of

23    like sheet music kind of thing?

24         A.    No.

25         Q.    So when you are talking about publishing,
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 26

```
 1   the only thing you are talking about is the final
 2   product, which is the mixed song and --
 3        A.   Right.
 4        Q.   And the beats and everything all put
 5   together in a final package?
 6        A.   Pretty much.  For the most part.  I have
 7   some songs that is registered that have not been
 8   released yet, though.  But, you know, I have been --
 9   been recording them.
10        Q.   They are ready to be released, they just
11   haven't been released?
12        A.   Right.  They just haven't been released.
13        Q.   So I'm just going to still want to
14   continue on to the process.
15             So you go to the studio, there is the
16   beats.  Then you do your piece either alone or with
17   anybody you are performing with?
18        A.   Right.
19        Q.   Over that and that is recorded together
20   then; right?
21        A.   Right.
22        Q.   What is that recorded on?  Is there a word
23   for what is created?
24        A.   It is whatever system you use.  Some
25   people use ADAC, Pro 2.  Some people use two-inch
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 27

```
 1   reels.
 2        Q.   But when you are finished, do you know
 3   what a master is?
 4        A.   Yeah.  It is the CD.  Regular CD.
 5        Q.   A master CD?
 6        A.   Unless you are talking about the two-inch
 7   reel, the two-inch master.
 8        Q.   Okay.
 9        A.   But, I mean, a master copy of the seal is
10   when you finish, it is mixed and mastered.  You can
11   run with it from there.
12        Q.   Well, let me go backwards a step.
13             So you are in the studio, you have the
14   beats, and you record your vocals along with the
15   beats to create something new, which is the beats
16   plus the song, plus the vocals; right?
17        A.   Right.
18        Q.   Is there anything else that goes into the
19   process besides those two pieces that you have
20   reported your vocals and you already have the beats
21   in terms of creating the final product?
22        A.   Mixing time.
23        Q.   Mixing?
24        A.   Yeah.
25        Q.   What is the process of mixing?  What does
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 28

```
 1   one do to do that?
 2        A.    An engineer, you know, he just mixing,
 3   just EQing the sound, get the levels right.  So you
 4   don't have one instrument way out loud and something
 5   too loud.  You get the vocal also just right into
 6   the music.
 7        Q.    Okay.  So once you have done the beats,
 8   the vocal recording and the micing, is the song
 9   essentially done and ready for?
10        A.    Ready to be mastered.
11        Q.    And when you are ready to be mastered,
12   what does that mean?
13        A.    Getting it ready for radio.  Again,
14   adjusting levels and everything so your record
15   sounds like the next level, always big, but not too
16   big.
17        Q.    So when you say, we refer to something as
18   "a master," is that the finished song ready for
19   distribution?
20        A.    I believe so.  That is the -- Yes, that is
21   what I believe it to mean.  Yeah.
22        Q.    I want to make sure we were using the
23   same --
24        A.    Yeah.
25        Q.    You know, I didn't maybe ask this.  We
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 29

```
 1   have talked about albums.
 2            Did you ever release an album called
 3   Strait Zooism?
 4       A.   Yes.
 5       Q.   When was that?
 6       A.   '95, '96.  I believe it was '95, going
 7   into '96.
 8       Q.   What label was that on?
 9       A.   Represent Entertainment.  Represent
10   Entertainment.  Through Warlock Records.  There you
11   go.  You might know that.  Warlock.
12       Q.   What did Warlock do and what did Represent
13   did?
14       A.   I guess Warlock was the distributor.
15   Represent was the label that album was licensed to,
16   assigned to.
17       Q.   Who did the licensing or assigning?
18       A.   Tom Wright, myself; Tom Wright for the
19   album.
20       Q.   Tom Wright, W R I G H T, is that how he
21   spells his name?
22       A.   I'm not sure.  Ryke.
23       Q.   Ryke?
24       A.   Ryke.
25       Q.   Who is Tom Ryke?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 30

```
 1         A.    He was the owner of Represent Records.
 2         Q.    What role did you have in Strait Zooism?
 3   You were the artist, obviously?
 4         A.    I'm the artist.
 5         Q.    Were you the sole artist at least in terms
 6   of the vocals?
 7         A.    Yes.  I'm the Poison Clan front man.
 8         Q.    What does it mean -- to be a front arm?
 9         A.    I'm just saying, all right?  All of the
10   years, Poison Clan, I was the only one that signed
11   the contract.  Out of all of the years.  Everybody
12   else was my home boys around me.
13         Q.    Okay.
14         A.    Do you understand what I'm saying?
15         Q.    They were your friends and people who were
16   helping?
17         A.    Right.
18         Q.    Okay.  With regard to the Strait Zooism
19   album, I'm going come back to it.  I wanted to come
20   back to get the list of albums.
21               Who signed what contracts with regard to
22   Strait Zooism?
23         A.    Me.  Myself.
24         Q.    Who did you sign contracts with?
25         A.    Tom Ryke.
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 31

```
 1        Q.    And Tom Ryke is Represent Records?

 2        A.    Correct.

 3        Q.    And how did Warlock get involved?

 4        A.    Distribution.

 5        Q.    Did you have a contract with Warlock?

 6        A.    Like, um, what is that?  An amendment or

 7   something.  What is that?

 8        Q.    Even if you don't know what it is called,

 9   explain to me what it was, even if you don't know

10   the word.

11        A.    No, I didn't have any dealings with

12   Warlock.  Tom Ryke dealt with Warlock.  I dealt with

13   Tom Ryke.

14        Q.    How did you get connected with Tom Ryke in

15   relation to Strait Zooism?

16        A.    I mean, I knew people from being on Luke

17   Records, prior, from my prior deal with Luke

18   Records.  So I traveled, I met a lot of folks.  He

19   was just ready to work, ready to do what I was ready

20   to do, put music out.

21        Q.    When had Strait Zooism been recorded?

22        A.    When was it recorded?

23        Q.    Yeah.

24        A.    I mean, I write -- Let me explain

25   something to you.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 32

1      Q.    Okay.

2      A.    This year right now, I'm working, I got an

3   album in the streets right now.

4      Q.    An album in the streets?

5      A.    Yes.   I have a recording finished that is

6   out in the stores publicly right now.

7      Q.    Okay.   Right.

8      A.    But I also have maybe three more albums

9   worth of material just sitting in my house waiting

10   to become the next album.   So ---

11      Q.    That has already been recorded you mean?

12      A.    Right.   It is already recorded.   I'm

13   wrapping to it right now, fixing how I'm going to

14   fix it up, what I'm going to do it.

15          Anyway, I always have songs, you know?   It

16   is like this album here.   I did some of these songs

17   about a year before I ever met up with Tom Ryke.

18      Q.    Strait Zooism you mean?

19      A.    Right.   Then after we hooked up, I may

20   have done two or three extra ones, just to complete

21   the album.   You know, when I come to you with an

22   album, this is what we working with.   But it is not

23   necessarily finished product.

24      Q.    Right.   They might decide what order they

25   want to go in and package it.   This song doesn't fit

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 33

```
 1  and they want to put that song.  That is what you
 2  are talking about?
 3       A.   Right.
 4       Q.   But actual recordings of the songs that
 5  did end up on the Strait Zooism album, eventually
 6  those had been recorded sometime before that?
 7       A.   About a year, maybe two years, a year and
 8  a half.
 9       Q.   Do you know how they came to be reported?
10       A.   What do you mean "how"?
11       Q.   Where did you record them?
12       A.   I first recorded them in my Sonny's
13  studio.  We drop it down, we had it on a one inch.
14       Q.   Who is "we"?
15       A.   My home boy, Sonny.  He had a studio we
16  used to work at in my neighborhood.
17       Q.   I thought you said "Sony."
18       A.   Sonny.
19       Q.   You meant Sonny.
20       A.   Yeah.
21            When we did the deal with Represent
22  Records, you know, we rerecorded everything in the
23  studio up in Orlando.
24       Q.   Did you bring masters to Represent Records
25  that eventually showed up in the Strait Zooism
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 34

```
 1  album?

 2      A.    Masters.   I let them hear my CD of what I

 3  had.

 4      Q.    Okay.   And the question is the CD that you

 5  had, was any of that, was that the stuff that Sonny

 6  had recorded for you?

 7      A.    Correct.

 8      Q.    Had there been any recording of any of the

 9  songs on that that you brought with you to Represent

10  that were done for Luke Records?

11      A.    Yes.   Everything at Sonny's house.   I

12  rerecorded it at Luke Records.   Because that was

13  going to be my album.   So, see, I did

14  pre-production.   You know?   That is just to let you

15  hear the song.

16          Now, we know we didn't do it on the big

17  SSL boards with the two-inch tape.   Naturally, we

18  would have to rerecord this, if we want to compete

19  with what is going on out there.   I did it on a

20  smaller level so you can hear what we doing.

21          You understand?

22      Q.    i understand that.   I'm trying to get the

23  order in which that happened in this album.

24          So the first thing you did --

25      A.    And masters from Luke Records, we didn't
```

Thompkins vs. Lil' Joe Records, Inc.                              8/28/2003

Page 35

```
 1   even use them with Represent.

 2            Now, I got my masters back from Luke

 3   Records because they didn't finish paying me for the

 4   album.  They didn't complete the deal.  So give me

 5   my masters back.

 6            Now, when I meet with Tom Ryke, you know,

 7   I just played my CD for him.  But we still

 8   rerecorded at another studio up there.  I forgot the

 9   name of it.  It is so long ago.

10        Q.    Let me see if --

11        A.    It is on the back of the album.

12        Q.    So the first thing you did in relation to

13   the things that ended up on Strait Zooism was you

14   recorded them in a CD format, so to speak, kind of a

15   rough format with Sonny?

16        A.    Right.  That was the original.  That is

17   when we got the ideas going.

18        Q.    Right.

19        A.    We did like 20 songs.  I might have

20   brought Luke eight or nine songs.

21        Q.    And the second thing after that you did

22   them in a more polished way at Luke, some of those

23   songs at least; right?  And they became masters?

24        A.    Yeah, we did them over.  Because Luke had

25   the big SSL board.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 36

```
 1        Q.    Right.

 2        A.    Bigger sound.

 3        Q.    So then you created masters of those same

 4   songs you had done at Sonny's, maybe not all of

 5   them, but the ones that ended up on Strait Zooism at

 6   Luke Records?

 7        A.    I mean, you can call the ones at Sonny's

 8   house a master, but it never been mixed.  Just like

 9   Luke Records was never mixed at Luke Records.

10             I put the roughs down.  Basically, if I

11   could -- We had devajuÆ.  That is basically what it

12   is.  I recorded this stuff and it is nothing that

13   got recorded over.

14        Q.    So you then went and rerecorded it again

15   at Luke?

16        A.    Right.

17        Q.    And then you said something about you got

18   the masters back from Luke?

19        A.    Yeah.  The two-inch reels.

20        Q.    How did you get those back?

21        A.    I went in this office one day and got my

22   masters.

23        Q.    Was someone there when you got them?

24        A.    Yes.

25        Q.    Who?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 37

```
 1        A.    Everybody  was  there.    The  whole  record

 2  company.

 3        Q.    Did  you  say,  "Can  I  have  them  back,

 4  please?"   And  they  handed  them  to  you?

 5        A.    I  said,  "I  fixing  to  get  my  masters  now."

 6        Q.    You  just  went  in  and  took  them  and  walked

 7  out  telling  them  that  you  had  taken  them?

 8        A.    Right.

 9        Q.    Did  you  take  any  masters  besides  the

10  Strait  Zooism  ones?

11        A.    No.

12        Q.    Even  those  that  you  --

13        A.    I  saw  them  a  week  or  two  prior  right  there

14  in  the  corner  in  the  office.    They  were  still  riding

15  there.    Yeah,  well,  I  will  just  go  get  them  now.    I

16  waited  and  I  waited  and  I  waited.    And  nothing  came

17  up.

18        Q.    You  mean  you  waited  while  you  were  in  the

19  office  that  day?

20        A.    Yeah.    See,  if  I  come  to  you  with

21  something  that  is  already  ready,  and  you  tell  me  we

22  are  going  to  do  a  deal,  my  stuff  is  already  ready.

23  All  you  got  to  do  is  just  pay  me  what  you  say  you

24  are  going  to  pay  me  and  you  can  go  on  with  that.

25  Right?
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 38

```
 1              Give me the advance.  I knock the stuff

 2   out in a matter of days, right?  Because it don't

 3   take that long to do it when you have already done

 4   it.  Do you understand that?  I'm waiting for my

 5   money.

 6              It was no money.  You go through our list,

 7   you know, he can't pay me.  So we can't do the deal,

 8   obviously.  That is my understanding.

 9        Q.   I'm just going over right now -- I

10   understand that.  But I'm going over the day that

11   you actually got the physical objects which are

12   called the masters.

13              On that day, you showed up at Luke Records

14   office?

15        A.   Yes.  Right.

16        Q.   Do you remember when that was?

17        A.   I have no idea.  '95.

18        Q.   Was it before or after the bankruptcy was

19   filed?

20        A.   I don't know.  It was probably going on in

21   the background or something.

22        Q.   Do you know if the bankruptcy actually had

23   been filed in court by that day?

24        A.   I think so.  I'm not sure, though.

25        Q.   So you went there and was Luke there that
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 39

```
 1    day?   Luther Campbell?

 2         A.   He had been there.  He wasn't there when I

 3    got there.

 4         Q.   How about Mr. Weinberger?

 5         A.   I believe he was in the office.

 6         Q.   Did you talk to him that day, if you

 7    recall?

 8         A.   I don't think so.  But if I did, I

 9    probably walked up and I said, "What is up, Joe?"

10    But we didn't have a conversation.  I may have even

11    came and asked and said, "Hey, man, you the chick."

12    But I don't know.

13         Q.   When you say you were waiting, when you

14    talked about you were waiting for the album to get

15    finished, you didn't mean --

16         A.   Waiting in the office that day for someone

17    to bring them out to me?  No.  When I turn in my

18    masters to you, I expect a check.  As soon as I give

19    it to you, I want a check.  Not two weeks later, a

20    month later.  Because I might withhold the album for

21    another month.

22         Q.   Is it your understanding that you own the

23    masters?

24         A.   Correct.  Until they pay for, that is my

25    understanding.  Until I'm paid what is due me, yeah.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 40

```
 1    That is my property.

 2         Q.    The actual physical object that the master

 3    is on, the master itself, belongs to you, you

 4    believe?

 5         A.    Yeah.  I do believe it.

 6         Q.    How did you come to that understanding?

 7         A.    How?

 8         Q.    Yes.  What makes you think that is the

 9    case?

10         A.    Because I know the tape only cost $100,

11    and I could have gave them that out of my pocket.

12    But my work is on that master.  That makes it mine.

13    And half the time, we brought our own masters,

14    sometimes.  So but not this particular case, though,

15    so it don't have nothing to do with it.

16         Q.    So, then, whatever the reason was, you

17    took those -- the masters that turned out to be

18    Strait Zooism out of Luke Records' office on that

19    particular day?  And what happened, then, with

20    regard to Strait Zooism?

21         A.    Nothing.  It was back on the market.

22    Getting ready to be shopped.

23         Q.    The Strait Zooism one?

24         A.    Yeah.

25         Q.    So then did you take those masters
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 41

```
 1    some -- eventually to Represent Entertainment?

 2         A.    No.   Those masters I have at my house

 3    right now.

 4         Q.    So what turned up to be on Strait Zooism

 5    was a third recording of the songs then?   A

 6    rerecording?

 7         A.    Yeah.   They have masters.   Tom Ryke or

 8    Warlock, I don't know.   They must have it.   Because

 9    they have songs that I don't even have in my stack.

10    I got maybe four reels pertaining to Strait Zooism.

11         Q.    When you say "reels," are they actually

12    tapes or are they CDs or are they digital?  Are they

13    analog?  Do you know?

14         A.    Probably both.   Two-inch reel.   They do

15    anything.

16         Q.    I have never seen one.   Understand where

17    I'm coming from.

18         A.    Yeah.

19         Q.    So let me see if I understand this, and

20    tell me if I'm wrong, you recorded some of the songs

21    first at Sonny's studio, so to speak?

22         A.    I mean, that is where we laid down the

23    idea.

24         Q.    Right.   The second time you recorded them

25    was at Luke Records?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 42

```
 1        A.    Luke Records, correct.
 2        Q.    And then did you record them a third time
 3   for Represent?
 4        A.    Right.  Correct.  Because we had -- Like
 5   when I did it for Luke, we just did the songs.  I
 6   just did them over.  I did what I did at Sonny's
 7   house over.
 8              When I went up and did the deal with
 9   Represent, we did them over because we did clean and
10   dirty for the whole album.  We did a clean album and
11   a whole dirty album.
12        Q.    I think I know what that means, but would
13   you tell me what the difference between clean and
14   dirty is?
15        A.    The dirty was the adult version.  The
16   clean was radio, you know; dirty was street.
17        Q.    Dirty has swear words and what some people
18   might think is profanity on it?
19        A.    Correct.
20        Q.    And the clean version does not?
21        A.    Correct.
22        Q.    That is the difference?
23        A.    Correct.
24        Q.    Is it typical in your field to do a clean
25   version and a dirty version?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

```
 1        A.    I mean, that is something Luke started
 2   himself, a clean and a dirty.  Because, you know, it
 3   gets so popular dirty, you want to take it to the
 4   next level.
 5        Q.    In your industry, what is your
 6   understanding of once you have mastered it and it
 7   has been recorded and ready for distribution, how
 8   does the distribution actually happen, generally?
 9        A.    I don't get it.
10        Q.    Okay.  Well, you are the artist and you
11   perhaps with others create a song.
12        A.    A song.
13        Q.    You write it?
14        A.    Right.
15        Q.    And then you record it?
16        A.    Right.
17        Q.    And it gets mixed and it turns into the
18   masters and then the masters are put together to
19   create an album; right?
20        A.    Right.
21        Q.    How does it get out to the street for
22   people to buy?
23        A.    I mean, that is through your distribution.
24   Whoever distributes for you.  You know, they put it
25   in the stores or one stops, mom and pop, buy
```

Thompkins vs. Lil' Joe Records, Inc.                                          8/28/2003

Page 44

```
 1   directly from them.
 2        Q.    Directly from, say, Represent
 3   Entertainment, you mean?
 4        A.    Warlock.
 5        Q.    Luke Records before that?
 6        A.    Yeah, Luke Records.
 7        Q.    Are you the only vocalist on the Strait
 8   Zooism album?
 9        A.    Huh-huh.
10        Q.    Is that a no?  She can't down "huh-huh."
11        A.    No, I'm not.
12        Q.    Who else are vocalists on that album?
13        A.    Paul Clark.  Steve Watler.  Raymond
14   Mitchell.
15        Q.    Is that true on just some songs here and
16   there?  Or is it all of the songs?
17        A.    Just some songs.  Maybe like four or five
18   out of the 14, 15.  Like, I mean, that is how it
19   always is.  They just do a couple of records with
20   me.
21        Q.    Do they write some of the songs, too, or
22   are you the sole author of the words that are used?
23        A.    It depends.  They write sometimes.  I
24   mean, on that album, for the most part, yeah,
25   everybody wrote their own parts, you know, the songs
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 45

```
 1   that they did, we split.  You know.
 2        Q.   Well, you are familiar with a song that is
 3   involved in this case and perhaps others called
 4   Shake Watcha Mama Gave Ya?
 5        A.   Yes.
 6        Q.   Who wrote that one?
 7        A.   I did.
 8        Q.   Were there other people also?
 9        A.   Devastator came with a beat, an
10   instrumental.
11        Q.   Devastator?
12        A.   Yes.
13        Q.   Who is that?
14        A.   I don't know.  Kenneth somebody.  I don't
15   know his name.
16        Q.   Okay.
17        A.   Devastator.  Kenneth Terry, maybe.
18        Q.   Ken Terry?
19        A.   Yeah.
20        Q.   And his nickname or street name, is that
21   the right phrase?  I don't want to do it --
22        A.   Yeah, nick name, stage name.
23        Q.   That is Devastator?
24        A.   Correct.
25        Q.   He came with the beat?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 46

```
 1        A.    Yes.   Instrumental.   Nothing on it.

 2        Q.    All right.

 3        A.    And I came with the song, the hook, the

 4   verses, everything, the song.

 5        Q.    When you say, "the hook," I want to make

 6   sure --

 7        A.    The chorus, Shake Watcha Mama Gave Ya.

 8        Q.    I thought that is what you meant, but we

 9   don't always speak the same language because I'm not

10   from --

11        A.    Yeah.

12        Q.    Okay.   Thank you.

13        A.    So I wrote that song.

14        Q.    When did you write it?

15        A.    The end of '91.  The end of '91, going

16   into '92.

17        Q.    Where did you get the idea from?

18        A.    Club Rolex.

19        Q.    Say again?

20        A.    Club Rolex.

21        Q.    Club Rolex.

22              Is that a night club?

23        A.    Strip club.

24        Q.    Even better.   With some exceptions.

25        A.    Uh-huh.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 47

1       Q.   Aside from the instrumental, there is, you

2   know, vocals, not just words.  There is a song.

3   There is music to the way you say the words; right?

4       A.   I assume so.

5       Q.   I mean, the way you just did it, you

6   didn't shake.  It is not you didn't say a straight,

7   flat, Shake Watcha Mama Gave Ya in a conversational

8   tone.  You did it with a chant or a song to it?

9       A.   Right.

10       Q.   Do you write down the chant or the song

11   that goes with the words?

12       A.   No.

13       Q.   Is that just something that is in your

14   head?

15       A.   Right.

16       Q.   Do you do it the same way every time?

17       A.   Every time.

18       Q.   Did anybody besides you participate in

19   that particular song in the music part of the

20   singing of the vocals?

21       A.   Devastator, the producer of the track.

22       Q.   In what way did he participate in that

23   part?

24       A.   He actually sang the chorus for me.  He

25   hollered out and then myself and the rest of my home

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 48

1   boys in Poison Clan, we did the chant, "Shake, Shake

2   Watcha Mama Gave Ya, Shake Watcha Mama Gave Ya."  So

3   we used Devastator on the hook.

4        Q.   Okay.  But who created the music part of

5   the words?

6        A.   I told them what to say.  I told what they

7   were going to say.

8        Q.   When you say "Poison Clan and your home

9   boys," how many of them are we talking about?

10        A.   I don't know.  Four.  Five.  It was six of

11   us all together.  But, you know, at any given time,

12   it was, you know, three or four of us.

13        Q.   Now, do you have times when someone else

14   will take -- Like in jazz music, if you go to a jazz

15   club, they will have what is sometimes called a

16   player's turn, sometimes it is called a break, then

17   it is the piano player's turn.

18             Do you do that in your music or is it

19   usually one lead person with everybody else being

20   kind the Pips in the background?

21        A.   No.  I mean, it is not a set formula.  We

22   do what feel good.  It is a vibe, you know.  We

23   actually creating a vibe.  We selling the vibe.  So

24   if somebody else fits in, they get in.  If they

25   don't fit, you back up, watch out.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 49

```
 1        Q.   You just kind of do it on the fly?
 2   Somebody takes their turn, if it feels right?
 3        A.   Yeah.  But, you know, even with that
 4   record, I had the beat.  When I came to the studio
 5   that next day, I had the whole song.  So you
 6   understand?
 7        Q.   Okay.  That is why I'm asking.
 8        A.   It ain't no more extra verses.  I'm going
 9   to take all three of these verses because I know
10   exactly what I want to do, what I want.
11             Yeah, I know what I'm trying to do right
12   here.  You don't know what I'm doing, so you just
13   watch me.
14        Q.   Right.  How do they know when to come in
15   and kind of do the reverb, you might say, or the
16   echo of Shake Watcha Mama Gave Ya hook, for example.
17        A.   That is called a response.  They say,
18   "Shake Watcha Mama Gave Ya."  All you have got to do
19   is say, "Shake Watcha Mama Gave Ya."
20        Q.   You just have to listen and then you know
21   when to come in?
22        A.   Correct.
23        Q.   Did you ever hear of a group called Sticky
24   in the Hoods?
25        A.   Yeah.  Yes.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 50

```
 1        Q.    Did you ever hear of a song that they did
 2   called Mama Gave You All at any time?
 3        A.    I heard about it a year later after mine.
 4   I heard about it from this little chick I know.  We
 5   used to go up to New York all of the time.
 6        Q.    From a what that you know?
 7        A.    Female.  This girl.  A chick.
 8        Q.    I thought you said "slick chick."
 9        A.    No.  This chick.  From this chick.
10             (Thereupon, a discussion was held off the
11             record, after which the following proceedings
12             were held:)
13             THE WITNESS:  She was just telling me,
14             they re trying to be like you.  Woo, woo, woo,
15             woo.  She was just telling me, some people in
16             New York trying to imitate me, mimic my style,
17             my game.
18             MR. LEVITT:  Off the record.
19             (Thereupon, a discussion was held off the
20             record, after which the following proceedings
21             were held:)
22   BY MR. LEVITT:
23        Q.    Back to Sticky in the Hoods, of course.
24        A.    Sticky, yeah.
25        Q.    Had you ever hear their song before you
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 51

1  did Shake Watcha Mama Gave Ya?

2      A.    No.   Never.   No way.

3      Q.    Do you know whether they had done it,

4  whether you heard it or not, before you created your

5  song?

6      A.    I didn't hear that phrase before my song.

7  Do you understand?   I didn't hear no one say that

8  before I said it.

9      Q.    Okay.

10     A.    No one.

11     Q.    Had you ever heard of Sticky in the Hoods

12 at all as a group, as an artist?

13     A.    I didn't hear of Sticky in the Hoods.

14 Usually the group who actually did it, I thought

15 that version was, you know, these New York and

16 Canada DJs, they remix songs all day.   They just

17 make your record over and put it on mixed tapes or

18 what have you.

19         That is what I thought that was -- a

20 popular mixed tape song.   I thought they emulated or

21 mimicked my record, you know?   And it was just pop a

22 long mixed CDs in the club.   I never heard it on the

23 radio.   I never seen any advertisements or

24 promotions for it.   I have never seen this ---

25         But I have always heard that, like, you

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 52

```
 1   know, you listen to the radio on Power 96, you may
 2   hear a mix coming, Shake Watcha Mama Gave Ya, Shake
 3   Watcha Mama Gave Ya, but you know it is not the way
 4   it is here, he didn't call in response to the crowd.
 5   He kept saying, Shake Watcha Mama Gave Ya, Shake
 6   Watcha Mama Gave Ya.
 7           So I didn't know who did that is what I'm
 8   saying.  I didn't never -- I didn't hear the name
 9   Sticky in the Hoods until we was trying to find out
10   about this record now.  About these people sampling
11   my song.  Yeah.
12       Q.  So these people, you mean the Charlie's
13   Angels people and all of that?
14       A.  That is the first time.  That is like, oh,
15   so that is who did it.
16       Q.  Now, the question I have is, had you heard
17   that kind of mix thing where somebody is just
18   saying, as you just did before, you created your
19   song called Shake Watcha Mama Gave Ya?
20       A.  No.
21       Q.  You never heard it on the radio or heard
22   it in a club?
23       A.  No.  Not even in a conversation.
24       Q.  Okay.
25       A.  That was my brain child.
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 53

```
 1        Q.    There are --

 2        A.    I'm just --

 3        Q.    Not to debate copyright law with you, you

 4   know about it, there is sometimes when people

 5   subconsciously may have heard it in the past,

 6   somebody might claim even though you were not trying

 7   to copy it, you may have heard it before; that is

 8   how you got the idea.   I'm asking --

 9             MR. JACKSON:  He's asked and answered that

10         question.

11             MR. LEVITT:   He qualified.   I'm trying to

12         make sure.   It is in both of our interests for

13         that.

14             THE WITNESS:   That was clear, too.

15   BY MR. LEVITT:

16        Q.    Did you hear of a person named Aaron

17   Collins?

18        A.    No.

19        Q.    Or a song that that person may have

20   written that had the title "Shake What Your Momma

21   Gave You" before you wrote your song?

22        A.    Never heard of it.

23        Q.    Even up today when I mention to you?

24        A.    Right.   This is new to me right now.

25        Q.    Have you ever registered a song that you
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

1   wrote for a copyright registration, you, yourself or

2   had someone do it for you?

3       A.   I tried in the beginning.  But, I guess, I

4   didn't do the right, you know, right process.   I

5   didn't go through the right -- So it never came back

6   as registered.  You know, I actually tried to

7   register a whole album, like, when I was on Luke

8   Records, they would register everything.  You know?

9        I would turn in my songs and they would be

10  like, yeah, we got to register your songs or yeah,

11  this is how you get paid.  But, you know, they

12  probably know.

13      Q.   Did you, yourself ever try and register a

14  song or an album or anything?

15      A.   Yes.

16      Q.   How did you go about doing it and

17  approximately when, for the first time?

18      A.   Well, as soon as I got into the business,

19  I was actually trying to take care of some business.

20  But, again, like I said, I must not have filled out

21  the paperwork correctly.  Or I didn't fill out the

22  right paperwork or send it into the right office or

23  what have you.  I was just grabbing for straws, you

24  know.

25      Q.   Do you have copies of the documents that

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 55

```
 1    you sent to whoever you sent them to?
 2         A.    Everything you guys have is all I have.
 3         Q.    We are going to go over that.
 4         A.    I turned in everything to my attorney.
 5         Q.    Which attorney?
 6         A.    Herman Hudson.
 7         Q.    When did you do that?
 8         A.    A year or two ago.
 9         Q.    Can you give me -- I'm not asking you to
10    give me a complete list, unless you can give me a
11    list of categories of things that you gave to
12    Mr. Hudson.  For example, you said one of them would
13    be whatever copyright attempts that you made?
14         A.    Yeah.  Contracts, registration forms,
15    writer clearance forms.
16         Q.    Writer clearance forms?
17         A.    Yeah.  BMI forms.  And old invoices I may
18    have gotten, you know, pertaining to some Poison
19    Clan stuff to go with the contracts.  Just before
20    this whole thing came about.  That is pretty much
21    it, I guess.
22         Q.    Any royalty statements that you may have
23    received?  Did you give those to Mr. Hudson, too?
24    Or did you have at any time?
25         A.    I only got one or two royalty statements
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 56

```
 1   ever since I have been at that label.  At Luke
 2   Records.
 3        Q.   By the way, Poison Clan, was that just you
 4   and Mr. Watler or anybody else?
 5        A.   Me and Watler, the first year.  Then it
 6   was just me after that.  Watler did his whole thing.
 7        Q.   Did he have a nickname, too?
 8        A.   Debonair.
 9        Q.   Right.  You did say that.  Sorry.
10             So after that, even though it was still
11   just you, you still continued on with the name
12   Poison Clan?
13        A.   Correct.
14        Q.   Who came up with that name?
15        A.   Mr. Watler and myself.
16        Q.   Are there documents that -- Well, let me
17   ask you this:  When you started in the music
18   business, you were still a minor under 18 or under
19   21 or whatever?
20        A.   Correct.  Correct.
21        Q.   So you were 16 when you worked on that
22   first album?
23        A.   Right.  Seventeen when it came out.
24        Q.   What was the name of that one?
25        A.   2 Low Life Muthas.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 57

```
 1        Q.    M U T H A S?

 2        A.    Yes.   Correct.

 3        Q.    At that time, then, there were contracts

 4   that still had to be signed by someone for Poison

 5   Clan and for you; right?

 6        A.    Right.

 7        Q.    Who signed them on your behalf?

 8        A.    My mother.

 9        Q.    When was the last time she needed she did

10   or needed to sign a contract on your behalf?

11        A.    Oh, excuse me.  Only that first one.  By

12   the time we renegotiated, like once me and Debonair

13   split up, I was old enough to sign them myself then.

14   You know.  I may have been 18 or 19, maybe.

15        Q.    Okay.  Are there documents that you never

16   had that your mother had because she got them while

17   you were still a minor?

18        A.    Everything she had, she has gotten from

19   me.  They never did a business with my mother.  I

20   only -- The only time my mother came into play was

21   if she needed to sign this document for me.  That

22   was just the one recording agreement.

23        Q.    Let me ask you this:  Documents that you

24   would have in connection with your music business,

25   whatever it was, you were living in Miami at your
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 58

1    mother's house?

2        A.    Right.

3        Q.    And your mother and father and you were

4    living there together?

5        A.    Right.

6        Q.    Was there anybody else?  Do you have

7    siblings, brothers and sisters?

8        A.    I have little twin sisters, and at any

9    given time my older sister or older brother could

10   have been staying there.

11       Q.    Anything that you had that related to the

12   music industry and your participation in it, that

13   would have been where it was at, that house in Miami

14   on 198th Street?

15       A.    Right.

16       Q.    You didn't have an office somewhere where

17   you kept it?

18       A.    No.

19       Q.    Or a warehouse where you kept it or some

20   other place?

21       A.    No.

22       Q.    And when you moved to Georgia?

23       A.    Right.

24       Q.    Did all of the documents stay in Miami?

25   Or did you bring them with you to Georgia?  Or some

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 59

```
 1   of each?
 2        A.    Most of it, you know, I have -- I have a
 3   filing cabinet in Miami as well as up in Georgia.  I
 4   left all of my business in Miami right here except
 5   what I needed to go, what I needed to take with me
 6   to Atlanta.  Meaning, you know, I may have had an
 7   old contract or something that was finished, you
 8   know, and, like, if you want to do a deal with me,
 9   you want to see that this is finished.  You know?
10   And like that.
11             But everything else was -- All of my
12   business was back home.  When my mother sent me
13   those files, she sent me my whole file, everything.
14        Q.    Let me ask you just another question.  I'm
15   going to come back to that.
16             What is your educational level?
17        A.    GED.
18        Q.    GED, high school equivalency?
19        A.    Yes.
20        Q.    When did you get that?  About?
21        A.    Shoot.  About '96.
22        Q.    Had you dropped out of high school?
23        A.    Yes.
24        Q.    And you went back and finished up?
25        A.    No.  I got it incarcerated.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 60

```
 1        Q.    So what were you incarcerated for at that
 2   time?
 3        A.    That pill they gave me, I think, nine
 4   months.  I had to do six months.  So I got a GED
 5   while I was.
 6        Q.    Have you done any other schooling?  That
 7   is, formal schooling as opposed to, after the GED?
 8        A.    No.
 9        Q.    Okay.  Going back to the file cabinet, how
10   many file cabinets did you have in Miami that
11   related to your music?
12        A.    I had a little box, you know, you know, a
13   little file cabinet.  Yeah.
14        Q.    Just one box worth?
15        A.    Right.
16        Q.    And then in Atlanta, how much do you have
17   there?
18        A.    About four.  Four cabinets.  You know.  I
19   mean, it is more -- back then, I didn't do business.
20   i didn't have any business.  I just, whatever paper
21   I got, I filed it accordingly.  And my -- right now,
22   I run a company.  So I got more business.  It is
23   totally different.  It is night and day.
24        Q.    Did you do the filing yourself or did you
25   have your mother do it?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 61

1    A.    No.   I did it on my own.   I still do it
2    there.   I take care of my own business.
3    Q.    Before the documents were sent to
4    Mr. Hudson, were they still in Miami?   Some of them
5    at least?   At 198th Street?
6    A.    Maybe.   I mean, what I didn't bring up,
7    she sent to me.   And that was, you know, over a
8    course of time.   You know, like I would take in my
9    whole file, showing them these three different
10   contracts from Luke Records.
11        The first one was Luke Records and then me
12   and Deb, we split up.   When I assumed the name by
13   myself, where it was just my signature, and then
14   when they was trying to do the next album, which
15   they was unable to pay me for, you know.   I always
16   had those together.   Because that is basically the
17   whole story right there.   If you want to see
18   anything else, you can just give me a call and I can
19   give it to you.
20   Q.    But before you moved to Atlanta or to
21   Georgia, anyway, you had basically one box of
22   documents that related to everything that you did in
23   the music industry?
24   A.    Yeah.   But, see, even in that box, the box
25   is like this, only probably that much paperwork was

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 62

```
 1   business.
 2        Q.    You are talking about maybe two or three
 3   inches worth?
 4        A.    One inch.
 5        Q.    Okay.
 6        A.    And, again, we didn't -- we didn't get a
 7   lot of paperwork back then.  We was asked to do
 8   something and we did it.
 9        Q.    Okay.  I'm just asking you what you have.
10        A.    Right.  I don't know what I have.  I know
11   I got those contracts.  I got a few bogus statements
12   that I never agreed, but nobody would even argue
13   back with me.  Everybody was, you know, kind of
14   trying to blow me off or whatever.
15             I'm glad I'm working.  I got to eat, you
16   dig?  Yeah.  That is how that go.  But ---
17        Q.    Right now I'm just trying to go over
18   documents and where they would be and where they
19   wouldn't be.  That is all.
20             So is there anything before everything was
21   sent to Mr. Hudson, was there anything that was
22   still at the 198th Street address or had everybody
23   already been sent up to Georgia?
24        A.    Everything I felt that was necessary -- I
25   took the important stuff.  The stuff I felt that
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 63

```
 1  didn't matter, that is what I left.  And if out of
 2  the documents I gave Mr. Hudson, if he asked me for
 3  something else, I may ask my mother, you have that
 4  down there, you have that and she would look for --
 5  she would say, "I got this.  Send me that.  Fax me
 6  that."  You know?
 7           But everything that was left was, yeah,
 8  least important.
 9      Q.   Do you know if your mother gave anything
10  that -- or your father, because he's the one that is
11  living at that house?
12      A.   He don't touch nothing.
13      Q.   Even though it is still at the house?
14      A.   He don't touch none of my stuff.  I'm just
15  telling you straight up.
16      Q.   Is there a reason you don't get along?
17      A.   No.  That is my man.  We respect each
18  other.  That is my man, you know.  He wouldn't let
19  you come in and touch none of my stuff.  He would
20  watch, wouldn't let you touch that stuff.
21      Q.   So if is there is something at that
22  address, it is your mother that has control over it,
23  even if she is not --
24      A.   Nothing is there.  When she moved out, all
25  of my stuff went with her to her condo.  The only
```

Thompkins vs. Lil' Joe Records, Inc.                        8/28/2003

Page 64

1    thing at that house I got some old clothes and

2    photos and studio equipment, you know, but besides

3    that.

4        Q.    If she had possession of anything that

5    related to your business, it would have been moved

6    with her to the condo?

7        A.    Correct.

8        Q.    Where is the condo?  Roughly.

9        A.    By the California Club.  Ives Dairy.

10   Boston Market, by there.  Over there.

11       Q.    Do you know if she has any documents that

12   relate to your music business from the time you

13   began the music business up until today at her

14   condo?

15       A.    She don't, no.

16       Q.    Because everything -- Where is it now,

17   whatever she used to have?

18       A.    Yeah.  She gave me everything.  I mean,

19   between the last few strips and since this has been

20   going on, I have taken everything, anything that I

21   saw that said Poison Clan, Luke Records, Rockville

22   Productions, JT Money, anything relating to anything

23   I have and I turned it over already.

24       Q.    I heard you mention one that I did not

25   hear you mention before.  Did you say Rock Reel?

Thompkins vs. Lil' Joe Records, Inc.                                    8/28/2003

Page 65

```
 1          MR. JACKSON:  Rockville.

 2          THE WITNESS:  Rockville.

 3  BY MR. LEVITT:

 4      Q.   What is Rockville?

 5      A.   Luke's booking agency.  That was his

 6  booking firm or what have you.

 7      Q.   So that all was taken by you from your

 8  mother's condo back to you in Georgia?

 9      A.   Right.

10      Q.   Since then, has it all been given to

11  Mr. Hudson?

12      A.   Correct.

13      Q.   Do you have anything left in your home in

14  Atlanta or Georgia?  Or is it all with Mr. Hudson's

15  office now?

16      A.   Like the first batch of stuff I give him,

17  I think he made copies of and gave it back to me.

18  So he had copied.  But the last few items, I just

19  have been giving him.  It is like, you know, do your

20  job.

21      Q.   If I were to stack from the table up,

22  however, all of the documents you have given

23  Mr. Hudson, how high would they go?

24      A.   I don't know.  I guess like -- you know,

25  accordion folders.  You know, them.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 66

```
 1        Q.    The expandable accordion folders?
 2        A.    I gave him one of those full of paperwork.
 3   Full of whatever.   You name it, anything pertains to
 4   anything.
 5        Q.    And just?
 6        A.    Just like that.
 7        Q.    Just one accordian folder full, is about
 8   all?
 9        A.    Just one.
10        Q.    That is all of the documents you have
11   given him?
12        A.    Probably.
13        Q.    But you have four file cabinets or so back
14   home --
15        A.    Yeah.
16        Q.    -- of documents you haven't given him?
17        A.    No.  He got everything pertaining to my
18   music business.   You know, I've got another life
19   outside of music.   Okay?   Just in case.
20              Yeah, I have given him everything
21   pertaining to my music and all of this, what is
22   relevant to all of this right here.   Everything that
23   I have that I know I have, he has everything.
24        Q.    For example, you mentioned that you had
25   some attempts at registering copyrights that for
```

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

1    whatever reason didn't work out and that you gave

2    copies of those to Mr. Hudson.

3            This -- and I will be happy to look at

4    this and mark it as an exhibit.  This is everything

5    that Mr. Hudson gave us.

6            MS. GARGIULO:  This is four copies of --

7    BY MR. LEVITT:

8       Q.   This is four copies of everything he gave

9    us.

10      A.   There is nothing in here that says

11   anything about copyright.  You can look at it but

12   see.  But, you see, you have to remember all of this

13   paperwork is the junk paper I got from Luke Records.

14   These bogus statements.  You all wouldn't have that

15   in there.  I mean, even when you all gave me you all

16   statements I got.  I had paperwork that I didn't

17   even see in there.  I had checks with three names on

18   them instead of one name.  You know?

19           MR. LEVITT:  All right.  Let's do this.

20       Let's mark this as Group Exhibit No. 1.

21           (Thereupon, the referred-to document was

22       marked by the court reporter for Identification

23       as Defendant's Exhibit 1.)

24   BY MR. LEVITT:

25       Q.   Why don't you take a look at Group Exhibit

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 68

1    No. 1?  And the only question I'm asking you right

2    now is, is this a hundred percent of the documents

3    that you gave to Mr. Hudson?

4         A.   I don't know.  I don't know what I have

5    given him, because, in all honestly, man, I don't --

6    being the paperwork, once I do the deal, it is done.

7    I put it away.  You know?

8         Q.   Put it away where?

9         A.   Wherever it go.  In the cabinet.  In the

10   dresser.  In the file cabinet.  What have you.

11        Q.   All right.  The only question I'm asking

12   now is, did you give Mr. Hudson --

13             MR. JACKSON:  I think he's testified that

14        he's given Mr. Hudson everything that he has.

15             THE WITNESS:  Everything I has.

16             MR. LEVITT:  And I'm asking --

17             MR. JACKSON:  Your subpoena asked

18        Mr. Hudson for particular documents.  You

19        didn't go to Atlanta to inspect them and asked

20        him to use his judgment as to what documents

21        you were requesting.

22             He copied those documents and sent them to

23        you.  If you would like to go to Atlanta and

24        look through the documents in Mr. Hudson's

25        office, as you have provided documents here for

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 69

```
 1        us to review, you are happy to do so.

 2              But where you don't go to Atlanta, you ask

 3        opposing counsel to use his judgment as to what

 4        documents you have requested and he produces

 5        them and sends them to you, that is what we

 6        have produced.

 7              You are more than welcome, starting

 8        tomorrow or any day thereafter to go to Atlanta

 9        and look at anything and everything in

10        Mr. Hudson's office and decide which, if any of

11        those, you would like to copy.

12              MR. LEVITT:  Thank you.

13   BY MR. LEVITT:

14        Q.   The question I have for you,

15   Mr. Thompkins, is the document that you have before

16   you as Group Exhibit No. 1 the total of all of the

17   documents you gave Mr. Hudson?  If you know, please

18   tell me.  If you don't --

19        A.   Is this the total?  No, I have given him

20   some statements.  I mean, you know what I mean?

21   Like, the invoices where they charging me back the

22   stuff.  I don't see none of that around here.  I

23   don't see any of that.

24              Yeah.  See, these, yeah, these are

25   basically the agreements.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 70

1      Q.   Right.  So there are other documents that
2   you gave Mr. Hudson besides those that we have in
3   front of us as Group Exhibit 1?
4      A.   Correct.
5      Q.   Can you give me an idea of the volume, how
6   many documents besides those there are?
7      A.   When you say "documents," you mean like --
8      Q.   Pieces of paper.
9      A.   -- contracts?
10     Q.   Anything.  Any piece of paper that has
11  writing on it that is in Mr. Hudson's possession
12  that relates to your music business besides those
13  that we have front of us as Group Exhibit 1?
14     A.   See, I don't know.  If I had had these
15  same four contracts, they would be fatter than this
16  right now because they were so old and worn.
17          See, you all got this neat package.  You
18  know, whatever, man.
19     Q.   I'm just asking you a question.
20     A.   I know you are just asking me a question.
21          I don't know, again, like I said,
22  everything I gave him, you know, my folder was about
23  this big.  But, you know, you squeeze it --
24          MR. JACKSON:  I would like to note for the
25          record he's pointing to four or five inches of

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 71

```
 1        documents --
 2              MR. LEVITT:  That is cool.
 3              MR. JACKSON:  -- that he's given
 4        Mr. Hudson.
 5   BY MR. LEVITT:
 6        Q.   So you think that it would be --
 7        A.   I still maybe --
 8        Q.   -- roughly twice as thick of what we have,
 9   although you are pointing out that this might be a
10   tighter package than the one Mr. Hudson has?
11        A.   Well, yeah, I do believe that.
12             But I'm sure he has this.  You know?
13        Q.   Well, he gave it to us, so I'm sure he has
14   it.
15        A.   Just some invoices where I'm charged back,
16   you know, probably that one -- that one statement
17   that I have gotten over the last 10, 15 years.  You
18   know?  It may have that with some checks stapled to
19   it.
20        Q.   Okay.  Thanks.
21             I'm going to take this back unless you
22   need to look at it for something.
23        A.   No.  This is done.
24        Q.   Okay.  And when we talked about the file
25   cabinets that you have in Atlanta, regardless of
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

1    what you gave to Mr. Hudson, are we talking about

2    standing metal file cabinets?

3         A.    No.   One is like my furniture.   You know,

4    it has just got a desk with two sides.   And I got

5    two of those short file cabinets in the corner, with

6    my fax and everything.

7         Q.    Short file cabinets, three or four feet?

8         A.    Two drawers.

9         Q.    Okay.   Two drawers?

10        A.    One, two, three.   And then I still have a

11   bunch of like, like, a little briefcase.   But it is

12   a file cabinet.   It is like an accordion, but you

13   open it.

14              But, see, all of that stuff, yeah, that is

15   all.   That is where my stuff used to be in the

16   little box in the little briefcase.

17              All of that was given, you know?   All of

18   this other stuff has been since JT Money, since I

19   have been solo, yeah.

20        Q.    Okay.

21        A.    Post Luke Records.

22        Q.    As one example of a document that might be

23   in that folder, regardless of whether I go to

24   Atlanta to look at it or not -- we will talk about

25   that some other time -- would be the attempts to

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

1    register copyrights, your copies of those documents?

2    Mr. Hudson should have those?

3        A.    I don't know if he has those.

4        Q.    I thought you mentioned you thought you

5    did give it to him.

6        A.    No.  I gave him everything I had.

7        Q.    Do you know if you had copies of those?

8        A.    I know I made the attempt, but they never

9    was registered.  So if I have got some paperwork

10   that was incompleted that I didn't do right, I don't

11   know what I did with it.  You know?  I may have

12   thrown it away.  I may have sat it somewhere.  It

13   may be in the file.  I'm not even sure.

14           MR. LEVITT:  Okay.  Do you have an extra

15        copy of this?

16           MS. GARGIULO:  Yes.

17           MR. LEVITT:  Can we mark this as Exhibit

18        2, please?

19           (Thereupon, the referred-to document was

20        marked by the court reporter for Identification

21        as Defendant's Exhibit 2.)

22           MR. LEVITT:  Thank you.

23   BY MR. LEVITT:

24        Q.    There you go, sir.

25           That is the request for production that we

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 74

1    sent to your lawyers in this case.  And if you turn

2    to Page 9, take a look at the first one, which asks

3    for production of documents that show that the

4    plaintiff, that is you, owner holds or has other

5    rights under the Copyright Act regarding the works.

6    I'm not going to read it word for word; you can do

7    that.

8         A.   Uh-huh.

9         Q.   Do you have any documents that are

10   responsive to that request, whether it be Mr. Hudson

11   has them or your lawyers have them or you have them

12   or your mother has them?

13        A.   I mean, that would be in those contracts.

14        Q.   Okay.  I'm asking you if you have it?

15        A.   I gave them everything I have.  Yeah.

16        Q.   So the only things that you can think of

17   that would be responsive to this request would be

18   the contracts we just looked at or Group Exhibit No.

19   1?

20             You are welcome to look at them again, if

21   you need to.

22        A.   No, no, no.  I know what that is.

23             MR. JACKSON:  I would like to make an

24        objection to the form of the question.  My

25        objection is this, you are asking this witness

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 75

1    to interpret, a witness with a GED, to

2    interpret a Request for Production of

3    documents, and I think this is Defendant's

4    Request for Production to Plaintiff.

5         MR. LEVITT:  All right.

6         MR. JACKSON:  And it is an 11, 12, 13 page

7    document dated July the 11th by Maureen Pearcy.

8         MR. LEVITT:  Right.

9         MR. JACKSON:  All documents that are in

10   the -- He's testified that he's given all

11   documents in his possession that relate to Luke

12   Records and all other documents to his counsel,

13   Herman Hudson.

14        Those were made available for inspection

15   and copying.  The defendants declined to come

16   to Atlanta to look at those documents.  They

17   have been available for months.  When I say

18   months, since late last year.  No one has come.

19        You asked Mr. Hudson to produce documents

20   to you which in his view were responsive to

21   this request.  He produced all of the documents

22   that he had, that he felt was responsive to

23   your request.

24        If you want to look at those documents,

25   the onus and burden is on the defendants to

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 76

1    come and inspect documents that are in their

2    possession.

3         Now, if they have deferred to plaintiff's

4    counsel which documents that they felt was

5    responsible, that is their problem.

6         But the documents are available and you

7    are more than welcome at any time, as we have

8    been offering because the defendants have not

9    produced one document to us in this case other

10   than were attached to pleadings and we have

11   been required, including on Tuesday of this

12   week, to come to Miami to look at documents.

13        I looked at some documents and Mr. Walden

14   is coming to next week at plaintiff's cost,

15   flying down here to look at documents and tag

16   and identify which, if any, documents in

17   defendant's possession that we wish to copy,

18   which is our burden under the Federal Rules of

19   Civil Procedure.

20        MR. LEVITT:  Okay.

21        MR. JACKSON:  Okay.  That is my objection.

22   You are asking this witness to interpret a

23   legal document that he has no knowledge of, and

24   what his view is of this legal vernacular in

25   these documents.  That is my objection to the

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 77

1      form of the question.

2           MR. LEVITT:  I do intend -- I'm not going

3      to get into a large discussion on this record.

4      We can, if we need to, about what was requested

5      and what happened.

6           I disagree with your interpretation of

7      what happened.  I mean, we asked, we will say,

8      Mr. Hudson to produce everything that he has.

9      We didn't give him discretion to decide what he

10     thought he would like to give us.

11          We asked for the entire file.  Now, if

12     that is the entire file, so be it.  We can deal

13     with that at another time in an appropriate

14     way.

15          Right now I'm asking if this witness has

16     knowledge about whether there are documents

17     that are responsive to this request.

18          MR. JACKSON:  Why don't you ask him a

19     specific question instead of asking him to

20     interpret a legal document?  This is a witness

21     with a high school equivalency diploma.

22          If you ask him what documents he has given

23     to his counsel, I think he's told you that he's

24     given all documents that he had to Herman

25     Hudson, who is co-counsel in this case.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

```
 1              If you want to ask him specific documents,
 2        if he has knowledge of them, I think those are
 3        appropriate questions.  But I don't think it is
 4        appropriate and objecting to the form asking
 5        him to interpret formal interrogatories or
 6        production of request to --
 7              MR. LEVITT:  I understand your objection.
 8        I don't agree with it.  You are allowed to and
 9        you made the objection.
10              MR. JACKSON:  Okay.
11   BY MR. LEVITT:
12        Q.    So what I'm asking you now, sir, is, do
13   you know of any documents that reflect that you have
14   or that your lawyers have, because you have given it
15   to them or from some other source that reflect your
16   ownership of the copyrights and the works that are
17   at issue in this lawsuit, what you are suing over?
18        A.    The agreements.
19        Q.    Anything else besides that?
20        A.    No.
21        Q.    What about Money Man Music as opposed to
22   you as an individual?  Do you know of any documents
23   that reflect whether Money Man Music owns any of
24   works?
25        A.    Money Man Music had nothing to do -- Money
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 79

1    Man Music came about after all of this.

2         Q.    Did you transfer any of your ownership

3    rights, to the extent that you have them, to Money

4    Man Music when you created Money Man Music?

5         A.    No.   Money Man Music started with JT Money

6    going solo.

7         Q.    Right.

8         A.    Right.

9         Q.    But JT Money is you as a person; right?

10        A.    Correct.

11        Q.    And --

12        A.    All of the old stuff is still registered

13   under Jeffrey Thompkins.   Everything relating to

14   this matter, Jeffrey Thompkins.

15        Q.    So Money Man Music had no interest at all

16   in any of the songs that are at issue in this

17   lawsuit?

18        A.    They will.   Because it is still me.

19        Q.    If you win this lawsuit, which we will be

20   debating --

21        A.    I just haven't transferred them yet.

22   Because it is obvious they are mine, if I wrote them

23   and created them and everything else.   That is the

24   obvious.   Whether 1 have paperwork or not, you know

25   who did that.   True?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 80

```
 1        Q.   Well, I'm not the one being deposed.
 2        A.   I'm just asking you a questions.  True?
 3   Okay.
 4        Q.   My turn to ask questions.  You get to ask
 5   questions when it is your turn.
 6        A.   All right.  You got it.
 7        Q.   Are you the only shareholder in JT Money,
 8   LLC?
 9        A.   Correct.
10        Q.   And the same thing for Money Man Music?
11        A.   Correct.
12        Q.   And the only officer of both of those
13   companies, too?
14        A.   Yeah.  I guess.  Yeah.  I'm the manager.
15        Q.   Is there a president of the company?
16        A.   No.
17        Q.   It is just you?
18        A.   Correct.  I mean, we ain't doing no
19   business yet really.  It just takes care of my
20   paperwork.
21        Q.   Who is Cheetah Records?
22        A.   I don't know.  Tom Ryke, the dude from
23   Represent, used to own Cheetah Records.  But that
24   has nothing to do with me.
25        Q.   Did you ever have any songs of yours that
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

1   were released, mastered, somehow involved with

2   Cheetah Records?

3        A.   No.

4        Q.   I'm going to say this a slightly different

5   way, recognizing the potential objection, okay?

6             As far as you know, Cheetah Records has

7   never had any involvement with any of your songs

8   that you ever wrote or recorded?

9        A.   Never.   Correct.   Never.

10       Q.   Warlock Records, who is that?

11       A.   The distributor for Represent Records.

12       Q.   Have you, that is you or any of the

13  companies that are you that you own, ever had any

14  relationship of any kind with Warlock Records except

15  for the distribution of the Strait Zooism album?

16       A.   That is it.   Through Represent.

17       Q.   Right.

18       A.   Represent was the middle man.   I never

19  dealt with these people.   And before you do that,

20  the companies I have now are all post what we are

21  doing.   So these companies, JT Money, LLC; Money Man

22  Music, they didn't exist when all of this was going

23  on.   It was nobody but Jeffrey Thompkins, artist.

24       Q.   Right.

25       A.   It is like, you know, the Money Man mask

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 82

```
 1    don't tie into this nowhere.
 2         Q.   Okay.  And is that same thing true for
 3    Represent Records?  What you just said about how
 4    nothing ties?
 5         A.   No.  Represent Records was the label that
 6    put out Strait Zooism.
 7         Q.   Okay.  Except for the label putting out
 8    Strait Zooism, has Represent Records ever done any
 9    other work in relation to any work that you, Jeffrey
10    Thompkins --
11         A.   Just that one album.
12         Q.   There is a written contract, is there,
13    between Represent Records and one -- either you or
14    one of your entities?  One of your companies?
15         A.   With myself.
16         Q.   Just yourself?
17         A.   Correct.
18         Q.   So there is no written contract between
19    Represent and Money Man Music, for example?
20         A.   No.
21         Q.   Or between Represent and JT Money, LLC?
22         A.   No.
23         Q.   Do you have a copy, in your files, of the
24    contract between you and Represent Records?
25         A.   I should.  I should.  There should be one
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 83

1    existing.  I haven't seen it in a long time.  I

2    don't know.

3        Q.   Do you know if a copy of that document was

4    given to Mr. Hudson or not?

5        A.   I'm sure he has a copy.

6        Q.   Freeworld Entertainment, that is the

7    entity that released or that was the label for the

8    next two albums?

9        A.   Correct.

10       Q.   That would be Pimpin' On Wax?

11       A.   Blood Sweat and Years.

12       Q.   Who were the distributors for those?

13       A.   Capitol Records.

14       Q.   For both?

15       A.   Yeah.

16       Q.   But Freeworld was the label?

17       A.   Right.

18       Q.   Did you, for Pimpin' On Wax, were those

19   all new songs that were created within a year or so

20   of the time the album came out in '99?

21       A.   Yeah.  Pretty much.  I mean, again, you

22   know, half of the songs, I have songs, like, it is

23   some songs on there, I had in '96 that I didn't --

24            MR. JACKSON:  That he put on Pimpin' On

25       Wax?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

```
 1   BY MR. LEVITT:
 2        Q.   When you say you had them, you mean they
 3   were recorded already in '96?
 4        A.   Right.
 5        Q.   Were they recorded before that, some of
 6   them, '94, '95?
 7        A.   To the different beats and everything.
 8   Yeah, I just changed the production.
 9        Q.   So when you did the Pimpin' On Wax album,
10   did you use any of the masters from the prior
11   recordings to put on to the album?  Or did you
12   rerecord them all anew?
13        A.   That is ask me the question again.
14        Q.   When you did the Pimpin' On Wax album in
15   1990 or so?
16        A.   '99, right.
17        Q.   If I were to buy a copy now and put it on
18   my player and I were to listen to it, would I hear
19   all new recordings that you made around 1999?  Or
20   would I hear something else?
21        A.   You would hear from '96 to '99.
22        Q.   So some of those, the actual recording
23   yourself, that I would hear on the album now, were
24   recordings that were made in '96?
25        A.   No.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 85

```
 1        Q.    That is what I'm asking.
 2        A.    The songs I recorded them to other beats,
 3   other instrumentals and, you know, like, when I have
 4   my deal, they may have liked the song, but, well, we
 5   had a harder beat with that.  We changed the
 6   production.  You know, take it to the -- yeah, so it
 7   went like that.
 8        Q.    So is that true for every song on Pimpin'
 9   On Wax that, each of them is a new recording of a
10   song you had already done?
11        A.    No.
12        Q.    Why am I wrong?  Where am I missing it?
13        A.    Because some of them was new records,
14   period.
15        Q.    Just plain new?
16        A.    Just made them, yeah.
17        Q.    On the ones that weren't -- Is it correct
18   that all of them -- It is a bad question.  Let me
19   try to do it better.
20              Some of the songs were new songs that you
21   just did just for that album; right?
22        A.    Correct.
23        Q.    That you just did fresh?
24        A.    Correct.
25        Q.    And some of them were songs that you
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 86

1    previously had recorded to start with?

2         A.    Well, I mean, all right, it is how you get

3    the deal.  You got to have some music, you got to

4    have the interest.  So I'm always recording.  I

5    always got material.

6              I mean, I could play a CD downstairs for

7    you about 15 tracks on it today, all brand new, you

8    never heard of it, but you may hear the song three

9    years from now and say, I remember that, but the

10   beat was different.  But, you know, I played it for

11   you.

12             So some of them, I let Tony Masala, Dallas

13   Austin here, they liked these songs that I have

14   done.  I previously did.  And we find the best

15   production to make it, you know, commercially

16   satisfactory for the labeling.  You know, for their

17   release.

18             And that is how the deal went.  You know,

19   some songs like Who Dat?, What You Did?  We did them

20   right on the spot.  Other songs, you know, again,

21   just like my round folder, I got a whole book of

22   songs just written, three verses, choruses, but I

23   haven't found beats for them right.

24        Q.    Just words?

25        A.    Yeah, just words.  So I walk into the

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 87

```
 1   studio.  If the beat playing, I like the beat --
 2   yeah.  I want to use this and use this one.  Yeah.
 3       Q.   So the question, though, is, for the
 4   Pimpin' On Wax album, there were some songs that --
 5   were those new songs such as what you just described
 6   and there were some that were the old songs that
 7   you --
 8       A.   But when you say "old songs" --
 9       Q.   Songs that you had already written the
10   words for, in your book.
11       A.   Yeah, I already -- I previously written
12   them, right.  But they were never released, if that
13   is what you are talking about.
14       Q.   I'm not asking about released yet.
15       A.   That is what I --
16       Q.   I'm not mentioning released.
17       A.   Old songs, I think you talking about this.
18       Q.   Let me see if I can say it better, and
19   then we will see if we can get the question
20   answered.
21       A.   No.  I understand.
22       Q.   Okay.  Some of the songs that showed up on
23   Pimpin' On Wax, you had written before?
24       A.   Correct.
25       Q.   And, in fact, some of them you had even
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 88

```
 1   recorded in some form or another before?

 2       A.   Correct.

 3       Q.   When you did Pimpin' On Wax, did you

 4   rerecord, afresh, again, all of those songs that

 5   were the "old ones" that ended up on the album?

 6            MR. JACKSON:  Objection to the form.  It

 7       is asked and answered.

 8            MR. LEVITT:  It hasn't been answered.

 9       That is the question.

10            MR. JACKSON:  I think the answer was that

11       he did.

12            MR. LEVITT:  No, I don't think it was.

13       Maybe I didn't understand it.

14   BY MR. LEVITT:

15       Q.   Do you understand my question?

16       A.   Anything that was old that I rerecorded

17   fresh versus taking that same old recording and

18   putting it on the album.

19       Q.   Yes, that is the question.

20       A.   Nothing old went on that album.  Nothing

21   previously -- Yeah, everything we did right there on

22   the spot.  Yeah.

23       Q.   All right.  Did you do it all in one

24   session or over a couple of days or what?

25       A.   A couple of weeks.  I mean, but see --
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 89

 1    Yeah, when we put the album together, you know, it

 2    was just -- I don't know, man.  I did a lot of songs

 3    to make that album.

 4          Q.    Okay.  When we are talking about that you

 5    rerecorded them, were you using the same song?  The

 6    same words but putting it to a different beat or are

 7    we talking about some other thing that I'm not

 8    understanding?

 9          A.    I may use my lyrics, right?  I may change

10    the chorus.  I may take out my talking and chanting

11    chorus.  I may throw in her harmonizing.  We may

12    change the beat from a slow beat to a more jumpy

13    beat, you know.  So the flow of the record just

14    changed then.

15                That is the only difference.  My songs is

16    my lyrics, right?  My lyrics, and then I concentrate

17    on the lyrics first.  We build around it.  I make

18    the chorus fit, you know, all to the beat.  That is

19    it.

20          Q.    Who is Priority Records?

21          A.    Um, they did -- they handled, I think,

22    marketing and promotion for Capitol Records.  Yeah.

23          Q.    Did you ever have any contract or other

24    relationship yourself or one of your companies with

25    Priority Records?

Thompkins vs. Lil' Joe Records, Inc.                            8/28/2003

Page 90

```
 1         A.    No.  I dealt with Freeworld.
 2         Q.    Okay.  And who is Cyptron, C Y P T R O N?
 3    How do you pronounce it?
 4         A.    Cyptron.
 5         Q.    Who are they?
 6         A.    That is Dallas's company.  Dallas Austin,
 7    the owner of Freeworld.
 8         Q.    Dallas Austin?
 9         A.    Correct.
10         Q.    Do you know what Cyptron has to do with
11    any of your music, if anything?
12         A.    I don't know.  Publishing.  Maybe.
13         Q.    Do you have any contracts with Cyptron?
14         A.    No.  I mean, we probably have a song split
15    in a way, if we produced the record.  I would write
16    the Money Man Music words and Cyptron music, you
17    know?  Do you understand how the split go, words and
18    music?
19         Q.    Right.
20         A.    Right.  I did all of the words; he did the
21    production.  So he gets the music.
22         Q.    When you talk about music, are you talking
23    about beats or something else in relation to your
24    music?
25         A.    No.  The beat.  The instrumental, the
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 91

1   music itself.

2        Q.    Do you ever do the beats yourself?  Maybe

3   nowadays you do it because you are starting to get

4   into it?

5        A.    Yeah.

6        Q.    When did you start doing the beats as

7   well?

8        A.    I have been messing with the drum machine

9   since about '94, '93.

10       Q.    On any of the songs that you have done

11  over time from the beginning of your involvement

12  until now that have been released, are you doing --

13  are you responsible for the music as well as the

14  words?

15       A.    No.  Not really.  I did a commercial skit

16  on the Zooism album.

17       Q.    You did a what?

18       A.    One long verse.  It is like a commercial

19  skit.  But use, really use my beats.  It is just for

20  my entertainment.  I record off real producer's

21  beats.  I'm not a producer myself, I just know how

22  to make records.

23       Q.    Have you ever done any sampling in any of

24  the songs that you do?

25       A.    No.  Not today.  When we started, that is

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 92

1   all there was was sampling.

2        Q.   What is sampling?  Just so we are clear on

3   record.

4        A.   You get a little piece of an old song and

5   to create, you know, the new music.

6        Q.   Does that show up on the recording, the

7   sample?

8        A.   Yeah.

9        Q.   Do you need to get a release or something

10  from that person from whom you are doing the

11  sampling?

12       A.   Yes.

13       Q.   Do you know who is responsible for doing

14  that in your music?

15       A.   Luke Records.  We just turned it in to

16  them.  If they like it, they will clear it.  If they

17  don't like it, they won't take the sample out.  They

18  will say, "J, I need to take this sample out."

19       Q.   Have you made money on the Strait Zooism

20  album?

21       A.   No.

22       Q.   Do you know why not?

23       A.   Because Tom Ryke was brought up on the

24  same tactics as Luke Records and your client.  So

25  they play the game the way they play it.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 93

1        Q.    So is it correct to say, and tell me if it

2    is not, that you have not gotten any revenue at all

3    paid to you or any of your companies as a result of

4    Strait Zooism?

5        A.    Zooism, he probably gave me about 5 or

6    $10,000 at one time.   You know?   Before we went in

7    the studio to rerecord the album we had done.

8    Because, you know, I didn't even take money for that

9    album.   I was looking -- I'm hoping this dude was

10   ready to do some business.

11            Once we dropped the Poison Clan record, we

12   was going to move X amount of units out the gate,

13   right?   It would have been money made.   So I'm,

14   like, don't give me the money, put the money into

15   the project.   Give me this, you know, these little

16   $10,000, we can pay some bills and we can work,

17   whatever.

18            So I wasn't trying to hit them up for a

19   $100,000 budget.   You know, independent.   I'm, like,

20   man, if you are going to do everything I have seen

21   you done prior to these other artists, you know?

22   Getting them out there --

23            See, my whole thing was the marketing and

24   promotion.   You know?   The visibility, the

25   awareness.   And, yeah, we didn't get that.   He made

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 94

```
 1   money before he filed bankruptcy.
 2        Q.    Represent filed bankruptcy, too?
 3        A.    Yeah.
 4        Q.    But the short question is, did you, except
 5   for that initial payment that you mentioned, did you
 6   ever get any revenue from any source of any kind out
 7   of the Strait Zooism album?
 8        A.    No.
 9        Q.    What about Pimpin' On Wax?  Did you ever
10   get any revenue out of that?
11        A.    I mean, yeah.  That was a good album.
12        Q.    Okay.  Who would you have gotten the
13   revenue from, payments from?
14        A.    It could have been anyone.  Freeworld,
15   Priority or Capitol.
16        Q.    Well, tell me what your understanding is,
17   how you get money paid to you out of the Pimpin' On
18   Wax album?  Who pays you and for what?
19        A.    Sales.
20        Q.    Well, the sales are from -- are paid by
21   Capitol?
22        A.    Yeah.
23        Q.    How does that end up back in your pocket,
24   if any?
25        A.    Excuse me?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 95

1        Q.    How does money from the sales go from

2    Capitol?  Do you get checks from Capitol?

3        A.    I have gotten.

4        Q.    I don't mean today.   I mean, have you

5    gotten checks from Capitol because of Pimpin' On

6    Wax?

7        A.    Yes.

8        Q.    Have you gotten checks from Freeworld

9    because of Pimpin' On Wax?

10       A.    Yes.

11       Q.    Have you gotten checks from anybody else

12   because of Pimpin on Wax?

13       A.    Priority Records, yes.

14       Q.    Do you know in all, roughly,

15   approximately, how much revenue, how much payments

16   you have gotten arising out of the Pimpin' On Wax

17   album?

18       A.    I don't know.   I mean, how would I

19   determine that?

20       Q.    Just memory.

21       A.    An advance?

22       Q.    Did you get an advance for Pimpin' On Wax?

23       A.    Um, yeah, I did.  But it was, like, you

24   know, $25,000 or something.  But, see, I had -- See,

25   this whole thing is -- Pimpin' On Wax, I have been

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 96

```
 1   working on that album since '96, '97, right?  I had

 2   just got a deal at the end of '98 for us to do it in

 3   '99.

 4          So about, yeah, 25K.  In advance.

 5      Q.   Right.  And that advance was paid to you

 6   by whom?  Which of those companies?

 7      A.   It came through from Capitol Records.

 8   Tony Mercedes hooked me up with the deal.

 9      Q.   Thomas?

10      A.   Tony Mercedes.  Yeah.

11      Q.   Okay.  Thank you.

12          And did you get a document or contract or

13   something that said your -- or a cover letter or

14   anything that said your $25,000, or whatever the

15   number turned out to be.  You are just giving me an

16   estimate, right?

17      A.   It was about 25K.  All right?  When I

18   signed -- What is that?  Inducement letter.  Yeah.

19   When I did the deal with Tony Mercedes, right?

20   Before Capitol give us -- release the money, I had

21   to sign the inducement, meaning if me and Tony

22   Mercedes felt like we could continue doing business

23   over here.  Once I did that, they cut him a check

24   and then he cut me a check.

25      Q.   Mercedes cut you a check?
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 97

```
 1        A.    Correct.

 2        Q.    Okay.  Do you have a copy somewhere of

 3   that letter that you are just referring to?

 4        A.    Somewhere.

 5        Q.    In your files?  Those files that you have

 6   that you described in Georgia?

 7        A.    Somewhere.  I don't know.  You know.

 8        Q.    If it would be anywhere, that is where it

 9   would be?

10        A.    Oh, yeah.

11        Q.    Did you give a copy of that document to

12   Mr. Hudson?  Or any of your lawyers?

13        A.    He may have -- I mean, Herman got

14   everything.  You know?  Any business I have come

15   across since '99, he should have, because, you know,

16   I have dealt exclusively with him, and that is how

17   we arrived.  And he got everything.

18        Q.    So, at least it is your belief now, and it

19   may turn out to be correct or not, that Mr. Hudson

20   should have a copy of that inducement letter that

21   you mentioned in his files because you gave it to

22   him?

23        A.    Yeah, he should.  Yeah, he should.

24   I guess.

25        Q.    Now, aside from that $25,000 or so that
```

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 98

```
 1   was the -- that you got as you described, have you

 2   gotten any other money from anyone because of

 3   Pimpin' On Wax?

 4        A.   I mean, cats want to license songs, you

 5   know, Who Dat?.  That is Pimpin' On Wax.  But that

 6   was just a single, you know?

 7             Yeah.  I guess we got some mechanicals or

 8   something later on down the line.  But, you know, we

 9   didn't sell that many albums.  You know?  We sold a

10   bunch of singles.

11             See, I got most of my money on the road

12   doing shows.  The record itself, the contract, I

13   didn't generate no money from the CD, the record

14   itself.

15        Q.   Did you do a video, too?  Or just the

16   album?

17        A.   Yeah.  We did a couple of videos.

18        Q.   For Pimpin' On Wax, you mean?

19        A.   Correct.

20        Q.   What about for Strait Zooism?

21        A.   We did one.

22        Q.   Did you get money because of the videos?

23        A.   No.  They don't pay us to do the video.

24        Q.   Okay.  You don't get any money if you do a

25   video?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 99

```
 1        A.   No.  You want your product to move, you
 2   will do a video.
 3        Q.   All right.  So your source of money, of
 4   income from these albums, is from sales of the album
 5   itself and from shows that you do because people
 6   want to hear you do the album?
 7        A.   Right.  Well, it is supposed to be from
 8   sales and mechanicals and what.  But, you know,
 9   through all of the hands, you know, washing and
10   everything, you never get paid from the record.
11   Unless you sell a million records, you probably
12   won't see any money.
13        Q.   How many records of Strait Zooism would
14   you say sold, all together, the best you can
15   remember or guess?
16        A.   I don't know.  30, 40,000 copies.  35,000.
17        Q.   What about Pimpin' On Wax?
18        A.   Oh, shit, Pimpin' On Wax, I think, maybe
19   400,000.  Almost Gold.  400,000.
20        Q.   400,000?
21        A.   Yeah.
22        Q.   So except for that 25,000 you mentioned
23   before, did you ever get any money paid to you
24   because of sales on Pimpin' On Wax?
25        A.   I don't know.  See, at one time I got some
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 100

```
 1   money, you know?  About 10,000 after that or
 2   something.  But I don't know what it was for.  I
 3   just know it was a statement with the whole album.
 4   I got my 10 grand.
 5        Q.   Who did that statement come from?
 6        A.   Priority Records.
 7        Q.   Do you still have that statement?
 8        A.   I don't know.  See, I probably tore the
 9   check off and did other things.  I don't know, man.
10        Q.   I'm just asking.  I'm not criticizing or
11   anything.  I just have to ask.
12        A.   I'm not sure I have the statement.  I'm
13   sure they have it.
14        Q.   If you still have it, would it be in that
15   file in your home in Atlanta?
16        A.   I mean, that is where it should be.
17        Q.   Would that be one of the kinds of
18   documents that you would have given to Mr. Hudson?
19        A.   Um, well, Herman, you know, he was on
20   something, like, when you get those, you need to
21   give them to me.  Because, you know, I have told him
22   of previous statements I have thrown away.  Because
23   if there wasn't no money at the bottom, I'm like ---
24        Q.   So do you know if that was something you
25   would have given to Mr. Hudson when you gave him all
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 101

1   of these documents?

2        A.   I mean, I know I didn't give him that.

3   Because that didn't have anything to do with this.

4        Q.   Okay.  So if it still exists, because you

5   didn't throw it out, if that is one of those you

6   didn't throw, that would be in Atlanta in your home

7   in the files, not with Mr. Hudson?

8        A.   Right.

9        Q.   All together, every dime you have received

10  from the day it was released until today, how much

11  money would you say you have received?  That is,

12  Jeffrey Thompkins, because of Pimpin' On Wax?

13  Including the $25,000 that you mentioned before.

14       A.   Because of Pimpin' On Wax?

15       Q.   Yes.  You did an album.  You did it to

16  make some money.

17            How much money did you get, you yourself?

18       A.   I mean, how would I determine that?

19  25,000?  I mean, I got an advance, about $25,000.

20       Q.   I'm not asking you to be -- Hold on a

21  second.  I'm not asking you to be mathematically

22  precise to the penny.

23            Give me your best estimate as to how much

24  money you have received because of Pimpin' On Wax.

25       A.   That year, I probably made a 100 grand,

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 102

```
 1   100 something thousand.
 2        Q.   Which year, 1999?
 3        A.   Yeah, maybe.
 4             MR. JACKSON:  He's asking you how much
 5        Priority Records paid you, not your touring.
 6             THE WITNESS:  Nothing to do with my shows.
 7   BY MR. LEVITT:
 8        Q.   I'm going to come to that separately.
 9        A.   They probably gave me about 35 grand.
10   Under 50.
11        Q.   Okay.  Was it only Priority who gave you
12   money because of Pimpin' On Wax?
13        A.   Capitol gave me the first advance.
14        Q.   Right.  You said that.
15        A.   So this was before Priority even came into
16   the picture.  Boom.
17        Q.   Right.  I understand that.
18        A.   As we start selling records, I got, like,
19   another 10,000 or something from Priority Records.
20        Q.   Right.
21        A.   Because of sales.  Yeah.
22        Q.   From Pimpin' On Wax?
23        A.   Right.
24        Q.   So that is 35 grand, 25 from Capitol to
25   start and 10,000 from Priority?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 103

1        A.    Right.

2        Q.    Anything else from anybody else?

3        A.    But after that statement, my next

4    statement came as, oh, we overpaid you.   You

5    understand?

6        Q.    Okay.

7        A.    Like, when the next three or four months

8    came by, they sent me another statement.

9        Q.    Priority did?

10        A.    It is like, oh, we overpaid you.   We have

11    some negative balances or something.

12        Q.    Do you still have those documents?   The

13    statements that said they overpaid you?

14        A.    I don't know.   I mean, I can request them.

15    Priority Records, I'm sure they have them.

16        Q.    I'm only asking if you know if you have

17    them.

18        A.    No.   I haven't seen any paperwork as such

19    in awhile, you know?   They still send me statements

20    today.   They still negative today.   Because they

21    overpaid me or what have you.   I don't know.

22        Q.    Do you get statements or money from

23    Freeworld or from Capitol on the album, besides what

24    you have already told us about?

25        A.    No.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 104

1      Q.   So these days, to the extent that you get

2  any statements about Pimpin' On Wax, it comes from

3  Priority?

4      A.   Right.  But I haven't even gotten a

5  statement on that.  I'm getting -- My last statement

6  was for Blood Sweat and Years, and that was in the

7  negative.

8      Q.   Okay.  Blood Sweat and Years, have you

9  made any money on Blood Sweat and Years?

10     A.   The advance.

11     Q.   And how much was the advance for that one?

12     A.   About $200,000.

13     Q.   And who paid that one?  Capitol again?

14     A.   Yes.

15     Q.   And except for that advance, have you

16  gotten any other money from any other source because

17  of Blood Sweat and Years?

18     A.   No.  I mean, besides these movies that

19  want to license songs off that album.  Singles.

20     Q.   Off that album, the Blood Sweat and

21  Years?

22     A.   Hi-Lo.  It was, like, in three movies.

23     Q.   Has anyone wanted to license anything off

24  Pimpin' On Wax?

25     A.   Who Dat?.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 105

1      Q.    That is a new song that you did for the

2   first time fresh for Pimpin' On Wax?

3      A.    Correct.

4      Q.    What about Strait Zooism?  Has anybody

5   wanted to license anything off of that album?

6      A.    Nobody one has really heard that album.

7      Q.    How many copies of Blood Sweat and Years

8   sold?  How many units?  About.

9      A.    About 150.

10      Q.    150,000?

11      A.    Yeah.

12      Q.    Less than Pimpin' On Wax?

13      A.    Correct.

14      Q.    What about the new one, the Return of the

15   B-izer?  Any sales on that one?

16      A.    Under 20.  About 20,000.

17      Q.    You mentioned that you also make money of

18   concerts or shows?  Have I said it wrong?

19      A.    Yeah.  Well, yeah, kind of.  I can make

20   money on shows.  I'm using these shows, like today I

21   use them to market and promote my record.

22          If you have an event, you know, if you

23   take care of my expenses, and I can use the

24   publicity to market and campaign for my product, you

25   know, I show up.

Thompkins vs. Lil' Joe Records, Inc.          8/28/2003

Page 106

```
 1              So it ain't like I'm on tour, you know,

 2     where you are on tour, they are going to pay you X

 3     amount of dollars every night automatically.  That

 4     is a difference.

 5              Yeah, but we make money off of shows,

 6     concerts, whenever they do come.

 7        Q.   For example, you mentioned that in 1999

 8     you made around $100,000.

 9        A.   Right.

10        Q.   Was most of that from shows?

11        A.   Yeah.  For the most part, yeah.

12        Q.   When you, back then, when you would do a

13     show, would you do the songs that were in your

14     current album, which was then Pimpin' On Wax or

15     would you do other songs, too?

16        A.   Yeah.  I did some other songs.  You know,

17     but for the most part, Pimpin' On Wax, because that

18     is what I was promoting.

19        Q.   When you are doing a show, is it just you,

20     along with lots of other performers doing their

21     songs, too?  Or is it just the Jeffrey Thompkins,

22     JT Money show?

23        A.   Well, it depends, you know.  If they just

24     booking JT Money or they are trying to put me on the

25     bill with some other folks.  It varies.
```

Thompkins vs. Lil' Joe Records, Inc.                      8/28/2003

Page 107

1          You know, I do club dates by myself.  But

2     if someone was doing an arena out in the park

3     somewhere, I'm sure there would be other groups.

4          Q.    Do you have a standard rate that you

5     charge for a club date for someone to have you come

6     and perform?

7          A.    No.  Not a standard.

8          Q.    You negotiate it each time, depending upon

9     the deal you are trying to strike?

10         A.    Yeah, pretty much.

11         Q.    How much a year in general would you say

12    that you make on shows?

13         A.    I don't know.

14         Q.    How much did you make last year?

15         A.    Because if I got a hot record, I could do

16    more shows.  If my product isn't out there, the

17    shows are slow.  And then they are for less.  So it

18    varies.  I don't know.

19         Q.    Okay.  Did you do shows between '95 or '96

20    when Strait Zooism came out and '99 when Pimpin' On

21    Wax came out?

22         A.    I do shows every year.  I mean, I do shows

23    whenever they call me.  I go out and try to make

24    sure what is happening.

25         Q.    And generally -- Well, let me ask you

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 108

1   this:  Would you say that the majority of your

2   income is from shows?

3        A.   Yes.

4        Q.   Okay.  And when you did shows before

5   Pimpin' On Wax came out, in '99, what songs did you

6   tend to do typically at those concerts?  Or shows?

7        A.   All of the songs prior.

8        Q.   So Strait Zooism or other ones?

9        A.   Yeah, Strait Zooism.

10        Q.   What about them?

11        A.   Every year there is a new album, which the

12   main songs we focus on is the ones that is on the

13   new album.  But then there is such a thing as

14   classics, the ones that they love and know from, you

15   know, from previous albums.

16             So, you know, you give them a little taste

17   of that, but you still, this is what I want you all

18   to hear tonight.

19        Q.   What songs would you describe as the ones

20   that are your classics?

21        A.   My classics?  Shake Watcha Momma Gave Ya.

22   I Hate Hos.

23        Q.   The second one was I Hate Hos?

24        A.   Yes.

25        Q.   What was the third one?

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 109

```
 1        A.    I think you are trying to steal game now.
 2              They stealing game from me right now?
 3        Q.    Stealing game?
 4              MR. JACKSON:  Just answer their questions.
 5              THE WITNESS:  My classics, Shake Watcha
 6        Mama Gave Ya.  I Hate Hos.  Push your Pad in
 7        the Hole.  Push your Pad in the Hole.  Dance
 8        All Night.
 9              MS. GARGIULO:  What was that one?
10              THE WITNESS:  Dance All Night.  In My
11        Nature.  Action.  Whole Stories, one, two and
12        three.  Well, one and two.  Three isn't
13        recorded.
14  BY MR. LEVITT:
15        Q.    Ho Stories is the name of the song; you
16  have two versions of it, one and two?
17        A.    Yes.
18        Q.    You don't have to give me every single
19  one.
20        A.    I'm giving you the classics.  You see,
21  these songs, right.  You have to come to the JT
22  Money, sorry.
23        Q.    I guess, I do.  I confess.
24        A.    You never heard these songs.  These are
25  songs they sing word for word.  I don't even have to
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 110

```
 1   do it, the beat come out.

 2       Q.    The audience all knows them?

 3       A.    Right.

 4       Q.    Those are those types of songs you

 5   mentioned, are these ones you recorded when you were

 6   still with Luke?

 7       A.    Correct.

 8       Q.    So you go out and you do new stuff, too.

 9   You also do some of the stuff you recorded when you

10   were with Luke?

11       A.    No, I don't none of yours.  I always do

12   Shake.  I always do Who Dat?  And then I do my Nuff

13   Stuff, Shake and Who Dat?  Those were like the

14   biggest records ever.

15       Q.    Did those sell as singles, too?

16       A.    Correct.

17       Q.    Or just as part of the album?

18       A.    Singles.

19       Q.    In addition to the album, you also had

20   singles that were out there in the stores for people

21   to buy?

22       A.    Yes.

23       Q.    How many copies of the single of Shake,

24   Shake Watcha Momma Gave Ya?

25       A.    I don't even know how much any of those
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 111

1  albums sold.  So we are talking about singles.  I
2  never got statements.  When I tell you that, I mean
3  that.  You know.  No sound scan, no nothing.
4      Q.    When did you, except for Shake and Who
5  Dat?, when did you stop doing the old stuff?  I
6  don't how else to call it.  The classics at
7  concerts, at shows?
8      A.    I mean, it only works around here in
9  Florida.  You know, my market is bigger than
10  Florida.  You know, I'm in other states.
11          So a lot of the classics that is here,
12  they didn't hear -- hadn't even heard those records
13  in other markets.  So if I go to Texas and try to do
14  "I Hate Hos," they are going to be, like, what the
15  hell are you doing?  You know.
16      Q.    Maybe they will like it new.
17      A.    May be.  But I'm not promoting that right
18  now, because I have nothing to do with that right
19  now.  I'm selling Return of the B-izer.
20      Q.    And Return of the B-izer is all new stuff.
21      A.    Correct.
22      Q.    I remember you told me you had some
23  stuff --
24      A.    Yeah, it is.
25      Q.    None of it was recorded while you were --

Thompkins vs. Lil' Joe Records, Inc.

8/28/2003

Page 112

```
 1        A.    The record, Shake Watcha Momma Gave Ya, it
 2  is like that particular one is how could you not do
 3  this one?  Versus the other one.  It is, like, you
 4  keep those.
 5        Q.    There are some people, you go to a show or
 6  a concert, you expect to see certain things.  No
 7  matter what else they do, they better do that one?
 8        A.    Yeah, you better do that one, What Dat?
 9  and all that.
10        Q.    Do you file tax returns every year?
11        A.    Yeah.
12        Q.    Do you keep them in your file in Atlanta
13  or in Georgia?
14        A.    Yeah.
15        Q.    Did you give them over to Mr. Hudson?
16        A.    My tax returns?
17        Q.    Yes.
18        MR. JACKSON:  We have objected to
19        producing tax returns --
20        MR. LEVITT:  You have?
21        MR. JACKSON:  -- in this case.
22        Yes.
23        MR. LEVITT:  Did you do it in writing?
24        MR. JACKSON:  To the interrogatories, we
25        should have.  We responded to those.  We are
```

25 S.E. Second Avenue
Miami, FL  33131

Taylor Jonovic White & Gendron
www.myreporters.com

Ph: 305.358.9047
Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 113

```
 1    not producing tax returns.
 2            MR. LEVITT:  Okay.  I just didn't see it.
 3    I see a request for production response.
 4            MR. JACKSON:  I think the burden is on you
 5    to show that there is --
 6            MR. LEVITT:  I'm just asking the question.
 7    We can debate the merits of the objection at
 8    another time.
 9            Okay.  I just wanted to make sure I
10    understood.
11  BY MR. LEVITT:
12       Q.   I want to make sure I understand what you
13  said.  I know you said you didn't get statements.
14            Is it your testimony today that you have
15  never received a royalty statement from the day you
16  began with Luke Records until the day you stopped
17  having a relationship with Luke Records?
18            MR. JACKSON:  That is not his testimony.
19            MR. LEVITT:  Then he will tell me no.
20            MR. JACKSON:  Objection to the form.  It
21    mischaracterizes his prior testimony.
22            THE WITNESS:  No.  The first year, 2 Low
23    Life Muthas, we got a statement the following
24    year.  And by eleven grand, me, Deb and Hobbs
25    had to split.
```

25 S.E. Second Avenue          Taylor Jonovic White & Gendron          Ph: 305.358.9047
Miami, FL  33131                   www.myreporters.com                 Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 114

```
 1              The following year, Poison Mentality, I
 2         didn't get a statement, but that record was
 3         bigger than the first record.  And I was solo
 4         doing that record, but then I'm in the red.
 5         Production didn't step up no more.
 6    BY MR. LEVITT:
 7         Q.    How did you know you were in the red?
 8         A.    That is what they told me.  I wasn't --
 9         Q.    Did they ever send you -- I remember you
10    said you got some documents from Priority that said,
11    we overpaid you, or, you are in the red now, we are
12    not giving you any more money because it is
13    negative.
14              Did you get documents from Luke at any
15    time, even if they weren't giving you cash dollars,
16    that said, "Here is where you are"?
17         A.    Oh, no.  I wish.
18         Q.    Okay.
19         A.    Yeah, I wish.  At least let me know where
20    I stand.  You know?
21         Q.    So except for that royalty or that
22    statement that you said you got that first year on
23    the first album, is it correct, tell me if it is
24    not, that you never got any other statements from
25    Luke Records?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 115

1          A.    Yeah.   The one Joe gave me.   The one with

2    all of that other stuff, you know, with Poison Clan,

3    Professor Griff, Giggy G, all mixed into one.   I'm

4    not worried about nobody else.   I want Poison Clan.

5    I want to know where I stand.   How much do I owe and

6    how much do you all owe me.

7          Q.    And when did you get that document?

8          A.    I'm not sure.   Joe, when he took over,

9    man?   About '93, '94?   When you took over?   '92, you

10   took over.

11         Q.    I'm asking what you best remember.

12         A.    I'm not sure.   '92, I would say.

13         Q.    It was before the bankruptcy of Luke

14   Records?

15         A.    Yes.

16         Q.    Do you still have that piece of paper?

17   That document?

18         A.    No, it is not just one piece.   That is --

19   that is the file I was talking about with all of the

20   bogus papers and everything.

21         Q.    Do you still have it?

22         A.    Somewhere.   I mean, I -- I'm sure I turned

23   it over.   I don't know if that is one of the ones he

24   copied and gave it back to me, or if it is one of

25   the ones he still has.

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 116

```
 1        Q.    Who he?   You mean Hudson?

 2        A.    Herman Hudson.

 3        Q.    But Hudson should have at least a copy of

 4   it, either the original or a photocopy of it?

 5        A.    He should have that statement.  Because it

 6   was only -- I can only remember trying to be

 7   accounted to twice.

 8        Q.    Okay.  Except for those two you have

 9   mentioned so far, you don't remember getting any

10   other statements?

11        A.    No.  No other statements.

12             (Thereupon, a recess was taken, after

13        which the following proceedings were held:)

14   BY MR. LEVITT:

15        Q.    Do you keep records of the shows that you

16   do so that you can go back and say, "I remember I

17   did a show at such and such a place on such a such a

18   date"?

19        A.    Not really.  Once we do the agreement and

20   once the show is over.

21        Q.    I mean, give me an idea of the kind of

22   circumstances that arise that you will end up doing

23   a show?  Someone will call you or you will call

24   them?  What?

25        A.    It depends.  Some of them may be looking
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 117

```
 1    for me.  Because something is hot in the area, they
 2    want to do a show.
 3             Yeah.  They will call and then we will
 4    tell them what it takes, you know?  Or they will
 5    call with an offer.  We have got this on the table,
 6    we want you to show up.
 7        Q.   How many different places -- I'm not going
 8    to ask you to list them right how -- many different
 9    places have you done shows?  Different clubs,
10    different -- Let's start with cities.  How many
11    different cities have you done shows in?
12        A.   All over the country.
13        Q.   Coast to coast?
14        A.   Coast to coast.
15        Q.   From the time you began with Luke, when
16    you did that first album, until today, give me your
17    best estimate of the total number of shows that you
18    have done all together.
19        A.   I couldn't.  I would be lying to you if I
20    told you a number.
21        Q.   More or less than a hundred?
22        A.   Since I have been with Luke Records?
23        Q.   Yes.
24        A.   More than a hundred.  That is all I do is
25    shows.  If it is --
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 118

1    Q.    Okay.

2    A.    That is how I eat.

3    Q.    More or less than a thousand?

4    A.    I mean, you have to break it down per

5  month and how many years.  Let's see.

6    Q.    Well, let me ask you this --

7    A.    Thirteen, 14 years.  Twelve months in the

8  year.  You made -- I don't know.  It depends, see,

9  when you are hot, like, when you are hot, you could

10 do three or four shows a week.  When you are not,

11 you might not done one every six months.

12   Q.    So, let me -- Let's get more recent.  How

13 many shows did you do last month?  Or this month in

14 August?

15   A.    I think I did two shows, one show or

16 something.

17   Q.    Where was that?

18   A.    Quincy, Florida.  And a little small town

19 by Lake City.

20   Q.    In Florida?

21   A.    Correct.

22   Q.    How many would you say you have done this

23 year?  We are now towards the end of August.

24   A.    I don't know.

25   Q.    On average about how many shows a year do

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 119

```
 1   you do?

 2        A.   I have never even tried to average that

 3   out.

 4        Q.   Okay.  When you do a show, is it typically

 5   at a club?

 6        A.   See, I only do shows to pay bills.  If I

 7   had my money sitting back there, I may turn these

 8   shows down.  No, I don't feel like going today.

 9        Q.   What kinds of places do you do shows at --

10   it is a concert halls?  Would it be a club or what?

11        A.   Like hole-in-the-wall clubs.  Clubs in the

12   hood, you know.

13        Q.   Mostly that or --

14        A.   Mostly.

15        Q.   Have you done them in bigger places?

16        A.   Yeah, I have.

17        Q.   Ever been on television performing?

18        A.   Yeah, I have.

19        Q.   When?

20        A.   Last year.  '99.

21        Q.   What shows, television shows have you

22   appeared on?

23        A.   I don't know.  It is a local show right

24   around here in Miami.  Over the -- I forgot the name

25   of it.  I did it and it is done.  When I leave it,
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 120

1    it is left right there.   Yeah.

2         Q.    When you do a show, do you typically have

3    a contract so that they will pay you for the show?

4    Or make sure you will arrive and show up to do the

5    show?

6         A.    Yeah, well, concerts normally do.   Like

7    for television, I never got -- If anything, they

8    make you sign a clearance saying that it is all

9    right for the -- to televise your performance.

10        Q.    If they do that, do you get a copy of the

11   document?

12        A.    If I request it.

13        Q.    Do you typically request it?

14        A.    No.   Because I'm doing it for free anyway.

15   I sign it.   You can go ahead and use it.

16        Q.    What about a show such as a club, such as

17   the kind of places you described?   Those are

18   arranged for in advance.   You don't show up one

19   night and say, "I'm here to perform."

20        A.    Right.

21        Q.    And they go out and promote it to get

22   people to come hear you sing because they want

23   people in the place to buy drinks and so they can

24   make money; right?

25        A.    Right.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 121

1      Q.    So they want to make sure you show up.
2  Not that you wouldn't.  I'm not saying that.  They
3  want to make sure that you do?
4      A.    Right.
5      Q.    Do they typically sign a contract saying
6  that you will show up and they will pay you whatever
7  the arrangement?
8      A.    Yes.
9      Q.    Do you keep copies of those contracts?
10     A.    For a little while.
11           But, again, like I say, once I came to
12  your event and did your show, this means nothing to
13  me any more.  This is just to make sure you hold up
14  your end of the bargain, I hold up my end of the
15  bargain.  Meaning I'm here on time.  Where is my
16  money?  You owe this amount of money.  Let me get
17  that amount of money.  I'm going to perform.
18     Q.    Right.
19     A.    By the time I get home, I'm not going to
20  file this in my cabinet, because it would be too
21  much junk in my file cabinet.
22           I'm not even going to try to save all of
23  the contracts.  When they are over with, they are
24  over with.  I may take the contact information, the
25  name of the person and put that in my Rolodex, my

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 122

1    address book.  But, yeah, that is a done deal.

2         Q.   So do you typically throw away the actual

3    document we were just talking about?

4         A.   That we did?

5         Q.   Right.

6         A.   Yeah.  A lot of times.  I mean, it was no

7    need to save it.  For what?

8         Q.   Do you typically get paid in some

9    particular way?  Cash?  Check?  Something like that?

10        A.   Yes.  Always.

11        Q.   Which one?  Cash or check or either way?

12        A.   Cash.  Cash, cashier's check, money order.

13        Q.   Do you keep track of the amount of money

14   you have been paid by each person?  Or each club?

15        A.   Yeah.  I know what I get.

16        Q.   Do you write it down somewhere?

17        A.   No.  I had the checks or the statements

18   from the bank.

19        Q.   Okay.  You deposit it in the bank?

20        A.   Right.  I mean, Promoters actually deposit

21   it into an account, the deposit.  You know, I may

22   call the bank and it would be, like, okay, yeah, the

23   money in.  Okay, so now I can do a radio drop for

24   you.

25        Q.   They don't actually give you a check for

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 123

1    you to bring home with you from the club, they

2    deposit it into an account that you have told them

3    about?

4        A.    Right.

5        Q.    Do you have an account that you keep --

6        A.    From the club, though, you picking up

7    cash.  Cash only.

8        Q.    Okay.  So all of the shows that you do

9    with maybe the occasional exception, you are paid in

10   cash?

11       A.    Yeah.  I mean, the first half would be,

12   you know, a cashier's check or money order, what

13   have you.  Or even cash.  Depending upon how you do

14   it.  But, yeah, cash.

15       Q.    Okay.  Do you keep track, a record of some

16   type of the cash that you get from these clubs?

17       A.    I don't know.  What do you mean, do I keep

18   a record?

19       Q.    I mean, you do your taxes every year.  I

20   know you have objected to the production of the tax

21   returns, but we will get to that some other time.

22             But you pay taxes every year on your

23   income just like everybody else?

24       A.    Right.

25       Q.    How do you know how much you made so you

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 124

1   can tell your accountant, or if you do it yourself,

2   what number to put down for your income taxes?

3       A.   Well, he has all of the statements, all of

4   the checks, everything I got.

5       Q.   If you get paid cash, do you record in

6   some way so you can tell him, by the way, I got more

7   income besides these statements because I got paid

8   in cash?

9       A.   Do I tell him?  Yeah, he knows about it.

10  But, like, the cash, like when I pick up cash, that

11  usually takes care of my entourage.  The deposit is

12  what -- I don't leave my house without the deposit;

13  right?

14           When we go get the pick up payment, you

15  know?  I got like five other cats on the road with

16  me, you know?  And other expenses.  So, I mean, the

17  cash, it don't be a lot of cash.

18      Q.   Is that the way it has been for the whole

19  time since you have been doing?

20      A.   Yeah.  That is the way I was taught.

21      Q.   That is the way you were taught?

22      A.   Yes.

23      Q.   By?

24      A.   By?

25      Q.   Who taught you that?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 125

```
 1        A.    Luke Records, baby.

 2        Q.    I figured you were going to tell me that,

 3   but I have to ask the question.

 4        A.    That's right.

 5        Q.    All I'm trying to get at is how you get

 6   money.  You said you do it to pay the bills.  I'm

 7   trying to figure out how you get money and how you

 8   keep track of how much money you get for the shows.

 9             Would you explain that to me?  Because I

10   don't think I have gotten it yet.

11             MR. JACKSON:  Objection to the form.  If

12        you have a specific question, he's asked and

13        answered your question.

14   BY MR. LEVITT:

15        Q.    I'm asking him to explain to me how you

16   make money from shows, and how you keep track of it.

17        A.    How do I make money from shows?

18             Showing up and performing.

19        Q.    All right.  I understand that is why they

20   pay you.

21        A.    Okay.

22        Q.    Now I want to know is --

23        A.    How.

24        Q.    -- how you keep track of what they paid

25   you.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 126

 1        A.    I don't.  I keep track of what is due to
 2   me, what you owe me.
 3            Then I will, you know, as long as you give
 4   me what I'm expecting from you, we are okay.
 5        Q.    You have no record, then -- and tell me if
 6   I'm wrong -- that will reflect how much money you
 7   were paid by that club or this club for that show?
 8        A.    The booking agent may have all of that
 9   stuff.  Because, you know, I deal with different
10   agencies.  So that is who calls me.
11            You know, the promoters call the agency
12   wanting to book a show.  They usually call me,
13   "Well, boom, J, we got this on the table."  Or they
14   want to do this.  See, I don't deal with these
15   promoters directly.  I don't see them until I am
16   going for the second half of the pick up payment.
17        Q.    Do you do your own income taxes or do you
18   have someone else?
19        A.    No.  I hae a tax guy that does it.
20        Q.    Who is that?
21        A.    Robert Polay.  Polay Financial.
22        Q.    Can you spell that last name?
23        A.    P O L A Y.
24        Q.    Where is that person located?
25        A.    Atlanta, Georgia.

Thompkins vs. Lil' Joe Records, Inc.                           8/28/2003

Page 127

```
 1        Q.    Do you know the address?

 2        A.    I really don't.

 3        Q.    How long has Mr. Polay been doing your

 4   taxes?

 5        A.    Since Herman been taking care of my legal

 6   affairs.  Almost the same.  About '99, I guess.

 7        Q.    Before that, did you do your own taxes or

 8   did you have someone else do them?

 9        A.    Um, one year, I had this dude.  I forgot

10   his name.  What is this man's name?  Moscowitz did

11   my taxes for me one year.

12        Q.    Moscowitz?

13        A.    Yeah.  Herman Moscowitz.  When I was down

14   here.

15        Q.    Here in Florida?

16        A.    But I have only -- Before '99, before I

17   got up to Atlanta, I have only filed that one year

18   in '92 because that was the only year we made money.

19   These other years, I wasn't making no money.

20        Q.    In '92 you filed a tax return?

21        A.    Yeah.  Poison Mentality.  Yeah.

22        Q.    This is you personally now, Jeffrey

23   Thompkins.  Not some other company.  We are talking

24   about Jeffrey Thompkins filing a tax return?

25        A.    Correct.
```

25 S.E. Second Avenue          Taylor Jonovic White & Gendron          Ph: 305.358.9047
Miami, FL  33131              www.myreporters.com                      Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 128

1       Q.   And you filed one in '92?

2       A.   Correct.

3       Q.   After that, you didn't file them?

4       A.   Um, no.  Not until '99.  Then I filed all

5   of those tax -- When I got to '99, I came back and

6   it said '93, '94, '95, '96.  You know?  And I still

7   owe them people right now today.  So if you all

8   would just go ahead and pay me, I will go ahead and

9   pay them.

10      Q.   You mean the IRS?

11      A.   Correct.

12           I just messed him up.

13      Q.   It is easy enough to do.  I am who I am.

14           In '99, did Mr. Polay prepare your tax

15  returns from '93 up to '99?

16      A.   Yes.

17      Q.   Do you have copies of those in your file?

18      A.   Um, yeah, I should.  I should have them.

19  I don't think I would throw that away.

20      Q.   Do you know if Mr. Hudson has copies of

21  those?

22      A.   No, he wouldn't have a copy of that.

23      Q.   The reason I'm asking that question is,

24  now did Mr. Polay get the numbers for your income

25  that he could use to put down on those tax returns?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 129

```
 1        A.    From documents that I provided him.
 2        Q.    And what documents are we talking about?
 3        A.    I don't know, whatever it was.  Whatever
 4   checks came through.  Yeah, whatever it was.  And I
 5   may have even estimated some figures, I don't know.
 6   Checks and receipts, though, you know?  You have got
 7   a big old file of receipts, some checks and what
 8   have you.
 9        Q.    You mentioned that the reason you didn't
10   file tax returns after '92 up until '99 is because
11   you didn't make any money in those years?
12        A.    Right.
13        Q.    Does that mean you didn't do any shows in
14   those years?
15        A.    I did a few shows.
16        Q.    Well --
17        A.    I mean, but it wasn't like -- I don't
18   know.  I mean, I didn't file because I didn't file.
19   I mean --
20        Q.    I'm not --
21        A.    I filed them in '99.
22        Q.    Did you do shows and have income, say, in
23   '94 and '95 and those years in between?
24        A.    I mean, I'm sure we did some shows.
25        Q.    And when you did those shows, you did the
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 130

1   songs, you performed the songs that were the songs

2   you had recorded, some of them at least, when you

3   were at Luke?

4        A.    Right.

5        Q.    Did you keep track in some way of the

6   amount of money you were getting from the various

7   shows that you were performing in those years?

8        A.    No.  I don't keep track.

9        Q.    And you don't write down somewhere or have

10  any kind of a ledger or anything that writes down

11  and records your income from shows?

12       A.    No.

13       Q.    You mentioned that somebody, that the

14  people who want you to perform in the show have to

15  do a deposit before you even walk out the door to go

16  to the concert, or to the club, the performance;

17  right?

18       A.    Correct.

19       Q.    Do you have an account that people make

20  the deposit into?

21       A.    The agency.

22       Q.    The booking agency?

23       A.    Correct.

24       Q.    Okay.  When the booking agency -- The

25  booking agency pays you; right?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 131

1      A.    Correct.

2      Q.    When the booking agency pays you, do they

3  pay you in cash or with a check or some other way?

4      A.    Check.

5      Q.    Do you have your own account that you

6  deposit the checks into?

7      A.    Right.   JT Money.

8      Q.    JT Money is the name of the account?

9      A.    Right.

10      Q.    Is that the JT Money, LLC?

11      A.    Correct.

12      Q.    What about before the corporation was

13  formed to become JT Money, LLC?

14      A.    It would have been Jeffrey Thompkins.   It

15  would have been straight to my name to me.

16      Q.    Is it a checking account or some other

17  kind of account?

18      A.    Well, I don't have a regular account

19  anymore.

20      Q.    Okay.   When it was Jeffrey Thompkins,

21  before it was JT Money, LLC, and the booking agent

22  was going to send a check?

23      A.    Right.

24      Q.    It would be payable to Jeffrey Thompkins?

25      A.    Correct.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 132

1      Q.    Would you just cash it?  Or did you

2   deposit into a bank account?

3      A.    Either/or.  I mean, some needed to be

4   deposit.  Some could be cashed.

5      Q.    Did you, Jeffrey Thompkins, in that time

6   frame have a checking account?

7      A.    What time frame?

8      Q.    The time frame before JT Money, LLC came

9   into existence.

10      A.    Yes, I did.

11      Q.    Did you have any other kinds of accounts

12   in banks or other institutions besides a checking

13   account?

14      A.    No.  Just that one account.

15      Q.    That was when you were still in Florida;

16   right?

17      A.    Correct.

18      Q.    Did you have it at one particular bank?

19      A.    Great Western back then.

20      Q.    Did that change from Great Western to

21   somebody else?

22      A.    They are Washington Mutual now.  But I

23   don't bank with --

24      Q.    You mean Great Western changed its name to

25   Washington Mutual?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 133

```
 1        A.    Correct.

 2        Q.    And you no longer have an account with

 3   Washington Mutual, is what you are telling me now?

 4        A.    Correct.

 5        Q.    Is that because you moved to Georgia or

 6   some other reason?

 7        A.    Oh, I don't know why.  Partly.  I mean, it

 8   may be.  I mean, Jeffrey Thompkins ain't got no more

 9   money.

10        Q.    It is all where -- in JT Money, LLC?

11              I apologize.  Jeffrey Thompkins doesn't

12   have an account any more in a bank?  That is, you

13   personally?

14        A.    No.  I don't even have a personal account.

15        Q.    The only account you have is from the two

16   companies that you have?

17        A.    Correct.

18        Q.    Where are those accounts?

19        A.    In Georgia.

20        Q.    What bank?

21        A.    Wachovia.

22        Q.    Wachovia?

23        A.    Correct.

24        Q.    The same as the building we are in called

25   Wachovia?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 134

1      A.    Correct.

2      Q.    Are both accounts with Wachovia?

3      A.    Correct.

4      Q.    Any particular branch?

5      A.    Austell.

6      Q.    Austell?

7      A.    A U S T E L L.

8      Q.    Is that the name of the town?

9      A.    Pretty much.

10     Q.    Do you have a banker that you deal with?

11 A personal banker?

12     A.    Not really.  I don't know the dude's name.

13 When I go in the bank, they know me, you know.   I

14 don't know the dude's name, though.

15     Q.    Do you have any other sources of revenue,

16 generally?  Income besides sales of albums --

17 Musically.  I don't care if you have real estate

18 investments.   I'm just talking about music related,

19 besides sales of albums or records and shows and

20 BMI?

21     A.    No, nothing outside of that.

22     Q.    When did you sign on with BMI?

23     A.    My first record.

24     Q.    And you have been with BMI, not ASCAP all

25 of that time?

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 135

```
 1        A.    Yeah.  Only BMI.
 2        Q.    Does BMI send you statements from time to
 3   time?
 4        A.    Yes.  Every quarter.
 5        Q.    Whether everybody else, at least BMI has?
 6        A.    Always, yes.
 7        Q.    And do you keep copies of the BMI
 8   statements you get?
 9        A.    I really don't.  I did.  But it gets,
10   too -- I'm not no pack rack.  I'm not trying to
11   store it.
12        Q.    How far back do you have BMI statements?
13        A.    I'm not sure.  I have to see.  I mean,
14   because I know, like, even right now today, even if
15   they send me a two dollar check, I tear my check out
16   and the paper is gone.  I look at it, see what made
17   the money, what made these two dollars.  And, yeah,
18   that is it.
19        Q.    Okay.  And they send you one every quarter
20   or every month?
21        A.    Every quarter, like three to four months.
22        Q.    On average, generally, how much do you get
23   from BMI a quarter these days?
24        A.    Fifty dollars.
25        Q.    And has that been true for a long time?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 136

```
 1   It has been around $50 a quarter?
 2        A.   Since the beginning.  But, see, when Who
 3   Dat? was out, we made some money.
 4        Q.   On BMI, you mean?
 5        A.   On BMI.
 6        Q.   How much were you getting when Who Dat?
 7   was hot?
 8        A.   I mean, versus under a hundred dollars,
 9   you will get more than a thousand dollars, you know.
10   So it could vary.
11        Q.   Over the time that you have been with BMI,
12   which is from the beginning, what would you say has
13   been the song that you got the most from through
14   BMI?
15        A.   Who Dat?.  That is it.
16             I remember, songs like Dance All Night,
17   Shake Watcha Momma Gave Ya, they appeared on
18   everything everywhere.  And BMI, they are out there
19   looking for their money.  So they report.
20             So, I mean, if I got a hundred dollars a
21   year for a song, that is still working.  You know?
22             What was the question?  The song that made
23   the most money?
24        Q.   Well, the ones that made the most money.
25   You mentioned Who Dat? as one of them, I take it.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 137

1      A.    Who Dat? is the biggest record.

2      Q.    Right.

3      A.    I think Shake was, like, the strongest

4    record for me.

5      Q.    How do you distinguish biggest from

6    strongest?

7      A.    Well, when Shake Watcha Momma Gave Ya came

8    out, I almost worked the next two or three years.

9    You know, just, that song was still jumping.  I

10   didn't have a record out, but that song was still

11   hot.

12          Who Dat? was real big across the world,

13   but then the next year, it is over.  You know?  That

14   was just something we did.

15          But that had the most publicity and

16   everything.

17     Q.    From just the BMI piece, how much income

18   would you say you have made on Shake Watcha Momma

19   Gave Ya?

20     A.    I don't know.

21     Q.    About.

22     A.    Well, I didn't make money off of these

23   records.  See, like, some kind of way, I was really

24   getting the short end of the stick, because even

25   when the record was out and it was hot and it was

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 138

```
 1   playing on radio, my checks would be looking like 20
 2   dollars.
 3       Q.   From BMI you mean?
 4       A.   Meaning they were sending the money
 5   somewhere else.  Somebody else was claiming.  Yeah.
 6       Q.   You are talking about BMI now?
 7       A.   Correct.
 8       Q.   Okay.
 9       A.   I didn't get money from BMI.  I'm saying,
10   my whole existence with BMI has always been $2, $6,
11   $17, $20, you know, little checks.
12            Until Who Dat?, when I did the deal with
13   the major, you know.  Then with these independent
14   guys, they want the money for themselves.  So, you
15   know, they claim everything.  Like they wrote
16   something or produced something when they don't even
17   hang in the studio.  They don't even be in the
18   studio.
19       Q.   And who are you talking about when you say
20   that?
21       A.   Executives.  Independent record executives
22   and counsel and such.  You know, no need to call
23   people.  They know.
24            So Shake Watcha Momma Gave, it didn't pay
25   me.  It allowed me to go get some money, but it
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 139

1   didn't pay me.

2        Q.   Okay.   It made you famous?

3        A.   Thank you.   Thank you.

4             And that is basically all that -- That is

5   what it was.   So, you know, that is the only reason

6   I continued to work, because I was establishing JT

7   Money as an artist, so he can go do what he needs to

8   do.

9        Q.   Now, so we have talked about BMI.   We have

10  talked about shows.   We have talked about whatever

11  you get out of sales of records.

12            Are there any other sources of income that

13  you have musically related besides those three?

14       A.   Sales of records.   Shows.

15            What was the last one?

16       Q.   BMI?

17       A.   BMI.   And that is it, besides somebody,

18  you know, who want to license a record for a movie.

19  The publishing side.

20       Q.   And the only one that you have mentioned

21  that you remember that happening on that you know of

22  that you were involved in it happening was Who Dat?

23       A.   And Hi-Lo.   Who Dat?

24       Q.   That last one was Hi-Lo.

25       A.   Hi-Lo.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 140

1        Q.    That was on which one?

2        A.    Blood Sweat and Years.

3        Q.    Which movie was that in?

4        A.    All About The Benjamins.  The New Guy.

5   And something else.

6        Q.    And they pay you a flat rate on Who Dat?

7   and Hi-Lo or they pay you some sort of percentage or

8   what?

9        A.    I'm not even sure.  Flat rate.  How much

10  the check is?

11       Q.    Yeah.

12       A.    That is what I'm saying.  No.  Those are

13  my words.  How much that check going to be?  Oh,

14  okay.  Let me get that.

15       Q.    That is what I'm asking.

16       A.    I don't think it was a percent.  I think

17  like a single license, a license, just for the -- It

18  is not -- The song not even on a sound track, it is

19  just in the movie.

20       Q.    Let me ask you this, for Who Dat? --

21       A.    Who Dat?.

22       Q.    -- did they contact you to say, "We would

23  like to put this in and license it"?

24       A.    Correct.

25       Q.    Did you have someone negotiate that for

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 141

1    you?

2         A.    Herman Hudson.

3         Q.    Herman Hudson.

4               And was there a contract created between

5    you and whoever was licensing it from you so that

6    they could put it in the movie?

7         A.    Correct.

8         Q.    And do you have a copy of that contract

9    somewhere?

10        A.    Herman Hudson should have it.

11        Q.    That was the question.  Thank you.

12              Do you know how much you ended up getting

13   paid in the end because Who Dat? was in that movie?

14        A.    5,000, 10,000.  I'm not sure.

15        Q.    Somewhere in that range?

16        A.    Yes.

17        Q.    And about what the Hi-Lo?  Because it was

18   in a movie.  Do you know how much that was?

19        A.    About the same.

20        Q.    About the same?

21        A.    Yeah.

22        Q.    We are getting there.  We still have a way

23   to go, but we are getting there.

24              We described how you got connected with

25   Luke Records, which is -- What was the fellow's

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 142

1    name?

2        A.    David Hobbs.

3        Q.    David Hobbs saw you at the club and had

4    you come in and cut an album?

5        A.    Right.

6        Q.    Did you sign a contract, you and your

7    mother sign a contract for that first album?

8        A.    Right.  Yes.

9            MR. LEVITT:  Can I have that, please?

10           MR. JACKSON:  What is this?

11           MR. LEVITT:  This is the 1989 employment

12       agreement.

13           MR. JACKSON:  Is this the agreement that

14       was rejected in bankruptcy?

15           MR. LEVITT:  I'm not characterizing it.

16       It is a document.

17           MR. JACKSON:  I'm asking you, is that one

18       of the executory agreements that were rejected

19       in bankruptcy?

20           MR. LEVITT:  I'm not going to characterize

21       it.  I'm going to ask questions about it.

22           MR. JACKSON:  I just wanted to be clear.

23           MR. LEVITT:  Would you mark this as an

24       exhibit, please?

25

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 143

1            (Thereupon, the referred-to document was

2       marked by the court reporter for Identification

3       as Defendant's Exhibit 3.)

4            MR. LEVITT:  Do you have a copy of --

5            MS. GARGIULO:  I just handed him one.

6   BY MR. LEVITT:

7       Q.   I'm going to show you what we have marked

8   as Exhibit 3.  But I'm going to keep -- I'm going to

9   show you two documents.  One is, and you can compare

10  them, if you want, to make sure I'm telling you the

11  correct thing.

12           One is a photocopy that has been marked as

13  Exhibit 3, and one that at least purports to be the

14  original, and I'm going to keep the original, but I

15  want you to be able to take a look at it.

16           Do you recognize this document?

17      A.   Can I look at it first?

18      Q.   Sure, go ahead.

19      A.   It is our first agreement.

20      Q.   Okay.  So Exhibit 3 is a photocopy of the

21  first -- that recording agreement that you and Luke

22  Records, or it was -- it says Effect Records.  Let

23  me ask you this question.

24           I want to ask your understanding of the

25  various companies that were involved with Luke.  Why

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 144

```
 1   don't you tell me, there is Luke Records; right?
 2        A.   Uh-huh.  Formerly Skyywalker Records,
 3   right.
 4        Q.   I'm asking you.  If you don't know, you
 5   can tell me.  I'm not asking you to be the lawyer.
 6        A.   Skyywalker Records was the beginning.
 7   Luke Skyywalker Records.  Then he had to take the
 8   Luke Skyywalker off.  That was the original
 9   contract.  Then he had to take the Luke Skyywalker
10   off.  I mean, so it just made it Luke Records.
11             Effect Records was his little company on
12   the side.  You know, it was like he put us on there,
13   we were just the test, you know.  But he did all
14   right on Effect.  Then on the next year, I don't
15   know if he let Effect go or what.  Because our next
16   record was Luke Records.
17        Q.   There was another company called PacJam?
18        A.   Luke's publishing company.
19        Q.   Sort of like your Money Man Music?
20        A.   Correct.
21        Q.   Do you know if there was any other
22   companies that Luke had?  We have mentioned Effect,
23   we have mentioned Skyywalker, which turned into Luke
24   Records.  We have mentioned --
25        A.   PacJam.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 145

1        Q.    PacJam.

2              Any others that you know that Luke had

3    that you are aware of?

4        A.    Besides Rockville Productions?

5        Q.    What was Rockville?  How was that

6    different?

7        A.    That was the booking.  That is the

8    management side.

9        Q.    So Luke Records was the production side?

10       A.    Luke Records, the label.

11       Q.    The label.

12             And when we say "label," what does that

13   mean to be a label?  What does that word mean in

14   this context?

15       A.    In this context, I mean, the dude actually

16   put out the record, market it, promote it as a

17   label.

18       Q.    The producer you might say?

19       A.    Executive producer.  Yeah.  Versus the

20   producer, the one in the studio.  Uh-huh.

21       Q.    All right.  So that is what Luke Records

22   was, the executive producer?

23       A.    Correct.

24       Q.    PacJam was the publishing arm?

25       A.    Right.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 146

```
 1        Q.     And Rockville was the booking agent arm?
 2        A.     Right.
 3        Q.     Were there any others?
 4        A.     I mean.
 5        Q.     That you know about?
 6        A.     Not that I know of.
 7        Q.     So this 1989 contract was between you and
 8   Patrick Watler and Skyywalker Records?
 9        A.     Yeah.
10        Q.     And that was the first one that you
11   entered into?  Right?
12        A.     Correct.
13        Q.     I'm going to ask you, I'm going to turn to
14   the last page of the original of Exhibit 3, the last
15   two pages and ask you if you recognize, there is a
16   line that says "Jeffrey J. Thompkins."  What does
17   the "J" stand for?
18        A.     Jermaine.
19        Q.     Thank you.
20               Artist, is that your signature?
21        A.     Yes.
22        Q.     Did you sign that document?
23        A.     Yes.
24        Q.     And did you, and there is a date, that is
25   your date of birth, that is your social security
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 147

1   number?

2        A.    Correct.

3        Q.    That is your handwriting that wrote in the

4   social security number?

5        A.    Yes.  That is my handwriting.

6        Q.    Underneath that, there is a line that

7   says, beneath it says "Brenda Thompkins, guardian."

8             Do you see that?

9        A.    Correct.

10        Q.    Do you recognize the signature that says

11   Brenda Thompkins as being your mother's signature?

12        A.    Yes, I do.

13        Q.    You have seen it before and you know what

14   it looks like?

15        A.    Right.

16        Q.    Your understanding, and tell me if this is

17   not correct, that the reason that she signed it is

18   because you were not yet 18 at the time, so she had

19   to sign?

20        A.    Correct.

21        Q.    When did you turn 18?

22        A.    We can do the math, I suppose.  '90, after

23   '90.  Late '90, September of '90.

24        Q.    Were you still -- .

25        A.    This is '89.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 148

1        Q.    You were still, you were almost 17?

2        A.    Almost.

3        Q.    This was in May, and you turned 17 in

4   September?

5        A.    Right.

6              MR. LEVITT:  Where is the next one?

7   BY MR. LEVITT:

8        Q.    Well, let me ask you this question,

9   without going through all of the stuff that is in

10  the actual piece of paper, but if you need to, go

11  ahead and do so, if you think it is important to

12  answer the question.

13       A.    Uh-huh.

14       Q.    What was your understanding of what the

15  subject matter of the recording agreement that we

16  have just looked at, Exhibit 3, was?

17       A.    My understanding --

18             MR. JACKSON:  I will make an objection to

19        the extent it calls for a legal conclusion.

20             Subject to that, you can answer the

21        question.

22  BY MR. LEVITT:

23       Q.    Go ahead.

24       A.    Okay.  I don't know.  We was going to make

25  these records.  And he was going to give us a

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 149

1   percentage of it, whatever it was, of the sales, you

2   know?  And that is all I understood.  We were going

3   to make these records and we were going to get paid

4   from them.

5        Q.    Before you and your mother signed this

6   document, did you have a lawyer look at it, too?

7        A.    She had a friend who was in the music

8   business look over it and it was, like, she had a

9   friend in the business.  I guess, he looked over the

10  agreement.  He was, like, he's not doing anything

11  right now, you know, and ain't nobody beating your

12  doors down.  You better jump on the deal, if

13  somebody is offering you a deal.

14          So I just wanted to make records, you

15  know.

16       Q.    Did you understand that any songs that you

17  created after you signed this document would subject

18  you to whatever terms that the contract required?

19       A.    I'm sure.  Whatever was in here, that is

20  what it was.

21       Q.    Did you understand how long this contract

22  was supposed to be in effect, binding on you?

23       A.    I thought, like, five years or four albums

24  or something.  Five years.

25       Q.    Okay.  But you knew it was for some time

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 150

1   period, not just that one album that you were doing;

2   correct?

3        A.   Correct.

4        Q.   Did you have an understanding of who owned

5   what in relation to the songs that were created

6   after you signed this contract?

7        A.   My understanding of who owned what?  No, I

8   really didn't.  But I knew who controlled it.

9   Luther Campbell, you know.

10        Q.   When you say "controlled," you mean what?

11        A.   He did whatever he wanted to do with it,

12   you know.  Controlled it.  The income and the outgo

13   of it.

14        Q.   Did you have any experience, except for

15   this lawsuit, obviously, with the subject of

16   copyright law?

17        A.   No.

18        Q.   Do you understand -- and if you don't,

19   tell me -- that there is a difference between the

20   publisher's copyright and the sound recording

21   copyright?  Is that a phrase that has meaning to

22   you?

23        A.   Yeah, well, I understand that a little

24   bit.

25        Q.   Well, tell me what you understand about

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 151

```
 1    it.

 2        A.    As far as --

 3        Q.    The difference between the sound recording

 4    right and the publishing right.

 5        A.    Well, I figure the publishing is the

 6    creative side, you know, I wrote it, I produced the

 7    track.  The sound recording is, you know, you may

 8    cover my song and perform it differently and sell a

 9    million records in Australia or somewhere, you know?

10            The sound recording, I don't know.  I

11    guess that is the actual -- the sound recording, you

12    know.

13        Q.    When it is laid down on a track?

14        A.    Like if you sample it or something, hmm?

15        Q.    When it is laid down on a track, you now

16    have a sound which exists on a certain medium which

17    could be a CD or the reels that you are talking

18    about, the sound itself.

19            Do you understand that that is separate --

20    if you don't, tell me -- that that is a separate

21    right, a separate ownership from the right to the

22    song, the words itself?

23        A.    Yeah.  That is my understanding, though.

24    All right.  This is how I feel.  Your client owns

25    those masters, those tapes.  But he don't own my
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 152

```
 1   songs.   So being that my song is on your tape and

 2   you selling your tape, pay me for my song.   That is

 3   just how I feel.

 4       Q.   You understand those are different rights?

 5       A.   Right.   It is different, and I know one

 6   thing don't have nothing to do with the other.   I do

 7   understand that much.

 8       Q.   Did you understand, then, that when this

 9   contract was signed that at least as of the song --

10   the tapes --

11       A.   The tapes.

12       Q.   -- those would belong to Skyywalker

13   Records, which became Luke Records?   You understood

14   that when you signed it?

15       A.   Well, I mean, my understanding was, I

16   trusted this man to give me what is due to me.   I

17   didn't know a thing about the music industry, the

18   business, nothing.   I just -- They didn't give us no

19   more.   We didn't get no more money.   I just doing

20   this because I wanted to do it.   I'm 16.   I'm going

21   to get famous.   I want to make me a record.

22            So, you know, she want to drag it out.

23   She wanted to go other places.   But I'm, like, you

24   are not going to blow this for me, I need this to

25   happen today.   We are just going to sign it, man.
```

Thompkins vs. Lil' Joe Records, Inc.                      8/28/2003

Page 153

```
 1   If it go wrong, it is my fault.  You know?  And that
 2   is how I did it.
 3           So as far as understanding, I didn't
 4   understand nothing.
 5       Q.   Okay.
 6       A.   Yeah.
 7       Q.   Can I take this back?  I think we are done
 8   with it now.
 9           What is this?
10           (Thereupon, a discussion was held off the
11           record, after which the following proceedings
12           were held:)
13           MR. LEVITT:  Why don't you mark this one
14           as Exhibit 4.
15           (Thereupon, the referred-to document was
16           marked by the court reporter for Identification
17           as Defendant's Exhibit 4.)
18   BY MR. LEVITT:
19       Q.   I'm going to do the same thing again.  I'm
20   going to show you a photocopy, which has been marked
21   as Exhibit 4, and what seems to be if you need to
22   look at it to confirm the original?
23       A.   Which one is the original?
24       Q.   The one not marked as Exhibit 4.  The one
25   on my left, your right is the original.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 154

1          Would you take a look at it?  If you need

2     to, take some time.  Let me know if you recognize

3     what it is.

4          A.    I mean, I really don't, but I see the

5     songs from 2 Low Life Muthas on there.

6          Q.    That is the album?

7          A.    Right.  That is the album, 2 Low Life

8     Muthas.

9          Q.    Let me turn the original over, and you can

10    look at the photocopy, too.  And ask you, there is a

11    line here that has your name typed in, Jeffrey

12    Thompkins.

13          Do you see that?

14          A.    Yes.

15          Q.    And there is something that seems to be at

16    least your signature.

17          Do you recognize that as being your

18    signature?

19          A.    Yes.  That is my signature.

20          Q.    Do you have any reason to believe you are

21    not the one who signed your name in that spot?

22          A.    I really don't.  I'm looking for one,

23    though.  I really don't have -- you know what I

24    mean.  That is it, though.  I don't even remember

25    this paper, though.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 155

```
 1        Q.    Well, at least on the front it says it was
 2   signed in March of 1990.  So, I mean, do you have
 3   reason to think that you would remember all of the
 4   documents you signed 13 years?
 5        A.    We have got very little payrolls.  We have
 6   got assignments like sheets of paper, you know?
 7   Yeah.  And we go through them, like, when we do
 8   these different songs.  We will get to it, I guess.
 9        Q.    We are going to get to it.  We are at the
10   paper stage of this case now, of this deposition
11   now.
12        A.    Yeah.  That is my signature.
13        Q.    Okay.  Thank you.
14             MR. LEVITT:  Let's do this again.  We will
15        have Exhibit 5 now.
16             (Thereupon, the referred-to document was
17        marked by the court reporter for Identification
18        as Defendant's Exhibit 5.)
19   BY MR. LEVITT:
20        Q.    Okay.  Now we are at Exhibit 5, this one
21   at least on top purports to be dated May of 1990.
22   I'm sorry.  Go ahead.  You can keep on looking.
23             I will note, at least on the photocopy,
24   which is different than the original, which has
25   Exhibit N typed on the bottom, which is not on the
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 156

```
 1    original, except for that, do you see any

 2    differences between the two documents?

 3            MR. JACKSON:  Are you asking him if sees

 4        any difference?

 5            MR. LEVITT:  Yes, if he notices.  If you

 6        don't want to go through the whole thing, I'm

 7        just asking if you notice anything.

 8    BY MR. LEVITT:

 9        Q.   Is that a no?

10        A.   No.  No.

11        Q.   Let me turn to the second page of the

12    original document, then, and ask if you see a line

13    that says "Jeffrey Thompkins" with the word "Artist"

14    below it and there is a signature there?

15        A.   Yes, I do.

16        Q.   Is that your signature?

17        A.   Yes, I do.

18        Q.   Did you sign it?

19        A.   Yes.

20        Q.   Thank you.

21            MR. JACKSON:  I would also like to note

22        for the record that that document is not

23        executed by Luther Campbell and/or Luke

24        Records.

25            MR. LEVITT:  Okay.  I guess we are at the
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 157

```
 1        next exhibit number.  This is the copy.
 2             (Thereupon, the referred-to document was
 3        marked by the court reporter for Identification
 4        as Defendant's Exhibit 6.)
 5   BY MR. LEVITT:
 6        Q.   Take a look at what we have marked as
 7   Exhibit 6 and tell me if you recognize the document?
 8        A.   '95, yeah.
 9        Q.   Excuse me?
10        A.   Yes, I do recognize it.
11        Q.   What is it?
12        A.   They was trying to redo my agreement from
13   the original because my agreement was actually up in
14   '94, from '89 to '94.  Well, that is the way I
15   understood it.  And this is '95.  He was getting
16   ready to try to reorganize and resign myself.  But I
17   was being like, I was going to sign it under my
18   production company, which is Rufftown Productions.
19   And, yeah, we was getting ready to do this deal.  I
20   agreed to it, obviously.  But that was it.  I never
21   got a full payment on this deal right here.
22        Q.   Well, let me start with the first thing.
23   Turn to the last page of the original, which is this
24   one.  And there is a signature for Rufftown
25   Productions that has a signature underneath it?
```

Thompkins vs. Lil' Joe Records, Inc.                                    8/28/2003

Page 158

1      A.    Uh-huh.

2      Q.    Is that your signature?

3      A.    Yes, it is.

4      Q.    You signed it?

5      A.    Correct.

6      Q.    And there is another one for Poison Clan

7  that has your name underneath it typed, "Jeffrey

8  Thompkins" and your social security number.

9             Do you see that?

10     A.    Yes.

11     Q.    There is a signature on that line?

12     A.    Yes.

13     Q.    Did you sign it?

14     A.    Yes.

15     Q.    And that is your signature?

16     A.    Yes, it is.

17     Q.    Who is Rufftown Productions?

18     A.    That was my company.  That was me and Mike

19  Fresh, the producer of the Poison Clan, the dude who

20  made all of the tracks for Poison Clan.

21     Q.    What did you call him -- Mike Fresh?

22     A.    Mike McCray.

23     Q.    He went by "Mike Fresh"?  That was his

24  nickname or street name?

25     A.    Right.

Thompkins vs. Lil' Joe Records, Inc.

8/28/2003

Page 159

```
 1        Q.   He did all of the whats for Poison Clan?
 2        A.   The tracks.
 3        Q.   He was the recording artist -- He was not
 4   the recording artist.  He was the engineer who
 5   listened to them?
 6        A.   He was our producer.  He made the beats
 7   and everything.
 8        Q.   I thought you mentioned someone else.  You
 9   said Luke had them already there when you got there.
10        A.   Hobbs was our first album when it was me
11   and Deb.  But when we split, it was me and Mike
12   Fresh, who came in on the second album and he has
13   been there ever since.
14        Q.   Was there any other vocalists besides you
15   on the second album?
16        A.   Bustdown.  He was on the label.  He was on
17   the record.
18        Q.   What is his name?
19        A.   Bustdown.
20        Q.   What is his given name?
21        A.   John Bustdown.
22        Q.   Oh, okay.  How do you spell "Bustdown"?
23        A.   B U S T D O W N.
24        Q.   Thank you.
25        A.   Let me think.  Let me think.  The first
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 160

1    album.    Any other vocalists?

2        Q.    No.    The second album I thought we were

3    talking about.    The second album.

4        A.    Yeah, Bustdown was on the -- My home boy,

5    Madball was on there.

6        Q.    Madball?

7        A.    Madball.

8        Q.    And what is his real name?

9        A.    Steve Watson.    He was a Poison Clan

10    member.

11        Q.    It was you and Patrick Watler, at least at

12    one time, and Steven Watson and who else was in

13    Poison Clan besides that?

14        A.    Originally.

15              Paul Clark and Raymond Mitchell.

16        Q.    On the first contract, the 1989 contract

17    we already looked at, how many albums did you do?

18        A.    How many?    No, that was the first year.

19    The one, Low Life Muthas.

20        Q.    Okay.    Did you do no other albums until

21    1995?

22        A.    No.    We did '92 and we did '93.

23        Q.    In '92, the first 1989 contract was still

24    in effect.    You thought it was in effect until '94?

25        A.    That exhibit you showed me without Luke's

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 161

1    signature, that was taking off Effect Records and

2    putting us on Luke Records.    That was taking Patrick

3    Watler out of Poison Clan and making me Poison Clan,

4    and we were just continuing on from there.

5         Q.    But you understood that the rest of the

6    terms of 1989, whatever they were --

7         A.    That agreement should have eliminated the

8    first one.

9         Q.    Let me --

10        A.    The addendum, I mean.

11        Q.    Let me finish asking the question.    I

12   understand you know where I'm going.

13             MR. JACKSON:    I will object to it.    He's

14        given a responsive answer.    That is his answer

15        to your question.    If you don't like his

16        answer, that is fine.    But I will object to the

17        form of the question.    He gave you the response

18        in response to the question you posed to him.

19        If he misunderstood it, then you need to

20        rephrase.

21             MR. LEVITT:    Well, that is what I'm going

22        to try and do.

23   BY MR. LEVITT:

24        Q.    The 1989 recording agreement, we talked

25   about that already?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 162

1      A.    Right.

2      Q.    You understood that was going to be in

3  effect it until '94 or so?

4      A.    '94, right.

5      Q.    Are you now telling me, or am I

6  misunderstanding, that you thought that the '92

7  document we looked at, another one of the exhibits,

8  took the place of the '89 agreement?

9      A.    Yes.

10     Q.    Even though it is much shorter?

11     A.    It was an addendum to, meaning from my

12  understanding --

13     Q.    Right.

14     A.    -- this agreement is subject -- is now

15  subject to the terms and conditions on this paper

16  right here that I'm adding to it.

17     Q.    Right.

18     A.    Stating Patrick Watler is no longer a

19  member of Poison Clan, and you are all are not on

20  Effect Records no more, you are on Luke Records.

21     Q.    Right.  Except for those changes, did you

22  understand that the rest of the '89 agreement still

23  remained in effect?

24     A.    Everything was the same except they may

25  even raise a point or two.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 163

1      Q.    We will do that.  I want to make sure that
2   we are understanding the same things.
3      A.    Yeah, exactly.
4      Q.    We are at the '89 agreement here, which
5   was Exhibit 3.
6      A.    Uh-huh.
7      Q.    And that is the one we talked about.
8      A.    Right.
9      Q.    Now, then, we have Exhibit 4, which is a
10  1992 document.
11          MR. JACKSON:  Where is Exhibit 5?
12          MR. LEVITT:  I have it in my hand.  I'm
13      going to give it to you next.
14          MR. JACKSON:  This is the publishing
15      agreement.
16          MR. LEVITT:  Okay.
17  BY MR. LEVITT:
18      Q.    Exhibit 5 is the '92 document that you
19  were mentioning, you thought was an addendum to the
20  '89 document?
21      A.    It says right here, addendum to exclusive
22  recording in May of '89.
23      Q.    Right.  Right.  So this made some changes
24  in addition to the '89 document?
25      A.    Correct.

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 164

```
 1        Q.    Except to the extent this changed, you

 2   understood that the '89 document still remained in

 3   effect, subject to whatever changes were made here

 4   in Exhibit 5?

 5        A.    Right.   This is still the agreement.

 6        Q.    Right.   That is all I was trying to get

 7   at.

 8        A.    But you see, it is different now because

 9   now you got 50 percent right here that probably

10   wasn't in here.

11        Q.    Okay.

12        A.    And then, you know, the point may have

13   risen or something, other terms and conditions.

14        Q.    Right.   The only thing I'm asking you,

15   though, I think we understand each other, and if I

16   don't, tell me I'm wrong, that the '89 agreement

17   remained in effect except to the extent it was

18   changed by the '92 agreement?

19        A.    Correct.

20        Q.    Any recordings or songs that you wrote up

21   until at least 1994 were subject to the terms of

22   these two documents put together after 1992; is that

23   right?

24        A.    Right.

25        Q.    So, the question I'm asking you is,
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 165

1    what -- We already know you did the first album, 2

2    Low Life Muthas in '89 or so; right?

3         A.    Right.

4         Q.    It was actually in '89?

5         A.    '89, 90.

6         Q.    What other albums did you do that were

7    subject to the terms of these documents?

8         A.    Poisonous Mentality and Rufftown Behavior.

9         Q.    So that is two other albums?

10        A.    Two other albums.

11        Q.    Was it Poison or Poisonous Mentality?

12        A.    Poisonous Mentality.

13        Q.    When did that one come out?

14        A.    1992.

15        Q.    And when did the third?

16        A.    Rufftown Behavior.

17        Q.    Yes.

18        A.    '93.

19              See, again, this first album did not come

20    out until 1990.  Yeah.  '90.  '89, '90.

21              We did it in '89.

22        Q.    Is Rufftown Behavior the last album that

23    you did that was pursuant to these, this Exhibit 3

24    and Exhibit 5 together?

25        A.    Yes.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 166

1      Q.    What was the next album that you did after

2   Rufftown Behavior?

3      A.    Strait Zooism.

4      Q.    And that was '95 or '96, I think you said

5   before?

6      A.    Right.

7      Q.    Okay.

8            MR. LEVITT:   I'm going to come back to

9      that one.

10           MR. JACKSON:   Okay.

11   BY MR. LEVITT:

12      Q.    I'm going to come back to it right now, in

13   fact.  Let me put these back in order over here.

14   That is Exhibit 5 or 6?

15           Okay.  You mentioned Rufftown Productions

16   was your production company?

17      A.    Correct.

18      Q.    Was that a corporation that you created?

19      A.    Yeah.  Well, getting ready to create or

20   what have you.  Probably held the name or something.

21   Reserved the name.

22      Q.    Do you know what had been done to reserve

23   it?

24      A.    Allen Jacobi, he was handling it for me.

25      Q.    Who was your lawyer?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 167

```
 1        A.    That is who I used to negotiate this deal.
 2   I was not going to talk to them myself again, so I
 3   used Jacobi to speak for me.
 4        MR. JACKSON:  Allen Jacobi was acting as
 5        your lawyer at the same time he was the lawyer
 6        for Luke Records?
 7        THE WITNESS:  Not at the same -- This was
 8        after, after all of the 2 Live Crew controversy
 9        and stuff.  This was '95.
10        MR. JACKSON:  At this time Allen Jacobi
11        was acting, was he --
12        THE WITNESS:  No.  He had his own practice
13        then, I think.
14        MR. JACKSON:  Okay.
15        THE WITNESS:  I don't know.  He wasn't
16        affiliated with Luke, supposedly, to my
17        understanding at the time.
18   BY MR. LEVITT:
19        Q.    How did you get in touch with Allen
20   Jacobi?
21        A.    I don't know.  I probably just called him.
22   I mean, around here, back in those days, there was
23   probably only three lawyers that anybody knew,
24   Berguson, Jacobi and somebody else, Wolf, maybe.
25   You know?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 168

1           Miami didn't have a music industry back

2      then.  You just had these cats who knew what they

3      was doing and keeping the game away from everybody

4      else.

5           Q.   In any event, you hired Allen Jacobi to be

6      your lawyer to negotiate this contract, Exhibit 6,

7      with Luke Records?

8           A.   Correct.

9           Q.   And as we look at the last page of the

10     original -- Maybe the next to the last page -- I'm

11     sorry.  I already asked it, just to make sure in

12     case I didn't, you signed in two places where it

13     appears to be your signature, Jeff Thompkins?

14          A.   Yes.

15          Q.   You usually sign "Jeff" instead of

16     "Jeffrey"?

17          A.   Right.

18          Q.   How come?

19          A.   That is my signature.

20          Q.   Okay.  Who is Kim Jones?

21          A.   I have no idea.  Was she there when she

22     witnesses?  I have no idea.  I don't even ---

23               (Thereupon, a discussion was held off the

24          record, after which the following proceedings

25          were held:)

```
 1   BY MR. LEVITT:
 2        Q.   If we look at the first page of Exhibit 6,
 3   Exhibit 6, I have the copy here, we see some
 4   initials where the word "seven" is changed to
 5   "five."
 6             Do you see that?
 7        A.   Yes.
 8        Q.   Is one of those initials yours?
 9        A.   The one at the top.
10        Q.   JT with two eyeballs?
11        A.   Yes.
12        Q.   Which one is the J, which one is the T?
13        A.   The first one is J and then T.
14        Q.   What are those two dots?
15        A.   Periods.
16        Q.   Do you do some sort of stylized things
17   when you initial?
18        A.   This is how I write my Js and Ts.  I write
19   my "J" like this and "T" like this.
20        Q.   So you did initial that spot where we see
21   it there?
22        A.   Yes.
23        Q.   Thank you.
24             Okay.  Does Rufftown Productions still
25   exist?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 170

```
 1        A.    No, it does not.

 2        Q.    How long was it in existence?

 3        A.    It never came to pass.  I was going to

 4   take care of it once we -- I was -- I just had the

 5   name reserved.  It wasn't a corporation or anything

 6   yet.

 7        Q.    Did you ask Mr. Jacobi to reserve it for

 8   you or did you do that for yourself?

 9        A.    No.  He was setting it up for me.

10        Q.    Do you know with what agencies or how he

11   went about reserving it?

12        A.    I really don't know.

13        Q.    Okay.  But it was -- So at that time, it

14   was really you.  You were Rufftown Productions?

15        A.    Right.

16        Q.    Just like you are JT Money, LLC, and you

17   are Money Man Music, Inc.?

18        A.    Right.

19        Q.    Anybody else involved in Rufftown

20   Productions besides Jeffrey Thompkins?

21        A.    Well, originally, like I says, myself and

22   Mike Fresh, the producer.  Because, you know, I'm

23   words; he's music.

24              THE REPORTER:  I'm sorry?

25              THE WITNESS:  Mike McCray.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 171

```
 1   BY MR. LEVITT:

 2        Q.    The last part --

 3        A.    I'm words, he's music.  That is how, you

 4   know, we came up with that.  This was something we

 5   was planning on doing.  At this point of the game,

 6   we were trying to handle our business now, you know?

 7   Yeah.

 8        Q.    Was Shake Watcha Mama on an album?

 9        A.    Poisonous Mentality.

10        Q.    That was second one?

11        A.    Yes.

12        Q.    That was the one that was subject to the

13   '89/'92 agreement; correct?

14        A.    Yes.  The biggest one we had, too, from

15   Poison Clan.  The one that was still in the red.

16   Forgive me.  Sarcasm.  I'm sorry.

17             MR. LEVITT:  Okay.  Let's mark this as

18        Exhibit 7.

19             (Thereupon, the referred-to document was

20        marked by the court reporter for Identification

21        as Defendant's Exhibit 7.)

22   BY MR. LEVITT:

23        Q.    Let me show you what has been marked as

24   Exhibit 7, and ask you if you recognize it?

25        A.    Okay.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 172

1          MR. JACKSON:  Is this one of the ones that
2     you gave us on Tuesday?
3          MR. LEVITT:  We don't have an original of
4     that.
5          MS. GARGIULO:  It would have been a copy
6     would have been in what we produced, and I
7     think one was attached to your complaint.  But
8     I don't have the original.
9  BY MR. LEVITT:
10         Q.   Let me know when you are done.
11         A.   I didn't sign this.
12         Q.   Okay.  First, do you recognize the
13    document?
14         A.   Yes.  It is another one.
15              Yeah, I think so.  Here I go.  They
16    deleted his name.  I was going to say, why was his
17    name up on here on '95?
18         Q.   Do you know what this document is?  Go
19    ahead and finish, if you want.
20         A.   All right.  This is the addendum to that
21    agreement, right.
22         Q.   This is an addendum to the 1995 recording
23    agreement that we looked at as Exhibit 6?
24         A.   All right.
25         Q.   And it is Rufftown Records, again, which

25 S.E. Second Avenue          Taylor Jonovic White & Gendron          Ph: 305.358.9047
Miami, FL  33131               www.myreporters.com                    Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 173

1    is you and Luke Records again?

2        A.    All right.

3        Q.    Now, turn to the second page of the

4    document.  And do you see as a line, Rufftown

5    Productions, underneath it is a signature that is

6    typed "Jeffrey Thompkins, Poison Clan"?

7              Do you see that?

8        A.    Yes.

9        Q.    Do you see that?

10        A.    Yes, I do.

11        Q.    Did you sign this document?

12        A.    Yes, I did.

13        Q.    Turn to the next page.  There is something

14    called "Addendum to Contract."

15              Do you see that?

16        A.    Okay.  Yes.

17        Q.    And there is a line that says "Jeffrey

18    Thompkins, Rufftown Productions, Poison Clan."

19              Do you see that?

20        A.    Yes.

21        Q.    Did you sign that document and is that

22    your signature?

23        A.    Yes.

24        Q.    We turn to the next page, which is --

25              MS. GARGIULO:  It is stapled to the back

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 174

```
 1        for some reason.
 2   BY MR. LEVITT:
 3        Q.   Do you see that document?
 4        A.   Yes.
 5        Q.   Now, this document doesn't have your
 6   signature on it, even though it has a line for it;
 7   right?
 8        A.   Right.
 9        Q.   Do you know why, if you happen to
10   remember, your signature does not appear on this
11   amendment to the contract?
12        A.   Do I know why?  Let me read it.  I will
13   tell you.  Give me a second.
14        Q.   Sure.
15             MR. JACKSON:  He's asking you, do you know
16        why you didn't sign it?
17   BY MR. LEVITT:
18        Q.   If there is a reason.
19        A.   I don't know why.
20        Q.   Okay.  Is there anything in there that, as
21   you sit here today, that you would think that you
22   wouldn't have wanted to agree to?  As you remember
23   it, from back then.
24        A.   I mean, I mean, right now, today, I mean,
25   I'm picturing back then, me, today, and back then.
```

Thompkins vs. Lil' Joe Records, Inc.                                8/28/2003

Page 175

1      Q.   My question is, can you think of any

2  reason from back then that you remember now?

3      A.   Why I refused to sign this?  Why I

4  wouldn't sign this?

5      Q.   Yes.

6      A.   I mean, no, not really.  But looking at

7  this, you will be solely responsible for

8  obtaining -- I wouldn't know how to obtain a sample

9  clearance.  I'm, like, you can't make me responsible

10 for that.

11     Q.   You had a lawyer named Mr. Jacobi who you

12 understood was experienced in the music business;

13 right?

14     A.   When they start throwing his name on

15 papers, he was not my lawyer.  I said he negotiated

16 this deal for me.  When we got to that last exhibit.

17     Q.   Sure.  I will pull it out.

18     A.   The last contract before the addendum.

19     Q.   This one?

20     A.   Before this addendum, he was paid and on

21 his way.  His business was done.

22     Q.   After Exhibit 6 --

23     A.   After Exhibit 6.

24     Q.   -- was signed, he ceased to be lawyer?

25     A.   Pretty much.  Unless I needed to go back

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 176

1    to him -- unless this got created.  But when this

2    came into play --

3         Q.   Exhibit 7 now?

4         A.   Yes.  I wasn't speaking with Jacobi

5    because the deal was done.

6         Q.   I want to make sure I'm clear.

7              Mr. Jacobi was your lawyer to help

8    negotiate Exhibit 6?

9         A.   Yes.

10        Q.   And you stopped paying him and he was

11   done?

12        A.   He just did a job for hire.

13        Q.   And after that, he was no longer your

14   lawyer?

15        A.   Right.

16        Q.   Then when Exhibit 7 came up --

17        A.   It was no lawyer --

18        Q.   -- even though his name was on here, did

19   you, in fact, go and contact him to help you with

20   it?

21        A.   No.  I sat here and read this.  And

22   because I know I did this agreement.  I knew it was

23   taking their name off.  And, yeah, I knew what was

24   going on by then.  Because we had did all of this

25   because I was just looking at the numbers.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 177

```
 1              MR. LEVITT:  Off the record.
 2          (Thereupon, a discussion was held off the
 3      record, after which the following proceedings
 4      were held:)
 5          (Thereupon, a lunch recess was taken,
 6      after which the following proceedings were
 7      held:)
 8          (Thereupon, the requested portion was read
 9      back by the reporter as above recorded.)
10  BY MR. LEVITT:
11      Q.   Having said that, what you just heard read
12  back to you, it is correct, isn't it, that
13  Mr. Jacobi was not your lawyer with respect to
14  Exhibit 7?
15      A.   Correct.
16      Q.   Thank you.
17          Let me ask you a question on a slightly
18  different topic, then we will come back to
19  documents.
20          You get copies of your albums once they
21  are ready for distribution?
22      A.   Yes.
23      Q.   And the singles, too?
24      A.   Yes.
25      Q.   Do you read them to make sure everything
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 178

```
 1   is right?
 2        A.    All of the words?
 3        Q.    Like the cover.
 4        A.    Yeah, I do.  Proofread, yes.
 5        Q.    Do you have a cover for each album?
 6        A.    Correct.
 7        Q.    When these were coming out in like '92,
 8   were we in the CD world yet?
 9        A.    Yes, we were.
10        Q.    Living in the -- in the wax --
11        A.    In the beginning, it was mostly wax and
12   cassette, on our first album.  And CDs was just
13   getting popular.
14        Q.    I'm sorry.
15        A.    As far as the rap game, yeah.
16        Q.    So they would have a cover for it, whether
17   it was wax or whether it was a cassette or whether
18   it was a CD; right?
19        A.    Correct.
20        Q.    And it would give credits to who was
21   performing and doing different things?
22        A.    Correct.
23        Q.    Did you ever look through those to make
24   sure everything was right?
25        A.    Yes.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 179

```
 1        Q.   You wanted to make sure if somebody was
 2   supposed to get credit, they got it on the album
 3   before it went out?
 4        A.   Yes.
 5        Q.   Did you ever check -- Usually an album has
 6   a copyright section on the cover somewhere.
 7            MR. JACKSON:  He's asking you if you
 8        looked at the liner notes --
 9            MR. LEVITT:  Or whatever.
10            MR. JACKSON:  -- of the CD or LP to
11        determine whether or not proper credit or
12        copyright designations were made therein.
13            MR. LEVITT:  I will take that question.
14        That wasn't quite what I was asking.  But, yes.
15            THE WITNESS:  Yes, all songs written by
16        whoever did it, myself, whoever did the beat,
17        as far as anything saying who owned the
18        copyright, the copyright was always Luke
19        Records.  Or PacJam Publishing or whatever,
20        what have you.
21   BY MR. LEVITT:
22        Q.   It never had your name on it?
23        A.   As far as copyright?
24        Q.   Right.
25        A.   Right.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 180

1      Q.    And you knew that before the albums were

2  distributed out into the public, the liner notes

3  didn't show you as the copyright holder?

4      A.    That I knew that?  Yeah.  I guess,

5  basically.  I seen it.

6      Q.    And was that true for all of the albums

7  that were done during the time that you were with

8  Luke?

9      A.    Basically.

10     Q.    Would Luke show up, sir, for both the

11  publishing copyright, which have may be a C, and for

12  the sound recording copyright, if you remember?

13     A.    I don't get what you are saying.

14     Q.    Well, we talked before about there are two

15  different copyrights, at least one for the

16  publishing and one for the sound recording.

17     A.    Right.

18     Q.    And would they both be listed on the album

19  liner notes, album cover somewhere?

20     A.    I don't know.  I just know it would be

21  like, something, copyright, 1999, copyright, you

22  know, whatever that said.  It never said "Jeffrey

23  Thompkins" or "JT Money."  It never said that.

24          But in my reading, I'm looking for this

25  song written by Jeffrey "JT Money" Thompkins.  This

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 181

1   song written by me.

2          As far as when it came back to the

3   copyright, again, we didn't know nothing about that.

4   I just know that I wrote that song and it is going

5   to say that I wrote that song.  Yeah.

6          Q.    We also talked about the sources of

7   income.  We talked about BMI and shows and sales of

8   records and licensing.  And we talked about the

9   things that the songs have been licensed to before.

10         Has it been licensed to anything other

11  than the movies you talked about?  Any of your work?

12         A.    Huh-huh.  All I know is Who Dat?, Hi-Lo,

13  Shake Watcha Momma Gave Ya.  These basically are the

14  only songs that being worked outside of any project

15  that I have.

16         Q.    Was there anything about licensing or

17  showing up licensed or not for a video game?

18         A.    Shake Watcha Momma Gave Ya.

19         Q.    Where did that show up?

20         A.    Excess Game and Extreme -- it is In

21  Excess, one of those skiing extreme games.  And,

22  yeah, I was playing the game one day.  I don't even

23  remember the game.  I think it was In Excess video

24  game.  And I heard the dude skiing down the slope

25  with Shake Watcha Momma Gave Ya.  But it sounded

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 182

```
 1   like the Fat Boy Slim version.  It was rock and
 2   roll, but then it was my hook.
 3        Q.   You mean somebody else had recorded --
 4        A.   Yeah.
 5        Q.   -- your song?
 6        A.   Correct.
 7        Q.   And used it on this video game?
 8        A.   Correct.
 9        Q.   Was this is a game that you find in an
10   arcade or home video?
11        A.   Home video.
12        Q.   Did you do anything about it once you
13   found out?
14        A.   Herman Hudson checked into it.  The
15   people, some Canadian company, they gave somebody
16   $1,500, and that was it.  And somebody licensed it
17   to them.  That is what they told us.
18        Q.   Did you ever find out who it was, who
19   licensed it to you?
20        A.   I'm sure you can get them from Herman
21   Hudson.
22        Q.   I'm just asking if you know.
23        A.   I don't know.  He know.  I hear it and
24   that is, like, what are we going to do about it.
25   Okay.  Is it worth it?  Okay, well.
```

Thompkins vs. Lil' Joe Records, Inc.                  8/28/2003

Page 183

```
 1        Q.   Did anything else ever come to you from
 2   that point when you heard some Canadian license got
 3   a license from some person Mr. Hudson might know?
 4        A.   No, nothing came out of that.  I mean, I'm
 5   giving you what I got.  You know?  I'm telling you
 6   what I know.
 7        Q.   That is all I'm asking is what you know.
 8             So as far as you know, you have never
 9   gotten any income because of that situation with the
10   video?
11        A.   Oh, no.
12        Q.   Back to documents.
13             Now, before we go back to documents, did
14   you mention Fat Boy Slim had done that?
15        A.   No.  I said it sounded like that version
16   or it could have been that version.
17        Q.   Did Fat Boy Slim do a version of Shake
18   Watcha Momma Gave Ya?
19        A.   That is what the whole Charlie's Angels
20   things is about.
21             MR. JACKSON:  Fat Boy Slim is the artist
22        who covered Shake Watcha Momma Gave Ya on
23        Charlie's Angels.
24             MR. LEVITT:  Thank you.
25
```

Thompkins vs. Lil' Joe Records, Inc.    8/28/2003

Page 184

1    BY MR. LEVITT:

2         Q.    Has anybody contacted Fat Boy Slim on your

3    behalf -- obviously we know there is a lawsuit

4    pending -- but have you guys, on behalf of you, ever

5    done anything regarding Fat Boy Slim or your song,

6    independent of what lawsuit that Lil' Joe Records

7    has filed?

8         A.    Yeah, we called them.

9         Q.    Did anything happen?

10        A.    It is on hold until we straighten out this

11   business here.

12        Q.    Okay.

13             MR. JACKSON:  Don't discuss any

14        conversations you have had with counsel about

15        that.

16   BY MR. LEVITT:

17        Q.    I don't want your conversations with your

18   lawyer.  I'm asking if there are conversations with

19   other people.

20        A.    It is just on hold until we finish this

21   pretty much.

22        Q.    Okay.  Now --

23             MR. LEVITT:  Let's mark this.

24

25

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 185

```
 1              (Thereupon, the referred-to document was
 2       marked by the court reporter for Identification
 3       as Defendant's Exhibit 8.)
 4  BY MR. LEVITT:
 5       Q.    Please take a look at Exhibit 8, and,
 6  again, we have marked a photocopy and we have an
 7  original.
 8              Let me know when you have had a chance to
 9  look at it, if you recognize it?
10       A.    Yes, I recognize this.
11       Q.    What is it?
12       A.    The agreement I was supposed to do with
13  Mark Ross for Lil' Joe, a side man deal for the
14  album.
15       Q.    Mark Ross goes by the nickname "Brother
16  Marquez"?
17       A.    Correct.
18       Q.    Did you ever do that album?
19       A.    I did a song or two.  And then Mark never
20  finished his record.  He, I guess, he and Joe didn't
21  come to terms or they split up or what have you.
22       Q.    Okay.  There is a line, here is looking at
23  the original.  There is a line on the first page of
24  this, Exhibit 8, that purports -- has "Jeffrey
25  Thompkins" underneath it typed and there is a
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 186

1   signature above it.

2            Is that your signature?

3   A.    Yes, it is.

4   Q.    Did you sign this document?

5   A.    Yes, I did.

6            MR. JACKSON:  What exhibit was that?

7            MR. LEVITT:  Eight.

8            MR. JACKSON:  It was Brother Marquez.

9            MR. LEVITT:  That is what he said.

10           MR. JACKSON:  That was the performing name

11   of Mark Ross.

12           THE WITNESS:  Correct.

13           (Thereupon, a discussion was held off the

14   record, after which the following proceedings

15   were held:)

16           MR. LEVITT:  9, I guess.

17           (Thereupon, the referred-to document was

18   marked by the court reporter for Identification

19   as Defendant's Exhibit 9.)

20           MR. LEVITT:  Okay.  Do you want this copy?

21           MR. JACKSON:  No, thank you.

22   BY MR. LEVITT:

23   Q.    I'm going to do the same thing here, we

24   have Exhibit 9.  We have a copy and an original.

25   Let me ask you if you recognize the document?

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 187

1        A.    I don't know.  All right.  We got forms

2    like these without all of this on it.  It wasn't

3    written in, it wasn't filled out.  We were asked to

4    just sign some of these songs so they can go ahead

5    and register our works, our copyrights.

6        Q.    When you say "we," by the way, who do you

7    mean?

8        A.    The different artists on the label.

9    Anybody that was writing.  Because they was turning

10   in all of the copyright, all of the force.  They

11   would have little chicks in the office say, "You all

12   need to sign these papers."

13             Yeah, we just did it.  Like this, I really

14   don't remember doing all of it.  I know you asked me

15   about the initial.  I'm going to say, yes, that is

16   my initial.  Even my tug or on the back I'm going to

17   say, yes, it is my signature.

18             But I still don't recall each song.  We

19   did a thing like that.  I remember doing some

20   papers, initialling them and signing them so they

21   could go ahead and register our works.

22             Have I answered your question?

23       Q.    Yes.  But let me break it down into

24   smaller pieces, if that is okay.

25             First, looking at the original, on the

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 188

1   last page, do you see where it says "d/b/a," and

2   somebody has written in "JT Money" and it is in ink

3   as opposed to a photocopy?  That is your handwriting

4   or printing, "JT Money"?

5        A.   No, it is not.

6        Q.   Do you know whose it is?

7        A.   I really do not know.

8        Q.   The next column, the line says "writer"

9   and a signature there.  Do you see that?

10       A.   Right.

11       Q.   Is that your signature?

12       A.   Yes, it is.

13       Q.   Did you sign it?

14       A.   Yes, I did.

15       Q.   And the address and social security number

16  and date of birth below it are all; correct?

17       A.   Except the date of birth.  It should be

18  '72, instead of '92.

19       Q.   Since it was signed in '92, I don't think

20  you were negative years old.  Something strange is

21  happening.

22            Did you fill any of the printing that you

23  we see there?

24       A.   No, I did not.

25       Q.   Now, do you remember, as you sit here

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 189

```
 1   today where you were and the occasion under which

 2   you signed this document, Exhibit 9, the original

 3   and the photocopy?

 4        A.    At Luke Records on 8400 --

 5        Q.    8400 Northeast --

 6        A.    At the office.

 7        Q.    Northeast Second Avenue, Miami?

 8        A.    That is where all of the business was

 9   conducted at that time.

10        Q.    By the way, looking at the bottom of each

11   of these pages there is the initials "JT," and I

12   think you said before -- I want to clarify it -- you

13   are the one who initialed each of those pages?

14        A.    Yeah.   That looks like my handwriting.

15   That is me.

16        Q.    As you sit here today, do you remember the

17   actual occasion, as you sit here, about when you

18   signed these documents?   This document, this

19   particular one?

20        A.    Do I remember when I signed it?

21        Q.    As you sit here now, do you remember the

22   day that this document was before you over at Luke

23   Records and you signed it?

24        A.    No.

25        Q.    Now, this document has the title,
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 190

```
 1   "Standard Songwriter Contract."

 2              Do you see that?

 3       A.    Uh-huh.

 4       Q.    Yes?

 5       A.    Yes, I do.

 6       Q.    Thank you.

 7              Did you sign just one of these, or

 8   multiples of them or what?  Regardless of what was

 9   filled in.  We will talk about that in a second.

10       A.    Yeah.  Well, I guess we did enough -- I

11   didn't sign one.  We did a few of them.  Like at

12   least enough for the album.  You know, I did 14

13   songs on an album.  It had to be at least 14, 20

14   papers like this.

15              But the reason was, and I remember this

16   because it was like to register the song, to

17   register the works.  Like, um, the stuff we wasn't

18   doing as artists back then, they was, like, "We have

19   to register you all's copyright."

20       Q.    Who told you that?

21       A.    It could have been anybody from Luke to

22   Joe to this little chick he used to always send at

23   us.

24       Q.    Who is that?

25       A.    Somebody.  Her name was Tara.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 191

```
 1        Q.    Her name was?
 2        A.    Tara, Terra.  Something like that.  She
 3  used to work for Luke Records.
 4        Q.    Why did you even show up to the office?
 5        A.    I went to the office every day.
 6        Q.    You went to Luke Records every day?
 7        A.    Yeah.
 8        Q.    How come?
 9        A.    That is the place of business.  That is
10  where is the business.  I didn't have any other
11  business nowhere in the world.
12        Q.    Did you have an office at Luke Records?
13  You know, space that was yours?
14        A.    Mike Hopkins' office.  Go in there and sit
15  with her and be like where the next show, when is
16  our next piece of money coming.
17        Q.    How much time would you spend every day?
18        A.    I don't know.  An hour.  Thirty minutes.
19  Two hours.  It depends.
20        Q.    Did you sign a whole bunch of the
21  songwriter agreements at all once or just one a day
22  or do you remember?
23        A.    No.  We just went ahead and knocked them
24  out.
25        Q.    When you say "we," again this is only
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 192

1    between you --

2         A.    Well, me, I.  It was "we" because it was

3    me and my entourage.  We always rode like that.  Me

4    and three or four of my members of the group.

5         Q.    You would always show up there together?

6         A.    Pretty much.

7         Q.    They all signed songwriter agreements like

8    this?  Or just one?

9         A.    No.  I was the only one capable.

10        Q.    Were they typically sitting in the room

11   with you when you signed it?

12        A.    More than likely, hanging around.

13        Q.    Would anybody else besides you and them

14   that -- What did you call them?

15        A.    My entourage.

16        Q.    Entourage.  I love that.

17             Would anybody besides you and your

18   entourage would be present when you actually signed

19   the documents?

20        A.    Anybody present?  Well, besides the person

21   that gave them to me.  They may walk out and bring

22   them back to their offices or somebody.  These dudes

23   were not studying what I was doing.  They were just

24   around me.  I could have all of these papers signed,

25   then they could have been over there cracking jokes

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 193

1   or doing whatever they are doing.

2        Q.   Do you have a specific memory of a

3   conversation with Joe Weinberger in particular about

4   this document, Exhibit 9?

5        A.   No.  A conversation?

6        Q.   Yes.

7        A.   Not necessarily, no.

8        Q.   Before or after you signed it.

9        A.   I don't remember signing the document.

10  What I'm telling you is that is my signature.  I

11  don't remember actually doing this, like this.  I

12  remember we had some blank forms like this to fill

13  out.  These look like the same body of work or what

14  have you.

15       Q.   When you say -- You mean the whole thing

16  was blank?  Was the date filled in?  Do you see the

17  date?  There is handwriting on the date on the top

18  of the page.  Was that blank when you signed it?

19       A.   Yeah, man.  All of this.  All of this was

20  blank.

21       Q.   And then there is handwriting where it

22  says "Shake Watcha Momma Gave Ya," somebody has

23  printed it?  Do you know whose printing that is?

24       A.   I don't know.

25       Q.   Are you telling me that was blank when you

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 194

```
 1   signed it?
 2        A.    Yes.   It was songs for the album.   Yeah.
 3        Q.    Shake Watcha Mama Gave Ya was one of the
 4   songs?
 5        A.    Yes.
 6        Q.    This Poisonous Mentality?
 7        A.    Poisonous.
 8        Q.    Even if Shake Watcha Mama wasn't filled in
 9   when you signed it, you knew that Shake Watcha Mama
10   was going to be filled on the document because that
11   is one of the songs on the album?
12        A.    Right.   I knew, yeah, one -- all of them
13   14 songs that was on the album.   Right.   That is
14   what I was doing this for.
15        Q.    Right.   Just to make sure we are clear,
16   you knew that, whether it was blank or not, there
17   were going to be 14 of these, one for each song on
18   the album, that the name of the song was going to be
19   filled in and you were signing that with that in
20   mind?
21        A.    Yeah.   Pretty much.   They was going to
22   fill in, yeah, or we will fill in the rest.   We need
23   you to go in here and sign this now so we ain't got
24   to be looking for you or what have you.
25        Q.    Right.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 195

```
 1        A.    And, shit, we did.  Most of the things we
 2    were asked to do, we just did.  "We" being me and my
 3    posse.  Anything we was asked, we basically did
 4    because -- just because.  It is like, why not do it,
 5    if we want something to happen.
 6        Q.    Did you read the document before you
 7    signed it?
 8        A.    Probably, probably not.  Probably read
 9    over it.
10              See, at the time none of that mattered to
11    me.  I wasn't even into that like that.  I was doing
12    whatever to register my works so I can be paid on
13    them.  Because I had never been paid any on my works
14    prior.
15        Q.    If you look on the second page, there is a
16    Line B that somebody has handwritten ten cents for
17    whatever.
18        A.    Right.
19        Q.    Was that blank when you signed it?
20        A.    Yes, the whole thing was blank.
21        Q.    Had you discussed what the number was
22    going to be that was going to be filled in before
23    you signed the document?
24        A.    The number was going to be whatever my
25    contract said.  This is just per song, right.  My
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 196

1   agreement states what my percentage of my piece of

2   anything was.

3       Q.   Now, if -- Thank you for pointing that

4   out.  If you look to the third page of the document,

5   and you see somebody has handwritten in "name and

6   share, Jeffrey Thompkins and Luther Campbell,

7   50 percent and 50 percent," do you see that?

8       A.   Yes.

9       Q.   Was that blank when you signed it?

10      A.   Hell, yeah.

11           MR. JACKSON:  I think that was "hell,

12      yeah."

13           THE WITNESS:  Hell, yeah.  And Luther

14      Campbell, he didn't write --

15           MR. LEVITT:  Thank you for that

16      translation.  I got that.

17           THE WITNESS:  He didn't write 50 percent

18      of the song.  Can you hear that?  You

19      understand that he did not write anything on my

20      record.  I write.

21   BY MR. LEVITT:

22      Q.   And who did the beats on that one?

23      A.   Devastator.

24      Q.   The given name?

25      A.   I'm thinking Kenneth Terry.  I don't know

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 197

```
 1    the name.   That is the name I kind of remember.
 2         Q.    Okay.  But that is your initial on the
 3    bottom of the page?
 4         A.    Yeah, man.
 5         Q.    All right.
 6         A.    That is my initial.
 7         Q.    Did you understand, when you signed this
 8    document that it said that you were transferring the
 9    publishing copyright to PacJam Music?
10         MR. JACKSON:  Objection to the form of the
11         question.  The document speaks for itself.
12    BY MR. LEVITT:
13         Q.    Thank you.
14         A.    All right.  Now did I understand it was
15    transferring publishing?
16         Q.    Yes.
17         A.    No.  My understanding was I was
18    registering my works with the copyright office.  I
19    didn't know I was transferring, giving up anything.
20    I thought they was doing my -- doing day-to-day
21    operations as a record company looking out for its
22    artists.  And that was my understanding, my whole
23    take on the whole thing.
24         I make the records, you sell them.  You
25    know what is needed.  You know the proper paperwork
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 198

```
 1    to receive.  I don't know nothing about this stuff.

 2    If you are handling all of the business, I'm

 3    trusting you to take care of this business for me.

 4    It is like boom.

 5            Okay.  What else do I got to do?  You

 6    know, just to make sure that my records are

 7    registered.  And that is, yeah, that is my argument.

 8        Q.   Okay.  Next one.

 9        A.   But, again, he did not write.

10        Q.   So you had.  I know you said it several

11    times.

12            MR. JACKSON:  Off the record.

13            (Thereupon, a discussion was held off the

14        record, after which the following proceedings

15        were held:)

16            (Thereupon, the referred-to document was

17        marked by the court reporter for Identification

18        as Defendant's Exhibits 10-A through K and 11.)

19    BY MR. LEVITT:

20        Q.   Let me show you what we have marked as

21    Group Exhibits A through 10-K.  I have the originals

22    over here, if you want to look at them.

23            We just talked about the one for Exhibit

24    9, Shake Watcha Momma Gave Ya, and we have been

25    through it.
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 199

```
 1              Is this all the same situation where you

 2     signed them all and initialled them and the line was

 3     blank and everything we just talked about the Shake

 4     Watcha Momma Gave Ya?

 5         A.   If you any see some Js different from

 6     other ones, I would assume it was just one paper and

 7     they photocopied it.  But I see the JTs are

 8     different.

 9         Q.   So let me just count them instead of

10     trying to figure it out.

11         A.   Should be 14 because that is all of the

12     songs we did.

13              MR. LEVITT:  I count 11.  Plus we had what

14         Shake Watcha Momma Gave Ya.

15              MR. JACKSON:  Which is 12, which is normal

16         album composition, but there is multiple songs.

17     BY MR. LEVITT:

18         Q.   There are 11 contracts that you separately

19     signed and separately initialed; correct?

20              MR. JACKSON:  Twelve.

21              MR. LEVITT:  In Exhibit 10.  We already

22         talked about Shake Watcha Momma Gave Ya.  Am I

23         right on that, Mr. Thompkins?

24              THE WITNESS:  Yes.

25
```

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 200

```
 1    BY MR. LEVITT:
 2        Q.   Am I correct with each of them it is the
 3    same situation as you already described with Shake
 4    Watcha Momma Gave Ya?
 5        A.   Yes.
 6        Q.   Did you have copies of these documents at
 7    any time before this lawsuit?
 8        A.   I don't have any, no.  Not that I recall.
 9    Because, you know, I keep up with certain things.
10    All of that paperwork I kept up with.  It went in my
11    file.  I don't remember these papers.  I mean, I
12    don't have them.
13        Q.   If you look through it and you look at the
14    names of the songs, are those the names of the songs
15    that were on the very first album?
16        A.   Huh-huh.  Poisonous Mentality.
17        Q.   The second album, Poisonous Mentality?
18        A.   The first album, it was like the third
19    one.  They were all typed in like that.
20        Q.   Did you sign documents like this for the
21    first album, too?  The standard songwriter
22    agreement, as you recall?
23        A.   Huh-huh.  I mean, they may have came back
24    later with the form right when we were getting ready
25    to do this because we didn't do it the first year,
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 201

```
 1    the previous year.  They probably brought them back

 2    the next year.

 3         Q.    All I'm asking you is this, we looked at

 4    exhibit 9, which is Shake Watcha Momma Gave Ya, we

 5    looked at Exhibit 10-A through K, which has each of

 6    the different song titles for different documents?

 7         A.    Uh-huh.

 8         Q.    Are all of the songs on the Poisonous

 9    Mentality album?

10         A.    Yes.

11         MR. JACKSON:  Didn't you just have one

12    that had multiple songs typed in?

13         MR. LEVITT:  That is Exhibit 11, which we

14    are going to do next.  That is why I had it

15    marked separately.

16         THE WITNESS:  '92 and the '90.

17         (Thereupon, a discussion was held off the

18    record, after which the following proceedings

19    were held:)

20         MR. LEVITT:  Back on the record.

21    BY MR. LEVITT:

22         Q.    Let me show you Exhibit 4 again.  This is

23    a document which has the songs from the first album,

24    2 Low Life Muthas.

25         MR. JACKSON:  This is the second album.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 202

```
 1              THE WITNESS:  This is the first album.
 2    BY MR. LEVITT:
 3         Q.   See?
 4         A.   Low Life Muthas.  This was the second
 5    album.
 6         Q.   So Exhibit 4 is a document that pertains
 7    to the songs in the first Poison Clan album?
 8         A.   Correct.
 9         Q.   And is that listing all of the songs that
10    were on that album, as you recall it?
11         A.   Yes.  Yes.
12         Q.   And we already talked about how you agreed
13    that you had signed this document?
14         A.   Yeah.
15         Q.   All right.  And this was -- At least the
16    document has a date on it of March of 1990.
17              Did that seem about the right time that
18    you would have signed it?  As best as you can
19    remember?
20         A.   I don't think so.  I think we got all of
21    these around the same time.  It was this time.  But,
22    see, this is a whole different paper, right?
23         Q.   Right.
24         A.   So I could have done that, especially
25    after that first -- Remember, I told you we got the
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 203

1    one, what was that?

2        Q.   The one statement.

3        A.   Uh-huh.  I don't remember doing that, but

4    when I saw the original, that was my signature and

5    did do that.

6        Q.   Can I ask you this?  I don't have to ask

7    permission.  I'm going to ask.

8             Was it blank when you signed Exhibit 4?

9        A.   Again, I don't remember this document.

10       Q.   Okay.

11       A.   Yeah.

12       Q.   I'm sorry.  Go ahead.

13       A.   I remember seeing stuff like this.  See,

14   that one don't even have initials on it, do it?

15       Q.   Let me pull it back out rather than having

16   me look at it and guessing and have me testify.

17       A.   This had to be from that first statement

18   we got.  Because it got numbers.

19       Q.   Let me ask you a different question.

20            When did you first meet Joe Weinberger?

21       A.   I don't know.

22       Q.   Do you know when Joe started working for

23   Luke Records?

24       A.   I don't know.

25       Q.   Or its predecessor names?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 204

```
 1        A.    Well, I guess, by the second year, by me

 2   being there, within a year after we got there,

 3   because it was Joe who did the paperwork, the

 4   addendum to the '89 that went to the '92 agreement.

 5   Yeah, it was Joe who did that paperwork.

 6        Q.    How did you know that Joe did that

 7   paperwork?  Were you there when he did it or did he

 8   tell you?

 9        A.    That is who I got it from.  Yeah.

10        Q.    So do you know if Joe Weinberger, for

11   example, worked at Luke Records in March of 1990 at

12   least when this document seems to be dated, Exhibit

13   4?

14        A.    I can't remember that far back.  I don't

15   know.  He may have.  I'm not sure.

16        Q.    How long was it that you kept on going

17   over to Luke Records pretty much every day to their

18   office?

19        A.    I mean, if we was in town, we went by.

20        Q.    Starting in '89, when you first had the

21   first album?

22        A.    No.  I didn't go over to the office until

23   they moved to 8400.

24        Q.    When was that?

25        A.    When they had the other office wherever,
```

Thompkins vs. Lil' Joe Records, Inc.                                    8/28/2003

Page 205

1    everything by the second album.  Before the second
2    album ended.  About the second album.
3         Q.    The second album was in '92?
4         A.    Yeah.
5         Q.    So it was '92 when you started going there
6    pretty much with your group, your entourage, I think
7    you called it?
8         A.    Yeah.  '91.  The album came out in '91,
9    the second album.
10        Q.    Poisonous Mentality?
11        A.    Yeah.  The end of '91, going into '92.
12        Q.    So by then Luke Records had already moved
13   to this address on Second Avenue?
14        A.    8400.
15        Q.    Northeast Second Avenue?
16        A.    Right.
17        Q.    When you went there, who would you talk to
18   me?
19        A.    Mike Hopkins.
20        Q.    Anybody else?
21        A.    Mike Hopkins, he was like a friend of
22   mine.  Everybody else came just to handle my
23   business and go.  I go see Joe, if I needed to
24   handle some paperwork, or go see Luke to ask when my
25   check was coming or the receptionist at the front

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 206

```
 1    desk, who in town, who back there.
 2            But I didn't deal with them.  Like the
 3    only people I dealt with, Debbie Bennett.
 4        Q.    Who was David Bennett?
 5        A.    Debbie Bennett.
 6        Q.    Debbie Bennett?
 7        A.    I don't know what she did or what is her
 8    business.  She was just nice to me when I came there
 9    and I went to see her.
10        Q.    Let's take a look at Exhibit 11, please.
11    I want you to at least compare it for a moment to
12    Group Exhibit 10.  And I point out to you, call your
13    attention to the fact there is a different date.
14            (Thereupon, a discussion was held off the
15        record, after which the following proceedings
16        were held:)
17    BY MR. LEVITT:
18        Q.    Do you remember Exhibit 11, even though we
19    talked about Exhibit 10?
20        A.    I mean, I remember, for what it is worth,
21    another one -- another one of those forms, someone
22    properly previously, you know, initialed and signed.
23        Q.    All right.
24        A.    But I don't remember signing this and all
25    of these songs being on one sheet in front of me.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 207

```
 1    When I started seeing all of this paperwork, yeah,

 2    it was unfamiliar to me.

 3         Q.    It was what?  Unfamiliar?

 4         A.    Yeah.  As far as something you might have

 5    forgotten about.  And, you know, I swear all of my

 6    business, man.  I know what I put my Hancock on.

 7         Q.    Did you sign Exhibit 11 and did you

 8    initial it?

 9         A.    Those are my initials.  That is my

10    signature.  That is my handwriting.  But this other

11    part, you know.

12         Q.    Where it says "JT Money" and the

13    handwriting of the address?

14         A.    All of that print, that is not me.  None

15    of it.

16         Q.    But the initials on each page are yours;

17    right?

18         A.    Yeah.

19         Q.    The songs that are listed there, are they

20    from one album?

21         A.    Something behavior.

22         Q.    That was the third album?

23         A.    Correct.

24         Q.    Were those songs typed in as we see them

25    on the page when you signed this document?  Exhibit
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 208

1   11.

2       A.   No.  Actually, I don't remember.  I don't

3   want to say no.

4       Q.   They might have or they may not have been,

5   you just don't remember one way or the other?

6       A.   I don't know.

7       Q.   Was the date typed in where you see it?

8       A.   I'm sure it wasn't.

9       Q.   You are sure it was not?

10      A.   Yes.

11      Q.   Why?  Why are you?

12      A.   None of that.

13      Q.   I don't mean to be argumentative.  You

14  just said --

15      A.   That is what I'm telling you.  I don't

16  remember none of this ever happening.  So if I

17  remember, it couldn't have happened.  And I'm sure

18  that didn't.  I'm positive.  All right.  If I want

19  to change, I want to change.  Because I don't

20  remember this.

21      Q.   What about your name being typed in there?

22  Was that in there?

23      A.   Typed where?

24      Q.   In the top first paragraph where it says

25  between PacJam and Jeffrey Thompkins, do you see

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 209

1  where "Jeffrey Thompkins" is typed in?

2      A.   I don't know.  All of that could have been

3  done at the same time.  All it of could have been

4  done at the same time.

5      Q.   Was this about the time that the Rufftown

6  Behavior came out, February of '93?

7      A.   Yeah.  That is around the time.  That is

8  just before we were getting ready to release it or

9  right after we released it.  Probably right before

10 we was getting ready to release it.

11     Q.   Are there any other documents besides

12 these songwriter contracts that you remember signing

13 where they had blanks in them in your life?

14     A.   No.  Just to register the songs.  I don't

15 know anything about registering no works, no music;

16 and, again, my label was taking care of me.  I put

17 that in my label's hands.  But the only other

18 documents I remember signing is the agreements.  I

19 didn't get a whole lot of paperwork.

20     Q.   Were you the sole writer of all of the

21 songs that are listed on Exhibit 11?

22     A.   Pretty much, except, you know, the music

23 part.  But all of the lyrics and the hooks -- A lot

24 of them didn't have hooks.  This whole album was

25 mostly myself and Mike McCray, and my other home

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 210

1   boys came in, and they just talked vocals on some

2   records.

3       Q.   When they did vocals, were they doing

4   vocals you had written and you told them it was?

5       A.   Pretty much like an intro.  What you are

6   going to tell them and I would take the song from

7   there or outro.  Either intro or outro.

8       Q.   That is actually a good description.  I

9   just never heard that word before.

10      A.   Yeah.  Listen, that had a couple of cats

11  on it.  I had some friends on this record.

12      Q.   Listen, you mean that cut?  Is that what

13  you call it -- a cut?

14      A.   Yes.

15      Q.   Or a track, I guess these days, since we

16  moved into the 21st century.  I'm an old guy.  That

17  is on the record, too, I hope.

18          (Thereupon, a discussion was held off the

19      record, after which the following proceedings

20      were held:)

21  BY MR. LEVITT:

22      Q.   Except for the one that we all seem to

23  remember that had multiple songs handwritten in but

24  we can't find right now -- Well, let me ask you

25  this, do you remember signing one that had multiple

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 211

1   songs handwritten in as opposed to the one we are

2   looking at on Exhibit 11?

3       A.   No.

4       Q.   Except for the ones we have looked at,

5   Exhibit 10 and Exhibit 11, and possibly that other

6   one, do you remember signing any other standard

7   songwriter contracts during your time with Luke or

8   anyone else?

9       A.   The songs I did on these albums, they gave

10  me papers like this.

11      Q.   Did you sign papers like this for, when

12  you got hooked up with Represent Entertainment?

13      A.   No.  We didn't do songwriter agreements.

14      Q.   Did you have recording agreements with

15  them?

16      A.   The licensing -- I leased them the album

17  for a year.  And they didn't pay up.

18      Q.   What about Freeworld?  Did you do any

19  recording agreements or songwriter contracts with

20  them?

21      A.   Yeah.  We did writer agreement, split

22  sheets.

23      Q.   Split sheets?

24      A.   Yes.  Just determine your portion of the

25  songs, each song.  They didn't come in this form.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 212

1   Like you transferring no publishing or anything.

2   Because I was, we weren't giving our part.   We were

3   only doing 50 percent and 50 percent.   And we all

4   signed off on it.

5          (Thereupon, a discussion was held off the

6       record, after which the following proceedings

7       were held:)

8          MR. LEVITT:   Let me show you what we are

9       going to mark as Defendant's Exhibit 12.

10          (Thereupon, the referred-to document was

11      marked by the court reporter for Identification

12      as Defendant's Exhibit 12.)

13  BY MR. LEVITT:

14      Q.   I'm going to show you what we have marked

15  as Exhibit 12, a photocopy and an original.

16          Do you recognize that?

17          Let me know when you are finished and then

18  I will ask you a question or two.

19          Do you recognize what we have marked as

20  Exhibit 12?

21      A.   Yes.   A royalty statement.

22      Q.   Do you remember getting it?

23      A.   Kinda, yeah, I do.

24      Q.   Did you ever have a copy of your own as

25  opposed to the one that I'm showing you now?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 213

```
 1        A.    I think we do -- We did have a copy.

 2        Q.    Was that in your files in Florida that

 3  moved to Georgia?

 4        A.    Yes.

 5        Q.    Was that included in the documents that

 6  you gave for Mr. Hudson?

 7        A.    I believe so.

 8        Q.    Do you see that on each page of Exhibit

 9  12, which consists of four -- five pages and there

10  is an initial that says "TJ" on the bottom?

11        A.    JT.

12        Q.    Thank you.  JT.

13        A.    Yes.

14        Q.    Is that your "JT"?

15        A.    Yes, it is.

16        Q.    Did you initial each of these pages?

17        A.    Yes, I did.

18        Q.    Do you see on the very first one it has

19  the date of 5/18/93 written in?

20        A.    Correct.

21        Q.    Do you know whose handwriting that is?

22        A.    That actually looks like my handwriting.

23        Q.    Did you say your handwriting?

24        A.    Yeah.

25        Q.    Thank you.
```

1          Do you recognize what looks like the
2     signature of Brenda Thompkins on the first couple,
3     several of those pages?
4          A.    Yes.
5          Q.    Do you recognize that as Brenda
6     Thompkins's signature?
7          A.    Yes, I do.
8          Q.    And then the very last one has a "BT" as
9     opposed to "Brenda Thompkins" written in.
10          Do you recognize that as your mother's
11     initials written in in her handwriting?
12          A.    Yes.
13          Q.    Did you receive this document somewhere
14     around the date of May of 1993?
15          A.    I guess.  Yes.  This says '93.
16          Q.    Does this document relate -- We are
17     talking at the same time.  Sorry about that.
18          It says "July 23, 1991" at the top.
19          Do you see that, right?  Somebody has
20     typed that in?
21          A.    Yes.
22          Q.    But you have handwritten in May 18, 1993
23     on the bottom?
24          A.    When I received it; yes.
25          Q.    And what does this relate to?

25 S.E. Second Avenue
Miami, FL   33131

Taylor Jonovic White & Gendron
www.myreporters.com

Ph: 305.358.9047
Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 215

```
 1        A.    The first album.

 2        Q.    Only the first album?

 3        A.    That is all it is.  Dance All Night.

 4        Q.    Was Dance All Night on the first album?

 5        A.    Correct.  Only the first album.

 6        Q.    When you got this royalty statement, did

 7   you do anything with it?  Or talk to anybody?  Or

 8   anything?

 9        A.    Yeah.  By '93, I was talking to Joe.

10   Joseph Weinberger.

11        Q.    What did you talk about?  And was it in

12   person or on the telephone?

13        A.    Always in person.

14        Q.    Okay.  Who else was there when you talked

15   to him?

16        A.    Obviously my mother was there.  This was

17   probably the time I got, as I would say, the bogus

18   statements just showing money and ain't showing, you

19   know, where it is going or where it actually went.

20              It is just -- I don't know.  Like, I

21   remember, see, I said the first album we had a split

22   body 11 grand, I remember that.  But then they give

23   me this again in '93, I don't know.  There was some

24   paperwork missing in between this.

25              Why did you give me the same thing?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 216

1    Q.   Let me ask you this question:  When you

2  got them, whenever it was, did you only get them

3  because you happened to be in the office and they

4  were handed to you?  Were they mailed to you?

5    A.   No.  I used to go to ask for statements,

6  show me where my money is going.

7    Q.   Did you get this document in 1991, which

8  was the date that is shown on the upper part of the

9  first page?

10   A.   I don't know if I received it in '91 as

11  well.  I don't know.  I remember I got a paper.  It

12  was a list, a list that kind of looked almost like

13  this.  But it seemed like it was more spaced out,

14  and you see 11 grand split between Jerry Tongon,

15  Patty Wile and David Hobbs.  And they broke that

16  down to 30 something hundred a piece.

17   Q.   Basically, you remember you got something

18  like this, but it might have been somewhat different

19  than this one in 1991?

20   A.   Yeah.  I guess.

21   Q.   And then you got this one in 1993, which

22  is why you put the date there?

23   A.   Right.  One.

24   Q.   When you got this in 1993, you said

25  something, you talked to Joe Weinberger about this?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 217

1        A.    That is who I dealt with.

2        Q.    And what was your conversation?

3        A.    I'm asking Joe where is the money.  Show

4    me -- Since you handle all of the paperwork, all of

5    the accounting, everything, tell me why I ain't got

6    no money.

7              Give me a statement.  I want to know how

8    much we are spending to record, and I know a lot of

9    stuff, we took care of on our own because we did a

10   lot of shows.  When they were calling us to show,

11   all of the promo was basically free because we piggy

12   backing.

13             I'm, like, show me.  And then this is what

14   I'm showed in '93.  Where is my '93 statement?  Why

15   give me a '91 statement in '93?

16       Q.    Are you telling me that now or are you

17   telling me you had a conversation with Joe

18   Weinberger back in '93, when you said those things

19   to him?

20       A.    Yeah, all of that.  You, too, all of that.

21   I'm giving you all something to think about,

22   everybody.

23       Q.    What I'm asking you, though, is what you

24   remember from them as opposed to what you think you

25   must have done back then because that is where you

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 218

```
 1    put the thought processes today?

 2        A.    What I remember is getting a bunch of

 3    papers that I didn't agree with it, that was

 4    irrelevant to anything I was asking.

 5        Q.    Is this one of those pieces of paper to

 6    the best you can remember or not?

 7        A.    It has to be.  If my mother's signature is

 8    on there, because she was with me that one day I

 9    came.  See, I always came, but one day in particular

10    she was there with me.  She and Joe Weinberger was

11    having a conversation.

12        Q.    Were you there when she wanted --

13        A.    I was in and out.  She wanted to keep

14    talking.  I was through talking.

15        Q.    Do you remember the conversation as to who

16    said what as you sit here today?

17        A.    No, I don't.

18            MR. LEVITT:  All right.  Let me know the

19        next exhibit number.

20            (Thereupon, the referred-to document was

21        marked by the court reporter for Identification

22        as Defendant's Exhibit 13.)

23    BY MR. LEVITT:

24        Q.    All right.  Let me show you what we have

25    marked as Exhibit 13.  Here is a copy for you.  I
```

Thompkins vs. Lil' Joe Records, Inc.                     8/28/2003

Page 219

```
 1   guess it isn't a copy for you. This is a different
 2   one.  Go ahead and share.
 3            Let me know when you are finished looking
 4   at it and if you recognize it.
 5       A.   I mean, I don't know what those papers
 6   are.  I remember seeing them when I was going
 7   through all of my files.  You know, when I was
 8   turning stuff over.  I remember actually seeing
 9   paperwork, but I don't know what this is.
10       Q.   Okay.  You remember seeing your copy of
11   Exhibit 13 in your files and you gave it to Mr.
12   Hudson?
13       A.   Probably.  Something like that, or one of
14   the ones my mother gave me.
15       Q.   But in any event, you had a copy of this
16   document in your possession at some time?
17       A.   Yes.
18       Q.   Are those your initials on each of the
19   pages that are initialed on Exhibit 13, which I
20   think is all of them?
21       A.   Yes, it is.
22       Q.   And do you recognize your mother's
23   initials on those pages?
24       A.   Yes, I do.
25       Q.   On the very last page, there is some
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 220

```
 1   printing.  Do you see that?  Royalty paid on, free

 2   goods, et cetera?

 3           The question I have for you is, do you

 4   recognize whose printing that is?

 5       A.   No, I do not.

 6       Q.   Now, if we look at the very first page, we

 7   will see that this relates, at least purports to

 8   relate, says it relates to Poison Clan between

 9   July 12, 1991 and March 31, 1992.

10           Do you see that?

11       A.   Uh-huh.

12       Q.   Yes.

13       A.   Yes.  I do.

14       Q.   Do you remember when, approximately, you

15   received it?

16       A.   The same day I received Exhibit 12.

17       Q.   Does it?

18       A.   Obviously.

19       Q.   Why do you say it?

20       A.   My mother was there.  Because she didn't

21   go to the office with me.

22       Q.   Is that the only time she went?

23       A.   The first time to sign the contract and we

24   did this.

25       Q.   Are these all signed in the same ink pen?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 221

```
 1            MR. JACKSON:  Is that the original?  Okay.

 2      Yeah.

 3  BY MR. LEVITT:

 4      Q.   Okay.  Do you know what Exhibit 13 relates

 5  to, which album and that sort of thing?

 6      A.   Well, with the three names at the top,

 7  Watler, Thompkins and Hobbs, it has to be 2 Low Life

 8  Muthas.

 9      Q.   And the rest of the document relates only

10  to that album as far as you can tell?

11      A.   As far as I can tell.

12            MR. LEVITT:  Let's look at Exhibit 14.

13            (Thereupon, the referred-to document was

14      marked by the court reporter for Identification

15      as Defendant's Exhibit 14.)

16  BY MR. LEVITT:

17      Q.   Let's take a look at Exhibit 14.  And let

18  me know when you are finished looking at that one,

19  at least glancing at it?

20      A.   Yeah.

21      Q.   And also tell me if on each of the pages

22  of Exhibit 14, both your initials and Brenda

23  Thompkins's initials appear?

24      A.   Yes, they do.

25      Q.   And your best memory is that you received
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 222

```
 1   this document at the same time that you received

 2   Exhibit 12 and 13 on the same day?

 3        A.    Correct.

 4        Q.    What does Exhibit 14 relate to?

 5        A.    One of Luke's albums.  Luke's solo album.

 6        Q.    Does that entire document relate to Luke's

 7   albums?

 8        A.    No.  It was just mechanical -- The titles

 9   that this relates to, Exhibit 14 is, I Got Shit on

10   My Mind, Luke's solo album; Banned in the USA,

11   Luke's album; Hanging with the Home Boys.  That was

12   a movie they licensed Dance All Night in.

13        Q.    Dance All Night was your song?

14        A.    Poison Clan.

15        Q.    Were you involved in any of the songs

16   except for the one you just mentioned, Dance All

17   Night or Hanging with the Home Boys that are listed

18   on Exhibit 14?

19        A.    Well, the songs are listed.  These are

20   actually album titles.  These album consist of 12,

21   14 songs.

22        Q.    Did you do any of the songs?

23        A.    Yes, I do two or three songs on every Luke

24   record.  Solo.

25        Q.    So they were Luke's solo, not really,
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 223

```
 1    because you did some of it, too?

 2        A.   I did.  But his name is on front of the

 3    package.

 4        Q.   Because it was no longer 2 Live Crew by

 5    that time?

 6        A.   It was still 2 Live through when Banned in

 7    the USA was going on.  I think that was one of the

 8    first solo albums.

 9        Q.   Do you know why you were given this

10    document when you were?

11            MR. JACKSON:  He wrote the songs.

12            THE WITNESS:  I wrote two or three songs

13        on each one of them.

14            But, again, my own opinion, I think it was

15        just giving me something to do, waste my time.

16    BY MR. LEVITT:

17        Q.   Did you do anything with these pieces of

18    paper other than tell them he was wasting your time?

19        A.   File them, put them up, save them for the

20    day when I would meet Herman so I can give them to

21    him so we can be right here right today.

22        Q.   In 1993, did you know you were going to

23    have to meet someone like Mr. Hudson?

24        A.   I know that the '91, after the first year

25    we did our record, I knew we were getting stuck.
```

Thompkins vs. Lil' Joe Records, Inc.          8/28/2003

Page 224

```
 1   But it was, like, what can I do?  Do I stop eating
 2   or do I make this record?
 3          Again, we were living off shows.  I wasn't
 4   getting paid for the record.  I still was doing
 5   better than I was doing.
 6      Q.    In 1991, did you know that you were not
 7   getting what you believed you were entitled to?
 8      A.    Definitely.  That is the reason me and Deb
 9   split.  Deb wanted to go.  I said, "What are you are
10   going to do?"
11      Q.    Dale?
12      A.    Deb.  Debonair.
13      Q.    Debonair.
14      A.    Patrick Watler.  I called him "Deb."
15      Q.    It sounded like "Dale" to me, I confess.
16      A.    So he left.  Because we knew we were
17   getting stuck.  My thing is, you know, should we
18   still eat?  Let's go eat.  We will work this out.
19   We will figure it out in the meantime.
20      Q.    And then I cut you off in the meantime?
21      A.    In the meantime, they was just happy still
22   sticking us.
23      Q.    Then when you did the next album in '92,
24   you knew the same thing was happening?
25      A.    Right.  When I came back, that was the
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 225

```
 1    same.   That was the same scenario, same situation.

 2             The album in '90 was done.  We hit the

 3    road and sell whatever units we were going to sell.

 4    When it came time to do the next Poison Clan record,

 5    that is when the problems arose.  There was no

 6    money.  But, yet, all right, when labels done make

 7    money, they don't call you to do another album.

 8    They drop it.

 9             They had this record, but they didn't come

10    off with no money.  You know, I agreed to do it.

11    give me 10,000.  I will go in the studio.  We are

12    talking about an 18 year old boy with 10,000 in his

13    pocket, you know?  I'm going to work.  I don't know

14    about nothing else.  I know if I collect me 10,000

15    to do what I do, rap, make a record, I can do that.

16    That is nothing.

17             Yeah, so now we are here.  And, like, I

18    still wrote them.  I want this over with the rest of

19    you.  I just want what is due me.  You take care of

20    me and I'm out of your way.

21             MR. LEVITT:  Next exhibit number.

22             (Thereupon, the referred-to document was

23        marked by the court reporter for Identification

24        as Defendant's Exhibit 15.)

25
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 226

```
 1   BY MR. LEVITT:

 2        Q.   All right.  Exhibit 14, here is the

 3   original, so we can look at it together?

 4        A.   This is 15.

 5        Q.   Fifteen.  Thank you very much.  You are

 6   right.

 7             Okay.  Take a look at Exhibit 15.  This

 8   looks like it goes with that one.

 9             Let me ask you this, at least we can see.

10   We can see that the ink is different on Exhibit 15

11   than it was on Exhibits 14, 13 and 12.

12        A.   Do you mean the printing?

13        Q.   I mean the pen.

14        A.   Yeah.

15        Q.   If you look at the originals, you see

16   there is a blue pen and blue pen, but that is a

17   different pen.

18             Do you see that?

19        A.   And no Brenda Thompkins either so it is

20   another day.  Different day.

21        Q.   That is what I was trying to get at.

22        A.   Okay.

23        Q.   Do you remember Exhibit 5, as you sit here

24   today?

25        A.   Let me see, am I negative?  Did I get a
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 227

```
 1   check with this?  Let's see.
 2       Q.   Do you remember?
 3       A.   I was negative.  I probably wouldn't
 4   remember it.
 5       Q.   Is that your signature?
 6       A.   Yeah.  That is my signature.
 7       Q.   And your initials?
 8       A.   Those are my initials.
 9       Q.   The day that it purports to go through is
10   up through June 30, 1993.
11            Do you see that?
12       A.   Uh-huh.
13       Q.   Do you remember if you got this document
14   on a day that you were visiting Luke's office some
15   date after June 30, 1993?
16       A.   That I would have gotten this document
17   after that date?
18       Q.   Yeah.  Because they didn't create it
19   through June 30, 1993 before June 30, you would
20   suspect?
21       A.   Well, I guess it makes sense.  I kind of
22   remember seeing something like this.  Because all I
23   do, again, show me where the money is going, but it
24   doesn't show the money.  What is that?  What is that
25   you taking out of the package?  Do you remember
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 228

```
 1    that?  Never.  We didn't get all of the paperwork.
 2    This is stuff, I got this, yeah, I probably got
 3    this.
 4         Q.   Did you get a copy of this to bring to put
 5    back in your file to give to Mr. Hudson eventually?
 6         A.   Yes.
 7         Q.   You understand Mr. Hudson should have a
 8    copy of this piece of paper somewhere in his files
 9    because you gave him everything?
10         A.   Yeah, I gave him everything I had.
11         Q.   I apologize if I asked you this already,
12    that is your initial and your signature on that
13    document?
14         A.   Correct.
15         Q.   Do you remember any conversations with
16    Mr. Weinberger or anybody else at Luke about this
17    document once you got it?
18         A.   No.  No, I do not remember.  Any
19    conversations with anybody else.
20              I mean, when I got this, I probably was
21    just speaking to Joe.  But I couldn't speak -- You
22    know, Joe would have been like yea, yea, yea.
23         Q.   She can't take that down.
24         A.   Well, he would have been like, yeah, yeah,
25    yeah.  He would have blew me off real easy.  The end
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 229

```
1   of the day, it is not my company.  I'm just doing
2   what I got to do, meaning I'm going to feed you
3   whatever they tell me to feed you.  Or hide what I
4   need to hide from you.
5           It was beyond Joe at this point right
6   here.  Joe was not in the picture.  He was handling
7   Luke's business.  He was Luke's man I needed to go
8   to get my account.
9       Q.   Did you ever talk to Luke about that?
10      A.   You couldn't talk to Luke nothing about
11  that, nothing like that.
12      Q.   He was in the office, you were there and
13  you would talk --
14      A.   He would be locked up in his office until
15  people leave.  Yeah.  Come in the back way, don't
16  come in the front door.  Be upstairs.  No one know
17  he's there.
18      Q.   When you saw this document, what was your
19  reaction?
20      A.   Another piece of paper showing me I ain't
21  got no more.
22      Q.   What album is this related to or what
23  music?
24      A.   This is the two Luke albums, I Got Shit On
25  My Mind, Banned in the USA and then Hanging with the
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 230

1    Home Boys.

2         Q.    The same as the previous one?

3         A.    Correct.

4         Q.    Thank you.

5         A.    Basically the same paper, I think.   Just

6    different format.

7              MR. LEVITT:   Let me take a second off the

8         record.

9              (Thereupon, a discussion was held off the

10        record, after which the following proceedings

11        were held:)

12             MR. LEVITT:   Back on the record.

13   BY MR. LEVITT:

14        Q.    We just went through a bunch of what

15   looked like royalty statements.   Is that what you

16   would call them?   Even though you don't agree they

17   had the right numbers on them.

18        A.    Yeah, yeah.

19        Q.    When you got those documents, do you

20   remember if you only got those sheets that I just

21   showed you?   Or did you get some other documents

22   with them that you don't have in front of us today?

23        A.    It was some sheets like receipts of

24   T-shirt printings, some kind of other club

25   promotions, buying stickers and posters and stuff

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 231

1   like that.

2        Q.   How thick would you say it would be?

3        A.   I don't know.  It was just a few papers.

4   But what it was, it was, instead of it just being

5   Poison Clan receipts, it was everybody on the label

6   tied in.

7        Q.   Right.

8        A.   So if you -- If it is a check made out to

9   you for $1,000, it is going to be on behalf of

10  myself, 2 Live, GG, Professor Griff, anybody like

11  that.

12            So my understanding is, so what?  I just

13  paid 250 or am I charged the whole thousand dollars?

14  See, this was never straightened out.

15       Q.   But did you get that document, is what I'm

16  asking?

17       A.   Yes.  I got paperwork like that.

18       Q.   Did you get a copy to take home with you?

19       A.   I'm sure.  Yeah.  That is another step

20  that I gave to Herman Hudson.

21       Q.   Included in the things Herman Hudson

22  should have would be those extra documents we talked

23  about?

24       A.   He should have, yes.

25       Q.   After the last one of these, which seemed

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 232

```
 1   to end in June of 1993, at least in terms of the

 2   date on the document itself, did you ever get any

 3   more royalty statement documents?

 4        A.   June of '93?  That was towards the end.

 5   Because I already assumed my contract was up in '94.

 6   I thought I was, you know, I was already to the

 7   point, by then, I wasn't going to make records.  I

 8   wasn't going to make records in that situation any

 9   more.

10        Q.   You mean with Luke?

11        A.   Right.

12        Q.   You were going to make them somewhere,

13   just not with Luke or were you leaving the music

14   business?

15        A.   No.  I was going to figure out a way -- I

16   mean, I was going to do what I had to do to survive

17   and eat and maintain my lifestyle and what have you.

18             Yeah.  That was it, see.  And then '95,

19   that was the next agreement.  It was like come on,

20   let's do this, you know, let's do this now.

21        Q.   So after all of that, why did you sign a

22   new contract with Luke Records?

23        A.   It was different terms and conditions.  It

24   wasn't the same.  You know, it was more money.  You

25   know, first contract was no money.  This '95, what
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 233

```
 1   he had?  Almost a hundred grand on the table.
 2   Almost, you know?
 3            I'm, like, let me get that money, man.  I
 4   don't know what you all are thinking about.
 5       Q.   You mean there was a hundred grand paid up
 6   front as a deposit?
 7       A.   No.  I was supposed to be paid $75,000 for
 8   this album.
 9       Q.   Upfront, you mean as a bonus?
10       A.   Yeah, when I turned it.  I'm supposed --
11   When we sign the contract, I was supposed to get
12   32,5 or 37, whatever makes it half of 75.  We signed
13   the contract.  I got the first half.
14            I turned in the master to the album, and
15   I'm waiting on my second half.  And I waited and I
16   waited and I waited and it never came.  That is when
17   I collected my masters.
18       Q.   That was the Strait Zooism stuff?
19       A.   Correct.
20       Q.   So you got 37,5 or so?
21       A.   Thirty-two.
22       Q.   Whatever it was, half of 75, which is
23   37,5, I think?
24       A.   37,5, yeah.
25       Q.   You got half of that right up front as --
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 234

```
 1   what?  A credit against profits or just a bonus or

 2   what?

 3        A.   No bonus.  All advances.

 4        Q.   It was an advance?

 5        A.   Yeah, it was an advance.

 6        Q.   And so if the album never made more than

 7   37,5, you wouldn't get any more money?

 8        A.   Correct.

 9        Q.   If it made more, you would get some more.

10   If it made less, would you have to give some back?

11        A.   I don't know how.

12        Q.   Out of the 37,5 that you got.

13        A.   No.  He just got to move that product and

14   get his money back.  He got to sell it.  You know.

15   I don't know all of that.

16             Listen, again, five percent, whatever,

17   wholesale, whatever on the first record, right?  We

18   don't know.  Versus doubling that the next time and

19   more money up front.  Because, again, we still

20   living off shows.  My thing was to do the record,

21   let them exploit it, put it out there.

22             I don't know how many we sold.  All I know

23   is when I walk out the house into the streets, I'm a

24   celebrity, you know?  And I'm doing this thing.  I'm

25   living this life.
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 235

1      Q.    Are you working on any projects with

2   Luther Campbell now?

3      A.    No.

4      Q.    Are there any in the works that you are

5   negotiating for?

6      A.    I'm not negotiating anything.  I did a

7   song for him.  I was just going to give him.

8      Q.    What was that?

9      A.    I don't know.  Oh, You Don't Know.

10      Q.    No, I don't.  That is the name of the

11   song?

12      A.    Yeah.  You Don't Know.

13      Q.    I have a minor sense of humor.  I guess

14   not very good.

15            When was that?

16      A.    I don't know.  About three or four months

17   ago.  About five months ago.

18      Q.    Well, I seem to remember reading something

19   on the internet or the press, you and Luke were

20   starting to hook up again.

21      A.    Yeah, well, I do go highlighting.  I'm

22   trying to get the man back to work.  I am, like,

23   man, you got to get back to work.  You can't sit

24   out, just because.  You know, that is just me,

25   though.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 236

```
 1        I'm, like, what are you going to lay down
 2   for?  What are you going to quit for?
 3        Q.   You are not working on any projects or
 4   songs or any albums where you and he are working
 5   together?
 6        A.   If something made sense, I would.  I'm
 7   doing my own thing.  He's got his own thing.  I'm
 8   like, yeah, we don't got to be enemies.  We started
 9   this together.  If you need me, I'm over here.  It
10   is going to cost today.  I got my own thing going.
11   Today I'm established.  Before I was piggy backing
12   off the brother.  Without him doing what he did, we
13   wouldn't have gotten where we gotten or went where
14   we have been or what have you.  So that is just it.
15   All right.  I'm going to.
16             MR. LEVITT:  Do we have a photocopy of
17        this, too?
18             I'm going to have marked as Group Exhibit
19        16.
20             (Thereupon, the referred-to document was
21        marked by the court reporter for Identification
22        as Defendant's Exhibit 16.)
23   BY MR. LEVITT:
24        Q.   I will show you the actual originals, too.
25   Why don't you take a look at Group Exhibit 16, and
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 237

1    tell me if you recognize what you see there?

2        A.   A bunch of Luke Records checks made out to

3    Jeffrey Thompkins, myself.  Cash by Jeffrey

4    Thompkins, myself.

5        Q.   Some of them were made to a person named

6    Vincent McGee?

7        A.   Vincent McGee, that was an attorney in a

8    case I was involved in.

9        Q.   What was that?

10       A.   The federal case.  But they released me.

11   I was acquited, whatever.  I didn't even go to

12   trial.

13       Q.   Was it a criminal charge?

14       A.   Yeah, it was a charge.

15       Q.   Of what?

16       A.   Conspiracy.

17       Q.   To do what?

18       A.   I don't know.  Sell cocaine.

19       Q.   And Vincent McGee was your criminal

20   defense attorney?

21       A.   Yes.

22       Q.   Why would Luke Records, if you know, send

23   checks for you to Vincent McGee?

24       A.   Get me out of jail.  I'm a commodity man.

25   I'm not going to make no money for you locked up.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 238

```
 1   You got to get me on the streets.

 2        Q.    So he was posting your bail?

 3        A.    My bail.

 4        Q.    Paying your attorneys fees?

 5        A.    Yeah.  Against whatever, you know, against

 6   whatever monies came in, too.

 7        Q.    Do you know who Ralph Cooper is?

 8        A.    He worked for the company.  He did street

 9   promotion for the company.

10        Q.    And Paul Clark is one of those Poison Clan

11   folks you mentioned?

12        A.    Correct.

13        Q.    Now, this particular one, which is toward

14   the back, and I will be happy to show you my copy.

15   It is July of 1993.  It says, "Poison Clan Savannah"

16   written on it.

17            MR. JACKSON:  Does it say "Rockville" or

18        "Luke" at the top?

19            MR. LEVITT:  This one says "Luke."

20   BY MR. LEVITT:

21        Q.    Did you guys do a concert or a show in

22   Savannah?  Is that why there would be a check to

23   Paul Clark?

24        A.    I don't know.  I don't know why they gave

25   him that check, 225.  It looks like a per diem or
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 239

```
 1   something maybe.  Because 225, I would have gave him

 2   that out of my pocket.

 3        Q.   Why don't you look at the very last one,

 4   which is the Rockville Productions check dated April

 5   4th, 1995, payable to Jeffrey Thompkins.

 6             Do you see that one?  For $5,000?

 7        A.   Okay.  When was this?  '95.

 8        Q.   Did you get that check in April of 1995?

 9        A.   I must have.

10        Q.   Now, it says "Partial of second advance."

11             Do you know, do you know what that is in

12   reference to?

13        A.   Partial of second advance.

14        Q.   That is what it says in the lower left

15   hand -- lower right hand corner here.

16             MR. JACKSON:  Was this deposited?

17             MR. LEVITT:  This is the only one that is

18        photocopied.

19             THE WITNESS:  Towards what?

20             MR. LEVITT:  As opposed to an original.

21   BY MR. LEVITT:

22        Q.   Does this ring a bell with you at all, I

23   will just ask you?

24        A.   No.  But I could have gotten it, though,

25   because, I mean, by that time, we were demanding a
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 240

```
 1  little more money by then.

 2       Q.   For shows?

 3       A.   Yes.

 4       Q.   Let me just ask you, let's go to the

 5  front.  We will see some several checks payable to

 6  Jeff or Jeffrey Thompkins.

 7            MR. JACKSON:  Why don't you read from the

 8       copies?  Because that is.

 9            MR. LEVITT:  You are right.  We are kind

10       of just fumbling around.  I'm sorry.

11  BY MR. LEVITT:

12       Q.   Let me look at the first one on top 15.

13            MR. LEVITT:  These aren't in order.

14            (Thereupon, a discussion was held off the

15       record, after which the following proceedings

16       were held:)

17  BY MR. LEVITT:

18       Q.   Go through the checks you have in your

19  hand, and you can compare them to Exhibit 16.  I

20  don't care if they are in the same order or not.

21  All I'm going to ask you about them, is there any

22  reason for you to believe you did get the checks

23  payable to you and then when they are signed on the

24  back with your signature, is that your signature?

25       A.   Well, can I?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 241

```
 1              MR. JACKSON:  He's asking you if this is
 2        your signature.
 3   BY MR. LEVITT:
 4        Q.   And did you get those checks?
 5        A.   I got these checks.
 6        Q.   And you signed them and deposited them or
 7   cashed them?
 8        A.   Yeah.  Yeah.
 9        Q.   So, as an example here, we have one that
10   is Check No. 5519, April 21, 1994, to you on Luke
11   Records and it says a loan of $500.
12              Do you happen to remember why he gave you
13   a loan of $500 in 1994, what it was for?
14        A.   I guess we were in the process of working
15   by then and I probably needed some cash.
16        Q.   All right.  You go ahead and look at those
17   and tell me if you see any that strike you as being
18   for something other than a concert or an album.  We
19   saw the loan one already.
20              Let me ask you this one, the ones made
21   payable to you that appear to have your signature on
22   the back, you got them all and you signed them all
23   and you took the money?
24        A.   Right.
25        Q.   That is all I wanted to know about those.
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 242

```
 1        A.    All right.
 2              (Thereupon, a discussion was held off the
 3        record, after which the following proceedings
 4        were held:)
 5   BY MR. LEVITT:
 6        Q.    Did you do a song, That is How I Feel?  Or
 7   a song called Represent?  Or were you side man on
 8   those?
 9        A.    That is How I Feel, I did three verses.
10   Luke talked on the record.  But it was a Luke
11   record.  It was on his album.  And Represent, I just
12   did just one verse.
13        Q.    What about You Don't Stop, which has
14   another name that I'm not going to repeat on the
15   record?
16        A.    You Don't Stop.  I don't know.  I don't
17   even know what song that is.
18        Q.    What about Freak for Life?
19        A.    That was the title of the album.
20        MR. LEVITT:  I'm not going to mark these
21        exhibits unless you think it is important.
22        MR. JACKSON:  No.
23        MR. LEVITT:  All right.
24   BY MR. LEVITT:
25        Q.    When did you find out that Luke was in
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 243

```
 1   bankruptcy?
 2        A.    Newspaper.
 3        Q.    What did you do when you found out?
 4        A.    Nothing.  I don't know.
 5        Q.    Did you hire a lawyer to protect your
 6   rights in the bankruptcy?
 7        A.    No, I did not.
 8        Q.    Did you think you had any rights in the
 9   bankruptcy to get something out of it?
10        A.    Um, I really didn't know.  And, um, I
11   figured if I did, it would come up.
12        Q.    Do you know what a proof of claim is?
13        A.    Just what you said, proof of claim.
14             MR. LEVITT:  Next exhibit number, please.
15             (Thereupon, the referred-to document was
16        marked by the court reporter for Identification
17        as Defendant's Exhibit 17.)
18   BY MR. LEVITT:
19        Q.    Let me show you what we marked as Exhibit
20   17.  Do you recognize Exhibit 17?
21        A.    Excuse me.
22        Q.    Do you recognize Exhibit 17?
23        A.    Yes, I do.
24        Q.    What is it?
25        A.    A proof of claim for the bankruptcy case,
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 244

```
 1    the records.
 2         Q.    I cut you off.  Look at the bottom of the
 3    first page.  It is four pages long.  Do you see?
 4         A.    Yes.
 5         Q.    Is that your signature?
 6         A.    Yes.
 7         Q.    Did you see it?
 8         A.    Yes, I did.
 9         Q.    Did you see it around November 21, 1995,
10    which is the date next to your signature?
11         A.    Yes.
12         Q.    Look at the top left, where there is box
13    and it says, "Name of creditor."  Do you see that
14    there is printing inside of it?
15         A.    Correct.
16         Q.    Who printed it?
17         A.    Me.  Jeffrey Thompkins, myself.
18         Q.    That is three people.
19               Is that the address you were living at in
20    1995?
21         A.    Correct.
22         Q.    At one point in a brief your lawyer
23    mentioned something about mailings going to you in a
24    empty lot that Luke owned or something like that.
25               Do you know anything about that?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 245

1     A.    I don't know if Luke owned a lot or what.

2  Herman told me they said they were sending me

3  letters, and I'm like where?  And he gave me this

4  address.  And I went, rode by and found the address.

5  And that is an empty lot.  That was nothing.  It was

6  119th Street and something else.  Because I rode

7  back and I called him back, where did they say they

8  sent this?  I'm like, that is an empty lot.  That is

9  nothing there.

10     Q.    What made you think Luke owned it?

11     A.    I never said Luke owned it.

12     Q.    Okay.  Or Luther Campbell, I should say.

13     A.    I never said Luther Campbell owned it.

14     Q.    Did you ever see any of the documents that

15  Herman was saying had been sent to this empty lot?

16     A.    I don't know what he's talking about.  He

17  just said, whoever he was speaking to told him they

18  were sending me papers at this address.  I never

19  resided at this particular address.

20     Q.    Let me ask you this question, except for

21  the signature itself and the printing in the space

22  that says, "This space is for court use only," on

23  the lower right hand, down over where the "7-9 a.m."

24  was, is the rest of the printing on this page yours?

25     A.    Yes.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 246

1     Q.    Who wrote the word, "under term" in two
2  different spots?
3     A.    That is my handwriting.
4     Q.    How did you know to use that word?
5     A.    How did I know?
6     Q.    Yes.  Did somebody tell you or did you
7  just know?
8     A.    I don't know.  Maybe I asked the lady
9  right behind the counter because I went up to the
10  court and did this myself.
11          I was trying to find out.  See, this is
12  when -- The one day I got up to try to find out
13  about it to see if I could get any information.  So
14  I filled this and put it in so they don't overlook
15  me.  Like I didn't hire an attorney, I didn't know
16  what was going on.  I was just, like, I'm here.
17     Q.    Do you see where it says "Poison Clan" on
18  here, there is something that is crossed out and you
19  wrote in "Poison Clan"?
20     A.    JT Money.  It said, JT Money wasn't signed
21  as an artist, solo artist.  They had Poison Clan
22  records on Luke Records.
23     Q.    Now, stapled to this piece of paper are
24  some typewritten pages that have lists of songs and
25  albums.

Thompkins vs. Lil' Joe Records, Inc.        8/28/2003

Page 247

1          Do you see that?

2     A.    Uh-huh, yes.

3     Q.    Who typed that?

4     A.    I don't know who typed it.

5     Q.    Was this attached to it when you signed

6  the document?

7     A.    No.  I guess this one paper by itself from

8  the court.  I mean, I went to the courthouse and got

9  this and filled this out and turned it in.  These

10 papers, this here, somebody just put that there to

11 go, I guess, with the case.

12    Q.    So is it your testimony that you had

13 nothing to do with the creation of this typewritten

14 document that is stapled to what we have stapled to

15 the exhibit, that is stapled for our copy that we

16 have right now of Exhibit 17?

17         That was a long question.  Let me start

18 again.

19         Exhibit 17 consists of a top page, which

20 has proof of that claim that we already talked about

21 that has your handwriting on it and we already

22 signed it.  Attached to it in this copy at least, is

23 a stapled three page document typed, which has a

24 list of songs and albums.

25    A.    Right.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 248

1        Q.    Did you have anything to do with the

2    creation of this part of the document, the typed

3    portion?

4        A.    No.  No, I did not.

5        Q.    Do you have any idea how it came to be

6    attached to your proof of claim?

7        A.    No, I do not.  But, I mean, I can see why.

8    Because it is the songs I'm talking about in the

9    proof of claim.  These are all of the works that I'm

10   claiming.

11       Q.    And this is for the 2 Low Life Muthas

12   album, Poisonous Mentality?

13       A.    And Rufftown Behavior.

14       Q.    Well, I don't see that.

15       A.    In the back.  Rufftown Behavior is the

16   last one.  Last phase.

17       Q.    Okay.  And Freak for Life is because you

18   did some of the songs on that album of Luke's?

19       A.    Yes.  Banned in the USA.  I Got Shit on My

20   Mind.  Luke in the Knees.  Freak for Life.  I was on

21   all of those albums.

22       Q.    And that is a list of songs that you were

23   on on those albums; right?

24       A.    Yes.

25       Q.    Do you know where these percentages came

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 250

```
 1   for your works?
 2        A.   All of those statements you just showed
 3   me.
 4        Q.   I meant in the context of the bankruptcy
 5   case.
 6        A.   That is saying that I owed him now?
 7        Q.   Or he didn't owe you because there was
 8   still much more to go before we broke even?
 9        A.   No.  I don't remember a document stating
10   that.
11             (Thereupon, the referred-to document was
12        marked by the court reporter for Identification
13        as Defendant's Exhibit 18.)
14   BY MR. LEVITT:
15        Q.   Let me ask you to take a look at Exhibit
16   18, and aside from the cover page, although if you
17   recognize that, you can tell me, take a look at the
18   documents underneath the cover page and tell me if
19   you recognize them or if you have ever seen them
20   before?
21        A.   I can't say that I have.
22        Q.   I want you, the very second page of the
23   document is titled "Summary of Artists Royalties
24   Due."
25             Do you see that?  From Luke Records to
```

25 S.E. Second Avenue          Taylor Jonovic White & Gendron        Ph: 305.358.9047
Miami, FL  33131                www.myreporters.com            Fax: 305.371.3460

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 251

```
1   Poison Clan?

2        A.    Yeah.

3        Q.    From January of '93 to June of '95.  And

4   it has a total unrecouped balance of $157,000 plus.

5             Do you see that?

6        A.    Yes, I do.

7        Q.    Had you ever seen this part of the

8   document before I showed it to you just now?

9        A.    I can't say that I had.

10       Q.    Had you ever heard that number of

11  unrecouped balance still being outstanding?

12       A.    Oh, no.

13       Q.    Until I just showed it to you just now?

14       A.    No.

15       Q.    Do you know what the phrase "unrecouped

16  balance" means in the music business?

17       A.    It is unrecouped.  They haven't received

18  their money yet, money they advanced for my project.

19  They didn't receive.

20       Q.    What does it mean if there is an

21  unrecouped balance to you as an artist?

22       A.    It means that I owe them.

23       Q.    Was this document ever attached to any of

24  the documents you received from the bankruptcy,

25  whoever was sending you things at the bankruptcy?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 252

```
 1        A.    I wouldn't know what was in there.  It was

 2   too much going on for me at the time.  I don't

 3   remember this document.

 4        Q.    Okay.

 5        A.    This here, they were just putting money

 6   off on us.

 7        Q.    Are you saying there is something that

 8   doesn't belong attributed to Poison Clan?

 9        A.    That 157,000, that doesn't belong to

10   Poison Clan.

11        Q.    Why not?

12        A.    I know they didn't spend money like that

13   on that on us.

14        Q.    How do you know that?

15        A.    I know what was spent on us.  I know

16   videos was only 10, $20,000.  We did one video for

17   50,000 that ain't doing nothing.  But that was a

18   whole another project.

19        Q.    Well, how many videos did you do?

20        A.    Maybe five all together.

21        Q.    And how much would they cost each to put

22   together as far as you understand it?

23        A.    The first album we did two, the second

24   album we did two, the third album we did two.

25        Q.    Do you have reason to believe what it says
```

1  on this piece of paper that they spent $70,487.60

2  for costs for videos that they didn't do that?

3      A.   No.   No.   It depends.   This is going from

4  '93 to '95.   I don't know.   That is a little late in

5  the game.   '93 was the year we spent almost 50 on

6  the video.

7      Q.   In '93, at least 50, you can account for

8  of the 70 shown on this document?

9      A.   Yeah.   Yeah.   But, then, I think that is

10  the same year we did the Check Out the Album Video.

11  I don't know how much that was.

12      Q.   Why don't you take a look at the upper

13  right side, Page 11.   Take it through to Page 11.

14          Okay.   Now, those were '93, those were all

15  costs which add to the same number we see on that

16  second page, 70,487.60, all for 1993 in terms of the

17  date.

18          Do you see that?

19      A.   What am I looking for?

20      Q.   Well, here, do you see the --

21      A.   Yeah.

22      Q.   Do you see it says "June of '93," and

23  "December of '93," all of those dates are in

24  December of '93.   Do you see that?

25      A.   Uh-huh.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 254

1        Q.    You see the total 70,487.60 is the same as

2    the total that was shown on that summary page, Page

3    2?

4        A.    Right.

5        Q.    Do you have reason to believe that the

6    expenses listed there weren't really spent by Luke

7    to do the videos that were reflected on this page?

8        A.    Reason to believe that the money -- that

9    he didn't spend the money?

10       Q.    Right.

11       A.    I mean, I guess he spent it.  I don't know

12   that he spent it besides what you are showing me

13   right here.  But I mean, whatever.

14       Q.    But you have nothing to say that he didn't

15   spend what it says here?

16       A.    No, I don't.

17       Q.    Is there anything, and I'm not asking you

18   to make a minute detailed examination right now,

19   every document, every number on this page, is there

20   anything that you notice on this document that looks

21   to you like it is not true?  In terms of what was

22   spent and what kind of expenses they had?  And the

23   royalties and whatever else we are looking at?

24       A.    Huh-huh.  You mean, I don't know.  I'm not

25   complaining.

Thompkins vs. Lil' Joe Records, Inc.          8/28/2003

Page 255

1          MR. JACKSON:  You have cancelled checks or

2     back up documents for this?

3          THE WITNESS:  Right.  That is what I want.

4          MR. LEVITT:  I'm not being deposed.  I'm

5     asking him questions.

6          THE WITNESS:  That is all I have ever

7     asked for, show me this money.

8  BY MR. LEVITT:

9     Q.   All I'm asking you now is if you have

10  anything that indicates to you that the firm that

11  did this document, which is Padell, Nadell, Fine &

12  Weinberger & Coe, did not actually reflect what they

13  found in their review of the documents?

14          MR. JACKSON:  Objection to the form of the

15     question as it lays a foundation that hasn't

16     been laid for this question, and there is no

17     testimony or documents by this firm that they

18     examined the underlying checks or documents to

19     prepare what looks like a Lotus or some type of

20     Excel spreadsheet summary of what you are

21     talking about.

22  BY MR. LEVITT:

23     Q.   All right.  I'm still asking the question.

24          (Thereupon, a discussion was held off the

25     record, after which the following proceedings

Thompkins vs. Lil' Joe Records, Inc.                           8/28/2003

Page 256

```
 1        were held:)

 2   BY MR. LEVITT:

 3        Q.   I'm waiting for you to tell me if there is

 4   anything, as you look through the document, that

 5   strikes you as incorrect or wrong?

 6        A.   I don't know.  I couldn't even say.  I'm

 7   just looking at this -- This is all new to me.  I'm

 8   just checking it out.  I'm seeing what Buddy is

 9   telling me I owe him or what have you.

10        Q.   Right.  I'm asking you if you see anything

11   in the numbers and the number of units sold or

12   anything along the way that looks to you to be

13   wrong?

14        A.   Yeah.  Well, first of all, where I got

15   27,000 in advances for whatever, this is just over

16   the period of time or two years.

17        Q.   Which document are you looking at?

18        A.   '93 to '94.

19        Q.   Page 13?

20        A.   Yeah.  What is this?  These are the same

21   checks you all just showed me?

22        Q.   I'm asking you if it looks familiar to

23   you.  That is all.

24        A.   And then all of these different people who

25   they say they paying for these different jobs, I
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 257

1    know nothing about this.

2        Q.   Okay.  Do you know -- Take a look at that

3    same page, Page 13 of the exhibit.  You see there is

4    on the top at least an advance to Brenda Thompkins,

5    July 30, 1993 for $1,500.

6            Do you know why there would be an advance

7    to Brenda?

8        A.   I'm sure I asked for it.  I okayed it or

9    what have you.

10       Q.   Okay.  Are you saying that you don't think

11   you got all of these advances?

12       A.   No, no, no.  I got them.  But, see, these,

13   if you paying me the dues, do something on your

14   album.  You try to do a Christmas album, you pay me

15   for those songs, all right?  So I'm supposed to get

16   that for that work.

17           But when I'm doing my own thing, I just

18   work until I'm finished.  Do you understand that?

19   So all of this, one thing don't have nothing to do

20   with the other, is what I'm saying.

21       Q.   You are saying that these weren't really

22   advances, they were just payments?

23       A.   No.  They were advances for other

24   projects.  But, now, as a record company, you got

25   this bright idea, oh, I want to do a Christmas album

Thompkins vs. Lil' Joe Records, Inc.                              8/28/2003

Page 258

1   today and I'm going to give you this money for these

2   songs.  Okay.  Give me the money; I do the songs and

3   I give them to you.

4            Later you find out you don't want to do it

5   or just hadn't done anything with it.  I mean, you

6   still got the product, sell the product.  That is

7   how you get your money.

8        Q.   You understand that an advance is just

9   that?

10       A.   That is right.

11       Q.   And if they don't sell it, it is still --

12       A.   Owed on this project.  It ain't got

13   nothing to do with Low Life Muthas, my Rufftime

14   Behavior.  That is monies on this.

15       Q.   So your interpretation --

16       A.   My interpretation.

17       Q.   -- is that an advance applies only to the

18   project that the advance is for and not to your --

19   whatever else you wrote all together?

20       A.   Right.  Why would it be?

21       Q.   I'm just asking the question.

22       A.   That is my understanding, interpretation

23   and all of that.

24       Q.   So that is what it is about, that page of

25   this exhibit, that you disagree with because the

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 259

```
 1    advances don't necessarily apply to the royalties
 2    that you think that you would be owed?
 3         A.    Right.  This is not, these are not Poison
 4    Clan records.  I mean, these like, this 15, I think
 5    that is -- I don't know.  Other songs.
 6         Q.    We talked about Pimpin' On Wax, but it is
 7    also a phrase Simply Pimpin'.  Is that the name of
 8    one of the songs on Pimpin' On Wax?
 9         A.    No.  That was a song me and Mark Ross was
10    going to do.
11         Q.    A particular song?
12         A.    Yeah.
13         Q.    And is this the same song or a different
14    song, Playa Ass Shit?
15         A.    My first verse is the same, but I added
16    two verses to that record.  I used the verse from
17    simply pimping that we did not use three, four years
18    prior.  And, yeah, I fit it with my song I was
19    doing.
20         Q.    So did Playa Ass Shit ever show up on an
21    album?
22         A.    It is on Pimpin' On Wax.
23         Q.    What about Simply Pimpin', is that on
24    Pimpin' On Wax?
25         A.    No.  Joe got that.
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 260

```
 1        Q.    Is it anywhere, Simply Pimpin'?

 2        A.    Your client has that.

 3        Q.    Did it ever show up on an album that you

 4   know about, whoever released it, Joe or anybody

 5   else?

 6        A.    No.  I mean, I don't know.

 7        Q.    Maybe you explained this and I didn't get

 8   it.  So Playa Ass Shit, which is on an album you

 9   released on Pimpin' On Wax, has some parts of what

10   was Simply Pimpin' and you did them on a different

11   way on Playa Ass Shit?

12        A.    Right.  Right.  Yes.

13             (Thereupon, a recess was taken, after

14        which the following proceedings were held:)

15             (Thereupon, the referred-to document was

16        marked by the court reporter for Identification

17        as Defendant's Exhibit 19.)

18   BY MR. LEVITT:

19        Q.    Mr. Thompkins, I have showed you what we

20   have now marked as Exhibit 19.  Actually, this is

21   Exhibit 19.  I will take that one back.

22             First, let me ask you to turn to the page

23   where all of the addresses are and there is one that

24   says Page 3 of 6 up at the top.

25        A.    3 of 6?
```

Thompkins vs. Lil' Joe Records, Inc.

8/28/2003

Page 261

1    Q.    It says it right here.

2    A.    Yeah.

3    Q.    And do you see about 25 percent of the way

4    down the page there is your name and an address and

5    your address in Miami?

6    A.    Uh-huh.

7    Q.    That is your name and address; right?

8    A.    Correct.

9    Q.    Your correct name and address?

10   A.    Correct.

11   Q.    At least the document says, if you look in

12   the upper right-hand corner, it was served April 11,

13   1996.

14         Do you see that?

15   A.    Yes.

16   Q.    Did you get this document from the

17   bankruptcy court or from any other source in April

18   of 1996?

19   A.    I don't know.  I'm not sure.

20   Q.    If you did get it, what would you have

21   done with it?  That is physically.  I'm not talking

22   about if you would have done something because you

23   got it.

24   A.    I don't know.  I probably would have tried

25   to read it and got tired and not finished reading

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 262

1   it.

2          Q.   Did you have a lawyer at this time?

3          A.   No.  No attorney.  No representation.

4          Q.   Not for any purposes?

5          A.   No.  I was not doing business at that

6   time.

7          Q.   But you did have some documents from the

8   bankruptcy court from time to time?

9          A.   I got letters from the mail.  Little

10  packages from the mail.

11         Q.   When you got them, did you throw them out

12  or did you put them in a file somewhere?

13         A.   For the most part, they piled up in my

14  room, right by my little file cabinet, and that was

15  it.  I didn't take them to an attorney or anything.

16         Q.   Do you still have them?

17         A.   I don't think so.  I may have one or two

18  or something.  I may have a paper.  I don't know.

19              As far as this bankruptcy thing, I did get

20  some papers.  I don't know where they have now.

21         Q.   Did you throw them out at some time?

22         A.   I'm not sure if I cleaned up and I'm not

23  using it.

24         Q.   Did you give them to Mr. Hudson or any

25  other lawyer eventually?

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 263

```
 1        A.    I hope so.  Anything I had pertaining to
 2   Luke Records, Poison Clan, he got it.  Anything.
 3        Q.    Do you know if back in your house in
 4   Georgia now you have some documents that relate to
 5   the bankruptcy case?
 6        A.    No, I don't know.
 7        Q.    What would you have to do to find out?
 8        A.    Go through all of the files.  Go home and
 9   go through everything I have.
10        Q.    Did you have a folder or something that
11   you created for the bankruptcy court?
12        A.    No, I didn't just make a folder for
13   bankruptcy.
14             (Thereupon, the referred-to document was
15        marked by the court reporter for Identification
16        as Defendant's Exhibit 20.)
17   BY MR. LEVITT:
18        Q.    Let me show you what we have marked as
19   Exhibit 20.  Do you recognize it?
20        A.    What is it?
21        Q.    It is on order regarding the joint plan of
22   reorganization.
23             My only question to you is, do you ever
24   remember getting a document with that title at any
25   time?
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 264

```
 1        A.    Plan for reorganization.  I remember those
 2   words, that phrase.  I don't remember the document.
 3             Like I say, I got a lot of documents, you
 4   know.  One month, I get one.  Next month, I might
 5   get one.  Wait two months, I might get another one.
 6        Q.    Did you ever see any of the documents
 7   Mr. Hudson had mentioned that were sent to that
 8   empty lot?
 9        A.    No.
10        Q.    Am I correct that the only way that you
11   know about the idea that something was sent to an
12   empty lot was because Mr. Hudson told you that that
13   had happened?
14        A.    Yeah.  He told me whoever he was speaking
15   to said they were sending me my statements or my
16   mail or whatever was coming to me at that particular
17   address.  And I rode by and saw that it was an empty
18   lot.
19        Q.    Do you remember approximately when it was
20   that Mr. Hudson told you that?
21        A.    I don't know.  A year or two ago.  A year,
22   two years.
23        Q.    2001?  2002?  Is that what you mean?
24        A.    Yeah.
25        Q.    Did Mr. Hudson tell you to whom he had
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 265

```
 1   spoken had told him that?
 2        A.    I'm sure he did.  But I don't remember.
 3             (Thereupon, the referred-to document was
 4        marked by the court reporter for Identification
 5        as Defendant's Exhibit 21.)
 6   BY MR. LEVITT:
 7        Q.    Let me show you what we have marked as
 8   Exhibit 21.
 9             Do you remember getting a document like
10   this one?
11        A.    I'm not sure.
12        Q.    All right.  Let me ask you to look towards
13   the back where they have a group of addresses.
14             Do you see that?  When you get there, look
15   at that first page and the top center.
16        A.    Uh-huh.
17        Q.    It says "Jeffrey J. Thompkins" with an
18   address in Miami.
19             That is your correct address; is that
20   right?
21        A.    Yes, it is.
22        Q.    Do you have any reason to think that this
23   document was not mailed to you as it seems to say?
24        A.    I'm thinking that I saw this document.
25   But I don't know, because the numbers look right --
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 266

```
 1   I mean, if is it is anything with dollar signs on
 2   it, if it the numbers are, I probably looked at it.
 3   What it was for or why, I don't know.
 4        Q.   Now, do you see, if you look at Page 7,
 5   your name is there?
 6        A.   Page 7.  Okay.
 7        Q.   At Number 79, Jeffrey Thompkins, unliq,
 8   unliquidated is what that means, next to your name.
 9             Do you see that?
10        A.   Uh-huh.  Yes, I do.
11        Q.   So when you got it, did you notice that
12   they were saying something about you and about your
13   claim?
14        A.   Yeah.  I knew they were saying something
15   about me if my name right there.
16        Q.   Once you received it, did you do anything
17   with it because they were saying something about you
18   and your claim?
19        A.   I mean, my whole thing with this whole
20   bankruptcy, I knew they were trying to get us out of
21   the way.  You all ain't major enough.  You all are
22   the little people.
23             Now, myself, I was only concerned with my
24   product.  Because that is my only claim.  My
25   creations, my intellectual properties, you know, my
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 267

1    creations.   Yeah.

2           So that is -- If I saw this and I see all

3    of these people who claim who they claim they owed

4    money, too, saying, 50,000, $100,000, 1,000 and next

5    to my name "unliq," they just blowing me off.

6           I don't have an attorney.  I don't even

7    know if it is worth it to go out there because we

8    never seen any money, period.  I don't know if they

9    have any money there to go get.  But what I do want

10   is my product.  My rights to my product.

11        Q.   All I'm asking you is this:  You have got

12   a document that was titled "Objections to claim,"

13   and your claim was one of the ones listed as one of

14   the ones they were objecting to; right?

15        A.   That is them objecting to my claims?

16        Q.   Right.  You understood that when you got

17   this document?

18        A.   No.  I'm just finding that out right now.

19   So it is their objections to whatever we claiming?

20        Q.   Correct.

21        A.   Okay.

22        Q.   Did you ever do anything, once you got

23   this document, to protect your claim, the one that

24   you had filed in the bankruptcy case?

25        A.   That is not what I did with the proof of

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 268

1    claim.

2        Q.   This came after the proof of claim.   You

3    filed your claim in 1995.   We will grab it and look

4    at it.

5            MR. JACKSON:   This was after.

6            MR. LEVITT:   I'm just.

7    BY MR. LEVITT:

8        Q.   So this came out after your proof of

9    claim.   That is how they knew where to send it

10   because it had your address on it; right?   You would

11   agree with that?

12       A.   Yeah.

13       Q.   All I'm asking you is when you got this

14   piece of paper that says there is an objection to

15   your claim, the one that you had already filed.

16           Did you do anything?

17       A.   Huh-huh.   I tried to show up at the next

18   court hearing I heard about.   But, still, it was

19   nothing.   I went down by myself.   Sat around, waited

20   in the hallway.   Kicked it with a couple of the

21   other artists, just sitting out there in the

22   hallway.

23       Q.   Who was that?

24       A.   Chris Wong from 2 Live and somebody else,

25   one the other artists.   I don't know if it was Verve

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 269

1    or somebody else.   Somebody like that.

2        Q.   Okay.  And then what?  What happened?

3        A.   I don't know.  Everybody was fighting over

4    the money, and then it was over.   And your client,

5    Mr. Weinberger was telling us former Luke Records

6    artists, you all don't worry about it, I'm going to

7    handle it.

8        Q.   He said that to you that day?

9        A.   Yes.

10        Q.   When?

11        A.   In the hallway?  Right in the hallway.

12    Right by the door, right in the hallway.  Yeah, what

13    I got to do?  I want to get my claim, da-da, da-da,

14    da-da.  Don't worry about it.  I'm going to handle

15    all of that.

16            So at this time I had no reason to doubt

17    that he would do that.  Because he was all right

18    back then.  In the dig.

19        Q.   He was already by then?

20        A.   He was all right back then.  He was okay.

21    I had -- I didn't know what I know today.  I was

22    virgin minded.  Virgin minded about that.

23            Did I answer the question?  I didn't

24    finish it, right?  Did I answer your question?

25        Q.   Right.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 270

```
 1        A.    All right.    Cool.    That is why nothing
 2   happened after that.
 3             (Thereupon, the referred-to document was
 4        marked by the court reporter for Identification
 5        as Defendant's Exhibit 22.)
 6   BY MR. LEVITT:
 7        Q.    Please take a look at Exhibit 22.    I'm
 8   done with this one.    There is three pages there with
 9   different dates.
10             Do you know what these documents are?
11        A.    It is songs I did on Luke's records.    On
12   his personal records.
13        Q.    Each of these three documents appears to
14   have a signature over a line, which is typed,
15   "Jeffrey Thompkins."
16             Do you see that?
17        A.    Yes, I do.
18        Q.    Did you sign each of the documents in the
19   space indicated and is that your signature?
20        A.    Yes, it is my signature.
21        Q.    And did you see it?
22        A.    Yes, I did see it.
23        Q.    And these each relate to albums that you
24   were going to be participating in, a Luke album?
25        A.    Excuse me.    Say that again.
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 271

```
 1        Q.    Do these each relate to something that you
 2   were going to be doing?
 3        A.    Participating in a Luke album and one H
 4   Town album.
 5        Q.    Who is H town?
 6        A.    Another group on the label.  Singing group
 7   out of Houston.
 8        Q.    What did you do?
 9        A.    Feature Fever for da Flavor.  On the
10   title, Fever for da Flavor.
11        Q.    Is that only thing you ever did for H Town
12   was that one song on that one album?
13        A.    Yeah.  That is it.  I did a remix to the
14   same cut, but they didn't use it.
15        Q.    I remember we looked at, and I will grab
16   it.  That side man agreement you did with Mark Ross?
17        A.    Yeah.
18        Q.    Did you get an advance for that one?
19        A.    Yes, I did.
20        Q.    Do you remember how much?
21        A.    About 10,000.
22        Q.    That would only apply to any royalties
23   that you would be entitled to get on that advance?
24        A.    Excuse me.
25        Q.    Was that $10,000 payment in cash or was
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 272

1    that an advance?

2         A.    That was an advance towards any money that

3    was made from that.

4         Q.    From that?

5         A.    From one song.  My portion of whatever I

6    did with Mark Ross.

7         Q.    And only sales of that one song for Mark

8    Ross?

9         A.    Well, the deal with Mark Ross was doing a

10   album.

11        Q.    Right.

12        A.    Right?  I don't know how he was going to

13   do the album or what.  They asked me to help him do

14   the album.  Feature on a few songs.  Maybe drop

15   hooks, you know.  Help the man complete an album.

16            I agreed to it.  Supposed to give me 20K.

17   Gave me 10.  We went to work.  We did the one song.

18   We started another one.  And the next thing I know,

19   Mark don't live in Miami no more.  And then, you

20   know, he ain't communicating with the record company

21   no more.

22            By that time I'm moving on because during

23   this whole process, I'm still looking for a JT Money

24   deal.  So my business is going on while theirs is

25   doing whatever it is.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 273

1      Q.   Suppose everything worked out, Mark Ross
2    had not left Miami, what you thought was going to
3    happen when you made the deal for the Mark Ross
4    album, what was your understanding of how you would
5    get paid, besides the advance, for anything, any
6    income that was received from the Mark Ross --
7      A.   Well, from that little side man thing, I
8    was 50/50 on the song.
9      Q.   Right.
10     A.   But I guess that was the songs I
11   participated in.
12     Q.   Yeah.
13     A.   So I guess they were my portion.  Whatever
14   I did.  If it is 12 songs on an album and I
15   participated in six of them, 50 percent of that
16   50 percent was mine.
17     Q.   That would only be on the royalties that
18   would be coming to Mark Ross?
19     A.   Mark Ross, right.
20     Q.   From that album?
21     A.   Right.
22     Q.   You would get your share of whatever
23   royalties Ross was supposed to get because of that
24   album under Ross's contract with?
25     A.   Correct.

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 274

```
 1        Q.    Okay.  And so for you to get any money,
 2   you would have to get more than $10,000 -- $20,000
 3   worth of royalties.  That is where it says
 4   50 percent.  That is what you are talking about on
 5   Exhibit 8?
 6        A.    Yes.
 7        Q.    In other words, in order for Luke to get
 8   back the 10,000 that it paid you in advance --
 9        A.    Luke didn't pay me for that.
10        Q.    Joe Weinberger did.
11        A.    It was his own label.  Lil' Joe.
12        Q.    You got me.  Thank you.
13              In order for you to get any money,
14   Weinberg would have to sell enough of that album to
15   have at least $20,000 in royalties payable to Mark
16   Ross, 10 of which would go to you?  Do you follow
17   you me?
18        A.    Well, yeah.
19        Q.    He's already out 10.  Because he's paid
20   you 10 as an advance.  He's already paid Ross 10, I
21   suppose, too.
22        A.    I don't know.  Maybe Ross was going to get
23   20 and I was going to get 20.  Maybe the upfront was
24   40.
25        Q.    But you remember --
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 275

```
 1        A.    I was supposed to get 20.  I got my first

 2   10 when we signed this.  And I did the song.

 3        Q.    Right.

 4        A.    And we was getting ready to start another

 5   one job, why we didn't do the other song.  But I was

 6   showing up every day trying to work.  This is --

 7   this is why they called me.  Because I worked.

 8   Whatever they was going through, that was their

 9   business.  When they fell out where did that leave

10   me, out there?

11        Q.    Right.

12        A.    Right.

13        Q.    All I'm trying to say --

14        A.    That is all I'm saying.  I want you to

15   understand.

16        Q.    I do understand.  All I'm trying to do is

17   ask this question and maybe I haven't asked it well,

18   so let me try again.

19             The only way that Lil' Joe Records would

20   get at the time money, so to speak, on the $10,000

21   it advanced you was if the album sold enough that it

22   made at least enough to cover the $10,000 that he

23   paid you as an advance?  Do you follow me?

24        A.    Yeah.  That is just business.  That is how

25   it goes.  Yes?  That is the way.
```

Thompkins vs. Lil' Joe Records, Inc.                8/28/2003

Page 276

```
 1        Q.    And the next question -- Go ahead.

 2        A.    Never an opinion.  I don't want to drag it

 3   out.

 4             MR. JACKSON:  Just answer this question.

 5             THE WITNESS:  Right, exactly.

 6   BY MR. LEVITT:

 7        Q.    In terms of royalties that you have

 8   received on your best selling song, which I think

 9   was Who Dat?, perhaps, what is the amount of

10   royalties that you have gotten on that all together?

11        A.    I don't know the amount.

12        Q.    Give me a rough estimate.

13        A.    I don't know.  For that particular song.

14   I don't know.  Twenty, $30,000.  Maybe.

15        Q.    All together from the time you recorded it

16   today?

17        A.    I'm telling you the next year that record

18   was over.

19        Q.    Wasn't there another song on that same

20   album Who Dat? was on that also tock off a little

21   bit?  Or do I misremember?

22        A.    I don't think on that album besides Who

23   Dat?.

24        Q.    Okay.  When you signed the 1995 recording

25   agreement with Luke Records, that is the one you
```

Thompkins vs. Lil' Joe Records, Inc.                    8/28/2003

Page 277

1    thought ended in '94, you signed a new one, did you

2    get an advance for that agreement of some amount?

3        A.    Yes.

4        Q.    How much?

5        A.    The 32,5, 37,5.

6        Q.    That was the 37,5 we were talking about

7    before?

8        A.    Correct.

9        Q.    Was that supposed to apply to all albums

10   you did under the recording agreement or just Strait

11   Zooism or what?

12       A.    I'm not sure.  But if they would have

13   called for another one after that, I was going to

14   ask for that money or more anyway.

15            MR. LEVITT:  Let me check my notes.  I

16       think I'm pretty well done.

17            I have no more questions.

18            MR. JACKSON:  We will read and sign.

19       Thank you.

20            (Thereupon, the taking of the deposition

21       was concluded at 3:25 p.m.)

22

23

24

25

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 278

```
 1                        AFFIDAVIT
 2      STATE OF FLORIDA           )
        COUNTY OF                  )
 3
 4
            I,                      , being first
 5      duly sworn, do hereby acknowledge that I did
        read a true and certified copy of my deposition
 6      which was taken in the case of JEFFREY
        THOMPKINS V. LIL' JOE RECORDS, ET AL., taken on
 7      the 28th day of August, 2003, and the
        corrections I desire to make are as indicated
 8      on the attached Errata Sheet.
 9
10                        CERTIFICATE
11
12      STATE OF FLORIDA           )
        COUNTY OF                  )
13
14
            Before me personally appeared
15      _____,
        to me well known / known to me to be the
16      person described in and who executed the
        foregoing instrument and acknowledged to and
17      before me that he executed the said instrument
        in the capacity and for the purpose therein
18      expressed.
19
20          Witness my hand and official seal, this
        _____ day of _____, _____.
21
22
23                      _____
                                (Notary Public)
24
25      MY Commission Expires:
```

```
                        ERRATA SHEET

 PAGE    LINE           REMARKS

 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
 ------------------------------------------------------
                       ------------------------------
                       Signature of Witness

 ------------------------------------
 (Notary Public)
 Dated this _____ day of _____, _____.
 MY Commission Expires: _____
```

Thompkins vs. Lil' Joe Records, Inc.                          8/28/2003

Page 280

```
 1                    CERTIFICATE OF OATH
 2    STATE OF FLORIDA    )
 3    COUNTY OF DADE       )
 4
 5            I, the undersigned authority, certify
      that JEFFREY THOMPKINS personally appeared before
      me and was duly sworn.
 6            WITNESS my hand and official seal this
      10th day of September, 2003.
 7
 8
                                KELLI ANN WILLIS, RPR
 9                              Notary Public, State of Florida
                                My Commission No. CC911443
10                              Expires: 2/16/04
11       + + + + + + + + + + + + + + +
12                      CERTIFICATE
13    STATE OF FLORIDA    )
14    COUNTY OF DADE       )
15            I, KELLI ANN WILLIS, Registered
      Professional Reporter, do hereby certify that
16    I was authorized to and did stenographically
      report the foregoing deposition of    JEFFREY
17    THOMPKINS; that a review of the transcript  was
      requested; and that the transcript is a true record
18    of my stenographic notes.
              I FURTHER CERTIFY that I am not a
19    relative, employee, attorney, or counsel of any
      of the parties, nor am I a relative or employee
20    of any of the parties' attorney or counsel
      connected with the action, nor am I financially
21    interested in the action.
              Dated this 28th day of September, 2003.
22
23              KELLI ANN WILLIS, RPR
24
25
```

25 S.E. Second Avenue        Taylor Jonovic White & Gendron        Ph: 305.358.9047
Miami, FL   33131            www.myreporters.com                  Fax: 305.371.3460

# EXHIBIT 6

Division of Corporations

Page 1 of 2



## Florida Profit

### PAC-JAM PUBLISHING, INC.

#### PRINCIPAL ADDRESS
C/O LUTHER R. CAMPBELL
8400 NE 2ND AVENUE
MIAMI FL 33138
Changed 07/09/1991

#### MAILING ADDRESS
C/O LUTHER R. CAMPBELL
8400 NE 2ND AVENUE
MIAMI FL 33138
Changed 07/09/1991

| Document Number | FEI Number | Date Filed |
|---|---|---|
| L15023 | 650150242 | 09/14/1989 |
| **State** | **Status** | **Effective Date** |
| FL | INACTIVE | NONE |
| **Last Event** | **Event Date Filed** | **Event Effective Date** |
| ADMIN DISSOLUTION FOR ANNUAL REPORT | 08/23/1996 | NONE |

## Registered Agent

| Name & Address |
|---|
| LUKE, INC. 8400 NE 2ND AVENUE MIAMI FL 33138 |
| Name Changed: 04/26/1990 |
| Address Changed: 07/09/1991 |

## Officer/Director Detail

| Name & Address | Title |
|---|---|
| CAMPBELL, LUTHER R. 8400 NE 2ND AVENUE | DPV |



MIAMI FL

## Annual Reports

| Report Year | Filed Date |
|-------------|------------|
| 1993 | 05/01/1993 |
| 1994 | 05/01/1994 |
| 1995 | 12/18/1995 |

Previous Filing          Return to List          Next Filing

View Events
No Name History Information

## Document Images
Listed below are the images available for this filing.

No images are available for this filing.

**THIS IS NOT OFFICIAL RECORD; SEE DOCUMENTS IF QUESTION OR CONFLICT**

# EXHIBIT 7

Addendum to Exclusive Recording Contract entered into in May, 1989 Between Effect Records, Inc. and Luke Records, Inc. and Jeffrey J. Thompkins (p/k/a JT Money) also known as the Poison Clan ("Artist"). This addendum is dated this _____ day of February, 1992.

The original Exclusive Recording Agreement is amended to provide the following:

1. No producer will receive any writer's or publishers royalties or share in any writer's royalties unless said producer actually writes the music.

2. Luke and Effect will use their best efforts to obtain the input of Artist on any promotional items spent on behalf of Artist and will attempt to obtain artists' approval, which shall not be unreasonably withheld, on a promotional budget prior to protion of Artist's album soon to be released and all future albums.

3. Luke and Effect will use their best efforts to notify Artist of the optional periods in the contract.

4. Artist shall receive a recoupable advance of $5,000.00 upon the completion of each album.

5. Artist will receive the entire royalty in the contract even if additional artists are added to the group.

6. Artist hereby sells, transfers and assigns to Pac Jam Publishing or such other company designated by Luke or Effect an undivided 50% of the publishing interest, in all compositions of artist including without limitation, the copyrights therein and all renewal and or extensions throughout the world and all claims and causes of actions related to the compositions, including without limitation, the words, titles and music of the compositions and each and every arrangement, adaptation and version thereof. Artist will execute and deliver to Luke and Effect or its successors and assigns or designees such instruments of transfer and other documents regarding the rights of Luke and Effect or their designees in the compositions which are reasonably necessary to carry out the purposes of this agreement including without limitation the songwiters agreement which is attached hereto and Luke and Effect or their designees may sign such documents in artist's name or the name of any controlled songwriter and make appropriate disposition of them. Artist irrevocably appoints Luke and Effect or their designess irrevocably for the term of the copyrights and renewal periods its lawful attorney to do all acts deemed necessary for Artist. All copyrights will be re-registered in the name of Artist and Luke and Effect or their designees

and any other additional parties which are appropriate.

7. All prior agreements entered into by Artist are hereby ratified and affirmed by Artist.


Luke Records, Inc.
and Effect Records, Inc.

By: _____
    Luther R. Campbell, President of
    both corporations


_____
Jeffrey Thompkins
("Artist")

# EXHIBIT 8

3/30/90

Copyright © 1966 Copyright Service Bureau, Ltd.

AGREEMENT made this _____30th_____ day of ___March_____, 1990

by and between _____ Luther R. Campbell
                         Pac Jam Publishing/Skyywalker Records
                         3050 Biscayne Blvd.
                         Suite 307
                         Miami, Fl.  33137

(hereinafter referred to as the "Publisher")

—and—            Jeffrey Thompkins
                 Patrick Watler
                 p.k.a.
        The Poison Clan (T.I.'s Money/Debonaire)

jointly and/or severally,

(hereinafter referred to as the "Composers")

## WITNESSETH:

WHEREAS the Composers have written, composed and created a new and original musical composition entitled

The Low Life Muthas,Spoiled Rotten,Jeri Curl,The Bitch that I Hate,
Dance All Night,Poison Freestyle,Flaugin',Bad Influence,You Gets
Nothin,The Neighborhood Haps, Juveniles

(hereinafter referred to as the "musical composition"); and,

WHEREAS, the Composers, recognizing the ability of the Publisher to exploit said musical composition, desire to assign same to the Publisher;

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, in hand paid to each of the parties hereto, receipt whereof is hereby mutually acknowledged, it is agreed:

1.  The Composers warrant and represent that they are the sole authors and composers of the music and/or lyrics constituting the musical composition, that said musical and/or lyrics are their own original work and creation; and that neither said music nor lyrics, nor any part thereof, are a copy of any other work. The Composers further represent that they have not sold, assigned, leased, licensed or in any other way disposed of or encumbered the rights herein granted to the Publisher and that they have the right to make this agreement.

2.  The Composers hereby sell, assign, transfer and set over unto the Publisher, its successors and assigns, the said musical composition (lyrics, music and title) and each and every arrangement thereof, together with the worldwide copyright thereof, and the right to secure copyright therein for the entire world, with all of their right, title and interest, both legal and equitable therein, including but not limited to the sole and exclusive worldwide publication, mechanical, electrical reproducing, transcription and motion picture and television synchronization rights and the right of public performance by radio, television and other means, and all other rights now known or hereafter to come into existence.

LJWR0029

3. In consideration for and in full payment of the rights granted to Publisher herein, the Publisher hereby agrees to pay the following royalties to the Composers with respect to the musical composition:

[a] Fifteen (15%) percent of any and all net sums actually received by Publisher, less printing costs, if any, and less collection fees, for piano/vocal editions (regular sheet music) thereof, printed, published and sold in the United States and/or Canada;

[b] Fifty (50%) percent of any and all net sums actually received by Publisher, less collection fees, for copies of orchestrations, band arrangements, choral arrangements, and/or arrangements for instruments and/or other copies of the musical composition (other than regular sheet music), so printed, published and sold in the United States and/or Canada;

[c] That proportion of fifty (50%) percent of the amount received by Publisher, less collection fees, as the musical composition hereunder bears to the total number of compositions used in any song book, song sheet, folio or similar publication, so printed, published and sold in the United States and/or Canada;

[d] Fifty (50%) percent of any and all net sums actually received by Publisher, less collection fees, from mechanical rights, electrical transcription and reproducing rights, motion picture synchronization and television rights and all other rights (excepting public performing rights) therein including the use thereof in song, lyric folios, magazines or other special editions, sold by licensees of Publisher in the United States;

[e] Fifty (50%) percent of any and all net sums actually earned and received by Publisher, less costs for collection of same, from sales and uses of the musical composition in countries outside of the United States and Canada.

The Composers shall receive their public performance royalties throughout the world, directly from their own affiliated performing rights society and shall have no claim whatsoever against the Publisher for any royalties received by the Publisher as a distribution from any performing rights society which makes payment directly to writers, authors and/or composers.

The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are distributed gratuitously for advertising or exploitation purposes.

4. Whenever the term "Composers" is used herein, it shall be deemed to mean all of the persons named hereinbelow, and any and all royalties herein provided to be paid to the Composers shall be paid jointly to the following persons, if there be more than one, and shall be divided among them as follows:

|  | Share |
|---|---|
| Name David Hobbs | 33.33 % |
| Address | |
| Name Jeffrey Thompkins | 33.33 % |
| Address | |
| Name Patrick Watler | 33.33 % |
| Address | |

LJWR0030

Share

Name _____     _____ %

Address _____

 

Name _____     _____ %

Address _____

_____ 100       %

5.  The Publisher agrees that within ninety (90) days after the last days of June and December of each year it will prepare and furnish statements to the Composers, and each such statement shall be accompanied by a check or checks in payment of any and all sums shown to be due thereby. Each such statement shall be binding on the Composers and not subject to any objection by them for any reason, unless specific objection, in writing, setting forth the basis thereof, is given the Publisher by the Composers within six (6) months from the date rendered and the Composers shall be barred from instituting any suit based thereon unless commenced within ninety (90) days after the delivery of such written objection to the Publisher.

6.  The Composers hereby authorize and empower the Publisher to renew, pursuant to law, for and in the name of the Composers, their heirs or assignees, the copyright of the said musical composition, and to execute and deliver in the name of the Composers, their heirs or assignees, a formal assignment of each renewal copyright to the Publisher, for its own use and benefit, subject to the payment of the same royalties as hereinbefore provided.

7.  Any actual action brought, or proposed enforcement, by the Publisher against any alleged infringer of the musical composition shall be initiated and prosecuted at its sole expense, and, of any recovery made by it as a result thereof, after deduction of the expenses therefor, a sum equal to thirty-three and one-third (33⅓%) percent shall be paid to the Composers, jointly.

[a]  If a claim is presented against the Publisher alleging that the musical composition is an infringement upon some other composition, and because thereof the Publisher is jeopardized, it shall thereupon serve written notice upon the Composers, containing the full details of such claim and thereafter, until the claim has been adjudicated or settled, shall pay any moneys coming due the Composers hereunder in escrow to any bank or trust company, to be held pending the outcome of such claim; provided, however, if no suit be filed within twelve (12) months after written notice to the Composers by the Publisher of the adverse claim, the said bank or trust company shall release and pay to the Composers all sums held in escrow, plus any interest which may have been earned thereupon, but less reasonable counsel fees incurred by the Publisher in dismissing the claim. Such payment shall be without prejudice to the rights of Publisher in the event of a subsequent adverse adjudication.

[b]  From and after the service of a summons in a suit for infringement filed against the Publisher in respect of said musical composition, all payments hereunder thereafter coming due to the Composers shall be paid by the Publisher in trust to any bank or trust company until the suit has been finally adjudicated and then be disbursed accordingly, unless the Composers shall elect to file an acceptable bond in the sum of such payments, in which event the sums due shall be paid to the Composers. The Composers agree to reimburse the Publisher for reasonable counsel fees incurred by the Publisher in defending the suit,

LJWR0031

8.   The Composers hereby consent to the assignment of this agreement or the musical composition, or the copyright thereof, or any and all of the rights therein by the Publisher, to any person, firm or corporation whatsoever, subject, however, to the payment of the royalties herein specified.

9.   In the event the said musical composition is in instrumental form, then the Publisher shall have the right to cause a lyric to be written and in such event, the Composers hereby agree to relinquish fifty (50%) percent of the Composers' share of royalties hereunder, which amount shall be paid to the lyricist.

10.   The Composers understand and agree that in order to best exploit the musical composition, it is frequently necessary for the Publisher, or the Composers, pursuant to instructions from the Publisher, to make recordings of the musical composition for demonstration purposes. Said recordings are, in the trade, commonly referred to as "demo-records". The Composers hereby consent and agree that effective from the date hereof, the Publisher shall charge to the Composers and deduct from all royalties earned by the Composers, in equal proportions from each Composer, if there be more than one, one-half (½) of the costs of the production of demo-records embodying the musical composition.

11.   The Composers consent to the use of their names and likenesses on printed sheet music, folios, jackets of recordings, player rolls and tape cartridges; and other similar uses; and in connection with publicity and advertising concerning the Publisher, its successors, assigns and licensees, and/or the musical composition hereunder.

IN WITNESS WHEREOF, the Composers have hereunto set their hands and seals and the Publisher has caused these presents to be signed by its duly authorized officer the day and year first above written.

Composers

_____ L.S.
Patrick Watler

_____ L.S.

_____ L.S.
Jeffrey Thompkins

_____ L.S.

_____ L.S.

Publisher

Luther R. Campbell/Pac Jam Publishing

By _____
(Title)      Luther R. Campbell, President

LJWR0032

# EXHIBIT 9

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this __4__ day of _Feb_, 19_92_ between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and _____ _Jeff Thompkins_ _____

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

_Clans Ralley_

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work, and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

LAWR0050

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was ___1992___ ,

   4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

       (a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

       (b) ___10¢___ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

       (c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

       (d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

       (e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

       (f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.    It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffery Thompkins | 50% |
| Luther CAmpbell | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment. Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated, affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

LJWR0053

13. This agreement shall be construed only under the laws of the State of _FL_ If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that              shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.


d/b/a  _J T Money_


By: _____


Writer _____

Address: _1321 NW 198 St Miami Fl 33169_

Soc. Sec. No. _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_

Date of Birth _9-14-72_


Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJWR0054

# EXHIBIT 10

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this ___4___ day of ___Feb___ , 199 2 between Pac Jam
Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called
the "Publisher") and ___Jeffery Thompkins___ ___

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the
sum of One ($1.00) Dollar and other good and valuable consideration
in hand paid by the Publisher to the Writer, receipt of which is
hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore
unpublished original musical composition ("Composition") written
and/or composed by the above named Writer, now entitled:

### Action

including the title words and music, and all copyrights thereof,
including but not limited to the copyright registration thereof
No._____, and all rights, claims and demands in any way
relating thereto, and the exclusive right to secure copyright
therein
throughout the entire world, and to have and to hold the said
copyrights and all rights of whatsoever nature now and hereafter
thereunder existing and/or existing under any agreements or
licenses relating thereto, for and during the full terms of all of
said copyrights. In consideration of the agreement herein contained
and the additional sum of One($1.00) Dollar and other good and
valuable consideration in hand paid by the Publisher, its
successors and assigns, all renewals and extensions of the
copyrights of the Composition to which the Writer may be entitled
hereafter, and all registrations thereof, and all rights of any and
every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of
copyrights. The Writer hereby authorizes and empowers the Publisher
to renew, pursuant to law, for and in the name of the Writer, if
living the copyrights of the Composition to the publisher, for
Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his
sole, exclusive and original work. and that he has fall right and
power to make the within agreement, and that there exist no adverse
claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and
the original and does not infringe any other copyrighted work and
has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _____ __

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) _l O ¢____ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.        It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| *Jeff Thompkins* | *50%* |
| *Luther Campbell* | *50%* |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the
publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use
of his name and likeness and the title to the said composition in
the music folios, recording, performances, player rolls and in
connection with publicity and advertising concerning the Publisher,
its successors, assign and license and the Composition and agree
that the use of such name, likeness and title may commence prior to
publication and may continue so long as the publisher shall own
and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements
provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any
alleged infringer of the Composition shall be initiated and
prosecuted at the Publisher's sole expense, and of any recovery
made by it as a result thereof, after deduction of the expense of
the allegation, a sum equal to thirty-three and one-third (33-1/3%)
percent shall be paid to the Writer. If a claim is presented
against the Publisher in respect of the composition, and because
thereof the Publisher is jeopardized, until the claim has been
adjusted or settled Publisher shall have the right to settle or
otherwise dispose of such claims in any manner as it in its sole
discretion may determine. In the event of any recovery against the
Publisher, either by way of judgement or settlement all of the
cost, charges disbursement, may be deducted by the Publisher from
any and all royalties or other payments theretofore or thereafter
payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all
authors and composers signing this agreement, jointly and
severally.

11. Writer hereby grants and conveys on irrevocable power of
attorney authorizing and empowering the Publisher or any of it's
officers, directors and general manager to file application for and
renew the copyright in the name of the Writer, and upon such
renewals, the execute proper and formal assignments thereof so as
to secure to the Publisher, its successors and assigns, the renewal
terms of, in and to said copyrights; and to make, sign, execute,
acknowledge and deliver any and all instruments which may be
desirable' or necessary in order to vest in the Publisher,' its
successors and assigns, any of the rights which are the subject of
this agreement.

12. The publisher shall have the right to assign this
agreement and its obligations hereunder, or sell, assign, transfer,
license or otherwise dispose of any of its rights and obligations
in whole or in part under this agreement to any person, firm or
corporation, but said disposition shall not affect the right of
Writer to receive the royalties hereinabove st forth from the
assignee.

13. This agreement shall be construed only under the laws of the State of    FL    If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that        shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a _J T Money_

By: _____

Writer _JLff Mousfin_

Address: _1321 NW 1985 Mimm Fl_ 33169

Soc. Sec. No. _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_

Date of Birth _9-14-72_

Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

# EXHIBIT 11

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this __4__ day of __Feb__ , 19_92_ between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and ____ _Jeffery Thompkins_ ____

_____

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

_All they good 4_

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has fall right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _1997_

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) __LO6__ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.     It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffery Thompkins | 50 % |
| Luther Campbell | 50 % |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign, this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

LJWR0063

13. This agreement shall be construed only under the laws of
the State of    *FL*    If any part of this agreement shall be
invalid or unenforceable, it shall not affect the validity of the
balance of this agreement.

14. This agreement shall be binding upon and shall inure to
the benefit of the respective parties hereto, their respective
successors in interest, legal representatives and assigns, and
represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the
Composition, Publisher shall be entitled to recoup the
demonstration record recording costs from Writer's royalties
hereunder.

16. The parties acknowledge that             shall be the
sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set
their hands and seals the day and year first above written.

d/b/a  *J T MONEY*

By: _____

Writer _____

Address: *1721 NW 198 ST*
*Miami Fl 33169*

Soc. Sec. No. *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*

Date of Birth *9-14-72*

Writer _____

Address _____

Soc. Sec. No._____

Date of Birth _____

LJWR0064

# EXHIBIT 12

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this __4th__ day of __Feb__, 19__91__ between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and ___Jeffery Thompkins___

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

*Fugetive*

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has fall right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _____ ___                                                                    ,

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) ___10¢___ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.       It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| *Jeffery Thompkins* | *50 %* |
| *Luther Campbell* | *50 %* |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

13. This agreement shall be construed only under the laws of the State of FL    If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that              shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a  _J T Money_____

By: _____

Writer _____

Address: _13 2 1 L/w 198 St
          miami Fl 33169_

Soc. Sec. No. _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_

Date of Birth _9-14-72_____

Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJWR0069

# EXHIBIT 13

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this __4__ day of __Feb__ , 19_92_between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33133 (hereinafter called the "Publisher") and _____ Jeffery Thompkins _____

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

Groove with the poison CLAN

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

LJWR0070

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) ____10¢____ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

LJWR0071

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.    It is understood and agreed by and between all the parties hereto.that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffery Thompkins | 50% |
| Luther Campbell | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated, affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell; assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

LJWR0073

J.T.

13. This agreement shall be construed only under the laws of the State of _FL_ If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that                shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.


d/b/a _JJ Money_                    Writer _____

                                    Address _1321 ᴸ ᵂ 198 st_
By: _____                  _Miami Fl 33169_

                                    Soc. Sec. No. _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_

                                    Date of Birth _9/14/72_


                                    Writer _____

                                    Address _____

                                    Soc. Sec. No. _____

                                    Date of Birth _____

LJWR0074

# EXHIBIT 14

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this ___4___ day of ___Feb___ , 19_92_between Pac Jam
Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called
the "Publisher") and ___ _Uckley Thompkins_ _____

(jointly and severally hereinafter called "Writer")


### WITNESSETH:

In consideration of the agreement herein contained and of the
sum of One ($1.00) Dollar and other good and valuable consideration
in hand paid by the Publisher to the Writer, receipt of which is
hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore
unpublished original musical composition ("Composition") written
and/or composed by the above named Writer, now entitled:

### Hoe stories

including the title words and music, and all copyrights thereof,
including but not limited to the copyright registration thereof
No._____, and all rights, claims and demands in any way
relating thereto, and the exclusive right to secure copyright
therein
throughout the entire world, and to have and to hold the said
copyrights and all rights of whatsoever nature now and hereafter
thereunder existing and/or existing under any agreements or
licenses relating thereto, for and during the full terms of all of
said copyrights. In consideration of the agreement herein contained
and the additional sum of One($1.00) Dollar and other good and
valuable consideration in hand paid by the Publisher, its
successors and assigns, all renewals and extensions of the
copyrights of the Composition to which the Writer may be entitled
hereafter, and all registrations thereof, and all rights of any and
every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of
copyrights. The Writer hereby authorizes and empowers the Publisher
to renew, pursuant to law, for and in the name of the Writer, if
living the copyrights of the Composition to the publisher, for
Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his
sole, exclusive and original work. and that he has fall right and
power to make the within agreement, and that there exist no adverse
claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and
the original and does not infringe any other copyrighted work and
has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) ____10¢____ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

EJWR0076

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.    It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| *Jeffrey Thompkins* | 50% |
| *Luther Campbell* | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the
publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use
of his name and likeness and the title to the said composition in
the music folios, recording, performances, player rolls and in
connection with publicity and advertising concerning the Publisher,
its successors, assign and license and the Composition and agree
that the use of such name, likeness and title may commence prior to
publication and may continue so long as the publisher shall own
and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements
provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any
alleged infringer of the Composition shall be initiated and
prosecuted at the Publisher's sole expense, and of any recovery
made by it as a result thereof, after deduction of the expense of
the allegation, a sum equal to thirty-three and one-third (33-1/3%)
percent shall be paid to the Writer. If a claim is presented
against the Publisher in respect of the composition, and because
thereof the Publisher is jeopardized, until the claim has been
adjusted or settled Publisher shall have the right to settle or
otherwise dispose of such claims in any manner as it in its sole
discretion may determine. In the event of any recovery against the
Publisher, either by way of judgement or settlement all of the
cost, charges disbursement, may be deducted by the Publisher from
any and all royalties or other payments theretofore or thereafter
payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all
authors and composers signing this agreement, jointly and
severally.

11. Writer hereby grants and conveys on irrevocable power of
attorney authorizing and empowering the Publisher or any of it's
officers, directors and general manager to file application for and
renew the copyright in the name of the Writer, and upon such
renewals, the execute proper and formal assignments thereof so as
to secure to the Publisher, its successors and assigns, the renewal
terms of, in and to said copyrights; and to make, sign, execute,
acknowledge and deliver any and all instruments which may be
desirable or necessary in order to vest in the Publisher, its
successors and assigns, any of the rights which are the subject of
this agreement.

12. The publisher shall have the right to assign this
agreement and its obligations hereunder, or sell, assign, transfer,
license or otherwise dispose of any of its rights and obligations
in whole or in part under this agreement to any person, firm or
corporation, but said disposition shall not affect the right of
Writer to receive the royalties hereinabove st forth from the
assignee.

LJWR0078

13. This agreement shall be construed only under the laws of the State of     FL   If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that                 shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.


d/b/a _JT Money_____

By: _____


Writer _____

Address _1821 NW 198 st_
         _Miami Fl 33169_

Soc. Sec. No. _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_

Date of Birth _9/14/72_


Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJWR0079

.

# EXHIBIT 15

<u>STANDARD SONGWRITERS CONTRACT</u>

AGREEMENT made this __4__ day of __Feb__, 19_92_between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and _____ _Jeffrey Thompkins_ _____

(jointly and severally hereinafter called "Writer")


WITNESSETH:

    In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

    1. Writer hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

                _I Hate Hoe's_

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

    2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has fall right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

    3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

LJWR0080

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _____ __ ,

   4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

   (a) ,_____ _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties. -

   (b) ___*LO¢*___ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

   (c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

   (d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

   (e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

   (f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.    It is understood and agreed by and between all the parties hereto..that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| *Jeffrey Thompkins* | 50% |
| *Luther Campbell* | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

13. This agreement shall be construed only under the laws of the State of _PL_ If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that            shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a _J T Money_

By: _____

Writer _____
Address: _Miami Fl_
Soc. Sec. No. _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_
Date of Birth _9-14-97_

Writer _____
Address _____
Soc. Sec. No. _____
Date of Birth _____

LJWR0084

# EXHIBIT 16

<u>STANDARD SONGWRITERS CONTRACT</u>

AGREEMENT made this ___4___ day of __Feb__, 19_92_between Pac Jam
Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called
the "Publisher") and _____Jeffery Thompkins_____

(jointly and severally hereinafter called "Writer")

WITNESSETH:

In consideration of the agreement herein contained and of the
sum of One ($1.00) Dollar and other good and valuable consideration
in hand paid by the Publisher to the Writer, receipt of which is
hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore
unpublished original musical composition ("Composition") written
and/or composed by the above named Writer, now entitled:

### Livin In the City

including the title words and music, and all copyrights thereof,
including but not limited to the copyright registration thereof
No._____, and all rights, claims and demands in any way
relating thereto, and the exclusive right to secure copyright
therein
throughout the entire world, and to have and to hold the said
copyrights and all rights of whatsoever nature now and hereafter
thereunder existing and/or existing under any agreements or
licenses relating thereto, for and during the full terms of all of
said copyrights. In consideration of the agreement herein contained
and the additional sum of One($1.00) Dollar and other good and
valuable consideration in hand paid by the Publisher, its
successors and assigns, all renewals and extensions of the
copyrights of the Composition to which the Writer may be entitled
hereafter, and all registrations thereof, and all rights of any and
every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of
copyrights. The Writer hereby authorizes and empowers the Publisher
to renew, pursuant to law, for and in the name of the Writer, if
living the copyrights of the Composition to the publisher, for
Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his
sole, exclusive and original work. and that he has fall right and
power to make the within agreement, and that there exist no adverse
claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and
the original and does not infringe any other copyrighted work and
has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and
music thereof has been, unless herein otherwise specifically noted,
the result of the joint efforts of the Writers and not by way of
any independent or separable activity by the Writer, and that the
year in which creation of the composition was completed was
——————— ——                                                   ,

    4. In consideration of this agreement, the publisher agrees to
pay Writer as follows:

    (a) _____ as a non-returnable advance against the
royalties payable to Writer hereunder, which sum and all other
advances which may be paid, shall be deductible from payments
hereinafter becoming due the Writer hereunder or under any other
agreement heretofore or hereafter made between the parties.

    (b) __10¢____ cents per copy, for each and every regular
pinafore copy thereof published and sold by and paid for to the
Publisher in the United States and Canada.

    (c) Five percent of the suggested retail list price (after
trade discounts, if any) for each and every printed copy of each
and every other arrangement and edition thereof published and sold
by and paid for to the Publisher in the United States and Canada,
except that in the event that the said work shall be used or enused
to be used in whole or in part in conjunction with one or more
other musical compositions in a folio or album, the Writer shall be
entitled to receive that proportion of said five percent which the
musical composition shall bear to the total number of musical
compositions contained in such folio or album.

    (d) FIFTY (50%) percent of any and all net sums actually
received by the Publisher from the mechanical rights, electrical
transcriptions   and   reproducing   rights,   motion   picture
synchronization and television rights, and all other rights (except
as otherwise specifically provided for herein) therein in the
United State and Canada, except that the Writer shall be entitled
to receive that portion of said five percent which the musical
composition shall bear to the total number of musical compositions
contained in such folio or album.

    (e) FIFTY (50%) percent of any and all net sums actually
earned and actually received by the Publisher from sales and uses
(other than public performances uses for which songwriters are paid
by any public performance rights organization) of the musical
composition in countries outside the United States and Canada.
Writer acknowledges that Publisher has the right to appoint sub-
publishers owned in whole or in part by Publisher and that the fees
payable to such sub-publisher shall be deducted from gross receipts
prior to calculation of Writer's royalties hereunder.

    (f) The Publisher shall not be required to pay any royalties
on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.    It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| *Jeffery Thompkins* | *50%* |
| *Luther Campbell* | *50%* |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

LJWR0087

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

13. This agreement shall be construed only under the laws of the State of _FL_ If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that                    shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a _J T Money_

By: _____

Writer _____

Address: _1521 New 178 st miami Fl 33169_

Soc. Sec. No. _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_

Date of Birth _9/14/72_

Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJWR0089

# EXHIBIT 17

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this ___4___ day of ___Feb___ , 19 _92_ between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and _____ *Jeffery Thompkins* _____

(jointly and severally hereinafter called "Writer")


### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

*Rough Nigga Gettin busy*

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

LJWR0090

herein and that the Composition including the title, words and
music thereof has been, unless herein otherwise specifically noted,
the result of the joint efforts of the Writers and not by way of
any independent or separable activity by the Writer, and that the
year in which creation of the composition was completed was

4. In consideration of this agreement, the publisher agrees to
pay Writer as follows:

(a) _____ as a non-returnable advance against the
royalties payable to Writer hereunder, which sum and all other
advances which may be paid, shall be deductible from payments
hereinafter becoming due the Writer hereunder or under any other
agreement heretofore or hereafter made between the parties.

(b) __10¢____ cents per copy, for each and every regular
pinafore copy thereof published and sold by and paid for to the
Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after
trade discounts, if any) for each and every printed copy of each
and every other arrangement and edition thereof published and sold
by and paid for to the Publisher in the United States and Canada,
except that in the event that the said work shall be used or enused
to be used in whole or in part in conjunction with one or more
other musical compositions in a folio or album, the Writer shall be
entitled to receive that proportion of said five percent which the
musical composition shall bear to the total number of musical
compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually
received by the Publisher from the mechanical rights, electrical
transcriptions and reproducing rights, motion picture
synchronization and television rights, and all other rights (except
as otherwise specifically provided for herein) therein in the
United State and Canada, except that the Writer shall be entitled
to receive that portion of said five percent which the musical
composition shall bear to the total number of musical compositions
contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually
earned and actually received by the Publisher from sales and uses
(other than public performances uses for which songwriters are paid
by any public performance rights organization) of the musical
composition in countries outside the United States and Canada.
Writer acknowledges that Publisher has the right to appoint sub-
publishers owned in whole or in part by Publisher and that the fees
payable to such sub-publisher shall be deducted from gross receipts
prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties
on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.      It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

**NAME**                                    **SHARE**

Jeffrey Thompkins            50%

Luther Campbell               50%

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment. Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

13. This agreement shall be construed only under the laws of the State of FL If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that                 shall be the sole and exclusive world wide administrator of the Composition.

   IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.


d/b/a  J T Money

By: _____


Writer _____

Address: 1321 Nw 148 St   mimmi  Fl 33169

Soc. Sec. No. 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

Date of Birth  9-14-72


Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

# EXHIBIT 18

<u>STANDARD SONGWRITERS CONTRACT</u>

AGREEMENT made this **4** day of **Feb** , 19**92** between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and _____

_____

(jointly and severally hereinafter called "Writer")

WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

**Some shit I used to do**

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work, and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _____ ___                                                                    ,

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) __10¢__ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(t) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.      It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffrey Thompkin | 50% |
| Luther Campbell | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

13. This agreement shall be construed only under the laws of the State of   FL   If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that        shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a  _J T Money_

By: _____

Writer _____

Address _13121 New 140B St Miami FL 33169_

Soc. Sec. No. _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_

Date of Birth _9/14/72_

Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJWR0099

# EXHIBIT 19

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this __4__ day of __Feb__ , 19 _82_ between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and _____

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

_Shake What your Mama gave Ya_

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

LJWR0100

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _____ _____ ,

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) _____ _IO¢_ _____ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.     It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffery Thompkins | 50% |
| Luther Campbell | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated, affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

LJWR0103

13. This agreement shall be construed only under the laws of the State of        FL        If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that              shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a _J.T. MoNeY_____        Writer _____

By: _____        Address _1321 MW 128 ST_
                                    _Miami Fl 33169_

                            Soc. Sec. No. _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_

                            Date of Birth _9/14/92_

                            Writer _____

                            Address _____

                            Soc. Sec. No. _____

                            Date of Birth _____

# EXHIBIT 20

<u>STANDARD SONGWRITERS CONTRACT</u>

AGREEMENT made this __4__ day of __Feb__, 19_92_ between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and _____

(jointly and severally hereinafter called "Writer")

WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

Shout Outs

including the title words and music, and all copyrights thereof, including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein
throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

LJWR0105          J.T.

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) ___10¢___ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.      It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| *Jeffery Thompkins* | *50%* |
| *Luther Campbell* | *50%* |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

*J.T.*

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated, affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been otherwise adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

LAW00108

13. This agreement shall be construed only under the laws of the State of *FL*        If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that          shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a  *J. T. MONEY*

By: _____

Writer _____

Address *1321 Mo 198 st*
        *hunmi. Fl 33189*

Soc. Sec. No. *263-47 7248*

Date of Birth *9-14-72*

Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJWR0109

# EXHIBIT 21

<u>STANDARD SONGWRITERS CONTRACT</u>

AGREEMENT made this __4__ day of __Feb__ , 19_92_ between Pac Jam
Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called
the "Publisher") and ____ _Jeffrey Thompkins_ _____

(jointly and severally hereinafter called "Writer")

WITNESSETH:

    In consideration of the agreement herein contained and of the
sum of One ($1.00) Dollar and other good and valuable consideration
in hand paid by the Publisher to the Writer, receipt of which is
hereby acknowledged, the present parties agree as follows:   —

    1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore
unpublished original musical composition ("Composition") written
and/or composed by the above named Writer, now entitled:

    _Something 4 you Ragedy Ho's_

including the title words and music, and all copyrights thereof,
including but not limited to the copyright registration thereof
No._____, and all rights, claims and demands in any way
relating thereto, and the exclusive right to secure copyright
therein
throughout the entire world, and to have and to hold the said
copyrights and all rights of whatsoever nature now and hereafter
thereunder existing and/or existing under any agreements or
licenses relating thereto, for and during the full terms of all of
said copyrights. In consideration of the agreement herein contained
and the additional sum of One($1.00) Dollar and other good and
valuable consideration in hand paid by the Publisher, its
successors and assigns, all renewals and extensions of the
copyrights of the Composition to which the Writer may be entitled
hereafter, and all registrations thereof, and all rights of any and
every nature now and hereafter thereunder existing
for the full terms of all such renewals and extensions of
copyrights. The Writer hereby authorizes and empowers the Publisher
to renew, pursuant to law, for and in the name of the Writer, if
living the copyrights of the Composition to the publisher, for
Publisher's own use and benefit.

    2. The writer hereby warrants that the Composition is his
sole, exclusive and original work. and that he has fall right and
power to make the within agreement, and that there exist no adverse
claims to or in the Composition.

    3. The Writer hereby warrants that the Composition is new and
the original and does not infringe any other copyrighted work and
has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and music thereof has been, unless herein otherwise specifically noted, the result of the joint efforts of the Writers and not by way of any independent or separable activity by the Writer, and that the year in which creation of the composition was completed was _____ ___                                                                    ,

4. In consideration of this agreement, the publisher agrees to pay Writer as follows:

(a) _____ _____ as a non-returnable advance against the royalties payable to Writer hereunder, which sum and all other advances which may be paid, shall be deductible from payments hereinafter becoming due the Writer hereunder or under any other agreement heretofore or hereafter made between the parties.

(b) ___ _1.0 ¢___ cents per copy, for each and every regular pinafore copy thereof published and sold by and paid for to the Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after trade discounts, if any) for each and every printed copy of each and every other arrangement and edition thereof published and sold by and paid for to the Publisher in the United States and Canada, except that in the event that the said work shall be used or enused to be used in whole or in part in conjunction with one or more other musical compositions in a folio or album, the Writer shall be entitled to receive that proportion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions and reproducing rights, motion picture synchronization and television rights, and all other rights (except as otherwise specifically provided for herein) therein in the United State and Canada, except that the Writer shall be entitled to receive that portion of said five percent which the musical composition shall bear to the total number of musical compositions contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually earned and actually received by the Publisher from sales and uses (other than public performances uses for which songwriters are paid by any public performance rights organization) of the musical composition in countries outside the United States and Canada. Writer acknowledges that Publisher has the right to appoint sub-publishers owned in whole or in part by Publisher and that the fees payable to such sub-publisher shall be deducted from gross receipts prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.    It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffery Thompkins | 50% |
| Luther Campbell | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment. Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by the publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the use of his name and likeness and the title to the said composition in the music folios, recording, performances, player rolls and in connection with publicity and advertising concerning the Publisher, its successors, assign and license and the Composition and agree that the use of such name, likeness and title may commence prior to publication and may continue so long as the publisher shall own and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statements provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against any alleged infringer of the Composition shall be initiated and prosecuted at the Publisher's sole expense, and—of any recovery made by it as a result thereof, after deduction of the expense of the allegation, a sum equal to thirty-three and one-third (33-1/3%) percent shall be paid to the Writer. If a claim is presented against the Publisher in respect of the composition, and because thereof the Publisher is jeopardized, until the claim has been adjusted or settled Publisher shall have the right to settle or otherwise dispose of such claims in any manner as it in its sole discretion may determine. In the event of any recovery against the Publisher, either by way of judgement or settlement all of the cost, charges disbursement, may be deducted by the Publisher from any and all royalties or other payments theretofore or thereafter payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include all authors and composers signing this agreement, jointly and severally.

11. Writer hereby grants and conveys on irrevocable power of attorney authorizing and empowering the Publisher or any of it's officers, directors and general manager to file application for and renew the copyright in the name of the Writer, and upon such renewals, the execute proper and formal assignments thereof so as to secure to the Publisher, its successors and assigns, the renewal terms of, in and to said copyrights; and to make, sign, execute, acknowledge and deliver any and all instruments which may be desirable or necessary in order to vest in the Publisher, its successors and assigns, any of the rights which are the subject of this agreement.

12. The publisher shall have the right to assign this agreement and its obligations hereunder, or sell, assign, transfer, license or otherwise dispose of any of its rights and obligations in whole or in part under this agreement to any person, firm or corporation, but said disposition shall not affect the right of Writer to receive the royalties hereinabove st forth from the assignee.

LJWR0113

13. This agreement shall be construed only under the laws of the State of _FL_ If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that               shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a _JT MoHEY_

By: _____

Writer _JW Mhomplin_

Address _17121 NW 1985t_
_Miami Fl 33169_

Soc. Sec. No. _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_

Date of Birth _9-14-72_

Writer _____

Address _____

Soc. Sec. No. _____

Date of Birth _____

LJW R0114

# EXHIBIT 22

## STANDARD SONGWRITERS CONTRACT

AGREEMENT made this __2nd___ day of ___February___, 19_93__between Pac Jam Music 8400 N.E. 2 Avenue Miami, Florida 33138 (hereinafter called the "Publisher") and __Jeffrey Thompkins_____

(jointly and severally hereinafter called "Writer")

### WITNESSETH:

In consideration of the agreement herein contained and of the sum of One ($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher to the Writer, receipt of which is hereby acknowledged, the present parties agree as follows:

1. Writer hereby sells, assigns, transfers and delivers to the

Publisher, its successors and assigns, a certain heretofore unpublished original musical composition ("Composition") written and/or composed by the above named Writer, now entitled:

Intro; Afraid of the flavor; come a surprise; put shit pass no hoe; some more shit; rk for free; peepin; pause for the cause; game recognize game; city boy; burn one; check out ave p & 2; let's get serious; setting up; sugarhill style; true player speaks; word from a player; hoe ries pt 2; madball back; Listen to sundance; suff from behavior; coming trap; goin' all out

including but not limited to the copyright registration thereof No._____, and all rights, claims and demands in any way relating thereto, and the exclusive right to secure copyright therein

throughout the entire world, and to have and to hold the said copyrights and all rights of whatsoever nature now and hereafter thereunder existing and/or existing under any agreements or licenses relating thereto, for and during the full terms of all of said copyrights. In consideration of the agreement herein contained and the additional sum of One($1.00) Dollar and other good and valuable consideration in hand paid by the Publisher, its successors and assigns, all renewals and extensions of the copyrights of the Composition to which the Writer may be entitled hereafter, and all registrations thereof, and all rights of any and every nature now and hereafter thereunder existing for the full terms of all such renewals and extensions of copyrights. The Writer hereby authorizes and empowers the Publisher to renew, pursuant to law, for and in the name of the Writer, if living the copyrights of the Composition to the publisher, for Publisher's own use and benefit.

2. The writer hereby warrants that the Composition is his sole, exclusive and original work. and that he has full right and power to make the within agreement, and that there exist no adverse claims to or in the Composition.

3. The Writer hereby warrants that the Composition is new and the original and does not infringe any other copyrighted work and has been created by the joint collaboration of the Writers named

herein and that the Composition including the title, words and
music thereof has been, unless herein otherwise specifically noted,
the result of the joint efforts of the Writers and not by way of
any independent or separable activity by the Writer, and that the
year in which creation of the composition was completed was
_____.

4. In consideration of this agreement, the publisher agrees to
pay Writer as follows:

(a) _____ as a non-returnable advance against the
royalties payable to Writer hereunder, which sum and all other
advances which may be paid, shall be deductible from payments
hereinafter becoming due the Writer hereunder or under any other
agreement heretofore or hereafter made between the parties.
– $1.00 per album/10 cents per single

(b) _____ cents per copy, for each and every regular
pinafore copy thereof published and sold by and paid for to the
Publisher in the United States and Canada.

(c) Five percent of the suggested retail list price (after
trade discounts, if any) for each and every printed copy of each
and every other arrangement and edition thereof published and sold
by and paid for to the Publisher in the United States and Canada,
except that in the event that the said work shall be used or enused
to be used in whole or in part in conjunction with one or more
other musical compositions in a folio or album, the Writer shall be
entitled to receive that proportion of said five percent which the
musical composition shall bear to the total number of musical
compositions contained in such folio or album.

(d) FIFTY (50%) percent of any and all net sums actually
received by the Publisher from the mechanical rights, electrical
transcriptions and reproducing rights, motion picture
synchronization and television rights, and all other rights (except
as otherwise specifically provided for herein) therein in the
United State and Canada, except that the Writer shall be entitled
to receive that portion of said five percent which the musical
composition shall bear to the total number of musical compositions
contained in such folio or album.

(e) FIFTY (50%) percent of any and all net sums actually
earned and actually received by the Publisher from sales and uses
(other than public performances uses for which songwriters are paid
by any public performance rights organization) of the musical
composition in countries outside the United States and Canada.
Writer acknowledges that Publisher has the right to appoint sub-
publishers owned in whole or in part by Publisher and that the fees
payable to such sub-publisher shall be deducted from gross receipts
prior to calculation of Writer's royalties hereunder.

(f) The Publisher shall not be required to pay any royalties
on professional or complimentary copies or any copies which are

distributed gratuitously to performing artist or orchestra leaders or for advertising exploitation purposes.

(g) The publisher shall not be required to pay royalties earned by reason of public performance of all musical composition: said royalties being payable only by the performing rights with which Writer is or may in his future become affiliated.

5.       It is understood and agreed by and between all the parties hereto that all sums hereunder payable jointly to the Writer shall be paid to and amongst them respectively as follows:

| NAME | SHARE |
|------|-------|
| Jeffrey Thompkins | 50% |
| Luther Campbell | 50% |

6. The publisher shall render royalty statements to Writer, on or before September 30th covering the six month ending June 30th and each March 31st covering the six months ending December 31st. Royalty statements shall be accompanied by remittance of any royalties shown due thereunder. After two years from the date of this agreement, royalty statements shall be rendered solely for periods in which royalties are due. Statements and payments, in the absence of written objection thereto by the writer within ninety (90) days from receipt thereof, shall constitute an account stated as to all royalties due for the period encompassed by such statement and or payment, Royalties are payable only upon sums actually received by Publisher in the United States and shall be calculated upon the dollar equivalent at the rate of exchange in effect at the time Publisher receives payment.

7. Writer hereby consents to such changes, adaptation, dramatization, transpositions, editing and arrangements of the Composition, and the setting of words to the music and of music to the words, and the change of title as the Publisher deems desirable. In the event that the Composition is an instrumental composition, then and in such event, the Writer hereby irrevocably grants to the Publisher the sole and excessive right and privilege to cause lyrics to be written for the composition by a writer or writers whereupon the Writer shall be entitled to only one half of the aforementioned royalties provided in this agreement. Writer hereby waives any and all claims which they have or may have against the Publisher and/or its associates, affiliated and subsidiary corporations by reason of the fact that the title of the composition may be the same or similar to that of any musical

composition or compositions heretofore or hereafter acquired by th
publisher and/or its associated,
affiliated and subsidiary corporations. Writer consents to the us
of his name and likeness and the title to the said composition i
the music folios, recording, performances, player rolls and i
connection with publicity and advertising concerning the Publisher
its successors, assign and license and the Composition and agre
that the use of such name, likeness and title may commence prior t
publication and may continue so long as the publisher shall ow
and/or exercise any rights in the Composition.

8. Written demands and notices other than royalty statement
provided for herein shall be sent registered mail.

9. Any legal action brought by the publisher against an
alleged infringer of the Composition shall be initiated an
prosecuted at the Publisher's sole expense, and of any recover
made by it as a result thereof, after deduction of the expense o
the allegation, a sum equal to thirty-three and one-third (33-1/3%
percent shall be paid to the Writer. If a claim is presente
against the Publisher in respect of the composition, and becaus
thereof the Publisher is jeopardized, until the claim has bee
adjusted or settled Publisher shall have the right to settle o
otherwise dispose of such claims in any manner as it in its sol
discretion may determine. In the event of any recovery against th
Publisher, either by way of judgement or settlement all of th
cost, charges disbursement, may be deducted by the Publisher fro
any and all royalties or other payments theretofore or thereafte
payable to the Writer by the Publisher.

10. "Writer", as used herein, shall be deemed to include al
authors and composers signing this agreement, jointly an
severally.

11. Writer hereby grants and conveys on irrevocable power of
attorney authorizing and empowering the Publisher or any of it's
officers, directors and general manager to file application for and
renew the copyright in the name of the Writer, and upon such
renewals, the execute proper and formal assignments thereof so as
to secure to the Publisher, its successors and assigns, the renewal
terms of, in and to said copyrights; and to make, sign, execute,
acknowledge and deliver any and all instruments which may be
desirable or necessary in order to vest in the Publisher, its
successors and assigns, any of the rights which are the subject of
this agreement.

12. The publisher shall have the right to assign this
agreement and its obligations hereunder, or sell, assign, transfer,
license or otherwise dispose of any of its rights and obligations
in whole or in part under this agreement to any person, firm or
corporation, but said disposition shall not affect the right of
Writer to receive the royalties hereinabove st forth from the
assignee.

LJWR0142

13. This agreement shall be construed only under the laws of the State of FLORIDA  If any part of this agreement shall be invalid or unenforceable, it shall not affect the validity of the balance of this agreement.

14. This agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors in interest, legal representatives and assigns, and represents the entire understanding between the parties.

15. Publisher shall make a demonstration recording of the Composition, Publisher shall be entitled to recoup the demonstration record recording costs from Writer's royalties hereunder.

16. The parties acknowledge that          shall be the sole and exclusive world wide administrator of the Composition.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

d/b/a _J T MoHEY_____

By: _____

Writer _____

Address _1721 NW 198 St_
        _Miami Pt  33169_

Soc. Sec. No. _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_

Date of Birth _9-14-72_

Writer _____

Address _____

Soc. Sec. No._____

Date of Birth _____

LJWR0143

# EXHIBIT 23

**AGREEMENT** made as of February 25, 1995, by and between **RUFF TOWN PRODUCTIONS,** c/o Allen Jacobi, Esquire with an address at 1313 N.E. 125th Street, North Miami, FL 33161 (hereinafter jointly, severally and collectively referred to as "you"), and **LUKE RECORDS, INC.,** with an address at 8400 N.E. 2nd Avenue, Miami, FL 33138 (hereinafter referred to as "we" or "us").

1. <u>**TERM**</u>

1.01. (a) The term of this agreement will begin on the date set forth above.

(b) The first Contract Period of the term will end nine (9) months after the earlier of the dates referred to in sections (1) and (2) below:

(1) the date of completion of the lacquer, copper or equivalent masters to be used in manufacturing the disc Phonograph Record units to be made for distribution in the United States from the last Master Recordings made in fulfillment of your Recording Commitment for that Contract Period under paragraph 3.01 below; or

(2) The date thirty (30) days after you give us notice that you have completed the Delivery of those Master Recordings;

but will not end earlier that one year after the date of its commencement.

1.02. You grant us ~~seven (7)~~ separate options to extend that term for additional Contract Periods ("Option Periods") on the same terms and conditions. Each of those options will be exercised automatically unless we send you a notice not later than the expiration date of the Contract Period which is then in effect (the "current Contract Period"). Upon exercise of each such option, the Option Period concerned will begin immediately after the end of the current Contract Period.

2. <u>**SERVICES**</u>

2.01. During the term of this agreement, you shall furnish to us the exclusive services of Jeffrey Thompkins and Patrick Walter p/k/a "Poison Clan" (the "Artist") as recording artists for the purpose of making Master Recordings for us, you will cause those Master Recordings to be produced, and you will Deliver the Master Recordings to us, as provided in this agreement. You shall be solely responsible for and shall pay all sums due to Artist, and to all other Persons entitled to receive royalties or any payments due hereunder, and the royalties payable in this agreement include all monies due to all such parties.

2.02.   (a)  Your obligations will include furnishing the services of the producers and remixers of those Master Recordings, and you will be solely responsible for engaging and paying them. (Producers whom you engage are sometimes referred to in this agreement by the capitalized terms "Producer" or "Producers.")

(b)  If we, instead, engage producers for any of those Master Recordings (which we are under no obligation to do), or if the producers of any such Master Recordings are regularly employed on our staff or render their services under contract with us, the following terms will apply:

(1)  Your royalty account and the production budget for the recording project concerned will be charged with a Recording Cost item of five thousand dollars ($5,000) per Side. We shall not engage a producer (or utilize a producer regularly employed on our staff) on terms pursuant to which we are obligated to pay those producers a higher fixed amount attributable to that project without your written consent; and in the event you so consent, the charge under this section will be that amount instead.

(2)  Your royalty on Phonograph Records made from those Master Recordings under Article 9 will be reduced by the amount of a royalty of six percent (6%) on Albums under Section 9.01(a) (1), adjusted in proportion to the other royalty rates and royalty adjustments provided for in the other provisions of Article 9 and 10.  (If you consent in writing to the payment of a higher royalty to such producers, the reduction under this section will by the amount of that royalty instead.)

3.   **RECORDING COMMITMENT**

3.01.   (a)  During the First Contract Period you shall cause Artist to perform for the recording of Master Recordings sufficient to constitute one (1) Album, cause those Master Recordings to be produced, and Deliver them to us (said Master Recordings, together with any additional Master Recordings required to be delivered by you hereunder during any Contract Period, along with all required delivery materials listed in Paragraph 4.01 are hereinafter referred to as the "Recording Commitment").

(b)  During each Option Period, if any, you shall cause Artist to perform for the recording of Master Recordings sufficient to constitute one (1) Album, which shall be deemed the

Recording Commitment for any such Option Period, subject to the terms of paragraph 3.03 below.

3.02.   You will fulfill the Recording Commitment for each Contract Period under paragraph 3.01 within the first three (3) months of the Period.

3.03.   Each Album (or other group of Master Recordings) Delivered to us in fulfillment of your Recording Commitment will consist entirely of Master Recordings made in the course of the same Album (or other) recording project, unless we consent otherwise.  We may withhold that consent in our unrestricted discretion.

4.   **RECORDING PROCEDURE**

4.01.   You will follow the procedure set forth below in connection with Master Recordings made hereunder:

(a)   Except as expressly noted otherwise in this agreement, prior to the commencement of recording in each instance you shall obtain our approval of each of the following, in order, before proceeding further:

(1)   Selection of Producer.

(2)   Selection of material, including the number of Compositions to be recorded.  You agree that no fewer than nine (9) Compositions shall be recorded in connection with each Album concerned.  We shall not be deemed to be unreasonable in rejecting any request to record an Album consisting of more that one twelve-inch 33 1/3 rpm Record.

(3)   Selection of date of recording and studios where recording is to take place, including the cost of recording there.  We will not be deemed to be unreasonable in rejecting any request to begin recording any Album which is a part of the Recording Commitment within three (3) months after the acceptance of a prior Album under this agreement.  The scheduling and booking of all studio time will be done by us.

(4)   A proposed budget (which you will submit to us sufficiently in advance of the planned commencement of recording to give us a reasonable time to review and approve or disapprove it at least fourteen (14) days before the planned commencement of recording) (the "Budget").

(b)   You shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)   You will comply with the following procedures in connection with the requirements of the U.S. Immigration Law:

(1)   Before each recording session:

(i)   You will require each background instrumentalist, background vocalist, and other person to be employed in connection with the session to complete and sign the EMPLOYEE INFORMATION AND VERIFICATION ("employee") section of a U.S. Immigration and Naturalization Service Employment Eligibility Certificate (Form 1-9); which we will supply to you.

(ii)   You will complete and sign the EMPLOYER REVIEW AND VERIFICATION ("employer") section of each such Certificate; and

(iii)   You will attach copies of the documents establishing identity and employment eligibility which you examine in accordance with the instructions in the employer section.

If any such person is engaged during a session you will comply with subsections (i) through (iii) above, with respect to that person, before he renders any services.

(2)   You will not permit any such person who fails to complete the employee section, or to furnish you with the required documentation, to render any services in connection with the Master Recordings to be made under the agreement.

(3)   You will deliver those Certificates and documents to us promptly, and in no event later than the Delivery of the Master Recordings concerned.

(4)   You will comply with any revised or additional verification and documentation requirements of which we advise you in the future.

(d)   As and when required by us, you shall allow our representatives to attend any or all recording sessions here-under.

(e)   You shall timely supply us with all of the information we need in order:  (1) to make payments due in connection with such Master Recordings; (2) to comply with any other obligation we may have in connection with the making of

-4-

such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.  Without limiting the generality of clause (2) of the preceding sentence:

(1)  You shall furnish us with all information we require to comply with our obligations under our union agreements, including, without limitations, the following:

(i)  If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were made, and the AFM Phonograph Recording Contract (Form "B") number(s) covering such sessions;

(ii)  Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B"); and

(iii)  A listing of all the musical selections contained in Master Recordings Delivered to us hereunder; and

(2)  You will furnish us with all of the immigration control documentation required by subparagraph 4.01(c) above, at the same time as the AFM or AFTRA session reports, tax withholding forms, and other documentation required by us in order to make the payments to the session musicians and other employees concerned, if any.

(f)  You shall Deliver to us fully mixed, edited, and unequalized and equalized Master Recordings (including but not limited to final two-track equalized tape copy), technically and commercially satisfactory to us for our manufacture and sale of Phonograph Records, and all original and duplicate Master Recordings of the material recorded, together with all necessary licenses and permissions, and all materials required to be furnished by you to us for use in the packaging and marketing of the Records.  Each Master Recording will be clearly marked to identify the Artist as the recording artist, and to show the title(s) of the composition(s) and recording date(s).

4.02.   No Composition previously recorded by the Artist will be recorded under this agreement.  No "live" Recording, Joint Recording, or Recording not made in full compliance with this agreement will apply in fulfillment of your Recording Commitment, nor will we be required to make any payments in connection with any such Recording except any royalties which may become due under this agreement if the Recording is released by us.  No Master Recordings shall be made by unauthorized dubbing,

-5-

and you shall be solely responsible for obtaining any and all necessary clearances or permissions in respect of so-called "samples" or other products of authorized or unauthorized dubbing which are embodied in Master Recordings Delivered by you hereunder, and for making all payments in connection with such clearances and permissions.

4.03.    Nothing in this agreement shall obligate us to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if we reasonably anticipate that the Recording Costs plus all other Advances attributable to the recording session or project concerned will exceed those specified in the approved budget or that the Master Recordings being produced will not be technically and/or commercially satisfactory to us.

4.04.    The Artist will not be required to perform together with any other royalty artist without the Artist's consent.  We shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

## 5.    RECOUPABLE AND REIMBURSABLE COSTS

5.01.    Subject to the terms and conditions of this agreement, we will pay all Recording Costs incurred pursuant to the budget for each album in connection with the production of Master Recordings under this agreement.  We will pay all union scale payments required to be made to Artist in connection with Master Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by us for the recording of such Master Recordings, and in connection with all other applicable laws or any collective bargaining agreement between us and any union representing Persons who render services in connection with such Master Recordings.

5.02.    (a)  All Recording Costs will constitute Advances. Any Recording Costs in excess of the Budget for a particular period or other amount approved in writing by us, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by us). Those amounts will also be recoupable from all moneys becoming payable to you by us under this agreement or otherwise to the extent to which they have not actually been paid or reimbursed as provided in the preceding sentence.  Subject to Paragraph 14.11, all costs incurred by us in connection with the production of motion pictures containing the Artist's performances (audiovisual or otherwise) or the acquisition of rights in such motion pictures, and fifty percent (50%) of all direct expenses paid or incurred by us in connection with independent promotion of recordings of

-6-

the Artists's performances (i.e., promotion by Persons other than our regular employees) will constitute Advances.

(b)   The amounts applicable to any Joint Recording which are payable by you or chargeable against your royalties under this paragraph 5.02 will be computed by apportionment as provided in paragraph 10.01.

(c)   Payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "per-record royalties"), will not be recoupable from your royalties or reimbursable by you.

## 6.   ADVANCES

6.01.   All monies paid by us to or on behalf of you or Artist during the term of this agreement, except royalties paid pursuant to Article 9 will constitute Advances unless otherwise expressly agreed in writing by our authorized officer.   Each payment (except such royalties) made by us during the term hereof to any other Person on your behalf will also constitute an Advance.

6.02.   (a)   With respect to the Album Delivered during the Initial Contract Period, we will pay you an Advance (which shall include all Recording Costs) of $75,000 payable as follows:

(1)   $32,500 upon full execution of this agreement by all parties (for the initial period and upon commencement of recording for Albums Delivered during the Option Periods) ($5,000 to be held in reserve should Cheatah Records make a claim against us).

(2)   The balance upon your Delivery to us of the Master Recordings consisting of the Album recorded during the Initial Contract Period (and Albums Delievered during the Option Periods).

(b)   In addition to the amounts payable in 6.02(a) above, upon the sale of 100,000 units of any Album (as shown by Soundscan), we will pay you an additional advance of $25,000.00.

(c)   For each Album Delivered hereunder which sells more than 100,000 units, as an additional recoupable Advance (the "Incentive Advance"), we shall pay you for each unit sold in excess of 100,000 units, One Dollar ($1.00) for each CD Album so

-7-

sold, 55¢ for each cassette tape so sold and 55¢ for each 12 inch
so sold with such Incentive Advance to be capped at $150,000.
Such Incentive Advance will be computed on a quarterly basis and
payable, if any, at the same times Mechanical Royalties are
payable in Paragraph 12.  We will send to you sales reports on a
quarterly basis at the same time we forward to you monies, if
any, in the preceding sentence, provided we will make such
reports available to you on a weekly basis at our office.

7.    **RIGHTS IN RECORDINGS**

    7.01.    Each Master Recording made or furnished to us by you
or the Artist under this agreement or during its term, from the
inception of Recording, will be considered a "work made for hire"
for us within the meaning of the U.S. Copyright Law; if any such
Master Recording is determined not to be a work made for hire it
will be deemed transferred to us by this agreement, together with
all rights in it.  All Master Recordings made or furnished to us
by you or the Artist under this agreement or during its term,
from the Inception of Recording, and all Matrices and Phonograph
Records manufactured from them, together with the performances
embodied on them, shall be our sole property, free from any
claims by you or any other Person; and we shall have the exclu-
sive right to copyright those Master Recordings in our name as
the author and owner of them and to secure any and all renewals
and extensions of such copyright throughout the universe.  You
will execute and deliver to us such instruments of transfer and
other documents regarding our rights in the Master Recordings
subject to this agreement as we may reasonably request to carry
out the purposes of this agreement, and we may sign such docu-
ments in your name or the name of the Artist and make appropriate
disposition of them.

    7.02.    Without limiting the generality of the foregoing, we
and any Person authorized by us shall have the unlimited, exclu-
sive rights, throughout the universe:  (a) to manufacture Phono-
graph Records in any form and by any method now or hereafter
known, derived from the Master Recordings made under this agree-
ment or during its term; (b) to sell, transfer or otherwise deal
in the same under any trademarks, trade names and labels, or to
refrain from such manufacture, sale and dealing; and (c) repro-
duce, adapt, and otherwise use those Master Recordings in any
medium and in any manner, including but not limited to use in
audiovisual works, without payment of any compensation to you or
the Artist except the royalties, if any, which may be expressly
prescribed for the use concerned under Article 9.

    7.03.    You hereby irrevocable authorize, empower, and
appoint us your true and lawful attorney (a) to initiate and

-8-

compromise any claim or action with respect to Master Recordings made under this agreement or otherwise furnished to us by the Artist or you, including any claim or action against infringers of our or your rights in the Master Recordings; and (b) to execute in the Artist's name and your name any and all documents and/or instruments necessary or desirable to accomplish the foregoing.   The power of attorney granted under this paragraph 7.03 is coupled with an interest and is irrevocable.

8.   <u>**NAMES AND LIKENESSES; PUBLICITY**</u>

8.01.   We and our licensees shall have the rights and may grant to others the rights to use your name, the names, portraits, pictures and likenesses of the Artist and Producer(s) and all other persons performing services in connection with Master Recordings made under this agreement (including, without limitation, all professional, group, and other assumed or fictitious names used by them, and other assumed or fictitious names used by them), and biographical material concerning them, on Phonograph Records and packaging, covers, sleeves, and liner notes thereto, as news or information, for the purposes of trade, advertising, publicity, and promotion, in any manner and in any medium, solely in connection with the marketing and exploitation of Phonograph Records and institutional advertising (i.e., advertising designed to create goodwill and prestige and not for the purpose of selling any unrelated product or service).   During the term of this agreement neither you nor Artist shall authorize any Person other than us to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist) in connection with the advertising or sale of:

>        (a)   phonograph records; or

>        (b)   blank recording tape or tape recording equipment.

8.02.   You and the Artist will cooperate with us, as we reasonably request, in making photographs and preparing other materials for use in promoting and publicizing the Artist and the Master Recordings made under this agreement, subject to your prior professional commitments.

8.03.   In connection with any independent promoters engaged by us, we will inform you of our plans and will consult with you regarding the selection of the independent promoter and how much we are spending.

8.04.   We will place your logo on all promotional materials (videos, full page trade ads) and record, cassette and CD jackets.

## 9.   ROYALTIES

9.01.   We will pay you a royalty computed at the applicable percentage indicated below, of the applicable Royalty Base Price in respect of Net Sales of Phonograph Records (other than audio-visual Records) consisting entirely of Master Recordings recorded under this agreement and sold by us or our licensees Through Normal Retail Channels ("NRC Net Sales"):

    (a)   ON ALBUMS SOLD FOR DISTRIBUTION IN THE UNITED STATES:

        (1)   (i)   On the Albums Delivered hereunder for the first Contract Period, the first Option Period, the second Option Period, the third Option Period, the fourth Option Period, the fifth Option Period, the sixth Option Period, and the seventh Option Period:  22%.

        (ii)   The royalty rate pursuant to sub-section 9.01(a)(1)(i) will apply to the first 100,000 units of NRC Net Sales in the United States ("USNRC Net Sales") of each Album consisting of Master Recordings made hereunder.  The royalty rate will be 24%, rather than 20%, on the next 100,000 units of USNRC Net Sales of any such Album, 26% on the next 100,000 units of USNRC Net Sales of any Album (units 200,001 to 300,000), 28% on the next 100,000 units of USNRC Net Sales of any Album (units 300,001 to 400,000), 29% on the next 100,000 units of USNRC Net Sales of any Album (units 401,000 to 500,000), 30% on the next 500,000 units of USNRC Net Sales of any Album (units 500,001 to 1,000,000) and 34% on USNRC Net Sales in excess of 1,000,000 units of any such Album.

    (b)   ON ALBUMS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

        (1)   On all Albums Delivered hereunder:

        (i)   80% of the rates listed in Paragraph 9.01 (a) on Albums sold for distribution in Canada;

        (ii)   66 2/3% of the rates listed in Paragraph 9.01 (a) on Albums sold for distribution in The United Kingdom, Germany, Japan or Australia;

(iii) 50% of the rates listed in Paragraph 9.01 (a) on Albums sold for distribution elsewhere in the universe.

(c) <u>ON SINGLES SOLD FOR DISTRIBUTION IN THE UNITED STATES</u>: sixteen percent (16%).

(d) <u>ON SINGLES SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES</u>:

(i) 80% of the rates listed in Paragraph 9.01 (c) on Singles sold for distribution in Canada;

(ii) 66 2/3% of the rates listed in Paragraph 9.01 (c) on Singles sold for distribution in The United Kingdom, Germany, Japan or Australia;

(iii) 50% of the rates listed in Paragraph 9.01 (c) on Albums sold for distribution elsewhere in the universe.

If any Licensee of ours accounts to us on the basis of less than 100% of Net Sales, we will account to you for the Records concerned on the same basis.

9.02.    The royalty rate under paragraph 9.01 on Phonograph Records (other than audiovisual Records) sold through any Club Operation in the United States shall be five percent (5%). The royalty rates under paragraph 9.01 on Phonograph records (other than audiovisual Records) sold through any Club Operation outside the United States will be five (5%) multiplied by a fraction, the numerator of which is the royalty rate under section 9.01(c) for the territory concerned, and the denominator of which is the royalty rate under subsection 9.01(a)(1)(i). Such royalties shall be computed on the basis of ninety percent (90%) of Net Sales of such Records. No royalty shall be payable with respect to (a) Phonograph Records received by members of any such Club Operation in an introductory offer in connection with joining it or upon recommending that another join it or as a result of he purchase of a required number of Records including, without limitation, Records distributed as "bonus" or "free" Records, or (b) Phonograph Records for which such Club Operation is not paid.

9.03.    The royalty rate on any Record described in clause (a), (b), or (c) of this sentence will be one-half (1/2) of the royalty rate that would apply if the Record concerned were sold through Normal Retail Channels:  (a) any catalog Phonograph Record sold by our special products operations or those of the distributor of the Records concerned ("SPO's") to educational institutions or libraries, or to other SPO clients for their

-11-

promotion or sales incentive purposes (but not for sale to the general public through normal retail channels); (b) any Record sold in conjunction with a television advertising campaign, during the calendar semi-annual period in which that campaign begins or either of the next two (2) such periods; and (c) any non-catalog Phonograph Record created on a custom basis for SPO clients. (The royalty increase provisions of subsections 9.01(a)(1)(ii) will not apply in computing royalties on any Records described in the preceding sentence.)  The royalty on any Record described in clause (c) will be computed on the basis of the SPO's actual sales price less all taxes and Container Charges.  In respect of any Master Recording leased by us to others for their distribution of Phonograph Records in the United States, we will pay you fifty percent (50%) of our net receipts from our licensee.  ("Net receipts", in the preceding sentence, means receipts as computed after deduction of payments to distributors and all copyright, AFM and other applicable third party payments.)  If another artist, a producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.

9.04.   (a)  The royalty rate on any Budget Record, any Record bearing a Reissue Label, and Multiple Record Set, any Record sold for distribution through military exchange channels, or any "picture disc" (i.e. a vinyl Record phonorecord with artwork reproduced on the surface of the Record itself) will be one-half (1/2) of the applicable royalty rate prescribed in paragraph 9.01.  The royalty rate on any Record which is not an Album or Single, will be one-half (1/2) of the applicable Album royalty rate prescribed in paragraph 9.01.

(b)  The royalty rate on any Audiophile Record will be seventh-five percent (75%) of the rate which would otherwise be applicable under this agreement.

(c)  The royalty increase provisions of subsection 9.01(a)(1)(ii) will not apply in computing royalties on any Records described in this paragraph 9.04.

9.05.   In respect of Phonograph Records derived from Master Recordings leased or otherwise furnished by our Licensees to others for their manufacture and distribution of Records outside the United States, we will pay you one-half (1/2) of our net receipts derived from such exploitation.

9.06.   We will pay you royalties as follows in connection with the following uses of Covered Videos:

-12-

(a)   (1)   (i)   We will pay you a royalty as provided in this paragraph 9.06 (the "Net Receipts Royalty", below) on all uses of a Covered Video which produce revenues directly for us.

(ii)   The Net Receipts Royalty will be the amount equal to fifty (50%) percent of our Net Receipts (defined below).

(2)   "Gross Receipts", in this paragraph 9.01, means all moneys actually earned and received by us directly from the exploitation of Covered Videos.   "Net Receipts" means Gross Receipts, after deduction and recoupment by us of all expenses, taxes, and adjustments incurred in connection with the production of Covered Videos or the acquisition of rights in them, the exploitation of Covered Videos, or the collection and receipt of those Gross Receipts in the United States, and a distribution fee equal to thirty percent (30%) of those Gross Receipts.   If any item of revenue or expenses is attributable to a Covered Video and to other audiovisual works, the amount of that item includable in Gross Receipts or deductible in computing Net Receipts will be determined by apportionment.

(b)   The following amounts will be charged in reduction of all royalties payable or becoming payable to you in connection with Covered Videos under this paragraph 9.06:

(1)   All royalties and other compensation which may become payable to any Person, notwithstanding paragraph 12.02 and 12.03, for the right to make any uses of copyrighted musical compositions in Covered Videos; and

(2)   All payments to record producers or other Persons which are measured by uses of Covered Videos or proceeds from those uses, whether such payments are to be computed as royalties on sales, as participations in revenues, or in any other manner.   (The amounts chargeable under the preceding sentence will not include non-contingent advances, but will include payments -- including payments in fixed amounts -- which accrue by reason that such sales, revenues, or other bases for computation attain particular levels.)

## 10.   MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Article 9:

10.01.   In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable by

-13-

a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02.   The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides embodying Master Recordings made hereunder and the denominator of which is the total number of Sides contained on such Record.   The royalty rate on an audiovisual Record containing a Covered Video and other audiovisual works will be determined by apportionment based on actual playing time on the Record concerned.

10.03.   No royalties will be payable to you in respect of Phonograph Records sold or distributed by us or our Licensees for promotional purposes; as surplus, overstock, or scrap; as cutouts after the listing of such Records has been deleted from our catalog or that of the particular Licensee; as "free," "no charge" or "bonus" Records (whether or not intended for resale); to our relatives and employees or those of the Distributor; to radio stations; or in territories where the Recordings concerned are in the public domain.   No royalties will be payable to you on Records containing Master Recordings of not more that two (2) Compositions made under this agreement, intended for free distribution as "samplers" to automobile or audio equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use of transportation carriers.

11.   **ROYALTY ACCOUNTINGS**

11.01.   (a)   We will compute your royalties as of each June 30th and December 31st for the prior six (6) months, in respect of each six-month period in which there are sales or returns of Records or any other transactions on which royalties are payable to you.   On the next September 30th or March 31st we will send you a statement covering those royalties and will pay you any royalties which are due after deducting unrecouped Advances.   If any statement reports total royalties payable to you of five dollars ($5.00) or less, we will not be obligated to render a royalty payment to you in connection with that statement.   Such unpaid royalties will continue to be credited to your royalty account, and they will be paid to you in connection with the first subsequent royalty statement reporting total royalties in excess of five dollars ($5.00).

(b)   We will not act unreasonably in maintaining royalty reserves against anticipated returns and credits.

-14-

Royalty reserves will be limited to 50% on Singles and 25% on Albums.  Each royalty reserve against anticipated returns and credits will be liquidated over the four (4) accounting periods following the accounting period during which it is established.  If we pay you any royalties on Records which are returned later, those royalties will be considered overpayments.

11.02.  Sales of Records for distribution outside the United States are called "foreign sales" below.  We will compute your royalties for any foreign sale in the same national currency in which our licensee pays us for that sale, and we will credit those royalties to your account at the same rate of exchange at which the licensee pays us.  For purposes of accounting to you, we will treat any foreign sale, and any sale made by or under the authority of any of our distributing licensees, as a sale made during the same six-month period in which we receive our licensee's accounting and payment for that sale.  If any licensee deducts any taxes from its payments to us, we may deduct a proportionate amount of those taxes from your royalties.  If any law, any government ruling, or any other restriction affects the amount of the payments which a licensee can remit to us, we may deduct from your royalties an amount proportionate to the reduction in the licensee's remittance to us.  If we cannot collect payment for a foreign sale in the United States in U.S. dollars, we will not be required to account to you for that sale.

11.03.  We will maintain books and records which report the sales of Phonograph Records and any other transactions on which royalties are payable to you.  You may, at your own expense, examine those books and records, as provided in this paragraph only.  You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under paragraph 11.01.  You may make such an examination for a particular statement only once, and only within two (2) years after the date when we are required to send you that statement under paragraph 11.01.  You may make those examinations only during our usual business hours, and at the place where we keep the books and records to be examined.  If you wish to make an examination you will be required to notify us at least thirty (30) days before the date when you plan to begin it.  We may postpone the commencement of your examination by notice given to you not later than five (5) days before the commencement date specified in your notice; if we do so, the running of the time within which the examination may be made will be suspended during the postponement.  If your examination has not been completed within fifteen (15) days from the time you begin it, we may require you to terminate it on seven (7) days notice to you at any time; we will not be required to permit you to continue the examination after the end of that seven day period.  You will not be entitled to examine any manufacturing records or any other

-15-

records that do not specifically report sales or other
distributions of Phonograph Records or other transactions on
which royalties will be payable to you.  You may appoint a
certified public accountant to make such examination for you, but
not if he or his firm has begun an examination of our books and
records for any Person except you unless the examination has been
concluded and any applicable audit issues have been resolved.  We
shall pay to you (following reimbursement of the costs incurred
in connection with audit) your proportionate portion of our net
recovery from such audit, as determined in our discretion.

    11.04.  If you have any objections to a royalty statement,
you will give us specific notice of that objection and your
reasons for it within one (1) year after the date when we are
required to send you that statement under paragraph 11.01.  Each
royalty statement will become conclusively binding on you at that
end of that one-year period, and you will no longer have any
right to make any other objections to it.  You will not have the
right to sue us in connection with any royalty accounting, or to
sue us for royalties on Records sold or Net Receipts derived by
us during the period a royalty accounting covers, unless you
commence the suit within that one-year period.  If you commence
suit on any controversy or claim concerning royalty accountings
rendered to you under this agreement, the scope of the proceeding
will be limited to determination of the amount of the royalties
due for the accounting periods concerned, and the court will have
no authority to consider any other issues or award any relief
except recovery of any royalties found owing.  Your recovery of
any such royalties will be the sole remedy available to you or
the Artist by reason of any claim related to our royalty
accountings.  Without limiting the generality of the preceding
sentence, neither you nor the Artist will have any right to seek
termination of this agreement or avoid the performance of your
obligations under it by reason of any such claim.

## 12.  LICENSES FOR MUSICAL COMPOSITION

    12.01.  (a)  (1)  You grant to us an irrevocable license,
under copyright, to reproduce each Controlled Composition on
Phonograph Records other than audiovisual Records, and to
distribute them in the United States and Canada.

        (2)  For that license, we will pay Mechanical
Royalties, on the basis of Net Sales, at the following rates:

        (i)  <u>On Records Sold for distribution in
the United States</u>:  The rate equal to seventy-five percent (75%)
of the minimum compulsory license rate applicable to the use of

-16-

musical compositions on phonorecords under the United States copyright law on whichever of the following dates is the earlier:

(A) The date of commencement of recording of the Album project (or other recording project) concerned; or

(B) The date of expiration of the time within which the Recording concerned is required to be Delivered under Article 3.

(ii) <u>On Records sold for distribution in Canada</u>: The rate prescribed in subsection (i) above or the Mechanical Royalty rate prevailing in Canada on a general basis on the applicable date specified in subsection (i) above with respect to the use of musical compositions on Standard Records, whichever rate is lower.

The Mechanical Royalty on any Record described in subparagraph 9.04(a) or any Record sold through a club operation will be three-fourths (3/4) of the amount fixed above. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be half of the amount fixed in clause (i) or clause (ii) above. No Mechanical Royalties will be payable for any Records described in paragraph 10.03.

(b) The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be limited to ten (10) times the amount which would be payable on it under section 12.01(a)(2) if it contained only one Controlled Composition. The total Mechanical royalty on any Single will be limited to twice that amount. The total Mechanical Royalty on any Record which is not an Album or a Single will be limited to three (3) times that amount.

(c) We will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you. On the next May 15th, August 15th, November 15, or February 15th, we will send a statement covering those royalties and will pay any net royalties which are due. Mechanical Royalty reserves maintained against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case. If any overpayment of Mechanical Royalties is made to any Person you will reimburse us for it; we may also recoup from any payment due or becoming due to you. If we pay any Mechanical Royalties for compositions which are returned later, those royalties will be considered overpayments. If the total

-17-

amount of the Mechanical Royalties which we pay on any Record
including Mechanical Royalties for compositions which are not
Controlled Compositions) is higher than the limit fixed for that
Record under subparagraph 12.01(b), that excess amount will be
considered an overpayment also.  Paragraphs 11.03 and 11.04 will
apply to Mechanical Royalty accountings.

12.02   You also grant to us an irrevocable license under
copyright to reproduce each Controlled Composition in Covered
Videos, to reproduce those videos, distribute them, and perform
them in any manner (including, without limitation, publicly and
for profit), to manufacture and distribute audiovisual Records
and other copies of them, and to exploit them otherwise, by any
method and in any form known now or in the future, throughout the
universe, and to authorize others to do so.  We will not be
required to make any payment in connection with those uses, and
that license will apply whether or not we receive any payment in
connection with any use of any Covered Video.

12.03.  (a)  If any Master Recordings made under this agree-
ment contains copyrighted Compositions which are not Controlled
Compositions, you will obtain licenses covering those Composi-
tions for our benefit on the same terms as those which apply to
Controlled Compositions under this Article 12.

(b)  You will cause the issuance of effective
licenses, under copyright and otherwise, to reproduce each
Controlled Composition on Phonograph Records and distribute those
Records outside the United States and Canada, on terms not less
favorable to Phonograph Record manufacturers prevailing on a
general basis in the country concerned with respect to the use of
musical compositions on Standard Records.

12.04.  You warrant and represent that the "Schedule of
Publishers" appended to this agreement is a complete list of the
music publishers in which you or the Artist has a direct or
indirect interest.  You will notify us promptly of each addi-
tional music publisher in which you or the Artist acquire any
such interest and of every other change required to keep the list
currently accurate.

12.05.  Neither you nor the Artist, not any Person deriving
rights from you or the Artist, will authorize the use of any
Controlled Composition in a radio or television commercial or any
other advertising or promotional matter, unless you first require
the Person authorized to make the use concerned to agree in
writing, for our benefit, that the use will not involve a "sound-
alike" recording resembling a performance of that Composition
recorded by the Artist (under this agreement) before of after the
date of authorization.  (A "sound-alike" recording is a different

-18-

recording which imitates or simulates the recording concerned by using a substantially similar musical arrangement or otherwise.) If you or the Artist, or any Person deriving rights from either you or the Artist, shall determine to grant any rights in any Controlled Composition to any music publisher or any other Person or to authorize the use of any music or lyrics written by you or the Artist in a Composition together with material written by anyone else, or if you or the Artist shall determine to collaborate with any other Person in the authorship of any Composition, you will first require the other parties to the transaction or collaboration concerned to enter into a written agreement, for our benefit, requiring compliance with this paragraph.  You will furnish us with a copy of each agreement required by this paragraph.

**13.   WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES; MINIMUM ANNUAL COMPENSATION**

13.01.  You warrant and represent:

(a)   You have the right and power to enter into and fully perform this agreement.

(b)   We shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by us pursuant to this agreement except as specifically provided in this agreement.

(c)   The Artist is or will become and will remain, to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of Artist's services hereunder.

(d)   No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person.  "Materials," as used in this Article means:  (1) the Master Recordings made under this agreement (2) all Controlled Compositions, (3) each name used by the Artist, individually or as a group, in connection with Master Recordings made hereunder, and (4) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist or any Producer and contained in or used in connection with any Master Recordings made hereunder or their packaging, sale, distribution, advertising, publicizing, or other exploitation.

-19-

(e)   No Person other than us has any right to use any existing Master Recordings of the Artist's performances for making, promoting, or marketing Phonograph Records.

13.02.   (a)   During the term of this agreement:

(1)   Neither you nor the Artist will enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder.

(2)   No Person other than us will be authorized to use any existing Master Recordings of the Artist's performances for making, promoting, or marketing Phonograph Records; and

(3)   The Artist will not perform or render any services, as a performing artist, a producer, or otherwise, for the purpose of making, promoting, or marketing Master Recordings or Phonograph Records for any Person except us.

(b)   (1)   A "restricted Composition", for the purposes of this paragraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to us under this agreement or any other agreement with us.

(2)   Neither you nor the Artist will authorize or knowingly permit the Artist's performance of any restricted Composition or any adaptation of a restricted Composition to be recorded for any Person except us for the purpose of making Master Recordings or Phonograph Records, or for any other purpose (including, without limitation, radio or television commercials), at any time before the later of the following dates:   (i) the date five (5) years after the date of Delivery to us of all the Master Recordings made in the course of the same Album (or other) recording project as the Recording of the restricted Composition concerned, or (ii) the date two (2) years after the expiration of the term of this agreement.

(c)   Neither you nor the Artist shall authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written agreement with the Person for whom the recording is to be made, for our benefit, prohibiting the use of such recording for making, promoting, or marketing Master Recordings or Phonograph Records in violation of the restrictions prescribed in subparagraphs 13.02(a) and 13.02(b). You will furnish us with a fully executed counterpart of each such agreement promptly after its execution.

-20-

13.03.   If you or Artist become aware of any unauthorized recording, manufacture, distribution, sale or other activity by any third party contrary to the restrictions in this agreement, you and Artist will notify us of it and will cooperate with us in any action or proceeding we commence against such third party. Luke Records acknowledges that "Poison Clan" was previously contracted with Cheatah Records and as a result of this contractual relationship a fee not to exceed $5,000.00 may become payable to Cheatah Records.  Luke Records will not be held liable for any fees in excess of $5,000.00.  Artist will indemnify and hold Luke Records harmless from and against any claims, damages, liabilities, costs and expenses (including legal costs and reasonable attorney's fees) arising out of any breach or alledged breach by Artist of any representation, warranty or agreement by Artist in excess of $5,000.00.

13.04.   During the term of this agreement the Artist will not render any musical performance (audiovisual or otherwise) for the purpose of making any motion picture or other audiovisual work ("picture" below) for any Person other than us, and no Person other than we will be authorized to produce, distribute, exhibit, or otherwise exploit any picture which contains any musical performance (audiovisual or otherwise) by the Artist.

13.05.   You warrant and represent that, as of the date hereof, neither you nor Artist is a resident of the state of California.  You shall notify us immediately in the event that you and/or Artist becomes a resident of the State of California.

13.06.   The services of the Artist are unique and extra-ordinary, and the loss thereof cannot be adequately compensated in damages, and we shall be entitled to seek injunctive relief to enforce the provisions of this agreement.

13.07.   You will at all times indemnify and hold harmless us and our licensees from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach or alleged breach by you of any warranty or representation made by you in this agreement or any other act or omission by you or the Artist. Pending the resolution of any claim in respect of which we are entitled to be indemnified, we will not withhold monies which would otherwise be payable to you under this agreement in an amount exceeding your potential liability to us under this paragraph.

13.08.   There is in existence between you and Artist a valid and enforceable agreement pursuant to which Artist is required to perform exclusively for you during the Term.  You will waive none of your rights under such contract and shall take all steps

necessary or desirable to keep the same in full force and effect so that we shall have the full benefit of Artist's exclusive services as if Artist had contracted hereunder directly with us. Simultaneously with the execution of this agreement, you shall deliver to us an agreement between us and Artist in the form annexed hereto as Exhibit "A"; you hereby give your consent and approval to the contents thereof and said Exhibit "A" is hereby made a part hereof.  You will require full and complete performance by the Artist of such contract.  If Artist breaches such contract, you will immediately notify us in writing of the details of such breach.  If you do not enforce any of your rights under your contract, we may, without limitation of our rights, enforce such rights in your name and/or our name.  In addition to the foregoing, we may exercise, in your stead, our right to seek injunctive relief against Artist for Artist's breach of Artist's obligations to provide personal services pursuant to the agreement between you and Artist.  If is our mutual intention that the rights granted herein specifically but without limitation be a grant of rights to receive injunctive relief pursuant to the provisions of California Civil Code Section 3423 (Fifth) and California Code of Civil Procedure Section 526 (second paragraph 5) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

13.09.  You are a Corporation duly organized and existing under the laws of the State of _____.  The party executing this agreement on behalf of you is your authorized representative, duly authorized to sign on your behalf.

## 14.  DEFINITIONS

14.01.  "Master Recording" - every recording of sound, whether or not coupled with visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

14.02.  "Inception of Recording" - the first recording of performances or other sounds with a view to the eventual fixation of a Master Recording.  "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this agreement.

14.03.  "Matrix" - any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording.

14.04.  "Person" - Any natural person, legal entity, or other organized group of persons or entities.  (All pronouns, whether personal or impersonal, which refer to Persons include natural persons and other Persons.)

14.05.  "Records" and "Phonograph Records" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, including Records of sound alone and audiovisual Records.

14.06.  "Royalty Base Price" - the amount specified below ("Gross Royalty Base") applicable to the Phonograph Records concerned, less all taxes and less the applicable Container Charge. The Royalty Base Price for Records sold through any Club Operation will be the same as that for the identical Records Sold Through Normal Retail Channels in the territory concerned.

(a)  WITH RESPECT TO RECORDS SOLD FOR DISTRIBUTION IN THE UNITED STATES OR CANADA:  The Gross Royalty Base for an audiovisual Record is the amount computed under section (1) below.  The Gross Royalty Base for a Record reproducing sound only is the amount computed under section (1) or section (2) below, whichever is lower:

(1)  Our distributor's published subdistributor price applicable to the price series of the unit concerned at the commencement of the accounting period in which the sale occurs, less ten percent (10%); or

(2)  One-half (1/2) of the prevailing industry suggested retail list price applicable to Records in the same configuration and the same wholesale price category as the unit concerned.  In this section (2):

(i)  A "major U.S. Record company" means one which distributes its own Records directly to wholesalers and retailers on a nationwide basis throughout the United States. (Those companies, at the date of this agreement, are Sony, the WEA group, BMG, Capitol/7EMI, MCA and Polygram.)

(ii)  The "wholesale price" of a Record distributed by another major U.S. record company means its published price corresponding most closely in amount to a subdistributor price for a Record in the same configuration published by our distributor.

(iii)  The "wholesale price category" of a Record distributed by our distributor includes:  (A) that Record; and (B) Records in the same configuration sold by major U.S.

-23-

record companies whose wholesale prices for those Records correspond most closely in amount to our distributor's published subdistributor price for the Record concerned.

(iv)   "Prevailing industry suggested retail list price" means the average of the suggested retail list prices assigned to Records in the wholesale price category concerned by the major U.S. Record companies which publish suggested retail list prices.

Royalties will be calculated separately with respect to each price series in which units of a particular Record release are sold during the semiannual accounting period concerned. References to published prices in this section refer to those in effect at the commencement of the accounting period concerned.

(b)   <u>WITH RESPECT TO RECORDS (INCLUDING AUDIOVISUAL RECORDS) SOLD FOR DISTRIBUTION OUTSIDE OF THE UNITED STATES AND CANADA</u>:  The Gross Royalty Base is the applicable amount specified in sections (1) through (3) below, in the country of sale (or section (4) below if it applies), at the commencement of the accounting period concerned, plus taxes:

(1)   If a base intended as an equivalent of or substitute for an actual or hypothetical retail price ("Retail-related Base") is used for computing Mechanical Royalties on the Records concerned by agreement between Record manufacturers and a licensing organization, such as BIEM, the Gross Royalty Base will be one-half (1/2) of that base.

(2)   If a majority of the major record companies in the country concerned use a different base for computing Mechanical Royalties (for example, a manufacturer's published price to dealers ("p.p.d.")) adjusted by an "uplift" or other factor intended to convert it to a Retail-related Base and calculated on the basis of a reliable industry-wide market survey, the Gross Royalty Base will be one-half (1/2) of the p.p.d. of the principal distributing Licensee in that country for the Records concerned, adjusted by the same conversion factor.

(3)   If neither section (1) nor section (2) applies, the Gross Royalty Base will be one-half (1/2) of the base generally used by the principal distributing Licensee in the country concerned to calculate the royalties it pays to recording artists ("Licensee Base").  If this section (3) applies then the Licensee Base will be one-half (1/2) of the amount equal to one hundred thirty percent (130%) of the p.p.d. fixed by the principal distributing Licensee for the Record concerned.

-24-

(4)   The Gross Royalty for a Record sold for a Record sold for distribution through military exchange channels is the amount prescribed in subparagraph 14.06(a).

14.07.   "Container Charge" - the applicable percentage, specified below, of the Gross Royalty Base applicable to the Records concerned:

(a)   Audiovisual Records - fifteen percent (15%).

(b)   Audiophile Records - twenty-five percent (25%).

(c)   Other Records - ten percent (10%) on vinyl Records and twenty percent (20%) on Records in non-vinyl configurations.

14.08.   "Net Sales" - eighty-five percent (85%) of gross sales, less returns, credits, and reserves against anticipated returns and credits.

14.09.   "Club Operation" - any direct sales to consumers conducted by mail-order or on a membership basis.

14.10.   "Contract Period" - the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

14.11.   "Advance" - a prepayment of royalties.  We may recoup Advances from royalties (but not mechanical royalties) to be paid to or on behalf of you or Artist pursuant to this or any other agreement, subject to the next sentence.  Not more than fifty percent (50%) of the aggregate amount of the motion picture production and acquisition costs referred to in subparagraph 5.02 may be recouped from your royalties on sales of Records which do not reproduce visual images ("Audio royalties").  "Any other agreement", as used in this paragraph, means any other agreement relating to you as a recording artist or as a producer of recordings of your own performances.

14.12.   "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.  Recordings of more than one arrangement or version of the same Composition, reproduced on the same Record, will be considered, collectively, a recording of one Composition for all purposes under this agreement.

14.13.   "Controlled Composition" - a Composition wholly or partly written, owned or controlled by you, the Artist, a Producer, or any Person in which you, the Artist, or a Producer has a direct or indirect interest.

-25-

14.14.   (a)   "<u>Album</u>" – one or more twelve-inch 33 1/3 rpm vinyl Records, or the equivalent in non-vinyl configurations, at least thirty-five (35) minutes in playing time, sold in a single package.

(b)   "<u>Single</u>" – a vinyl Record not more that seven (7) inches in diameter, or the equivalent in a non-vinyl configuration.

(c)   "<u>Twelve-inch Single</u>" – A twelve-inch vinyl Record, or the equivalent in a non-vinyl configuration which contains Master Recordings of not more than three (3) compositions and does not constitute an Album.

(d)   "<u>Extended Play Record</u>" – A Record which contains Master Recording of four (4) or more Compositions but does not constitute an Album.  (Audiovisual Records are not Albums, Singles, Twelve-inch Singles, or Extended Play Records.)

14.15.   "<u>Side</u>" – A Master Recording of a continuous performance of a particular arrangement of version of a Composition, not less than two and one quarter (2 1/4) minutes in playing time.  If any Album (or other group of Master Recordings) Delivered to us in fulfillment of a Recording Commitment expressed as a number of Sides includes Master Recordings of more than one arrangement or version of any Composition, all of those Master Recordings will be deemed to constitute one Side.

14.16.   "<u>Joint Recordings</u>" – any Master Recording embodying the Artist's performance and any performance by another artist with respect to which we are obligated to pay royalties.

14.17.   "<u>Sales Through Normal Retail Channels</u>" – sales other than as described in paragraphs 9.02, 9.03, 9.05, 9.06, and 10.03.

14.18.   "<u>Licensees</u>" – includes companies who enter into agreements with us or our distributors for the distribution of Records for us.

14.19.   "<u>Delivery</u>" – when used with respect to Master Recordings – means our actual receipt of the Master Recordings concerned and all documents and other materials required to be furnished to us in connection with them.  Without limiting the generality of the preceding sentence, no Master Recordings will be deemed Delivered until we have received all of the related documentation required under subparagraphs 4.01(c) and 4.01(e) and all other materials referred to in paragraph 4.01(f).

14.20.  "Reissue Label" - A label used primarily for reissues of recordings previously released.

14.21.  "Budget Record" - a Record, whether or not previously released, bearing a Gross Royalty Base at least one dollar ($1.00) lower (if it is sold for distribution in the United States or Canada), or twenty percent (20%) lower (if it is sold for distribution elsewhere), than the Gross Royalty Base applicable to the Top Line Records in the same configuration (e.g., whether it is a tape cassette, compact disc, or vinyl Record and whether it is an Album or Single) released by us or our licensees in the territory concerned.  A "Top Line" Record release is one bearing the same Gross Royalty Base as the majority (or plurality) of the Record releases in the same configuration (other than classical releases) then in initial release in our active catalog or that of our distributing licensee.  (For the purposes of the preceding sentence, a Record release will not be deemed in its initial release if it bears a Gross Royalty Base lower than that which applied to it when it was first released by us or our licensee.)

14.22.  "Multiple Record Set" - An Album containing two (2) or more 12-inch 33 1/3 rpm Records packaged as a single unit, or the equivalent in playing time in other configurations.

14.23.  "Mechanical Royalties" - Royalties payable to any Person for the right to reproduce and distributed copyrighted musical compositions on Phonograph Records other than Audiovisual Records.

14.24.  "Recording Costs" - all amounts representing direct expenses paid or incurred by us in connection with the production of finished Master Recordings under this agreement.  Recording Costs include, without limitation, the amounts referred to in paragraph 5.01, travel, rehearsal, and equipment rental expenses, advances to producers, studio and engineering charges in connection with our facilities and personnel or otherwise, all costs of mastering, remastering, and remixing.  Recording costs do not include the costs of producing metal parts, but include studio and engineering charges or other costs incurred in preparing Master Recordings for the production of metal parts.  (Metal parts include lacquer, copper, and other equivalent masters).

14.25.  "Special Packaging Costs" - costs incurred by us in creating and producing Album covers, sleeves, and other packaging elements, in excess for the following amounts:  (a) three thousand dollars ($3,000) per Album for design of artwork (including expenses for reproduction rights); (b) two thousand dollars ($2,000) per Album for engraving; (c) packaging manufacturing costs of twenty-five cents ($.25) per long-playing

vinyl Album unit, twenty-two cents ($.22) per tape cassette Album unit (including the cost of the "C-O" cassette housings), and sixty-six cents ($.66) per compact disc Album unit, for Albums manufactured for distribution in the United States or Canada; and (d) for Albums in those configurations manufactured for distribution elsewhere, the standard packaging manufacturing costs incurred by us or the licensee concerned for Albums manufactured in the same territory as the Album units concerned.

14.26.   (a)   "Audiophile" Records, units, etc. – Records (other than audiovisual Records) marketed in specially priced catalog series by reason of the superior sound quality or other distinctive technical or artistic characteristics.   (All Records made for digital playback are Audiophile Records.)

(b)   "Standard" Records, units. etc. – Records other than Audiophile Records and audiovisual Records.

14.27.   "Covered Video" – An audiovisual work owned or controlled by us or our distributor and containing one or more Master Recordings subject to this agreement.

## 15.   REMEDIES

15.01.   If you do not fulfill any portion of your Recording Commitment within the time prescribed in Article 3, we will have the following options:

(a)   to suspend our obligations to make payments to you under this agreement until you have cured the default;

(b)   to terminate the term of this agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(c)   to require you to repay to us the amount, not then recouped, of any Advance previously paid to you by us and not specifically attributable under Article 6 to an Album which has actually been fully Delivered.

We may exercise each of those options by sending you the appropriate notice.  No exercise of an option under this paragraph will limit our rights to recover damages by reason of your default, our rights to exercise any other option under this paragraph, or any of our other rights.

15.02.   If we refuse without cause to allow you to fulfill your Recording Commitment for any Contract Period and if, not later than sixty (60) days after that refusal takes place, you

-28-

notify us of your desire to fulfill such Recording Commitment, then we shall permit you to fulfill said Recording Commitment by notice to you to such effect within sixty (60) days of our receipt of your notice. Should we fail to give such notice, you shall have the option to terminate the term of this agreement by notice given to us within thirty (30) days after the expiration of the latter sixty-day period; on our receipt of such notice the term of this agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligations to pay royalties), at which time we shall pay you at the applicable minimum union scale rate in full settlement of our obligation in connection therewith, which payment shall constitute an Advance. In the event you fail to give us either notice within the period specified therefore, we shall be under no obligation to you for failing to permit you to fulfill such Recording Commitment.

15.03.  If because of:  act of God; inevitable accident; fire; lockout; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of a similar of different nature not reasonable within our control; we are materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting our rights, we shall have the option by giving you notice to suspend the running of the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that we shall have no less than thirty (30) days after the cessation of such contingency in which to exercise our option, if any, to extend the term of this agreement for the next following Option Period.

16.  **AGREEMENTS, APPROVAL AND CONSENT**

16.01.  As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent will not be unreasonably withheld (except as otherwise expressly provided in this agreement).

16.02.  Your agreement, approval or consent, or that of the Artist, whenever required (including, without limitation, written agreement, approval, or consent), shall be deemed to have been given unless you notify us otherwise within ten (10) days following the date of our written request to you therefor.

17.   **NOTICES**

17.01.   Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by courier or other personal delivery registered or certified mail, at the addresses shown above, or such other address or addressed as may be designated by either party.  Notices shall be deemed given when mailed or, if personally delivered, when so delivered, except that notice of change of address shall be effective only for the date of its receipt.  A copy of each such notice to us shall be sent simultaneously to Moraima A. Kelly, Esquire, Montgomery McCracken Walker & Rhoads, Three Parkway - 20th Floor, Philadelphia, PA 19102.

18.   **MERCHANDISING RIGHTS**

You hereby grant to us and our licensees the exclusive right, throughout the universe, during the Term and the non-exclusive right thereafter, to use and authorize the use of Artist's name, portraits, pictures, videos, likenesses and biographical material, either alone or in conjunction with other elements, in connection with the sale, lease, licensing or other exploitation of so-called merchandising rights.  For the rights granted by you and Artist to us in this paragraph, we shall pay to you a royalty equal to fifty (50%) percent of our receipts derived from the exploitation of such rights, after deducting all costs and third party payments relating thereto.  Such merchandising rights shall be accounted to by us to you in the same manner as record royalties are accounted to you by us hereunder.

19.   **MISCELLANEOUS**

19.01.   The Artist will, prior to the release of the first Album hereunder, prepare an act of professional quality and will during the term of this agreement, actively pursue a career as an entertainer in the live engagement field.

19.02.   We will have the right, throughout the term of this agreement, to obtain or increase insurance on the life of the Artist in such amounts as we determine, in our name and for our sole benefit or otherwise, in our discretion.  The Artist will cooperate in such physical examinations, and otherwise will cooperate full with us, as we may request in connection with any such insurance.  You and the Artist warrant and represent that, to your best knowledge, the Artist is in good health and does not suffer from any medical condition which might interfere with the timely performance of your obligations under this agreement.

19.03.   (a)   This agreement contains the entire under-
standing of the parties relating to its subject matter.   No
change or termination of this agreement will be binding upon us
unless it is made by an instrument signed by us.   A waiver by
either party of any provision of this agreement in any instance
shall not be deemed to waive it for the future.   All remedies,
rights, undertakings, and obligations contained in the agreement
shall be cumulative and none of them shall be in limitation of
any other remedy, right, undertaking, or obligation of either
party.   The captions of the Articles in this agreement are
included for convenience only and will not effect the inter-
pretation of any provision.

(b)   No change of a budget prescribed in this agree-
ment of established under it will be effective unless he change
is approved in writing by us.

19.04.   Those provisions of any applicable collective
bargaining agreement which are required, by the terms of such
agreement, to be included in this agreement shall be deemed
incorporated herein.

19.05.   We may assign our rights under this agreement in
whole or in part.   You may not assign any of your rights
hereunder.

19.06.   Each option and election granted to us in this
agreement including, without limitation, to suspend the running
of one or more periods of time, to terminate the term, to acquire
the direct and individual services of a leaving member (if a
group artist is involved), or otherwise, is separate and
distinct, and the exercise of any such option or election shall
not operate as a waiver of any other option or election unless
specifically so stated by us in our notice of exercise of such
option or election.

19.07.   You shall not be entitled to bring an action for
damages by reason of any breach us of our material obligations
hereunder, unless such breach has not been remedied within a
period of sixty (60) days following receipt of written notice
thereof.

19.08.   THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF
FLORIDA, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF
THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF
FLORIDA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED
ENTIRELY WITHIN THE STATE OF FLORIDA.   THE FLORIDA COURTS (STATE
AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES
REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH
INVOLVED SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, AND

NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS. ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS FIRST ABOVE WRITTEN OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE PURSUANT TO ARTICLE 17. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON THE ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE US TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS FIRST ABOVE WRITTEN OR SUCH OTHER ADDRESS AS THE ARTIST OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN THE MANNER PRESCRIBED IN ARTICLE 17. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF FLORIDA.

19.09. In entering into this agreement, and in providing services pursuant hereto, you and the Artist have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you or the Artist as our agents or employees.

19.10. Monies to be paid to you under this agreement will not be assignable by you without our written consent, which we may withhold in our unrestricted discretion.

19.11. This agreement shall not become effective until executed by all proposed parties hereto.

19.12. Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and us.

## 20. GROUP PROVISIONS

20.01. (a) The Artist's obligations under this agreement are joint and several. All references to the "Artist" include all members of the group inclusively and each member individually, unless otherwise specified.

(b) Notwithstanding any change in the membership of the group, we will continue to have the right to remit all payments under this agreement in your name.

20.02. If any member of the Artist ("leaving member") ceases to perform as a member of the group:

(a) (1) You will notify us promptly.

(2)   The leaving member will be replaced by a new member, if you and we so agree.  The new member will be deemed substituted as a party to this agreement in the place of the leaving member and you will cause the new member to execute and deliver to us such instruments as we, in our judgment, may require to accomplish chat substitution.  Thereafter, you will have no further obligation to furnish the services of the leaving member for performances under this agreement, but you (and the leaving member individually) will continue to be bound by the other provisions of this agreement, including, without limitation, subparagraphs 20.02(b) and 20.02(c) below.  You will not permit any person to perform in place of the leaving member in making Master Recordings under this agreement, unless that person has executed and delivered to us the substitution instruments referred to in the second sentence of this subsection (2).  We will continue to have the right to use the name "Poison Clan", and any other professional, group, and other assumed or fictitious names used by the Artist at any time, in connection with Master Recordings of the Artist's performances made at any time; no leaving member will make any use of the name "Poison Clan" or any such other name under any circumstances.

(3)   We will have the right to terminate the term of this agreement with respect to the remaining members of the Artist by notice given to you at any time before the expiration of ninety (90) days after our receipt of your notice.  In the event of such termination, all of the members of the Artist will be deemed leaving members as of the date of such termination notice, and subparagraph 20.02(c) will apply to all or any of them, collectively or individually as we elect.

(b)   Each Advance becoming payable under this agreement after the leaving member ceases to perform as a member of the group will be reduced in that proportion which the number of leaving members bears to the size of the group as constituted before their departure (for example, to 80% of the amount prescribed in paragraph 6 if there are five members and one of them leaves), whether or not any leaving member is replaced by another performer.  The royalty percentage rates applicable under paragraph 9.01 to Records derived from Master Recordings made under this agreement after the leaving member ceases to perform as a member of the group will also be reduced in the same proportion.

(c)   You and the Artist grant to us an option to engage the exclusive services of each leaving member as a recording artist (or, if at the time such option vests in our favor and the applicable leaving member as a recording artist) ("Leaving Member Options"). Each Leaving Member Option may be exercised by us by notice to the leaving member at any time

-33-

before the expiration of ninety (90) days after the date of:
(i) our receipt of your notice under section 20.02 (a)(1), or
(ii) our termination notice pursuant to section 20.02(a)(2), as
the case may be.  If we exercise a Leaving Member Option, the
leaving member concerned will be deemed to have entered into a
new agreement with us containing the same provisions as this
agreement, except as follows:

       (1)  the new agreement will apply only to that
leaving member, and all reference to "you" and "the Artist" will
be deemed to refer to the leaving member (or the furnishing
entity, if any).

       (2)  the term will commence on the date of an
exercise of such Leaving Member Option and may be extended by us,
at our election exercisable in the manner provided in paragraph
1.02 of this agreement, for the same number of option periods, if
any, remaining pursuant to paragraph 1.02 at the time of an
exercise of the Leaving Member Option (but at least two such
additional periods in any event);

       (3)  the Minimum Recording Commitment for each
Contract Period of such term will be one (1) Album.

       (4)  the Recording Fund prescribed in paragraph
6 will be one-half (1/2) of the amounts prescribed therein.

       (5)  the royalty percentage rates in respect of
Master Recordings made during that term will be sixty-six and
two-thirds (66 2/3%) of the royalty percentage rates prescribed
in sections 9.01(a)(1), 9.01(a), 9.01(b), 9.01(c), and 9.01(d);
and

       (6)  if your royalty account under this agree-
ment is in an unrecouped position at the date of our exercise of
the Leaving Member Option, a part of the amount of that unre-
couped balance, determined in the same manner as the reductions
prescribed in subparagraph 20.02(b) (i.e., 20% of that balance if
there are five members and one of them leaves) will constitute an
Advance recoupable from the royalties payable under the new
agreement.

21.  **CO-PUBLISHING AND ADMINISTRATION AGREEMENT**

    (a)  You and/or Artist (as the case may be) hereby
irrevocably and absolutely assigns, conveys and sets forth over
to us (or our publishing designee) an undivided fifty percent
(50%) interest in the worldwide copyright (and all renewals and
extensions thereof) and all other rights in and to the extent of

-34-

your and/or Artist's original interest in any musical composition written by you and/or Artist, in whole or in part, or owned and controlled by you, in whole or in part, during the Term of this Agreement which musical compositions are embodied on Masters recorded hereunder (the "Compositions").

(b)  We shall be the exclusive administrator of all rights in and to throughout the world and it shall be entitled to exercise any and all rights with respect to the control, exploitation and administration of the Compositions including, without limitation, the sole right to grant licenses, collect all income, and to use the name, likeness and biographical material of each composer, lyricist and songwriter hereunder in connection with each Composition for the full term of copyright wherein and thereto (including all renewals and extensions thereof).

(c)  You and Artist represent and warrant that:  (i) the Compositions are, and shall be, original and shall not infringe upon or violate the rights of any other person; and (ii) you and/or Artist shall have the full and unencumbered right, power and authority to grant to us all of the rights herein granted. You and Artist hereby agrees to indemnify us from and against any loss, damage, expense or liability (including actual legal costs and reasonable attorneys' fees) in respect of any claims, demands, liens or encumbrances.

(d)  From all royalties earned and received by us in the United States from the exploitation of the Compositions throughout the world (the "Gross Receipts"), we shall:  (i) deduct and retain all out-of-pocket costs incurred by us in connection with the exploitation, administration and protection of the Compositions; (ii) deduct and pay any actual third party administration fees; (iii) deduct and pay royalties payable to the writers of the Compositions (which you warrant and represent shall not exceed fifty percent (50%) of the Gross Receipts); (iv) deduct and pay any recording costs or other advances expended hereunder or under the Distribution Agreement.  In addition, the royalties payable to the writers of the Compositions pursuant to this subparagraph shall not include any of the so-called "writer's share" of any public performance income received by us from any performing rights society which directly pays writers, authors or composers the writer's share of such income unless received by us in which case the writer's share will be promptly paid without deduction or offset; and (iv) pay to you an amount equal to fifty percent (50%) of the sum remaining after deducting the aggregate sum set forth in subparagraphs (i), (ii), (iii) and (iv) above, and the remaining fifty percent (50%) thereof shall be retained by us for our own use and benefit.

(e)  Accountings for such royalties shall be rendered semi-annually.

(f)  We shall pay to you 50% of the advances paid solely in connection with the Compositions, if any, payable to us by any third party administrator, provided that we shall not be obligated to pay such advance to you if we include your and/or Artist's Compositions as part of a deal including compositions written by writers other than you and/or Artist.  All such advances shall be recoupable against royalties payable to you hereunder.

(g)  You and/or Artist shall execute and deliver to us any and all documents (including, without limitation, assignments of copyright) which we may require to vest in us and/or our designees the copyright and other rights herein granted to us in respect of each Composition.  If you and/or Artist shall fail to promptly execute any such document within ten (10) days after you receive the applicable documentation, you hereby irrevocably grant us a separate power of attorney to execute such document in your name and/or Artist's name and place.

(h)  The provisions of this paragraph 21 with respect to co-publishing shall serve as the complete understanding between the parties with respect to the subject matter hereof unless the parties (or their respective publishing designees) enter into a more formal co-publishing agreement (the "Formal Co-Publishing Agreement") embodying the provisions hereof and such other provisions as shall be negotiated in good faith and accordance with industry standards.  The parties agree that if they do not enter into such Formal Co-Publishing Agreement, the provisions of this Paragraph 21 shall remain in full force and effect.

## 22.  RIGHT OF FIRST REFUSAL FOR RUFF TOWN ACTS.

In the event you or any other Person or company you own or control or any other Person or company that owns or controls you shall have the right to enter into an agreement with a third party regarding that third party's providing services as a recording artist to you ("Third Party Artist") then, prior to entering into such agreement, you shall first notify us ("Your Notice") of the terms and conditions of said proposed agreement and offer to us the right ("First Refusal") to enter into an agreement with you to furnish the services of such Third Party Artist to us on the same terms and conditions as you propose to accept from such Third Party Artist.  We shall have the right to exercise the First Refusal and enter into said agreement by notice to you on or before thirty (30) days after the date of our receipt of Your Notice.  If we shall reject said offer or fail to notify you within said thirty (30) day period, you shall have the

-36-

right thereafter to enter into the agreement with such Third
Party Artist provided the agreement is consummated in arm's
length negotiations upon the same economic terms and conditions
as set forth in Your Notice within thirty (30) days after the
expiration of the thirty (30) day period referred to in the
preceding sentence.  If such agreement is not so consummated
within such thirty (30) day period based upon the same material
and information on which we based our refusal, no person other
than us will be authorized to enter into a recording agreement
regarding any agreement you propose to enter into with respect to
Third Party Artist's services.

LUKE RECORDS, INC.

By: _____

LUTHER CAMPBELL,
PRESIDENT


RUFF TOWN PRODUCTIONS

By: _____

EIN/SS#: _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_____


-37-

## "EXHIBIT A"

Dated as of :_____

Luke Records, Inc.
8400 N.E. 2nd Avenue
Miami, FL 33138

Gentlemen:

Pursuant to an exclusive recording agreement between Ruff Town
Productions ("Grantor") and me, Grantor is entitled to my
exclusive services as a recording artist.  I have been advised
that Grantor is entering into a written agreement with you of
even date herewith ("Agreement"), pursuant to which Grantor is
agreeing to furnish my exclusive services to perform for the
purpose of making phonograph records to be distributed by you.  I
am familiar with each of such provisions of the Agreement, which
is for an initial delivery obligation of One (1) Album and which
may be extended for Seven (7) further successive additional
options, which shall be for One (1) Album each, which grants you
certain rights with respect to Artist's name.  Unless otherwise
defined herein, all terms shall have the same meaning as given
them in the Agreement.

In consideration of your executing the Agreement and as a further
inducement for you to do so (it being to my benefit as recording
artist that you execute the same), I hereby agree as follows:

1.  I confirm, warrant, guarantee and agree that I will duly
and to the best of my ability, perform and discharge all of the
obligations undertaken by me pursuant to the terms and conditions
of my agreement with Grantor so as to fulfill all of the
commitments contained in the Agreement and in all of the
provisions as the same apply to me.  Without limiting the
generality of the foregoing, I agree to perform for the recording
of Master Recordings embodying my performances as provided for in
the Agreement.

2.  If, during the Term of the Agreement or any extensions
or renewals thereof, Grantor shall cease to be entitled to my
recording services in accordance with the terms of the agreement
between Grantor and myself, or if Grantor shall fail or refuse to
furnish Master Recordings embodying my performances to you, I
shall, at your request, do all such acts and things as shall give
to you the same rights, privileges, and benefits as you would
have had under the Agreement if Grantor had continued to be
entitled to my recording services and if Grantor had continued to

-38-

furnish Master Recordings to you and such rights, privileges, and benefits shall be enforceable in your behalf against me and all the terms and conditions contained in the Agreement shall be effective, except that with respect to the royalty provisions, the royalties payable to me in respect of Compositions performed by me and recorded by you subsequent to each request shall be the same as provided for in my agreement with Grantor, provided that, with regard to royalties and Advances payable in connection therewith, you may withhold all such payments to me in escrow pending settlement of any disputes between Grantor and me with respect to the subject matter hereof; notwithstanding such right to withhold payment, you shall have the right in your sole discretion to make payments to me at a royalty rate not in excess of one percent (1%) less than the royalty rate provided for in my agreement with Grantor, the balance to be held in escrow by you pending final settlement.  Said royalties, together with any and all other recording fees and other monies which may become payable to me under my agreement with Grantor subsequent to the date of your request as specified in this Paragraph 2, shall be paid by you directly to me, except that I shall continue to look to Grantor for payment of royalties in respect of Compositions performed by me and recorded by Grantor prior to such request, and such other monies as Grantor was obligated to pay to me prior to such request.

3.   During the Term of the Agreement you have the exclusive right to use and publish and permit others to use and publish my name (both legal and professional), autograph (including facsimile signature) and likeness for advertising, promotion and purposes of trade and in connection with other merchandising of any kind, including the making and exploitation of Records under the Agreement and in general goodwill advertising; you have the right to refer to me as your exclusive artist, and you shall be entitled to equitable relief, including injunctive relief, to enforce the provisions of this agreement.  After the Term you have the exclusive right to use and publish and permit others to use and publish my name (both legal and professional), autograph (including facsimile signature) and likeness for advertising and purposes of trade in connection with the manufacture and sale of Records, including Audio-Visual Devices, embodying my performances recorded during the Term of the Agreement, and you shall be entitled at any time hereafter to injunctive relief, as well as other equitable relief, to enforce any breach of this grant of exclusivity by me, or my heirs or legal assigns.

4.   I shall not, during the Term of the Agreement, or any extensions or renewals thereof, perform individually or as a part of a group or otherwise for anyone other than you or Grantor (pursuant to the Agreement) for the purpose of making Recordings. In addition, after the expiration of the Term of the Agreement, I

-39-

will not perform any Composition which shall have been recorded pursuant to the Agreement for the purpose of making Recordings prior to the later of the date five (5) years from the date of delivery to you of the Master Recording embodying such Composition, or the date two (2) years subsequent to the expiration or other termination of the Term of the Agreement.

5.   During the Term and thereafter as provided for herein, I will not record or authorize or with knowing intent permit to be recorded, for any purpose, any performance for a third party other than you, without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than you of Records and other devices for home and/or consumer and/or juke box use and/or use in or on means of transportation embodying such performance. Specifically, without limitation of the generality of the foregoing, I agree that:

(a)  If, during the Term of the Agreement, I perform any Composition for the purpose of making transcriptions for radio or television or soundtracks for motion picture films, or

(b)  If, during the period of recording restriction referred to in paragraph 4 above, I perform for any such purpose any Composition which was recorded pursuant to the Agreement I will do so only pursuant to a written contract containing an express provision that neither such performance nor any Recording thereof will be used, directly or indirectly, for the purpose of making Records or any other device for home and/or consumer and/or juke box use and/or use on or in means of transportation. I agree upon your request promptly to furnish to you a copy of the pertinent provisions of each such contract and will cooperate with you in any controversy which may arise or litigation which may be brought relating to your rights under this paragraph.

6.   I warrant and represent that, as of the date hereof, I am not a resident of the State of California.   I hereby agree that I shall immediately notify you in the event that, at any time during the Term, I become a resident of the State of California.

7.   No termination of my agreement with Grantor shall operate to diminish my liability or obligation hereunder without your written consent.

8.   Except as provided for in Paragraph 2 above, I agree that I will look solely to Grantor for the payment of all monies payable to me by reason of my rendering services in accordance with the Agreement, and I agree that you shall have no responsibility to me therefor whatsoever.   No breach by Grantor of any agreement which I may now or from time to time have with

-40-

Grantor shall be sufficient cause for my failure or refusal to fully perform for you in accordance with the Agreement and this agreement.

9.   During the Term, I will exert best efforts to be billed, advertised and described as an exclusive recording artist of your label designee.

10.   Any assignment (pursuant to the Agreement) by you of the Agreement shall constitute an assignment of this agreement to such assignee and I hereby consent to any such assignment.   Upon any such assignment you shall have no further obligation to me, or to Artist, other than payment of royalties otherwise due to me with respect to Records sold prior to such assignment.

11.   I agree to indemnify, save and hold you harmless from and against any liability, loss, damage, cost or expense (including reasonable attorneys' fees), paid or incurred by you by reason of any breach by me of the covenants, representations or warranties contained herein or in the Agreement or in my agreement with Grantor, and agree to reimburse you on demand for any payment made by you at any time after the date hereof with respect to any of the foregoing.   Pending the determination of any claim involving such alleged breach or failure you may withhold sums due me.

12.   This agreement is entered into in the State of Florida and shall be construed in accordance with the laws of Florida applicable to contracts to be wholly performed therein (without giving effect to any conflict of laws principals under Florida law).   The parties agree that any action, suit or proceeding based upon any matter, claim or controversy arising hereunder or relating hereto shall be brought solely in the State Courts of or the Federal Court in the State of Florida; except that in the event you are sued or joined in any other Court in respect of any matter which may give rise to a claim by you hereunder, the parties hereto other than you consent to the jurisdiction of such court over any claim which may be asserted by you herein.   The parties hereto irrevocably waive any objection to the venue of the above-mentioned courts, including any claim that such action, suit or proceeding has been brought in an inconvenient forum. Any process in any action, suit or proceeding arising out of or relating to this agreement may, among other methods permitted by law, be served upon me by delivering or mailing the same in accordance with the Agreement.

13.  This agreement may not be modified except by an instrument in writing executed by both parties hereto.  The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

Very truly yours,

POISON CLAN

Jeffrey Thompkins
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

ACCEPTED AND AGREED TO:

LUKE RECORDS, INC.

By:

Patrick Walter

CONSENTED AND AGREED TO:

RUFF TOWN PRODUCTIONS

By:

Kim Jones
WITNESS

-42-

# EXHIBIT 24

03 02/95  12:55    MMWR PHILA → 3057572560                      NO.184  P002

## AMENDMENT TO EXCLUSIVE RECORDING AGREEMENT

THIS AMENDMENT TO EXCLUSIVE RECORDING AGREEMENT (the "Amendment") is made as of this 2nd day of March, 1995, by and between **RUFF TOWN PRODUCTIONS**, c/o Allen Jacobi, Esq. with an address at 1313 N.E. 125th Street, North Miami, Florida 33161 (hereinafter jointly, severally and collectively referred to as "you"), and **LUKE RECORDS, INC.**, with an address at 8400 N.E. 2nd Avenue, Miami, Florida 33138 (hereinafter referred to as "we" or "us") and

W I T N E S S E T H :

WHEREAS, we and you have entered into a certain Exclusive Recording Agreement dated as of February 25, 1995 concerning the services of Artist, in which you shall furnish to us the exclusive services of Jeffrey Thompkins and Patrick Walter p/k/a "Poison Clan" (the "Artist"), as more particularly described in the Agreement; and

WHEREAS, you subsequently disclosed to us that Patrick Walter is not a member of the group "Poison Clan".

WHEREAS, we and you acknowledge and agree that it is in the mutual best interest of both parties to make certain modifications to the Agreement as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, it is mutually agreed between us and you that the Agreement is hereby amended as follows:

1.   <u>Amendment to Paragraph 1.02 (Term)</u>:  Paragraph 1.02 of the Agreement shall be amended as follows:

You grant us five (5) separate options to extend that term for additional Contract Periods ("Option Periods") on the same terms and conditions.  Each of those options will be exercised automatically unless we send you a notice not later than the expiration date of the Contract Period which is then in effect (the "current Contract Period").  Upon exercise of each such option, the Option Period concerned will begin immediately after the end of the current Contract Period.

2.   <u>Amendment to Paragraph 2.01 and Page 42 (Inducement Letter)</u>:  Paragraph 2.01 and Page 42 shall be amended as follows:

Delete Patrick Walter's name.

LJWR0203

3.   <u>Additional Paragraph 23 on Page 37</u>:

It is understood by all parties that the group Poison Clan consists of one member, Jeffrey Thompkins.  However, there

will be additional artists appearing on the album by Poison Clan. It is understood that we own all rights to the Masters and 50% of the copyright in the Compositions delivered by Poison Clan regardless of who appears on the Albums.  It is the contractual obligation of Jeffrey Thompkins to insure that anyone who co-writes any Compositions with him agrees to transfer 50% of the copyright and 100% of the administration rights to us.  Jeffrey Thompkins warrants that he will obtain the transfers of copyright.  Co-writers on any Poison Clan Albums shall have no rights against us concerning their services.  Additionally, performers rendering their services on any Poison Clan Albums shall have no rights against us concerning their services.

4    <u>Effective Date</u>:  This Amendment shall be deemed to be effective as of the effective date of the Agreement, as if this Amendment was executed contemporaneously with the Agreement.

5    <u>Extent of Amendment</u>:  Except as expressly amended and modified herein, all the terms, conditions and provisions of the Agreement are hereby ratified and confirmed as being in full force and effect.  In the event that any of the terms, conditions and provisions of this Amendment shall conflict with any of the terms, conditions and provisions of the Agreement, this Amendment shall be controlling.

6.    <u>Governing Law</u>:  This Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment on the date first set forth above.

LUKE RECORDS, INC.                    RUFF TOWN PRODUCTIONS

By:_____           By:_____
   Luther R. Campbell,                   Jeffrey Thompkins
   President                             Poison Clan

# ADDENDUM TO CONTRACT

Both parties have five (5) working days from this date to make any changes to this contract.

This addendum made and entered into as of this ___/___ day of March, 1995.

_____
LUTHER CAMPBELL
PRESIDENT LUKE RECORDS


_____
JEFFREY THOMPKINS
RUFF TOWN PRODUCTIONS (POISON CLAN)

_____
WITNESS

LJWR0205

# EXHIBIT 25

P.02

# AMENDMENT TO CONTRACT DATED FEBRUARY 25, 1995

THIS AMENDMENT TO RECORDING AGREEMENT (the "Amendment") is made as of this 28th day of March, 1995, by and between RUFF TOWN PRODUCTIONS, c/o Allen Jacobi, Esq. with an address at 1313 N.E. 125th Street, North Miami, Florida 33161 (hereinafter jointly, severally and collectively referred to as "you"), and LUKE RECORDS, INC., with an address at 8400 N.E. 2nd Avenue, Miami, Florida 33138 (hereinafter referred to as "we" or "us") and

### W I T N E S S E T H:

We will be responsible for clearing all samples on the album "Straight Zooizm". The cost of clearing any and all samples is 100% recoupable to the company.

You will be solely responsible for obtaining any and all necessary clearances of permissions in respect of so-called "samples" or other products of authorized or unauthorized dubbing which are embodied in Master Recordings Delivered by you hereunder, and for making all payments in connection with such clearances and permissions for all future albums.

_____
LUTHER CAMPBELL
PRESIDENT LUKE RECORDS


_____
JEFFREY THOMPKINS
RUFF TOWN PRODUCTIONS (POISON CLAN)


_____
WITNESS

LJWR0206

# EXHIBIT 26

**UNITED STATES BANKRUPTCY COURT**

Jonathan K Winer, Esq.
1 SE 3 Ave #2200
Miami, FL 33131

Southern District of Florida
Claude Pepper Federal Building
51 SW 1st Avenue, #1517
Miami, FL 33130

NOTICE OF COMMENCEMENT OF CASE UNDER CHAPTER 11
OF THE BANKRUPTCY CODE,
MEETING OF CREDITORS, AND FIXING OF DATES
(Individual or Joint Debtor Case)

Case Number:   95-12785 - RAM
Date Filed:    6/12/95

IN RE(NAME OF DEBTOR)
Luther R. Campbell, 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

ADDRESS OF DEBTOR
7180 N Oakmont Dr
Miami, FL 33015

NAME/ADDRESS OF ATTORNEY FOR DEBTOR
Jonathan K Winer, Esq
1 SE 3 Ave #2200
Miami, FL 33131

NAME/ADDRESS OF TRUSTEE

Telephone Number:
DATE/TIME/LOCATION OF MEETING OF CREDITORS
July 21, 1995 at 10:00 am
51 SW 1 Ave
Room 105
Miami, FL 33130

Telephone Number:

DEADLINE FOR FILING CLAIMS WITH THE COURT: **10/19/95** [Except governmental units must file before 180 days after the date relief was ordered.]
DEADLINE TO FILE A COMPLAINT TO DETERMINE DISCHARGEABILITY OF CERTAIN TYPES OF DEBTS: **09/19/95**

**WARNING:** **Without further notice or hearing the Court may dismiss your case for failure of the debtor to appear at the meeting of creditors or failure of the debtor to timely file required schedules, statements or lists.**

COMMENCEMENT OF CASE/CREDITORS MAY NOT TAKE CERTAIN ACTIONS: An order for relief has been entered on behalf of this debtor. Under 11 U.S.C. section 362, the debtor is granted protection against creditors who are prohibited from taking certain actions against the debtor or property of the debtor. Common examples of prohibited actions by creditors are contacting the debtor to demand repayment, taking action against the debtor to collect money owed to creditors or to take property of the debtor, and starting or continuing foreclosure actions, repossessions, or wage deductions. If unauthorized actions are taken by a creditor against a debtor, the court may penalize that creditor.

MEETING OF CREDITORS: The debtor (husband and wife in a joint case) is required to appear at the meeting of creditors scheduled as set forth above for the purpose of being examined under oath. Attendance by creditors is welcomed but not required.

DEADLINE FOR FILING CLAIMS: Creditors need not file a claim with the court unless the debtor has omitted the claim on the schedules, listed the claim incorrectly, or listed it as disputed, contingent or unliquidated. WHEN REQUIRED, A PROOF OF CLAIM MUST BE FILED BY THE DEADLINE SET FORTH ABOVE FOR FILING CLAIMS. CLAIMS SHOULD BE FILED USING THE FORM ON THE REVERSE SIDE OF THIS NOTICE AND MUST BE RETURNED TO: CLERK, U.S. BANKRUPTCY COURT, 51 S.W. FIRST AVE., ROOM 1517, MIAMI, FL 33130. Attachments to the claim must not be originals and (except for copies of instruments upon which liability is based) must not exceed 5 pages. If greater than 5 pages, a list or summary must be attached instead. To receive acknowledgement of receipt by the clerk, enclose a copy of the claim and an adequate sized stamped self-addressed envelope. The deadline for filing objections to claims will be established pursuant to Local Rule 307(B).

DEADLINE TO OBJECT TO EXEMPT PROPERTY: Under state and federal law, the debtor is permitted to keep certain money or property as exempt. Creditors must file objections to debtor's claim of exempt property within 30 days after the conclusion of the meeting of creditors or within 30 days of any amendment to the list of supplemental schedules.

DEADLINE TO OBJECT TO DISCHARGE/DISCHARGEABILITY OF DEBTS: The deadline set forth above is the last day for filing an adversary complaint to determine dischargeability of certain debts under 11 U.S.C. section 523(a)(2), (4), (6) or (15). An adversary complaint objecting to the debtor's discharge under 11 U.S.C. sections 1141 (d)(3)(C) and 727(a) must be filed no later than the first date set for the hearing on confirmation. WRITING A LETTER TO THE COURT OR JUDGE IS NOT SUFFICIENT. An adversary complaint must be filed in accordance with the applicable rules. If no complaint objecting to the discharge is filed, the debtor may be granted a discharge. If no complaint objecting to dischargeability is filed, the debt may be discharged.

MISCELLANEOUS ITEMS: The court does not provide translating services. Translator must be certified and of no relation to the debtor. All documents filed in this case (other than proof of claims - which are filed in Miami) must be filed at the address for the court listed in the upper right hand corner of this notice.

Case filing information and deadline dates can be obtained free of charge by calling our Voice Case Information System: (305)536-5979, (305)536-5696 or (800)473-0226.

For the Court:       Karen Eddy              06/24/95
                     Clerk of the Bankruptcy Court       Date              FORM B9E   0001

Bancap 341 3/9/95 BNC

424001162

# CORDANT

11400 Commerce Park Drive
Reston, Virginia 22091-1506

# CERTIFICATE OF SERVICE

1-800-BNC-5055

| | |
|---|---|
| District/off: 113c-1 | User: catala | Page 1 of 2 | Date Rcvd: 06/22/95 |
| Case: 95-12785 | Form ID: 39E | Total Served: 33 | Date Served: 06/24/95 |

```
db        Luther R. Campbell,  7180 N Oakmont Dr,  Miami, FL 33015
aty       Jonathan K Winer, Esq,  1 SE 3 Ave #2200,  Miami, FL 33131
smg       BNC Coordinator,  Claude Pepper Federal Building,  51 SW 1st Avenue,  Room 1517,  Miami, FL 33130
smg       Florida Department of Revenue,  POB 6668,  Bankruptcy Division,  Tallahassee, FL 32314-6668
smg       IRS,  ATTN SPF-BKC,  Stop 5730,  POB 17167,  Ft Lauderdale, FL  33318
smg       Metro-Dade Bankruptcy Unit,  111 NW 1 St,  26th floor,  Miami, FL 33128
1867850   Aaron Rents Furniture,  7101 Coral Way,  Miami FL 33155
1867851   Allstate Auto Insurance,  P.O. Box 32572,  Charlotte NC 28232
1867852   American Express,  P.O. Box 407135,  Ft.Lauderdale FL 33340
1867854   Blue Cross/Blue Shield,  P.O. Box 2913,  Jacksonville FL 32231
1867856   Coral Gables Federal,  P.O. Box 141488,  Coral  Gables FL 33114
1867857   Country Club at Doral,  4400 N.W. 87th Avenue,  Miami FL 33178
1867858   Dade Christian School,  6601 N.W. 167th Street,  Miami FL 33015
1867859   Dade County Tax Coll.,  140 West Flagler St.,  Room #101,  Miami FL 33130
1867860   Dime Savings Bank,  P.O. Box 5724,  Hicksville NY 11802
1867870   George Brown as Per Rep,  c/o Cooper & Wolfe P.A.,  700 Courthouse Tower,  44 West Flagler Street,
              Miami FL 33130
1867862   Hollywood Christian Schl,  1708 N. 60th Avenue,  Hollywood FL 33021
1867863   Interamerican Bank FSB,  9190 Coral Way,  Miami FL 33165
1867864   Internal Revenue Service,  Atlanta GA 39901
1867875   Joseph Weinberger,  19510 East Oakmont Dr.,  Miami FL 33015
1867866   Miami Dade Sewer & Water,  P.O. Box 339055,  Miami FL 33233
1867867   Muirfield Group Inc.,  6801 Miami Gardens Dr.,  Miami FL 33015
1867868   Nelda Parinas,  c/o Pamela Beckham Esq.,  P.O. Box 600550,  N. Mia Beach FL 33160
1867865   Peter Jones,  c/o Richard Wolfe Esq.,  Bedzow Korn & Kan P.A.,  20803 Biscayne Blvd #200,  Aventura FL 33180
1867861   Quinn Echols,  c/o William B. King Esq,  628 Stoner Avenue,  Shreveport LA 71101
1867869   Red Distribution,  79 Fifth Avenue,  New York NY 10003
1869578   Red Distribution Inc,  c/o James P.S. Leshaw,  1221 Brickell Avenue,  Miami, FL 33131
1867871   Richard Sandfield,  c/o Michael S. Taylor,  10474 Santa Monica Blvd.,  Suite 401,  Los Angeles CA 90025
1867872   Seeker Systems,  4600 W. Commercial Blvd,  Tamarac FL 33319
1867873   TCI of South Florida,  P.O. Box 371431,  Pittsburgh PA 15250
1867853   Teenear Barnett,  7180 N. Oakmont Drive,  Miami Lakes FL 33105
1867855   Terri Brimberry,  c/o Dade Cent Depository,  370 S.E. 1st Street,  Room #200,  Miami FL 33131
1967874   The Grand Condominium,  1717 N. Bayshore Drive,  Miami FL 33132
```

***** UNDELIVERABLE LIST *****

NONE.                                                                        TOTAL: 0

***** CLIN SUMMARY *****

| CLIN | Description | Unit | Qty | Unit Price | Extended Price |
|---|---|---|---|---|---|
| 3002 | Elect, print two sides | Sheet | 33 | 0.15000 | 4.950 |
| 4001 | Prepare to transmit Notice Service | Case | 1 | 0.10000 | 0.100 |
| | | | | TOTAL | 5.050 |

24001163

District/Off: 113c-1        User: catala         Page 2 of 2           Date Rcvd: 06/22/95
Case: 95-12785             Form ID: B9E         Total Served: 33      Date Served: 06/24/95

I, H. Douglas Dangerfield, declare under the penalty of perjury that I have prepared the Certificate of Service and that it is true and correct to the best of my information and belief.

Date: 06/24/95                          Signature:

# EXHIBIT 27

Jonathan K Winer, Esq
1 SE 3 Ave #2200
Miami, FL 33131

UNITED STATES BANKRUPTCY COURT
Southern District of Florida
Claude Pepper Federal Building
51 SW 1st Avenue, #1517
Miami, FL 33130

NOTICE OF COMMENCEMENT OF CASE UNDER CHAPTER 11
OF THE BANKRUPTCY CODE,
MEETING OF CREDITORS, AND FIXING OF DATES
(Corporation/Partnership Case)

Case Number:   95-11447 - RAM
Date Filed :   6/14/95

IN RE(NAME OF DEBTOR)
Luke Records, Inc.

ADDRESS OF DEBTOR
8400 NE 2 Ave
Miami, FL 33138

NAME/ADDRESS OF ATTORNEY FOR DEBTOR
Jonathan K Winer, Esq
1 SE 3 Ave #2200
Miami, FL 33131

NAME/ADDRESS OF TRUSTEE

Telephone Number:
DATE/TIME/LOCATION OF MEETING OF CREDITORS
August 25, 1995 at 11:00 am
51 SW 1 Ave
Room 105
Miami, FL 33130

Telephone Number:

[ X ] Corporation  [ ] Partnership

DEADLINE FOR FILING CLAIMS WITH THE COURT: **11/23/95** [Except governmental units must file a claim before 180 days after the date relief was ordered.]

**WARNING: Without further notice or hearing the Court may dismiss your case for failure of the debtor to appear at the meeting of creditors or failure of the debtor to timely file required schedules, statements or lists.**

COMMENCEMENT OF CASE/CREDITORS MAY NOT TAKE CERTAIN ACTIONS: An order for relief has been entered on behalf of this debtor. Under 11 U.S.C. section 362, the debtor is granted protection against creditors who are prohibited from taking certain actions against the debtor or property of the debtor. Common examples of prohibited actions by creditors are contacting the debtor to demand repayment, taking action against the debtor to collect money owed to creditors or to take property of the debtor, and starting or continuing foreclosure actions, repossessions, or wage deductions. If unauthorized actions are taken by a creditor against a debtor, the court may penalize that creditor. If the debtor is a partnership, remedies otherwise available against general partners are not necessarily affected by the filing of this partnership case.

MEETING OF CREDITORS: The debtor (if corporation, by its president or other executive officer or if partnership, by a general partner) is required to appear at the meeting of creditors scheduled as set forth above for the purpose of being examined under oath. Attendance by creditors is welcomed but not required.

DEADLINE FOR FILING CLAIMS: Creditors or equity security holders need not file a claim with the court unless the debtor has omitted the claim on the schedules, listed the claim incorrectly, or listed it as disputed, contingent or unliquidated. WHEN REQUIRED, A PROOF OF CLAIM MUST BE FILED BY THE DEADLINE SET FORTH ABOVE FOR FILING CLAIMS. CLAIMS SHOULD BE FILED USING THE FORM ON THE REVERSE SIDE OF THIS NOTICE AND MUST BE RETURNED TO: CLERK U.S. BANKRUPTCY COURT, 51 S.W. FIRST AVE., ROOM 1517, MIAMI, FL 33130. Attachments to the claim must not be originals and (except for copies of instruments upon which liability is based) should not exceed 5 pages. If greater than 5 pages, a list or summary must be attached instead. To receive acknowledgement of receipt by the clerk, enclose a copy of the claim and an adequate sized stamped self-addressed envelope. The deadline for filing objections to claims will be established pursuant to Local Rule 307(B).

MISCELLANEOUS ITEMS: The court does not provide translating services. Translator must be certified and of no relation to the debtor. All documents filed in this case (other than proof of claims - which are filed in Miami) must be filed at the address for the court listed in the upper right hand corner of this notice.

Case filing information and deadline dates can be obtained free of charge by calling our Voice Case Information System: (305)536-5979, (305)536-5696 or (800)473-0226.

| | | |
|---|---|---|
| For the Court: | Karen Eddy | 08/04/95 |
| | Clerk of the Bankruptcy Court | Date |

FORM B9F  0001

Bancap 341 3/9/95 BNC

104048851

(rev. 01/95)    FLSB    9511447:7    190249Ь

# United States Bankruptcy Court
## Southern District of Florida

# PROOF OF CLAIM

| In re (Name of Debtor)<br>Luke Records, Inc. | Case Number<br>95-11447 |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
*(The person or other entity to whom the debtor owes money or property)*
Joseph Weinberger

Name and Address Where Notices Should be Sent

19510 E. Oakmont  Dr.
Miami FL 33015

Telephone No.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR

Check here if this claim ☐ replaces ☐ amends     a previously filed claim, dated:_____

**1. BASIS FOR CLAIM**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other (Describe briefly)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)
Your social security number _____
Unpaid compensation for services performed
from_____ to _____
(date)         (date)

| 2. DATE DEBT WAS INCURRED | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Secured. (2) Unsecured nonpriority. (3) Unsecured Priority.
It is possible for part of a claim to be in one category and part in another. A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.
CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM $_____
Attach evidence of perfection of security interest
Type of Collateral: ☐ Real Estate ☐ Motor Vehicle ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed
included in secured claim above, if any $_____
☐ UNSECURED NONPRIORITY CLAIM $_____
☐ UNSECURED PRIORITY CLAIM $_____
*If you checked category "unsecured priority claim", specify the priority of the claim using the boxes in the next column. Note: Amounts in § 507(a) are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

☐ Wages, salaries, or commissions (up to $2,000[1] or $4,000[2]) earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier -11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan-11 U.S.C. § 507(a)(4)
☐ Up to $900[1] or $1,800[2] of deposits toward purchase, lease, or rental of property or services for personal, family, or household -11 U.S.C. § (507)(a)(6)
☐ Alimony, maintenance or support owed to a spouse, former spouse, or child -11 U.S.C. § (507)(a)(7)
☐ Taxes or penalties of government units-11 U.S.C. § 507(a)(8)
☐ Other-Specify applicable paragraph of 11 U.S.C. § 507(a)_____
[1]*Cases commenced prior to 10/22/94.* [2]*Cases commenced on or after 10/22/94*

**5. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:**    $_____ (secured)    $_____ (unsecured nonpriority)    $_____ (unsecured priority)    $_____ (Total)
☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**7. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If documents are not available, explain. If the documents are voluminous, attach a summary.

**8. DATE-STAMPED COPY:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

MAIL CLAIM TO:

Clerk, U.S. Bankruptcy Court
51 SW 1 Avenue
Room 1517
Miami, FL 33130

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

10404855ᵗ

# EXHIBIT 28



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 95-11447-BKC-RAM
Chapter 11 Proceeding

In Re:

**LUKE RECORDS, INC.**

      Debtor.
_____/

### ORDER ON DEBTOR-IN-POSSESSION'S MOTION PURSUANT TO 11 U.S.C. §365 TO DETERMINE ABILITY TO ASSUME AND ASSIGN EXECUTORY CONTRACTS; AND TO DETERMINE COSTS TO CURE DEFAULTS, IF ANY

.THIS CAUSE, having come before the Court on Debtor, LUKE RECORDS, INC.'s Motion Pursuant to 11 U.S.C §365 to Determine Ability to Assume and Assign Executory Contracts; and to Determine Costs to Cure Defaults, if Any, and the Court having considered the record, having heard arguments of counsel, and being otherwise fully advised in the premises, it is therefore,

**ORDERED AND ADJUDGED** as follows:

1. The Debtor's Motion Pursuant to 11 U.S.C §365 to Determine Ability to Assume and Assign Executory Contracts; and to Determine Costs to Cure Defaults, if Any is hereby deemed withdrawn without prejudice.

2. The Debtor has until March 20, 1996, the date currently set for the hearing on confirmation herein, to move to assume any executory Artist contracts, with the exception of the Debtor's exclusive recording agreement with H-Town (hereinafter, the "H-Town Agreement"), which is dealt with pursuant to a proposed settlement agreement. Any contracts not assumed will be deemed rejected.

3.   Should the Debtor fail to achieve confirmation of this Joint Plan of Reorganization on March 20, 1996, the Court will set a deadline on that date, by which any executory Artist contracts, with the exception of the H-Town Agreement, must be assumed or rejected.

DONE AND ORDERED in the Southern District of Florida this 21st day of _____March_____, 1996.

Robert A. Mark
United States Bankruptcy Judge

Copies furnished:

Chad P. Pugatch, Esquire

ATTORNEY PUGATCH IS DIRECTED TO MAIL CONFORMED COPIES OF THIS SIGNED ORDER TO ALL INTERESTED PARTIES AND TO FILE
A CERTIFICATE OF MAILING WITH THE COURT.

2

# EXHIBIT 29

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

LUTHER R. CAMPBELL,                    CASE NO.  95-12785-BKC-RAM

                                       CHAPTER 11

            Debtor.
_____/

ORDER SETTING BAR DATE FOR REJECTION
OF CLAIMS ARISING FROM REJECTED EXECUTORY CONTRACTS

THIS CAUSE having come before the Court on 10:00 a.m. on March
20, 1996, and 1:30 p.m. on March 22, 1996, at the hearing on
confirmation and the Court having entered an Order Confirming Joint
Plan of Reorganization and having been advised that the instant
Debtor rejects all executory contracts and being otherwise fully
advised in the premises; it is thereupon

ORDERED AND ADJUDGED as follows:

1.   All executory contracts are rejected.

2.   Parties to such contracts are granted thirty (30) days
from the date of this Order in which to file any claims arising as
a result of such rejection.

3.   Any claims not timely filed shall be deemed waived and
will not be entitled to distribution under the confirmed Joint Plan

CASE NO.   95-12785-RAM
PAGE 2

of Reorganization.

DONE AND ORDERED in the Southern District of Florida this
30 day of March, 1996

ROBERT A. MARK

_____
ROBERT A. MARK
UNITED STATES BANKRUPTCY JUDGE

Copies furnished:
Jay M. Gamberg, Esq.
Office of the U.S. Trustee
All Parties of Interest

Attorney Gamberg is directed to provide an executed copy of this Order to each of the parties named above upon
receipt and to provide a Certificate of mailing thereof with the Court.


RECEIVED APR - 4 1996

2

# EXHIBIT 30

## GENERAL RELEASE AND HOLD HARMLESS
## AND INDEMNIFICATION AGREEMENT

Whereas, Joseph Weinberger and Lil' Joe Records, Inc., a Florida Corporation ("Weinberger Parties" or "second Parties"), pursuant to a Letter of Intent executed by Luther Campbell, debtor and Debtor in Possession, and Luke Records, Inc., Debtor and debtor in Possession ("first parties") dated on or about February 3, 1996, further approved by Court Order Confirming Joint Plan Of Reorganization of the Assignor dated March 22, 1996, in Case Nos 95-11447 BKC RAM and 95-12785 BKC RAM, the US Bankruptcy Court Southern District Of Florida, has acquired certain assets of the first parties which is exempt from tax under any law imposing a stamp or similar tax

KNOW ALL MEN BY THESE PRESENTS:

That we Peter Jones and Richard C. Wolfe, as Liquidating Trustee of the Luther Campbell bankruptcy estate, first party, for and in consideration of the sum of TEN DOLLARS ($10.00), or other valuable considerations, received from or on behalf of Joseph Weinberger and Lil' Joe Records, Inc., second party, the receipt whereof is hereby acknowledged.

(Wherever used herein the terms "first party" and "second party" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.)

HEREBY remise, release, acquit, satisfy, and forever discharge the said second party of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which said first party ever had, now has, or which any personal representative, successor, heir or assign of said first party, hereafter can, shall or may have, against said second party, for, upon or by reason of any matter, cause or thing from the beginning of the world to the day of these presents, which arose out of case 95-01914 Dade County Circuit Court and adversarial case            , and shall waive and relinquish all claims as that term is defined in 11 USC 101 (5), in law or in equity, that they have against the Weinberger parties including but not limited to preference actions and other avoidance actions under the Bankruptcy Code arising out of or in connection therewith (the "Conduct") and (ii) any claims by, through, or under first party or any of its agents, employees, or others permitted by first party on said premises or to otherwise participate in the Conduct, for any injuries to person or property, or any other claim of damage occasioned at or on the said premises or in connection with the Conduct. In addition, to the extent any such agents, employees or others so permitted by first party actually pursue any claim against second party, for any of said injuries or damages, then first party shall save and hold second party harmless of and from such claims, and first party shall indemnify second party against all costs and, if litigation commences, attorneys' fees, incurred by second party in defense and response to any such claims. The first parties do not release the Weinberger parties from the promissory note of even date herewith.

IN WITNESS WHEREOF, we have hereunto set our hand(s) and seal(s) this __ day of _____, 1996.

LIL' JOE RECORDS, INC.

By: _____
    Joseph Weinberger
    President

_____
Peter Jones

_____
Richard C. Wolfe

_____
Joseph Weinberger

LJWR0897

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and the County aforesaid to take acknowledgements, personally appeared Peter Jones, to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed the same.

    WITNESS my hand and official seal in the County and State last aforesaid this __ day of _____, 1996.

 

                                                NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

STATE OF Florida )
                 ) SS:
COUNTY OF Dade   )

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and the County aforesaid to take acknowledgements, personally appeared Richard C. Wolfe, to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed the same.

    WITNESS my hand and official seal in the County and State last aforesaid this 30 day of APri l, 1990.

                                                NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and the County aforesaid to take acknowledgements, personally appeared Joseph Weinberger, to me known to be the person described in an who executed the foregoing instrument and he acknowledged before me that he executed the same.

    WITNESS my hand and official seal in the County and State last aforesaid this __ day of _____, 1996.

                                                NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:                FRANK P. TERZO

114734                                FRANK P TERZO
                                      My Commission CC500735
                                      Expires Oct. 10, 1999

LJWR0898

# EXHIBIT 31

B10 (Official Form 10)
(Rev. 6-90)

| United States Bankruptcy Court | PROOF OF CLAIM |
|---|---|
| District of _____ | |

FILED BY _____ DC

In re (Name of Debtor)

**LUKE RECORDS**

Case Number

**95-11447-BKC-RAM**

95 NOV 22 PM 4:15

CLERK
U.S. BANKRUPTCY CT.
S.D. OF FLA.

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
*(The person or entity to whom the debtor owes money or property)*

**JEFFREY THOMPKINS**

Name and Addresses Where Notices Should be Sent

**1321 NW. 198 st**
**Miami FL, 33169**

Telephone No. **(305) 652-9322**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

**Poison Clan**

Check here if this claim: ☐ replaces ☐ amends   a previous claim, dated: _____

THIS SPACE FOR COURT USE ONLY

1. BASIS FOR CLAIM
   - ☐ Goods sold
   - ☒ Services performed
   - ☐ Money loaned
   - ☐ Personal injury/wrongful death
   - ☐ Taxes
   - ☒ Other (Describe briefly) **Royalties - Records $ Copywright Due**

   - ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
   - ☐ Wages, salaries, and compensations (Fill out below)
     Your social security number _____
     Unpaid compensations for services performed
     from _____ to _____
     (date)              (date)

2. DATE DEBT WAS INCURRED

   **1989 to 1994**

3. IF COURT JUDGMENT, DATE OBTAINED:

Certified to be a true and correct copy of the original.
Karen Eddy, Clerk
U.S. Bankruptcy Court
By _____ Deputy Clerk
12/12/02

4. CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

☐ SECURED CLAIM $ _____
Attach evidence of perfection of security interest
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle   ☐ Other (Describe briefly)

Amount of arrearage and other charges included in secured claim above, if any $ _____

☒ UNSECURED NONPRIORITY CLAIM $ **UNDER TERM**
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM $ _____
Specify the priority of the claim.
- ☐ Wages, salaries, or commissions (up to $2000), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)
- ☐ Contributions to an employee benefit plan—U.S.C. § 507(a)(4)
- ☐ Up to $900 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use—11 U.S.C. § 507(a)(6)
- ☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(7)
- ☐ Other—11 U.S.C. §§ 507(a)(2), (a)(5)—(Describe briefly)

5. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:
$ _____ (Unsecured)   $ _____ (Secured)   $ _____ (Priority)   $ **Under Term** (Total)

☐ Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges

6. CREDITS AND SETOFFS. The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

7. SUPPORTING DOCUMENTS. *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. TIME STAMPED COPY. To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date
**11-21-95**

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)

*[signature] Jeff Thompkins*

*Penalty for presenting fraudulent claim* Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U.S.C. §§ 152 and 3571

"POISON CLAN"


ALBUM TITLE: 2 LOW LIFE MUTHA'S
ARTIST: POISON CLAN
WRITER: JEFREY THOMPKINS
50% WRITERS, 50% PUBLISHERS

SONGS:
2 LOW LIFE MUTHA'S
SPOILED ROTTEN
JHERI CURL
BITCH THAT I HATE
DANCE ALL NIGHT
POISONOUS FREESTYLE
FLAUGIN
BAD INFLUENCE
YOU GETS NOTHIN
NEIGHBORHOOD HAPS
JUVENILES



ALBUM TITLE: POISONOUS MENTALITY
ARTIST: POISON CLAN
WRITER: JEFREY THOMPKINS
100% WRITERS, 100% PUBLISHERS

SONGS:
INSIDE EDITION
ALL THEY GOOD FOR
ACTION
LIVIN IN THE CITY
FUGATIVE
HO STORIES
I HATE HO'S
RUFF NIGGA GETTIN BUSY
JUST SOME SHIT I USED TO DO
GROOVE WITH THE P.C.
NO HAPS
SHAKE WHAT YA MAMA GAVE YA
SOMTHIN 4 YOU RAGEDEY HO'S
SHOT OUTS

CONT'D
POISON CLAN


ALBUM TITLE: BANNED IN THE USA
ARTIST: 2 LIVE CREW/LUKE
WRITER: JEFREY THOMPKINS

SONGS:
FUCK A GANG 50% WRITERS, 50% PUBLISHERS
TO LUKE FROM THE POSSE 20% WRITERS, 50% PUBLISHERS


ALBUM TITLE: I GOT SHIT ON MY MIND
ARTIST: LUKE
WRITER: JEFREY THOMPKINS

SONGS:
FAKIN LIKE GANGSTAS 50% WRITERS, 50% PUBLISHERS
PAYBACK IS A BITCH 50% WRITERS 50% PUBLISHERS
HEAD HEAD & MORE HEAD 50% WRITERS 50% PUBLISHERS


ALBUM TITLE: LUKE IN THE NUDE
ARTIST: LUKE
WRITER: JEFREY THOMPKINS

SONGS:
COWARDS OF COMPTON 50% WRITERS, 50% PUBLISHERS
HEAD HEAD & MORE HEAD PART 2 50% WRITERS 50% PUBLISHERS
FREE STYLE JOINT 25% WRITERS, 25% PUBLISHERS
WORK IT OUT 50% WRITERS, 50% PUBLISHERS

CONT'D
"POISON CLAN"


ALBUM TITLE: RUFFTOWN BEHAVIOR
ARTIST: POISON CLAN
WRITER: JEFREY THOMPKINS
100% WRITERS, 100% PUBLISHERS

SONGS:
AFRAID OF THE FLAVOR
PUT SHIT PASS NO HO/DON'T SLEEP ON A HIZZO
SOME MORE SHIT
PEEPIN
GAME RECOGNIZE GAME
CITY BOY
CHECK OUT THE AVE PART 1
CHECK OUT THE AVE PART 2
SUGAR HILL STYLE
WORDS FROM A PLAYER
HO STORIES PART 2
LISTEN
RUFFTOWN BEHAVIOR
GOIN ALL OUT


ALBUM TITLE: FREAK FOR LIFE
ARTIST: LUKE
WRITER: JEFREY THOMPKINS

SONGS:
THAT'S HOW I FEEL 50% WRITERS, 50%PUBLISHERS
REPRESENT 25% WRITERS, 25% PUBLISHERS
LET THEM HO'S DIE 33% WRITERS, 33% PUBLISHERS

# EXHIBIT 32

# United States Bankruptcy Court
# for the Southern District of Florida

I, Karen Eddy, Clerk of the Bankruptcy Court in and for the Southern District of Florida, do hereby certify that the attached copies of _____ COURT PAPER #330  (98 PAGES)

-----------------------------------------------------------

in the case of _____ LUKE RECORDS, INC. _____

case number _95 - 11447 RAM_ are true and correct copies of such originals as they appear of record and on file in this office.

_____ KAREN EDDY _____
Clerk of Bankruptcy Court

By _____
Deputy Clerk

Date _____ APR  _____

[Seal of the U.S. Bankruptcy Court]

CMF-R4 (11/09/94)

LJWR0471

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CHAPTER 11

FILED BY.

25 FEB 16  PM 1: 49

CLERK
U.S. BANKRUPTCY CT.
SD OF FLA.

IN RE:

LUKE RECORDS, INC.

Debtor,

CASE NO. 95-11447-BKC-RAM

LUTHER CAMPBELL,

Debtor.

CASE NO. 95-12795-BKC-RAM

## JOINT PLAN OF REORGANIZATION

Proponents: The OFFICIAL UNSECURED CREDITORS COMMITTEE OF LUKE

RECORDS, INC. ("Committee"); and Luke Records, Inc. ("Luke Records") and Luther

Campbell ("Campbell"), the Debtors herein, submit the following Joint Plan of Reorganization:

I.   DEFINITIONS

The following terms have the following meanings in this Plan of Reorganization:

1.      "Administrative Claim" or "Administrative Expense" has the same meaning

herein as it is used in Section 503(b) of the Code.

2.      "Allowed Claim" means a claim, (a) a proof of which is filed within the time

fixed by the Rules of Bankruptcy Procedure or by the Court, or if the Claim arose from the

rejection of an executory contract or unexpired lease, within such other time as may be fixed

by the Court, or (b) that has been, or hereafter is, scheduled by Debtor as liquidated in amount

and not disputed or contingent; as to which no objection to the allowance thereof has been filed

on or before February 14, 1996, or as to which any such objection has been determined by a

Final Order.

LJWR0472

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

3.    "Luther R. Campbell" or "Campbell" means the Individual Debtor and Debtor-In-Possession or President, Sole Director and Shareholder of the Corporate Debtor.

4.    "Claim" means any

(a)    right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(b)    right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

5.    "Code" means Title 11 U.S.C. Sections 101, et seq.

6.    "Confirmation Date" means the date of the entry by the Court of the Order of Confirmation (hereinafter defined).

7.    "Corporate Debtor" or "Luke Records" means Luke Records, Inc., Debtor-In-Possession.

8.    "Corporate Case" means Luke Records, Inc., case number 95-11447 - BKC-RAM

9.    "Court" means the United States Bankruptcy Court for Southern District of Florida, including the Bankruptcy Judge presiding in the Debtor's Chapter 11 case, and any Court having competent jurisdiction to hear appeals therefrom.

10.    "Creditor" means any person that holds an Allowed Claim, including governmental units.

11.    "Effective Date" means within five (5) days after the Confirmation Date.

-2-

LJWR0473

12.    "Final" means, with respect to any order, decree or judgment of any Court, that such order, decree or judgment is no longer subject to appeal or rehearing and as to which no appeal, rehearing or motion for rehearing is then pending.

13.    "H-Town" means the musical group comprised of Delando Connor (Dino), Solomon Connor (Shazam) and Darryl Jackson (GI)

14.    "H-Town Buyer" means such buyer as is obtained pursuant to the provisions of the letter of intent hereinafter defined.

15.    "H-Town Contract for Purchase and Sale" means that Agreement attached as Exhibit "B" hereto.

16.    "H-Town Contract Rights" means these contract rights owned by the Corporate Debtor pursuant to the exclusive Recording Agreement of H-Town.

17.    "H-Town Masters" means all Master Tapes, Mothers, Acetates, P.A.T.S. and copies of same, together with all performance copyrights to the recordings of H-Town, in all configurations, owned by Luke Records.

18.    "H-Town Publishing Rights" means the publishing rights and underlying copyrights to the compositions, written in whole or in part by H-Town; owned by Pac Jam and encompassed on the H-Town Masters.

19.    "INDI" means Independent National Distributors, Inc.

20.    "Individual Case" means Luther Campbell case number 95-12795 - BKC-RAM.

21.    "Individual Debtor" means Luther Campbell, Debtor and Debtor-In-Possession.

22.    "Letter-Of-Intent" means the letter agreement as and between the respective Debtors, their Counsel, Counsel for the Official Unsecured Creditors' Committee of Luke

LJW R0474

CA... NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Records, Inc., Luther Campbell, as Debtor, Rockville Productions, Inc. by Luther Campbell, 2 L.C., Inc. by Luther Campbell, Luke Mortgage, Inc. by Luther Campbell, Luke Records' Fan Club, Inc. by Luther Campbell, Pac-Jam Publishing, Inc. by Luther Campbell, Joe Weinberger and Lil' Joe Records, Inc. by Joseph Weinberger, Peter Jones by Richard Wolfe, Esq. and Red Distribution, Inc. dated February 7, 1996, a copy of which, in its substantially completed format, is attached hereto as **Exhibit A.**

      23.   "Island Records Contract" means all proceeds and rights of Luther Campbell and/or Scandalous, Inc. pursuant to the agreement with Island Records, Inc. under the contract dated July 25, 1995.

      24.   "Liquidating Corporate Trustee" means Frank Terzo, Esq., or such other person as is appointed by the Court to fulfill the requirements of Articles V and VI of the Plan.

      25.   "Liquidating Individual Trustee" means Richard C. Wolfe, Esq., or such other person as is appointed by the Court to fulfill the requirements of Articles V and VI of the Plan.

      26.   "Luke Development" means Luke Development, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

      27.   "Luke Mortgage" means Luke Mortgage, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

      28.   "Luke Records" means the Corporate Debtor.

      29.   "Luke Records Fan Club" means Luke Records Fan Club, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

      30.   "Luke Records Office Building" means that parcel of Real Estate, together with all building and fixtures owned by the Corporate Debtor located at: 8400 N.E. 2nd Avenue,

LJWR0475

Miami, Florida 33138 and more particularly described as Lot 6 Less the S 10' and Less the E 2' hereof, Lot 7 and the S 10' of Lot 8 Less the E 2' thereof, also the N 40'of Lot 8 and Lot 9 Less the E 2' thereof, BK 1 Royal Palm Gardens, PB 7/71, Dade County, Florida.

31. "Luther Campbell Residence" shall mean that house located at 7180 Oakmont Drive, Miami Lakes, FL 33130, more particularly described as Lot 20, Block 24, COUNTRY CLUB OF MIAMI ESTATES, Section 5, according to the Plat thereof, as recorded in Plat Book 79, Page 80, of the Public Records of Dade County, Florida, owned by Luther Campbell.

32. "Order of Confirmation" means the Order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

33. "Pac-Jam" means Pac-Jam Publishing, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

34. "Palm Beach Lot" means the parcel of vacant land owned by the Individual Debtor and described as Lot 33-42-41, N. 241.5 Ft. of S. 1296.5 Ft. of W. 209 Ft. of E. of 1922 Ft. of Section A/K/A F-3630. (Avocado Blvd., Palm Beach Gardens, Florida).

35. "Pensacola Gold Club" means Pensacola Gold Club, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

36. "Peter Jones Judgment" means the judgment obtained by Peter Jones against Luther R. Campbell and Luke Records, Inc., in Case No. 90-32359 (CA) 27 and entered on October 28, 1994, and supplemented on March 24, 1995.

37. "Petition Date" means March 28, 1995, the date on which an involuntary Chapter 7 petition was filed by the Corporate Debtor's creditors, or June 12, 1995, the date on which a voluntary Chapter 11 petition was filed by Luther Campbell.

LJWR0476

38.  "Plan" means this Chapter 11 Plan, in its present form, or as may be amended or modified in accordance with the Code.

39.  "Pro-rata" means, with respect to any distribution on account of any Allowed Claim, in the same proportion as the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims of its class.

40.  "Publishing Rights" means the publishing rights and underlying copyrights to the compositions written by all the artists recorded by Luke Records and owned by either Pac Jam or Luke Records, Inc. and encompassed on the Masters.

41.  "Records" means vinyl albums, compact discs, cassettes, P.A.T.S., on LP albums, together with any new technology created for the sale and distribution of Masters or H-Town Masters, whether or not now contemplated.

42.  "Recording Studio" means that equipment, furniture, fixtures and recording equipment located at 67 N.W. 71st Street, Miami, Florida 33150.

43.  "RED" means RED Distribution, Inc. f/k/a Relatively Entertainment Distribution, Inc., a New York corporation.

44.  "Rockville Productions" means Rockville Productions, Inc. a Florida corporation, which is wholly owned by Luther R. Campbell.

45.  "Secured Claim" means an Allowed Claim secured by a lien, security interest, judgment or other charge against an interest in property in which the Debtor has an interest, or which is subject to setoff under Section 553 of the Code, not voidable under any section of the Code to the extent of the value (determined in accordance with Section 506(a) of the Code) of

-6-

the interest of the holder of such Allowed Claim in the Debtor's interest in such property or to the extent of the amount subject to such setoff, as the case may be.

46.    "Stanley Campbell Home" means the fifty (50%) percent undivided interest in the house located at 8225 Mentient Terrace, Miami Lakes, Florida 33015, occupied by Stanley Campbell (Luther Campbell's father).

47.    "Trust" refers to the Liquidating Trusts, more specifically described in Article VI of the Plan.

48.    "Tax Liability" means the amount of money owed by Luther R. Campbell for personal income taxes for the years prior to 1995, if any.

49.    "2 L.C." means 2 L.C., Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

## II.    ADMINISTRATIVE EXPENSES, FEES UNDER 28 U.S.C. SECTION 1930, AND UNSECURED CLAIMS OF GOVERNMENTAL UNITS (FOR THE LUKE RECORDS CASE AND THE LUTHER CAMPBELL CASE).

A.    Administrative Expenses.  All Allowed Administrative Claims shall be paid in full in cash shortly after the Effective Date in accordance with the Trust Agreements set forth herein, unless the holder of such claim has agreed to accept lesser treatment, or pro-rata to the extent that each of the Liquidating Trustees has funds available from liquidation of the property in the Luke Records Liquidating Trust and the Luther Campbell Liquidating Trust, respectively.  The Debtors, their counsel and the Committee agree subject to court approval that the total fee to Debtors' bankruptcy counsel, exclusive of the retainer received and not including costs in the Campbell bankruptcy estate, shall in no event exceed the sum of $150,000 and the total administrative costs for professional fees of the Luke Records bankruptcy estate, exclusive of

-7-

LJWR0478

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

retainer received and not including costs, shall in no event exceed the sum of $180,000. Those

Administrative Expenses which are not allowed before the Effective Date shall be paid in

accordance with Class 5 (Luke Case) or Class 7 (Campbell Case), except to the extent that the

holder of such a Claim agrees to different treatment.

      B.    Fees. All fees payable under 28 U.S.C. Section 1930 shall be paid in full on the

Effective Date, if not previously paid.

      C.    Claims of Governmental Units. All allowed Claims of governmental units entitled

to priority under Section 507(a)(8) of the Code shall be paid after full payment of the Claims

referred to in Paragraphs IIA and B, above, on the Effective Date, except with regard to the

Claim of the Internal Revenue Service for the Tax Liability of Luther Campbell which shall be

paid by Luther Campbell from his post confirmation personal assets pursuant to 11 USC

1129(a)(9)(C) in equal monthly installments with interest at 8% per annum on a direct reduction

basis commencing 30 days after the Effective Date and not exceeding six years after the date of

assessment of such claim. Luther Campbell does not believe that any amounts are due and

owing to the Internal Revenue Service, although the Internal Revenue Service has filed a Claim

in the amount of $1,241,981.41.

      D.    UNCLASSIFIED CLAIMS - PURSUANT TO 11 U.S.C.§1123 EACH OF THE

ALLOWED ADMINISTRATIVE CLAIMS AND CLAIMS OF GOVERNMENTAL UNITS

UNDER §507(A)(8) ARE NOT REQUIRED TO BE CLASSIFIED AS CLAIMS OR

INTERESTS IN THE BANKRUPTCY PROCEEDING.

LJWR0479

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

III.   CLASSIFICATION OF CLAIMS AND INTERESTS IN BOTH CASES

For the purposes of distribution under this Plan, Claims, Secured Claims, and Interests in the Luke Records case are divided into the following classes:

Class 1: Allowed Secured Claim of InterAmerican Bank (Luke Records Office Building)

Class 2: Allowed Secured Claim of RED

Class 3: Insider Claims against Luke Records

Class 4: Equity Interests of Luke Records

Class 5: Allowed Unsecured Claims against Luke Records

Class 6: Priority Claims - Salaries of Employees of Luke Records

For the purposes of distribution under this Plan, allowed secured claims and interests in the Campbell case are divided into the following classes:

Class 1: Allowed Secured Claim of Coral Gables Federal Bank (Mortgagee on Luther Campbell Residence).

Class 2: Allowed Secured Claim of Dime Savings Bank (Mortgagee on Stanley Campbell's home).

Class 3: Allowed Secured Claim of Ouida Belle Cooper Jennerman (Mortgagee on property located in Pensacola, Florida).

Class 4: Allowed Secured Claim of Casi, Inc. (Tax Certificate holder on real property located in Palm Beach Gardens, Florida.

Class 5: Allowed Secured Claim of Peter Jones.

Class 6: All Non-Priority Prepetition Allowed Unsecured Claims of $500.00 or less  or which elect to be reduced to $500.00, pursuant to the ballot to be submitted hereunder.

-9-

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Class 7: Allowed Unsecured Claims greater than $500.

IV.  TREATMENT OF CLAIMS AND INTERESTS IN THE LUKE RECORDS CASE.

Class 1: Allowed Secured Claim of InterAmerican Bank (Luke Records Office Building).

Description: Class 1 consists of the holder of an allowed secured claim of InterAmerican Bank as first mortgagee on the Luke Records Office Building located at 8400 N.E. 2nd Avenue, Miami, Florida  33138.  InterAmerican Bank filed its Proof of Claim in the amount of $157,186.00.

Treatment: The Class 1 claim shall be paid pursuant to the Letter-of-Intent by Luther Campbell, either by assuming the obligations under the Note and Mortgage or, alternatively, by refinancing and paying off the claim; in either case, the obligation will involve a payment(s) outside the Plan of Reorganization.

Impairment: Class 1 is unimpaired.

Class 2: Allowed Secured Claim of RED.

Description: Class 2 consists of the secured claim of RED secured by security interests in and upon the master recordings, inventory and reserves of Luke Records.

Treatment: Treatment has been agreed to pursuant to the terms of letter of intent.

Impairment: Class 2 is impaired.

Class 3: Insider Claims Against Luke Records.

Description: Class 3 consists of any claims of Campbell or any of Campbell's affiliates, including Pac-Jam Publishing, Inc., as well as potentially those claims of Joseph Weinberger.

Treatment: All of the insider claims of Campbell and claims of Weinberger shall be waived pursuant to the Letter-of-Intent.

-10-

LJWR0481

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Impairment: Class 3 claims are impaired.

Class 4: Equity Interest in Luke Records.

Description: Class 4 consists of the equity interest of Luke Records, namely, the shareholders' interests of Campbell.

Treatment: Campbell shall retain his shares, but they will become worthless by reason of the liquidation of Luke Records. NO distribution shall be made to equity holder under the Plan on account of his equity interest.

Impairment: Class 4 is impaired.

Class 5: Allowed Unsecured Claims against Luke Records

Description: Class 5 consists of all allowed general unsecured creditors.

Treatment: Holders of Class 5 claims shall be paid pro rata an interim distribution within 15 days of the Effective Date from the proceeds of the sale of the Debtor's assets, if any funds remain after payment of administrative, secured and priority claims. Further payments to the Class 5 claims shall be paid in accordance with the Trust Agreement set forth herein. Pursuant to a settlement reached with Jones, Jones shall be entitled to a Class 5 general unsecured claim in the amount of $900,000.

Impairment: The Class 5 claims are impaired.

Class 6: Priority Claims - Salaries of employees of Luke Records.

Description: Class 6 consists of those allowed claims for wages to the extent that they are entitled to priority pursuant to 11 U.S.C. §507(a)(3) treatment. The Allowed Class 6 claim shall be paid in full in cash within 15 days of the Effective Date if, and only if, the Trustee has sufficient funds with which to do so after payment of all allowed administrative claims. If there

-11-

LJWR0482

are insufficient funds, then Class 6 may receive no dividend or may receive a prorata dividend, depending upon the funds available. If, and in the event, funds become available after the Effective Date by reason of subsequent liquidation efforts by the Liquidating Trustee, Class 6 claims shall retain their priority over unsecured claims and shall be paid accordingly.

Impairment: Class 6 is believed to be unimpaired, but may be impaired depending upon the availability of sufficient funds to pay any class 6 claims within 15 days of the Effective Date.

### TREATMENT OF CLAIMS AND INTERESTS IN CAMPBELL CASE

Class 1: Allowed Secured Claim of Coral Gables Federal Bank (Mortgagee on Luther Campbell Residence).

Description: Class 1 consists the Allowed Secured Claim of Coral Gables Federal or First Union Mortgage Corporation, as its assignee against the homestead of Luther Campbell located at 7180 Oakmont Drive, Miami Lakes, FL 33130, more particularly described as Lot 20, Block 24, COUNTRY CLUB OF MIAMI ESTATES, Section 5, according to the Plat thereof, as recorded in Plat Book 79, Page 80, of the Public Records of Dade County, Florida.

Treatment: This is a first mortgage on Campbell's homestead and will be paid pursuant to the terms of the mortgage and paid outside of the Plan of Reorganization.

Impairment: Class 1 is unimpaired

Class 2: Allowed Secured Claim of Dime Savings Bank (Mortgagee on Stanley Campbell's home).

Description: Class 2 consists of the Allowed Secured Claim of Dime Savings Bank, the first mortgagee on a house located at  8225 Mentient Terrace, Miami Lakes, Dade County,

LJWR0483

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Florida 33015. The Debtor owns a one-half (1/2) interest in the property currently occupied by the Debtor's father, Stanley Campbell.

Treatment: The amount is fully secured and the mortgage will be paid pursuant to its terms and outside the Plan of Reorganization.

Impairment: Class 2 is unimpaired.

Class 3: Allowed Secured Claim of Ouida Belle Cooper Jennerman (Mortgagee on property located in Pensacola, Florida).

Description: Class 3 consists of the Allowed Secured Claim of Ouida Belle Jennerman on a first mortgage on property located at 2369 North Palafox Street, Pensacola, Escambia County, Florida.

Treatment: By agreement of parties, under the Plan of Reorganization, the Debtor shall Quit Claim the property back to the secured creditor, with the secured creditor receiving a $40,000.00 Class 7 unsecured claim on account of his deficiency, as the claim exceeds the present value of the property.

Impairment: Class 3 is impaired.

Class 4: Allowed Secured Claim of Casi, Inc. (Tax Certificate holder on real property located in Palm Beach Gardens, Florida.

Description: Class 4 consists of the Allowed Secured Claim of Casi, Inc., c/o FUNB as a tax certificate holder on real property located in Palm Beach Gardens, Florida with an outstanding tax certificate due and owing in the amount of $562.40.

Treatment: The holder of Class 4 claim shall retain their legal, equitable and contractual rights which will remain unaltered by the Plan and shall be deemed to be unimpaired.

LJWR0484

Impairment: Class 4 is unimpaired.

Class 5: Allowed Secured Claim of Peter Jones.

Description: Class 5 consists of the Secured Claim of Peter Jones.

Treatment: By agreement of Secured Creditor and Debtor, Peter Jones will be treated as an unsecured creditor for purposes of this Plan of Reorganization and Disclosure Statement with an allowed unsecured claim in the amount of $1,400,000.00 and will be a claimant of Class 7.

Impairment: Class 5 is impaired.

Class 6: All Non-Priority Prepetition Allowed Unsecured Claims less than $500.00.

Description: Class 6 consists of all Non-Priority, Pre-Petition, Unsecured, Non-Contingent Allowed Claims in the amount of $500.00 or less or who voluntarily reduces their allowed claim to $500.00 pursuant to the Ballot to be provided hereunder.

Treatment: Holders of Class 6 claims will receive distribution in cash equal to one-hundred (100%) percent with fifty (50%) percent paid thirty (30) days after the Effective Date and fifty (50%) percent paid ninety (90) days thereafter.

Impairment: Class 6 is impaired.

Class 7: Allowed Unsecured Claims greater than $500.

Description: Class 7 consists of all Non-Priority, Pre-Petition, Unsecured, Non-Contingent Allowed Claims greater than $500.00.

Treatment: Holders of Class 7 claims will receive distribution in cash of their pro-rata share of the proceeds of assets being sold under the Plan of Reorganization after payment of the preceding classes, pursuant to the Trust Agreement described herein.

Impairment: Class 7 is impaired.

LJWR0485

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

## V.   MEANS FOR EXECUTION OF THE PLAN

The letter of intent annexed as Exhibit "A" will serve as the means for execution of the

Plan.

LJWR0486

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

VI.   CREATION OF THE LUKE RECORDS, INC. LIQUIDATING CORPORATE TRUST

A.   The Liquidating Corporate Trust.

1.   Creation of the Trust. A Trust is hereby declared and established on behalf of Luke Records and Frank P. Terzo is hereby designated as Liquidating Corporate Trustee who shall serve as the Liquidating Corporate Trustee without the necessity of posting a bond and for the purpose of receiving all of the Trust Property and Property of Luke Records and the bankruptcy Estate and any other consideration to be received by the Trust Creditors pursuant to the terms of the Plan, including, but not limited to the following Trust Property:

a.   All causes of action, rights, claims, demands against third parties, investors, individuals or insiders that Luke Records and the bankruptcy Estate own, or have an interest in, or can assert in any fashion since its formation, including all causes of action belonging to Luke Records and the bankruptcy Estate, whether Pre-Petition, Post-Petition or Post-Confirmation and whether pending prior to Confirmation, including, but not limited to, actions under Sections 542, 543, 544, 545, 546, 547, 548, 550, and 553 of the Code to recover assets for the estate and the benefit of the Creditors, except for those expressly waived pursuant to the Letter-of-Intent; and any interest in properties or entities which Luke Records and the bankruptcy Estate own or control.

b.   Any and all proceeds from the sale, disposition or liquidation of the assets of Luke Records.

c.   Any and all causes or rights of action of Luke Records and the bankruptcy Estate against the stockholders, officers and directors of Debtor, except for those expressly waived pursuant to the Letter-of-Intent; .

-16-

    d.    Any and all other Property of Luke Records and the bankruptcy Estate.

2.    <u>Authorization</u>. Pursuant to the terms of the Plan, the Liquidating Corporate Trustee shall have the power and authority to perform the following acts, in addition to any powers granted by law or conferred to him by any other provision of the Plan; <u>provided however</u>, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Corporate Trustee to act as specifically authorized by any other provision of this Plan and to act in such manner as the Liquidating Corporate Trustee may deem necessary or appropriate to discharge all obligations of or assumed by the Liquidating Trust or provided herein and to conserve and protect the Trust Estate or to confer on the Trust Creditors the benefits intended to be conferred upon them by this Plan:

    a.    Perfect and secure the Liquidating Corporate Trustee's right, title and interest to the properties comprising the Trust Property.

    b.    Reduce all of the Trust Property to the Liquidating Corporate Trustee's possession and hold same.

    c.    Sell and convert the Trust Property to cash, free and clear of liens, with liens to attach to the proceeds, and distribute the net proceeds as described herein.

    d.    Manage and protect the Trust Property and distribute the net proceeds as described herein.

    e.    Grant options to purchase, contracts to sell the Trust Property or any part or parts thereof where such purchase price is for cash and on such terms that the Court shall approve.

    f.    Release, convey or assign any right, title or interest in the Trust Property.

LJW R0488

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

g.   Purchase insurance to protect the Liquidating Corporate Trustee and the Trust Property from liability.

h.   Deposit Trust funds, draw checks and make disbursements thereof.

i.   Employ and retain, and discharge and dismiss, appraisers, financial advisors, attorneys, accountants, auctioneers, agents and such other professionals as the Liquidating Corporate Trustee may deem necessary or appropriate to assist in fulfilling the purposes of the Plan, and to pay reasonable charges, commissions and compensation to all of the foregoing, subject to review, and approval by the Court.

j.   Exercise any and all powers granted to the Trustee by any agreements, by common law or any statute which serves to increase the extent of the powers granted to the Liquidating Corporate Trustee hereunder.

k.   Take such other action as the Liquidating Corporate Trustee may determine to be necessary or desirable to carry out the purpose of this Plan.

l.   Commence any lawsuit or other legal or equitable action, including filing objections to late filed Claims, in any court of competent jurisdiction which are necessary to carry out the terms and conditions of the Plan.

m.   Settle, compromise or adjust any disputes or controversies in favor of, or against, the Liquidating Corporate Trust, subject to review, and approval by the Court.

n.   Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable.

-18-

LJW R0489

o.  Have Instituted on behalf of the Liquidating Corporate Trust, all claims and causes of action which can be brought by a Trustee or Luke Records under the Code and prosecute or defend all appeals on behalf of Luke Records or the Liquidating Corporate Trust.

p.  Prepare and file tax returns on behalf of the Liquidating Corporate Trust and Luke Records as mandated by applicable state and federal law.

q.  In general, without in any manner limiting any of the foregoing, deal with the Trust Property or any part or parts thereof in all other ways as would be lawful for any person owning the same to deal therewith, whether similar to, or different from, the ways above specified at any time or times hereafter.

3.  <u>Operations of the Trust</u>.

a.  The Liquidating Corporate Trustee shall have full and complete authority to do and perform all acts and execute all documents and make all payments and disbursements of funds directed to be done, executed, performed, paid and disbursed by the provisions of the Plan.

b.  The Liquidating Corporate Trustee shall have the power to invest funds of the Liquidating Corporate Trust in demand and time deposits in any national bank which is an authorized depository for bankruptcy funds in the Southern District of Florida, or to make temporary investments such as short-term certificates of deposit in such banks or treasury instruments.

c.  In no case shall any party dealing with the Liquidating Corporate Trustee in any manner whatsoever in relation to the Trust Property or to any part or parts thereof, be obligated to see that the provisions of the Plan or the terms of this Liquidating Corporate Trust

LJW R0490

or any direction from the Court have been complied with, or be obligated or privileged to inquire into the authority the Liquidating Corporate Trustee to act, or to inquire into any other limitation or restriction of the power and authority of the Liquidating Corporate Trustee, but as to any party dealing with the Liquidating Corporate Trustee in any manner whatsoever in relation to the Trust Property, the power of the Liquidating Corporate Trustee to act or otherwise deal with the Trust Property shall be absolute.

d.     The Liquidating Corporate Trustee shall be responsible for making distributions to Trust Creditors from the funds held in the Collected Cash Account and at the following times and in the following order of priority:

e.     Administrative. Each Creditor holding an Allowed Administrative shall be paid 100% of its Allowed Claim from the Collected Cash by the Liquidating Corporate Trustee on the later of the ten (10) days after the Effective Date, or ten (10) days after the Court determines that they hold an Allowed Claim, or ten (10) days after the funds become available.

f.     Class 6. Each Creditor holding an Allowed Priority shall be paid 100% of its Allowed Claim from the Collected Cash by the Liquidating Corporate Trustee on the later of the ten (10) days after the Effective Date, or ten (10) days after the Court determines that they hold an Allowed Claim, or ten (10) days after funds become available, provided that administrative claims have been satisfied.

g.     Class 5. The first distribution to the Creditors holding Allowed Class 5 Claims shall be paid within 15 days after the Effective Date the, or as soon thereafter as is practicable, ["Initial Distribution Date"] and subsequent to the distributions made by the Liquidating Corporate Trustee to holders of Allowed Administrative and Priority Claims of Class

-20-

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

6 as described herein as follows: the Liquidating Corporate Trustee shall distribute to Creditors holding Allowed Class 5 Claims, on a pro rata basis, all available funds in the Collected Cash Account. If there are insufficient funds in the Collected Cash Account to pay Creditors holding Allowed Class 5 Claims, in full, on the Initial Distribution Date, the Second Distribution, and all subsequent distributions, shall be made by the Liquidating Corporate Trustee once every six (6) months, or less, if the Liquidating Corporate Trustee determines it to be necessary.

h. Additionally, pursuant to the Letter-of-Intent under §V(D)(2) and (3), the Liquidating Corporate Trustee shall pay over to the Liquidating Individual Trustee, the sum of $50,000 to hold such sums in trust pending an assignment for the benefit of creditors which will be commenced immediately thereafter upon receipt by the Liquidating Individual Trustee.

i. The Liquidating Corporate Trustee shall keep an accounting of receipts and disbursements which shall be open to inspection and review by any creditors holding allowed claims with reasonable notice.

j. All reasonable costs, expenses and obligations incurred by the Liquidating Corporate Trust or Liquidating Corporate Trustee in administering the Liquidating Corporate Trust or in any manner connected, incidental or related thereto, including but not limited to the fees and expenses of professionals retained by the Liquidating Corporate Trustee to assist in carrying out his duties pursuant to the Plan and the Liquidating Corporate Trust, shall be a charge against the Trust Property, and the Liquidating Corporate Trustee shall pay same, maintaining at all times adequate reserves for such payments prior to making distributions to the Trust Creditors.

-21-

k.   The Liquidating Corporate Trustee shall maintain an adequate reserve fund after payment of all fees, expenses, etc. in the Trust which shall be available to cover all anticipated expenses and costs associated with carrying out the provisions of the Liquidating Corporate Trust and the Plan. The balance of the reserve fund shall be included in the final disbursement to Trust Creditors prior to termination of the Trust, including any and all tax obligations.

l.   No recourse shall ever be had, directly or indirectly, against the Liquidating Corporate Trustee personally, or any employee of the Liquidating Corporate Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Corporate Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidating Corporate Trustee under this Trust for any purpose authorized by the Trust, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Liquidating Corporate Trustee, whether in writing or otherwise, under this Liquidating Corporate Trust shall be enforceable only against, and be satisfied only out of, the Trust Property, or such part thereof as shall, under the terms of any such agreement, be liable therefor or shall be evidence only of a right of payment out of the income, proceeds and avails of the Trust Property, as the case may be; every undertaking, contract, covenant or agreement entered into in writing by the Liquidating Corporate Trustee shall provide expressly against the personal liability of the Liquidating Corporate Trustee.

m.   The Liquidating Corporate Trustee shall receive 3% of gross disbursements for his services as Liquidating Corporate Trustee.

-22-

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

n.    The Liquidating Corporate Trustee shall not be liable for any act he may do, or omit to do, as Liquidating Corporate Trustee hereunder or acting in good faith and in the exercise of his best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as attorney for the Liquidating Corporate Trustee or this Liquidating Corporate Trust shall be conclusive evidence of such good faith and best judgment.

o.    In case of the resignation of the Liquidating Corporate Trustee, a successor shall be nominated by the retiring Liquidating Corporate Trustee or the largest allowed claimant and confirmed by majority vote in dollar amount of those beneficiaries voting on the election.

p.    This Liquidating Corporate Trust shall be effective as of the Effective Date and shall remain, and continue in full force and effect, until the earlier of the following: (1) the indebtedness of Luke Records to all Creditors has been paid or satisfied in accordance with the provision of the Plan, or (2) the Trust Property has been wholly converted to cash and all costs, expenses and obligations incurred in administering this Liquidating Corporate Trust have been fully paid and discharged and all remaining income, proceeds and avails of the Trust Property have been distributed to the Trust Creditors pursuant to the Plan.

4.    Collected Cash Account. The Liquidating Corporate Trustee shall deposit all cash in his, her or its possession as of, and subsequent to, the Confirmation Date, plus the net cash proceeds received from liquidation of the Trust Property, into the Collected Cash Account. The cash in the Collected Cash Account shall be invested by the Liquidating Corporate Trustee pursuant to Section 345 of the Code.

-23-

5.   Plan Reserves. Prior to making any distributions under the terms of the Plan, the Liquidating Corporate Trustee shall reserve amounts (i) sufficient to cover the estimated costs to fully and completely administer the Liquidating Corporate Trust including any and all tax liabilities; plus (ii) the sum of any Disputed Administrative Expenses and, if sufficient funds remain, the sum of any Disputed Priority Claims.  Funds reserved pursuant to this paragraph shall be held by the Liquidating Corporate Trustee and shall be used to pay the cost of administrating the Liquidating Corporate Trust and satisfying all Disputed Administrative Expenses and Disputed Priority Claims when such claims become Allowed Claims.  Any excess cash or other Trust Property held by the Liquidating Corporate Trustee for administering the Liquidating Corporate Trust, or held in respect of the disallowed portion of any Disputed Administrative Expense or Disputed Priority Claim, shall be considered Collected Cash (or shall be reduced to cash).  For all Disputed Claims which are not Disputed Administrative or Disputed Priority Claims, the Liquidating Corporate Trustee shall reserve Collected Cash in an amount which the Liquidating Corporate Trustee believes will reasonably necessary to pay Luke Records' anticipated liability on the Disputed Claims  The Liquidating Corporate Trustee shall reserve said Collected Cash until such time as the Disputed Claim becomes an Ultimately Allowed Claim.  Once a Claim becomes an Ultimately Allowed Claim in whole, or in part, the cash then due to the holder of the Ultimately Allowed Claim shall be distributed to the claimant in accordance with the provisions of the Plan.  The distributions to be made to holders of Ultimately Allowed Claims shall be made as soon as practicable after the date that such Claim becomes an Ultimately Allowed Claim, unless the Liquidating Corporate Trustee determines that

LJWR0495

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

any such distributions cannot be made until all Claims in a given Class are Ultimately Allowed Claims.

6. <u>Timing of Distribution Under the Liquidating Corporate Trust</u>. Payments and distributions in respect of Allowed Claims under the Plan shall be made as mandated under the Plan and the Trust. Ten (10) days after the Effective Date, or as soon thereafter as is practicable, the Liquidating Corporate Trustee shall distribute to all Allowed Administrative Claimants and all Allowed Priority Claimants, 100% of the amount of their Allowed Claims. On the Initial Distribution Date, or as soon thereafter as is practicable, and following the distribution to all Priority Tax Claims, the Liquidating Corporate Trustee shall distribute any remaining cash held in the Collected Cash Account in accordance with the provisions of the Plan and the Trust. Distributions shall thereafter be made by the Liquidating Corporate Trustee once, every three (3) months, unless the Liquidating Corporate Trustee deems it necessary to make more frequent distributions. The Liquidating Corporate Trustee shall continue to make distributions to Trust Creditors until the Final Distribution Date.

7. <u>Manner of Payments</u>. Any payments to be made by the Liquidating Corporate Trustee pursuant to the Plan, shall be made by checks drawn on accounts maintained by the Liquidating Corporate Trustee.

8. <u>Reliance on Documents</u>. The Liquidating Corporate Trustee may rely upon, and shall be protected in acting, or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by the Liquidating Corporate Trustee to be genuine and to have been signed or presented by the proper person or persons.

-25-

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

9.    Requirement of Undertaking.  The Liquidating Corporate Trustee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under the Liquidating Corporate Trust, or in any suit against the Liquidating Corporate Trustee for any action taken or omitted by the Liquidating Corporate Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

10.    Removal of Liquidating Corporate Trustee.  Upon a vote of the majority of claimants after two weeks written notice to all Claimants, the Liquidating Corporate Trustee may be removed and a successor voted in upon a majority vote.

11.    Acceptance of Appointment By Successor Trustee.  Any successor Liquidating Corporate Trustee shall execute and deliver an instrument accepting such appointment, and thereupon such Liquidating Corporate Trustee, without further act, shall become vested with all the rights, powers, and duties of the predecessor Liquidating Corporate Trustee, as if originally named as Liquidating Corporate Trustee herein.

12.    Fee Requests.  The Liquidating Corporate Trustee shall provide a semi-annual accounting of receipts and disbursements. Fees shall be paid as earned and expenses reimbursed as incurred.

LJWR0497

VII. CREATION OF THE LUTHER CAMPBELL LIQUIDATING INDIVIDUAL TRUST

A.   The Liquidating Individual Trust.

1.   Creation of the Trust. A Trust is hereby declared and established on behalf of Campbell and Richard Wolf, Esq. is hereby designated as Liquidating Individual Trustee who shall serve as the Liquidating Individual Trustee without the necessity of posting a bond and for the purpose of receiving all of the Trust Property and Property of Campbell and the bankruptcy Estate and any other consideration to be received by the Trust Creditors pursuant to the terms of the Plan, including, but not limited to the following Trust Property:

a.   All causes of action, rights, claims, demands against third parties, investors, individuals or insiders that Campbell and the bankruptcy Estate own, or have an interest in, or can assert in any fashion since its formation, including all causes of action belonging to Campbell and the bankruptcy Estate, whether Pre-Petition, Post-Petition or Post-Confirmation and whether pending prior to Confirmation, including, but not limited to, actions under Sections 542, 543, 544, 545, 546, 547, 548, 550, and 553 of the Code to recover assets for the estate and the benefit of the Creditors, except for those expressly waived pursuant to the Letter-of-Intent; and any interest in properties or entities which Campbell and the bankruptcy Estate own or control.

b.   Any and all proceeds from the sale, disposition or liquidation of the assets of Campbell.

c.   Any and all causes or rights of action of Campbell and the bankruptcy Estate against the stockholders, officers and directors of Debtor, except for those expressly waived pursuant to the Letter-of-Intent; .

-27-

CAS      OS. 95-11447-BKC-RAM
95-12785-BKC-RAM

shall be paid by Luther Campbell from his post confirmation personal assets pursuant to 11 USC 1129(a)(9)(C) in equal monthly installments with interest at 8% per annum on a direct reduction basis commencing 30 days after the Effective Date and not exceeding six years after the date of assessment of such claim.  Luther Campbell does not believe that any amounts are due and owing to the Internal Revenue Service, although the Internal Revenue Service has filed a Claim in the amount of $1,241,981.41.  An objection to the IRS Claim is pending and will be heard on or before March 20, 1996.

E.    UNCLASSIFIED CLAIMS - PURSUANT TO 11 U.S.C.§1123 EACH OF THE ALLOWED ADMINISTRATIVE CLAIMS AND CLAIMS OF GOVERNMENTAL UNITS UNDER §507(A)(8)ARE NOT REQUIRED TO BE CLASSIFIED AS CLAIMS OR INTERESTS IN THE BANKRUPTCY PROCEEDING.

F.    Treatment of All Claims and Interests.

TREATMENT OF CLAIMS AND INTERESTS IN LUKE RECORDS CASE

Class 1: Allowed Secured Claim of InterAmerican Bank (Luke Records Office Building).

Description: Class 1 consists of the holder of an allowed secured claim of InterAmerican Bank as first mortgagee on the Luke Records Office Building located at 8400 N.E. 2nd Avenue, Miami, Florida  33138.  InterAmerican Bank filed its Proof of Claim in the amount of $157,186.00. This is a balloon mortgage which has matured.

Treatment: The Class 1 claim shall be paid pursuant to the Letter-of-Intent by Campbell, by refinancing or paying off the claim, both alternatives will involve a payment(s) outside the Plan of Reorganization. The holder of the Class 1 claim shall not have its legal, equitable or contractual rights altered.

Impairment: Class 1 is unimpaired.

LJWRC499

Class 2: Allowed Secured Claim of RED.

Description: Class 2 consists of the secured claim of RED secured by security interests in and upon the master recordings, inventory and reserves of Luke Records.

Treatment: Provided that return record liability is assumed, pursuant to the terms and conditions set forth in the Letter-of-Intent, and further that any unrecouped balance that exists on the day of Confirmation is paid in full after reserves are liquidated, RED shall waive any and all distributions to any and all claims it has filed in the Luke Records case.

Impairment: Class 2 is impaired.

Class 3: Insider Claims of Luke Records.

Description: Class 3 consists of any claims of Campbell or any of Campbell's affiliates, including Pac-Jam Publishing, Inc., as well as potentially those claims of Joseph Weinberger.

Treatment: All of the insider claims of Campbell, Campbell's affiliates and claims of Weinberger shall be waived pursuant to the Letter-of-Intent.

Impairment: Class 3 claims are impaired.

Class 4: Equity Interest in Luke Records.

Description: Class 4 consists of the equity interest of Luke Records, namely, the shareholders' interests of Campbell.

Treatment: Pursuant to the Letter of Intent, Campbell shall retain his shares, but they will become worthless by reason of the liquidation of Luke Records. NO distribution shall be made to equity holder under the Plan on account of his equity interest.

Impairment: Class 4 is impaired.

Class 5: Allowed Unsecured Claims of Luke Records

LJWR0500

CAS.   OS. 95-11447-BKC-RAM
95-12785-BKC-RAM

Description: Class 5 consists of claims of all allowed general unsecured creditors.   To date, in excess of $10,000,000 worth of general unsecured claims have been filed in the Luke Records case.   Pursuant to the Letter-of-Intent, various claimants such as RED, Weinberger, Campbell, all of Campbell's affiliates (including Pac-Jam) will be eliminated.   Various objections have been filed with the Court on the remaining Class 5 claimants.  It is expected that through the objection process, the settlement of the Jones Claim described herein, and the Letter-of-Intent that the aggregate amount of Class 5 Claimants will be in an amount of approximately $3,000,000.

Treatment: Holders of Class 5 shall be paid pro rata beginning with a distribution within 15 days of the Effective Date from the proceeds of the sale of Luke Records' assets, if any funds remain after payment of administrative, secured and priority claims.  Further payments to the Class 5 claims shall be paid in accordance with the Trust Agreement set forth herein.  Pursuant to a settlement reached with Jones, Jones shall be entitled to a claim in the amount of $900,000.

The first distribution to the Creditors holding Allowed Class 5 Claims shall be paid within 15 days after the Effective Date the, or as soon thereafter as is practicable, ["Initial Distribution Date"] and subsequent to the distributions made by the Liquidating Corporate Trustee to holders of Allowed Administrative and Priority Claims of Class 6 as described herein as follows: the Liquidating Corporate Trustee shall distribute to Creditors holding Allowed Class 5 Claims, on a pro rata basis, all available funds in the Collected Cash Account ("Collected Cash Account" is a defined term in the Plan).  If there are insufficient funds in the Collected Cash Account to pay Creditors holding Allowed Class 5 Claims, in full, on the Initial Distribution Date, the Second Distribution, and all subsequent distributions, shall be made by the Liquidating Corporate

-30-

CASE   )S. 95-11447-BKC-RAM
95-12785-BKC-RAM

Trustee once every six (6) months, or less, if the Liquidating Corporate Trustee determines it
to be necessary.

Impairment: The Class 5 claims are impaired.

Class 6: Priority Claims - Salaries of employees of Luke Records.

Description: Class 6 consists of those allowed claims for wages to the extent that they are
entitled to priority pursuant to 11 U.S.C. §507(a)(3) treatment.  The allowed Class 6 claim shall
be paid in full in cash within 30 days of the Effective Date if, and only if, the Trustee has
sufficient funds with which to do so after payment of all allowed administrative claims.  If there
are insufficient funds, then Class 6 may receive no dividend or may receive a pro rata dividend,
depending upon the funds available.  If, and in the event, funds become available after the
Effective Date by reason of subsequent liquidation efforts by the Liquidating Trustee, Class 6
claims shall retain their priority over other unsecured claims and shall be paid accordingly. The
Proponents are not aware of any Class 6 Claimants but to the extent any exist, treatment is
provided herein.

Impairment: Class 6 is believed to be unimpaired, but may be impaired depending upon
the availability of sufficient funds to pay any class 6 claims within 30 days of the Effective Date.

### TREATMENT OF CLAIMS AND INTERESTS IN CAMPBELL CASE

Class 1: Allowed Secured Claim of Coral Gables Federal Bank (Mortgagee on Campbell
Residence).

Description: Class 1 consists of holders of Allowed Secured Claim of Coral Gables Federal
or First Union Mortgage Corporation, as its assignee against the homestead of Campbell located
at 7180 Oakmont Drive, Miami Lakes, FL 33130, more particularly described as Lot 20, Block
24, COUNTRY CLUB OF MIAMI ESTATES, Section 5, according to the Plat thereof, as

-31-

LJW R0502

CASE  )S. 95-11447-BKC-RAM
95-12785-BKC-RAM

recorded in Plat Book 79, Page 80, of the Public Records of Dade County, Florida. This is a first mortgage.

Treatment: The amount is fully secured and will be paid pursuant to the terms of the mortgage and paid outside of the Plan of Reorganization. The holder of the Class 1 claim shall not have its legal, equitable or contractual rights altered.

Impairment: Class 1 is unimpaired

Class 2: Allowed Secured Claim of Dime Savings Bank (Mortgagee on Stanley Campbell's home).

Description: Class 2 consists of the Allowed Secured Claim of Dime Savings Bank, the first mortgage on a house located at  8225 Mentient Terrace, Miami Lakes, Dade County, Florida 33015. Campbell owns a one-half (1/2) interest in the property currently occupied by Campbell's father, Stanley Campbell.

Treatment: The amount is fully secured and the mortgage will be paid pursuant to its terms and outside the Plan of Reorganization. The holder of the Class 2 claim shall not have its legal, equitable or contractual rights altered.

Impairment: Class 2 is unimpaired.

Class 3: Allowed Secured Claim of Ouida Belle Cooper Jennerman (Mortgagee on property located in Pensacola, Florida).

Description: Class 3 consists of the Allowed Secured Claim of Ouida Belle Jennerman on a first mortgage on property located at 2369 North Palafox Street, Pensacola, Escambia County, Florida. The mortgage amount is in excess of the fair market value of the property.

LJWR0503

j.   All reasonable costs, expenses and obligations incurred by the Liquidating Individual Trust or Liquidating Individual Trustee in administering the Liquidating Individual Trust or in any manner connected, incidental or related thereto, including but not limited to the fees and expenses of professionals retained by the Liquidating Individual Trustee to assist in carrying out his duties pursuant to the Plan and the Liquidating Individual Trust, shall be a charge against the Trust Property, and the Liquidating Individual Trustee shall pay same, maintaining at all times adequate reserves for such payments prior to making distributions to the Trust Creditors.

k.   The Liquidating Individual Trustee shall maintain an adequate reserve fund after payment of all fees, expenses, etc. in the Trust which shall be available to cover all expenses and costs associated with carrying out the provisions of the Liquidating Individual Trust and the Plan. The balance of the reserve fund shall be included in the final disbursement to Trust Creditors prior to termination of the Trust.

l.   No recourse shall ever be had, directly or indirectly, against the Liquidating Individual Trustee personally, or any employee of the Liquidating Individual Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Individual Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidating Individual Trustee under this Trust for any purpose authorized by the Trust, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Liquidating Individual Trustee, whether in writing or otherwise, under this Liquidating Individual Trust shall be enforceable only against,

-33-

LJW R0504

and be satisfied only out of, the Trust Property, or such part thereof as shall, under the terms

of any such agreement, be liable therefor or shall be evidence only of a right of payment out of

the income, proceeds and avails of the Trust Property, as the case may be; every undertaking,

contract, covenant or agreement entered into in writing by the Liquidating Individual Trustee

shall provide expressly against the personal liability of the Liquidating Individual Trustee.

m.    The Liquidating Individual Trustee shall receive a reasonable

compensation for his services consistent with Trustees under similar circumstance, namely 3%

of gross disbursements.

n.    The Liquidating Individual Trustee shall not be liable for any act he may

do, or omit to do, as Liquidating Individual Trustee hereunder or acting in good faith and in the

exercise of his best judgment, and the fact that such act or omission was advised, directed or

approved by an attorney acting as attorney for the Liquidating Individual Trustee or this

Liquidating Individual Trust shall be conclusive evidence of such good faith and best judgment.

o.    In case of the resignation of the Liquidating Corporate Trustee, a

successor shall be nominated by the retiring Liquidating Corporate Trustee or the largest allowed

claimant and confirmed by majority vote in dollar amount of those beneficiaries voting on the

election.

p.    This Liquidating Individual Trust shall be effective as of the Effective

Date and shall remain, and continue in full force and effect, until the earlier of the following:

(1) the indebtedness of Campbell to all Creditors has been paid or satisfied in accordance with

the provision of the Plan, or (2) the Trust Property has been wholly converted to cash and all

costs, expenses and obligations incurred in administering this Liquidating Individual Trust have

LJWR0505

been fully paid and discharged and all remaining income, proceeds and avails of the Trust Property have been distributed to the Trust Creditors pursuant to the Plan.

     4.    Collected Cash Account. The Liquidating Individual Trustee shall deposit all cash in his, her or its possession as of, and subsequent to, the Confirmation Date, plus the net cash proceeds received from liquidation of the Trust Property, into the Collected Cash Account. The cash in the Collected Cash Account shall be invested by the Liquidating Individual Trustee pursuant to Section 345 of the Code.

     5.    Plan Reserves. Prior to making any distributions under the terms of the Plan, the Liquidating Individual Trustee shall reserve amounts (i) sufficient to cover the estimated costs to fully and completely administer the Liquidating Individual Trust including any and all tax liabilities; plus (ii) the sum of any Disputed Administrative Expenses and, if sufficient funds remain, the sum of any Disputed Priority Claims. Funds reserved pursuant to this paragraph shall be held by the Liquidating Individual Trustee and shall be used to pay the cost of administrating the Liquidating Individual Trust and satisfying all Disputed Administrative Expenses and Disputed Priority Claims when such claims become Allowed Claims. Any excess cash or other Trust Property held by the Liquidating Individual Trustee for administering the Liquidating Individual Trust, or held in respect of the disallowed portion of any Disputed Administrative Expense or Disputed Priority Claim, shall be considered Collected Cash (or shall be reduced to cash). For all Disputed Claims which are not Disputed Administrative or Disputed Priority Claims, the Liquidating Individual Trustee shall reserve Collected Cash in an amount which the Liquidating Individual Trustee believes will reasonably necessary to pay Campbell's anticipated liability on the Disputed Claims. The Liquidating Individual Trustee

-35-

LJWR0506

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

shall reserve said Collected Cash until such time as the Disputed Claim becomes an Ultimately Allowed Claim. Once a Claim becomes an Ultimately Allowed Claim in whole, or in part, the cash then due to the holder of the Ultimately Allowed Claim shall be distributed to the claimant in accordance with the provisions of the Plan. The distributions to be made to holders of Ultimately Allowed Claims shall be made as soon as practicable after the date that such Claim becomes an Ultimately Allowed Claim, unless the Liquidating Individual Trustee determines that any such distributions cannot be made until all Claims in a given Class are Ultimately Allowed Claims.

      6.   Timing of Distribution Under the Liquidating Individual Trust. Payments and distributions in respect of Allowed Claims under the Plan shall be made as mandated under the Plan and the Trust. Ten (10) days after the Effective Date, or as soon thereafter as is practicable, the Liquidating Individual Trustee shall distribute to all Allowed Administrative Claimants and all Allowed Priority Claimants, 100% of the amount of their Allowed Claims. On the Initial Distribution Date, or as soon thereafter as is practicable, and following the distribution to all Priority Tax Claims, the Liquidating Individual Trustee shall distribute any remaining cash held in the Collected Cash Account in accordance with the provisions of the Plan and the Trust. Distributions shall thereafter be made by the Liquidating Individual Trustee once, every six (6) months, unless the Liquidating Individual Trustee deems it necessary to make more frequent distributions. The Liquidating Individual Trustee shall continue to make distributions to Trust Creditors until the Final Distribution Date.

-36-

LJWR0507

7.    Manner of Payments.  Any payments to be made by the Liquidating Individual Trustee pursuant to the Plan, shall be made by checks drawn on accounts maintained by the Liquidating Individual Trustee.

8.    Reliance on Documents.  The Liquidating Individual Trustee may rely upon, and shall be protected in acting, or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by the Liquidating Individual Trustee to be genuine and to have been signed or presented by the proper person or persons.

9.    Requirement of Undertaking.  The Liquidating Individual Trustee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under the Liquidating Individual Trust, or in any suit against the Liquidating Individual Trustee for any action taken or omitted by the Liquidating Individual Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

10.    Removal of Liquidating Individual Trustee.  Upon a vote of the majority of claimants after two weeks written notice to all Claimants, the Liquidating Corporate Trustee may be removed and a successor voted in upon a majority vote.

11.    Acceptance of Appointment By Successor Trustee.  Any successor Liquidating Individual Trustee shall execute and deliver an instrument accepting such appointment, and thereupon such Liquidating Individual Trustee, without further act, shall become vested with all

EJW R0508

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

the rights, powers, and duties of the predecessor Liquidating Individual Trustee, as if originally named as Liquidating Individual Trustee herein.

12. Fee Requests. The Liquidating Corporate Trustee shall provide a semi-annual accounting of receipts and disbursements. Fees shall be paid as earned and expenses reimbursed as incurred.

VIII. DUTIES OF LUKE RECORDS, CAMPBELL AND JOSEPH WEINBERGER

Commencing on the Effective Date and continuing thereafter, Luke Records and Campbell shall cooperate as is necessary to carry out the provisions of the Plan and the Letter-of-Intent. Without limitation of the foregoing, Luke Records and Campbell shall cause to be delivered:

1. All documents under the Letter-of-Intent, all information necessary or appropriate to comply with the Letter-of-Intent and all executed documents evidencing the transfer of title to the Masters as contemplated by the Letter-of-Intent.

2. In connection with the distribution of the Trust Property or its proceeds and the implementation of the Plan, supply all information reasonably requested by the Liquidating Trustees in connection with the prompt and timely prosecution of objections to claims field against the Estates, the prompt and speedy defense of litigation against the Estates and the execution of all documents and the performance of all acts as may be necessary or desirable to promptly implement and effectuate the distribution to the creditors of the Estates and the overall implementation of the Plan. Luke Records and Campbell shall cooperate fully with the Liquidating Trustees and shall grant to the Liquidating Trustees access to and shall permit the Liquidating Trustees to copy all financial statements, tax returns, books and records of every kind as are within the possession, custody or control of Luke Records or Campbell.

-38-

LJWR0509

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

3.　In connection with the sale, transfer or transfer of any and all of the assets of the Debtor's estates, the corporate Debtor and Luther Campbell shall endorse over to the respective Liquidating Trustees all drafts, negotiable instruments or any other consideration given to Campbell or Luke Records in conformity and pursuant with the Letter-of-Intent at the time of closing.

4.　Campbell to the best of his knowledge and belief shall provide to the Individual Liquidating Trustee a list of names and addresses of all potential claimants against Pac-Jam Publishing, Inc.

## IX.　EXECUTORY CONTRACTS

To the extent that any executory contracts exist and have not been assumed rejected, or are the subject of a pending motion to assume or reject, they are rejected. The Agreement between RED and Luke Records, dated August 26, 1994 shall be assumed pursuant to Section 365 of the Code, and assigned to Lil' Joe Records, all in accordance with the terms of the Letter-of-Intent. Luther Campbell's Island Record Contract is specifically assumed.

## X.　EFFECT OF CONFIRMATION.

A.　Terms Binding. Upon the Effective Date, all of the provisions of this Plan, including all appendices and other exhibits hereto, shall be binding on the Debtor, the Estate, all Creditors, and all other entities who are affected (or whose interests are affected) in any manner by the Plan.

B.　Automatic Stay Provisions. The automatic stay provisions of §362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date, provided, however, that such

LJW R0512

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

automatic stay shall remain in force as to Disputed Claims until a Final Order has been entered in respect of such Disputed Claims.

XI.   MISCELLANEOUS.

A.   Modifications to Plan Prior to Confirmation.  At any time prior to the Confirmation Date, the Proponents may modify the Plan, but may not modify the Plan so that the Plan as modified fails to meet the requirements of §§ 1122 and 1123 of the Code.  If the Proponents file a modification with the Court, the Plan as modified shall become the Plan.

B.   Modifications to Plan After Confirmation.  At any time after the Confirmation Date, and before Substantial Consummation, the Proponents may modify the Plan but may not modify the Plan so that the Plan as modified fails to meet the requirements of §§ 1122 and 1123 of the Code.  The Plan as modified under this Section becomes the Plan only if the Court, after notice and a hearing, confirms such Plan, as modified, under §1129 of the Code.

C.   Remedy of Defects.  After the Effective Date, the Proponents may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan.

D.   Jurisdiction of Bankruptcy Court.  Except as is otherwise provided in the Confirmation Order, the Bankruptcy Court shall retain jurisdiction for the following purposes:

1.   Classification of any Claim, reexamination of any Claim which has been allowed for purposes of voting, and determination of any objection filed to any Claim.  Failure

LJW R0513

to object to any Claim for the purpose of voting shall not be deemed to be a waiver of the right to object to the Claim in whole or in part.

2.    Determination of all questions and disputes regarding the Plan, the Debtor or Property of the Estate and determination of all causes of action, controversies, disputes, or conflicts involving the Plan, any Creditor, the Debtor or Property of the Estate arising prior to or on the Effective Date whether or not subject to action pending as of the Confirmation Date including resolution of Disputed Claims.

3.    Determination of any issue, violation, injunction, contempt, relief, or other proceeding as contemplated under §362 of the Bankruptcy Code.

4.    Correction of any defect, curing of any omission of reconciliation of any inconsistency in the Plan or in the Confirmation Order as may be necessary or appropriate to carry out the purposes and intent of the Plan.

5.    Modification of the Plan after the Confirmation Date pursuant to the provisions of the Plan, the Code and the Rules.

6.    Interpretation of the Plan.

7.    Entry of any order, including a mandatory injunction or restraining order, required to facilitate consummation of the Plan or to enable the Effective Date to occur; and reconsideration or vacation of the Confirmation Order in the event Substantial Consummation is rendered impossible.

8.    Entry of a final decree closing the Case.

E.    Savings Clause. Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

LJWR0514

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

XII.  NOTICE OF INTENT TO REQUEST CRAMDOWN.

In the event that a sufficient number of holders of any impaired class of claims do not accept the Plan, the Proponents hereby give notice that it will request, and does hereby request, confirmation of the Plan pursuant to 11 U.S.C. § 1129(b), commonly referred to as the "cramdown" provision of the Bankruptcy Code. The Debtor hereby reserves the right to modify or vary the treatment of the claims as to comply with 11 U.S.C. §1129(b).

LJWR0515

CASE NOS. 95-11447-BKC-RAM
95-12785-BKC-RAM

C.    Cramdown.  The Plan provides for a possible "Cramdown".  Basically, this means that as long as one class which is adversely affected by the Plan votes in favor of it by the necessary majority, the Court may decide to confirm the Plan over the negative votes or objections of other classes.  Before it can do this certain criteria must be met, including a specific finding that the Plan is "fair and equitable" under the circumstances.  The Court may or may not grant a proposed cramdown.  The decision will be made at the Confirmation hearing.

D.    Role of Creditors' Committee.  The Creditor's Committee has been extremely active in this case.  It had taken an active role in reorganizing Luke Records at times  with the cooperation of Campbell and at times opposing him.   Once it became evident that a reorganization of an operating company was not possible, the Committee played an integral role in insuring that a Plan could be developed for the systematic liquidation of both estates' assets.  Additionally, the Committee was charged with the responsibility of drafting the Disclosure Statement and Plan of Reorganization.

## VII.  BALLOT INFORMATION

Creditors in the Luke Records estate will receive a separate ballot  as will creditors of the Campbell estate. Secured Creditors will receive a ballot for Secured Claimants; Unsecured Creditors will receive a ballot for Unsecured Claimants.  In the Campbell estate only unsecured creditors in Class 7 will have an opportunity to elect to reduce their claim to $500 and thereafter be treated as a Class 6 creditor.  The ballot in the Campbell estate  will afford unsecured creditors this election.

The ballot for Unsecured Claimants is used to either accept or reject the Plan of Reorganization. Note that the amount to be filled in on the ballot does not determine the amount of the dividend which the Creditor will receive; rather, the dividend will be based upon the

-43-

CASE   JS. 95-11447-BKC-RAM
95-12785-BKC-RAM

uncontested, liquidated amount listed in Luke Records' schedules, the Creditor's Proof of Claim, or the amount determined by a Court Order.

VIII.  **FINANCIAL INFORMATION PERTAINING TO THE PROPOSED PLAN.**

A.    Introduction. The purpose of this section is to provide to creditors and interested parties an estimate of the value of Luke Records and CAMPBELL's assets, both in a systematic liquidation as set forth under the Plan, and in a forced liquidation under Chapter 7.  In doing so, the Proponents have made certain assumptions and the numbers provided may not be exact, but are good faith estimates. It is the Committee's belief that little or nothing would be available to unsecured creditors in a forced sale of the assets from either estate in a conversion to Chapter 7.  Their belief stems from the competing claims to ownership of assets, the litigation these competing claims would engender, the non-waiver of insider claim absent confirmation of this Plan and the rejection claims of RED.

B.    Valuation of the Luke Records' Assets.

Office Building.

1.    The Office building located at 8400 N.E. 2nd Avenue, Miami, Florida 33138. The real property is encumbered with a first mortgage to InterAmerican Bank in the approximate amount of $175,000.   The property was listed on Luke Records' schedule for $500,000; however, based on certain offers to purchase the real estate the Committee believes that the value of the office building, while greater than the mortgage balance, is substantially less than the value stated in the Schedules.

Luke Records Profit Sharing Plan.

2.    As outlined in the joint Letter-of-Intent (attached to the Plan as **Exhibit "1"** of the Plan), Luke Records represented that the Luke Records profit sharing plan was not a

-44-

LJW R0517

CASE JS. 95-11447-BKC-RAM
95-12785-BKC-RAM

qualified retirement plan pursuant to ERISA or IRC§401, et seq. and that upon confirmation of the plan, Luke Records and Campbell will transfer to the Luke Records Liquidating Trustee the account balances that were initially set up as profit sharing plans in NationsBank and Capital Bank containing in the aggregate an approximate balance of $52,000. The Trustees must determine whether the employees of Luke Records (other than Campbell) or the creditors are entitled to these funds.

### Master Recordings and Inventory.

3.      The master recordings, as well as all of the inventory held by RED in their warehouses are fully encumbered by the RED security agreement and RED's potential claim in excess of $5,100,000 dollars.   The amount of inventory that RED has in its possession is approximately $1,000,000.   Additionally, Luke Records listed on its Schedules an additional $1,188,000 worth of inventory located in Dade County, not encumbered by RED's security interest.   Upon further review and examination of the items listed in the inventory in Dade County, both the Committee and Luke Records believe that much of the Inventory is worthless, since many of the items listed on the Inventory have been "cutout" i.e. title and configurations that are no longer marketable.   Hence, Luke Records believes that the value of the Inventory located in Dade County is not more than $350,000.

### Accounts Receivable (INDI).

4.      Luke Records had listed in excess of $1,800,000 in receivables purportedly owed to Luke Records from INDI for records distributed during the INDI Distribution period. The agreement with Weinberger specifies that if the H-Town hard assets are sold to another party other than Weinberger before confirmation, then these account receivables will remain as part of the residual assets being conveyed to the Liquidating Trustee of Luke Records, who shall

-45-

LJWR0518

CASE . JS. 95-11447-BKC-RAM
95-12785-BKC-RAM

investigate the collectibility of these receivables and, if feasible, collect them for the benefit of the Creditors. On the other hand, if the hard assets of H-Town are not sold to a third party purchaser, other than Weinberger, before confirmation, Weinberger in consideration for assuming the return record liability for the H-Town masters will acquire any and all rights attendant to these receivables. In any event, INDI disputes it owes Luke Records anything and, in fact, claims Luke Records owes it $1,000,000.

Accounts Receivable (Atlantic and M.S. Distributors).

5. There are two account receivable balances owed by Atlantic Recording Corporation and M.S. Distributors in the approximate amount of $120,000 which Luke Records has represented are due and owing and that have not been pledged, hypothecated or collected.

C. Valuation of Campbell's Assets.

ASSETS

| | |
|---|---|
| Cash in hand / checking account: | |
| Contents of household goods and furnishing: | 25,000.00 |
| Clothing: | 5,000.00 |
| Jewelry, collectibles & equipment: | 10,000.00 |
| Luke Records Mortgage: | 242,000.00 |
| Luke Records Development | 100,000.00 |
| Exempt Assets: | |
|     Homestead and adjacent lot: | 900,000.00 |
|     Annuity - Guardian company: | 135,000.00 |
|     Qualified Retirement Acct : | 27,000.00 |
|     Flexible life insurance  : | 33,127.00 |
| Automobiles: | |

-46-

LJWR0519

CASE   OS. 95-11447-BKC-RAM
95-12785-BKC-RAM

| | |
|---|---|
| 1992 Truck | 15,000.00 |
| 1993 Ford Van | 6,000.00 |
| Palm Beach lot: | 90,000.00 |
| One-half (1/2) interest in father's home: | 17,000.00 |
| Luke, Inc.: | unknown |
| Pac Jam Publishing, Inc.: | unknown |
| Campbell - Charitable Foundation: | unknown |
| 2 LC, Inc.: | unknown |
| Luke Recording Studios, Inc.: | 75,000.00 |
| The 2 Live Crew, Inc.: | unknown |
| Luke Leasing, Inc.: | unknown |
| Luke Records Fan Club: | unknown |
| Luke Records, Inc.: | unknown |
| Pensacola Gold Club, Inc.: | unknown |
| Rockville Productions, Inc.: | unknown |
| Accounts Receivables from various royalties and salary payment: | unknown |
| Trademark rights to 2 Live Crew: | unknown |

## IX.  MISCELLANEOUS

A.    Risk Analysis. The Plan provides for an initial distribution to creditors, anticipated

to be paid within 15 days of the Effective Date and ongoing distributions based upon collections

by the Liquidating Trustees. There is substantial risk under this Plan.  A certain portion of

distributions to the respective estates are to be made within six months and one year,

LJWR0520

respectively, as set forth in the Letter-of-Intent, **Exhibit "1"** to this Plan and as Summarized on Exhibit "E" hereto. The Plan of Reorganization involves the systematic liquidation of all of the assets of the Debtors' bankruptcy estates. There is certain risk attendant to the liquidation process by virtue of not having the entire purchase price paid on the Effective Date.

Other risk factors are as follows:

1.   The sale of assets to Weinberger are contingent upon approval of Weinberger by RED or approval of Weinberger by some other reputable record distribution company. As of the filing of this Disclosure Statement, Weinberger has not been approved although ongoing negotiations between him and RED are continuing.

2.   The sale of H-Town hard and soft assets has not been agreed to as of the filing of the Disclosure Statement. Ongoing negotiations are continuing. However, H-Town is contesting the assignability of their contract and the amount due them to cure if the contract is assignable. While the Plan is not conditional upon the H-Town sale, a failure to sell this asset will have a significant impact on the amount of distribution to the unsecured creditors of Luke Records.

3.   Further, there is additional risk in the Corporate Liquidating Trustee of Luke Records pursuing collection activities on those receivables that may be retained as residual assets by the Trustee. No representation is made at this time as to what percentage, if any, of the outstanding receivables can be collected by the Luke Records liquidating estate. With regards to the risk factors in the Campbell case, a significant portion of the distribution to be made to the unsecured creditors of Campbell will rest upon the collectibility of the promissory note that will be provided to the Liquidating Trustee of Campbell by Campbell, in return for purchasing certain assets of the Campbell estate. Campbell is executing a mortgage on three (3) pieces of real estate owned by him or more fully set forth as in the Letter-of-Intent.

-48-

CASE OS. 95-11447-BKC-RAM
95-12785-BKC-RAM

4.     Both Weinberger and Campbell must execute certain promissory notes and in turn grant security interests in various collateral to insure that payment is made over the next six to twelve months.   No assurances are provided that these payments will ultimately be made and it is possible that the Liquidating Trustees of both estates may have to institute legal proceedings in order to collect on these promissory notes.

Assuming that the two Liquidating Trustees are successful in collecting all proceeds of the sale of the estates' assets and subject to claims objections, the unsecured creditors could anticipate a distribution in the amount of approximately 15% to 25% of their claims.

B.     Post Confirmation Management. The Masters and all assets of Luke Records will be sold under this Plan. The Publishing Rights owned by Pac-Jam Publishing will be sold. Further, the Liquidating Trustee in the Campbell case will execute an irrevocable exclusive license to Lil' Joe for all remaining compositions, to enable Lil' Joe to exploit the Masters he is buying, subject to Lil' Joe paying all writers Royalties directly to the owners of the writing portion of the publishing rights. Thus, one of the entities of Campbell (Pac-Jam) will remain in existence and may continue operations post confirmation until such time that the Liquidating Trustee of Campbell receives $100,000 from the respective estates and an assignment for the benefit of creditors is made for Pac-Jam Publishing.

C.     Insider and Affiliate Claims. Under the terms of the Plan, all insider and affiliate claims are extinguished.   That means that Campbell will waive all personal claims and claims on behalf of Pac-Jam Publishing in the Luke Records bankruptcy estate.   Moreover, Luke Records in turn shall waive any claim it may have in the Campbell bankruptcy estate and, finally, without any representations as to Weinberger's status as an insider or non-insider, Weinberger has agreed to waive any and all claims he may have against both the Luke Records

-49-

LJWR0522

and Campbell bankruptcy estates and the two bankruptcy estates, in turn, shall waive any and all claims they may have against Weinberger.  Mutual Releases shall be executed.

      D.    <u>Transactions with Insiders or Affiliates</u>. As previously described herein, Campbell post-petition was given court approval to contract his individual recording talents with Island Records.  Shortly after, Campbell disclosed that he had reached an agreement with Island Records, the Committee for Luke Records moved for authority to sue Campbell on behalf of Luke Records for loss of corporate opportunity.  Campbell had asserted prior to the agreement with Island Records that he had never signed an artist recording agreement with Luke Records and as such, was permitted to "market" his artistic talents to other record labels besides Luke Records.   The Committee felt that any attempt by the principal of Luke Records to usurp a corporate opportunity was a breach of Campbell's fiduciary duties.  The Court granted the Committee relief from stay to file the adversary against Campbell for signing a record deal with Island Records.  No adversary was ever filed, since Campbell has now agreed to fund a portion of this liquidating plan through the proceeds of the advance received from Island Records to produce his first LP.  The sale of the H-Town soft assets (that is the contract for performances going forward) for H-Town may involve a transaction in which Campbell is either directly or indirectly involved because of the need for his involvement pursuant to the terms and conditions governing the assignment of the relevant artist contracts.

      E.    <u>Preferential and Fraudulent Transfers</u>. The Committee is not aware of any transfers made by the Debtors outside of the ordinary course of business of any assets within the last year, except the liquidation of Luke Records' interest in Shopco Regional Malls, a Ltd. partnership and Luke Records' interest in the Pilgrim Fund, Franklin Fund and Securities of America, all

LJWR0523

money market accounts, liquidated for the purposes of making payroll and paying other expenses of the business during the pendency of the Bankruptcy.

With regards to prepetition transfers, as previously set forth and described herein, the avoidance analysis made by the Examiner in June of 1995 indicates that the two significant transfers made by Luke Records to Jones and Weinberger may have been preferences. However, as further described in the Plan, the purchase of certain assets of the Debtor's estates by Weinberger and the reduction of Jones' claim and waiver of Jones' secured claim in Luke Records obviates any need for the Committee or the Liquidating Trustees to pursue any further investigation regarding these transfers.

     F.    <u>Disputed Claims</u>. Both Luke Records and Campbell have filed objections to claims and the remaining disputes on claims are focused on the following:

     1.    Those proofs of claim that were filed without adequate documentation to which the Debtors' books and records reflect a different balance owed;

     2.    The proofs of claim of George Brown and Shelley Wilson for personal injury occurring on or about the premises owned by Luke Records to which the Debtors have objected on the basis that there was insurance coverage in effect regarding the uniliquidated personal injury claims and, as such, there is no claim against the estate;

     3.    The proofs of claim of certain professionals such as Mancini and Stevens, P.A., Williams and Klein, P.A., Williams and Associates, P.A., in which proofs of claim had been filed, but no adequate allocation of services performed as between the two bankruptcy estates.

LJW R0524

CASE .OS. 95-11447-BKC-RAM
95-12785-BKC-RAM

4.  The proofs of claim of Akuff-Rose Music, Inc., which is now a claim that has been compromised and a settlement reached in which Akuff-Rose Music, Inc. shall have no allowed claim.

5.  Those proofs of claim that are treated pursuant to the agreed Letter-of-Intent regarding the systematic liquidation and purchase (i.e. claims of Campbell, Luke Records, Weinberger, Jones, RED, affiliated companies, Campbell, including Pac-Jam, Inc.); and

6.  Substantially all of the artists that have been contracted to record for Luke Records, to which Luke Records believes that in light of the significant advances provided to each of the artists, only a minimal amount of prepetition royalties are due.

## X. <u>ALTERNATIVES TO THE PLAN</u>.

The Committee believes there is no viable  alternative to the proposed Plan of Reorganization, but for a Chapter 7 liquidation.  A Chapter 7 liquidation scenario would likely result in a rejection of the RED agreement.  Several rejection damage models have been suggested, and depending on which one the court would consider, it is possible that the RED rejection damage claim could reach as high as $10,000,000.  Thus, in that scenario, if RED were to have a claim in that amount, it is likely the Trustee would abandon its interest in the master recordings and the inventory held by RED.

The Chapter 7 Trustees could realize $100,000 in equity from the sale of the office building, take possession of the purported retirement account in the sum of approximately $52,000 and vigorously prosecute the Jones' preference claim and the §548 and/or §547 actions against Weinberger.  Sale of any unencumbered inventory in Dade would yield a minimal amount and the recording studio about $75,000.  The Chapter 7 Trustees would likely incur significant legal expense in prosecuting these actions and battling between themselves as to who

-52-

LJWR0525

would get the net assets. The net recovery to the Luke Records estate might be as little as $300,000 to $400,000. If RED's unsecured rejection claim is approved by the Court, its claim could likely be far in excess of the total amount of unsecured claims filed to date. Moreover, all of the claimants who are now waiving or reducing their claims (i.e. Weinberger, Campbell, affiliated companies of Campbell, Jones, etc.) could significantly raise the total amount of unsecured claims to far in excess of $10,000,000. The distribution under a Chapter 7 liquidation could be only a few pennies on the dollar.

## XI. CONCLUSION.

For the foregoing reasons, the proponents herein respectfully submits that the most appropriate course of action open to the creditors is to approve the Debtors' Plan of Reorganization on the Ballot enclosed herewith.



LJWR0526

**EXHIBIT "A"**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CHAPTER 11

IN RE:

    LUKE RECORDS, INC.

      Debtor,

LUTHER CAMPBELL,

      Debtor.

CASE NO. 95-11447-BKC-RAM

CASE NO. 95-12795-BKC-RAM

## JOINT PLAN OF REORGANIZATION

EXHIBIT A

**LETTER-OF-INTENT**

Letter of Intent re:  Joint Plan of
Re-Organization (the "Plan") of the Luke Records and
Luther Campbell Bankruptcy Estates as proposed by
the Official
Unsecured Creditors Committee of Luke Records
and Luther Campbell

The undersigned parties agree to the terms of a plan of reorganization for the Bankruptcy Estates of Luther Campbell and Luke Records, Inc. under the following terms and conditions:

I.  Conveyance of Assets to Joseph Weinberger/Lil' Joe Records, Inc. ("Weinberger")

A.      Luke Records, Inc., debtor and debtor in possession, Luther Campbell, debtor and debtor in possession, Pac Jam Publishing, Luke Mortgage, Inc., 2 L.C., Inc., Luke Records Fan Club, Inc., and Rockville Productions, Inc. will convey the following assets to Weinberger, conveyed and delivered to Weinberger, or his nominee or nominees, free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind, except as noted hereinbelow, subject to an order of confirmation of the Bankruptcy Court entered pursuant to 11 U.S.C. § 1129 after notice and a hearing within the meaning of the Bankruptcy Code not later than April 1, 1996; or such later date that the parties agree.

1.      All worldwide rights to the masters, two inch and one-quarter inch reels, all DATs, production masters, video masters (one inch, three-quarter inch and betacam), film, artwork, color separations, matchprints, pictures, signs, etc. owned or controlled by Luther Campbell or Luke Records including all masters of H-Town (XR126 and XR212) (except as provided in paragraph V.C.1), but not including (a) (subject to paragraph 13 pertaining to Lorenzo and Verb and section P below); (b) (subject to Paragraph 13 and Section P below) the following "Luther Campbell" masters:  I Got Shit on My Mind, I Got Sumthin on my Mind, Luke in the Nude (nasty and clean versions) and Freak For Life, Cat. Nos. XR118; XR119; XR200; XR201; and XR6996; (c) all recordings of the artists Trellini and Society as well as any singles released from the foregoing albums and subject to paragraph 13 and Section P below. All Masters to be transferred to Weinberger under this Agreement including those pursuant to Paragraph I.A.13 and I.P. hereof, if applicable, are hereinafter referred to as the "Masters" and all other Masters are collectively referred to as the "Excluded Masters").  Luther Campbell and/or Pac Jam Publishing shall receive no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters or compositions being sold.

2.      All worldwide copyrights and/or publishing interests held by Luther Campbell, Luke Records, Inc., or Pac Jam Publishing, except as related to the compositions embodied on the Excluded Masters.

3.      The Publishers share of BMI performance monies related to the masters in paragraph I.A. above, except related to the Compositions contained on the Excluded Masters.

RCW\J707 0000\J1936.1\020696

4.      All inventory wherever located, except for the inventory of the Excluded Masters.

5.      Assignment of all merchandising rights and merchandise, except that which is related to the recording artists on the Excluded Masters and all account balances of Luke Records Fan Club, Inc.

6.      Assignment of judgments belonging to Luke Records, Inc. against Patsy Billingsly, Jim Sears, and Tony Butler.

7.      Assignment of Mortgages and account balances and notes and/or proceeds held by Luke Mortgage or its attorneys for the following:  Urban Constructors, Inc. ($38,000.00 net of $4,000.00 attorney's fees); Hopkins ($84,490.60) balance as of 11/10/94; Humphrey ($105,532.57) balance as of 11/29/94), including all original notes, mortgage files and copies of bank records related to the above, with a warranty that there have been no discounts given or payments received except in ordinary course.  In the event any mortgage has been foreclosed on, the proceeds shall be escrowed until closing.  Hopkins shall have the right to pay off his mortgage for the sum of $70,000.00 provided a binding commitment from an institutional lender is provided upon confirmation of the Plan and such payoff occurs no later than April 15, 1996. Otherwise a 6 month moratorium against foreclosure shall be given, provided all then applicable monthly payments are made, in accordance with the terms of the Note, and there are no other defaults under such mortgage.

8.      Assignment of all receivables and future payments from all contracts receivables on Masters and compositions being sold, except as set forth on Exhibit "A" which are retained for Luke Records and related to the Excluded Masters, and except for masters being retained in paragraph V.B and except for receivables, if any, owing from RED, as to which the net receivable (balance on owners' activity report, less reserves) is to be divided by 50% up to a maximum of $200,000.00 to Weinberger and the remaining amount shall be distributed to the bankruptcy estate of Luke Records, Inc.

9.      Whatever rights to the 2 Live Crew name, servicemark and trademark are held by either Luther Campbell, debtor and debtor in Possession, Luke Records, Inc., debtor and debtor in possession, 2 LC, Inc. or any other affiliated Companies.  Separate consideration shall be given for such conveyances and sale in the amount of $100.00 to each party; provided, however, that nothing contained herein shall affect the right of the Luke Records Liquidating Trustee to object to the Chris Wong Won claim or to assert defenses and counterclaims with respect to the claims asserted against the Luke Records estate by Wong Won.

10.    Irrevocable license worldwide in perpetuity to use the likeness of Luther Campbell, his name and the Luke Records name and Luke Records logos only in connection with all previously released masters, the masters being sold herein, and all product already manufactured, including but not limited to, compilations, refurbished product and so called greatest hits albums, comprised solely of the Masters sold hereunder but not with regard to releasing product recorded after June 12, 1995, i.e. must use all photographs or artwork in being without alteration to the likeness of Luther Campbell.  The album covers on the previously issued album "Banned in the U.S.A." shall be changed to a group picture and all references to "The Luke LP Featuring 2 Live Crew" shall be deleted.   Also, the compositions "F—Martinez" and "Arrest in Effect" shall be deleted from all future manufacturing.  Nothing in this paragraph shall prohibit the sale of existing inventory or the resale of returned inventory.

11.    Luke Records, debtor and debtor in possession, shall assume and assign to Weinberger, in Weinberger's sole discretion, and at Weinberger's sole expense all existing artist and producer contracts to which Luke Records or its affiliates and subsidiaries is a party with Poison Clan, Bust Down, U-Mynd, Professor Griff, Home Team, Jiggie Gee,  Likkle Wicked, Junior Demus, and Indo G & Lil' Blunt, except for the contracts to the Excluded Masters, H Town, and Verb & Lorenzo as provided in Paragraph A.13.  Luke Records shall reject any contract to which it is a party with Chris Wong Won.

12.    Assignment at the expense of Weinberger of all pending trademark and/or copyright applications regarding the Masters and/or groups being sold, including, without limitation, any with respect to the name "2 Live Crew", excluding those regarding the Excluded Masters and the Artists and compositions appearing thereon.

13.    If Luther Campbell elects prior to March 3, 1996 and subject to RED's approval to be delivered on or before March 10, 1996, and any conditions attached by them, he may retain the rights to the masters, publishing and merchandising of the Luther Campbell Masters specifically described in paragraph I.A.1., Lorenzo (XR214), and Verb as an individual artist (no catalog number assigned), as well as future contractual rights of said artists.  A condition precedent to such election shall be the agreement by a "major" record distributor (as that Term is understood in the Recording Industry) to assume all return liability emanating from these masters for which RED may otherwise be liable, to agree to reimburse RED in an amount equal to monies paid or credited by RED to customers in connection with returns such records accepted by RED in its sole discretion notwithstanding such distributor's assumption of return liability, and to agree to send a jointly with RED at such distributors' expense, and in a form acceptable to RED, informing retail distributors, wholesalers, one-stops and the like that all future returns of records emanating from these masters are to be sent to such new distributor.

R:\WLJ\KT7 00503\1936.12\200694

In such event, Weinberger shall receive in return for the Masters, Publishing Rights existing inventory wherever located and publisher's share of BMI performance monies and Merchandising Rights to Lorenzo and Verb at Luther Campbell's option:

    a.    payment of $200,000.00 from Luther Campbell (deemed $180,000 for Lorenzo and $20,000 for Verb), or

    b.    Transfer of stock and assets of Luke Development, Inc., the Miami Lakes Lot and Palm Beach lot owned by Luther Campbell free and clear of any claims, liens and encumbrances. If Luther Campbell fails to elect to purchase Lorenzo and Verb, he shall nevertheless receive all the rights to Society and Trellini without further payment subject to paragraph 14 below.

    14.    Furthermore, if he makes such election to purchase Lorenzo and Verb as provided in Paragraph 13, which is approved by RED, Luther Campbell shall arrange for a third party record company in the business of distribution of records to accept the returns of prior sales of such product including returns of records shipped by RED, which distributor must be acceptable to RED, and such distributor must assume all liability with respect to the return of records, CD's, tapes and videos from retail distributors, wholesalers, one stops and the like corresponding to the Excluded Masters in such form suitable to RED.

    15.    For the avoidance of doubt, except as specified herein to the contrary, this paragraph grants to Weinberger no rights to future recording services or songs written by Artists appearing on the Excluded Masters.

    16.    Whenever RED's approval is required hereunder, RED shall not act unreasonably to withhold such consent. With respect to paragraphs 13 and 14, RED will not withhold its consent regarding Luther Campbell's election to retain rights to Excluded Masters and with respect to Paragraph V.C., RED will not withhold its consent regarding a change of distributor notice in a form H-Town Hard Assets, provided in either case that Luther Campbell/the Liquidating Trustee enters into an agreement with a "major" distributor that possesses the ability to perform as contemplated hereunder or Alliance Distribution, Inc. Such performance shall include, but not be limited to, preparing and distributing to customers a change of distributor notice in a form acceptable to RED which will state that such distributor shall accept returns of all records embodying the Excluded Masters, as well as a guaranty (also in a form acceptable to RED) pursuant to which such "major" distributor or Alliance shall agree to reimburse RED in an amount equal to the amount paid or credited by RED to customers in connection with return of

records embodying Masters and/or Excluded Masters notwithstanding the distribution of the change of distributor notice.

17.   Weinberger agrees that any compositions on the 2 Live Crew Masters that represent solo performances by Luther Campbell shall not be included in any future "Greatest Hits" compilations (other then existing "Greatest Hits" compilations) which are released by Weinberger or Lil' Joe.

B.   Weinberger shall assume all of RED's liability for returned Records, CDs, tapes and orders processed on or after the Closing hereunder with respect to Masters being purchased by him for which RED would otherwise have liability. RED shall retain its right to recoup such liability from funds to otherwise come due to Weinberger under the amended distribution agreement. RED and Weinberger agree to negotiate in good faith to modify the Distribution Agreement. Modification of the Distribution Agreement in form satisfactory to both shall be a condition precedent to the obligation of RED and Weinberger to perform hereunder, which shall be completed on or before February 22, 1996 or such later date agreed by Weinberger and Red.

C.   Any new distribution agreement will contain terms no less favorable to Weinberger or RED than the terms of the existing distribution agreement between RED and Luke Records, Inc., except that any future receivables reserve shall be increased to 20%, Weinberger shall personally guarantee the obligations thereunder, the security interest shall transfer to the masters being sold, and customary inducement letters shall be executed by all artists signed by Weinberger.

D.   The parties hereto shall execute all documents and take such actions as shall be necessary to perfect the transfers and assignments hereunder, including making all necessary filings with the U.S. Office of Copyright and the U.S. Patent and Trademark Office, and execute notice of assignments to all third parties, including, but not limited to, K-Tel, Priority Records, Tommy Boy Records, Landmark Distributors, Inc., Music Distributors, Inc., and Independent National Distributors, Inc. Additionally, each of the parties herein shall deliver all business records and documents in its possession representing or evidencing the assets being acquired hereunder, including copies of all sales reports, sales and credit invoices and/or memoranda, ledger statements, sample and other license agreements, mechanical license agreements and other underlying documentation, artists contracts, producer contracts and accompanying royalty statements and back-up documentation. No representation is made to the accuracy of such documents.

RCW-J307 0000.31936.19-030696

LJWR0570

E.    The obligation of each of the parties to this letter to consummate the transactions described herein shall be subject to (i) each corporation other than Luke Records being in good standing in the jurisdiction of incorporation, as evidenced by a certificate of good standing dated the date of closing, (ii) delivery of corporate resolutions authorizing the consummation of the transactions (except from RED and Luke) contemplated hereby and the execution of all appropriate documentation, and (iii) bankruptcy court confirmation of the Plan.  The parties hereto agree to negotiate in good faith to arrive at such documentation.

F.    All inventory of the records described in Paragraph A.1. and Masters being sold hereunder on the confirmation date located at Luke Records, Inc.'s headquarters at 8400 N.E. 2nd Avenue, Miami, Florida shall, except to the extent sold at an arms' length basis, be substantially identical to that set forth on the current inventory schedules.  For purposes of this paragraph, "substantially identical" shall mean a difference of less than or equal to ten (10%) percent of the records set forth in Luke Records' initial bankruptcy schedules using the valuation methodology used in such bankruptcy schedules.  In the event the inventory transferred is not substantially identical, any claims arising out of such difference shall belong to the liquidating trustee.  Debtors shall document to Weinberger and to the Luke Records liquidating trustee, any differences between the current Inventory Schedule and the Inventory identified in the Bankruptcy Schedules.

G.    The Debtors at Weinberger's expense, if any, shall direct all manufacturers, vendors and other relevant parties to transfer all Masters, artwork, and the other items acquired hereunder to Weinberger.  If a court order shall be necessary to effectuate such a transfer, the Debtors shall use best efforts to obtain such order.

H.    Rockville Productions, Inc. shall have no claims against any of the artists being sold and hereby releases, and shall execute any written releases of, the artists or any management rights to such artists.

I.    All parties shall have a continuing obligation to cooperate in any pending litigation and execute all appropriate documents.  In the event of non-cooperation as set forth in an order compelling cooperation, the non-prevailing party shall reimburse the  prevailing party for all attorneys fees, costs and expenses incurred in all court proceedings, including the Bankruptcy Court.

J.    The Debtors shall return to Weinberger the Bally Briefcase and the Hewlett Packard III Printer, belonging to Weinberger.

K.     Luther Campbell shall not re-record any Compositions recorded by him or as a member of The 2 Live Crew contained on the Albums purchased by Weinberger for a period of 2 years from confirmation of the Plan.

L.     The Debtors shall execute the release and settlement agreements in the *Acuff Rose V. Campbell* litigation matters and seek to obtain Bankruptcy Court approval of same, and shall assign to Weinberger any licenses granted thereby.

M.     Luther Campbell, Pac Jam Publishing, and Luke Records shall grant on a quitclaim basis, a worldwide, royalty-free master and mechanical license to Lil' Joe Records, Inc. and its publishing company of that portion of the Luther Campbell composition "I Wanna Rock to the extent written and/or controlled by Luther Campbell, PAC Jam or Luke Records and solely as contained on the album <u>Bass Records Greatest Hits</u> for said Album and no other. No warranties or representations are made as to any samples.

N.     Peter Jones, PAC Jam Publishing and Luke Records shall cause Peter Jones to grant to Weinberger, on a most favored nation basis, the worldwide master and mechanical license for the composition "Shake It" contained on the album <u>Bass Records Greatest Hits</u>.

O.     Within 3 days of posting the deposit provided in Paragraph X below, the Debtors shall, at Weinberger's expense, remove all original documents, and inventory artwork, DATS, and masters to a location selected by Weinberger and Frank Terzo for inspection by Weinberger, to be held in custody by Frank Terzo until the closing hereunder.

P.     If any of the Excluded Masters are not assigned to Luther Campbell as set forth in paragraph A.13 above or sold by the Luke Records liquidating trustee pursuant to paragraph V.C. below, then Excluded Master(s) shall be deemed a Master and shall remain the property of Weinberger hereunder, and Weinberger shall assume all return liability associated therewith.

Q.     Weinberger shall accept returns of any and all records returned to RED in any configuration, including without limitation, vinyl discs, analog cassette tapes and compact discs (collectively, "records") embodying the master recordings acquired by Weinberger herein.

R.     Subject to paragraph II.A.(i) and II.C.3., Weinberger shall reimburse RED in an amount equal to any monies paid or credited by RED to retailers, wholesalers and the like in connection with the return of records referred to in Section Q to the extent RED has not offset or recouped such amounts from reserves maintained pursuant to the agreement between Luke Records and RED, dated August 26, 1994, as amended (the "RED Agreement").

II:C:\J2977 00005 51926, 18-000696

S.     Luke Records and Luther Campbell, individually and as debtors and debtors in possession waive and relinquish all claims that they have against Weinberger including preference and other avoidance actions under the Bankruptcy Code and agree to execute general releases regarding same.

T.     Weinberger and his corporate affiliates (including all companies owned by him) shall receive a General Release from all parties, except from RED with respect to returns liability as set forth herein and except for obligations in the distribution agreement as amended and give to all parties general releases at closing. All pending lawsuits against Weinberger shall be dismissed with prejudice.   Releases given to Weinberger and his corporate affiliates shall include, without limitation, any and all claims which the Debtors, Debtors-in-Possession, Creditors Committee and/or any successor Trustee may hold or could assert (e.g., preference and/or other avoidance actions under the Bankruptcy Code). Said releases shall be approved in the order confirming the plan.

U.     Weinberger agrees to waive all claims against Luke Records, Inc. and Luther Campbell  including but not limited to those claims previously filed in the Bankruptcy case and shall issue a general release upon confirmation.

V.     As consideration for the foregoing, Weinberger shall pay:

1.     To Luke Records Bankruptcy Estate the sum of $450,000.00, which shall be paid as follows:

a.     $350,000.00 in cash upon an order confirming the Plan; and

b.     $100,000.00 on or before the first anniversary thereof, which amount shall be paid without interest and personally guaranteed by Joe Weinberger as set forth in a promissory note which will provide for default interest at 12% and attorneys fees.

2.     In addition, Weinberger agrees to pay upon an order confirming the Plan the sum of $350,000.00 in cash to the Luther Campbell Bankruptcy Estate.

W.     On the later of ten (10) days following execution of this document, or upon approval of Weinberger by RED, Weinberger agrees to deposit with the trust account of Coll, Davidson, Carter, et al. the sum of $80,000.00 in an interest bearing trust account towards the purchase price set forth in Paragraph  V above.

RCW\2307 0000 51936.10-030696

LJWR0573

X.     If Weinberger is unable to obtain financing, he shall give written notice to the Luke Records Liquidating Trustee to be received on or before February 12, 1996. If Weinberger fails to timely give such notice, his obligations under this agreement shall become absolute to the extent provided for herein. Weinberger shall use his reasonable best efforts to obtain such financing.

Y.     Luther Campbell, debtor and debtor in possession, and Pac Jam Publishing shall exchange mutual General Releases.

## II.  RED/Luke

A.     Luke Records shall assume the distribution agreement between RED and Luke, dated August 26, 1994, as amended (the "RED Agreement") pursuant to Section 365(a) of the Bankruptcy Code, and assign the RED Agreement (as modified in accordance with the terms of this Agreement) to Lil' Joe pursuant to Section 365(f) of the Bankruptcy Code (the "Assumption and Assignment"). Subject to (i) payment in full in cash by the Luke Records estate on the effective date of the Plan of the entire unrecouped balance owing to RED, (ii) Lil' Joe providing RED with adequate assurance of future performance under the RED Agreement (including a personal guaranty from Joseph Weinberger and suitable collateral) RED shall consent to the Assumption and Assignment, and (iii) sale and assignment of the H-Town Masters to an entity acceptable to RED that agrees to assume the return record liability in accordance with the terms of this Agreement as set forth in Paragraph II.C.2.

B.     Lil Joe shall grant to RED a security interest in the Masters and in the inventory in its possession. Any party taking title to the Masters and record inventory (the "Inventory") shall execute such security agreements and related documents as RED may request to permit RED to perfect its security interest in the Masters and Inventory owned by such new owner. RED shall agree that its security interest in the Masters and Inventory shall only secure the indebtedness and obligation of the party taking title to those Masters and Inventory. RED agrees to release its security interest in the Masters and Inventory within six (6) months following the end of the Post-Term Return Period (as defined in the RED Agreement), provided that all obligations owing to RED from Lil' Joe or the owner of the H-Town assets (as the case may be) have been satisfied in full.

C.     RED shall waive its claim against Luke Records' estate for return record liability (the "Return Record Claim") upon the satisfaction of each of the conditions described in subparagraphs 1, 2 and 3 of this paragraph; provided, however, that to the extent these

RCW\2507 0000.5 1936.16v020696

conditions are not satisfied on or before the effective date of the plan, RED shall not be required to waive the Return Record Claim to the extent attributable to the unsatisfied condition.

      1.    The Assumption and Assignment and sale to Weinberger of all Masters described in Paragraph I.A.1 owned or controlled by Luke Records other than the Excluded Masters;

      2.    A sale of the H-Town Masters, pursuant to paragraph V.C., to an entity suitable to RED as set forth in paragraph 14 above, who shall have agreed to accept and be liable for the portion of the Return Claim attributable to return of records embodying the performances of H-Town and to reimburse RED in an amount equal to any and all sums paid or credited by RED to customers in connection with returns accepted by RED, regardless of when such records were sold or returned.

      3.    Payment in full in cash by the Luke Records estate of the unrecouped balance owing to RED (including returns in excess of Reserves) as of the effective date of the Plan on the effective date of the Plan.

      D.    RED shall provide an accounting to the Luke Records Liquidating Trustee of all records sold under the RED Agreement and back up documents describing the unrecouped balance at least seven (7) days prior to the Confirmation.

      E.    Upon confirmation of the plan, Luke Records, debtor and debtor in possession and Luther Campbell, debtor and debtor in possession, shall deliver general releases to RED (including its officers, directors, employees, agents, affiliates and attorneys) of all claims as defined in Section 101(5) of the Bankruptcy Code, except that Luke Records shall not release RED from RED's future obligation to liquidate reserves in accordance with the RED Agreement, to the extent  reserves exceed the then unrecouped balance.  These releases shall be approved in the order confirming the Plan.

      F.    RED will amend its proof of claim against Luke Records consistent with the terms of the plan no later than three (3) days after the effective date of the plan waiving all claims against Luke Records, except the unrecouped balance owing to RED including returns in excess of reserves and except amounts being assumed by other entities hereunder, which indebtedness will be transferred to such other entities.

      G.    On the effective date of the Plan, the Luke Records estate shall pay to RED in full in cash the unrecouped balance owing to RED as of the effective date of the Plan (inclusive

BCW\23671 00000 31936.19\000696

LJWR0575

of amounts by which returns have exceeded reserves and to the extent RED has agreed to pay Jones for any liability under the terms of the Settlement Agreement dated December 27, 1994).

     H.     On the effective date of the Plan, RED shall liquidate its reserves and use the amount of such reserves to reduce the amount of its unrecouped balance.

     I.     As a condition precedent to the performance of RED's obligations hereunder, RED shall have the right to review and approve financial statements of Weinberger and Lil' Joe, which shall be completed on or before twenty (20) days following receipt of same or such later date as shall be agreed by Weinberger and RED.  Subject to execution of a suitable confidentiality agreement by RED, Weinberger and Lil' Joe shall give RED within ten days after the date of execution hereof, such financial information as RED may reasonably request.

### III.  Peter Jones/Luke Records/Luther Campbell

     A.     The Bankruptcy Estates of Luke Records, debtor and debtor in possession and Luther Campbell, debtor and debtor in possession agrees to waive all claims against Peter Jones for preferential payments.  Releases given to Peter Jones shall include without limitation all claims which the Debtors, Debtors in possession, creditors committee and/or any successor Trustee may hold or assert.

     B.     Peter Jones agrees to reduce his entire claim in the Luke Records Bankruptcy Estate to an unsecured claim in the sum of $900,000.00.  Peter Jones will not reduce his claim in the Luther Campbell Bankruptcy Estate which shall not be objected to by any of the parties. Peter Jones shall be entitled to receive distributions in respect to the claims he holds in both Estates, but his total recovery shall be limited to the unreduced amount of his claim in the Luther Campbell Bankruptcy Estate.

     1.     Upon confirmation of the Plan, Peter Jones agrees to release Luther Campbell for any and all liabilities except as provided herein to the extent his Bankruptcy claims are not fully satisfied.

     C.     Luke Records and Weinberger (to the extent he receives same) agree to deliver to Peter Jones on or before the confirmation date the Master tapes of his recordings which shall remain his property free and clear of all third party claims.

IV.  Luke Records/Luther Campbell Bankruptcy Estate/Luther Campbell

    **A.**    The following assets shall be sold, transferred to or retained by Luther Campbell in addition to the rights otherwise provided herein:

    1.    Miami Lakes lot.

    2.    Palm Beach lot.

    3.    Stock of Luke Development, Inc. and/or any properties owned therein.

    4.    Office building located at 8400 N.E. 2nd Avenue, Miami, FL, owned by Luke Records, Inc., subject to all liens and mortgages.

    5.    Any and all interests in home of Stanley Campbell.

    6.    Any interest in stock of Scandalous, Inc. and proceeds of contract with Island Records.

    7.    All personal items owned by Luther Campbell.

    8.    All cars owned by Rockville Productions, Inc., with the exception of the Viper which shall be returned to the leasing company.

    9.    Subject to Paragraph I.A.10., all servicemark, trademark, intellectual property and merchandising rights to the name Luke and Luke Records, including, subject to Paragraph I.A.1 inventory of merchandise related to the Artist Luke.

    10.    The recording studio and all fixtures, equipment and personal property located at 67 N.W. 2nd Avenue, Miami, Florida.

    11.    All furniture, equipment and personalty owned by Luke Records, Inc.

    12.    1990 Jaguar.

    13.    1992 Chevrolet Van.

    14.    Stock of Luke Records Fan Club, Inc.

15.    All book and publication rights.

16.    The stock of Rockville Productions.

17.    The annuity claimed as exempt.

18.    All other assets not specifically set forth in this Agreement, provided they have been disclosed on the Schedules or Amended Schedules, filed to date.

B.    The above items shall be transferred to Luther Campbell in "as is" condition, "where is" and subject to all liens, encumbrances and assessments of record.

C.    In return therefore, Luther Campbell shall pay the following sums:

1.    Upon confirmation of the Plan the sum of $100,000.00 to be paid to Luke Records Bankruptcy Estate.

2.    Upon confirmation of the Plan the sum of $100,000.00 plus the costs described in paragraph a.(1) below shall be paid to the Luther Campbell Liquidating Trustee.

3.    In addition, the sum of $100,000.00 shall be paid to the Luke Records Liquidating Trustee; and the sum of $200,000.00 shall be paid to the Luther Campbell liquidating trustee, on or before the first anniversary of confirmation of the Plan, subject to the following:

a.    The amounts set forth in this Paragraph C.3 shall be secured by:

(1)    A second mortgage on the home of Luther Campbell located at 7180 N. Oakmont Drive, Miami Lakes, Florida.

(2)    A first mortgage on the Miami Lakes lot at 7190 N. Oakmont Drive.

(3)    A first mortgage on the Palm Beach lot. The Real Estate described in sub-paragraphs 1 through 3 above, is more fully described on Exhibit "C" and hereinafter called the "Secured Real Estate. The mortgage shall be in the amount of $300,000.00, (split between the two Bankruptcy Estates as provided in Paragraph C.3. above which mortgages must be executed on or before confirmation of the Plan and recorded within

2 days thereafter, at the expense of Luther Campbell (including abstracting, recording fees and applicable taxes).  Luther Campbell agrees to keep the Secured Real Estate free of liens and unpaid assessments and insured with the Liquidating Trustees named as an additional insured, in an amount and in a form acceptable to the Liquidating Trustees.

     4.    Notwithstanding the foregoing, the aforementioned $300,000.00 shall be paid upon the earlier of:

         a.    the first anniversary, following confirmation of the Plan;

         b.    sale of the Secured Real Estate.

     5.    In the event of default, the amounts outstanding shall bear interest at the rate of eighteen (18%) percent, and the Liquidating Trustees shall be entitled to recovery of all attorneys fees and other costs of collection.

     6.    Upon execution of this document, Luther Campbell agrees to deposit the sum of $50,000.00 in the trust account of Jay Gamberg, Esquire.

    D.    Luther Campbell shall execute such documents reasonably requested to confirm the foregoing.

    E.    Luther Campbell agrees to assume the obligation to the Internal Revenue Service for all outstanding income taxes payable and liabilities which shall be payable by him from his personal assets, outside of the assets of the Bankruptcy Estate.

    F.    Within three (3) days of posting the deposit provided in paragraph I.X. above, Luther Campbell shall deliver to a bonded warehouse, all master tapes, inventory, contracts and property described in Paragraph's I.A., and V.C. which warehouse shall be selected and paid for by Joseph Weinberger.

    G.    Luther Campbell agrees to execute a release to Joe Weinberger, Lil' Joe Records, Inc., Richard C. Wolfe, Peter Jones, Frank Terzo, George Tavares for any and all claims, including the claim for royalties to be paid in the future, as a result of sales of those master tapes described in Paragraph I.A. above.

LJWR0579

H.    Luther Campbell will waive all personal claims and claims on behalf of Pac Jam Publishing, Inc. in the Luke Records Bankruptcy Estate.

I.    Upon a default by Luther Campbell of any of the terms of this agreement, the Peter Jones Judgment in the full amount shall be deemed reinstated in full, less only any payments made to date or from the Liquidating Trustees.

## V.  Residual Assets

A.    The other net assets of Luke Records and Luther Campbell Bankruptcy Estates described on Exhibit "A" shall be conveyed to the Liquidating Trustees, Frank Terzo and Richard C. Wolfe, respectively, who shall liquidate same for the benefit of the creditors. Luke Records believes that the accounts receivable balance with Atlantic Recording Corporation and M.S. Distributors, Inc. in the total amount of $120,000.00 remain due and owing and that Luke Records has not pledged, hypothecated or collected same. Luke Records further represents that the Luke Records Profit Sharing Plan is not a Qualified Retirement Plan pursuant to ERISA or IRC §401 et. seq., and that upon confirmation of the Plan, Luther Campbell shall transfer to the Luke Records Liquidating Trustee account balances of Nations Bank Account No. 3603554779 and Capital Bank Account No. 2020001233 containing an approximate balance of $52,000.00. The Luke Records Liquidating Trustee shall determine, pursuant to applicable law, if said funds are to be distributed to the Luke Records creditors or the employees. To the extent the funds are to be distributed to the employees, then Luther Campbell's share is to be distributed to the Luther Campbell Liquidating Trustee. Any funds which becomes otherwise the property of Luke Records because of forfeiture, vesting or waiver shall be distributed to the creditors of Luke Records.

B.    The Liquidating Trustees shall make a quarterly accounting of proposed distributions fees and costs expended in the liquidation process and send same to the Creditors Committee of Luke Records and the 20 largest Creditors of the Luther Campbell Estate. If no objection is received within thirty (30) days of mailing, the Trustees shall make such disbursement(s). The Bankruptcy Court shall retain jurisdiction to hear and rule upon any objections filed with said thirty (30) day period.

C.    The sale of "H-Town" assets shall be conducted as follows:

1.    Sale of Hard Assets: Frank Terzo as liquidating trustee of the Luke Records Bankruptcy Estate shall endeavor to sell the H-Town assets to any third party person, including Luther Campbell or his assignee, which will include:

LJWR0580

a.        The rights to all master tapes recorded by H-Town and owned by Luke Records;

b.        all publishing rights to the compositions contained thereon owned by Pac Jam Publishing;

c.        all H-Town inventory held by RED or Luke Records, but specifically excluding any contract rights with the group H-Town (the assets described in Paragraphs a, b and c above are hereinafter called the "H-Town Hard Assets"). The sale shall be completed by the Liquidating Trustee on terms acceptable to the liquidating trustee. The Sale of the H-Town assets must be in accordance with Paragraph II.C.2. above. It is agreed that the proceeds from the sale of the H-Town assets shall be divided eighty (80%) percent to the Luke Records Bankruptcy Estate and twenty (20%) percent to the Luther Campbell Bankruptcy Estate.

In the event that Frank Terzo is unable to sell the H-Town Hard Assets as described herein, on or before the fifth day prior to the Effective Date of the Plan, then in such event:

i)        Upon notice by Frank Terzo or RED that no sale has taken place, Weinberger agrees to purchase the H-Town Hard Assets for the sum of $10.00.

ii)        Weinberger agrees to accept the H-Town Return Record liability as provided in Paragraph II.C.2 above.

iii)        Those Accounts Receivable of Luke Records, listed on Schedule "B" shall be assigned by Luke Records, Debtor and Debtor in Possession to Weinberger, to collect for his own account.

iv)        $200,000.00 of the Purchase Price, otherwise payable to Luke Records by Weinberger pursuant to Paragraph I.V.1.a. shall be deferred and allocated eighty (80%) percent to the payment due Luke Records Bankruptcy Estate and twenty (20%) percent to the payment due Luther Campbell Bankruptcy Estate for a period of six months so that the sum of $150,000.00 shall be paid upon an order confirming the Plan and $200,000.00 shall be paid six months thereafter. This amount shall be paid without interest, personally guaranteed by Weinberger as set forth on a Promissory Note which will provide for default interest at 12% and attorneys' fees and secured by a Letter of Direction, in a form acceptable to RED and the Luke Records Liquidating Trustee directing payment of any money otherwise

R("VA2507 00003.1936.119.020696

becoming payable to Weinberger (if any) from RED and further secured by all of the issued and outstanding shares of Lil' Joe Records, Inc. or any other entity owned or controlled by Weinberger taking title to the H-Town Hard Assets. Notwithstanding the foregoing, if Luke Records fails to sell the H-Town Hard Assets by February 22, 1996, then Weinberger shall be entitled to the deferral as set forth in this Paragraph IV.

2.    Sale of Soft Assets:  Frank Terzo as attorney for the Creditors Committee of the Luke Records Bankruptcy Estate shall, subject to court approval, endeavor to sell the Contract Rights that Luke Records asserts against the members of the group H-Town (hereinafter called "H-Town Soft Assets"): In this regard, the parties grant Philip Calloway a seven-day period from January 31, 1996 to complete a deal for the sale of such rights, so long as the Bankruptcy Estate, prior to confirmation of the Plan receives net of commissions the minimum sum of $600,000.00 or such other amount acceptable to the Luke Records creditors committee. The sale shall be completed by the Luke Records Liquidating Trustee on terms acceptable to the Luke Records Liquidating Trustee. It is agreed that the proceeds from the sale of the H-Town Soft Assets shall be divided 80% to the Luke Records Bankruptcy Estate and 20% to the Luther Campbell Bankruptcy Estate.

a.    In the event the Luke Records Liquidating Trustee is unable to complete the sale of the H-Town Soft Assets, the Luke Records Liquidating Trustee may otherwise, in his own discretion, assume the Exclusive Recording Agreement pursuant with H-Town to Section 365(a) of the Bankruptcy Code and assign same to any third party, pursuant to Section 365(f) of the Bankruptcy Code on terms acceptable to the Luke Records Liquidating Trustee.

b.    Any sale of the H-Town Soft Assets shall be accomplished at the discretion of the Luke Records Liquidating Trustee, with a waiver of any claims that the members of H-Town may assert against the Luke Records Bankruptcy Estate.

c.    The sale of the H-Town Soft Assets herein shall not be a condition precedent to the remainder of the provisions set forth hereunder.

D.    The liquidation of the remaining assets of Pac Jam Publishing shall be conducted as follows:

1.    Luther Campbell shall assign all issued and outstanding shares of Pac Jam Publishing, Inc. ("Pac Jam") to the Luther Campbell Liquidating Trustee, who in turn, will agree to assign to Luther Campbell the publishing rights to the compositions encompassed on

the Albums described in Paragraph I.A.1., in perpetuity, in consideration for his waiving all claims against Pac Jam.

2.    The Luther Campbell Liquidating Trustee will:

a.    Sell to Weinberger the publishing rights to the songs and the compositions and assign all licenses in perpetuity, consistent with the terms of Paragraph I.A.

b.    Sell to the purchaser of the H-Town Hard Assets the publishing to the compositions encompassed on the prior Albums described in Paragraph V.B. consistent therewith.

c.    Distribute the sum of $100,000.00 and all other remaining assets if any, to a designated assignee for the benefit of creditors of Pac Jam who will file claims consistent with Florida Statute §727.112 and distribute all proceeds consistent with Florida Statute §727.et seq.  Luther Campbell will, on or before the Confirmation Date, provide to the Luther Campbell Liquidating Trustee a list of names and addresses of all potential claimants against Pac Jam.

3.    Upon confirmation of the Plan, Luke Records, and Luther Campbell Bankruptcy Estates agree to each contribute the sum of $50,000.00 to the Liquidating Trustee of the Luther Campbell Bankruptcy Estate, to hold such sums in trust pending an assignment for the benefit of creditors which will be commenced immediately thereafter.  Any sums not distributed to the creditors of Pac Jam, shall be returned to the respective Estates in equal proportions.  Luther Campbell agrees to waive any rights that he may otherwise have to a portion of the Pac Jam funds.

4.    The Circuit court of Dade County will have jurisdiction to determine the validity of any filed claims against Pac Jam that are objected to by the Assignee.

5.    All claims against professionals for malpractice together with various causes of action for account balances as designated on Exhibit "A" except as provided in paragraph V.B.1. shall be retained by the Bankruptcy Estates and shall be jointly prosecuted or abandoned by the two liquidating trustees, who shall hire counsel to prosecute such claims, if appropriate, and the recovery net of attorneys fees and costs shall be distributed equally by the Luke Records Liquidating Trustee and the Luther Campbell Bankruptcy Trustee.  Luther Campbell and Weinberger agree to cooperate with the Liquidating Trustees in the prosecution of all causes of action and agree to provide all necessary information and documents as requested

by the Liquidating Trustee's attorneys unless otherwise prohibited by court order or privilege, subject to reimbursement of any reasonable costs incurred by Luther Campbell or Weinberger.

## VI. General Terms

A.    All the parties hereto agree:

    1.    to endorse the Plan; and

    2.    confirmation of each plan is subject to confirmation of the other;

    3.    Approval of the Plan is not conditional upon the performance of Luther Campbell hereunder.  If Luther Campbell fails to perform those obligations required of him, prior to confirmation of the plan, then in such event all non-exempt assets described in paragraph IV above shall be sold by the Luther Campbell Liquidating Trustee and Luke Records Liquidating Trustee satisfied hereunder.

B.    All parties shall acknowledge their agreement to this Plan by returning the acknowledgment copy of this letter to the undersigned, which shall be received not later than February 2, 1996.

C.    In all events, the Joint Plan of Re-Organization shall be filed not later than February 5, 1996.

D.    Frank Terzo will file the objections to the claims in the Luke Records Bankruptcy Estate and Howard Berlin will file objections to the claims in the Luther Campbell Bankruptcy Estate as set forth on the attached schedules.

E.    Except as provided for herein, all deposits shall be forfeited to the Luke Records Bankruptcy Estate, if the depositor fails to complete the agreements set forth herein, (without cause attributable to a third party) on or before the effective date of the Plan.

F.    The Plans of Reorganization and Disclosure Statements shall be drafted by Plan Proponents with the parties acknowledging the benefit of the services of the law firm of Kluger, Peretz, Kaplan & Berlin and Bedzow, Korn & Kan, P.A. to the formation and execution of the Plan.

RCW\2507.0000.51936.10.000696

G.     The parties and their counsel acknowledge that the total Administrative Costs of the debtors counsel in the Luther Campbell Bankruptcy Estate shall in no event exceed the sum of $150,000 and the total administrative costs of the Luke Records Bankruptcy Estate shall in no event exceed the sum of $180,000.00.

H.     This Agreement may be executed in counterparts with each signature page deemed binding as a whole original.

I.     Except to the extent actions are required to be taken before confirmation of a Plan of Reorganization, all obligations hereunder are subject to an order of confirmation of Plans of Reorganization in the Luke Records and Luther Campbell bankruptcy cases.

J.     Whenever the term "record" is used herein, such Term shall mean any reproduction of a master recording containing sounds with or without visual images in any configuration now or hereafter known, including but not limited to, vinyl disc, analog cassette tape or compact discs.

K.     The parties acknowledge that the Luke Records Creditors Committee is a party in interest in the Luther Campbell Bankruptcy Case and may be a proponent of this Plan of Reorganization in such case.

L.     All transactions contemplated by this Agreement shall be closed within five (5) days after the date of entry of confirmation orders in the Luke Records and Luther Campbell Bankrupcy cases.

VII.  Acknowledgments

The signatures below acknowledge and confirm such persons agreement, on behalf of themselves and/or their clients to the terms and conditions stated herein.

**Joint Plan of Re-Organization**
Page 1

RED Distribution, Inc.

By: _____
James P.S. Leshaw, Esquire

Signature Page 1

RCW\2507 0000\51936.1\\020646

LJWR0586

Joint Plan of Re-Organization
Page 2

The Official Unsecured Creditors Committee
of Luke Records, Inc.

By: _____
Frank Terzo, Esquire

Signature Page 2

LJWR0587

**Joint Plan of Re-Organization**
**Page 3**

Luther Campbell, Debtor and Debtor in Possession

By: _____
    Jay Gamberg, Esquire
    Mark Cohen, Esquire

_____
Luther Campbell, Debtor and Debtor in Possession

Signature Page 3

LJW R0588

Joint Plan of Re-Organization
Page 4

Luke Records, Inc., Debtor and Debtor in Possession

By: _____
Luther Campbell, President

Signature Page 4

LJWR0589

Rockville Productions, Inc.

By: _____
Luther Campbell, (President

Signature Page 5

LJWR0590

2 L.C., Inc.

By: _____
    Luther Campbell, President

LJWR0591

Luke Mortgage, Inc.

By: _____
        Luther Campbell, President

Signature Page 7

LJWR0592

Joint Plan of Re-Organization
Page 8

Luke Records Fan Club, Inc.

By: _____
        Luther Campbell, President

Signature Page 8

Joint Plan of Re-Organization
Page 9

PAC Jam Publishing, Inc.

By:_____

Luther Campbell, President

LJWR0594

Luke Records, Inc.

By: _____
           Luther Campbell, President

    SWORN TO and subscribed before me this  7  day of  February  1996, by LUTHER CAMPBELL, who is personally known to me, or who has produced  _Personally Known_ as identification and who did take an oath.

My Commission Expires:

_____
Notary Public, State of Florida

NOTARY PUBLIC, STATE OF FLORIDA
RICHARD C. WOLFE
COMMISSION NO. CC-498419
MY COMMISSION EXPIRES
JUNE 00, 1997

8:CW\2507 00000.51736.18\0200696

Signature Page 10

Joe Weinberger and
Lil' Joe Records

By: _____
        Joseph Weinberger

SWORN TO and subscribed before me this ____ day of _____, 1996, by LUTHER CAMPBELL, who is personally known to me, or who has produced _____ as identification and who did take an oath.

My Commission Expires:

_____
Notary Public, State of Florida

LJWR0596

Joint Plan of Re-Organization
Page 12

---

Peter Jones

By: _____
Richard C. Wolfe, Esquire

LUKE RECORDS, INC.

By: _____
    Jonathan Miller, Esquire

LJWR0598

Exhibit A

**A.    Luther Campbell Assets to be delivered to Luther Campbell Liquidating Trustee:**

Minimum Amount

1.    Barnett Bank account 1464677253
2.    Money Market account - Great Western
3.    Securities America account
4.    Stock of Pensacola Gold Club, Inc.

**B.    Luke Records Assets to be delivered to Liquidating Trustee:**

| | | | Minimum Amount |
|---|---|---|---|
| 1. | Barnett Checking account (DIP) 1596254197 | | |
| 2. | FPL Deposits | | 4,280.00 |
| 3. | NationsBank account 03603554779 | | 50,000.00 |
| 4. | Capital Bank account 2020001233 | | 1,150.00 |

Causes of Action Prosecuted by the Liquidating Trustee:

| | |
|---|---|
| Action Distributions | Great Bay |
| Associated Distributions | Jerry Bassin One Stop |
| Indie: Big State | JFL |
| | |
| Malverne CRDI | Landmark |
| City Hall Records | M.S. Distributors |
| Debbie Benett | Music Distributors, Inc. |
| Frankie One Stop | Herman Moskowitz |
| Nic Manzini/Manzini & Stevens | |
| Atlantic Recording Corp. | |
| Thomasina Williams/Williams & Clyne | |

LJWR0599

## EXHIBIT "B"

Conditional Assignment of Accounts Receivable to Weinberger, pursuant to the terms of paragraph V.B.1.iii:

Action Distributors
Associated Distribution
Indie: Big State, Malverne, CRDI
City Hall Records
Debbie Bennett
Frankie One Stop
Great Bay
Jerry Bassin One Step
JFL
Landmark
Music Distributors

Joint Plan of Re-Organization
Page 1

RED Distribution, Inc.

By: _____
James P.S. Leshaw, Esquire

RCWA2507.00005.51976.08-0707/96

Signature Page 1

LJW R0601

Joint Plan of Re-Organization
Page 2

The Official Unsecured Creditors Committee
of Luke Records, Inc.

By: _____
Frank Terzo, Esquire

Signature Page 2

Luther Campbell

By: _____
    Jay Gamberg, Esquire
    Mark Cohen, Esquire

_____
Luther Campbell, Debtor and Debtor in Possession

Signature Page 3

Joint Plan of Re-Organization
Page 4

Luke Records, Inc., Debtor and Debtor in
Possession

By: _____
Luther Campbell, President

Signature Page 4

Joint Plan of Re-Organization
Page 5

Rockville Productions, Inc.

By: _____
Luther Campbell, President

#CW\3107 0000\31976 0#-020796

Signature Page 5

LJWR0605

Joint Plan of Re-Organization
Page 6

2 L.C., Inc.

By: _____
      Luther Campbell, President

LJWR0606

Joint Plan of Re-Organization
Page 5

Rockville Productions, Inc.

By: _____

Luther Campbell, President

LJWR0607

Joint Plan of Re-Organization
Page 6

2 L.C., Inc.

By: _____
Luther Campbell, President

Signature Page 6

Luke Mortgage, Inc.

By: _____
       Luther Campbell, President

Signature Page 7

Joint Plan of Re-Organization
Page 8

Luke Records Fan Club, Inc.

By: _____
        Luther Campbell, President

LJWR0610

Joint Plan of Re-Organization
Page 9

PAC Jam Publishing, Inc.

By: _____

Luther Campbell, President

Signature Page 9

Joint Plan of Re-Organization
Page 10

Luke Records, Inc.

By: _____
Luther Campbell, President

SWORN TO and subscribed before me this ____ day of _____, 1996, by LUTHER
CAMPBELL, who is personally known to me, or who has produced _____
as identification and who did take an oath.

My Commission Expires: _____

_____
Notary Public, State of Florida

Signature Page 10

Joe Weinberger and
Lil' Joe Records

By: ~~Joseph Weinberger~~ _(signature)_
Joseph Weinberger

    SWORN TO and subscribed before me this __4__ day of __February__ , 1996, by LUTHER CAMPBELL, who is personally known to me, or who has produced _personal known_ as identification and who did take an oath.

My Commission Expires:

_____
Notary Public, State of Florida

NOTARY PUBLIC, STATE OF FLORIDA
RICHARD C. WOLFE
COMMISSION NO. CC-282410
MY COMMISSION EXPIRES
JUN. 06, 1997

LJWR0613

Peter Jones

By: _____

Richard C. Wolfe, Esquire

LJWR0614

Join  lan of Re-Organization
Page 13

LUKE RECORDS, INC.

By: _____
Jonathan Winer, Esquire

LJWR0615

LAW OFFICES OF
# JAY M. GAMBERG, P.A.

BROWARD OFFICE
4651 SHERIDAN STREET, SUITE 300
HOLLYWOOD, FLORIDA 33021

BROW: (305) 963-8889
DADE: (305) 945-6332
FAX: (305) 966-6239

Member of New York Bar
Member of Florida Bar
Qualified in Bankruptcy under
the Florida Designation Plan

DADE OFFICE
9700 SOUTH DIXIE HIGHWAY, SUITE 1030
MIAMI, FLORIDA 33156

Of Counsel:
Jerome H. Shevin, P.A.

PLEASE RESPOND TO: BROWARD OFFICE

February 5, 1996

Richard C. Wolfe, Esq.
Bedzow Korn & Kan, P.A.
20803 Biscayne Boulevard
Suite 200
Aventura, FL  33180

     Re: <u>Luther Campbell</u>

Dear Richard:

    In reference to the Letter of Intent regarding the Joint Plan of Reorganization for Luther Campbell, I consider the document to be signed.  Mr. Campbell, at present is on an airplane to Florida and cannot be reached.  The additional signature pages which require Luther Campbell's signature will be signed upon his return tomorrow, Tuesday, February 6, 1996.

    I presently am in a deposition which will continue to about 3:30 p.m.

    If you need any additional information, please contact my assistant, Vicki Lanzillotta.

                Very truly yours,

                Jay Gamberg  V.L.

                Jay M. Gamberg
                (Dictated But Not Read)

JMG/vl
cc:  Mark Cohen, Esq.
     Jonathan Winer, Esq.
     campbell\wolfe).ltr

SIGNED FOR JAY M. GAMBERG
IN HIS ABSENCE TO PREVENT
DELAY IN MAILING.

LJWR0616

# LIl' Joe Records, Inc.

6157 NW 167th Street, 17
Miami, FL 33015
305-362-6500
Fax: 305-822-1112

February 3, 1996

Via Fax 212-554-0444

Matthew Greenberg, Esq.
Grubman, Indursky
152 West 57th Street
New York, NY 10019-3301

Dear Mr. Greenberg:

I am in receipt of a copy of your fax to Richard Wolfe (copy annexed for your reference). Upon review of the letter of intent, this point is covered in IA15 as Luther Campbell is obviously an Artist appearing on the Excluded Masters and therefore I would have no rights to future recording services or songs written by him. In the future, I would appreciate your copying my attorney on all future correspondance.

Sincerely,

Joseph Weinberger

cc: Jimmy Morales, Esq. Via fax 374-7296

Richard C. Wolfe, Esq. Via Fax 936-2795

Jay Gamberg, Esq. Via Fax 966-6259

LJWR0617

GRUBMAN INDURSKY SCHINDLER & GOLDSTEIN, P.C.

ATTORNEYS AT LAW

CARNEGIE HALL TOWER
152 WEST 57th STREET
NEW YORK, N.Y. 10019-3301
TELEPHONE (212) 554-0400
TELEFAX (212) 554-0444

WRITER'S DIRECT NUMBER
(212) 554-0416

By Facsimile
305 932 6043

February 2, 1996

Richard C. Wolfe, Esq.
Bedzow, Korn & Kan
20803 Biscayne Boulevard
Aventura, FL 33180

Re: Luther Campbell--Bankruptcy Reorganization Plan

Dear Richard:

In reviewing the most recent draft of the above-referenced plan which I received this afternoon, I noticed a point that needs clarification. That is, it should be clarified in paragraph I(A)(2) that "Joseph Weinberger is not acquiring any compositions which are not contained on the Masters Weinberger is acquiring (e.g. Weinberger is _not_ acquiring any interest in compositions written and recorded pursuant to the Island Records agreement)."

Please make sure this is clarified in the execution copies.

Sincerely yours,

Matthew Greenberg

MG/

cc: Luther Campbell (by fax)
Joseph Weinberger, Esq. (by fax)
Jay Gamberg, Esq. (by fax)
Paul D. Schindler, Esq.

LJWR0618

COLL DAVIDSON CARTER SMITH SALTER & BARKETT

PROFESSIONAL ASSOCIATION

ATTORNEYS AT LAW

PABLO A. ALVAREZ
JANIE L. ANDERSON
JOHN M. BARKETT
FRANCIS L. CARTER
NORMAN A. COLL
MICHAEL J. COMPAGNO
TED C. CRAIG
BARRY R. DAVIDSON
YALE J. FISHMAN
MICHAEL R. GOLDSTEIN
MICHAEL J. HIGER
CHRISTOPHER N. JOHNSON
JOHN J. MCNALLY
JIMMY L. MORALES
GARY M. MURPHREE
DARRELL W. PAYNE
VANCE E. SALTER
HARRIS C. SISKIND
RICHARD C. SMITH
SHERRY A. STANLEY
COURTNEY B. WILSON

3200 MIAMI CENTER
201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131-2312
(305) 373-8200

TELECOPIER (305) 374-7696

CHRIS M. MCALILEY
OF COUNSEL

February 6, 1996

Matthew Greenberg, Esq.
Grubman Indursky Schindler
   & Goldstein, P.C.
Carnegie Hall Tower
152 W. 57th Street
New York, New York  10019-3301

Re:  Luther Campbell--Bankruptcy Reorganization Plan

Dear Matt:

Yesterday we agreed, and the final version of the Letter of Intent will hopefully reflect, that paragraph I(A)(2) should read at the end thereof as follows:

Joseph Weinberger is not acquiring any compositions which are not contained on the Masters Weinberger is acquiring (e.g. Weinberger is not acquiring any interest in compositions written and recorded pursuant to the Island Records Agreement), provided, however, that Weinberger does not hereby waive or release any of his rights or claims with respect to any unauthorized sampling or publishing infringement regarding the Masters and compositions being acquired by him hereunder.

As such, the final Plan of Reorganization (and other relevant documents) should reflect the fact that the general release which Joe Weinberger is giving pursuant to paragraph I(U) of the Letter of Intent will specifically carve such infringement claims.

LJWR0619

Please contact me if you have any questions regarding the foregoing.

Very truly yours,

Jimmy L. Morales

cc:  Frank Terzo, Esq.
     Richard Wolfe, Esq.
     Joseph Weinberger, Esq.

109030

LJWR0620

Law Offices of

**MARK D. COHEN, P.A.**

Emerald Hills Executive Plaza II
4651 Sheridan Street, Ste. 300
Hollywood, FL 33021

Broward: (305) 962-8889                                Facsimile: (305) 966-6259

*February 2, 1996*                    <u>*Letter sent via facsimile*</u>
                                     <u>*and U.S. Mail*</u>

*Richard Wolfe, Esq.*
*Bedzow, Korn, Kan et al*
*20803 Biscayne Blvd., #200*
*Miami, FL 33180*

*RE:        Luther R. Campbell, Debtor / Case No. 95-12785-BKC-RAM*
*           Luke Records, Inc., Debtor / Case No. 95-11447-BKC-RAM*

*Dear Richard:*

*We are trying to get the fax copies with Luther's signature sent to
you directly. You are not authorized to release them or Jay
Gamberg's signature until we can speak early Monday morning or over
the weekend to straighten out a few of the typographical errors
that still exist.*

*Notably, page 17, paragraph 2 still has the name Phillip Calloway
instead of Paul Schindler and we cannot find the release from RED
to Luther at confirmation. Also on page 15 - Residual Assets, it
appears from the books of the company that only at least $87,338.00
appears to be due of record. We discussed this with Frank Terzo
who agreed to make that change.*

*We know time is of the essence and we will get back to you as soon
as possible.*

*Very truly yours,*

*MARK D. COHEN, P.A.*

*Mark D. Cohen, Esq.*

*MDC/jw*
*c:  Luther Campbell*
*    Matt Greenberg, Esq.*

LJWR0621

$200,000 of the purchase price, otherwise payable to Luke Records Bankruptcy Estate and the Luther Campbell Bankruptcy Estate by Weinberger, pursuant to paragraph 5_____ shall be deferred and such deferral allocated eighty percent (80%) to the payment due the Luke Records Bankruptcy Estate and twenty percent (20%) to the payment due to the Luther Campbell Bankruptcy Estate for a period of six (6) months, so that the sum of One Hundred and Ninety Thousand ($190,000) and Three Hundred and Ten Thousand Dollars ($310,000) shall be paid, respectively, to the Luke Records Bankruptcy Estate and the Luther Campbell Bankruptcy Estate upon an order confirming the plan.  The balance of One Hundred and Sixty Thousand ($160,000) and Forty Thousand ($40,000) to the respective estates shall be paid six (6) months thereafter.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
CHAPTER 11

IN RE:

LUKE RECORDS, INC.,

        Debtor,

CASE NO. 95-11447-BKC-RAM

LUTHER CAMPBELL,

        Debtor.

CASE NO. 95-12785-BKC-RAM

## DISCLOSURE STATEMENT

EXHIBIT "C"



# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.  95-11447-BKC-RAM
CHAPTER 11 PROCEEDING

IN RE:

LUKE RECORDS, INC.,

Debtor.

_____/

## EXAMINER'S REPORT AND RECOMMENDATIONS



LUKE RECORDS, INC.
CASE NO. 95-11447-BKC-RAM

EXAMINER'S REPORT AND RECOMMENDATIONS

TABLE OF CONTENTS

I.  SUMMARY OF FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  EXAMINER'S RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  PROCEDURAL BACKGROUND AND HISTORY OF THE DEBTOR . . . . . . 3
    A.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.  Nature and Background of the Debtor's Business . . . . . . . . . . . . . . . . . . 4
    C.  Events Leading Up to the Filing of the Involuntary Petition . . . . . . . . . . 5

IV.  RED DISTRIBUTION AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.  Distribution Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    B.  INDI/RED Transition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.  The RED Agreement and Status of Negotiations . . . . . . . . . . . . . . . . . 8
    D.  Negotiations with RED and Other Distributors . . . . . . . . . . . . . . . . . 9

V.  AVOIDANCE ACTIONS IN FAVOR OF THE DEBTOR . . . . . . . . . . . . . . . 9
    A.  Documents Reviewed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    B.  §547 Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    C.  §548 Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    D.  §549 Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.  ALL RECEIPTS WHICH WERE OR SHOULD HAVE BEEN RECEIVED BY
    THE DEBTOR WITHIN THE 90 DAYS PRIOR TO THE PETITION DATE
    AND THROUGH THE DATE OF THE EXAMINER'S REPORT . . . . . . . . . . . 12

VII.  §1104 TRUSTEE APPOINTMENT ANALYSIS . . . . . . . . . . . . . . . . . . . . 12
    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.  Fraud and Dishonesty Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    C.  Analysis of Debtor Management Competency . . . . . . . . . . . . . . . . . . 13
    D.  Debtor Professionals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    E.  Winer conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    F.  Finance, Contract Administration and Accounting . . . . . . . . . . . . . . . 14
    G.  Remedial measures Taken by the Debtor . . . . . . . . . . . . . . . . . . . . . 15
    H.  Creditors' Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VIII.  THE DEBTOR'S ABILITY TO REORGANIZE . . . . . . . . . . . . . . . . . . . . 17

LJWR0625

## EXHIBITS

| | |
|---|---|
| A | Order Delineating Duties of Examiner |
| B | Analysis of Revenues from RED Distribution Agreement for Period September 1994-May 1995 |
| C | Avoidance Analysis |
| D | Analysis of Monthly Payroll Account Disbursements, Barnett Bank Acct. #1596258303 |
| E | Related Parties |
| F | Analysis of Accounts Receivable |
| G | Analysis of Receipts & Disbursements for Period January 1995-June 1995 |
| H | Organizational Chart |
| I | Royalty Accounting Fundamentals |
| J | Effect of a Trustee Appointment on Estate Property |



UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 95-11447-BKC-RAM
CHAPTER 11 PROCEEDING

IN RE:

LUKE RECORDS, INC.,

       Debtor.

_____/

## EXAMINER'S REPORT AND RECOMMENDATIONS

Pursuant to the Order Delineating Duties of Examiner and
Setting Hearing on Examiner's Report, James S. Feltman, the duly
appointed examiner (the "Examiner") for Luke Records, Inc., the
Debtor and Debtor-in-Possession (the "Debtor"), respectfully
files his Examiner's Report and recommendations.

I.    SUMMARY OF FINDINGS

Except for the areas of finance, contract administration,
and accounting, current Debtor management is competent.  Luther
Campbell is clearly talented, an astute businessman, and a
valuable asset to the Debtor.

The vast majority of the Debtor's historical and current
financial problems relate to the Debtor's inability to
effectively handle the financial, contract administration, and
accounting aspects of its business.

Based on documents provided and reviewed by the Examiner,
there was no evidence of fraud or dishonesty by the Debtor's
current management during the recent pre- and post-petition
period of time.

Jonathan Winer's representation of both the Debtor and

Luther Campbell individually is a potential, if not an actual, conflict of interest.

The RED Distribution, Inc. ("RED") distribution agreement is a commercially viable distribution agreement and a significant business element to the Debtor's short-term financial viability. Negotiations are ongoing with RED, as well as other reputable distributors and record companies.

Although there may be significant avoidance actions exercisable by the Debtor, the nature, amount and frequency of the payments/transfers (other than certain unusual payments received by Joseph Weinberger) do not indicate any unusual patterns or circumstances. The Debtor appears to be collecting on its undisputed receivables.

While the Debtor is in the earliest stages of a Chapter 11 proceeding and quality information is scarce, it appears that the basic ingredients which generally facilitate to plan confirmation exist.

II. **EXAMINER'S RECOMMENDATIONS**

The Examiner does not recommend the appointment of a Chapter 11 Trustee if the following conditions are met:

1.    Luther Campbell agrees to execute an appropriate management contract with the Debtor, and

2.    the Debtor agrees to hire a financial officer who would have direct responsibility for financial, contract administration and accounting functions, and

3.    the Debtor promptly restarts or replaces the RED

2

Distribution, Inc. distribution agreement, and

4.   the Debtor agrees to file a plan of reorganization by October 13, 1995 or agrees to permit the termination of the exclusivity period within 120 days from the Order for Relief.

Alternatively, the Examiner recommends the appointment of a Chapter 11 Trustee, if

1.   Luther Campbell does not agree to execute an appropriate management contract with the Debtor, or

2.   the Debtor does not agree to hire a financial officer who would have direct responsibility for financial, contract administration, and accounting functions, or

3.   the Debtor does not promptly restart or replace the RED distribution agreement, or

4.   the Debtor does not generate sufficient revenue or cash flow to meet its non-professional post-petition debts.

**III. PROCEDURAL BACKGROUND AND HISTORY OF THE DEBTOR**

**A. Procedural background.**

On or around March 28, 1995, an involuntary petition was filed against the Debtor seeking an Order for Relief under Chapter 7 of the Bankruptcy Code.  On June 13, 1995, the Debtor filed its Notice of Conversion of the involuntary Chapter 7 case to a voluntary Chapter 11 case, and consented to the entry of an Order for Relief.

On June 16, 1995, in response to the Renewed Emergency Motion for Appointment of Interim Trustee, the Court entered an Order Directing Appointment of Chapter 11 Examiner.  On June 26,

3

LJWR0629

1995, the Court entered an Order Delineating Duties of Examiner and Setting Hearing on Examiner's Report (the "Order Appointing Examiner"). Hereto attached as Exhibit "A" is a true and correct copy of the Order Appointing Examiner.  Pursuant to the Order Appointing Examiner, the Examiner was directed to investigate:

a.   The distribution agreement between the Debtor and RED Distribution, Inc., and the Debtor's agreements or negotiations with other distributors;

b.   All avoidance actions in favor of the Debtor;

c.   All receipts which were or should have been received by the Debtor within the 90 days prior to the filing of the petition and through the date of the Examiner's Report;

d.   Whether this Court should direct the appointment of a Chapter 11 Trustee; and

e.   Whether the Debtor has a reasonable likelihood of confirming a plan of reorganization.

B.   **Nature and background of the Debtor's business.**

The Debtor is one of the largest independent record companies in the Southeast United States and may be best known for its involvement with 2 Live Crew, Luke, Poison Clan, Society, H-Town and Lorenzo.  The Debtor specializes in young, non-mainstream, "street" music and has had numerous gold and platinum records. Luther Campbell (Campbell) is the president, CEO, and 100 percent stockholder of the Debtor.  According to the Debtor's tax returns, the Debtor grossed in excess of $14 million in 1993.

C.   **Events leading up to the filing of the involuntary petition.**

4

LAW R0630

Three events led to the filing of the Debtor's involuntary bankruptcy petition by the movant creditors, ASR Recording Services of California, Nimbus Manufacturing, Inc., and LFL Music Productions, Inc.

First, payment disputes between the Debtor and Independent National Distributors, Inc. ("INDI"). INDI acted as the Debtor's exclusive distributor between the Fall of 1993 and the Fall of 1994 and has alleged that the Debtor owes it $822,000.[1]   The Debtor has alleged that INDI owes it in excess of $1 million for non-payment of net sales proceeds and possible improper "recoupments".  Debtor was unable to provide an accounting to support its position or refute INDI's allegations.  A review of INDI's documents indicate that it is warehousing approximately $611,000 in product inventory.  There appears to have been no communication between the two parties since October 1994.

Second, the Peter Jones ("Jones") judgment against the Debtor in an amount in excess of $1.5 million dollars and the Debtor's inability to "bond-out" for an appeal or make additional payments to Jones.  Currently, there is a dispute as to whether Jones is a secured or unsecured creditor of the Debtor's estate due to a Writ of Garnishment having been withdrawn and re-issued during the "gap" period.

Third, RED Distribution, Inc.'s (referred to as "RED") past and current "recoupments" against current ordinary course

---

[1] This amount consists of on-hand product inventory, valued by INDI at $611,00 and a credit balance of $211,000.

5

LJWR0631

payments due to the Debtor for non-RED product returns and the cessation of payments for product sales to the Debtor.

The Examiner found that all of these problems relate to the Debtor's historical and continued inability to effectively handle the financial, contract administration and accounting aspects of its business.

### IV.   RED DISTRIBUTION AGREEMENT

### A.   Distribution Generally

Distribution is the process in which the Debtor sells records to wholesale and retail record stores.  A national distribution network is a key factor to the Debtor's success.

The Examiner found that the Debtor has historically sought to improve it distribution network.  The Debtor began distributing product (product is the industry terms for compact discs, cassette tapes, and vinyl records) locally.  It then distributed through a number of regional distributors, then became associated with INDI, an "independent" distributor, and in 1994, initiated an exclusive distribution agreement with RED. RED is a subsidiary of Sony Music.

In the record industry, product is sold by the distributors to the record stores on an 100 percent return privilege. Thus, record stores can return and receive full credit on unsold product for an unlimited period of time.[2]  When product is returned, the distributor credits the record stores and then

---

[2]  Industry-wide, approximately 20 percent of all product is returned.

6

"recoups" against current ordinary course payments due to the record company. Returned product is generally refurbished by the distributor and then reintroduced into the market place. Due to the industry's 100 percent return policy and the distributor's practice to "recoup" against ordinary course payments, distributors generally keep a portion of the sales proceeds as a "reserve" for returns.

**B.   INDI / RED transition.**

In the Fall of 1994, the Debtor terminated its distribution agreement with INDI and initiated a distribution agreement with RED (the "RED Agreement"). At the time of INDI contract termination, there was an unknown population of INDI distributed product in the marketplace.

To date, neither INDI nor the Debtor are able to quantify the number of unsold INDI distributed product in the retail marketplace (i.e. record stores) as of the date of termination. This presented a problem for INDI and RED since the record stores would be returning a portion of the product and there was no mechanism to differentiate INDI product from RED product. Further, by industry convention, RED as the successor distributor, must accept and give credit for Debtor product returns even if the returned product was distributed/sold by INDI or other distributors.

Pursuant to an amendment to the RED Agreement dated November 23, 1994, RED agreed to accept INDI's returns and the Debtor agreed to allow RED to "recoup" against ordinary course payments

7

for INDI returns subject to certain terms and conditions.

C.    **The RED Agreement and status of negotiations.**

The Examiner investigated the RED distribution agreement and has found it to be a commercially viable distribution agreement and an attractive asset of the Debtor.  The Red Agreement creates a reliable source of income for the Debtor as well as giving the Debtor market credibility.

Unfortunately, disputes between the Debtor and RED as to how much money is owed to the Debtor, and rumors that the Debtor may be rejecting the Red Agreement have resulted in RED essentially cutting off the Debtor's income stream.

The Debtor has alleged that RED owes it  $1,018,072, however, it has been unable to provide an accounting to support its position.  RED alleges that as of May 1995, the Debtor had a balance of $1,018,071 due to RED.

RED's accounting indicates between September of 1994 and May of 1995, Debtor revenues (i.e. the gross proceeds from product sales Debtor less reserves, RED-returns, distribution fees and processing fees) were $4,456,188.   Payments and advances aggregated to $4,027,946.  During the same period of time, RED "recouped" $1,446,313 against ordinary course payments due the Debtor for non-RED product returns, thus, resulting in a balance owed to RED in the amount of $1,018,071.  Attached as Exhibit "B" is an analysis of Debtor revenues and recoupments by RED.

The Examiner found the RED Agreement to be a significant business element affecting the Debtor's short-term financial

8

viability.   Without a timely deal with RED (or another national distributor) and the continued production and distribution of new product, the Debtor will not realize an income stream from product sales.[3]

   D.   <u>Negotiations with RED and other distributors</u>.

   The Debtor has represented that it is currently negotiating with RED, as well as negotiating an alternative distribution agreement with Alliance, an "independent" national distributor and the successor to INDI.   The Debtor has also had preliminary discussions with an affiliate of Sony Music for a joint venture. Conversations with interested creditors and parties, including RED, have revealed that they are open to negotiations with the Debtor.

   V.   AVOIDANCE ACTIONS IN FAVOR OF THE DEBTOR

   A.   <u>Documents reviewed.</u>

   The Examiner reviewed bank statements and canceled checks from the following Debtor accounts:

   Barnett - operating account #1596177298

---

   [3]   Aside from negative balance/recoupment issue, RED has argued that it is a secured creditor of the Debtor pursuant to alleged security documents and UCC-1 filings against the Debtor's master recordings.   (Master recordings are the original tape recordings made in the studio.)   The Examiner has not reviewed the alleged security documents but has identified the assets under RED's control. Per documents provided by RED, the assets are as follows:   (i) a "reserve" against RED returns in the amount of $986,057 (as of May 1995), (ii) product warehoused by RED with a purported RED valuation of $945,730, and (iii) unpaid product at the record stores.   Additionally, there may be an issue under applicable bankruptcy law as to whether RED may continue to "recoup" or "set-off" against post-petition ordinary course payments due the Debtor.

LJWR0635

                          (March 1994 - January 1995)

     Barnett - operating account #1596258298
               (January 1995 - June 1995)

     Barnett - special account # 1596258808
               (April 1995 - June 1995)

     Barnett - payroll account (2LC, Inc.) # 1596258303
               (January 1995 - May 1995)

Although there may be significant avoidance actions exercisable by the Debtor pursuant to 11 U.S.C. §§ 547, 548 and 549, generally speaking, the nature, amount and frequency of the underlying payments/transfers (other than certain payments received by Weinberger) do not indicate any unusual patterns or circumstances. Attached as Exhibit "C" is a preliminary avoidance analysis. Attached as Exhibit "D" is an analysis of monthly payroll account disbursements.

B.   §547 Actions.

The Examiner reviewed the aforementioned Debtor accounts for payments made in excess of $2,999 within 90 days of the petition date. Without taking into account possible defenses to preference actions, the Examiner identified approximately $627,499 in payments made to creditors within the preference period.

C.   §548 Actions.

The Examiner reviewed the aforementioned Debtor accounts and the Debtor's available books and records for transfers made in excess of $2,999 within 90 days and one year of the involuntary petition date. Within one year of the petition date, the Debtor paid Weinberger (or Weinberger paid Weinberger out of Debtor

                               10

accounts) approximately $620,073.24. Further, the Examiner identified two journal entries reflecting management fees allegedly paid to Pac Jam Publishing, Inc. ("Pac Jam"), an entity wholly owned by Campbell. However, there are no canceled checks further evidencing the Pac Jam transactions. Based on the foregoing, it is reasonable to conclude that the checks to Pac Jam may not have been issued. The Examiner further found that the Debtor routinely deposited checks made out to Pac Jam into Debtor accounts and that the Debtor paid Pac Jam's expenses. The Debtor / Pac Jam relationship may warrant further inquiry.

Other than the described dealings with Weinberger and Pac Jam, the Examiner did not find unusual dealings between the Debtor and third parties, including any of the other entities owned or controlled by Campbell, during the recent pre- and post petition period.[4]  Attached as Exhibit "E" is an analysis of entities owned by Campbell individually.

D.    **§549 Actions.**

The Examiner reviewed the aforementioned Debtor accounts and the Debtor's available books and records for transfers in excess of $2,999 made on or after the petition date. The Examiner found payments/transfers in the aggregate amount of $434,642. Other than advances made to vendors directly by RED

---

[4]    Other entities owned 100 percent by Campbell include Effect Records, Inc.; Luke Development, Inc.; Luke, Inc., Luke Leasing, Inc., Luke Records, Inc., Luther Campbell Charitable Foundation, Inc., Pac-Jam Publishing, Inc.; Pensacola Gold Club, Inc., 2 Live Crew, Inc.; 2LC, Inc.; Luke Mortgage, Inc.; Luke Records Fan Club, Inc.; Rockville Productions, Inc.; and Luke Skywalker Records, Inc.

LJWR0637

during the "gap" period, the payments made during this period do not appear unusual or out of the ordinary.

**VI.   ALL RECEIPTS WHICH WERE OR SHOULD HAVE BEEN RECEIVED BY THE DEBTOR WITHIN THE 90 DAYS PRIOR TO THE PETITION DATE AND THROUGH THE DATE OF THE EXAMINERS REPORT**

The Examiner found that the Debtor's records for the time period from 90 days prior to the petition date through the date of the Examiner's report indicate that the Debtor is collecting undisputed receivables owed.  Attached as Exhibit "F" is a preliminary analysis of the Debtor's accounts receivable. Disputed receivables include receivables allegedly due from INDI and RED.  The Debtor's financial records are not sufficiently updated to reflect whether or not all domestic and foreign royalties (exclusive of INDI and RED) are being billed and collected.  To date, the Examiner has been unable to quantify the amount, if any, of such royalties.  Attached as Exhibit "G" is an analysis of receipts and disbursements.

**VII. §1104 TRUSTEE APPOINTMENT ANALYSIS**

**A.   Applicable law.**

Pursuant to 11 U.S.C. §1104(a), the Court may order the appointment of a Chapter 11 Trustee:

> (a) At any time after the commencement of the case but before confirmation of a plan on request of a party in interest, and after notice and a hearing,  . . . .

> (1)  For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after the commencement of the case . . . ; or

> (2)  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

12

**B.     Fraud and dishonesty analysis.**

The Examiner did not find evidence of fraud or dishonesty by
the Debtor's current management, during recent pre- or post-
petition time periods.[5]

**C.     Analysis of Debtor management competency.**

Except for the areas of finance, contract administration,
and accounting, current Debtor management is competent.

The Examiner found Campbell to be an astute, self-educated,
street-wise businessman, with tremendous talent in the areas of
artist and product development, as well as promotion.     Campbell
personally handles and/or directly supervises the A&R, sales,
marketing, promotion, product management, artist development, and
production aspects of the business.

The Debtor employs 17 people, inclusive of a field promoter,
production coordinator, national promotions director, general
manager, director of sales and marketing, marketing manager, and
bookkeeper.   Attached as Exhibit "H" is a chart of the Debtor's
key personnel and their respective areas of responsibility.   The
Examiner found the Examiner's staff to be competent and
cooperative.

Pre-December 1994, the Debtor utilized the accounting firm
of Gerstle, Rosen, Moscowitz & Assoc. ("Moscowitz") and in-house

---

[5]  In his analysis, the Examiner did not consider the findings
of fact contained in the "Findings of Fact and Conclusions of Law
and Final Judgment" dated October 28, 1994 from the Peter Jones v,
Luke Records, Inc. state court action (the "Final Judgment").   The
time periods referenced in the Final Judgment appear to related to
the late 1980's.

13

counsel, namely Weinberger, a C.P.A., J.D., to handle the financial and legal aspects of the business.  Moscowitz and Weinberger resigned or were terminated on or around December of 1994.   In support of allegations made by the Debtor of possible malfeasance or malpractice on the part of Weinberger, the Examiner found that (i) within one year of the petition date Weinberger received over $620,073.24 in payments from the Debtor, and (ii) the accounting records were in disarray. (See Exhibit "C", pp. 4-5, for a summary of disbursements to Weinberger.)

   **D.    Debtor professionals.**

   Between the Fall of 1994 and the Spring of 1995, the Debtor hired an accounting manager, Kim Jones; an outside accounting service, Rachlin Cohen & Holtz; an outside accounting firm specializing in royalty accounting; an entertainment advisor, Philip Calloway; and outside counsel including; Paul D. Schindler, Esq. (entertainment counsel);  Moraima Kelly, Esq. (entertainment counsel); and Jonathan Winer, Esq. (bankruptcy counsel).  The Examiner found the Debtor's professionals to be generally competent and cooperative.

   **E.    Winer conflict.**

   Competency issues aside, the Examiner believes that Winer's representation of both the Debtor and Campbell individually is a potential, if not an actual, conflict of interest.

   **F.    Finance, contract administration, and accounting.**

   The Debtor has historically proven itself to be ineffective, if not incompetent, in the areas of finance, contract

LJWR0640

administration, and accounting, particularly in the area of royalty accounting.

The Debtor has failed to produce any royalty statements to its artists under contract since mid-1993.  Attached as Exhibit "I" is a narrative describing how royalties are generally calculated as well as a hypothetical royalty calculation analysis.

The magnitude and effect of the Debtor's failure to produce royalty statements may not be a significant financial factor in Debtor's case, particularly since the Debtor routinely gave its artists under contract significant advances.  Substantial efforts will be required to compute any and all claims for unpaid royalties.

The Debtor's historical inability to produce royalty statements appears to have been a result of its inability to (i) create, maintain and/or utilize an accounting system that would track product sales and returns; (ii) to create, maintain and/or utilize an accounting system that would track royalties and payments due; and (iii) to institute sufficient controls that would enable the Debtor's upper management (i.e. Campbell) to evaluate the effectiveness of the professionals dedicated to the financial/accounting end of the business.

G.    **Remedial measures taken by the Debtor.**

Within the last 6 months, the Debtor appears to have taken substantial remedial measures to clean up the financial, contract administration, and accounting aspects of its business.  The

15

LJWR0641

Debtor hired, pre-petition, a number of highly qualified professionals to assist it, including a well regarded New York accounting firm specializing in royalty accounting.

The Examiner has been informed by Rachlin, Cohen & Holtz that the Debtor's 1994 books will be closed shortly and that the 1994 tax returns are being prepared.  The Examiner found the 1995 non-royalty, day-to-day accounting to be in relatively good shape.

However, even with these improvements, the Debtor still has a substantial weakness in the areas of finance, contract administration, and accounting, thus, the need for a qualified chief financial officer.

**H.   Creditors' interests.**

The Examiner found that the interests of the creditors would be best served through the retention of current Debtor management, namely Campbell, subject to the conditions outlined in the Examiner's recommendations.  The Examiner further found that the appointment of a Trustee is essentially a "cure" that is worse than the Debtor's malaise.  Specifically, the value of the Debtor as a going concern lies in its ability to identify and contract with new talent, produce and maintain a constant flow of new and successful product in the marketplace, promote its product, create and maintain relationships within the music industry, and maintain a relationship with a nationally recognized distributor or major label.  Campbell has these abilities.  Replacement of Campbell by a similarly qualified

16

LJWR0642

entrepreneur is unlikely.  Additionally, the Debtor has no funds to attract a Campbell replacement.  Further, artists, vendors and the distribution/retail market would likely not respond favorably to management changes without the requisite industry affiliation. Simply stated, Campbell is the business.  Attached as Exhibit "J" an analysis outlining the anticipated effect that a Trustee appointment would have on the assets of the Debtor estate.

**VII.    THE DEBTOR'S ABILITY TO REORGANIZE**

While the Debtor is in the earliest stages of a Chapter 11 proceeding and quality information is scarce, it appears that the basic ingredients that would lead to and support plan confirmation exist.  These elements include a (i) viable business capable of significant profits; (ii) competent management whose deficiencies can be overcome; (iii) a reasonable relationship between asset values and liabilities; (iv) a reasonable amount of communication with creditors; and (v) industry conditions which permit alternative financial and funding options.

Respectfully submitted this 13th day of July, 1995.

James S. Feltman, Examiner
for Luke Records, Inc.
One Biscayne Tower
Suite 2100
Miami, Florida 33131
Telephone: (305) 789-2492

By: _____
    James S. Feltman, EXAMINER

17

LJWR0643



RELATED PARTIES

LUTHER CAMPBELL

(100% ownership of).

Luther Campbell Charitable Foundation, Inc.

Luke Records, Inc. (Debtor)
Record Company

Rockville Productions, Inc.

The 2 Live Crew, Inc.
(owns trademark rights)

Effect Records, Inc.
(no longer in business)

Pac-Jam Publishing, Inc.
(owns Publishing Rights)

Pensacola Gold Club, Inc.
(owns Night Club)

Luke Development, Inc.

Luke Leasing, Inc.

Luke Records Fan Club, Inc.

2 LC, Inc.
(Shell Corporation - Payroll Account)

Luke Mortgage, Inc.
(owns several mortgages)

Luke, Inc.

LJWR0644

# EXHIBIT A



UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Case No.: 95-11447-BKC-RAM
Chapter 11

In re:

LUKE RECORDS, INC..

_____ Debtor./

ORDER DELINEATING DUTIES OF EXAMINER AND
SETTING HEARING ON EXAMINER'S REPORT

This matter having come before this Court on June 22, 1995, pursuant to this Court's Order Approving Selection of Examiner and Setting Further Hearing, and the Court having listened to the arguments of counsel and being otherwise duly apprised in the premises, it is

ORDERED that the examiner shall investigate the following:

(1)  the distribution agreement between the debtor and RED Distribution, Inc. and the debtor's agreements or negotiations with other distributors;

(2)  all avoidance actions in favor of the debtor;

(3)  all receipts which were or should have been received by the debtor within the 90 days prior to the filing of the petition and through the date of the examiner's report;

(4)  whether this Court should direct the appointment of a chapter 11 trustee; and

(5)  whether the debtor has a reasonable likelihood of confirming a plan of reorganization.

LJWR0646

**and it is further**

ORDERED that if the examiner intends to recommend to this Court that a chapter 11 trustee be appointed (1) the examiner shall (a) provide to the debtor written notice of such intent on or before July 12, 1995 and (b) make himself available for examination under oath on the afternoon of July 13, 1995 and (2) Luther Campbell shall make himself available for examination under oath on the afternoon of July 13, 1995, and it is further

ORDERED that on July 14, 1995, at 10:00 p.m. at the United States Bankruptcy Court, 51 Southwest First Avenue, Miami, Florida, Courtroom 1406, the examiner shall report to the Court on the matters described above and will consider whether to direct the appointment of a chapter 11 trustee.

DONE and ORDERED this ___26___ day of June, 1995.

ROBERT A. MARK

ROBERT A. MARK, Judge
United States Bankruptcy Court

xc:   Amber Donner
      Jonathan Winer (Mr. Winer is directed to mail a conformed
      copy of this Order to all parties in interest immediately
      upon receipt.)

LJWR0647

# EXHIBIT B



LUKE RECORDS, INC
EXAMINER'S PRELIMINARY ANALYSIS OF REVENUES FROM RED DISTRIBUTION AGREEMENT
FOR PERIOD SEPTEMBER 1994 - MAY 1995

| | Sept-94 (1) | Oct-94 | Nov-94 | Dec-94 | Jan-95 | Feb-95 | Mar-95 | Apr-95 | May-95 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Luke Records Inc Revenues from RED Plus | $ 32,195 | $566,526 | $1,806,431 | $ 288,790 | $ 275,755 | $ 227,674 | $ 282,467 | $ 516,975 | $ 459,375 | $ 4,456,188 |
| Reserves (15%) (2) | 7,106 | 125,021 | 398,675 | 64,122 | 61,943 | 51,300 | 62,863 | 113,994 | 101,033 | 986,057 |
| **Total Revenues** | $ 39,301 | $691,547 | $2,205,106 | $ 352,912 | $ 337,698 | $ 278,974 | $ 345,330 | $ 630,969 | $ 560,408 | $ 5,442,245 |
| **Deductions** | | | | | | | | | | |
| Initial Advance (3) | 1,200,000 | | | | | | | | | 2,000,00* |
| December 1994 | | | 228,480 | | | | | | | 228.48 |
| January 1995 | | | | | 613.348 | | | | | 613.348 |
| Addl Advance - Payment to Bedzow Koin, et al | | | | 375,000 | | | 25 000 | | | 425,000 |
| March Marketing Advance | | | | | | 25,000 | | | | 75,000 |
| Manufacturing Advance (4) | | | | | | 75,000 | | | | 21,467 |
| Co-Op Advertising (4) | | | | | | | | | | 198,757 |
| Letter of Direction Advances - Luke Records, Inc | | | | | | | | | 135,000 | 135,000 |
| -Caribbean Mfg | | | | | | | | | 50,000 | 50,000 |
| -Classic Concepts | | | | | | | | | 30,000 | 30,000 |
| -Precision Litho | | | | | | | | | 3,796 | 3,796 |
| -Delmoore Services | | | | | | | | | 12,900 | 12,900 |
| **Total Deductions** | $ 1,200,000 | $ 450,000 | $ 350,000 | $ 603,480 | $ 613,348 | $ 100,000 | $ 25,000 | $ - | $ 216,000 | $ 3,793,744 |
| **Total Deductions Before Non Red Returns** | $(1,160,699) | $241,547 | $1,855,106 | $(250,568) | $(275,650) | $ 178,974 | $ 320,330 | $ 630,969 | $ 345,408 | $ 1,648,497 |
| Recoupment for Non Red Returns | (1,037) | (11,747) | | (44,884) | (252,641) | (250,763) | (303,765) | (282,893) | (203,821) | (1,446,313) |
| **Total Deductions Before June Third-Party Payments** | $(1,161,736) | $229,800 | $1,810,222 | $(346,330) | $(628,291) | $ (71,789) | $ 16,565 | $ 348,076 | $ 141,587 | $ 202,184 |
| Deduction for Payments in June to Third Parties (5) | | | | | | | | | | (234.19 |
| **Net Revenues** | $(1,161,736) | $229,800 | $1,810,222 | $(346,330) | $(628,291) | $ (71,789) | $ 16,565 | $ 348,076 | $ 141,587 | $ (32,01 |
| **Ending Balance (Funds due Red from Debtor)** | | | | | | | | | | $(1,018,071) |

**Notes:**

(1) It should be noted that this analysis reflects sales made by only RED and does not include any sales made by Indi. In September 1994 there may have been sales by Indi for a portion of the month which have are not reflected in this analysis.

(2) Included in revenues generated by Debtor but withheld by contract by Distributor

(3) The $450,000 payment was received, I have not been able to confirm the month it was received.

(4) The manufacturing and co-op advertising advances have been included in the total column, the date is not clear.

(5) Payments were made to the following vendors on behalf of Luke Records, Inc in the total amount of $234,198.

-MVP Entertainment, Jeff McClusky & Assoc., Connie Johnson, Americ Disc, Inc.

Source: RED's Revised Statement of Owners Activity for Luke Records, Inc for the month ended May 31, 1995 including detailed supporting schedules for Non-RED Return Recoupment, and Summary of RED Letter of Direction Advances to Luke

# EXHIBIT C



Luke Reco ̄ Inc.
Examiner's Preliminary Avoidance Analysis

| Vendor | Paid Date | Check Number | Type of Service | Pre-Petition Section 547 | Post-Petition Section 549 | Section 548 |
|---|---|---|---|---|---|---|
| AGI Incorporated | 2/10/95 | 2064 | Production | $ 3,000.00 | $ - | $ |
| Ameri. Disc. Inc - Direct Payment | 2/14/95 | 2061 | Production | 11,500.00 | | |
| | 3/24/95 | 2226 | Production | | 8,000.00 | |
| | 4/10/95 | 2328 | Production | | 12,000.00 | |
| Ameri. Disc. Inc (Payment by Third Party-RED) | 6/14/95 | 204181 | Production | | 82,812.48 | |
| | | | | 11,500.00 | 102,812.48 | |
| AT&T | 3/2/95 | 2135 | Telecommunications | 10,000.00 | | |
| BIN | 2/15/95 | 2028 | Reports & Publications | 1,000.00 | | |
| | 3/17/95 | 2196 | Reports & Publications | 600.00 | | |
| | | | | 1,600.00 | | |
| BPI Communications- Direct Payment | 3/14/95 | 2029 | Reports & Publications | 4,500.00 | | |
| | 3/20/95 | 2197 | Reports & Publications | 3,000.00 | | |
| | | | | 7,500.00 | | |
| Broadcast Data Systems - Direct Payment | 2/14/95 | 2030 | Reports & Publications | 4,500.00 | | |
| | 2/23/95 | 2129 | Reports & Publications | 5,000.00 | | |
| | 3/17/95 | 2198 | Reports & Publications | 5,000.00 | | |
| | | | | 14,500.00 | | |
| Cable and Wireless, Inc - Direct Payment | 2/14/95 | 2024 | Telecommunications | 4,157.89 | | |

Page 1

LJWR0651

## Luke Records Inc.
### Examiner's Preliminary Avoidance Analysis

| Vendor | Paid Date | Check Number | Type of Service | Pre-Petition Section 547 | Post-Petition Section 549 | Section 548 |
|---|---|---|---|---|---|---|
| Caribbean Records Mfg - Direct Payment | 2/8/95 | 2003 | Production | $ 20,000.00 | $ | $ |
| | 3/8/95 | 2207 | Production | 10,000.00 | | |
| | 3/23/95 | 2218 | Production | | 10,000.00 | |
| | 4/3/95 | 2316 | Production | | 3,304.24 | |
| | 4/3/95 | 2317 | Production | | 5,000.00 | |
| | 4/11/95 | 2324 | Production | | 1,666.67 | |
| Caribbean Records Mfg - 3rd Party Payment | 4/11/95 | 2323 | Production | | 8,333.33 | |
| | 5/12/95 | 203506 | Production | | 50,000.00 | |
| | 6/7/95 | 203935 | Production | | 52,610.80 | |
| | 6/14/95 | 204136 | Production | | 37,180.04 | |
| | | | | 30,000.00 | 168,095.08 | |
| Cassette Productions - Direct Payment | 2/17/95 | 2072 | Production | 8,000.00 | | |
| Classic Concept Productions, Inc - Direct Payme | 2/7/95 | 2004 | Production | 10,000.00 | | |
| | 2/7/95 | 113 | Production | 30,000.00 | | |
| | 2/16/95 | 2128 | Production | 30,000.00 | | |
| | 2/28/95 | 2182 | Production | 30,000.00 | | |
| Classic Concept Productions - 3rd Party Payment | 3/19/95 | 203629 | Production | | 30,000.00 | |
| | | | | 100,000.00 | 30,000.00 | |
| Delmoore Services, Inc - Direct Payments | 2/8/95 | 110 | Printing | 12,000.00 | | |
| | 2/15/95 | 2103 | Printing | 12,000.00 | | |
| | 3/24/95 | 2222 | Printing | | 7,000.00 | |
| Delmoore Services, Inc - 3rd Party Payment | 4/12/95 | 2326 | Printing | | 5,000.00 | |
| | 5/25/95 | 203766 | Printing | | 2,400.00 | |
| | 5/25/95 | 203765 | Printing | | 6,000.00 | |
| | 5/25/95 | 203767 | Printing | | 4,500.00 | |
| | | | | 24,000.00 | 24,900.00 | |
| Jerry Bassin Distributors - Direct Payment | 2/14/95 | 2050 | Distributor | 2,500.00 | | |

Page 2

**Luke Reco Inc.**
**Examiner's Preliminary Avoidance Analysis**

| Vendor | Paid Date | Check Number | Type of Service | Pre-Petition Section 547 | Post-Petition Section 549 | Section 548 |
|---|---|---|---|---|---|---|
| Precision Litho - Direct Payments | 2/13/95 | 2075 | Printing | $ 10,000.00 | $ | $ |
| | 2/27/95 | 2136 | Printing | 5,000.00 | | |
| | 3/20/95 | 2192 | Printing | | 5,000.00 | |
| | 4/13/95 | 2325 | Printing | | 7,500.00 | |
| | 5/22/95 | 203676 | Printing | | 3,796.00 | |
| | 6/7/95 | 203938 | Printing | | 11,465.2? | |
| Precision Litho - 3rd Party Payments | | | | 15,000.00 | 27,761.2? | |
| Prime Hospitality Corp. - Direct Payment | 2/17/95 | 2083 | Expense Reimb. | 1,014.72 | | |
| Profit Freight Systems - Direct Payment | 2/14/95 | 2071 | Shipping | 5,000.00 | | |
| R & R, The Industry's Newspaper - Direct Paym | 2/16/95 | 2087 | Reports & Publications | 1,500.00 | | |
| | 3/28/95 | 2220 | Reports & Publications | | 1,860.00 | |
| | | | | 1,500.00 | 1,860.00 | |
| Vista Color Corporation - Direct Payment | 2/14/95 | 2099 | Printing | 4,057.00 | | |
| | 3/28/95 | 2289 | Printing | | 2,000.00 | |
| | | | | 4,057.00 | 2,000.00 | |
| MVP Entertainment - Direct Payment | | | | | | |
| MVP Entertainment - 3rd Party Payment | 6/7/95 | 203941 | | | 34,700.00 | |
| Jeff McClusky & Associates - Direct Payment | | | | | | |
| Jeff McClusky & Associates - 3rd Party Payment | 6/7/95 | 203940 | | | 12,500.00 | |

Page 3

LJWR0653

Luke Reco    Inc.
Examiner's Preliminary ...voidance Analysis

| Vendor | Paid Date | Check Number | Type of Service | Pre-Petition Section 547 | Post-Petition Section 549 | Section 548 |
|---|---|---|---|---|---|---|
| Connie Johnson - 3rd Party Payment | 6/9/95 | 204026 | | $ - | $ 2,930.00 | $ - |
| Joseph Weinberger - Direct Payment | 4/1/94 | 4907 | | | | 1,774.81 |
| | 4/11/94 | 4906 | | | | 1,778.21 |
| | 4/25/94 | 5060 | | | | 3,000.00 |
| | 4/25/94 | 5061 | | | | 3,000.00 |
| | 4/25/94 | 5062 | | | | 3,000.00 |
| | 4/25/94 | 5063 | | | | 3,000.00 |
| | 4/25/94 | 5064 | | | | 3,000.00 |
| | 4/25/94 | 5065 | | | | 3,000.00 |
| | 4/25/94 | 5066 | | | | 3,000.00 |
| | 4/25/94 | 5067 | | | | 3,000.00 |
| | 4/25/94 | 5068 | | | | 3,000.00 |
| | 4/25/94 | 5069 | | | | 3,000.00 |
| | 4/25/94 | 5070 | | | | 3,000.00 |
| | 4/25/94 | 5071 | | | | 3,000.00 |
| | 4/25/94 | 5072 | | | | 3,000.00 |
| | 4/25/94 | 5073 | | | | 3,000.00 |
| | 4/25/94 | 5074 | | | | 3,000.00 |
| | 4/25/94 | 5075 | | | | 3,000.00 |
| | 4/25/94 | 5076 | | | | 3,000.00 |
| | 4/25/94 | 5077 | | | | 3,000.00 |
| | 4/25/94 | 5177 | | | | 1,345.00 |
| | 4/25/94 | 5215 | | | | 3,000.00 |
| | 4/25/94 | 5216 | | | | 3,000.00 |
| | 5/23/94 | 5459 | | | | 3,000.00 |
| | 5/23/94 | 5460 | | | | 1,853.64 |
| | 6/1/94 | 5078 | | | | 3,000.00 |
| | 6/1/94 | 5079 | | | | 3,000.00 |
| | 6/1/94 | 5082 | | | | 3,000.00 |
| | 6/1/94 | 5083 | | | | 3,000.00 |
| | 6/1/94 | 5084 | | | | 3,000.00 |
| | 6/1/94 | 5085 | | | | 3,000.00 |
| | 6/1/94 | 5086 | | | | 3,000.00 |

Page 4

LJWR0654

## Luke Reco ̄ Inc.
### Examiner's Preliminary Avoidance Analysis



| Vendor | Paid Date | Check Number | Type of Service | Pre-Petition Section 547 | Post-Petition Section 549 | Section 548 |
|---|---|---|---|---|---|---|
| Joseph Weinberger - Direct Payment | 6/1/94 | 5087 | | $ | $ | $ 3,000.00 |
| | 6/1/94 | 5088 | | | | 3,000.00 |
| | 6/1/94 | 5089 | | | | 3,000.00 |
| | 6/1/94 | 5090 | | | | 3,000.00 |
| | 6/1/94 | 5091 | | | | 3,000.00 |
| | 7/1/94 | 5461 | | | | 3,000.00 |
| | 7/1/94 | 5462 | | | | 3,000.00 |
| | 7/1/94 | 5463 | | | | 3,000.00 |
| | 7/1/94 | 5464 | | | | 3,000.00 |
| | 7/1/94 | 5465 | | | | 3,000.00 |
| | 7/1/94 | 5466 | | | | 3,000.00 |
| | 7/1/94 | 5467 | | | | 3,000.00 |
| | 7/1/94 | 5468 | | | | 3,000.00 |
| | 7/1/94 | 5469 | | | | 3,000.00 |
| | 7/1/94 | 5470 | | | | 3,000.00 |
| | 7/1/94 | 5471 | | | | 3,000.00 |
| | 7/1/94 | 5472 | | | | 2,000.00 |
| | 7/5/94 | 5092 | | | | 3,000.00 |
| | 7/5/94 | 5093 | | | | 3,000.00 |
| | 7/5/94 | 5094 | | | | 3,000.00 |
| | 7/5/94 | 5095 | | | | 3,000.00 |
| | 7/5/94 | 5096 | | | | 3,000.00 |
| | 9/19/94 | 6089 | | | | 1,250.00 |
| | 9/19/94 | 6122 | | | | 308,415.84 |
| | 10/14/94 | 6271 | | | | 4,380.00 |
| | 10/14/94 | 6298 | | | | 5,900.00 |
| | 10/14/94 | 6312 | | | | 1,000.00 |
| | 10/19/94 | 6338 | | | | 13,205.00 |
| | 10/21/94 | 6354 | | | | 32,739.00 |
| | 10/21/94 | 6370 | | | | 2,811.74 |
| | 11/15/94 | 6481 | | | | 75,000.00 |
| | 11/23/94 | 6540 | | | | 9,620.00 |
| | 12/29/94 | 6576 | | | | 10,000.00 |
| | | | | | | 620,073.24 |

LJWR0655

## Luke Reco    Inc.
### Examiner's Preliminary Avoidance Analysis

| Vendor | Paid Date | Check Number | Type of Service | Pre-Petition Section 547 | Post-Petition Section 549 | Section 548 |
|---|---|---|---|---|---|---|
| Peter Jones (MC Shy D) - c/o Bedzow, Korn, et a | 4/21/95 | Cashier's Check | | $ - | $ 27,083.33 | $ - |
| Unidentified Payees | Various | Various | Unknown | 384,169.42 | - | 940,623.26 |
| Totals | | | | 384,169.42 | - | 940,623.26 |
| | | | | $ 627,499.03 | $ 434,642.11 | $ 1,560,696.50 |

Notes

(1) This preliminary analysis is based on review of bank statements and cancelled checks provided by the Debtor for the following accounts. Barnett Bank #1596258298 and #1596258808 for period January 1995 through June 1995, and for account # 1596172298 for period March 1994 through December 1994. These payments appear to be avoidance actions, the defenses have not been analyzed

(2) The date of the involuntary petition was March 18, 1995, the date of the notice of conversion was June 13, 1995.

Source: Bank statements and cancelled checks for bank accounts provided by Debtor.



LJWR0656

# EXHIBIT D



LJWR0657

2L— Inc.
## Examiner's Preliminary Analysis of
### Monthly Payroll Account Disbursements
#### Barnett Bank Account #1596258303

| | Jan-95 (2) | Feb-95 | Mar-95 | Apr-95 | May-95 | Totals |
|---|---|---|---|---|---|---|
| Payroll (1) | $ 87,946.21 | $ 48,066.19 | $ 52,997.62 | $ 32,009.04 | $ 44,249.14 | $ 265,268.20 |
| Taxes | - | 15,957.49 | 16,384.22 | 14,268.61 | 13,610.75 | 60,221.07 |
| Bank Charges | - | 85.50 | | 57.00 | 85.50 | 228.00 |
| Misc. Expenses | - | 1,082.71 | - | - | 19,710.00 | 20,792.71 |
| TOTALS: | $ 87,946.21 | $ 65,191.89 | $ 69,381.84 | $ 46,334.65 | $ 77,655.39 | $ 346,509.98 |

|  |  |
|---|---|
| Jan-95 | |
| Feb-95 | 38,180.00 |
| Mar-95 | 18,470.00 |
| Apr-95 | 18,470.00 |
| May-95 | 9,780.61 |
| | $ 84,900.61 |

Notes:
1) The payments made to Luther Campbell for payroll are as follows:

2) For the month of January 1995 there were two payroll accounts, Barnett Bank accounts #1596239333 and account #1596258303

Sources: Bank statements and cancelled checks provided by the Debtor.

LJWR0658

# EXHIBIT E





RELATED PARTIES

LUTHER CAMPBELL

(100% ownership of)

Luther Campbell Charitable Foundation, Inc.

Effect Records, Inc. (no longer in business)

Luke Leasing, Inc.

Luke, Inc.

The 2 Live Crew, Inc. (owns trademark rights)

Luke Development, Inc.

Luke Mortgage, Inc. (owns several mortgages)

Rockville Productions, Inc.

Pensacola Gold Club, Inc. (owns Night Club)

2 L.C., Inc. (Shell corporation - Payroll Account)

Luke Records, Inc. (Debtor) Record Company

Pac-Jam Publishing, Inc. (owns Publishing Rights)

Luke Records Fan Club, Inc.

LJWR0660

# EXHIBIT F



LJWR0661

Luke ...ords, Inc.

Examiner's Preliminary Analysis of

Accounts Receivable

| Customer Name | Balance as of 3/9/95 | Average Days Old | Services Rendered after 3/9/95 | Total Payments by Customer | Balance as of 6/30/95 |
|---|---|---|---|---|---|
| Action Distributors | $ 19,793.71 | 1,046 | $ | $ | $ 19,793.71 |
| Associated Distributors | 7,172.38 | 391 | | | 7,172.38 |
| Big Slate Distributing Corp. (1) | 365,805.71 | 277 | | | 365,805.71 |
| Carlos Oberoi | 2.00 | 197 | | | 2.00 |
| CRDI (1) | 353,479.12 | 319 | | | 6,179.12 |
| City Hall Records | 704.16 | 1,155 | | | 704.16 |
| Creative Music Emporium | 219.26 | 1,116 | | | 219.26 |
| Debbie Bennett (Employee) | 5,065.00 | 262 | | | 5,065.00 |
| Frankie One Stop | 4,585.86 | 1,015 | | | 4,585.86 |
| Great Day Distributors | 5,595.27 | 1,108 | | | 5,595.27 |
| Jerry Bassin One Stop | 83,363.70 | 518 | | | 83,363.70 |
| JFL Distributors | 6,717.85 | 481 | | | 6,717.85 |
| Landmark Distributors (Atlanta) | 116,807.71 | 967 | | | 116,807.71 |
| Landmark Distributors (New York) | 78,853.69 | 873 | | | 78,853.69 |
| MS Distributors | 69,620.22 | 845 | | | 69,620.22 |
| Malverne Distributors (1) | 646,517.28 | 288 | | | 646,517.28 |
| Music Distributors | 41,846.50 | 1,031 | | | 41,846.50 |
| Select O Hits | 7,690.05 | 528 | | | 7,690.05 |
| TOTALS | $ 1,813,839.47 (2) | N/A | $ | $ | $1,813,839.47 |

* N/A = Not Applicable

Notes:
1) Operating divisions of INDI
2) Exclusive of RED Distribution receivables

LJW R0662

# EXHIBIT G

LJWR0663

LUKE RECORDS, INC.
EXAMINER'S PRELIMINARY ANALYSIS OF
RECEIPTS & DISBURSEMENTS
FOR PERIOD JANUARY 1995-JUNE 1995

| | Jan-95 | Feb-95 | Mar-95 | Apr-95 | May-95 | Jun-95 | Total |
|---|---|---|---|---|---|---|---|
| **I. SOURCES/RECEIPTS** | | | | | | | |
| **OPERATING** | | | | | | | |
| RED Distribution | | | | | | | |
| Payments directly to Luke Records | 375,000.00 | 582,941.06 | | 75,000.00 | 135,000.00 | | 792,941.06 |
| Pmts to 3rd parties on behalf of Luke Re | | 25,000.00 | 25,000.00 | | 96,696.00 | 234,198.00 | 755,895.00 |
| Other Royalty Receipts | 12,985.53 | 7,650.00 | 22,848.00 | 41,863.11 | 2,021.96 | 11,578.11 | 125,947.25 |
| Total Operating Sources | $ 387,985.53 | $ 615,591.06 | $ 52,848.00 | $ 118,863.11 | $ 233,717.96 | $ 265,776.11 | $ 1,674,761.31 |
| **NON-OPERATING** | | | | | | | |
| Transfer from Existing Account - For Operati | 87,295.88 | | | | | | 87,295.88 |
| Transfer from Existing Account - For Payroll | 84,093.66 | | | | | | |
| Securities | | | | 28,693.00 | | | 28,693.00 |
| Loan from RED | | | | | | | |
| Loan from Profit Sharing Plan | | | 74,000.00 | | | | 74,000.00 |
| Loan from Luke Fan Club | | | 4,000.00 | | 700.00 | | 4,700.00 |
| Loan from Luke Mortgage | | | 10,000.00 | | 1,460.00 | 3,000.00 | 14,460.00 |
| Loan from Rockville | | | | | 1,400.00 | 500.00 | 1,900.00 |
| Misc | 200.00 | 234.76 | 1,435.23 | 766.00 | 415.87 | 5.00 | 3,056.86 |
| Interest | | 718.01 | 1,680.73 | 947.50 | 810.48 | | 4,156.72 |
| Unidentified | 1,835.50 | | | | | | 1,835.50 |
| Total Non-Operating Sources | $ 173,425.04 | $ 952.77 | $ 91,115.96 | $ 30,406.50 | $ 4,786.35 | $ 3,505.00 | $ 220,097.96 |
| Total Sources | $ 561,410.57 | $ 616,543.83 | $ 143,963.97 | $ 149,269.81 | $ 238,504.31 | $ 269,281.44 | $ 1,894,881.27 |
| **II. USES/DISBURSEMENTS** | | | | | | | |
| **OPERATING** | | | | | | | |
| Accounting Services | | 638.60 | | 1,111.50 | 10,093.33 | 11,869.39 | 23,512.82 |
| Advertising | | 5,792.02 | | | | 1,141.00 | 6,933.02 |
| Artist - Fees | 10,813.33 | 34,012.50 | 37,500.00 | | | | 82,345.83 |
| Artist - Expenses | 740.03 | 1,575.04 | 2,850.00 | | | | 5,165.07 |
| Auto Expenses | | 2,248.64 | 1,456.00 | | 834.63 | | 4,539.27 |
| Bank Charges | 15.00 | | | 171.00 | 174.53 | 173.82 | 574.35 |
| Telecommunications | | 14,835.51 | 15,231.98 | | | | 30,067.49 |

Page 1

LJWR0664

**LUKE RECORDS, INC.**
**EXAMINERS PRELIMINARY ANALYSIS OF**
**RECEIPTS & DISBURSEMENTS**
**FOR PERIOD JANUARY 1995-JUNE 1995**

| | Jan-95 | Feb-95 | Mar-95 | Apr-95 | May-95 | Jun-95 | Total |
|---|---|---|---|---|---|---|---|
| Computer System | | 6,000.00 | 4,000.00 | | | | 10,000.00 |
| Consulting Fees - Entertainment | | | | | | 12,500.00 | 12,500.00 |
| Independent Contractors | | 6,091.20 | 2,467.90 | 418.75 | 1,150.00 | | 10,127.85 |
| Distributor - Jerry Bassin | | 2,500.00 | | | | | 2,500.00 |
| Engineer | | 1,090.00 | 1,340.00 | | | | 2,430.00 |
| Expense Reimbursement | 1,810.22 | 4,153.82 | 1,128.35 | 450.00 | | | 7,532.39 |
| Graphic Design | | | 1,740.00 | | | | 1,740.00 |
| Industry Reporting & Publications | | 16,500.00 | 10,460.00 | | | | 26,960.00 |
| Insurance | | 1,469.60 | | 1,044.54 | | | 2,514.14 |
| Legal Fees | | 1,935.00 | 8,120.98 | | | 40,000.00 | 56,263.98 |
| Loan | | 5,353.66 | | | | | 5,353.66 |
| Misc | 4,370.63 | | | | | | 4,370.63 |
| Mortgage | | 4,647.00 | | | | | 4,647.00 |
| Office Expenses | | 1,755.10 | 1,500.77 | | 2,600.00 | 4,321.97 | 10,177.84 |
| Payroll/Payroll Taxes | 87,946.21 | 69,589.85 | 69,381.84 | 46,114.65 | 77,655.19 | (5,277.11) | 376,185.05 |
| Peter Jones - Bedzow, Kern, et al. | 375,000.00 | 32,716.48 | 52,087.83 | 27,087.33 | | | 486,891.64 |
| Postage & Courier | | 14,084.75 | 4,586.00 | 3,000.00 | | | 21,670.75 |
| Printing | | 44,540.00 | 14,379.75 | 12,500.00 | 16,996.00 | 11,165.22 | 99,580.97 |
| Production | | 171,659.03 | 29,477.00 | 42,404.24 | 80,000.00 | 172,601.12 | 496,143.59 |
| Promotions | | 14,642.35 | 14,110.00 | 36,507.25 | 1,700.00 | 50,130.00 | 117,089.60 |
| Public Relations | | 2,000.00 | | | | | 2,000.00 |
| Rent - Studio | 642.38 | 642.38 | 642.38 | | | 1,284.76 | 3,211.90 |
| Sales Tax/Withholding | 62.60 | 35.29 | 254.62 | | | | 352.51 |
| Shipping | | 9,657.77 | | | | | 9,657.77 |
| Storage | | 312.82 | | | | | 312.82 |
| Studio Equipment | | | 1,744.08 | | | | 1,744.08 |
| Tax | | 6,697.06 | 6,459.49 | 425.00 | | 868.53 | 14,450.08 |
| Utilities | | 4,837.72 | 1,700.92 | 2,291.21 | | 5,819.54 | 14,639.39 |
| | | | | | | | |
| **Total Operating Uses** | $ 481,410.40 | $ 482,013.19 | $ 282,909.89 | $ 173,745.47 | $ 196,904.76 | $ 337,161.78 | $ 1,954,145.49 |
| | | | | | | | |
| **Total Uses** | $ 481,410.40 | $ 482,013.19 | $ 282,909.89 | $ 173,745.47 | $ 196,904.76 | $ 337,161.78 | $ 1,954,145.49 |
| Beginning Balance as of 1/1/95 | $ (5,468.40) | | | | | | |
| **Net Cash Flow** | $ 74,531.77 | $ 209,062.41 | $ 70,116.49 | $ 45,640.83 | $ 87,240.38 | $ 19,360.04 | |

**Note:**

1) This payment to Bedzow, Kern & Kern on behalf of Luke Records, Inc. was a wire on 12/28/94.

Source: Bank statements and cancelled checks provided by Debtor

Page 2

# EXHIBIT H



LJWR0666



A&R
Luther Campbell

Sales
Luther Campbell
Sandy Jones

Promotion
Luther Campbell
Leon Jackson
Connie Johnson

Business
Affairs/Legal
Outside Counsel

THE PREZ
LUTHER CAMPBELL

Marketing
Luther Campbell
Sandy Jones
Tara Oxidine

International
Outside Counsel

Artist
Development
Luther Campbell

Finance
Kim Jones
(as of Jan. 1995)

Production
Luther Campbell
John Jenkins

Product
Management
Luther Campbell

**EXHIBIT I**



LJWR0668

## ROYALTY ACCOUNTING FUNDAMENTALS

Generally speaking, artists' royalties are a contractual percentage of the royalty base of records actually sold less contractual deductions, set-offs and reserves against returns. The royalty base is usually computed on the suggested retail list price less deductions for packaging. Packaging is generally computed at 25 percent for compact discs. Contractual deductions generally include costs associated with promotional charges, productions costs, and free goods. The net royalty due is set-off against any and all advances made by the record company. Further, because product is sold on a 100 percent return basis, record companies, such as the Debtor, keep a portion of the royalties that would otherwise be payable to the artist until it knows whether the sales to the record stores are final. This holdback is called a reserve against returns.

To illustrate at a simplistic level what a new artist may be owed by the record company for royalties under a basic recording agreement, a hypothetical royalty computation is in order.

Assuming, hypothetically, a record company signs a new artist wherein the record company agrees to pay the artist an 11 percent artist's royalty and gives the artist a $100,000 advance. Also assuming the recording agreement provides for (i) an estimated suggested retail price of $10.98 less packaging costs at 25 percent; (ii) deductions in the amount of $100,000 for recordings costs, 50 percent of the production costs at $50,000, 50 percent of the video costs at $50,000; (iii) a 15 percent free goods factor; and (iv) the hold-back of 20 percent of all royalty payments for reserves against returns. Let's further assume that the record company produced one album for the artist which sold 500,000 copies (a relatively big hit).

Attached is a pictorial of this hypothetical royalties model. Using this model, which is somewhat standard and simplistic in the industry, at the end of the day, the record company would only owe the artiest $4,750.[1]

---

[1]   Notably, this hypothetical royalty computation does not include mechanical royalties which may be due to the artist for a percentage of the publishing rights. In the Debtor's case, publishing rights were generally owned and maintained by an affiliate of the Debtor, PAC JAM, Inc.

# LUKE RECORDS, INC.
## HYPOTHERICAL ROYALTY COMPUTATION

| | | |
|---|---|---:|
| CD Suggested Retail Price | $ | 10.98 |
| Less Packaging at 25% | | (2.75) |
| Royalty Base | $ | 8.23 |
| | | |
| Royalty Rate 11% | $ | 0.91 |
| | | |
| Gross Royalty x 500,000 units | $ | 455,000.00 |
| Less 15% - Free Goods Factor | | (68,250.00) |
| | $ | 386,750.00 |
| | | |
| Less Recording Costs | $ | (100,000.00) |
| Less 50% of Production | | (50,000.00) |
| Less 50% of Video Costs | | (50,000.00) |
| | $ | 186,750.00 |
| | | |
| Holdback Against Reserves* | | (82,000.00) |
| | $ | 104,750.00 |
| | | |
| Set-Off Against Advance | $ | (100,000.00) |
| | | |
| Net Royalty Due | $ | 4,750.00 |

*The artist doesn't get his/her check all at once due to the holdback
against reserve of approximately 20%. This percentage is applied
to the gross royalties after the free goods reduction.

# EXHIBIT J



LUKE RECORDS, INC.
CASE NO. 95-447 BKC-RAM
EXAMINER'S PRELIMINARY ANALYSIS OF THE EFFECT OF
A TRUSTEE APPOINTMENT ON ESTATE PROPERTY

| DESCRIPTION OF ESTATE PROPERTY | DIP/ GOING CONCERN | STATUTORY TRUSTEE | COMMENTS |
|---|---|---|---|
| Luther Campbell Involvement -Entrepreneurship -Music Talent -Artist Relationships -Industry Connections -Vision/Management | Stable/increase value to debtor | Complete decrease in value | Luther Campbell to start new company if not with Debtor |
| Contract Rights and Artists Relationships | Retained value | Cost and Cure ($) Unknown Net decrease in value | Diminish rapidly; breach for lack of performance by debtor |
| Master Recordings | Retained value | Decrease in value | Shelf life declines without promotion; values decline without new product |
| Inventory - CD's, cassettes, and vinyl | Stable market value | Substantial decrease in value | Market risk to distributor - price adjustment Increased returns by retailers Rejection damages by distributor(s) |
| Tangible, Accounts Receivable, Bankruptcy and Litigation Claims | Stable value | Accounts Receivable decrease in value Bankruptcy and Litigation Claims - decrease value | A/R disputes; Need for Luther Campbell in claims disputes |

LJWR0672

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### CHAPTER 11

IN RE:

    LUKE RECORDS, INC.,

        Debtor,

    LUTHER CAMPBELL,

        Debtor.

CASE NO. 95-11447-BKC-RAM

CASE NO. 95-12785-BKC-RAM

## DISCLOSURE STATEMENT

### EXHIBIT "D"



LJWR0673

Form 1120S (1994)   LUKE RECC    INC.                                    59-2698013   Page 4

## Schedule L — Balance Sheets

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | 627,770. | | 22,084. |
| 2 a Trade notes and accounts receivable | | | | |
| Less allowance for bad debts | | | | |
| 3 Inventories | | 222,689. | | 1,349,375. |
| 4 U.S. Government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets STMT 12 | | 179,460. | | 119,397. |
| 7 Loans to shareholders | | | | |
| 8 Mortgage and real estate loans | | | | |
| 9 Other investments STMT 13 | | 173,515. | | 175,936. |
| 10 a Buildings and other depreciable assets | 2,056,800. | | 2,061,145. | |
| b Less accumulated depreciation | 682,108. | 1,374,692. | 824,061. | 1,237,084. |
| 11 a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 12 Land (net of any amortization) | | 47,680. | | 47,680. |
| 13 a Intangible assets (amortizable only) | 232,748. | | 232,748. | |
| b Less accumulated amortization | 226,839. | 5,909. | 232,748. | |
| 14 Other assets STMT 14 | | 43,350. | | 60,781. |
| 15 Total assets | | 2,675,065. | | 3,012,337. |
| Liabilities and Shareholders' Equity | | | | |
| 16 Accounts payable | | | | |
| 17 Mortgages, notes, bonds payable in less than 1 year | | 23,668. | | |
| 18 Other current liabilities STMT 15 | | 533. | | |
| 19 Loans from shareholders | | 68,633. | | 163,779. |
| 20 Mortgages, notes, bonds payable in 1 year or more | | 380,261. | | 609,321. |
| 21 Other liabilities STMT 16 | | | | 315,684. |
| 22 Capital stock | | 500. | | 500. |
| 23 Paid-in or capital surplus | | | | |
| Retained earnings STMT 18 | | 2,201,470. | | 1,923,053. |
| 25 Less cost of treasury stock | | ( ) | | ( ) |
| 26 Total liabilities and shareholders' equity | | 2,675,065. | | 3,012,337. |

## Schedule M-1 — Reconciliation of Income (Loss) per Books With Income (Loss) per Return (You are not required to complete this schedule if the total assets on line 15, column (d), of Schedule L are less than $25,000.)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | -278,417. | 5 Income recorded on books this year not included on Schedule K, lines 1 through 6 (itemize): | |
| 2 Income included on Schedule K, lines 1 through 6, not recorded on books this year (itemize): | | a Tax-exempt interest $ | |
| 3 Expenses recorded on books this year not included on Schedule K, lines 1 through 11a, 15e, and 16a (itemize): | | 6 Deductions included on Schedule K, lines 1 through 11a, 15e, and 16a, not charged against book income this year (itemize): | |
| a Depreciation $ | | a Depreciation $ | |
| b Travel and entertainment $ 13,806. | | | |
| STMT 17          70,585. | 84,391. | 7 Add lines 5 and 6 | |
| 4 Add lines 1 through 3 | -194,026. | 8 Income (loss) (Schedule K, line 23). Line 4 less line 7 | -194,026. |

IJVR0674

## Schedule M-2 — Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed

| | (a) Accumulated adjustments account | (b) Other adjustments account | (c) Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|
| 1 Balance at beginning of tax year | 2,201,470. | | |
| 2 Ordinary income from page 1, line 21 | | | |
| 3 Other additions STMT 10 | 43,888. | | |
| Loss from page 1, line 21 | 236,639. | | |
| 5 Other reductions STMT 11 | ( 85,666 ) | ( ) | |
| 6 Combine lines 1 through 5 | 1,923,053. | | |
| 7 Distributions other than dividend distributions | | | |
| 8 Balance at end of tax year. Subtract line 7 from line 6 | 1,923,053. | | |

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
CHAPTER 11

IN RE:

LUKE RECORDS, INC.,

     Debtor,

              CASE NO. 95-11447-BKC-RAM

LUTHER CAMPBELL,

     Debtor.

              CASE NO. 95-12785-BKC-RAM

## DISCLOSURE STATEMENT

EXHIBIT "E"



RED — Statement Of Owners Activity

| Month | Gross Billings | RED Returns | Net Sales | Reserves 15% | Net Sales After Reserves | Cumulative Net Sales After Reserves | Distribution Fee | Returns Processing Fees | Total Deductions | Total Due |
|---|---|---|---|---|---|---|---|---|---|---|
| September 1994 | 47,376 | | 47,376 | 7,106 | 40,270 | 40,270 | | 21 | 8,075 | |
| October 1994 | 833,472 | | 833,472 | 125,021 | 708,451 | 748,721 | 141,690 | 235 | 141,925 | 568,528 |
| November 1994 | 2,657,693 | | 2,657,693 | | | | | | 452,730 | 1,909,451 |
| December 1994 | 427,473 | | 427,478 | 64,122 | 363,356 | 3,371,238 | 72,671 | 1,895 | 74,567 | 228,790 |
| January 1995 | 412,563 | | 412,563 | 51,900 | | 3,712,248 | | 5,015 | 75,265 | 216,358 |
| February 1995 | 342,000 | | 342,000 | 51,300 | 290,700 | 4,012,948 | 58,001 | 5,015 | 63,028 | 227,674 |
| March 1995 | 418,063 | 1,843 | | | | 4,661,607 | | 6,075 | 73,461 | 241,199 |
| April 1995 | 774,968 | 8,361 | 766,607 | 114,991 | 651,616 | 5,019,223 | 123,807 | 5,858 | 129,785 | 521,851 |
| May 1995 | 887,641 | 13,839 | | | | | | 4,894 | 313,232 | 488,766 |
| June 1995 | 1,020,771 | 145,611 | 875,160 | 131,274 | 743,886 | 6,339,068 | 141,336 | 5,254 | 146,592 | 587,284 |
| July 1995 | 902,881 | | | | | 6,451,819 | | 3,111 | 146,116 | 181,699 |
| August 1995 | 158,327 | 90,381 | 66,947 | 9,882 | 56,055 | 6,607,900 | 10,650 | 4,302 | 14,953 | 41,102 |
| September 1995 | 64,801 | 75,390 | | | | 6,561,979 | | 2,639 | (1,430) | (618,459) |
| October 1995 | 15,483 | 91,407 | (75,924) | | (75,924) | 6,511,156 | (14,425) | 2,353 | (12,072) | (63,851) |
| November 1995 | 21,181 | 129,911 | (128,730) | | (128,730) | 6,402,425 | (20,159) | 3,167 | (17,552) | (91,928) |
| **Total** | 8,043,285 | 615,728 | 7,558,537 | 1,169,112 | 6,402,425 | | 1,256,451 | 50,231 | 1,306,682 | 5,086,734 |

| Returns Processing Fees - 2% | | | | |
|---|---|---|---|---|
| Month | Non - RED Returns | RED Returns | Total Returns | Returns Processing Fee - 2% |
| September 1994 | 1,037 | | 1,037 | 21 |
| October 1994 | 11,747 | | 11,747 | 235 |
| November 1994 | 44,884 | | 44,884 | 898 |
| December 1994 | 94,762 | | 94,762 | 1,895 |
| January 1995 | 252,641 | | 252,641 | 5,053 |
| February 1995 | 250,763 | | 250,763 | 5,015 |
| March 1995 | 301,922 | 1,843 | 303,785 | 6,075 |
| April 1995 | 289,539 | 8,361 | 297,900 | 5,958 |
| May 1995 | 204,375 | 13,839 | 218,214 | 4,364 |
| June 1995 | 117,089 | 145,611 | 262,700 | 5,254 |
| July 1995 | 90,573 | 68,987 | 155,580 | 3,11* |
| August 1995 | 124,732 | 90,381 | 215,113 | 4,302 |
| September 1995 | 61,567 | 75,390 | 126,958 | 2,539 |
| October 1995 | 26,263 | 91,407 | 117,669 | 2,353 |
| November 1995 | 27,928 | 129,911 | 157,839 | 3,167 |
| Total | 1,895,613 | 615,728 | 2,511,650 | 60,23* |

Payments To Luke:
| | |
|---|---|
| December 1994 Payment | (228,480) |
| January 1995 Payment | (613,348) |
| Sub - Total | (841,828) |

RED Distribution Advances:
| | |
|---|---|
| Initial Advance | (2,000,000) |
| Additional Advance - Lawsuit - Bedzow Korn & Kan | (425,000) |
| March marketing adv | (75,000) |
| Manufacturing Advance | (21,467) |
| Total Non-RED Returns | (1,695,823) |
| Letter Of Direction Advances | (471,554) |
| Co-op Advertising | (194,650) |
| Per Unit Advance | (23,838) |
| Sub - Total | (5,113,582) |

| | |
|---|---|
| Total Payments To Luke And Distribution Advances | (5,855,390) |
| Reserve Liquidation | 424,642 |
| RED Unrecouped Balance | (435,014) |

LJW R0676

# EXHIBIT "E"
## PRO FORMA
## FINANCIAL PROJECTIONS ACCOMPANYING
## JOINT PLAN OF LIQUIDATION

| Asset | Luke Records | Luther Campbell |
|---|---|---|
| Sale of Assets to Lil' Joe Records, Inc.:<br>upon Effective Date<br>within one year | 350,000<br>100,000 | 350,000 |
| Sale of H-Town soft assets to prospective purchasers upon Effective Date | 440,000 | 110,000 |
| Sale of H-town Assets (To Purchaser Other than Weinberger) | 80,000 | 20,000 |
| Settlement with Campbell:<br>upon execution<br>within one year | 100,000<br>100,000 | 100,000<br>200,000 |
| Other assets:<br>Claim vs. Atlantic*<br>Claim vs. INDI*<br>Claim vs. Professionals* | 100%<br><br>50% | 0%<br><br>50% |
| 2 Receivables (Atlantic Recording & M.S. Distributors | 120,000 | |
| Barnett Bank | 51,000 | |
| TOTAL ASSETS TO BE LIQUIDATED: | 1,341,000 | 780,000 |
| ANTICIPATED ADMINISTRATIVE FEES: | 180,000 | 180,000 |
| Unrecouped Balance (RED) | 250,000 | |
| Contributions to Pac-Jam'S ABC | 50,000 | 50,000 |
| Estimated Expenses of Liquidating Trustees | 50,000 | 50,000 |
| Estimated Distributions to Unsecured Creditors | 811,000 | 530,000 |
| *To be investigated by the Luke Records liquidating trustee and prosecuted or abandoned in the trustee's discretion.  Therefore, no value is assigned to these claims. | | |

Qualifying Note:
    The Proponents make no representation as to the accuracy of this Pro Forma Financial Projections accompanying this Joint Plan of Reorganization.  No reliance can be placed on: the limitation of administrative expenses set forth herein, the ultimate realized from the Liquidation of RED reserves, or validity of certain claims which are filed, objected and assumed (solely for purposes of this pro forma statement) not to be deemed approved.

[dkrlP:\WP\WP\1214\001\EXHIBIT14.PPT(2/16/96-10:50)

LJWR0678

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
CHAPTER 11

IN RE:

    LUKE RECORDS, INC.,

        Debtor.

    LUTHER CAMPBELL,

        Debtor.

CASE NO. 95-11447-BKC-RAM

CASE NO. 95-12785-BKC-RAM

## DISCLOSURE STATEMENT

### EXHIBIT "F"



LJWR0677

# EXHIBIT "G"

## DISCLOSURE STATEMENT

| | |
|---|---|
| **Luther Campbell Liquidating Trustee**<br><br>5 (See Note C), 11 (See Note B),<br>31, 32, 33, & 34 | **Luke Records Liquidating Trustee**<br><br>5 (See Note C), 8, 9, 10,<br>11 (See (Note B), 30 |
| **Estate of Luther Campbell**<br><br>$650,000<br><br>$20% of proceeds of H-Town sale | **Estate of Luke Records, Inc.**<br><br>$650,000<br><br>80% of proceeds of H-Town sale |
| **Joseph Weinberger/Lil' Joe Records**<br><br>1, 2, 3, 4, 5 (See Note C),<br>6 (See Note A), 7, 12, 13, & 14 | **Mr. Luther R. Campbell**<br><br>1 (See Note A), 6 (See Note A),<br>15, 16, 17, 18, 19, 20, 21, 22,<br>23, 24, 25, 26, 27, 28, 29, 35 & 36 |

Notes

A.   If Luther Campbell makes election by March 3, or otherwise extended by agreement, to purchase certain of his Masters, Verb, and Lorenzo, he must pay Joseph Weinberger $200,000 plus asset numbers 15, 16, and 17.

B.   To be split 50%/50% between the Estates of Luther Campbell and Luke Records.

C.   Accounts receivable to be prosecuted and proceeds divided 50%/50% between estates of L. Campbell and Luke Records; however, this asset is assigned to J. Weinberger in the event he buys H-Town Masters and assumes H-Town return record liability.

[d:\JP\WP\WP\1214\001\DISSTA54.FPT(2/29/96-11:12)]

**Key to Assets conveyed pursuant to the Joint Plan**
**(PLEASE SEE LETTER OF INTENT FOR FULL EXPLANATION)**

1.  Master Recordings
    a. Owner- Luke Records
    b. Scheduled Value- $500,000 (at liquidation)
    c. Notes- Following Masters may not be included
        i. M - Town Masters
        ii. Lorenzo, Verb, and L. Campbell Masters
        iii. Excluded Masters

2.  Copyrights/Publishing Interests
    a. Owner- Disputed: Luke Records/Pac-Jam Publishing, Inc.
    b. Scheduled Value- N/A
    c. Notes- Not included
        i. Excluded Masters

3.  Inventory of Records
    a. Owner- Luke Records
    b. Scheduled Value- $1,182,000 (on-hand), $945,000 (held by RED Distribution)
    c. Notes-
        i. Excluded Masters not included
        ii. Acting as collateral for secured creditors

4.  Judgments against P. Billingsly, J. Sears, and T. Butler
    a. Owner- Luke Records
    b. Scheduled Value- N/A
    c. Notes-

5.  Accounts Receivable
    a. Owner- Luke Records
    b. Scheduled Value- $1,813,000 (not including $931,000 reserve account w/RED)
    c. Notes- Majority of amount owed by IMDI, prior distributor, disputed
        i. RED Reserve Account- setoff by RED to reduce its claim against Luke Records
        ii. Various individual accounts receivable disputed and collectability in
doubt.

6.  Executory Artist Contracts
    a. Owner- Luke Records
    b. Scheduled Value- N/A
    c. Notes- Contract with Christopher Wong Won to be rejected; please see no.1

7.  RED Distribution Agreement
    a. Owner- Luke Records
    b. Scheduled Value- N/A
    c. Notes-

8.  Nationsbank A/C# 03603356779 (Profit Sharing Account)
    a. Owner- Disputed: Luke Records/Employees of Luke Records
    b. Scheduled Value- $50,000
    c. Notes- No profit sharing plan documents found

9.  Deposits at Florida Power & Light
    a. Owner- Luke Records
    b. Scheduled Value- $4,280
    c. Notes-

10. Capital Bank A/C# 2020001233
    a. Owner- Luke Records
    b. Scheduled Value- $1,150
    c. Notes- current value approximately zero

11. Claims against pre-petition professionals
    a. Owner- Luther R. Campbell/ Luke Records
    b. Scheduled Value- N/A
    c. Notes-

12. Merchandising rights and merchandise of Luke Records Fan Club, Inc.
    a. Owner- Luke Records Fan Club, Inc.
    b. Scheduled Value- $100,000
    c. Notes- not included
        i. Excluded Masters

13. Mortgages owned by Luke Mortgage, Inc.
    a. Owner- Luke Mortgage, Inc.
    b. Scheduled Value- N/A
    c. Notes- Stock of Luke Mortgage, Inc. scheduled at $242,000

14. "2 Live Crew" service mark
    a. Owner- Disputed: 2LC, Inc./Luke Records/L. Campbell/Chris Wong Won
    b. Scheduled Value- N/A
    c. Notes- 2LC, Inc.'s only asset; its stock not conveyed under Plan.

15. Miami Lakes Lot, 7190 Oakmont Drive, Miami Lakes
    a. Owner- Luther R. Campbell
    b. Scheduled Value- $110,000
    c. Notes-

16. Palm Beach Lot, Avacodo Boulevard
    a. Owner- Luther R. Campbell
    b. Scheduled Value- $9,200
    c. Notes-



17. Stock in Luke Development, Inc. and its assets
    a. Owner- Luther R. Campbell
    b. Scheduled Value- $100,000
    c. Notes-

18. Office Building located at 8400 N.E. 2nd Avenue
    a. Owner- Luke Records
    b. Scheduled Value- $500,000
    c. Notes- First mortgage of $157,000.  Scheduled value believed high and true
value to be approximately $300,000.

2

LJWR0681

19. Home of Stanley Campbell, 8225 Mentient Terrace
    a. Owner- Luther R. Campbell, joint tenant
    b. Scheduled Value- approximately $17,000
    c. Notes-

20. Stock in Scandalous, Inc. and its right to Island Records contract
    a. Owner- Luther R. Campbell
    b. Scheduled Value- none to estate
    c. Notes-

21. Personal Property of Luther R. Campbell
    a. Owner- Luther R. Campbell
    b. Scheduled Value- $38,000
    c. Notes- includes contents of homestead

22. Cars owned by Rockville Productions, Inc.
    a. Owner- Rockville
    b. Scheduled Value- N/A
    c. Notes- Stock of Rockville scheduled at $20,000

23. Recording Studio at 67 N.W. 2nd Avenue
    a. Owner- Luther R. Campbell
    b. Scheduled Value- none
    c. Notes- includes all furniture, fixtures, and equipment

24. All furniture, fixtures, and equipment owned by Luke Records
    a. Owner- Luke Records
    b. Scheduled Value- $12,500
    c. Notes-

25. 1990 Jaguar Automobile
    a. Owner- Luke Records
    b. Scheduled Value- $5,400
    c. Notes-

26. 1992 Chevrolet Van Automobile
    a. Owner- Luther R. Campbell
    b. Scheduled Value- $15,000
    c. Notes-

27. Stock of Luke Records Fan Club, Inc.
    a. Owner- Luther R. Campbell
    b. Scheduled Value- Unknown
    c. Notes-

28. Stock of Rockville Productions, Inc.
    a. Owner- Luther R. Campbell
    b. Scheduled Value- Unknown
    c. Notes-



3

# EXHIBIT 33

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                          CASE NO. 95-11447-BKC-RAM

LUKE RECORDS, INC.              CHAPTER 11

        Debtor.
_____/

<u>OBJECTIONS TO CLAIMS</u>

IMPORTANT NOTICE TO CREDITORS:
THIS IS AN OBJECTION TO YOUR CLAIM

THIS OBJECTION SEEKS EITHER TO DISALLOW, OR REDUCE THE AMOUNT OR CHANGE THE PRIORITY STATUS OF, THE CLAIM FILED BY YOU OR ON YOUR BEHALF.  PLEASE READ THIS OBJECTION CAREFULLY TO IDENTIFY WHICH CLAIM IS OBJECTED TO AND WHAT DISPOSITION OF YOUR CLAIM IS RECOMMENDED.

IF YOU DISAGREE WITH THE OBJECTION OR THE RECOMMENDED TREATMENT, YOU MUST FILE A WRITTEN RESPONSE WITHIN <u>23 DAYS</u> FROM THE DATE OF THIS OBJECTION, EXPLAINING WHY YOUR CLAIM SHOULD BE ALLOWED AS PRESENTLY FILED, AND YOU MUST MAIL A COPY TO THE UNDERSIGNED ATTORNEYS, OR YOUR CLAIM WILL BE DISPOSED OF IN ACCORDANCE WITH THE RECOMMENDATION IN THIS OBJECTION.  FURTHERMORE, IF YOU FILE A WRITTEN RESPONSE BEFORE THE DEADLINE, AND THE CONTESTED MATTER THAT RESULTS IS NOT RESOLVED PRIOR TO THE VOTING DEADLINE FOR THE DEBTOR'S PROPOSED PLAN OF REORGANIZATION, YOUR VOTE WILL NOT BE COUNTED TO DETERMINE CONFIRMATION OF THE DEBTOR'S PLAN.

ANY WRITTEN RESPONSE MUST CONTAIN THE CASE NAME, CASE NUMBER, AND MUST BE FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT:

    ☐  51 S.W. First Ave., Room 1517, Miami, FL 33130

Case No. 94-11447-BKC-RAM

Pursuant to F.R.B.P. 3007 and Local Rule 307, Luke Records, Inc., debtor and debtor-in-possession, and The Official Committee of Unsecured Creditors of Luke Records, Inc. object to the following claims filed in this case:

| Claim Nos. | Name of Claimant | Amount of Claim | Basis for Objection and Recommended Disposition |
|---|---|---|---|
| 2 | Gerstle Rosen | $25,162 | The amount of this claim is not commensurate with the benefit provided to the Debtor as a result of Claimant's services. Claim should be allowed in the amount of value provided to the Debtor as a result of Claimant's services. Claim should be allowed in such amount as the Court determines. |
| 3 | Music Express East | $31,364 | According to Debtor's books and records the claimed amount is not due, but the claim should be allowed in the amount of $26,021. |
| 4 | Watkins Motor Lines | $518 | Claim superseded by an amended claim. Claim should be disallowed and stricken. |
| 5 | Stearns Weaver et al | $6,834 | As to priority claim, Claimant required to file fee application in accordance with Code and Local Rules; failing same, claim should be disallowed and stricken. |
| 6 | Watkins Motor Lines | $2,267 | $1748 element of claim filed as priority with no basis stated. Priority element should be reclassified and Claimant granted an allowed general unsecured claim of $2,267. |

2

Case No. 94-11447-BKC-RAM

| 7 | George Brown, as Rep. | >$1,000,000 | Debtor is informed and believes that there is insurance coverage in effect regarding this unliquidated personal injury claim; hence, there is no claim against the estate. Claim should be disallowed and stricken. |
| 8 | Shellie Wilson, Jr. | >$1,000,000 | Debtor is informed and believes that there is insurance coverage in effect regarding this unliquidated personal injury claim; hence, there is no claim against the estate. Claim should be disallowed and stricken. |
| 9 | Manzini & Stevens, PA | $20,193 | The amount of this claim is not commensurate with the benefit provided to the Debtor as a result of Claimant's services. Claim should be allowed in the amount of value provided to the Debtor as a result of Claimant's services. Claim should be allowed in such amount as the Court determines. Additionally, the Debtor believes that some of the services were not rendered on behalf of the Debtor and hence, the claim is unenforceable under applicable law to that extent. |
| 10 | Gerstle Rosen et al | $25,163 | Claim is duplicative, and should be disallowed and stricken. |
| 12 | Black Entmt T.V. | $48,425 | According to Debtor's books and records the claimed amount is not due, but the claim should be allowed in the amount of $1,300. |
| 16 | Williams & Clyne, P.A. | $23,098 | The Debtor believes that some of the services were not rendered on behalf of the Debtor and hence, the claim is unenforceable under applicable law to that extent. Claim should be allowed in such amount as the Court determines. |

3

Case No. 94-11447-BKC-RAM

| 30 | Studio Studio | $2,000 | Claim filed as a priority claim and it is a general unsecured claim. Additionally, according to Debtor's books and records only $1,000 is due. Claim should be reclassified as a general unsecured claim and allowed in the amount of $1,000. |
|----|---------------|--------|---|
| 31 | Black Entmt T.V. | $40,000 | Claim is duplicative, and should be disallowed and stricken. |
| 36 | Society Productions | $9,150 | Claim unsigned and should be disallowed and stricken. |
| 37 | Society | $10,000 | Claim is duplicative and should be disallowed and stricken. |
| 46 | Wilshire Scott & Dyer | $15,743 | Claim is unenforceable under applicable nonbankruptcy law as being barred by the statute of limitations, and should be disallowed and stricken. |
| 48 | Williams & Assoc. P.A. | $105,069 | The Debtor believes that some of the services were not rendered on behalf of the Debtor and hence, the claim is unenforceable under applicable law to that extent. Claim should be allowed in such amount as the Court determines. |
| 49 | Pandisc Music Corp. | $13,000 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |
| 52 | Acuff-Rose Music, Inc. | unliq. | Claim resolved by compromise and settlement in Agreement subject to Court approval. In the event of Agreement approval, claim should be disallowed and stricken. |

4

Case No. 94-11447-BKC-RAM

| 53 | Markowitz, Davis et al | $18,600 | Claimant is required to file fee application in accordance with Code and Local Rules; failing same, claim should be disallowed and stricken. |
| 54 | Chuck Rush | $1,300 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |
| 55 | Acuff-Rose Music, Inc. | unliq | Claim is duplicative, and should be disallowed and stricken. |
| 58 | Nuclear Promotions | $40,000 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |
| 59 | Peter Jones | $1,422,760 | Claim filed as partially secured improperly and should be reclassified as general unsecured. Pursuant to Agreement, Claimant agreed to reduce claim, and it should be allowed in the amount of $900,000. |
| 63 | L. and W. Smith | $8,833 | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |
| 64 | Rick Smith | 2,500 | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |
| 65 | Lorenzo Smith | $16,667 | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |

5

Case No. 94-11447-BKC-RAM

| 66 | Chris Wong Won | $1,000,000 | According to the Debtor's books and records, and the calculations of the Debtor's accountant, the Claimant is due nothing, and the claim should be disallowed and stricken. |

| 67 | Mark Ross | $30,000 | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |

| 68 | 4 Sight Records | $50,000 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |

| 69 | Nimbus Manufacturing | $582,867 | Claim appears to include unmatured interest, which is unenforceable. According to Debtor's books and records the claimed amount is not due, but the claim should be allowed in the amount of $557,469. |

| 70 | Joseph Weinberger | $669,943 | Claimant has voluntarily agreed to waive this claim, so that this claim should be disallowed and stricken. |

| 71 | David Hobbs | 30,000 | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |

| 72 | Visonic Publishing | $50,000 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |

| 73 | Stepping Stone Prods. | $4,626 | According to Debtor's books and records the claimed amount is not due, but the claim should be allowed in the amount of $395. |

6

Case No. 94-11447-BKC-RAM

| 75 | H- Town Boys | unliq | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |
| 76 | H- Town Boys | unliq | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |
| 77 | Luther R. Campbell | $2,500,000 | Claimant has voluntarily agreed to waive this claim, so that this claim should be disallowed and stricken. |
| 78 | RED Distribution, Inc. | $5,192,024 | Claimant has voluntarily agreed to waive this claim, so that this claim should be disallowed and stricken. |
| 79 | Jeffrey Thompkins | unliq | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |
| 81 | Jerry Williams, Inc. | $100,000 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |
| 85 | H- Town Boys | $150,000 | Claim sought pursuant to executory contract. Pending Debtor's decision on assumption or rejection, claim should be disallowed and held in abeyance. |
| 86 | Stanley Cobbie | $1,950 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |
| 87 | Slackson Productions | unliq | According to the Debtor's books and records, this claim is not due. |

Case No. 94-11447-BKC-RAM

Insufficient documentation attached.
Claim should be disallowed and
stricken.

| 88 | Detrius L. Dawson | $3,000 | According to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |
|---|---|---|---|
| 89 | Pac-Jam Publishing | $1,500,000 | Claimant has voluntarily agreed to waive this claim, so that this claim should be disallowed and stricken. |
| 92 | Management Info Sols | $3,132.50 | Claim filed late, and should be disallowed and stricken. |
| 93 | Anthony Walker | $198,000 | Claim filed late.  Additionally, according to the Debtor's books and records, this claim is not due. Insufficient documentation attached. Claim should be disallowed and stricken. |

Case No. 94-11447-BKC-RAM

**WE HEREBY CERTIFY** that we are admitted to the Bar of the
United States District Court for the Southern District of Florida
and we are in compliance with the additional qualifications to
practice in this Court set forth in Local Rule 910(D)(1)(2).

**DATED** this ⟍⟋ day of February, 1996.

Respectfully submitted,
JONATHAN K. WINER, P.A.
Co-counsel to the Debtor
2200 Sun Bank Int'l Center
1 S.E. 3rd Avenue
Miami, Florida  33131
(305)377-1778

By:_____
Jonathan K. Winer
Florida Bar No. 909970

and

SEMET LICKSTEIN et al
Attorneys for the Committee
201 Alhambra Circle
Suite 1200
Coral Gables, FL  33134
(305)444-1400

By:_____
Frank P. Terzo

9

Case No. 94-11447-BKC-RAM

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing Objections to Claims was furnished via U.S. Mail to all the interested parties on the attached Service List this 12th day of February, 1996.

By: _____
Jonathan K. Winer

wpdocs\bankr\campluk\obclaims.mot

10

RED Distribution, Inc. —
James P.S. Leshaw
1221 Brickell venue
Miami, Florida 33131

Jeffrey J. Thompkins
1321 N.W. 198th Street
Miami, Florida 33169

Jerry Williams Inc. & Power Artist Musica
6433 Topanga Boulevard #142
Canoga Park, California 91303

Delano & Solmon Conner & Darryl Jackson
c/o Raymond C. Reed, Esquire
433 N. Camden Drive, #600
Beverly Hills, California 90210

Slackson Productions
1026 Sleepy Hollow Road
Terry, MS

Pac Jam Publishing
8400 N.E. 2nd Avenue
Miami, Florida 33138

Management Info. Solution
700 S.E. 3rd Avenue
Suite 300
Fort Lauderdale, Florida 33316

Statis In Da Muzik Publishing
Anthony Waliker
9 Clippef Court
4 Seaons
Newark, DE 19702

Luke Records, Inc.
President, Luther Campbell
8400 N.E. Second Avenue
North Miami, Florida 33138

Amber Donner, Esq.
Office of the U.S. Trustee
51 South West First Avenue
Federal Building Room 1204
Miami, Florida 33130

Frank P. Terzo, Esq.
Semet, Lickstein, et al.
201 Alhambra Circle, Suite 1200
Coral Gables, Florida 33134

Chad P. Pugatch, Esq.
Chad P. Pugatch, P.A.
6700 N. Andrews Ave., Su. 407
Ft. Lauderdale, FL 33309

Mark D. Cohen, Esq.
4651 Sheridan Street, Ste. 300
Hollywood, Florida 33021

Music Express East, Inc.
c/o Shantz, Schatzman, et al.
200 South Biscayne Blvd., Suite 1050
Miami, Florida 33131

Watkins Motor Lines, Inc.
P.O Box 95001
Lakeland, Florida 33804-5001

Stearns Weaver Miller Weissler Alhadeff
& Sitterson, P.A.
c/o Patricia A. Redmond, Esq.
150 West Flagler Street
Museum Tower, Suite 2200
Miami, Florida 33130

George Brown, as Per. Rep. of
Estate of Shelton Wilson
c/o Sonya L. Salkin, Esq.
Elser, Petrie & Salkin, P.A.
315 S.E. 7th Street, Suite 300
Fort Lauderdale, Florida 33301

Shellie Wilson, Jr.
Sonya L. Salkin, Esq.
Esler, Petrie & Salkin, P.A.
315 S.E. 7th Street, Suite 300
Fort Lauderdale, Florida 33301

Black Entertainment Television, inc.
Shapiro & Fishman
20803 Biscayne Boulevard, Suite 300
North Miami Beach, Florida 33180

Williams & Clyce, P.A.
450 N. Park Road
Suite 605
Hollywood, Florida 33021

Stuido, Studio
#325 Key Highway
Baltimore, Maryland 21230

Chuck Rush
7278 Hollywood Boulevard
#12A
Los Angeles, California 90046

Stepping Stone Productions
3583 W. Hillsboro Boulevard
Suite 108
Deerfiedl Beach, Florida 33442

Stanley Cobble
1161 Holmes Court
Austin, Texas 78702

Detrius L. Dawson
567 N.E. 60th Street
Miami, Florida 33137

Smart Colbert, Esquire
Paul Weiss et al.
1285 6th Avenue of the Americas
New York, New York 10019

Gerstle Rosen Moskowitz & Associates
c/o Kenney E. Zeilberg, Esq.
1500 Cypress Creek Road
#207
Fort Lauderdale, Florida 33309

Sterns Weaver Miller et al.
c/o Patricia Redmond, Esquire
150 West Flagler Street
#2200
Miami, Florida 33130

George Brown as Personal
Representative for the Estate of
Shelton Wilson, Esquirte
c/o Sonya L. Salkin, Esquire
315 S.E. 7th Street, #300
Fort Lauderdale, Florida 33301

Shellie Wilson, Jr.
c/o Sonya L. Salkin, Esquire
315 S.E. 7th Street, #300
Fort Lauderdale, Florida 33301

Manzini & Stevens, P.A.
c/o Nicholas A. Manzini, Esquire
44 West Flagler Street
#2050
Miami, Florida 33130

Gerstle Rosen Moskowitz & Assoc.
c/o Kenneth E. Zeilberg, Esquire
1500 West Cypress Creek Road
#207
Fort Lauderdale, Florida 33309

Black Entertainment TV
One BET Plaza
1900 West Place, N.E.
Washington, DC 20018

Society Productions
P.O. Box 2077
Miami, Florida 33138

Society
Marcus Effinger
P.O. Box 12077
Miami, Florida 33138

Montgomery McCracken
Walker Rhoads
Three Parkway
Attention: Moraima Kelly, Esquire
Philadelphia, PA 19102

Wilshire Scott & Dyer
4450 First City Tower
Houston, TX 77002

Williams & Associates, P.A.
2937 S.W. 27th Avenue
Suit e301
Coconut Grove, Florida 33133

Pandisc Music Corp.
c/o Neil J. Berman, Esquire
100 S.E. 2nd Street
35th Floor
Miami, Florida 33131-2130

Acuff-Rose Music, Inc.
Paul Weiss Rifkind Wharton & Garrison
Attention: Signey S. Rosdeitcher
1285 Avenue of the Americas
New York, New York 10019=6064

Markowitz Davis & Ringel, P.A.
Attention: Jerry M. Markowitz, Esq.
9130 South Dadeland Boulevard
Suite 1225
Miami, Florida 33156

. . .

Nuclear Promotions, Inc.
c/o Arthur Halsey Rice, Esq.
848 Brickell Avenue
#1100
Miami, Florida 33131

Peter Jones
c/o Paul L. Orshan, Esquire
Kluger Peretz et al.
201 S. Biscayne boulevard
#1970
Miami, Florida 33131

Wendell Rick Smith & Lorenzo Smith
c/o Marlow V. White, Esquire
P.O. Box 1050
Tallahassee, Florida 32302

Wendell Rick Smith
c/o Marlow . White, Esquire
P.O. Box 1050
Tallahassee, Florida 32302

Lorenzo Smith
c/o Marlow V. White, Esquire
P.O. Box 1050
Tallahassee, Florida 32302

Christopher Wong Won
c/o Douglas D. Stratton
407 Lincoln Road, #2B
Miami Beach, Florida 33139

Mark Ross
c/o Douglas D. Stratton, Esquire
407 Lincoln Road, #2B
Miami Beach, Florida 33139

4 Sight Records
c/o Visonic Studios
1862 N.W. 38th Avenue
Lauderhill, Florida 33311

Nimbus Manufacturing
P.O. Box 7427
Charlottesville, Virginia 22906-7427

Joseph Weinberger
c/o Francis L. Carter, Esquire
Coll Davidson Carter et al.
201 South Biscayne Boulevard
Miami, Florida 33131-2312

David Hobbs
c/o Douglas D. Stratton, Esquire
407 Lincoln Road
#2B
Miami Beach, Florida 33139

Visonic Publications
c/o Visonic Studios
1862 N.W. 38th Avenue
Lauderhill, Florida 33311

Delano & Solomon Conner & Darryl Jackson
c/o Raymond C. Roe, Esquire
433 N. Camedn Drive, #600
Beverly Hills, California 90210

Delano & Solmon Conner & Darryl Jackson
c/o Raymond C. Reed, Esquire
433 N. Camden Drive, #600
Beverly Hills, California 90210

Luther R. Campbell
8400 N.E. 2nd Avenue
Miami, Florida 3313*

# EXHIBIT 34



## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA

IN RE:

LUKE RECORDS, INC.,

         Debtor.

_____/

In Proceedings Under Chapter 11

Case No.:  95-11447-BKC-RAM

### DEBTOR-IN-POSSESSION'S MOTION PURSUANT TO 11 U.S.C. §365 TO DETERMINE ABILITY TO ASSUME AND ASSIGN EXECUTORY CONTRACTS; AND TO DETERMINE COSTS TO CURE DEFAULTS, IF ANY

COMES NOW the Debtor-in-Possession, LUKE RECORDS, INC., (hereinafter referred to as "Debtor") by and through its undersigned counsel, and pursuant to the applicable provisions of 11 U.S.C. §365 moves the Court to determine the Debtor's ability to assume and assign certain executory contracts and to determine costs to cure defaults, if any, and for cause alleges:

1.  Among the assets of the estate herein are certain executory contracts which the Debtor has with recording artists as more specifically described on the schedules attached hereto as Exhibits "A" and "B" and incorporated herein by reference. The Debtor also has an executory contract with Relativity Entertainment Distribution, Inc. (hereinafter referred to as "RED"), known as the RED Distribution Agreement. The Debtor will file a separate exhibit with the Court containing copies of the aforesaid contracts when available.  Copies of the actual contracts will not be attached to this Motion due to the voluminous nature of this exhibit.

2.  As announced in open Court on February 7, 1996, and set forth in the Court's Order Discharging Order to Show Cause and Setting Various Deadlines resulting from said hearing, there has

been an agreement reached on the material terms of an agreement which is to form the basis of a Plan of Reorganization in this case.

3.    Said Plan of Reorganization will give effect to the terms of a Letter of Intent re: Joint Plan of Reorganization of the Luke Records and Luther Campbell bankruptcy estates as proposed by the Official Unsecured Creditors Committee of Luke Records and Luther Campbell.

4.    A material provision of said agreement and Plan will be the assumption and ultimate assignment of the executory contracts described in Exhibits "A" and "B" hereto, as well as the Debtor's Distribution Agreement with RED.

5.    In order to assume and assign the aforesaid contracts, it is necessary that the cost of any cure of defaults be determined in accordance with the provision of 11 U.S.C. §365, as well as any other terms and conditions for the assumption and assignment of said contracts.

6.    Pursuant to paragraph 5 of the Court's Order Discharging Order to Show Cause and Setting Various Deadlines the Debtor was to file this Motion to Determine Costs to Cure and Ability to Assume on or before February 16, 1996, with a hearing to be conducted on March 18, 1996 at 10:00 a.m. to consider such motions.    In accordance with the Court's Order, the Notice of Hearing is served herewith.

7.    The assumption and assignment of the aforesaid contracts is a material component of the Agreement which forms the basis for

the forthcoming Plan of Reorganization herein.  The assumption and assignment of said contracts is in the best interests of the creditors and the estate.  It is therefore respectfully prayed that the Court will consider the terms and cost of cure for the assumption pursuant to 11 U.S.C. §365 and assignment of each of the aforesaid contracts referred to in Exhibits "A" and "B" hereto, as well as the RED Distribution Agreement.

8.    The contracts referred to in Exhibit "A" hereto are to be assigned to Joseph Weinberger/Lil' Joe Records, Inc. (hereinafter referred to as "Weinberger), pursuant to the aforesaid letter of intent.

9.    The contracts referred to in Exhibit "B" are assets of the estate which are also to be sold and assigned pursuant to the forthcoming Plan of Reorganization.

10.   Pursuant to the records maintained by the Debtor, a summary of the accounting breakdown and estimate of costs to cure the aforesaid contracts, if any, is attached hereto as Composite Exhibit "C".  Said breakdown is provided on an artist by artist basis.  As is reflected on said accounting breakdown, due to unrecouped balances, most of these artists are due no money from the Debtor's estate.  Any artists due money may be compensated out of the proceeds received for the assignment of these contracts.  Full copies of the accounting breakdown will be provided to each artist upon request.

WHEREFORE, it is respectfully prayed that the Court will enter an Order:

3

a.   Determining the Debtor's ability to assume and assign the aforesaid executory contracts;

b.   Determining the costs to cure as to each of such contracts, if any; and

c.   Granting such further relief as may be just and proper under the circumstances.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 910(D)(1) and (2).

I FURTHER HEREBY CERTIFY that a true copy of the foregoing has been furnished via U.S. Mail, this 16th day of February, 1996, to all parties on the attached service list.

                    CHAD P. PUGATCH, P. A.
                    Cypress Park West, Suite 407
                    6700 North Andrews Avenue
                    Fort Lauderdale, Florida   33309
                    Telephone:  (305) 776-2055 Broward
                    Attorneys for Debtor

By: _____
                    Chad P. Pugatch, Esquire
                    Florida Bar No. 220582

4

## EXHIBIT A

The Debtor's Exclusive Recording Agreement with:

POISON CLAN
BUST DOWN
U-MYND
PROFESSOR GRIFF
HOME TEAM
JIGGY GEE
LIKKLE WICKED
JUNIOR DEMUS
INDO G & LIL' BLUNT

## EXHIBIT B

The Debtor's Exclusive Recording Agreement with:

**H - TOWN**
**CLAYVOISE**
**LORENZO**
**VERB**
**TRELLINI DAVIS**
**SOCIETY**
**DISCO RICK**
**ANQUETTE**

LJWR0236

PADELL.NADELL.FINE        TEL:( )-307-6935        Feb 12'9°   12:30 No.017 P.02

FROM:   LUKE RECORDS, INC.

TO:     POISON CLAN

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE

------------------------------------------------------------------

ROYALTIES DUE                                    $146,674.69
(SCHEDULE ATTACHED)                              --------------


LESS: CHARGEABLE EXPENSES:
        (SCHEDULES ATTACHED)

        HOTELS                                    $3,299.96
        PROMOTION/MARKETING                        37,205.09
        RECORDING COSTS                           132,438.38
        TOUR COSTS                                  7,991.91
        TRAVEL COSTS                               16,974.80
        VIDEO COSTS                                70,487.60
        MISCELLANEOUS COSTS                         8,585.50
                                                 --------------
        TOTAL CHARGEABLE COSTS                   $276,983.24
                                                 --------------
        UNRECOUPED BALANCE BEFORE ADVANCES       ($130,308.55)

LESS: ADVANCES - SCHEDULE ATTACHED               (  27,449.00)
                                                 --------------
UNRECOUPED BALANCE                               ($157,757.55)
                                                 --------------

*Poison Clan* (handwritten)

*Composite* **EXHIBIT** __"C"__ (handwritten)

LJWR0237

FROM:   LUKE RECORDS, INC.

TO:     POISON CLAN

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE

---------------------------------------------------------------

ROYALTIES DUE                                  $146,674.69
(SCHEDULE ATTACHED)                            --------------

LESS: CHARGEABLE EXPENSES:
      (SCHEDULES ATTACHED)

          HOTELS                                $3,299.96
          PROMOTION/MARKETING                   37,205.09
          RECORDING COSTS                      132,438.38
          TOUR COSTS                             7,991.91
          TRAVEL COSTS                          16,974.80
          VIDEO COSTS                           70,487.60
          MISCELLANEOUS COSTS                    8,585.50
                                               --------------
          TOTAL CHARGEABLE COSTS              $276,983.24
                                               --------------
          UNRECOUPED BALANCE BEFORE ADVANCES  ($130,308.55)

LESS: ADVANCES - SCHEDULE ATTACHED            (  27,449.00)
                                               --------------
UNRECOUPED BALANCE                            ($157,757.55)
                                               --------------

*Poison Clan* (handwritten)

Composite **EXHIBIT** "C"

LJWR0239

PADELL,NADELL,FINE        TEL:?`?-307-6935        Feb 12`~    12:45 No.018 P.02

FROM:    LUKE RECORDS INC.

TO:      BUSTDOWN

ARTIST ROYALTIES

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

| PRE-FIX | SELECTIONTITLE | ROYAL. UNITS | ROYAL. BASE | ROYALTY PERCENT. | ROYALTY RATE | ARTIST ROYALTIES |
|---------|----------------|-------------|-------------|------------------|--------------|------------------|
|         | E3005-2  NASTY BITCH       | 1,354 | 11.984 | 8.0000% | .95872 | $1,298.15 |
|         | E3005-4  NASTY BITCH CHAP I | 6,625 | 7.984 | 8.0000% | .63872 | 4,231.54 |
|         | 3005-4   BUST DOWN          | 23    | 7.984 | 8.0000% | .63872 | 14.66 |
|         | CE716    PUT YOUR BALLYS ON | -28   | 3.141 | 8.0000% | .25128 | (7.14) |
|         | CE717    PUT YOUR BALLYS ON | -520  | 3.141 | 8.0000% | .25128 | (130.60) |
| LKK     | 68124    NASTY BITCH CHAPTE | 664   | 11.984 | 8.0000% | .95872 | 636.61 |
| LKT     | 68124    NASTY BITCH CHAPTE | 1,271 | 7.984 | 8.0000% | .63872 | 811.60 |

$6,854.82

Bustdown

LJWR0238

PADELL,NADELL,FINE          TEL:212-307-6955          Feb 12'96    12:45 No.018 P.02

FROM:    LUKE RECORDS INC.

TO:      BUSTDOWN

ARTIST ROYALTIES

PERIOD:   JANUARY 1, 1993 TO JUNE 30, 1995

| PRE-FIX | SELECTION | TITLE | ROYAL. UNITS | ROYAL. BASE | ROYALTY PERCENT. | ROYALTY RATE | ARTIST ROYALTIES |
|---------|-----------|-------|-------------|-------------|------------------|--------------|------------------|
|         | E3005-2   | NASTY BITCH | 1,354 | 11.984 | 8.0000% | .95872 | $1,298.15 |
|         | E3005-4   | NASTY BITCH CHAP I | 6,625 | 7.984 | 8.0000% | .63872 | 4,231.54 |
|         | 3005-4    | BUST DOWN | 23 | 7.984 | 8.0000% | .63872 | 14.66 |
|         | CE716     | PUT YOUR BALLYS ON | -28 | 3.141 | 8.0000% | .25128 | (7.14) |
|         | CE717     | PUT YOUR BALLYS ON | -520 | 3.141 | 8.0000% | .25128 | (130.60) |
| LKK | 68124 | NASTY BITCH CHAPTE | 664 | 11.984 | 8.0000% | .95872 | 636.61 |
| LKT | 68124 | NASTY BITCH CHAPTE | 1,271 | 7.984 | 8.0000% | .63872 | 811.60 |

                                                                        $6,854.82
                                                                        ==========

*Bustdown*

PADELL.NADELL.FINE        TEL( 2-307-6935            Feb 12 '96   10:32 No.002 P.02

FROM:    LUKE RECORDS, INC.

TO:      UMYND

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
------------------------------------------------------------------------

ROYALTIES DUE                                        $22,126.73
(SCHEDULE ATTACHED)                                 --------------

LESS: CHARGEABLE EXPENSES:
        (SCHEDULES ATTACHED)

        HOTELS                                       $17,681.84
        PROMOTION/MARKETING                           42,393.24
        RECORDING COSTS                              141,725.74
        TOUR COSTS                                     3,462.65
        TRAVEL COSTS                                  70,625.28
        VIDEO COSTS                                   33,000.00
        MISCELLANEOUS COSTS                               89.00
                                                    ------------
        TOTAL CHARGEABLE COSTS                      $308,977.75
                                                    ------------
        UNRECOUPED BALANCE BEFORE ADVANCES         ($286,851.02)

LESS: ADVANCES - SCHEDULE ATTACHED                 (  64,971.00)
                                                    ------------
UNRECOUPED BALANCE                                 ($351,822.02)
                                                    ------------

U Mynd

LJWR0241

PADELL.NADELL.FINE        TEL:2~~-5U~-6955            ~~~ ~~ ~~~ ~~~~~ ~~~~~ ~~~~

**FROM:**   LUKE RECORDS, INC.

**TO:**     HOMETEAM

**PERIOD:**  JANUARY 1, 1993 TO JUNE 30, 1995

**SUMMARY OF ARTIST ROYALTIES DUE**

---------------------------------------------------------------------

| | |
|---|---:|
| ROYALTIES DUE | $80,177.91 |
| (SCHEDULE ATTACHED) | -------------- |
| | |
| LESS: CHARGEABLE EXPENSES: | |
| (SCHEDULES ATTACHED) | |
| | |
| HOTELS | $7,301.56 |
| PROMOTION/MARKETING | 13,759.43 |
| RECORDING COSTS | 71,733.50 |
| TOUR COSTS | 421.50 |
| TRAVEL COSTS | 10,977.00 |
| MISCELLANEOUS COSTS | 1,202.08 |
| | ------------ |
| TOTAL CHARGEABLE COSTS | $105,395.07 |
| | ------------ |
| UNRECOUPED BALANCE BEFORE ADVANCES | ($25,217.16) |
| | |
| LESS: ADVANCES - SCHEDULE ATTACHED | ( 15,803.08) |
| | ------------ |
| UNRECOUPED BALANCE | ($41,020.24) |
| | ------------ |

*Hometeam*

LJWR0242

ADELL,NADELL,FINE        TEL:2~~-~~~-~~~~        Feb 12 98   10:58 No.005 P.02

```
FROM:    LUKE RECORDS, INC.

 O:      LIKKLE WICKED

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
----------------------------------------------------------

ROYALTIES DUE                          $6,386.30
(SCHEDULE ATTACHED)                    -------------


LESS: CHARGEABLE EXPENSES:
         (SCHEDULES ATTACHED)

         HOTELS                          $112.50
         PROMOTION/MARKETING              450.00
         RECORDING COSTS               10,852.55
         TRAVEL COSTS                   8,436.27
         MISCELLANEOUS COSTS             295.00
                                      -------------
         TOTAL CHARGEABLE COSTS       $20,146.32
                                      -------------
         UNRECOUPED BALANCE          ($13,760.02)
                                      -------------
```

LIKKLE
Wicked

LJWR0243

NADELL.NADELL.FINE        TEL:2          -307-6955

FROM:     LUKE RECORDS, INC.

TO:       JR. DEMUS

PERIOD:   JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROYALTIES DUE                              $4,423.33
(SCHEDULE ATTACHED)                        - - - - - - - - - - - - -


LESS: CHARGEABLE EXPENSES:
          (SCHEDULES ATTACHED)

          HOTELS                           $141.26
          RECORDING COSTS                  10,937.25
          TRAVEL COSTS                        674.55
          MISCELLANEOUS COSTS                 130.83
                                           - - - - - - - - - - - -
          TOTAL CHARGEABLE COSTS           $11,783.89
                                           - - - - - - - - - - - -
          UNRECOUPED BALANCE BEFORE ADVANCES  ($7,360.56)

LESS: ADVANCES - SCHEDULE ATTACHED         (   5,000.00)
                                           - - - - - - - - - - - -
UNRECOUPED BALANCE                         ($12,360.56)
                                           - - - - - - - - - - - -

LJWR0244

ADELL.NADELL.FINE        TEL:2  -307-6935           Feb 12'9   11:12 No.007 P.02

FROM:   LUKE RECORDS, INC.

TO:     INDO G & LIL BLUNT

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROYALTIES DUE                                          $24,812.03
(SCHEDULE ATTACHED)                                    - - - - - - - - - - - - -


LESS: CHARGEABLE EXPENSES:
        (SCHEDULES ATTACHED)

        PER DIEMS                                        $880.00
        RECORDING COSTS                                27,815.00
        VIDEO COSTS                                     33,333.33
                                                       - - - - - - - - - - - - -
        TOTAL CHARGEABLE COSTS                         $62,028.33
                                                       - - - - - - - - - - - - -
        UNRECOUPED BALANCE BEFORE ADVANCES            ($37,216.30)

LESS: ADVANCES - SCHEDULE ATTACHED                   (   8,000.00)
                                                       - - - - - - - - - - - - -
UNRECOUPED BALANCE                                    ($45,216.30)
                                                       - - - - - - - - - - - - -

LJWR0245

ARTIST ROYALTIES - PER SCHEDULE          $77,018.43

BALANCE UNRECOUPED - MAY 31, 1995      ( 782,851.40)

BALANCE UNRECOUPED - JUNE 30, 1995     ( $685,832.97)

*New Town*

LJWR0246

PUBLISHING ROYALTIES - FIRST LP

333,419.68

$1,489,292.69

SCHEDULE

| | AMOUNT | ARGEABLE PERCENT. | AMOUNT CHARGED |
|---|---|---|---|
| RECORDING COSTS | $151,704.19 | 100.00% | $151,704.19 |
| TOUR COSTS | 92,317.87 | 100.00% | 92,317.87 |
| TRAVEL COSTS | 187,114.53 | 100.00% | 187,114.53 |
| VIDEO COSTS | 281,284.64 | 50.00% | 140,642.32 |
| PRODUCER ADVANCES | 10,000.00 | 100.00% | 10,000.00 |
| *CELLANEOUS COSTS | 9,388.35 | 100.00% | 9,388.35 |
| *EL CHARGES | 15,540.02 | 100.00% | 15,540.02 |
| ER DIEMS | 10,300.00 | 100.00% | 10,300.00 |
| NDEPENDANT PROMO - OLD LP | 395,564.85 | 100.00% | 395,564.85 |
| NDEPENDANT PROMO - NEW LP | 26,119.50 | 50.00% | 13,059.76 |
| DVANCES - ARTIST AND PRODUCER | 1,228,512.41 | 100.00% | 1,228,512.41 |

TOTAL CHARGES $2,252,144.09

BALANCE UNRECOUPED ( $762,851.40)

LJWR0247

PADELL,NADELL,FINE        TEL:1 -307-6935          Feb 12'( 11:37 No.010 P.02

FROM:   LUKE RECORDS, INC.

TO:     CLAYVOISE

PERIOD: JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE

```
ROYALTIES DUE                              $3,553.98
(SCHEDULE ATTACHED)                        -------------


LESS: CHARGEABLE EXPENSES:
          (SCHEDULES ATTACHED)

      RECORDING COSTS                      $27,212.50
      TOUR COSTS                             1,500.00
                                           -------------
      TOTAL CHARGEABLE COSTS               $28,712.50
                                           -------------
      UNRECOUPED BALANCE                   ($25,158.52)
                                           -------------
```

*ClayVoise*

LJWR0248

PADELL.NADELL.FINE        TEL:(  2-307-6935          Feb 12(    12:16 NO.015 P.02

FROM:   LUKE RECORDS, INC.

TO:    TRELLINI DAVIS

PERIOD:   JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
------------------------------------------------------------------------

ROYALTIES DUE                                    $13,923.39
(SCHEDULE ATTACHED)                              -------------


LESS: CHARGEABLE EXPENSES:
        (SCHEDULES ATTACHED)

        HOTELS                                   $14,538.21
        PROMOTION/MARKETING                       35,973.27
        RECORDING COSTS                           91,767.33
        TOUR COSTS                                28,232.98
        TRAVEL COSTS                               7,754.00
        VIDEO COSTS                               40,079.33
        MISCELLANEOUS COSTS                          750.00

        TOTAL CHARGEABLE COSTS                   $219,095.12
                                                 -------------

        UNRECOUPED BALANCE BEFORE ADVANCES       ($205,171.73)

LESS: ADVANCES - SCHEDULE ATTACHED               (    4,080.00)
                                                 -------------
UNRECOUPED BALANCE                               ($209,251.73)
                                                 -------------

LJWR0249

PADELL,NADELL,FINE        TEL: 2-307-6935          Feb 12 '95   13:29 No.019 P.02

FROM:    LUKE RECORDS INC.

TO:      LORENZO LEE SMITH

ARTIST ROYALTIES

PERIOD:   JANUARY 1, 1993 TO JUNE 30, 1995

| PRE-FIX | SELECTION | TITLE | ROYAL. UNITS | ROYAL. BASE | ROYALTY PERCENT. | ROYALTY RATE | ARTIST ROYALTIES |
|---------|-----------|-------|-------------|-------------|------------------|--------------|------------------|
| LK  | 29057 | LOVE ON MY MIND | 505    | 8.982  | 12.0000% | 1.07784 | $544.52 |
| LKK | 29057 | LOVE ON MY MIND | 26,984 | 11.984 | 12.0000% | 1.43808 | 38,805.20 |
| LKT | 29057 | LOVE ON MY MIND | 29,343 | 7.984  | 12.0000% | .95808  | 28,112.95 |
| LKT | 29058 | IF IT'S ALRIGHT | 53,292 | 2.872  | 12.0000% | .34464  | 18,366.45 |

$85,829.12

PADELL,NADELL,FINE        TEL:12-307-6935           Feb 12/96    10:58 No.005 P.02

FROM:    LUKE RECORDS, INC.

TO:      SOCIETY

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROYALTIES DUE                                        $12,773.59
(SCHEDULE ATTACHED)                                  - - - - - - - - - - - - - -


LESS: CHARGEABLE EXPENSES:
        (SCHEDULES ATTACHED)

        PROMOTION/MARKETING                          $1,500.00
        RECORDING COSTS                              12,847.50
        TOUR COSTS                                    4,332.02
        TRAVEL COSTS                                    403.00
        VIDEO COSTS                                  33,333.33
                                                     - - - - - - - - - - - - -
        TOTAL CHARGEABLE COSTS                       $52,415.85
                                                     - - - - - - - - - - - - -
        UNRECOUPED BALANCE BEFORE ADVANCES           ($39,642.26)
                                                     - - - - - - - - - - - - -

PADELL.NADELL.FINE      TEL: 2-307-6935          Feb 12'95   12:01 No.012 P.02

FROM:    LUKE RECORDS, INC.

TO:      DISCO RICK

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE
--------------------------------------------------------------

ROYALTIES DUE                              $36,461.43
(SCHEDULE ATTACHED)                        ------------

LESS: CHARGEABLE EXPENSES:
        (SCHEDULES ATTACHED)

        PROMOTION/MARKETING                  2,025.75
        RECORDING COSTS                      6,838.60
        TOUR COSTS                             164.83
        TRAVEL COSTS                         2,930.00
        MISCELLANEOUS COSTS                    375.00
                                           ------------
                                           $12,334.18

LESS: OTHER CHARGEABLE EXPENSES
        LEGAL COUNSELOR                      1,500.00
        LOAN ON BEHALF OF ROCKVILLE          1,000.00
        VIDEO - KELSEY WHITE PROD.          15,000.00

        TOTAL CHARGEABLE EXPENSES          $29,834.18
                                           ------------

        ROYALTY BALANCE                     $6,627.25

        LESS: ADVANCE                     ( 50,000.00)
                                           ------------

        UNRECOUPED BALANCE                ($43,372.75)
                                           ------------

*[signature: Disco Rick]*

LJWR0252

PADELL.NADELL.FINE          TEL:      2-507-6955                FEB 12 99    12:08

FROM:    LUKE RECORDS, INC.

TO:      ANQUETTE

PERIOD:  JANUARY 1, 1993 TO JUNE 30, 1995

SUMMARY OF ARTIST ROYALTIES DUE

---

ROYALTIES DUE                                    $1,147.49
(SCHEDULE ATTACHED)                          ---------------


LESS: CHARGEABLE EXPENSES:
          (SCHEDULES ATTACHED)

          RECORDING COSTS                        $6,055.73
                                             ---------------
          TOTAL CHARGEABLE COSTS                 $6,055.73
                                             ---------------
          UNRECOUPED BALANCE BEFORE ADVANCES    ($4,908.24)

LESS: ADVANCES - SCHEDULE ATTACHED          (      290.00)
                                             ---------------
UNRECOUPED BALANCE                              ($5,198.24)
                                             ---------------

SERVICE LIST

LUKE RECORDS, INC.
CASE NO.: 95-11447-BKC-RAM

Jeffrey J. Thomkins
1321 NW 119th Street
Miami, FL  33169

Patrick Watler
830 NW 200 Terrace
Miami, FL  33169

Markus A. Effinger
P.O. Box 2077
Miami, FL  33138

Ruff Town Productions
c/o Allen Jacobi, Esquire
1313 NE 125th Street
North Miami, FL  33161

Lorenzo Lee Smith
c/o Curtis M. Shaw, Esquire
6255 Sunset Boulevard
Suite 2000
Los Angeles, CA  90028

Larry Dobson
2331 NW 91st Street
Miami, FL  33147

Jonathan K. Winer, Esquire
JONATHAN K. WINER, P.A.
2200 SunBank International Center
One S.E. Third Avenue
Miami, FL  33131

Mark D. Cohen, Esquire
MARK D. COHEN, P.A.
Emerald Hills Executive Plaza II
4651 Sheridan Street, Suite 800
Hollywood, FL  33021

1

LJWR0254

Jay M. Gamberg, Esq.
JAY M. GAMBERG, P.A.
Emerald Hills Executive Plaza II
4651 Sheridan Street, Suite 800
Hollywood, FL  33021


Yale Fishman, Esquire
COLL, DAVIDSON
201 S. Biscayne Boulevard, Suite 3200
Miami, FL  33131-4331


James P. S. Leshaw, Esquire
counsel for RED
GREENBERG, TRAURIG, et al.
1221 Brickell Avenue
Miami, FL  33131


Frank P. Terzo, Esquire
SEMET, LICKSTEIN, MORGENSTERN, BERGER,
   FRIEND, BROOKE & GORDON, P.A.
201 Alhambra Circle, Suite 1200
Coral Gables, FL  33134


George M. Tavares, Jr., Esquire
13250 S.W. 43rd Street
Miami, FL  33175


**PERSONAL & CONFIDENTIAL**
Luther R. Campbell, President
Luke Records, Inc.
8400 Northeast Second Avenue
Miami, FL  33138

Robert S. Kobert, Esq.
De La Cruz & Cutler, P.A.
241 Sevilla Avenue
Suite 805
Coral Gables, FL  33134

Douglas D. Stratton, Esq.
407 Lincoln Road, Suite 2B
Miami Beach, FL  33139

LJWR0255

Barry S. Fishman, Esq.
Shapiro & Fishman
20803 Biscayne Boulevard
Suite 300
North Miami Beach, FL  33180


Robin Kent-Gardner, Supervisor
Metro Dade Bankruptcy Unit
111 Northwest First Street
26th Floor
Miami, FL  33128

Francis L. Carter, Esq.
Coll, Davidson, et al.
3200 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131

Amber Donner, Esq.
Office of the U.S. Trustee
51 SW First Avenue
Federal Building, Room 1204
Miami, FL  33130

Paul L. Orshan, Esq.
Kluger, Peretz, et al.
1970 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131

Allison R. Day, Esq.
Schantz, Schatzman, et al.
First Union Financial Center
200 South Biscayne Boulevard
Suite 1050
Miami, FL  33131-2399

Jeffrey R. Sonn, Esq.
Sanctuary Centre, Suite 105E
4800 North Federal Highway
Boca Raton, FL  33431

Michael I. Goldberg, Esq.
Kronengold, Gottlieb & Goldberg, P.A.
One East Broward Boulevard, Suite 1410
Fort Lauderdale, FL  33301-1804

3

Jerry M. Markowitz, Esq.
Markowitz, David & Ringel
9130 South Dadeland Boulevard
Suite 1225
Miami, FL  33156-7850

Thomasina H. Williams, Esq.
Williams & Associates, P.A.
2937 Southwest 27th Avenue
Suite 301
Coconut Grove, FL  33131

Arthur Halsey Rice, Esq.
Arthur Halsey Rice & Associates, P.A.
848 Brickell Avenue, Suite 1100
Miami, FL  33131

Craig V. Rasile, Esq.
Holland & Knight
701 Brickell Avenue
Miami, FL  33131

Peter D. Spindel, Esq.
7731 S.W. 62nd Avenue
Suite 203
South Miami, FL  33143

Kenneth E. Zeilberger, Esq.
Kay & Roger, P.A.
Corporate Square, Suite 207
1500 West Cypress Creek Road
Fort Lauderdale, FL  33309

Ellen D. Silvers, Esq.
Leinoff & Silvers, P.A.
1500 San Remo Avenue
Suite 206
Coral Gables, FL  33146

Jay J. Lorenzo, Esq.
Lorenzo & Capua, P.A.
9192 Coral Way, Suite 201
Miami, FL  33165

Keith T. Grumer, Esq.
Keith, Mack, Lewis, et al.
200 South Biscayne Boulevard
20th Floor
Miami, FL  33131-2310

4

Neil J. Berman, Esq.
Berman, Wolfe & Rennert, P.A.
35th Floor, International ZPlace
100 S.E. Second Street
Miami, FL  33131-2130

Glenn R. Miller, Esq.
Glenn R. Miller, P.A.
67 N.E. 168th Street
North Miami Beach, FL  33162

William Larkin

Trellini Davis

Jermaine Scott

Marcus Miller

Anthony Fredericks

Garvin T. Henderson

LJWR0258

# EXHIBIT 35

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

CHAPTER 11

CASE NO.

In re                                    )
                                         )
LUKE RECORDS, INC.,                      )
                                         )
        Debtor.                          )
                                         )
                                         )
                                         )
                                         )
_____)

CHAPTER 11

CASE NO. 95-12785-BKC-RAM

In re                                    )
                                         )
LUTHER CAMPBELL,                         )
                                         )
        Debtor.                          )
                                         )
                                         )
                                         )
_____)

## ORDER CONFIRMING JOINT PLAN OF REORGANIZATION

THIS CAUSE came before the Court on Wednesday, March 20,
1996 at 10:00 a.m. and Friday, March 22, 1996 at 1:00 p.m. upon the
confirmation hearing of the Joint Plan of Reorganization (the
"Plan") proposed by Luke Records, Inc., debtor in possession ("Luke
Records"), Luther Campbell, debtor in possession (together with
Luke Records, the "Debtors") and the Official Committee of
Unsecured Creditors of Luke Records in the above-captioned Chapter
11 cases.  The Court having read and considered the Plan, the
Letter of Intent (the "Letter of Intent" attached as Exhibit "A"
to the Plan, and the accompanying Disclosure Statement, the
Affidavit of the Debtors, the proposed amendment to the

Distribution Agreement (as hereinafter defined), the H-Town Agreement (as hereinafter defined), the accommodation letter dated March 18, 1996 from James P.S. Leshaw to Frank P. Terzo (the "Accommodation Letter"), pursuant to which RED Distribution, Inc. ("RED") has agreed to modify the timing of its receipt of payments under the Letter of Intent and Plan, having heard and considered the argument and proffers of counsel on the record at the hearing, and otherwise being duly advised in the premises, the Court hereby finds and determines as follows:

A.   The solicitation of acceptances from holders of claims and interests has been made in the manner required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and prior Orders of this Court.

B.   The sale of the Debtors' assets to Joseph Weinberger and Lil' Joe Records, Inc. (together, "Weinberger") pursuant to the terms of the Plan and the Letter of Intent is in the best interest of each of the Debtors' estates. The Letter of Intent and all transactions contemplated thereby are a necessary and integral part of the Plan. Weinberger is an independent third-party purchaser and the Letter of Intent was negotiated in good faith and at arms'-length.

C.   The sale of the Debtors' assets to Luther Campbell ("Campbell") pursuant to the terms of the Letter of Intent is in the best interest of each of the Debtors' estates.

2

LJWR0457

D.    Weinberger and Campbell are good faith purchasers as that term is used in 11 U.S.C. § 363(m) and are entitled to all of the protection of a good faith purchaser pursuant thereto.

E.    The Plan has been proposed in good faith and not in any manner forbidden by law.

F.    The H-Town Agreement is in the best interest of each of the Debtors' estates.

Accordingly, it is hereby,

ORDERED AND ADJUDGED as follows:

1.    The Plan complies with the applicable provisions of title 11 of the United States Code.

2.    The proponents of the Plan have complied with the applicable provisions of title 11 of the United States Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payments made or to be made by the proponents of the Plan, by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable.

5.    The proponents of the Plan have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, affiliates of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under

3

LJWR0458

the Plan.  The appointment to, or continuance in, such offices of such individuals, is consistent with the interest of creditors and equity security holders and with public policy, and the proponents of the Plan have disclosed the identity of any insider that would be employed or retained by the reorganized Debtors and the nature of any compensation for such insiders.

6.    There are no governmental or regulatory commissions with jurisdiction, after confirmation of the Plan, over the rates of the Debtors.

7.    Each impaired class of claims or interests has accepted the Plan.  Section 1111(b)(2) of the Bankruptcy Code is not applicable.

8.    Except to the extent the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that (A) with respect to a claim of a kind specified in Section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of such claim would receive on account of such claim cash equal to the allowed amount of such claim; (B) with respect to a class of claims of a kind specified in Sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim.  With respect to a claim of a kind specified in Section 507(a)(8) of the Bankruptcy Code the holder of such claim will receive on account of such claim deferred cash payments over a period not exceeding six

4

years after the date of assessment of such claim, of a value as of
the Effective Date of the Plan equal to the allowed amount of such
claim.

9.   Confirmation of the Plan is not likely to be
followed by the liquidation, or the need for further financial
reorganization, of the Debtors or any successor to the Debtors
under the Plan, except to the extent that such liquidation is
contemplated with respect to Luke Records.

10.   All fees payable under Section 1930 of Title 28
have been paid or the Plan provides for the payment of all such
fees on the Effective Date of the Plan.

11.   There are no "retiree benefits" as that term is
defined in Section 1114 of the Bankruptcy Code.

12.   The Plan complies with all the requirements of 11
U.S.C. § 1129.

13.   The Liquidating Trustees shall make all payments
required to be made under the Plan (as modified by the
Accommodation Letter) on the Effective Date of the Plan, and shall
pay all postconfirmation fees payable pursuant to 28 U.S.C. 11
U.S.C. § 1930. Jonathan K. Winer, Esq., counsel for Luke Records,
and Jay Gamberg and Mark Cohen, counsel for Luther Campbell, shall
file Motions for Decrees Closing Cases within sixty (60) days after
the Effective Date of the Plan.   Failure to timely file said
Reports will result in the imposition of sanctions, which may
include the return of attorneys' fees.

LJWR0460

14.    Subject to satisfaction of the terms and conditions of the Plan and Letter of Intent, the Agreement dated August 26, 1994 (as amended, the "Distribution Agreement") between RED Distribution, Inc. ("RED") and Luke Records is hereby further amended in accordance with the terms of the amendment dated March 19, 1996 (the "Amendment") between Weinberger and RED, and the Distribution Agreement, as amended by the Amendment, shall be assumed pursuant to Section 365(a) of the Bankruptcy Code and assigned to Lil' Joe Records, Inc. ("Lil' Joe") pursuant to Section 365(f) of the Bankruptcy Code.  The Distribution Agreement and the Amendment are a necessary and integral part of the Plan.

15.    Frank P. Terzo is hereby appointed Liquidating Trustee for the estate of Luke Records.  Richard Wolfe is hereby appointed Liquidating Trustee for the estate of Luther Campbell (together with Frank Terzo, the "Liquidating Trustees").

16.    Each of the releases provided for in the Plan is hereby approved as reasonable.

17.    Luther Campbell has failed to make the election provided for in paragraph I A 13 of the Letter of Intent.  As such, each of the assets provided for therein shall be transferred to Weinberger in accordance with the terms of the Letter of Intent.

18.    The Creditors' Committee has been unable to sell the H-Town Hard Assets.  Accordingly, the provisions of paragraph V C 1 c (i)-(iv) of the Letter of Intent are applicable and the parties are required to comply with the terms thereof.

6

19.    The Plan is hereby modified to the extent set forth in this paragraph.  The Plan, as modified hereby, is the Plan. None of the modifications provided for herein adversely affects the treatment of any creditor under the Plan.    Accordingly,  no additional disclosure, solicitation or notice is required.

A.    In  addition  to  the  other  assets  to  be transferred to Weinberger under the terms of the Plan and the Letter of Intent, Luke Records is hereby directed to transfer and assign to Weinberger its UPC vendor number and alternate vendor number, and all of its right, title and interest in and to each contract rejected pursuant to Section 365 of the Bankruptcy Code, subject to the Liquidating  Trustees'  right  to  assert  defenses, recoupment or setoff.

B.    Paragraph I O and IV F of the Letter of Intent is hereby deleted in its entirety and replaced with the following language:

> On or before March 28, 1996, Luke
> Records or Luther Campbell as the
> case may be shall, at the sole
> cost and expense of Weinberger,
> transport all original documents,
> inventory,   artwork,   DATS   and
> masters to a location selected by
> Weinberger and acceptable to Frank
> Terzo.  Frank Terzo shall be given
> the only key to such location, but
> shall permit reasonable inspection
> by Weinberger until the closing
> hereunder.  The parties shall use
> good  faith  to  accomplish  the
> purpose of this provision.

7

C.     Paragraph I W of the Letter of Intent is hereby deleted in its entirety and replaced with the following language:

> On or before March 27, 1996, Weinberger shall deposit into an interest bearing trust account at Semet Lickstein, the sum of $80,000 towards the purchase price set forth in paragraph V above.

D.     Paragraph I V of the Letter of Intent is hereby modified such that all funds to be paid by Weinberger thereunder shall be deposited into the trust account of Coll, Davidson, Carter, et al no less than one day before the Effective Date of the Plan, and shall be released on the Effective Date, subject to the terms and conditions of the Letter of Intent.

E.     Paragraph IV C 1 and 2 of the Letter of Intent are hereby deleted in their entirety and replaced with the following language:

> 1.     Within one day after the Confirmation Order becomes a Final Order, the sum of $100,000 is to be deposited into Jay Gamberg's trust account.  Such funds shall be released to the Luke Records Liquidating Trustee on the Effective Date, subject to the terms and conditions of the Letter of Intent.

> 2.     Within one day after the Confirmation Order becomes a Final Order, the sum of $100,000 plus the costs described in paragraph a.(1) shall be deposited into Jay Gamberg's trust account. Such funds shall be released to the Luther Campbell Liquidating Trustee on the Effective Date, subject to the terms and conditions of the Letter of Intent.

LJWR0463

F.    The reference to "five (5)" in paragraph VI L of the Letter of Intent is hereby deleted and replaced with "twelve (12)".

G.    The reference to "five (5)" in paragraph I 13 of the Plan is hereby deleted and replaced with "twelve (12)."

H.    Paragraph V D 2c 3 and 4 of the Letter of Intent are hereby deleted in their entirety.

I.    The following language shall be added as Paragraph I Z of the Letter of Intent:

> Z.    The accounts receivable from INDI and its affiliates ("INDI") listed on schedule B to the Letter of Intent shall be conveyed to the Luke Records Liquidating Trustee, and the Luke Records Liquidating Trustee shall pay to Weinberger 20% of the cash proceeds (net of fees and costs) received by the Luke Records Liquidating Trustee from any lawsuit brought by the Luke Records Liquidating Trustee against INDI.    Any inventory recovered in such action will also be turned over immediately to Weinberger pursuant to paragraph I 4 of this Letter.

J.    Section I 14 of the Plan is hereby deleted in its entirety and replaced with the following language:

> 14.    "Final" means, with respect to any order, decree or judgment of any court, that such order, decree or judgment is no longer subject to rehearing, as to which no motion for rehearing is

9

then pending, and which is not subject to a stay.

K.   Paragraphs   VI(A)(4)(n)   and VII(A)(4)(n) of the Plan is hereby deleted in its entirety and replaced with the following language:

> (n)   The Trustee shall not be personally liable to the trust or to the holder of any claim, future claim or interest, except for such of his own acts as shall constitute bad faith, willful misconduct, or willful disregard of his duties except as aforesaid, the Trustee shall be entitled to be exonerated and indemnified from time to time from the trust assets against any and all losses, claims, costs, expenses and liabilities arising out of or in connection with the trust assets or the affairs of the trust. The foregoing provisions of this section shall also extend to the employees, representatives and agents of the trust, as the case may be.

L.   Paragraph VII.A.4.m of the Plan is hereby deleted in its entirety and replaced with the following language:

> m.   The   Liquidating Individual Trustee shall receive reasonable compensation for his services based upon a reasonable hourly rate.

20.   The Letter of Intent and the Plan as modified by this Order are hereby APPROVED and CONFIRMED and the parties are authorized and directed to perform thereunder.

10

LJWR0465

21.   The Agreement dated March 22, 1996, including the exhibits thereto (the "H-Town Agreement"), by and among RED, Luke Records, the Official Committee of Unsecured Creditors of Luke Records, Darryl Lynn Jackson, Solomon Conner and Delando Omigo Conner (collectively p/k/a "H-Town") is hereby approved in its entirety pursuant to Federal Rule of Bankruptcy Procedure 9019. The H-Town Agreement is a necessary and integral part of the Plan. The Exclusive Recording Agreement between Luke Records and H-Town, dated February 9, 1993 (as amended, the "H-Town Recording Agreement"), shall survive this bankruptcy case to the full extent provided for in the H-Town Agreement.  80% of the sum payable by H-Town pursuant to Paragraph 2 of the H-Town Agreement shall inure to the benefit of the Luke Records Liquidating Trustee. The remaining 20% of the proceeds of the sum payable by H-Town pursuant to Paragraph 2 of the H-Town Agreement shall inure to the benefit of the Luther Campbell Liquidating Trustee.

22.   The Debtors and the Liquidating Trustees are hereby authorized and directed to comply with the terms of the Plan and the Letter of Intent, and are authorized and directed to execute and deliver any and all documents as may be reasonably necessary to comply with the terms of the Plan and the Letter of Intent.

23.   Except for the Distribution Agreement and the H-Town Recording Agreement (as modified by the H-Town Agreement), all executory contracts and unexpired leases of the Debtors are hereby rejected pursuant to Section 365(a) of the Bankruptcy Code. Parties to such rejected contracts and leases are directed to file

11

LJWR0466

proofs of claim for rejection damages within thirty days after the date hereof, or be forever barred from asserting such claims.

24.   Weinberger and Campbell are good faith purchasers as that term is used in 11 U.S.C. § 363(m), and are entitled to all of the protection of good faith purchasers pursuant thereto.

25.   The transfer of assets from Pac Jam Publishing, Inc. is fair and reasonable and supported by valid consideration.

26.   All the assets to be transferred under the Plan, the Letter of Intent or this Order shall, except as otherwise expressly provided for in the Plan, the Letter of Intent or the Amendment, be transferred free and clear of any interest in such property of an entity other than the Debtors.

27.   Upon entry of this Order, the Debtors shall immediately transfer all funds in their respective debtor in possession accounts to the applicable Liquidating Trustee, without prejudice to Luke Records' right to claim use of a portion of these funds for expenses already incurred; provided that at least $5,000 of such funds shall be available for distribution pursuant to the terms of the Plan and Letter of Intent.

28.   The issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, the Letter of Intent, the Distribution Agreement, the Amendment, or the H-Town Agreement may not be taxed under any law imposing a stamp tax or a similar tax.

29.   If the transactions contemplated by the Letter of Intent and the Plan are not closed on or before 15 days after entry

12

*or on the Court's own motion.* KM

of this Order, upon motion made by any party in interest, the Court shall consider whether to vacate this Order pursuant to Federal Rule of Civil Procedure 60(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 9024. Nothing in this paragraph shall impair the ability of the parties to close the transactions contemplated by the Letter of Intent or the Plan while such a motion is pending, affect the application of Section 363(m) of the Bankruptcy Code to the transactions contemplated by the Plan or Letter of Intent, or otherwise affect the "substantial consummation" of the Plan.

30. If Weinberger fails to post the $80,000 deposit required by Paragraph I W of the Letter of Intent as modified herein, and the transactions contemplated by the Plan and Letter of Intent are not consummated as a result of the fault of Weinberger, then no earlier than the thirteenth day following entry of this Order, the Court shall enter a judgment against Weinberger in the amount of $80,000.

31. Notwithstanding anything to the contrary contained in the Plan or Letter of Intent, Weinberger shall be responsible for payment of RED's unrecouped balance accruing on and after the day that is seven days before the closing of the transactions contemplated by the Plan and Letter of Intent, and the Luke Records Estate and Liquidating Trustee shall be responsible for the payment of RED's unrecouped balance accruing before such date.

32. Campbell is discharged from any debt that arose before the date of confirmation of the Plan, and any debt of a kind

13

specified in 11 U.S.C. § 502(g), (h) or (i), except as provided in the Plan, Letter of Intent or this Order. Any judgment obtained in any court other than this Court is null and void as a determination of personal liability of Campbell for debts dischargeable under 11 U.S.C. § 523 unless determined by order of this Court to be nondischargeable.

33.   The parties shall act in good faith to consummate the transactions contemplated by the Plan and Letter of Intent.

34.   The Court shall retain jurisdiction in accordance with the terms of the Plan and the Letter of Intent.

35.   This Order shall be deemed to be entered immediately upon the issuance thereof, and the Clerk of the Court is hereby directed to enter this Order on the docket as of the date hereof.

DONE AND ORDERED in Miami, Southern District of Florida, this 22nd day of March, 1996.

_____
ROBERT A. MARK
U.S. Bankruptcy Judge

Copies furnished to:

James P.S. Leshaw, Esq.
Frank P. Terzo, Esq.
Howard Berlin, Esq.
Jay Gamberg, Esq.
Marc Cohen, Esq.
Jonathan K. Winer, Esq.
Yale Fishman, Esq.
United States Trustee

[Attorney Winer is directed to mail a conformed copy of this Order to all creditors and other interested parties in the Luke Records

14

LJWR0469

case, and attorney Gamberg is directed to mail a conformed copy of this Order to all creditors and other interested parties in the Luther Campbell case, as their names and addresses appear on the Debtors' mailing matrices immediately upon receipt of same and file a Certificate of Service with the Court.]



15

# EXHIBIT 36

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In Proceedings Under Chapter 11

IN RE:

Case No.:  95-11447-BKC-RAM

LUKE RECORDS, INC.,

Debtor.
_____/

## ORDER SETTING BAR DATE FOR REJECTION
## CLAIMS ARISING FROM REJECTED EXECUTORY CONTRACTS

This cause having come before the Court on 10:00 a.m. on March 20, 1996, and 1:00 p.m. on March 22, 1996, at the hearing on confirmation and the Court having entered an Order Confirming Joint Plan of Reorganization and having been advised that the instant Debtor rejects all executory contracts and unexpired leases except the contracts with RED Distribution, Inc. and H-Town which were transferred pursuant to the Joint Plan of Reorganization and being otherwise fully advised in the premises; it is thereupon

ORDERED AND ADJUDGED as follows:

1.    All of the Debtor's executory contracts and unexpired leases, including those exclusive recording contracts known to the Debtor shown on Exhibit "A" attached hereto and incorporated herein by reference, and excluding only RED Distribution, Inc. and H-Town, are rejected.

2.    Parties to such contracts are granted thirty (30) days from the date of this Order in which to file any claims arising as a result of such rejection.

1

3.    The deadline for filing such claims set forth in Paragraph 2 above supercedes the deadline set forth in Paragraph 23 of the Order Confirming Joint Plan of Reorganization entered March 22, 1996.

4.    Any claims not timely filed shall be deemed waived and will not be entitled to distribution under the confirmed Joint Plan of Reorganization.

DONE AND ORDERED in said Southern District of Florida this ___4th___ day of April, 1996.

_____
ROBERT A. MARK
UNITED STATES BANKRUPTCY JUDGE

Copies Furnished:

Chad P. Pugatch, Esquire
Office of the U.S. Trustee
All creditors and interested parties

Attorney Pugatch is directed to provide an executed copy of this Order to each of the parties named above upon receipt and to provide a Certificate of Mailing thereof with the Court.

## EXHIBIT "A" TO ORDER SETTING BAR DATE FOR REJECTION CLAIMS ARISING FROM REJECTED EXECUTORY CONTRACTS

POISON CLAN
BUST DOWN
U-MYND
PROFESSOR GRIFF
HOME TEAM
JIGGY GEE
LIKKLE WICKED
JUNIOR DEMUS
INDO G & LIL' BLUNT
CLAYVOISE
LORENZO
VERB
TRELLINI DAVIS
SOCIETY
DISCO RICK
ANQUETTE
FRESH KID ICE
AAAAA PRECISION
GOLD KEY LEASE, INC.
RICHARD D. HAGE
GREG MOVE
ROBBIE STADIUM CORP.
THE MIAMI HEAT
ATTIC RECORDS, LTD.
MUSHROOM RECORDS
MUSHROOM MUSIC PTY, LTD.
TOP TAPE RECORDS & VIDEO
GLOBAL RECORDS
GLOBAL MUSIKVERLAG
MUSICDISC SA
TEICHIKU RECORDS CO., LTD.
MCA MUSIC, LTD.
FUJIPACIFIC MUSIC
RPM RECORD CO.

# CORDANT

11400 Commerce Park Drive
Reston, Virginia 22091-1506

# CERTIFICATE OF SERVICE

1-800-BNC-5055

| | |
|---|---|
| District/off: 113c-1 | User: smith |
| Case: 95-11447 | Form ID: #03 |

| | |
|---|---|
| Page 1 of 6 | Date Rcvd: 04/09/96 |
| Total Served: 264 | Date Served: 04/11/96 |

```
db        Luke Records, Inc.,   8400 NE 2 Ave,   Miami, FL 33138
aty       Jonathan K Winer, Esq,   1 SE 3 Ave #2200,   Miami, FL 33131
smg       BNC Coordinator,   Claude Pepper Federal Building,   51 SW 1st Avenue,   Room 1517,   Miami, FL 33130
smg       Florida Department of Revenue,   POB 6668,   Bankruptcy Division,   Tallahassee, FL 32314-6668
smg       IRS,   ATTN SPF-BKC,   Stop 5730,   POB 17167,   Ft Lauderdale, FL 33318
smg       Metro-Dade Bankruptcy Unit,   111 NW 1 St,   26th floor,   Miami, FL 33128
ust       Assistant U. S. Trustee,   51 SW 1 Ave #1204,   Miami, FL 33130
2007145   4 Sight Records,   c/o-Visconic Studios,   1862 NW 38 Ave,   Lauderhill, FL 33311
1902304   AGI Incorporated,   c/o Silver & Silver,   150 S.E. 2 Avenue,   Suite 500,   Miami FL 33131
2012990   ASR Recording Services of California,   8960 Eton Ave,   Canoga Park, CA 91304
1902305   ASR Recording Svcs,   c/o Hassett & Kelly,   10850 Wilshire Blvd.,   8th Floor,   Los Angeles CA 90024
1902307   AT&T,   1701 Golf Road Twr 3,   Rolling Meadow IL 60008
1902306   AT&T,   P.O. Box 27-850,   Kansas City MO 64160
1902308   AT&T Credit Corp,   P.O. Box 827,   Parsippany NJ 07054
1902309   AT&T Uniplan Svc,   P.O. Box 8206,   Fox Valley IL 60504
1902310   Accord Productions,   2000 S. Dixie Highway,   Suite 112,   Miami FL 33133
2013898   Accord Productions,   c/o Robert I Barrar Jr Esq.,   2333 NE 24 St,   Miami, FL 33137
1902311   Accountants on Call,   Attn: Linda Sondey,   Park West Plaza II,   (5th Fl),   Saddle Brook, NJ 07663
2099198   Acuff-Rose Music Inc,   c/o Sidney S Rosedeitcher,   1285 Ave of the Americas,   New York, NY 10019
1973336   Acuff-Rose Music, Inc,   Paul Weiss Rifkind Wharton & Garrison,   Attn: Sidney Rosedeitcher,
              1285 Ave of the Americas,   New York, NY 10019-6064
1902313   Air Rescue/Studio AC Svc,   12220 S.W. 105 Street,   Miami, FL 33186
1902314   Airborne Express,   P.O. Box 91001,   Seattle WA 98111
1902315   Aladdin's Limousine Inc.,   DBA Chils Chariots,   P.O. Box 5304,   Boca Raton FL 33432
1902478   Alan Mark Turk,   200 Fourth Avenue North,   Suite 820,   Nashville IN 37219
1902414   Alicia McDonald,   6500 W. 43 Street #2010,   Houston TX 77092
1902316   Allstate Insurance Co.,   P.O. Box 3578,   Akron OH 44309-3578
1902317   AmericDisc Inc.,   8455 N.W. 30 Terr.,   Miami FL 33122
1902318   American Dental Plan,   P.O. Box 5697028,   Atlanta GA 31156-7028
1902319   American Federation TV,   & Radio,   260 Madison Avenue,   New York NY 10016
1902321   American Savings & Loan,   Box 69-4556,   Miami FL 33269
1902322   Ameriford Domestic,   Levy Ehrlich & Kronen.,   One University Plaza,   Suite 501,   Hackensack NH 07601
1902323   Anderson Car Service,   2351 N.W. 150th Street,   Opa Locka FL 33138
1902324   Anthony's Limo Service,   323 Minneola Drive,   Orlando FL 32811
1902326   Astro Moving & Storage,   9385 N.W. 101st St.,   Miami FL 33178
1902327   Atlantic Recording Corp.,   75 Rockerfeller Plaza,   New York NY 10019
1902328   BET,   1700 North Moore Street,   Suite 2200,   Rosslyn VA 22209
1916976   BET,   c/o Barry Fishman, Esq.,   20803 Biscayne Blvd #300,   North Miami, FL 33180
1902329   BIN/BPI Communications,   Broadcast Data Systems,   P.O. Box 1213 Dept 927,   Newark NJ 07101-1213
1902330   BPS Equipment Rental,   c/o Bilateral Credit Co.,   141 W. 28th Street,   New York NY 10001
1825976   Barnett Bank of South Florida,   c/o Bruce E Bloch, Esq,   9700 S Dixie Hwy #1000,   Miami, FL 33156
1902332   Behind the Scenes,   712 Main Street,   Suite 110,   Buffalo NY 14202
1902485   Bernard Veargis,   1095 N.W. 58 Terrace,   Miami FL 33127
1902333   Black Entertainment TV,   One BET Plaza,   1900 W Place, NE,   Washington, DC 20018
1918319   Black Entertainment TV, Inc,   One BET Plaza,   1900 W Place, NE,   Washington, DC 20018-1211
2104316   Black Entertainment Television Inc,   c/o Alicia L Accinelli, Esq,   20803 Biscayne Blvd #300,
              North Miami Beach, FL 33269
1902334   Broadcast Data Systems,   P.O. Box 1213 Dept 903,   Newark NJ 07101-1213
1902335   Bruce Rogow P.A.,   2441 S.W. 28 Avenue,   Ft. Lauderdale FL 33312
1902336   CMJ New Music Report,   11 Middleneck Road,   Suite 400,   Great Neck NY 11021
```

1020106

District/off: 113c-1           User: smith           Page 2 of 6           Date Rcvd: 04/09/96
Case: 95-11447                Form ID: #03          Total Served: 264       Date Served: 04/11/96

```
1902337   Cable & Wireless Inc.,   46020 Manekin Plaza,   Sterling VA 20166
1902338   Captain Don,   9600 Thanksgiving Dr.,   Miami FL 33157-8750
1878706   Caribbean Records Manufacturing Corp,   c/o Jeffrey R Sonn,   4800 N Federal Hwy,   Boca Raton, FL  33431
1902339   Caribbean Records Mfg.,   3081 N.W. 24  Street,   Miami FL 33142
1902342   Carlos Castellanos,   8191 N.W. 98th Lane,   Hialeah Garden FL 33016
1902341   Cassette Productions Inc,   109 Prospect Place,   Hillsdale NJ 07642
1902430   Charlie Passantino,   205 Thomas Street,   Newark NJ 07114
1867309   Christopher Wong Won,   c/o Douglas D Stratton,   407 Lincoln Rd #2B,   Miami Beach, FL  33139
1977258   Chuck Rush,   7278 Hollywood Blvd.,   #12A,   LA, CA  90046
1902343   City of Miami,   P.O. Box 016777,   Miami FL 33101
1902344   City of Miami Beach,   Debora J. Turner Esq.,   1700 Convention Ctr  Dr.,   Miami Beach, FL  33139
1902345   City of Philadelphia,   Philadelphia Rev Dept.,   1600 Arch St 4th Floor,   Philadelphia PA 19103
1902346   Classic Concepts Prods,   444 West 35th Street,   Suite 1D,   New York NY 10001
1902347   Color Lab Miami,   111 N.E. 21st Street,   Miami FL 33137
1943169   Commonwealth of PA,   Bureau of Employer Tax Operations,   1171 South Cameron St #312,   Harrisburg, PA  17104
1902349   Complete Business Systms,   1310 N. Congress Avenue,   P.O. Box 24627,   W. Palm Beach FL 33146
1902350   Copier Products Inc.,   13279 S.W. 124th  Street,   Miami FL 33186
1902351   Crowne Plaza Hotel,   1601 Biscayne Blvd.,   Miami FL 33132
1902352   Crystal Springs Water,   P.O. Box 30193,   Tampa FL 33630
1902353   Dade Cnty.Tax Collector,   Metro Dade Cnty. BKC Unit,   111 NW 1st St. 26th Fl.,   Miami, FL  33128
1953293   Dade County Tax Collector,   c/o Robin Kent-Gardner,   111 NW 1 St 26 Fl,   Miami, FL  33128
1902354   Darp Studios,   582 Trabert Avenue NW,   Atlanta GA 30309
1930442   Darryl Lynn Jackson,   c/o Craig V. Rasile,   701 Brickell Ave #3000,   Miami, FL  33131
2007164   David Hobbs,   c/o Douglas D. Stratton Esq.,   407 Lincoln Rd.  #2B,   Miami Beach, FL  33139
2008623   Delano & Solmon Conner &,   Darryl Jackson,   c/o-Raymond C Reed, Esq.,   2323 W Camden Dr,  #600,
          Beverly Hills, CA  90210
1930439   Delano Onigo Connor,   c/o Craig V Rasile,   701 Brickell Ave #3000,   Miami FL  33131
1902355   Delmoore Services Inc.,   16911 N.E. 6 Avenue,   Miami FL 33162
1902356   Dept State Div Corps,   Annual Reports  Section,   P.O. Box 1500,   Tallahassee FL 32302
2013049   Detrius L Dawson,   567 ne 60TH st,   Miami, FL  33137
1902357   Disctronics Texas Inc.,   2800 Summit Avenue,   Plano TX 75086-9080
1902358   Drago Artistic  Designs,   8346 N.W. S. River  Dr.,   Suite E,   Medley FL 33166
1902359   Entertainment,   V.O. Box 60001,   Tampa FL 33660
1902360   Entertainment Resources,   c/o Mr. Philip Calloway,   9380 S.W. 72nd St.,   Suite B-220,   Miami FL 33173
1902361   Escambia Tax Collector,   P.O. Box 1312,   Pensacola FL 32596
1902362   Esquire Express Inc.,   777 Brickell Avenue,   Suite 900A,   Miami FL 33131
1902363   Exquisite Tees  Inc.,   272 West 21st  Street,   Hialeah FL 33010
1902364   F&M Services,   P.O. Box 380713,   Miami FL 33138
1902365   FPL Offices,   General Mail Facility,   Miami FL 33188-0001
1902366   Federal Express,   2650 Thousand Oaks Blvd.,   Suite 1180,   Attn: Rev Recovery BKC Dept,   Memphis, TN  38118
1902367   Fine Host Corp.,   c/o Joe Robbie Stadium,   2269 N.W. 199 Street,   Miami FL 33056
1902368   Football Sandwich Shop,   8484 N.E. 2 Avenue,   Miami FL 33138
1902369   Fullersound Inc.,   1755 N.E. 149 Street,   Miami FL 33181
1902370   Future Sights and Sounds,   7708 Greenspring Ave.,   Baltimore MD 21208
1902371   G'Xtraz Productions,   6503 Ridgecrest #E,   Dallas TX 75231
1902372   Gavin,   140 Second Street,   San Francisco CA 94105
1902373   General Label Mfg.,   P.O. Box 640371,   Miami FL 33164
1904466   George Brown,   c/o Sonya L. Salkin,   315 S.E. 7th Street,   Ste. 300,   Ft. Lauderdale, FL  33301
1901190   George Brown, as Per Rep fo Est,   of Shelton Wilson, Dec.,   c/o-Sonya L Salkin, Esq,   315 SE 7 St #300,
          Ft Laud, FL  33301
2098770   Gerstle Rosen & Moskowitz,   c/o Kenneth E Zeilberger,   1500 W Cypress Creek Rd #207,   Ft. Lauderdale, FL  33309
1874501   Gerstle Rosen Moskowitz & Assoc,   c/o-Kenneth E Zeilberg, Esq,   1500 W Cypress Creek Rd,   #207,
          Ft Laud, FL  33309
1857705   Gerstle Rosen et al,   c/o Kenneth E Zeilberger, Esq,   1500 W Cypress Creek Rd #207,   Ft. Lauderdale, FL  33309
1902375   Globe Poster Printing,   1801 Byrd Street,   Baltimore MD 21230
1902376   Gold  Coast  Cellular,   15315 S. Dixie Highway,   Miami FL 33157
1902377   Goldcoast Mechanical,   14725 N. Miami Avenue,   Miami FL 33168
```

District/off: 113c-1          User: smith           Page 3 of 6          Date Rcvd: 04/09/96
Case: 95-11447               Form ID: #03           Total Served: 264     Date Served: 04/11/96

| | |
|---|---|
| 1902379 | Graphic Zone Inc., 8009 N.W. 36 Street, Suite 215, Miami FL 33166 |
| 1902452 | Greg Schwabe, 6515 S.W. 78 Terrace, Miami FL 33143 |
| 1930443 | H-Town Boys, c/o Craig V. Rasile, 701 Brickell Ave #3000, Miami, FL 33131 |
| 1902380 | Happy Endings, 651 N.W. 106 Street, Miami FL 33150 |
| 1902381 | Harrington Studios, 940 Fourth Avenue South, Nashville TN 37310 |
| 1902384 | Hit Factory Mastering, 421 West 54 Street, New York NY 10019 |
| 1902385 | Hits, 14958 Ventura Blvd., Sherman Oaks CA 91403 |
| 1902386 | Holiday Inn, 200 S.E. 2 Avenue, Miami FL 33131 |
| 1902387 | Honeywell, 2032 Scott Street, Hollywood FL 33020 |
| 1902389 | Howard Johnson, 16500 N.W. 2 Avenue, Miami FL 33169-6089 |
| 1902390 | Hyde Park Limousine Svc, 4832 S. Dorchester, Chicago IL 60615 |
| 1902391 | Impact Publication, 5'32 Township Line Road, Blue Bell PA 19422-2701 |
| 1902392 | Industrial Waste Service, 3840 N.W. 37 Court, Miami FL 33142-4296 |
| 1902393 | Inner Circle Commun., 379 W. Broadway, Suite 404, New York NY 10012 |
| 1902394 | Interamerican Bank, 9190 Coral Way, Miami FL 33165 |
| 1879771 | Interamerican Bank, c/o Peter D Spindel, 28 W Flagler St 11 Fl, Miami, FL 33130 |
| 1908661 | Interamerican Bank, FSB, c/o-Jay J Lorenzo, Esq., 9192 Coral Way #201, Miami, FL 33165 |
| 1913168 | Jay M Gamberg Esq, 4651 Sheridan St #300, Hollywood FL 33021 |
| 1902477 | Jeffrey J. Thompkins, 1321 N.W. 198th Street, Miami FL 33169 |
| 1902492 | Jennifer Wallace, 704 Forest Avenue, Greenwood IN 46143 |
| 1902429 | Jerry Parker, 1505 N.E. 140 Street, Miami FL 33161 |
| 2012975 | Jerry Williams Inc & Power Artist Music, 6433 Topanga Bl #142, Canoga Park, CA 91303 |
| 1902396 | Joe Robbie Stadium Corp., 2269 N.W. 199 Street, Gate G, Miami FL 33269 |
| 1958859 | John Bickham Jr, c/o Keith T Grumer, 200 S Biscayne Blvd 20th Fl, Miami, FL 33131 |
| 1902383 | Jorge Herrera, 6272 N.W. 186 Street, Miami FL 33015 |
| 1902495 | Joseph Weinberger, 19510 E. Oakmont Dr., Miami FL 33015 |
| 2007163 | Joseph Weinberger—, c/o Francis L. Carter Esq., Coll. Davi___son Carter et ba., 201 S. Biscayne Blvd., Miami, FL 33131-2312 |
| 1902398 | KKBT-FM The Beat, 6735 Yucca Street, Los Angeles CA 9002_- |
| 1902432 | Kara Peterson, 222 Calabrio #8, Coral Gables FL 33134 |
| 1902399 | Kelvyn Ventour Promtns, 2-3750 Riverview Dr., Southfi___ MI 480__ |
| 1902400 | Kussner & Son, 4811 N.W. 35 Avenue, Miami FL 33142 |
| 1902401 | L.E.P. Profit Int'l, P.O. Box 93u476, Atlanta GA 3119_ |
| 1902402 | LFL Music Productions, 13928 S. Biscayne River, Miami FL 33___ |
| 1902403 | Law Offices of Jean Ryan, 9130 S. Dadeland Blvd., Suite 110_, ___mi FL 33156_7849 |
| 1902404 | Lewis Freeman & Assoc., 3250 Mary Street, Suite 202, Miami FL 33___ |
| 2005979 | Lorenzo Smith, c/o- Marlow V White Esq, POB 1050, Tallahassee, FL 32302 |
| 1902382 | Lori Harris, 4004 Kenway Avenue, Los Angeles CA 90008 |
| 1846300 | Luce Press Clippings, 42 S Center, Mesa, AZ 85210 |
| 1902405 | Luce Press Clippings, c/o Jonathan Leiderman, 9130 S. Dadeland Blvd., Miami FL 33156 |
| 1902406 | Luroga Design, 8009 S.W. 157 Court, Miami FL 33193 |
| 1902502 | Luther R. Campbell, 8400 N.E. 2nd Avenue, Miami FL 33138 |
| 1902312 | M. Tommy Afont, 12376 N.W. 11 Lane, Miami FL 33182 |
| 1902407 | MGM Press Inc., 1631 West 38 Place, Bay 1501A, Hialeah FL 33012 |
| 1902408 | Mac Hartsborn Inc., 1130 Venetian Way 2L, Miami Beach, FL 33139 |
| 1902409 | Management Info Solution, 700 S.E. 3 Avenue, Suite 300, Ft. Lauderdale FL 33316 |
| 1902410 | Manzini & Stevens P.A., 44 W. Flagler Street, Suite 2050, Miami FL 33130 |
| 1901192 | Manzini & Stevens, PA, c/o-Nicholas A Manzini, Esq., 44 W Flagler St #2050, Miami, FL 33130 |
| 1913169 | Mark D Cohen Esq, 4651 Sheridan St #300, Hollywood FL 33021 |
| 2007144 | Mark Ross, c/o-Douglas D Stratton, Esq, 407 Lincoln Rd #2B, Miami Bch, FL 33139 |
| 1902411 | Markowitz Davis & Ringel, 9130 S. Dadeland Blvd., Miami FL 33156 |
| 1973351 | Markowitz Davis & Ringel PA, attn: Jerry M Markowitz Esq, 9130 S Dadeland Blvd #1225, Miami, FL 33156 |
| 1902412 | Maroone Dodge Inc., 21151 N.W. 2nd Avenue, Hollywood FL 33254 |
| 1902413 | Master Records, 3000 Biscayne Blvd., Suite 105, Miami FL 33137 |
| 1902416 | Metro Dade Parks &, Recreation, Finance Marina Services, 50 S.W. 32 Road Bldg. 5, Miami FL 33129 |
| 1902417 | Miami Dade Water & Sewer, P.O. Box 339055, Miami FL 33233-9055 |
| 1902418 | Miami Tele-Communication, 1306 N.W. 7 Avenue, Miami FL 33136-2330 |

1020108

District/off: 113c-1          User: smith            Page 4 of 6            Date Rcvd: 04/09/96
Case: 95-11447               Form ID: #03            Total Served: 264       Date Served: 04/11/96

```
1902388    Michael Hopkins,   14330 N.W. 13 Avenue,   Miami FL 33167
1902420    Million Dollar Music,   2459 Roosevelt Highway,   Suite B1,   College Park GA 30037
1902421    Milton Mizell,   80 N.W. 93 Street,   Miami FL 33150
1902422    Montgomery McCracken,  Walker Rhoads,  Three Parkway,  Attn: Moraima Kelly, Esq,  Philadelphia, PA  19102
1902423    Music Express,   475 Boulevard,   Elmwood Park NJ 07407
1851378    Music Express East Inc,   c/o Allison R Day,   200 S Biscayne Blvd #3650,   Miami, FL 33131
1875486    Music Express East, Inc,   c/o-David Ribak, Esq,   200 S Biscayne Blvd,   #1050,   Miami, FL 33131
1902424    National Promotions &,  Advertising Inc.,  4117 W. Jefferson Blvd.,  Los Angeles, CA  90016
1902425    Nimbus Manufacturing,   P.O. Box 7427,   Charlottesville VA 22906-7427
2104315    Nuclear Promotions,   c/o Arthur Halsey Rice,   848 Brickell Ave #1100,   Miami, FL 33131
1994652    Nuclear Promotions, Inc,   c/o-Arthur Halsey Rice, Esq,   848 Brickell Ave #1100,   Miami, FL 33131
1902395    Ouida  Jennerman,   9601 Brewster Street,   Pensacola FL 32514
1902426    PA Unemply. Comp. Fund,   Seventh & Forster Sts.,   P.O. Box 68568,   Harrisburg PA 17106
2013061    Pac Jam Publishing,   8400 NE 2nd Ave,   Miami, FL 33138
1902427    Padell Nadell Fine,   Weinberger & Co.,   156 West 56 Street,   New York NY 10019
1902428    Page America,   1400 N.W. 23 Avenue,   Ft. Lauderdale FL 33311
1962501    Pandisc Music Corp,   c/o-Neil J Berman, Esq,   100 SE 2nd St,   (35th Fl),   Miami, FL 33131-2130
2017068    Pandisc Records Inc,   c/o Neil J Berman,   100 SE 2 St 35 Fl,   Miami, FL 33131
1902431    Paychex,   8181 N.W. 154 Street,   Suite 100,   Miami FL 33016
1902397    Peter Jones,   c/o Paul L. Orshan Esq.,   Kluger Peretz et al,   201 S. Biscayne #1970,   Miami FL 33131
1902433    Power 96,   20295 N.W. 2 Avenue,   Miami FL 33169
1902434    Precision Litho,   242 West 23 Street,   Hialeah FL 33010
1878679    Precision Litho Corp,   c/o Roger S Kobert,   241 Sevilla Ave,   #805,   Coral Gables, FL 33134
1902435    Prime Hospitality Corp.,   c/o Adorno & Zeder,   2601 Bayshore Drive,   Suite 1600,   Miami FL 33133
1902436    Prodigy,   P.O. Box 8667,   Gray TN 37615-8667
1902437    Profit Freight Systems,   c/o Law Offices Ross,  Gelfand,  3280 Pointe Parkway,  Norcross GA 30092
1902438    Public Storage Mgmt,   18450 N.E. 5 Avenue,   Miami FL 33179
1902439    Pumo Enterprises,   7327 N.W. Miami Court,   Miami FL 33137
1902440    R&R Airplay Monitor,   1515 Broadway,   New York NY 10036
1902441    R&R The Industry's Newspapers,  Radio & Records, Inc,  10100 Santa Monica,
           Los Angeles, CA  90067
2008638    RED Dist. Inc.--,   James P.S. Leshaw,   1221 Brickell Ave.,   Miami, FL 33131
1902442    RED Distribution Inc.,   79 Fifth Avenue,   New York NY 10003
1902443    Rachlin Cohen & Holtz,   P.O. Box 43-2040,   South Miami FL 33243
1902444    Ramada Plaza Suites,   1507 Boardwalk,   Atlantic City NJ 08401
1902445    Ramallo Travel,   3737 S.W. 8 Street,   Suite 302,   Coral Gables FL 33134
1902374    Ray George,   2231 N.E. 173 Street,   Miami FL 33160
1825894    Red Distribution Inc,   c/o Mark D Bloom,   1221 Brickell Ave,   Miami, FL 33131
1902446    Review Printers,   P.O. Box 010589,   Miami FL 33101
1902457    Rick Smith,   10879 Hereford Chase,   Tallahassee FL 32311
2117066    Robbie Stadium Corp. (RSC),  c/o Rodolfo Pittaluga Jr. (agt.),  SunTrust International Center,
           One SE Third Ave. 28th Fl.,   Miami, FL 33131-1704
1902419    Robert H. Miller Esq.,   44 W. Flagler Street,   #1725,   Miami FL 33130
1902447    Rockville Production,   9400 N.E. 2 Avenue,   Miami FL 33138
1902496    Roderick Whitehead,   809 N.W. 46 Avenue,   Plantation FL 33311
1902325    Roger C. Appell Esq.,   2001 Park Place Tower,   Suite 1000,   Birmingham AL 35203
1902448    Rolling Stone Magazine,   P.O. Box 55300,   Boulder CO 80322-5300
1902378    Ron Goodman,   3243 Dunkirk Avenue,   Norfolk VA 23509
1902449    Roto-Rooter Services,   7911 N.W. 72 Avenue,   Suite 117,   Medley FL 33166
1902450    Sample Clearance Limited,   315 W. 57 Street,   Suite 5J,   New York NY 10019
1902451    San Francisco Airport,   Hilton,   International Airport,   San Francisco CA 94128
1902453    Seford Industrie,   3890 N.W. 132 Street,   Bay 1,   Opa Locka FL 33054
1901191    Shellie Wilson, Jr,   c/o-Sonya L Salkin, Esq,   315 SE 7 St #300,   Ft Laud, FL 33301
1902454    Sir Speedy Printing,   3886 Biscayne Blvd.,   Miami FL 33137
1902455    Sister 2 Sister,   P.O. Box 41148,   Washington DC 20018
1902456    Skytel,   P.O. Box 3887,   Jackson MS 39207-3887
2013045    Slackson Productions,   1026 Sleepy Hollow RD,   Terry, MS
```

District/off: 113c-1        User: smith           Page 5 of 6          Date Rcvd: 04/09/96
Case: 95-11447             Form ID: #03          Total Served: 264     Date Served: 04/11/96

```
1902458   Society, Marcus Effinger,  P.O. Box 2077,  Miami FL 33138
1902459   Society Productions,  P.O. Box 2077,  Miami FL 33138
1930440   Solomon Connor,  c/o Craig V. Rasile,  701 Brickell Ave #3000,  Miami, FL  33131
1902460   Soundscan Inc.,  220 N. Central Park Ave,  Hartsdale NY 10530
1902461   South Beach Studios,  1200 Collins Avenue,  Miami Beach FL 33139
1902462   Southeast Music Inc.,  P.O. Box 55-1926,  Miami FL 33055
1902463   Southern Bell,  P.O. Box 66002,  New Orleans LA 70166
1902465   Spartan Express  Inc.,  P.O. Box 1050,  Greer SC 29652-1050
2013043   Stanley Cobbie,  1161 Holmes Ct,  Austin, TX  78702
1902466   State Farm Insurance,  P.O. Box 30084,  Tampa FL 33630-0084
2017875   Stattic In Da Muzik Publishing,  Anthony Walker,  9 Clipper Ct,  4 Seasons,  Newark, DE  19702
1902467   Stearns Weaver Miller,  et al.,  150 W. Flagler Street,  Suite 2200,  Miami FL 33130
1902468   Stepping Stone Prod.,  3583 W Hillsboro Blvd,  #108,  Deerfield Bch, FL  33442
2104380   Stepping Stone Productions,  3583 W Hillsboro Blvd #108,  Deerfield Bch., FL  33442
1895567   Sterns Weaver Miller, et al,  c/o Patricia A Redmond, Esq,  150 W Flagler St,  #2200,  Miami, FL  33130
1902470   Stuart Silfen P.C.,  488 Madison Avenue,  New York NY 10022
1902471   Studio Studio,  1325 Key Highway,  Baltimore, MD  21230
1902472   Synergetic Services Inc.,  1926 N.E. 151 Street,  Miami FL 33162
1904812   Teenear Barnett,  c/o Sandy Karlan Esq.,  100 SE 2 st #2700,  Miami FL 33131
1908506   Teenear Barnett,  c/o Ellen Dee Silvers,  1500 San Remo Ave #206,  Coral Gables, FL 33146
1902473   Teriminix,  5721 N.W. 158 Street,  #46,  Miami Lakes FL 33014
1902475   The Miami Herald,  Subscriber Service Ctr,  P.O. Box 019663,  Miami FL 33101-9663
1902476   The Source,  594 Broadway,  Suite 510,  New York NY 10012-3233
1953290   Thomasina H Williams,  2937 SW 27 Ave #301,  Coconut Grove FL 33133
1902340   Tom Cassell,  1350 E. Rock Spring Rd #1,  Atlanta GA 30306
1902479   U. S. Air,  C-/o Allied Interstate,  P.O. Box 1471,  Minneapolis MN 55440
1923612   UPS,  5400 S University Dr,  Bldg 3,  Davie, FL  33328
1902482   United Business Forms,  13001 N.W. 42 Avenue,  Miami FL 33054
1902483   United Parcel Service,  6517 Taft Street,  Hollywood FL 33024
1902484   Urban Network,  120 N. Victory Blvd.,  Burbank CA 91502
1902486   Viking Freight System,  Credit & Collection Dept,  P.O. Box 649001 Ste 41,
2007165   Visonic Pub.,  c/o Visonic Studios,  1862 NW 38 Ave.,  Lauderhill, FL  333
1902487   Vista Color Corporation,  3401 N.W. 36 Street,  Miami FL 33142
1902488   WDZZ,  c/o Lilisa Valentine,  120 E. First Street,  Suite 1830,  Flint MI 48502
1902489   WEDR-FM,  P.O. Box 55-1748,  Miami FL 33054
1902491   WTMP Radio Ltd.,  5207 Washington Blvd.,  Tampa FL 33619
1902493   Warlock,  19 W. 21 Street,  Suite 702,  New York NY 10010
1964555   Warlock Records Inc,  c/o Arthur Halsey Rice,  848 Brickell Ave #1100,  Miami,
1994651   Warlock Records, Inc,  c/o Arthur Halsey Rice, Esq,  848 Brickell Ave #1100,  Miami, FL  33131
1902494   Watkins Motor Lines Inc.,  1144 W. Griffin Road,  P.O. Box 95002,  Lakeland FL 33804-5002
1882081   Watkins Motor Lines, Inc,  POB 95001,  Lakeland, FL  33804-5001
2012993   Wayn Cook,  Gold Coast Boat,  POB 630427,  Miami, FL  33163
2005975   Wendell Rick Smith,  c/o- Marlow V White Esq,  POB 1050,  Tallahassee, FL  32302
2005972   Wendell Rick Smith & Lorenzo Smith,  c/o- Marlow V White Esq,  POB 1050,  Tallafassee, fl 32302
1902497   Williams & Assoc. P.A.,  2937 S.W. 27 Avenue,  Suite 301,  Coconut Grove FL 33133
1902498   Williams & Clyne P.A.,  450 N Park Rd,  #605,  Hollywood, FL  33021
2104579   Williams & Clyne PA,  c/o Thomasina H Williams Esq,  2937 SW 27 Ave #301,  Coral Gables, FL  33133
1902499   Wilshire Scott & Dyar,  4450 First City Tower,  Houston TX 77002
1902500   Winning Applications Inc,  1860 N. Pine Island Road,  Suite 108,  Plantation FL 33322
1902501   Yellow Freight System,  P.O. Box 453,  Agoura Hills CA 91376
1902469   Zelda Stewart,  2449 Jackson Avenue,  Baton Rouge LA 70802
```

| District/off: 113c-1 | User: smith | Page 6 of 6 | Date Rcvd: 04/09/96 |
|---|---|---|---|
| Case: 95-11447 | Form ID: #03 | Total Served: 264 | Date Served: 04/11/96 |

##### ***** UNDELIVERABLE LIST *****

| | |
|---|---|
| 1902303 | ARTISTS' ROYALTIES |
| 1902320 | American Gen Hospitality |
| 1902331 | Bassin Distributors,   c/o Furst and Furst |
| 1902348 | Commonwealth of Virginia |
| 1902415 | John McGill |
| 1902464 | Southern Living At Best |
| 1902474 | Terry Alexander |
| 1902480 | U.S. Magazine |
| 1902481 | U.S. News & World Report |
| 1902490 | WJPC 106 JAMZ |

TOTAL: 10

##### ***** CLIN SUMMARY *****

| CLIN | Description | Unit | Qty | Unit Price | Extended Price |
|---|---|---|---|---|---|
| 3007 | Paper, print one side | Sheet | 263 | 0.15000 | 39.450 |
| 3008 | Paper, print two sides | Sheet | 265 | 0.16000 | 42.400 |
| 4001 | Prepare to transmit Notice Service | | 1 | 0.10000 | 0.100 |
| | | | | TOTAL | 81.950 |

I, H. Douglas Dangerfield, declare under the penalty of perjury that I have prepared the Certificate of Service and that it is true and correct to the best of my information and belief.

Date: 04/11/96

Signature:   *H. Dough Dangfild*

# EXHIBIT 37

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                          CASE NO. 95-11447-BKC-RAM

LUKE RECORDS, INC.                              CHAPTER 11

      Debtor.
_____

ORDER APPROVING SETTLEMENT
AND COMPROMISE OF CLAIM
AND AUTHORIZING DEBTOR TO
ENTER INTO SETTLEMENT AGREEMENT

      **THIS CAUSE** came into consideration before the Court, without notice or hearing, upon the Debtor's Motion to Approve Settlement Agreement by and between the Debtor and Acoff-Rose Music, Inc., and the Court receiving the Debtor's Certificate of No Response, and being otherwise duly advised in the premises, it is hereby,

      **ORDERED AND ADJUDGED** as follows:

      1.    The Debtor's Motion to Approve Settlement Agreement by and between the Debtor and Acuff-Rose Music, Inc. is granted.

      2.    The Debtor is authorized to enter into the Settlement Agreement by and between the Debtor and Acoff-Rose which is attached to the Motion as being in the best interest of the estate.

      **DONE AND ORDERED** in Chambers, at Miami, Southern District of Florida this _13th_ day of February, 1996.

                                                _____
                                                Robert A. Mark
                                                U.S. Bankruptcy Judge

cc:  Jonathan K. Winer, Esq.

(Attorney Winer shall serve a conformed copy of this Order immediately upon receipt to all parties in interest and file a Certificate of Service with the Court.)

\bankrupt\camp-luke\settle.ord

# EXHIBIT 38

# COPYRIGHT ASSIGNMENT

Whereas, Luther Campbell, Debtor and Debtor in Possession, Luke Records, Inc., a Florida Corporation, Debtor and Debtor in Possession, Pac Jam Publishing, Inc., Pac Jam Music and/or Pac Jam Publishing ("Assignors") own certain master recordings and associated license agreements wherein the master recordings have been licensed to the third parties listed on Exhibit A (the Masters);

Whereas, Lil' Joe Records, Inc., a Florida Corporation ("Assignee") Pursuant to a Letter of Intent executed by the Assignors dated on or about February 3, 1996, further approved by Court Order Confirming Joint Plan Of Reorganization of the Assignor dated March 22, 1996, in Case Nos 95-11447 BKC RAM and 95-12785 BKC RAM, the US Bankruptcy Court Southern District Of Florida has acquired the masters on Exhibit A which is exempt from tax under any law imposing a stamp or similar tax;

For valuable consideration of the sum of ten dollars ($10.00), an other good and valuable consideration, receipt of which is acknowledged, the undersigned, ASSIGNORS, jointly and severally, hereby assign, transfer, set over and convey to Lil' Joe Records, Inc., and its respective successors and assigns all of ASSIGNORS' portion of all rights, title and interest set forth in and to the musical compositions, comprising 100% of all worldwide rights owned by Assignor (see attached COMPOSITE exhibit "A"), including but not limited to the lyrics, music, and title of the compositions, and any and all works derived therefrom, together with the copyrights and proprietary rights therein and in any and all versions of said musical compositions, and any renewals and extensions thereof (whether presently available or subsequently available as a result of intervening legislation or to which ASSIGNORS may become entitled under prior, existing or subsequently enacted federal, state or foreign laws) in the United States of America and elsewhere throughout the world, and further including any and all causes of action for infringement of the same, past, present or future, any other causes of action related to the compositions or any of the rights therein all of the proceeds from the foregoing accrued and unpaid or uncollected and or hereafter accruing together with any mechanical and or sample licenses previously issued in connection with the copyrights or compositions.

ASSIGNORS agree to sign any and all other papers which may be required to effectuate the purpose and intent of this Assignment, and hereby irrevocably authorize and appoint Richard Wolfe, Liquidating Trustee, his attorney and representative in its or his name as his true and lawful attorney-in-fact to take such action and make, sign, execute, acknowledge and deliver all such documents as may from time to time be necessary to convey to ASSIGNEE, its successors and assigns, all rights herein granted, provided that ASSIGNORS shall first be given the opportunity to execute such documents upon seven (7) business days prior written notice, after which time Richard Wolfe shall be free to execute such documents. ASSIGNORS ACKNOWLEDGE THAT THEY SHALL NOT RECEIVE ANY WRITERS, PUBLISHING OR OTHER MONIES (PAST, PRESENT OR FUTURE ON ANY OF THE COPYRIGHTS BEING TRANSFERRED).

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of this _8TH_ day of April, 1996.

Witnessed:                                          Luke Records, Inc. Debtor and
                                                    Debtor in Possession

_Maria Teresa Gering_                               _Luther Campbell, President_
                                                    Secretary
                                                    (Corporate Seal)

_____

The foregoing instrument is joined in and assented to by Frank P. Terzo
Liquidating Trustee of Luke Records, Inc.

Witnessed:
                                                    Frank P. Terzo Liquidating Trustee
                                                    Luke Records, Inc.
_____

_____


_Maria Teresa Gering_                               Luther Campbell, Debtor and
                                                    Debtor In Possession
_____                             F/D/B/A PAC JAM
                                                    PUBLISHING AND PAC JAM
                                                    MUSIC


_Maria Teresa Gering_                               PAC JAM PUBLISHING INC.

_____                             LUTHER CAMPBELL, PRESIDENT AND
                                                    SECRETARY
                                                    (CORPORATE SEAL)


The foregoing instrument is joined in and assented to by Richard C. Wolfe
Liquidating Trustee of Luther Campbell bankruptcy estate

                                                    Richard C. Wolfe Liquidating Trustee
                                                    Luther Campbell Bankruptcy Estate

STATE OF FLORIDA    )
                    ) ss:
COUNTY OF DADE      )

    The foregoing was acknowledged before me this ____ day of April, 1996, by RICHARD
C. WOLFE, who is personally known to me and who did/did not take an oath.

┌─────────────────────────────┐
│   OFFICIAL NOTARY SEAL      │        _Elizabeth C. Manning_
│   ELIZABETH C MANNING       │        _____
│ NOTARY PUBLIC STATE OF FLORIDA│      NOTARY PUBLIC - ELIZABETH C. MANNING
│ COMMISSION NO CC422324      │
│ MY COMMISSION EXP NOV 21 1998│
└─────────────────────────────┘

STATE OF FLORIDA   )
                   )ss:
COUNTY OF DADE     )

The foregoing instrument was acknowledged before me this 8TH day of April, 1996, by Luther Campbell President and Secretary of Luke Records, Inc. Debtor and Debtor in Possession on behalf of the corporation AND LUTHER CAMPBELL PRESIDENT AND SECRETARY OF PAC JAM PUBLISHING, INC., who is personally known to me or who produced _____ as identification, and who did/did not take an oath.

Print Name: MARIA TERESA GERSING
Notary Public State of Florida

My Commission Expires:

OFFICIAL NOTARY SEAL
MARIA TERESA GERSING
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC449431
MY COMMISSION EXP. MAR. 29,1999

STATE OF FLORIDA   )
                   )ss:
COUNTY OF DADE     )

The foregoing instrument was acknowledged before me this 8TH day of April, 1996, by Luther Campbell Debtor and Debtor in Possession, who is personally known to me or who produced _____ as identification, and who did/did not take an oath.

Print Name: MARIA TERESA GERSING
Notary Public State of Florida

My Commission Expires:

OFFICIAL NOTARY SEAL
MARIA TERESA GERSING
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC449431
MY COMMISSION EXP. MAR. 29,1999

STATE OF FLORIDA   )
                   )ss:
COUNTY OF DADE     )

The foregoing instrument was acknowledged before me this 8TH day of April, 1996, by Richard C. Wolfe Liquidating Trustee of the Luther Campbell Bankruptcy Estate, who is personally known to me or who produced _____ as identification, and who did/did not take an oath.

Print Name: MARIA TERESA GERSING
Notary Public State of Florida

My Commission Expires:

OFFICIAL NOTARY SEAL
MARIA TERESA GERSING
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC449431
MY COMMISSION EXP. MAR. 29,1999

STATE OF FLORIDA   )
                   )ss:
COUNTY OF DADE     )

The foregoing instrument was acknowledged before me this 9th day of April, 1996, by Frank P. Terzo  liquidating trustee of the Luke Records, Inc. Bankruptcy Estate, who is personally known to me or who produced _____ as identification, and who did/did not take an oath.

Print Name: Emma Lastra
Notary Public State of Florida

My Commission Expires:
6-13-96

OFFICIAL NOTARY SEAL
EMMA LASTRA
COMMISSION NUMBER
CC206439
MY COMMISSION EXP
JUNE 13,1996

114711

LJWR0816

| TITLE | COMPOSER | CPYRT |
|---|---|---|
| (SAMPLE TAKEN FROM) FUNKY STUF | R.BELL/R.BELL/R.WESTFIELD/D.THOMAS | 5379 |
| BET $100 | LUTHER CAMPBELL | 25463 |
| THE 2 LIVE CREW MEGA MIX | LUTHER CAMPBELL | |
| A BETTER WAY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| ACTION | R. ANDERSON | |
| ACTION | PATRICK MENDEZ | 16760 |
| AFRAID OF THE FLAVOR | JEFF THOMPKINS | |
| AGONY | JEFF THOMPKINS | |
| A.I.D.S. (PRELUDE) | PATRICK MENDEZ | |
| AIN'T NOBODY BAD LIKE ME | M. EFFINGER | 5344 |
| AIN'T NO PUSSY LIKE.... | LEJUAN BIGGERS/MARK ROSS | 8351 |
| AIN'T THAT A B-TCH PART 1 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 16556 |
| AIN'T THAT A B-TCH PART II | LUTHER CAMPBELL/JOHHN GUITAR WATSON/DOUGLAS BIGSON | 16562 |
| ALLEY BOY | LUTHER CAMPBELL/JOHNNY GUITAR WATSON/ | |
| ALL MY EX'S | PATRICK WATLER/VAN WATLER | |
| ALL NIGHT ALL DAY | LUTHER CAMPBELL | 20478 |
| ALL THEY GOOD 4 | T.BUTLER/E.KENDRICK/B.MUHAMMED | 16758 |
| ALWAYS | JEFF THOMPKINS | 5384 |
| ALWAYS ON MY MIND | DERRICK RAHMING | |
| ANAL S-X | U-MYND | |
| ANGEL SIN | LUTHER CAMPBELL | 5340 |
| ANOTHER JEALOUS B-CH | MICHAEL STERLING | |
| ANOTHER LEVEL | R. ANDERSON | |
| ANQUETTE'S GROOVE | R. ANDERSON | 5370 |
| ARREST IN EFFECT | DAVID HOBBS | 5246 |
| ASSASSINATION ATTEMPT | LUTHER CAMPBELL/RODNEY C. TERRY/MICHAEL MCCRAY/CAR | 8362 |
| ATTENTION PLEASE | RICHARD GRIFFIN/ANTHONY MILLS*/R.SCURDY (50%/50%*) | 8368 |
| THE B***H THAT I HATE | RICHARD GRIFFIN/ANTHONY MILLS/R SCURDY | 5452 |
| B-L-N-T | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5329 |
| BABY BABY PLEASE (JUST A LITTLE | MICHAEL THOMAS/KEITH JORDAN | 8336 |
| BABY I NEED YOU | U-MYND | |
| BACK FROM H-LL | R. TAYLOR | |
| BACK TO THE BRONX | PATRICK WATLER/VAN WATLER | 5268 |
| BAD ASS BITCH | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| BAD BOYS MOVE IN SILENCE | CHRIS WONG WON | |
| BAD INFLUENCE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5456 |
| BAD LAND BOOGIE | LUTHER CAMPBELL | 25448 |

| Title | Credits | Number |
|---|---|---|
| BALLS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8356 |
| BANNED IN THE USA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| BASS 9-1-7 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5243 |
| BEAT BOX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5290 |
| BEAT YOUR LOVER | LUTHER CAMPBELL | |
| BEAT YOUR LOVER REPRISE | LUTHER CAMPBELL | |
| BETCHA HE DONT | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| BIG NOSE | JEFF THOMPKINS | 16776 |
| THE BITCH THAT I HATE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 7782 |
| BLACK IS THE COLOR | R. ANDERSON | |
| BLACKDRAFT | RICHARD GRIFFIN | |
| BLAME IT ON THE FUNK | INDO G & lIL bLUNT SMK | |
| BLAX THANX | PROFESSOR GRIFF | 5399 |
| BLAX THANX PT 2 | RICHARD GRIFFIN/ANTHONY MILLS | 8377 |
| BLAX THANX PT 111 | RICHARD GRIFFIN | |
| BODY FINE | PATRICK MENDEZ | |
| THE BOMB HAS DROPPED | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5283 |
| THE BOTTOM | DERRICK RAHMING | 5392 |
| BOUT TO LOSE MY MIND | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| THE BOY GOT SOME D-K | LUTHER CAMPBELL | 25467 |
| BOYZ WITH DA BASS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| BREAKDOWN | LUTHER CAMPBELL/CALEB ARMSTRONG/RAY ANTHONY SMITH | 16557 |
| BREAK IT ON DOWN | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5258 |
| BRO KEMIT SPLITTING ATOMS IN THE | RICHARD GRIFFIN/MARCUS/EFFINGER*/L NEWTON*/T.TUCKER* | 8379 |
| BROTHER TO BROTHER | MICHAEL JOHNSON/KEVIN JOHNSON | 5366 |
| BUCK 'EM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| BURN ONE | JEFF THOMPKINS | |
| BUST A NUT | LUTHER CAMPBELL | 25464 |
| C'MON BABE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5256 |
| CALM DOWN | C.MCNEIL & H.MCCLARTY | |
| CAN'T GO FOR THAT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5464 |
| CAN YOU FEEL IT | R. TAYLOR | |
| CAPER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| CAPT. D-CK AND DOLEMITE | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| CAUGHT IN THE ACT | V.D. BROOMFIELD | 5411 |
| CHECK IT OUT Y'ALL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5286 |
| CHECK OUT THE AVENUE PT 1 | JEFF THOMPKINS | |
| CHECK OUT THE AVENUE PT 2 | JEFF THOMPKINS | |

| Title | Author | Number |
|---|---|---|
| CHESTERFIELD ISLAND | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8354 |
| CHILLIN' | CHRIS WONG WON/ANQUETTE ALLEN | 5371 |
| CHILLIN LIKE A VILLAIN | INDO G & LIL BLUNT SMK | |
| CHRISTMAS FREESTYLE | L. CAMPBELL/C. WONG WON/L. DOBSON | |
| CHRISTMAS F-IN DAY | R. ANDERSON | |
| CHRISTMAS SPLIFF | JEFF THOMPKINS | |
| CHRISTMAS TIME MEGAMIX | M.MCCRAY | 16552 |
| CISCO | LUTHER CAMPBELL | |
| CITY BOY | JEFF THOMPKINS | |
| CITY OF BOOM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5272 |
| CLIP ON CLICKS | LUTHER CAMPBELL | |
| COLOR CONFRONTATION | RICHARD GRIFFIN | |
| COME HOME | U-MYND | |
| COME INSIDE | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| COME ON | LUTHER CAMPBELL | |
| COME ON DOWN | R. ANDERSON | |
| COME QUICK | H.MCCLARTY & C.MCNEIL | |
| COME A SURPRISE | JEFF THOMPKINS | |
| COME AND GET IT | A LARKINS II | 5412 |
| COMING HOME FOR CHRISTMAS | S. CONNOR, D. CONNOR, D. JACKSON | |
| COMING STRAP | JEFF THOMPKINS | |
| COMMERCIAL INQUIRING MINDS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7298 |
| COMMERCIAL NASTY M.F.S. | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7301 |
| CONDOM COMMERCIAL | R. TAYLOR | |
| COOL (SOME COOL SH-T) | LUTHER CAMPBELL | 5270 |
| COOLIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| COWARDS IN COMPTON | LUTHER CAMPBELL | 25452 |
| CRAZY BOUT U | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| CRUCIFIED | RICHARD GRIFFIN/ANTHONY MILLS* (50%/50%)* | 8375 |
| CRUCIFIED (PROLOGUE) | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 8365 |
| CUT IT UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5289 |
| CUTNESS SAKE | DERRICK RAHMING | 5391 |
| DANCE ALL NITE (HOUSE MIX) | | |
| DANCE ALL NITE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5453 |
| DANCE TO THE RHYTHM | CHRIS WONG WON | |
| DANCE WITH ME BAILA BAILA | K. FELICIANO | 5417 |
| DEDICATION | JOHN BICKHAM, JR. | |
| DEM A TALK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

| Title | Artist | Number |
|---|---|---|
| DEMON | CHRIS WONG WON | |
| DICK ALMIGHTY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5255 |
| DICK 'EM DOWN | CHRIS WONG WON | |
| DINNER DATE | TRELLINI DAVIS AND BISHP "STICK" BURRELL | |
| DIRTY NURSERY RHYMES | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5257 |
| DISTURB N THA PEACE | RICHARD GRIFFIN | |
| DJ DESTRO - SCRATCH MILITANT | MICHAEL JOHNSON/KEVIN JOHNSON | 5364 |
| DO CRACK TAKE THE RAP | BRIM/HAGER/LAWRENCE/MCGUIRE/RAHMING | 5418 |
| DO IT LIKE THAT | U-MYND | |
| DO IT TO YA | U-MYND | |
| DOGGIE STYLE | DERRICK RAHMING | 5389 |
| DOMINATION | D. SAUNDERS/D. MILLER | 5422 |
| DON'T CALL ME BABY | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| DON'T EVEN | D. STINSON, W. KELLUM, C. JANNEST | |
| DON'T GO OUT LIKE A SUCKA | ANTHONY DURHAM/DAVID HOBBS | 5304 |
| DON'T NEED U B-T-H | R. TAYLOR | |
| DON'T WANNA SHARE | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| DOO DOO BROWN | PATRICK MENDEZ | |
| DO THAT SHIT | MICHAEL PAYNE | 5415 |
| DO THE BART | CHRIS WONG WON/MARK ROSS/RODNEY C. TERRY/MIKE MCC | 5241 |
| DO WAH DIDDY | MANFRED MANN | |
| DO YOU BELIEVE | BEAT GOES BANG | |
| DO YOU HEAR THE LAMBS CALLING | LUTHER CAMPBELL | 25445 |
| DOWNTOWN | UNIDENTIFIED | 7341 |
| DRE'S MOMMA NEEDS A HAIRCUT | LUTHER CAMPBELL | 25445 |
| DROP IT OFF YOUR ASS | INDO G & LIL bLUNT SMK | |
| DROP THE BOMB | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/C. WONG WON | |
| DROP YOUR DRAWS | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| DRUGZ BULLSHITTIN' | JEFF THOMPKINS | 16767 |
| EDDIE MILLER | TRELLIN DAVIS AND BISHOP "STICK" BURRELL | |
| EVERYBODY SAY 'YEAH | LEJUAN BIGGERS/MARK ROSS | 5347 |
| F-K A GANG | LUTHER CAMPBELL/RODNEY C TERRY/JEFFERY THOMPKINS (J | 5252 |
| F-K MARTINEZ | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5239 |
| FACE DOWN, A-- UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5242 |
| FAKIN' LIKE GANGSTERS | LUTHER CAMPBELL/SYLVESTOR ALLEN/HAROLD BROWN/MOR | 16551 |
| FEAT DJ MAN | LEJUAN BIGGERS/MARK ROSS | 5350 |
| FEEL ALL RIGHT Y'ALL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5280 |
| FELLAS IN THE HOOD | JOHN BICKHAM, JR. | |

LJW R0820

| Title | Writer(s) | Number |
|---|---|---|
| FINGER ON THE TRIGGER | INDO G & LIL BLUNT SMK | 5455 |
| FLAUGIN | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | |
| FOLLOW MY HEART | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| FOR HOW LONG | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8331 |
| FOR THOSE WHO LIKE TO DO IT | UNIDENTIFIED (CAMPBELL/ROSS/HOBBS/WONG-WON) | 16469 |
| FRATERNITY JOINT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8341 |
| FRATERNITY RECORD A/K/A FRATER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5267 |
| FREAK FOR LIFE | LUTHER CAMPBELL | |
| FREAK THAT GIRL | ANTHONY DURHAM/DAVID HOBBS | 5299 |
| FREESTYLE | CHRIS WONG WON | |
| FREAKY BEHAVIOR | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8349 |
| FREAKY BUSINESS | LUTHER CAMPBELL | |
| FREESTYLE JOINT | LUTHER CAMPBELL | 25462 |
| FREESTYLE RAPPIN' | CHRIS WONG WON | 5372 |
| FROM THE BOTTOM TO THE CUFF | MICHAEL JOHNSON/KEVIN JOHNSON | 5363 |
| FROM THE BOTTOM TO THE TOP | CHRIS WONG WON | |
| F--K | H. MCCLARTY/C.MCNEIL | |
| F--K 'EM INTRO | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F--K 'EM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F--KEM UP RICK | R. TAYLOR | |
| A F--K IS A F--K | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8333 |
| F--K NIGGA | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F--K OFF | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8346 |
| THE FUNK SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| THE F--K SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5262 |
| FUGITIVE | RICHARD GRIFFIN/MARCUS EFFINGER*/JIM O'BRIEN**/ANTHON | 8378 |
| FUGITIVE (PC) | JEFF THOMPKINS | |
| F.U.N.K (FROM US NASTY KIDZ) | M.EFFINGER, S.SIMONIAN,P.MARCELIN, AND J. NIXON | |
| FUNKY STUFF | LUTHER CAMPBELL | 5466 |
| GAME RECOGNIZE GAME | JEFF THOMPKINS | |
| GAMES | T. BUTLER/D. MOHAMMED | 20481 |
| GANGSTER ROCK | DAVID ZILMER/MICHAEL PAYNE | 5416 |
| GENTLE | MICHAEL STERLING | 5357 |
| GET A REFILL | PATRICK WATLER/VAN WATLER | |
| GET IT GIRL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5287 |
| GET LOOSE NOW | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5261 |
| GET OFF YOUR A-- AND JAM | ANQUETTE ALLEN | |
| GET ON THE MIC | INDO G & LIL BLUNT SMK | 5377 |

| Title | Credits | Number |
|---|---|---|
| GET THE F--K OUT OF MY HOUSE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5265 |
| GET WITH THIS | DERRICK RAHMING | 5386 |
| GHETTO | U-MYND | |
| GHETTO BASS 2 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5274 |
| GHETTO STYLE | LUTHER CAMPBELL | 5409 |
| GIRL YOU SWEET | PATRICK MENDEZ | |
| GIRL WANT MONEY | PATRICK MENDEZ | |
| GOD BLESS AMERIKKKA | RICHARD GRIFFIN | |
| GO RAHMING GO | DERRICK RAHMING | 5383 |
| GOING ALL OUT | JEFF THOMPKINS | |
| GOOD LOVING | U-MYND | |
| GOOD TO THE LAST DROP | LUTHER CAMPBELL | 25469 |
| GOT TO GET SOME WORK DONE | LUTHER CAMPBELL | |
| GRANDMA VANILLA DON'T LIKE LOUD | RICHARD GRIFFIN/ANTHONY MILLS*/ROBERT SCURDY* (50%/50 | 8370 |
| GRAVEYARD | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8337 |
| GROOVE WITH THE PC | JEFF THOMPKINS | 16772 |
| H-TOWN'S COMING TO TOWN | D. CONNOR, S. CONNOR, D. JACKSON | |
| HANGIN' OUT | MIKE MCCRAY/LUTHER WONG WON/MARK ROSS | 7829 |
| HANGIN' WITH THE HOMEBOYS AND | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 20503 |
| HARD TO GET | PATRICK MENDEZ | |
| HARDER | R. ANDERSON | |
| HEAD, BOOTY & COCK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5277 |
| HEAD, HEAD & MORE HEAD | LUTHER CAMPBELL | 16558 |
| HEAD, HEAD & MORE HEAD PT II | LUTHER CAMPBELL | 25453 |
| HEADBANGER | LUTHER CAMPBELL | 25468 |
| HELL, YEAH | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| HERE I COME | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8343 |
| THE HERO | LUTHER CAMPBELL | 25457 |
| HEY JACK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7306 |
| HO HOE HOES | L. CAMPBELL/C WONG WON/L DOBSON/J THOMPKINS/R ANDERSON | |
| HO' STORIES | JEFF THOMPKINS | 16764 |
| HO' STORIES PT. 2 | JEFF THOMPKINS | |
| HOLD ME DOWN | C.MCNEIL & H. MCCLARTY | |
| HOLIDAY | MICHAEL STERLING | 5339 |
| HOLIDAYS | CHRIS BRINSON | |
| HOME TEAM | PATRICK WATLER/VAN WATLER | |
| HOOCHIE MAMA | L.CAMPBELL/D. HOBBS/M. ROSS/C. WONG WON | |
| THE HOODIE | PATRICK WATLER/VAN WATLER | |

LJWR0822

| Title | Credits | Number |
|---|---|---|
| THE HOP | LUTHER CAMPBELL | 25460 |
| A HOOKER? | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8340 |
| HOP-A-LON | R. TAYLOR | |
| HOT | H.MCCLARTY & C.MCNEIL | |
| HOTEP (INTRO) | M.EFFINGER | |
| THE HOUSE JUMPS | MICHAEL THOMAS/KEITH JORDAN | 5327 |
| I'LL ALWAYS BE TH—**DO NOT USE** | UNIDENTIFIED | 7342 |
| I'LL ALWAYS LOVE YOU | DWAYNE OHARR | 5355 |
| I'M COOL | DAVID HOBBS/DELANO PIGATI | 5420 |
| I'M SO SMOOTH | DERRICK RAHMING | 5390 |
| I'M THAT TYPE OF NIGGA | ANTHONY DURHAM/DAVID HOBBS | 5303 |
| I AIN'T BULL——TIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5260 |
| I AIN'T BULL——TIN'  PART III | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8355 |
| I AIN'T BULL——TIN'  PART II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS | 16468 |
| I AIN'T BULL——TIN'  PART IV | LUTHER CAMPBELL | 16553 |
| I CAN DO THAT | DERRICK RAHMING | 5388 |
| IF IT'S ALRIGHT WITH YOU | KEITH SWEAT/ERIC MCCAIN | |
| IF YOU BELIEVE IN HAVING SEX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5263 |
| I GOT A F—IN' HEADACHE | LUTHER CAMPBELL | 25449 |
| I HATE HO'S | JEFF THOMPKINS | 16766 |
| I LIKE IT, I LOVE IT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8344 |
| I LIKE IT LOUD | MICHAEL THOMAS/KEITH JORDAN | 5330 |
| I NEED A GOOD MAN | R. ANDERSON | |
| I WANNA BE YOURS QUIET STORM | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| I WANNA BE YOURS | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| I WANT YOU (NEW MIX) | R. ANDERSON | |
| I WAS AT A JAM | FOLANDA JOHNSON & rODNEY PARKER | |
| IN-COG-NEGROW | RICHARD GRIFFIN/ANTHONY MILLS/ROBERT SCURDY* (45%, 45 | 8369 |
| INCOLOR MEN ON RECORDS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7309 |
| IN THE DUST | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| THE INITIATION | LUTHER CAMPBELL/ CHRIS WONG WON/LARRY DOBSON | |
| INSIDE EDITION | JEFF THOMPKINS | 16757 |
| INTERMISSION TIP | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| THE INTERVIEW | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5403 |
| INTRO INDO G | INDO G & lIL bLUNT SMK | |
| INTRO | UNIDENTIFIED (CAMPBELL/WONG WON/HOBBS/RO | 16470 |
| INTRO BUSTDOWN | JOHN BICKHAM, JR. | |
| INTRO DISCO RICK | R. TAYLOR | |

LJWR0823

| Title | Writer(s) | Number |
|---|---|---|
| INTRO 94 NEW 2LC | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| INTRO PC RUFFTOWN | JEFF THOMPKINS | |
| I STILL FEEL GOOD | LEJUAN BIGGERS/MARK ROSS | 5346 |
| I'LL BE HERE | CHRIS WONG WON | |
| IT'S A BLAX THANX | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5462 |
| IT'S BEEN A LONG TIME | LEJUAN BIGGERS | |
| IT'S YOUR BIRTHDAY | LUTHER CAMPBELL/HARRY WAYNE CASEY/RICHARD FINCH | 16550 |
| I WANNA ROCK | MICHAEL STERLING | 5378 |
| I WILL ALWAYS BE THERE FOR YOU | LUTHER CAMPBELL | |
| JC'S DETAILED CAR WASH | RICHARD GRIFFIN/MARCUS EFFINGER | 8381 |
| JAIL SALE | ANQUETTE ALLEN | 5373 |
| JANET RENO | R. ANDERSON | |
| JEALOUS B—CH | DAVID HOBBS/DELANO PIGATI | 5369 |
| JEALOUS GIRLS | MARK BOCCACIO | 5419 |
| JEALOUS GIRLS | PATRICK WATLEY/JEFFREY THOMPKINS/DAVID HOBBS | 5451 |
| JERI CURL | V. WATLER/P.WATLER | |
| JESUS IS BLACK | LEJUAN BIGGERS/MARK ROSS | 5336 |
| JOCKIN 'ROBIN | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 20226 |
| JOEY HATE RAP CALLS THE COPS | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| JOKE'S ON YOU | JEFF THOMPKINS | 16765 |
| JT'S CONFESSION | JEFF THOMPKINS | 16756 |
| JT'S DREAM | JEFF THOMPKINS | 16773 |
| JT OLE BOY | U-MYND | |
| JUST FOR THE MOMENT | JOHN BICKHAM, JR. | |
| JUST KICK-N-IT | C.KOOLEY/K.JONES | 5414 |
| JUST LOOK AND LISTEN | MIKE THOMAS | 5421 |
| JUST ROCK (2 DIS HERE BEAT) | DWAYNE OMARR | 5354 |
| JUST SAY GOODNIGHT | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| JUST WANNA TOUCH YA | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5459 |
| JUVENILES | RICHARD GRIFFIN | |
| KKK-VS-DOO DOO BROWN | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY (50%, 50%) | 8363 |
| KAO'S II WIZ'7"DOME | ANTHONY DURHAM/DAVID HOBBS | 5293 |
| KEEP DANCIN' | CHRIS WONG WON | |
| KID ICE GROOVE | D. CONNOR, S. CONNOR, D. JACKSON | |
| KNOCKIN BOOTS FOR CHRISTMAS | R. ANDERSON | |
| KNOWLEDGE | PATRICK WATLER/VAN WATLER | |
| KNOW THE FLAVOR | MICHAEL JOHNSON/KEVIN JOHNSON | 5469 |
| KNOW WHO YOUR ENEMY IS | | |

| Title | Artist/Writer | Number |
|---|---|---|
| KOOL | DERRICK RAHMING | 5387 |
| L.L.O.M. | LUTHER CAMPBELL | 25461 |
| LAST ASIATIC DISCIPLES | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK | 5402 |
| THE LATE GREAT BLACK MAN | RICHARD GRIFFIN/ANTHONY MILLS | 8376 |
| THE LEAST WE FORGET | RICHARD GRIFFIN | |
| LET THE RHYTHM RIDE | R. ANDERSON | |
| LET ME LICK YOU GIRL | R. TAYLOR | |
| LET'S GET FU-KED UP | INDO G & LIL bLUNT , smk | |
| LET'S GET SERIOUS | JEFF THOMPKINS | |
| LET'S GO SOME MO' | R. TAYLOR | |
| LET'S PARTY FOR THIS ONE | MICHAEL JOHNSON/KEVIN JOHNSON | 5368 |
| LET'S ROCK & ROLL Y'ALL | ANQUETTE ALLEN | 5376 |
| LET IT GO | DERRICK RAHMING | 5381 |
| LET IT RIP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8334 |
| LET ME TAKE YOU TO THE ROCK HO | ANTHONY DURHAM/DAVID HOBBS | 5300 |
| LIFE AIN'T NOTHING BUT A B–CH | INDO G & LIL bLUNT SMK | |
| LISTEN | JEFF THOMPKINS | |
| LIVIN' IN THE CITY | JEFF THOMPKINS/AARON NEVILLE*/L. NOCENTELLI*/J. MODELIS | 16761 |
| LONG D-CK CHINESE | CHRIS WONG WON | |
| LOOKS AND SHAPE | C. MCNEIL & H.MCCLARTY | |
| LOVE COME DOWN | C.MCNEIL & H.MCCLARTY | |
| LOVE ON MY MIND | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| LOVE THY ENEMY | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI | 5397 |
| LOVE YOUR LIFE | MICHAEL JOHNSON/KEVIN JOHNSON | 5470 |
| LOVIN' | PATRICK MENDEZ | |
| LOW LIFE MUTHA F–KA | PATRICK WATLER/JEFFERY THOMPKINS/DAVID HOBBS | 5449 |
| MADBALL BACK | JEFF THOMPKINS | |
| MADD-MIX | CHRIS WONG WON | |
| MAKE IT BOUNCE | INDO G & LIL bLUNT SMK | |
| MAN 'O' MAN (PRELUDE:FEATURING | M. EFFINGER | |
| MAN, NOT A MYTH (SAMPLED, TONIG | RODNEY C TERRY/MIKE MCCRAY/MARK ROSS/CHRIS WONG W | 5250 |
| MARY MACK | MICHAEL THOMAS/KEITH JORDAN | 5331 |
| MARY MARY | ANQUETTE ALLEN | 5374 |
| MATERIAL GIRL | ANQUETTE ALLEN | 5375 |
| M.C.SUNDANCE | JEFF THOMPKINS | |
| MEGAMIX LUKE | CAMPBELL/CURTIS/KING/FLIPPIN/SHELTON/WILLIAMS/CORNW | 16563 |
| MEGAMIX FREAK FOR LIFE | LUTHER CAMPBELL | |
| MEGAMIX 94 | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

| Title | Credits | Number |
|---|---|---|
| MEGAMIX | LUTHER CAMPBELL*/BILL CURTIS/JOHNNY KING/JOHNNY FLIPP | 16563 |
| MEGA MIX IV | DAVID HOBBS/RODNEY C TERRY/MICHAEL MCCRAY/CARL DOR | 5247 |
| MEGA MIX HOUSE STYLE | LEJUAN BIGGERS/MARK ROSS | 5349 |
| MEGA MIX V | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8347 |
| MEGA MIXX II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5282 |
| MEGA MIXX III | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5269 |
| MENAGE A TROIS | LUTHER CAMPBELL/GERRY THOMAS/DOUGLAS BIGSON | 16555 |
| MENAGE A TROIS PT II | LUTHER CAMPBELL | 25455 |
| MENTAL GENOCIDE | RICHARD GRIFFIN/ANTHONY MILLS/ROBERT SKARDY"(45%, 10 | 8373 |
| ME SO HORNY | RICARDO WILLIAMS*/LUTHER CAMPBELL/DAVID HOBBS/MARK | 5253 |
| MESSAGE | LUTHER CAMPBELL | 20479 |
| MI PISTOL | PATRICK MENDEZ | |
| MIAMI | J.GREY | 5408 |
| MIAMI DA BOTTOM | CHRIS WONG WON | |
| MIAMI HEAT | MICHAEL JOHNSON/KEVIN JOHNSON | 5367 |
| MIAMI "LIBERY CITY" | R. TAYLOR | |
| MINE ALL MINE | MANUEL DEMETRIUS/JONATHAN BLACK | 5471 |
| MOVE SOMETHIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5273 |
| MOVIN' ALONG | LUTHER CAMPBELL | |
| MR MIXX ON THE MIX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5291 |
| MR MIXX TURNTABLE SHOW PART 1) | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7780 |
| MR MIXX TURNTABLE SHOW PART 2 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7781 |
| MY HARDCORE RHYMES | LEJUAN BIGGERS/MARK ROSS | 5345 |
| MY IDEOLOGY | RICHARD GRIFFIN/ANTHONY MILLS/MARCUS EFFINGER* (45% | 8380 |
| MY LADY | PATRICK MENDEZ | |
| MY SEVEN BIZZOS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5264 |
| NASTY B-TCH | JOHN BICKHAM, JR | |
| NEGATIVE FORCE | DERRICK RAHMING | 5385 |
| THE NEIGHBORHOOD HAPS | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5458 |
| NEWS FLASH BRITISH YOUTH | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7300 |
| NEWS FLASH NATION BY STORM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7311 |
| NEWS FLASH PEOPLE IN THE NEWS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7295 |
| NEWS FLASH POLL RESULTS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7304 |
| NEWS FLASH SUPER SNOOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7312 |
| NEWS FLASH 350 MEN | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7297 |
| NIGGA'S COMIN' UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8342 |
| NOBODY | U-MYND | |
| NOBODY GOING TO LOVE YOU | U-MYND | |

LJWR0826

| Title | Author(s) | Number |
|---|---|---|
| NO BUN | PATRICK MENDEZ | |
| NO HAPS | JEFF THOMPKINS/EDDIE MILLER | 16774 |
| NO RUSH MI | PATRICK MENDEZ | |
| NO SUCH ANIMAL | MICHAEL STERLING | 5341 |
| NOT JUS' A PRETTY FACE | MICHAEL THOMAS/KEITH JORDAN | 5332 |
| NOT YOUR MAMA | | |
| OHHH | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| ONE BLACK AND A BUNCH OF DIRTY | WHITE BOYS LUTHER CAMPBELL | 16561 |
| ONE MORE CHANCE | MICHAEL STERLING | 5343 |
| ONE ON ONE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5281 |
| OUT OF CONTROL | LUTHER CAMPBELL | |
| OUTRO | INDO G LIL BLUNT SMK | |
| P.W.Y.P. (PRACTICE WHAT YOU PREA | ANTHONY DURHAM/DAVID HOBBS | 5297 |
| PARKAY | M.EFFINGER | |
| PASS THE AMMO | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5396 |
| PASS THE BUDDAH | PATRICK WATLER/VAN WATLER | |
| PAUSE FOR THE CAUSE | JEFF THOMPKINS | |
| PAWN'S IN THE GAME | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5404 |
| PEEPIN' | JEFF THOMPKINS | |
| PERFIDIA | PATRICK MENDEZ, FOXY BROWN | |
| PHUCK THA MEDIA | RICHARD GRIFFIN | |
| PICK IT UP | PATRICK WATLER/VAN WATLER | |
| PIMPLE ON MY DICK | LUTHER CAMPBELL | 25456 |
| PISSIN' RAZOR BLADES | JOHN BICKHAM, JR. | |
| PLEASE STAY | LEJUAN BIGGERS/MARK ROSS | 5351 |
| PLAYERS DON'T FALL | INDO G & LIL BLUNT SMK | |
| POISON FREESTYLE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5454 |
| POP THAT COOCHIE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| POP THAT P—Y | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8328 |
| POP THAT THANG | JOHN BICKHAM, JR. | |
| THE POWER (HOMEBOYS mIX) | SNAP | |
| PRE-GAME ACTIVITY | RICHARD GRIFFIN | |
| PREMASTERBATORIAL | LUTHER CAMPBELL | |
| PRETTY GIRLS | STEVIE B | 20501 |
| PRETTY WOMAN | ADAPTATION OF ROY ORBISON AND WILLIAM DEES | |
| PROVE MY LOVE | U-MYND | |
| PSYCHOTIC | JAMES PARKER/ERICH KRAUSE/PHILLIP MUELLER | 19796 |
| PUBLIC RELATIONS EXPRESS | MICHAEL JOHNSON/KEVIN JOHNSON | 5472 |

LJWR0827

| Title | Writers | Number |
|---|---|---|
| FUMP & GRIND | ANTHONY DURHAM/DAVID HOBBS | 5296 |
| P—Y (REPRISE) FOR THOSE WHO LIK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8360 |
| P—Y AIN'T SH-T | CHRIS WONG WON | |
| P—Y AND D-CK THING | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| PUSSY ASS KID AND HOE ASS PLAY | LUTHER CAMPBELL | 16554 |
| P—Y A—NIGGA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5276 |
| P—Y HUNT | C.MCNEIL & H.MCCLARTY | |
| THE P—Y CAPER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8357 |
| PU—Y SQUEEZER | PATRICK MENDEZ | |
| PUTCHA' BALLYS ON | JOHN BICKHAM, JR. | |
| PUT HER IN THE BUCK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5254 |
| PUT SH-T PASS NO HO | JEFF THOMPKINS | |
| R.A.P. REAL AFRICAN PEOPLE (PT1) | PROFESSOR GRIFF | 5393 |
| R.A.P. REAL AFRICAN PEOPLE (PT2) | PROFESSOR GRIFF | 5394 |
| R.O.A. | MICHAEL THOMAS/KEITH JORDAN | 5333 |
| THE RAIN | DWAYNE OMARR | 5352 |
| RAMATION | H. MCCLARTY C. MCNEIL | |
| RAP AS AN ART | M.EFFINGER,S.SIMONIAN,P.MARCELIN | |
| RAP TERRORIST | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK | 5405 |
| RAYMOND UP THE ROAD | JEFF THOMPKINS | 16762 |
| REAL AFRICAN PEOPLE "RAP" PT1 | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5460 |
| REAL AFRICAN PEOPLE "RAP" PT2 | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5461 |
| REAL NIGGAZ MAKING NOISE | INDO G & LIL BLUNT SMK | |
| REBEL YELL | MICHAEL JOHNSON/KEVIN JOHNSON | 5362 |
| REBELZ AGAINST THA DEVELZ | RICHARD GRIFFIN | |
| REGGAE JOINT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5266 |
| REMINISCING | PATRICK WATLER/VAN WATLER | |
| REPRESENT | LUTHER CAMPBELL | |
| RESPECT | H.MCCLARTY & C.MCNEIL | |
| RESPECT | O.REDDING/ANQUETTE ALLEN | 5380 |
| RESPECT THA ART-KILL-TECH | RICHARD GRIFFIN | |
| REV | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 8366 |
| ROCKBOTTOM | | |
| ROCK HOUSE (FILM) | VARIOUS | 10495 |
| ROLL CALL | CHRIS WONG WON | |
| ROUGH NIGGA GETTIN' BUSY | JEFF THOMPKINS/NILE RODGERS/BERNARD EDWARDS | 16768 |
| RUFF TOWN BEHAVIOR | JEFF THOMPKINS | |
| RUFF NECK BUSINESS | PATRICK WATLER/VAN WATLER | |

LJWR0828

| Title | Artist | Number |
|---|---|---|
| S&M | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5278 |
| SAME OL' THANG | ANTHONY DURHAM/DAVID HOBBS | 5302 |
| SAVIN' MYSELF FOR YOU | DWAYNE OMARR | 5356 |
| SENSE OR SH-T | RICHARD GRIFFIN | |
| SETTING UP | JEFF THOMPKINS | |
| SEX, I LIKE -- I LOVE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7779 |
| SEX ME | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 25427 |
| SEX...SEX | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SHAKE IT (DO THE 61ST) | LUTHER CAMPBELL | 5410 |
| SHAKE WHATCHA MAMA GAVE YOU | JEFF THOMPKINS | 16775 |
| SHE KEEP CALLING ME | U-MYND | |
| SHE PUT ME IN A TRANCE | ANTHONY DURHAM/DAVID HOBBS | 5295 |
| SHERYL & DONNA | K.JONES/C.PUCKETT | 5413 |
| SHINING STAR | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| SHOCK THE HOUSE | MICHAEL THOMAS/KEITH JORDAN | 5335 |
| SHORTY T IN MADBALL'S BASEMENT | JEFF THOMPKINS | 16778 |
| SHOUTOUTS | R. TAYLOR | |
| SHOUT-OUTS (HOLLA' AT ME) | CHRIS WONG WON | |
| SHOW HIM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SHOUT OUTS | JEFF THOMPKINS/SADE ADU/LEROY OSBOURNE/STUART MAT | |
| SILENT NIGHT | | |
| SISTA' SISTA | RICHARD GRIFFIN | |
| SOLO (BREAK MIX) | R. ANDERSON | |
| SOME HOT HEAD | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| SOME MORE SH-T | JEFF THOMPKINS | |
| SOME OL' BULLSH-T | LUTHER CAMPBELL | |
| SOME SHIT I USED TO KNOW | JEFF THOMPKINS | |
| SOMETHING 4 YOU RAGEDY HO'S | JEFF THOMPKINS | |
| SON OF A GUN | H.MCCLARTY& C. MCNEIL | |
| SPASTIC A-- | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| SPLAK IT LIKE YOU LIKE IT | CHRIS WONG WON | |
| THE SPLAK SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| SPOILED ROTTEN | JEFF THOMPKINS /PATRICK WATLER | |
| STAY WIT ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| STOP LOOK LISTEN | U-MYND | |
| STRICTLY FOR DA G'S | INDO g lIL bLUNT SMK | |
| SUCK GOOD D-CK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SUCK MY D-CK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

LJWR0829

| Title | Artist/Credits | Number |
|---|---|---|
| SUGARHILL STYLE | JEFF THOMPKINS | |
| SWEET SUZY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8348 |
| SWINGIN' | PRINCE AKEEM | |
| TAKE IT OFF | LUTHER CAMPBELL | 25466 |
| TAKE IT SLOW | TRELLIN DAVIS AND BISHOP "STICK" BURRELL | |
| TAKE OFF YOUR CLOTHES | U-MYND | |
| TALES FROM THE DARKSIDE | MICHAEL JOHNSON/KEVIN JOHNSON | 5358 |
| TASTE YOUR LOVE | U-MYND | |
| TEARS OF MY PRIDE | MICHAEL STERLING | 5338 |
| TEDDY BEAR | MICHAEL STERLING | 5337 |
| TELL ME BABY | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TELL ME WHAT YOU KNOW | LUTHER CAMPBELL | 25450 |
| THAT WAS RAM | JEFF THOMPKNS | 16771 |
| THAT'S HOW I FEEL | LUTHER CAMPBELL | |
| THE 90'S ARE MINE (LP MIX 2) | R. ANDERSON | |
| THE F-CK HOUSE | R. TAYLOR | |
| THIS IS HOW IT SHOULD BE DONE | DERRICK RAHMING | 5382 |
| THROW THE D | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5288 |
| THROW THE P | ANQUETTE ALLEN, CHRIS WONG WON | |
| TI'ANT NO B**CH | RICHARD GRIFFIN | |
| TICKET TO HEAVEN | KNOWLEDGE FEAT KENNY BOBIEN | |
| TIME IS RUNNING OUT | MICHAELJOHNSON/KEVIN JOHNSON | 5359 |
| TIME TO GET MINE | ANTHONY DURHAM/DAVID HOBBS | 5298 |
| THE TIP ON MADBALL | JEFF THOMPKINS | 16769 |
| THIS IS TO LUKE FROM THE POSSE | PATRICK WATLER/RICHARD GRIFFIN | 5251 |
| TOGETHER FOREVER | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TONY ROCK'S THEME | ANTHONY DURHAM/DAVID HOBBS | 5305 |
| TOO INQUISITIVE | H.MCCLARTY & C.MCNEIL | |
| THE TRICK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| TRICK DADDY | JOHN BICKHAM, JR. | |
| TRUE 2 ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TRUE PLAYER SPEAKS | JEFF THOMPKINS | 5342 |
| TRY ME | MICHAEL STERLING | |
| A TYPICAL SEX THING | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| U GETTIN ILL 2 MUCH | MICHAEL THOMAS/KEITH JORDAN | 5328 |
| UGLY AS F--K | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8338 |
| U SAID U LOVED ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| UNDERWATER | MICHAEL JOHNSON/KEVIN JOHNSON | 5361 |

LJW R0830

| Title | Writer(s) | Number |
|---|---|---|
| UNITED STATIC ASSOCIATIONKAVON SHAH | | |
| UNTO US | C. BRINSON | |
| UP A GIRL'S A— | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8358 |
| UZI GETS SHOT | JEFF THOMPKINS | |
| VACATE THE PREMISES | KAVAN SHAH | |
| THE V AMENDMENT | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/JIM O'BRIEN(P/K/ | 5463 |
| VERBAL INTERCOURSE | RICHARD GRIFFIN/MARCUS EFFINGER*/ANTHONY MILLS (37.5% | 8382 |
| THE VERDICT | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5395 |
| VIA SATELLITE FROM SATURN | PATRICK WATLER/VAN WATLER | |
| VIDEO NO SOUL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7302 |
| WANNA DO YA | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| WANNA RECORD DEAL | R. TAYLOR | |
| WAS IT WORTH IT | JOHN BICKHAM, JR. | |
| WEAR A RUBBER | LUTHER CAMPBELL | 25465 |
| WE'RE F-CKIN' | LUTHER CAMPBELL | 25447 |
| WE'RE ON A MISSION | MICHAEL JOHNSON/KEVIN JOHNSON | 5365 |
| WE'RE THE WEAVE | LUTHER CAMPBELL | |
| WE BRING YOU JOY | L. CAMPBELL/S. CONNOR/D. CONNOR/D. JACKSON | |
| WE LIKE TO CHILL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| WE WANT SOME P—Y!! | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5285 |
| WE WANT SOME P–Y II | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WEENIE ROAST | LUTHER CAMPBELL | 25454 |
| WELCOME TO THE QUIET STORM | LUTHER CAMPBELL | |
| WHAT IS A MAN | M. EFFINGER | |
| WHAT IS BLACK | BILLY BOX | |
| WHATEVER | LUTHER CAMPBELL | 25458 |
| WHAT UPS | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| WHERE DEM DOGG'S AT | INDO G & LIL BLUNT SMK | |
| WHERE DEM HOES AT | LUTHER CAMPBELL | |
| WHERE'S THE TI.IE | LUTHER CAMPBELL | |
| WHO'S DOING WHO | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/C. WONG W | |
| WHO'S FIRST | DWAYNE OMARR | 5353 |
| WHO'S F–KIN' WHO | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8359 |
| WHO'S N THE HOUSE | R.TAYLOR | |
| WHO'S TONY ROCK | ANTHONY DURHAM/DAVID HOBBS | 5292 |
| WHY U TRIPPING | U-MYND | |
| WIGGLE WIGGLE | R.TAYLOR | 19719 |
| WILDSTYLE | PATRICK WATLER/VAN WATLER | |

| Title | Writer(s) | No. |
|---|---|---|
| WILL YOU BE THERE FOR CHRISTMA | M. HUDSON | |
| WITH YOUR BAD SELF | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5275 |
| WLAD | RICHARD GRIFFIN | |
| WORD II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5279 |
| THE WORD OF G.O.D. GRIFF ON DUT | RICHARD GRIFF (P/K/A PROFESSOR GRIFF BMI) | 5401 |
| WORD FROM A PLAYER | JEFF THOMPKINS | |
| WORK FOR FREE | JEFF THOMPKINS | |
| WORK IT | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WORK IT OUT | LUTHER CAMPBELL | 25446 |
| WORK THAT BODY | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WORK THAT P...Y | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YEA YEA YALL | R. ANDERSON | |
| YEAH, YEAH | LUTHER CAMPBELL/CHRIS, WONG WON/LARRY DOBSON | |
| YEAH, YEAH (LUKE DUB) | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YES N'DEED | M. EFFINGER | |
| YES SHE DID | R. TAYLOR | |
| YOU'RE MY DEVOTION | J.DIAZ/M.ROOFE/D.MONTAIVO | 5406 |
| YOU AIN'T HAD NO LOVIN' | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| YOU AND ME | LUTHER CAMPBELL | 16560 |
| YOU ARE VERY ERECT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8352 |
| YOU DONT EVEN KNOW ME KID | INDO G & LIL bLUNT SMK | |
| YOU GET'S NOTHING | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5457 |
| YOU GO GIRL | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YOU GOT LARCENY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5371 |
| YOU HAVE BEEN BAD | LUTHER CAMPBELL | |
| YOU TURN ME ON | TONY BURTON/ELLISON KENDRICK | 12371 |
| YOU UNDERSTAND | MICHAEL JOHNSON/KEVIN JOHNSON | 5360 |
| 1-900-STE OREO TYPE | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/JIM O'BRIEN(P/K/ | 5398 |
| 12" LONG | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8350 |
| 15TH AVENUE | LEJUAN BIGGERS/MARK ROSS | 5348 |
| 2 LIVE BLUES | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5259 |
| 2 LIVE IS WHAT WE ARE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5284 |
| 2 LIVE FREESTYLE | LUTHER CAMPBELL/CHRIS WONG WON/ LARRY DOBSON | |
| 2 MINUTE WARNING | RICHARD GRIFFIN | |
| 7 WATTZ OF REALITY | RICHARD GRIFFIN | |
| 43RD NEGATIVE CONFESSION | RICHARD GRIFFIN | |
| 107 POINT LIVE(AT THE SLAVE THEATER) | rICHARD GRIFFIN | |
| 2 LIVE CHRISTMAS | L. CAMPBELL/C.WONG WON/L.DOBSON | |

20'S

INDO G & LIL bLUNT SMK

| Title | Authors | Number |
|---|---|---|
| H-TOWN | | |
| ALBUM 1 INTRODUCTION | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25424 |
| CAN'T FADE DA H | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25433 |
| TREAT U RIGHT | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25425 |
| FEVER FOR DA FLAVOR | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25426 |
| SEX ME | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25427 |
| H-TOWN BOUNCE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 23820 |
| KEEPIN' MY COMPOSURE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25428 |
| INTERLUDE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25429 |
| LICK U UP | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25430 |
| KNOCKIN' DA BOOTS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 23819 |
| WONT U COME BACK | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25431 |
| BABY I WANNA | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25432 |
| ALBUM 2 H-TOWN INTRO 94 | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| SEX BOWL | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| ONE NIGHT GIGOLO | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| PRELUDE TO EMOTION | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| EMOTIONS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| CRUISIN FO' HONEYS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| FULL TIME | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| 1-900-CALL GI | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| TUMBLE & RUMBLE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| MUCH FEELIN' (AND IT TASTES GREA | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| BEGGIN' AFTER DARK | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| INDO LOVE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| BACK SEAT (WIT NO SHEETS) | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| BUSS ONE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| BABY I LOVE YA' | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| STICKY LEE PRESLEY | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| ROCKIT STEADY | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |
| THE LAST RECORD | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | |

RIGHTS FROM SOUNDTRACKS TO INCLUDE FOLLOWING SONGS ON GREATEST HITS ALBUM
PART TIME LOVER FROM ABOVE THE RIM SOUNDTRACK dEATH rOW/INTERSCOPE
IT'S YOUR THING ADDAMS FAMILY VALUES ATLAS/POLYGRAM
A THIN LINE BETWEEN LOVE & HATE ? WARNER BROS.

KTEL EMOTIONS?

LJWR0834



06/23/95 13:33:16                    Parts Inventory For Client                    (*LIBL/INV0080)                    PAGE   1

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | ODCE 709 | DANCE ALL NIGHT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODCE 713 | GET A LIL' STUPID | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODCE 714 | PLAYING YOUR GAME | LABEL FILM | BLK | 1 |
| LUKE RECORDS | ODCE 714 | PLAYING YOUR GAME | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 012 | 1 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 305 | 1 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 032 | 1 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 267 | 1 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | BOOKLET (OED) | | 6.057 |
| LUKE RECORDS | ODE 118 | I GOT SHIT ON MY MIN | INLAY (OED) | | 8.163 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 012 | 1 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 305 | 1 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 032 | 1 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 267 | 1 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | BOOKLET (OED) | | 3.769 |
| LUKE RECORDS | ODE 119 | I GOT SOMTHIN' ON MY | INLAY (OED) | | 5.636 |
| LUKE RECORDS | ODE 120 | LET ME TAKE YOU TO.. | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3000 | POISON CLAM | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3001 | POISON CLAM | LABEL FILM | 199 | 1 |
| LUKE RECORDS | ODE 3001 | POISON CLAM | LABEL FILM | BLK | 1 |
| LUKE RECORDS | ODE 3001 | POISON CLAM | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3001 | POISON CLAM | BOOKLET (OED) | | 7.137 |
| LUKE RECORDS | ODE 3002 | PENNY | INLAY (OED) | | 11.390 |
| LUKE RECORDS | ODE 3002 | PENNY | LABEL FILM | 159 | 1 |
| LUKE RECORDS | ODE 3002 | PENNY | LABEL FILM | 364 | 1 |
| LUKE RECORDS | ODE 3002 | PENNY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3002 | PENNY | BOOKLET (OED) | | 3.595 |
| LUKE RECORDS | ODE 3002 | PENNY | INLAY (OED) | | 3.534 |
| LUKE RECORDS | ODE 3002 | PENNY | LONGBOX (OED) | | 0 |
| LUKE RECORDS | ODE 3003 | LIVE IN CONCERT | LABEL FILM | 320 | 1 |
| LUKE RECORDS | ODE 3003 | LIVE IN CONCERT | LABEL FILM | BLK | 1 |
| LUKE RECORDS | ODE 3003 | LIVE IN CONCERT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3003 | LIVE IN CONCERT | BOOKLET (OED) | | 4.693 |
| LUKE RECORDS | ODE 3003 | LIVE IN CONCERT | INLAY (OED) | | 1.078 |
| LUKE RECORDS | ODE 3004 | LIVE IN CONCERT | LONGBOX (OED) | | 1 |
| LUKE RECORDS | ODE 3005 | KONFLIC OF INTEREST | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3005 | | LABEL FILM | BLK | 1 |
| LUKE RECORDS | ODE 3005 | | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3005 | | BOOKLET (OED) | | 9.929 |
| LUKE RECORDS | ODE 3005 | | INLAY (OED) | | 10.140 |
| LUKE RECORDS | ODE 3005 | | STICKER (OED) | | 9.200 |
| LUKE RECORDS | ODE 3006 | POISONOUS MENTALITY | LABEL FILM | 186 | 1 |
| LUKE RECORDS | ODE 3006 | POISONOUS MENTALITY | LABEL FILM | BLK | 1 |
| LUKE RECORDS | ODE 3006 | POISONOUS MENTALITY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | ODE 3006 | POISONOUS MENTALITY | BOOKLET (OED) | | 2.361 |
| LUKE RECORDS | ODE 3006 | POISONOUS MENTALITY | INLAY (OED) | | 3.631 |
| LUKE RECORDS | ODE 3007 | POISONOUS MENTALITY | LABEL FILM | 032 | 1 |
| LUKE RECORDS | ODE 3007 | POISONOUS MENTALITY | LABEL FILM | | 1 |
| LUKE RECORDS | ODE 3007 | POISONOUS MENTALITY | MASTER TAPE | U-MATIC | 1 |

LJWR0835

06/23/95  13:33:16                    Parts Inventory For Client        (*LIBL/INV008Q)                    PAGE  2

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDE 3007 | CREWLAPOO | BOOKLET (OED) | | 5,782 |
| LUKE RECORDS | CDE 3007 | CREWLAPOO | INLAY (OED) | | 4,882 |
| LUKE RECORDS | CDE 706 | IS WHAT WE ARE | LABEL FILM | 300 | 1 |
| LUKE RECORDS | CDE 706 | IS WHAT WE ARE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 100 | IS WHAT WE ARE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDDR 100 | IS WHAT WE ARE | MASTER TAPE | U-MATIC | 0 |
| LUKE RECORDS | CDDR 100 | IS WHAT WE ARE | BOOKLET (OED) | | 8,591 |
| LUKE RECORDS | CDDR 100 | COMING CORRECT '88 | INLAY (OED) | | 13,644 |
| LUKE RECORDS | CDDR 100S | MOVE SOMETHING | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 101 | MOVE SOMETHING | LABEL FILM | PANY | 1 |
| LUKE RECORDS | CDDR 101 | MOVE SOMETHING | LABEL FILM | 354 | 1 |
| LUKE RECORDS | CDDR 101 | MOVE SOMETHING | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 101 | MOVE SOMETHING | BOOKLET (OED) | | 7,269 |
| LUKE RECORDS | CDDR 101 | MOVE SOMETHING | INLAY (OED) | | 10,680 |
| LUKE RECORDS | CDDR 102 | MOVE SOMETHIN-CLEAN | LABEL FILM | PANY | 1 |
| LUKE RECORDS | CDDR 102 | MOVE SOMETHIN-CLEAN | LABEL FILM | 354 | 1 |
| LUKE RECORDS | CDDR 102 | MOVE SOMETHIN-CLEAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 102 | MOVE SOMETHIN-CLEAN | BOOKLET (OED) | | 6,082 |
| LUKE RECORDS | CDDR 102 | MOVE SOMETHIN-CLEAN | INLAY (OED) | | 5,912 |
| LUKE RECORDS | CDDR 103 | RESPECT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 107 | AS NASTY AS THEY WAN | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDDR 107 | AS NASTY AS THEY WAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 107 | AS NASTY AS THEY WAN | BOOKLET (OED) | | 2,152 |
| LUKE RECORDS | CDDR 107 | AS NASTY AS THEY WAN | INLAY (OED) | | 3,597 |
| LUKE RECORDS | CDDR 108 | AS CLEAN AS THEY WAN | LABEL FILM | PANY | 1 |
| LUKE RECORDS | CDDR 108 | AS CLEAN AS THEY WAN | LABEL FILM | 354 | 1 |
| LUKE RECORDS | CDDR 108 | AS CLEAN AS THEY WAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 108 | AS CLEAN AS THEY WAN | BOOKLET (OED) | | 6,208 |
| LUKE RECORDS | CDDR 108 | AS CLEAN AS THEY WAN | INLAY (OED) | | 5,955 |
| LUKE RECORDS | CDDR 108 | AS CLEAN AS THEY WAN | STICKER (OED) | | 2,500 |
| LUKE RECORDS | CDDR 109 | AGAINST ALL ODDS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 110 | DARK SIDE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 111 | BANNED OF THE GAME | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 114 | BANNED IN USA-NASTY | LABEL FILM | 300 | 1 |
| LUKE RECORDS | CDDR 114 | BANNED IN USA-NASTY | LABEL FILM | 185 | 1 |
| LUKE RECORDS | CDDR 114 | BANNED IN USA-NASTY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 114 | BANNED IN USA-NASTY | BOOKLET (OED) | | 2,252 |
| LUKE RECORDS | CDDR 114 | BANNED IN USA-NASTY | INLAY (OED) | | 5,136 |
| LUKE RECORDS | CDDR 115 | BANNED IN USA-CLEAN | LABEL FILM | 300 | 1 |
| LUKE RECORDS | CDDR 115 | BANNED IN USA-CLEAN | LABEL FILM | 185 | 1 |
| LUKE RECORDS | CDDR 115 | BANNED IN USA-CLEAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 115 | BANNED IN USA-CLEAN | BOOKLET (OED) | | 5,996 |
| LUKE RECORDS | CDDR 115 | BANNED IN USA-CLEAN | INLAY (OED) | | 7,629 |
| LUKE RECORDS | CDDR 116 | SPORTS WEEKEND-NASTY | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDDR 116 | SPORTS WEEKEND-NASTY | LABEL FILM | 021 | 1 |
| LUKE RECORDS | CDDR 116 | SPORTS WEEKEND-NASTY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDDR 116 | SPORTS WEEKEND-NASTY | BOOKLET (OED) | | 0 |
| LUKE RECORDS | CDDR 116 | SPORTS WEEKEND-NASTY | INLAY (OED) | | 5,511 |
| LUKE RECORDS | CDDR 117 | SPORTS WEEKEND-CLEAN | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDDR 117 | SPORTS WEEKEND-CLEAN | LABEL FILM | 021 | 1 |

LJW R0836



06/23/95 13:33:16    Parts Inventory For Client    (*LBL/INV0080)    PAGE 3

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | MASTER TAPE | U-MATIC | 5,556 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | BOOKLET (DED) | | 10,727 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | LABEL FILM | BLK | 21,129 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | LABEL FILM | 116 | 20,864 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | BOOKLET (DED) | | 1 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | LABEL FILM | 032 | 25,492 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | LABEL FILM | BLK | 27,144 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 122 | BEST OF...: 15 TRKS | BOOKLET (DED) | | 1 |
| LUKE RECORDS | CDXR 122 | BEST OF...: 15 TRKS | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 122 | BEST OF...: 15 TRKS | LABEL FILM | 032 | 15,880 |
| LUKE RECORDS | CDXR 122 | BEST OF...: 15 TRKS | LABEL FILM | BLK | 1,479 |
| LUKE RECORDS | CDXR 122 | BEST OF...: 15 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 123 | BEST OF...: 9 TRKS | BOOKLET (DED) | | 1 |
| LUKE RECORDS | CDXR 123 | BEST OF...: 9 TRKS | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 123 | BEST OF...: 9 TRKS | LABEL FILM | 137 | 29,617 |
| LUKE RECORDS | CDXR 123 | BEST OF...: 9 TRKS | LABEL FILM | BLK | 33,503 |
| LUKE RECORDS | CDXR 123 | BEST OF...: 9 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | BOOKLET (DED) | | 1 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | LABEL FILM | PROY | 33,358 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | LABEL FILM | BLK | 27,454 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 125 | BODY FINE | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 125 | BODY FINE | LABEL FILM | BLK | 19,684 |
| LUKE RECORDS | CDXR 125 | BODY FINE | LABEL FILM | 032 | 25,229 |
| LUKE RECORDS | CDXR 125 | BODY FINE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | WHI | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | 117 | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | BLK | 79,496 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | MASTER TAPE | U-MATIC | 54,226 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | BOOKLET (DED) | | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | INLAY (DED) | 4665 | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | LABEL FILM | 186 | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | MASTER TAPE | | 55,027 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | BOOKLET (DED) | | 54,609 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | MASTER TAPE | | 16,406 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | BOOKLET (DED) | | 18,463 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | LABEL FILM | IML STD BKGD | 1 |



06/23/95  13:33:16                     Parts Inventory For Client        (*LIBL/INV0080)                        PAGE    4

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | BOOKLET (OED) | | 16.612 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | INLAY (OED) | | 18.890 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | INL | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | STD | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | DESIGN | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | MASTER TAPE | TEXT | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | BOOKLET (OED) | | 3.485 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | INLAY (OED) | | 3.874 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | E TO E | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | BOOKLET (OED) | | 9.915 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | INLAY (OED) | | 12.760 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | BOOKLET (OED) | | 14.928 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | INLAY (OED) | | 14.276 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | STICKER (OED) | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | STICKER (OED) | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | MASTER TAPE | NO EXPLICIT LYRICS | 1 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | INLAY (OED) | | 0 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | BOOKLET (OED) | BKGD | 16.130 |
| LUKE RECORDS | CDXR 207 | '94 | INLAY (OED) | | 15.21 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | BOOKLET (OED) | | 13.032 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | INLAY (OED) | | 11.472 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | BOOKLET (OED) | | 14.915 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | INLAY (OED) | | 15.435 |
| LUKE RECORDS | CDXR 210 PRO | GHETTO STYLE BASS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | | GHETTO STYLE BASS | LABEL FILM | | 1 |

LJWR0838



06/23/95  13:33:16                    Parts Inventory For Client              (*LIBL/INV008QD)                         PAGE  5

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | MASTER TAPE | | 11,595 |
| LUKE RECORDS | CDXR 210 | | BOOKLET (QED) | | 11,135 |
| LUKE RECORDS | CDXR 211 | | INLAY (QED) | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | MASTER TAPE | | 3,106 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | BOOKLET (QED) | STD | 3,683 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | INLAY (QED) | | 1 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 212 | | MASTER TAPE | | 25,082 |
| LUKE RECORDS | CDXR 212 | | BOOKLET (QED) | BKGD W/ KO | 23,508 |
| LUKE RECORDS | CDXR 212 | | INLAY (QED) | TEXT | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | LABEL FILM | | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | MASTER TAPE | | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | BOOKLET (QED) | | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | INLAY (QED) | | 0 |
| LUKE RECORDS | CDXR 214 | LOVE ON MIND | BOOKLET (QED) | | 0 |
| LUKE RECORDS | CDXR 214 | LOVE ON MIND | INLAY (QED) | | 1 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | LABEL FILM | BLK | 6,707 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | INLAY (QED) | U-MATIC | 7,832 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | LABEL FILM | 226 | 1 |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | MASTER TAPE | INLAY | |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | BOOKLET (QED) | U-MATIC | |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | INLAY (QED) | | |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | MASTER TAPE | | 4,245 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | BOOKLET (QED) | BKGD | 20,815 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | BOOKLET (QED) | | 17,704 |
| LUKE RECORDS | CDXR 777 | YES N DEED | INLAY (QED) | | 17,581 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN  7 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN  7 TRKS | MASTER TAPE | U-MATIC | 1 |

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | GR 452-2 | BREAKDOWN 7 TRKS | BOOKLET (OED) | | 3,933 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN 7 TRKS | INLAY (OED) | | 3,816 |
| LUKE RECORDS | LUKE GEN. | | WALLET (GEN) | | 2,700 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | LABEL FILM | BLK | 1 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | BOOKLET (OED) | | 9,077 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | INLAY (OED) | | 8,706 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | STICKER (OED) | | 3,297 |
| LUKE RECORDS | PR CDE 218 | BREAKDOWN-6 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 218 | BREAKDOWN-6 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 221 | FREAK..EM DOWN-2TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 221 | FREAK..EM DOWN-2TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 222 | HERE IT COMES-1 TRK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 222 | HERE IT COMES-1 TRK | MASTER TAPE | ROAT | 1 |
| LUKE RECORDS | PR CDE 225 | PICK IT UP-1 TRK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 225 | PICK IT UP-1 TRK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 226 | WIGGLE WIGGLE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 226 | WIGGLE WIGGLE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 229 | ACTION-3 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 229 | ACTION-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 231 | SISTA SISTA | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 231 | SISTA SISTA | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 457 | NO RUSH MI/....4 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 457 | NO RUSH MI/....4 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 458 | YOU & ME-3TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 458 | YOU & ME-3TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 459 | I'LL BE THERE-4TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 459 | I'LL BE THERE-4TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE-722 | IN MY NATURE-3 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE-722 | IN MY NATURE-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE-724 | I JUST WANT TO USE U | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE-724 | I JUST WANT TO USE U | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR E-718 | PSYCHOTIC-3 TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PROD E-718 | PSYCHOTIC-3 TRKS | LABEL FILM | BLK | |
| LUKE RECORDS | PROD M-1300 | U TURN ME ON-4 TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PROD M-1300 | U TURN ME ON-4 TRKS | LABEL FILM | BLK | |
| LUKE RECORDS | PROD 207 | ONE TRACK MIND-4TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PROD 213 | SHAKE WATCHA MAMA... | LABEL FILM | BLK | |
| LUKE RECORDS | PROD 213 | SHAKE WATCHA MAMA... | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PROD 214 | 2 DIFFERENT TRKS | LABEL FILM | BLK | |
| LUKE RECORDS | PROD 214 | 2 DIFFERENT TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | P18Z-2 | | LABEL FILM | BLK | |
| LUKE RECORDS | P18Z-2 | | LABEL FILM | BKGD | |
| LUKE RECORDS | P18Z-2 | | MASTER TAPE | TEXT | |
| LUKE RECORDS | PR460-2 | BACK TO THE BRONX | LABEL FILM | BLK | |
| LUKE RECORDS | PR460-2 | BACK TO THE BRONX | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PR461-2 | KNOCKIN DA BOOTS-STK | LABEL FILM | BLK | |
| LUKE RECORDS | PR461-2 | KNOCKIN DA BOOTS-STK | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PR463-2 | I'LL ALWAYS BE THERE | LABEL FILM | BLK | |
| LUKE RECORDS | PR463-2 | I'LL ALWAYS BE THERE | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PR464-2 | CAN YOU FEEL IT-6TRK | LABEL FILM | BLK | |

LIW R0840



06/23/95  13:33:16                    Parts Inventory For Client          (*LIBL/INV0080)                          PAGE  7

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | PR464-2 | CAN YOU FEEL IT-6TRK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR464-2 | CAN YOU FEEL IT-6TRK | VIEWPACK (QED) | VPK | 0 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | VIEWPACK (QED) | VPK | 0 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | WHI | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | MASTER TAPE | U-MATIC | 0 |
| LUKE RECORDS | PR467-2 | PERFIDIA | VIEWPACK (QED) | | |
| LUKE RECORDS | PR467-2 | PERFIDIA | MASTER TAPE | BLK | |
| LUKE RECORDS | PR467-2 | PERFIDIA | LABEL FILM | U-MATIC | |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | EMAG | |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | EYEL | |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | CYAN | |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | BLK | |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | WHI | |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | EYEL | |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | EMAG | |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | CYAN | |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | BLK | |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PR470-2 | DON'T SLEEP OKA HIZZ | LABEL FILM | STD BKGD | |
| LUKE RECORDS | PR470-2 | DON'T SLEEP OKA HIZZ | LABEL FILM | TEXT | |
| LUKE RECORDS | PR470-2 | DON'T SLEEP OKA HIZZ | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | MASTER TAPE | H/T&TEXT | |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | LABEL FILM | STD BKGRO | |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | LABEL FILM | TEXT | |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | MASTER TAPE | | |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | STD BKGD | |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | MASTER TAPE | | |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | STD BKGD | |
| LUKE RECORDS | PR474-2 | THE HOP | MASTER TAPE | TEXT | |
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | LABEL FILM | | |
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | LABEL FILM | | |



06/23/95  13:33:16                              Parts Inventory For Client                    (*LIBL/INV0080)                     PAGE   8

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | LABEL FILM | LARGE TEXT | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | MASTER TAPE | | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | MASTER TAPE | | 1 |
| LUKE RECORDS | PR478-2 | PROVE MY LOVE/...4TRK | LABEL FILM | | 1 |
| LUKE RECORDS | PR478-2 | PROVE MY LOVE/...4TRK | MASTER TAPE | | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | PR480-2 | | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR480-2 | | LABEL FILM | DESIGN | 1 |
| LUKE RECORDS | PR480-2 | | LABEL FILM | HALFTONE | 1 |
| LUKE RECORDS | PR480-2 | | MASTER TAPE | | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | LEFT BKGD | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | SWATCH | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | HALFTONE | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | MASTER TAPE | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | MASTER TAPE | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | ETOE | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | MASTER TAPE | | 1 |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | MASTER TAPE | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CONE IN | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CONE IN | LABEL FILM | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CONE IN | LABEL FILM | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CONE IN | LABEL FILM | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CONE IN | MASTER TAPE | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | LABEL FILM | | 0 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | LABEL FILM | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | LABEL FILM | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | MASTER TAPE | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | STD BKGD | 1 |

LJWR0842

06/23/95  13:33:16

Parts Inventory For Client

PAGE  9

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | (*[BL./INV0080) | QUANTITY |
|-------------|-----------|-------|-------------|-----------------|----------|
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | MASTER TAPE | | 1 |
| LUKE RECORDS | PR490-2 | MALIGNANT GRAFFITI | LABEL FILM | | 1 |
| LUKE RECORDS | PR490-2 | MALIGNANT GRAFFITI | MASTER TAPE | | 1 |
| LUKE RECORDS | PR492-2 | EXOTIONS | LABEL FILM | | 1 |
| LUKE RECORDS | XR 100 | IS WHAT WE ARE | LABEL FILM | | 1 |
| LUKE RECORDS | XR 100 | IS WHAT WE ARE | MASTER TAPE | | 1 |
| LUKE RECORDS | XR-106 | | | 155 | 0 |
| LUKE RECORDS | 1551-2 | U TURN ME ON | BOOKLET (OED) | 355 | 0 |
| LUKE RECORDS | 1551-2 | U TURN ME ON | INLAY (OED) | U-MATIC | 0 |
| LUKE RECORDS | 3005-2 | NASTY BITCH CHAPTER | BOOKLET (OED) | INL | 0 |
| LUKE RECORDS | 3005-2 | NASTY BITCH CHAPTER | INLAY (OED) | INL | 0 |

*** E N D   O F   R E P O R T  ***

*Total Print Pieces 1,133,647*

LJWR0843

# EXHIBIT 39

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

Whereas, Lil' Joe Records, Inc., a Florida Corporation ("Assignee"), pursuant to a Letter of Intent executed by the seller dated on or about February 3, 1996, further approved by Court Order Confirming Joint Plan Of Reorganization of the Assignor dated March 22, 1996, in Case Nos 95-11447 BKC RAM and 95-12785 BKC RAM, the US Bankruptcy Court Southern District Of Florida, has acquired the masters and other assets of the seller on Exhibit A which is exempt from tax under any law imposing a stamp or similar tax;

That Luke Records, Inc., Debtor and Debtor in Possession, a Corporation organized and existing under and by virtue of the laws of the State of Florida, having its principal place of business in the City of Miami, and County of Dade in the State of Florida, party of the first part, for and in consideration of the sum of ten Dollars, in lawful money (and other good and valuable consideration unto it moving) to it paid by Lil' Joe Records, Inc., a Florida Corporation, of the City of Miami, County of Dade, and State of Florida, party of the second part, the receipt of which is hereby acknowledged by it, has granted, bargained, sold, transferred, set over and delivered, and by these presents does grant, bargain, sell, transfer, set over and deliver unto the party of the second part, its successors and assigns, all those certain goods and chattels, described as follows:

Portion Conveyed:   100% worldwide rights or whatever right title and interest the Assignor has, if any, to the master recordings as hereinafter defined

See attached exhibit "A";

Together with all DAT's, masters, production masters, mothers, two inch studio reels, ½ inch and 1/4 inch studio reels, video masters and film, artwork, color separations, matchprints, pictures, signs, merchandising rights, all inventory wherever located, all rights to collect royalties to the contracts described in exhibit "A."; all right, title and interest in and to each contract rejected pursuant to section 365 of the Bankruptcy Code, subject to the liquidating trustees' right to assert defenses, recoupment or setoff; all master recording containing the musical compositions on Exhibit "A"; all merchandising rights to the Artists contained on the master recordings; all rights under all terminated artist and producer contracts, subject to the Luke Records, Inc. liquidating trustee having the right to offset the negative unrecouped balances against any rejection claims; all rights to the UPC council vendor number and alternate vendor number for Luke Records, Inc.(0 22471); and all rights to the tradename and/or service mark "2 Live Crew".

Seller agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Bill of Sale, and hereby irrevocably authorizes and appoints Frank P. Terzo,

Liquidating Trustee, as his true and lawful attorney-in-fact to take such action and make, sign, execute, acknowledge and deliver all such documents as may from time to time be necessary to convey to Buyer, its successors and assigns, all rights herein granted, provided that Seller shall first have an opportunity to execute such documents on seven (7) business days prior notice, after which time Frank P. Terzo shall be free to execute the documents.

Now Therefore, for ten dollars ($10.00) and good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, said Seller does hereby sell to said buyer all right title and interest to the Masters and the right to collect all accrued income not yet collected or to be collected in the future, free and clear of any and all liens, claims, encumbrances, charges, setoffs, or recoupments of any kind, and shall be transferred free and clear of any interest in such property of an entity other than Debtor and Debtor in Possession as more particularly described in the aforementioned letter of intent and order confirming plan of reorganization which relevant portions are incorporated herein by reference.

TO HAVE AND TO HOLD the same unto the party of the second part, its successors and assigns forever.

And the party of the first part, for itself and its successors, hereby covenants to and with the party of the second part its successors and assigns that it is the lawful owner of the said goods and chattels; that they are free from all liens and encumbrances pursuant to the Plan and Letter of Intent; that it has good right to sell the same.

Witnesses:

_____

_____

_____

Luke Records, Inc.,
Debtor and Debtor In
Possession

_____
Luther Campbell,
President & Secretary
(Corporate Seal)

The foregoing instrument is joined in and assented to by Frank P. Terzo, Liquidating Trustee of Luke Records, Inc.

_____

_____

_____
Frank P. Terzo,
Liquidating Trustee of
Luke Records, Inc.

114713

2

LJWR0722

| CPYRT | TITLE | COMPOSER | |
|---|---|---|---|
| | (SAMPLE TAKEN FROM) FUNKY STUF | R.BELL/R.BELL/R.WESTFIELD/D.THOMAS | 5379 |
| | BET $100 | LUTHER CAMPBELL | 25463 |
| | THE 2 LIVE CREW MEGA MIX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| | A BETTER WAY | R. ANDERSON | |
| | ACTION | PATRICK MENDEZ | 16760 |
| | ACTION | JEFF THOMPKINS | |
| | AFRAID OF THE FLAVOR | JEFF THOMPKINS | |
| | AGONY | PATRICK MENDEZ | |
| | A.I.D.S. (PRELUDE) | M. EFFINGER | |
| | AIN'T NOBODY BAD LIKE ME | LEJUAN BIGGERS/MARK ROSS | 5344 |
| | AIN'T NO PUSSY LIKE... | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8351 |
| | AIN'T THAT A B-TCH PART 1 | LUTHER CAMPBELL/JOHHN GUITAR WATSON/DOUGLAS BIGSON | 16556 |
| | AIN'T THAT A B-TCH PART II | LUTHER CAMPBELL/JOHNNY GUITAR WATSON/ | 16562 |
| | ALLEY BOY | PATRICK WATLER/VAN WATLER | |
| | ALL MY EX'S | LUTHER CAMPBELL | |
| | ALL NIGHT ALL DAY | T.BUTLER/E.KENDRICK/B.MUHAMMED | 20478 |
| | ALL THEY GOOD 4 | JEFF THOMPKINS | 16758 |
| | ALWAYS | DERRICK RAHMING | 5384 |
| | ALWAYS ON MY MIND | U-MYND | |
| | ANAL S-X | LUTHER CAMPBELL | |
| | ANGEL SIN | MICHAEL STERLING | |
| | ANOTHER JEALOUS B-CH | R. ANDERSON | 5340 |
| | ANOTHER LEVEL | R. ANDERSON | |
| | ANQUETTE'S GROOVE | DAVID HOBBS | 5370 |
| | ARREST IN EFFECT | LUTHER CAMPBELL/RODNEY C. TERRY/MICHAEL MCCRAY/CAR | 5246 |
| | ASSASSINATION ATTEMPT | RICHARD GRIFFIN/ANTHONYMILLS*/R.SCURDY (50%/50%*) | 8362 |
| | ATTENTION PLEASE | RICHARD GRIFFIN/ANTHONY MILLS/R SCURDY | 8368 |
| | THE B***H THAT I HATE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5452 |
| | B-L-N-T | MICHAEL THOMAS/KEITH JORDAN | 5329 |
| | BABY BABY PLEASE (JUST A LITTLE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8336 |
| | BABY I NEED YOU | U-MYND | |
| | BACK FROM H-LL | R. TAYLOR | |
| | BACK TO THE BRONX | PATRICK WATLER/VAN WATLER | |
| | BAD ASS BITCH | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5268 |
| | BAD BOYS MOVE IN SILENCE | CHRIS WONG WON | |
| | BAD INFLUENCE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5456 |
| | BAD LAND BOOGIE | LUTHER CAMPBELL | 25448 |

LJWR0723

| Title | Name | Number |
|---|---|---|
| BALLS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8356 |
| BANNED IN THE USA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| BASS 9-1-7 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5243 |
| BEAT BOX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5290 |
| BEAT YOUR LOVER | LUTHER CAMPBELL | |
| BEAT YOUR LOVER REPRISE | LUTHER CAMPBELL | |
| BETCHA HE DONT | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| BIG NOSE | JEFF THOMPKINS | 16776 |
| THE BITCH THAT I HATE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 7782 |
| BLACK IS THE COLOR | R. ANDERSON | |
| BLACKDRAFT | RICHARD GRIFFIN | |
| BLAME IT ON THE FUNK | INDO G & ILL bLUNT SMK | 5399 |
| BLAX THANX | PROFESSOR GRIFF | 8377 |
| BLAX THANX PT 2 | RICHARD GRIFFIN/ANTHONY MILLS | |
| BLAX THANX PT 111 | RICHARD GRIFFIN | |
| BODY FINE | PATRICK MENDEZ | |
| THE BOMB HAS DROPPED | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5283 |
| THE BOTTOM | DERRICK RAHMING | 5392 |
| BOUT TO LOSE MY MIND | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| THE BOY GOT SOME D-K | LUTHER CAMPBELL | 25467 |
| BOYZ WITH DA BASS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| BREAKDOWN | LUTHER CAMPBELL/CALEB ARMSTRONG/RAY ANTHONY SMITH | 16557 |
| BREAK IT ON DOWN | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5258 |
| BRO KEMIT SPLITTING ATOMS IN THE | RICHARD GRIFFIN/MARCUS EFFINGER*/L.NEWTON*/T.TUCKER* | 8379 |
| BROTHER TO BROTHER | MICHAEL JOHNSON/KEVIN JOHNSON | |
| BUCK 'EM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 5366 |
| BURN ONE | JEFF THOMPKINS | |
| BUST A NUT | LUTHER CAMPBELL | 25464 |
| C'MON BABE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5256 |
| CALM DOWN | C.MCNEIL & H.MCCLARTY | |
| CAN'T GO FOR THAT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5464 |
| CAN YOU FEEL IT | R. TAYLOR | |
| CAPER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| CAPT. D-CK AND DOLEMITE | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| CAUGHT IN THE ACT | V.D. BROOMFIELD | 5411 |
| CHECK IT OUT Y'ALL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5286 |
| CHECK OUT THE AVENUE PT 1 | JEFF THOMPKINS | |
| CHECK OUT THE AVENUE PT 2 | JEFF THOMPKINS | |

| Song | Writer | Number |
|---|---|---|
| CHESTERFIELD ISLAND | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8354 |
| CHILLIN' | CHRIS WONG WON/ANQUETTE ALLEN | 5371 |
| CHILLIN LIKE A VILLAIN | INDO G & LIL bLUNT SMK | |
| CHRISTMAS FREESTYLE | L. CAMPBELL/C. WONG WON/L. DOBSON | |
| CHRISTMAS F–IN DAY | R, ANDERSON | |
| CHRISTMAS SPLIFF | JEFF THOMPKINS | |
| CHRISTMAS TIME MEGAMIX | M.MCCRAY | |
| CISCO | LUTHER CAMPBELL | 16552 |
| CITY BOY | JEFF THOMPKINS | |
| CITY OF BOOM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5272 |
| CLIP ON CLICKS | LUTHER CAMPBELL | |
| COLOR CONFRONTATION | RICHARD GRIFFIN | |
| COME HOME | U-MYND | |
| COME INSIDE | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 5412 |
| COME ON | LUTHER CAMPBELL | |
| COME ON DOWN | R. ANDERSON, | |
| COME QUICK | H.MCCLARTY & C.MCNEIL | |
| COME A SURPRISE | JEFF THOMPKINS | |
| COME AND GET IT | A LARKINS II | |
| COMING HOME FOR CHRISTMAS | S. CONNOR, D. CONNOR, D. JACKSON | |
| COMING STRAP | JEFF THOMPKINS | 7298 |
| COMMERCIAL INQUIRING MINDS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7301 |
| COMMERCIAL NASTY M.F.S. | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| CONDOM COMMERCIAL | R. TAYLOR | |
| COOL (SOME COOL SH-T) | LUTHER CAMPBELL | 5270 |
| COOLIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 25452 |
| COWARDS IN COMPTON | LUTHER CAMPBELL | |
| CRAZY BOUT U | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| CRUCIFIED | RICHARD GRIFFIN/ANTHONY MILLS* (50%/50%* | 8375 |
| CRUCIFIED (PROGLOGUE) | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 8365 |
| CUT IT UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5289 |
| CUTNESS SAKE | DERRICK RAHMING | 5391 |
| DANCE ALL NITE (HOUSE MIX) | | |
| DANCE ALL NITE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5453 |
| DANCE TO THE RHYTHM | CHRIS WONG WON | |
| DANCE WITH ME BAILA BAILA | K. FELICIANO | 5417 |
| DEDICATION | JOHN BICKHAM, JR. | |
| DEM A TALK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

LJWR0725

| Title | Artist | Number |
|---|---|---|
| DEMON | CHRIS WONG WON | 5255 |
| DICK ALMIGHTY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| DICK 'EM DOWN | CHRIS WONG WON | 5257 |
| DINNER DATE | TRELLINI DAVIS AND BISHP "STICK" BURRELL | |
| DIRTY NURSERY RHYMES | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5364 |
| DISTURB N THA PEACE | RICHARD GRIFFIN | 5418 |
| DJ DESTRO - SCRATCH MILITANT | MICHAEL JOHNSON/KEVIN JOHNSON | |
| DO CRACK TAKE THE RAP | BRIM/HAGER/LAWRENCE/MCGUIRE/RAHMING | |
| DO IT LIKE THAT | U-MYND | |
| DO IT TO YA | U-MYND | |
| DOGGIE STYLE | DERRICK RAHMING | 5389 |
| DOMINATION | D. SAUNDERS/D. MILLER | 5422 |
| DON'T CALL ME BABY | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| DON'T EVEN | D.STINSON. W. KELLUM. C. JANNEST | |
| DON'T GO OUT LIKE A SUCKA | ANTHONY DURHAM/DAVID HOBBS . | 5304 |
| DON'T NEED U B-T-H | R. TAYLOR | |
| DON'T WANNA SHARE | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| DOO DOO BROWN | PATRICK MENDEZ | |
| DO THAT SHIT | MICHAEL PAYNE | 5415 |
| DO THE BART | CHRIS WONG WON/MARK ROSS/RODNEY C. TERRY/MIKE MCC | 5241 |
| DO WAH DIDDY | MANFRED MANN | |
| DO YOU BELIEVE | BEAT GOES BANG | |
| DO YOU HEAR THE LAMBS CALLING | LUTHER CAMPBELL | 25445 |
| DOWNTOWN | UNIDENTIFIED | 7341 |
| DRE'S MOMMA NEEDS A HAIRCUT | LUTHER CAMPBELL | 25445 |
| DROP IT OFF YOUR ASS | INDO G & LIL BLUNT SMK | |
| DROP THE BOMB | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/C. WONG WON | |
| DROP YOUR DRAWS | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| DRUGZ BULLSHITTIN' | JEFF THOMPKINS | 16767 |
| EDDIE MILLER | TRELLIN DAVIS AND BISHOP "STICK" BURRELL | |
| EVERYBODY SAY YEAH | LEJUAN BIGGERS/MARK ROSS | 5347 |
| F--K A GANG | LUTHER CAMPBELL/RODNEY C TERRY/JEFFERY THOMPKINS (J | 5252 |
| F--K MARTINEZ | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5239 |
| FACE DOWN, A-- UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5242 |
| FAKIN' LIKE GANGSTERS | LUTHER CAMPBELL/SYLVESTOR ALLEN/HAROLD BROWN/MOR | 16551 |
| FEAT DJ MAN | LEJUAN BIGGERS/MARK ROSS | |
| FEEL ALL RIGHT Y'ALL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5350 |
| FELLAS IN THE HOOD | JOHN BICKHAM, JR. | 5280 |

| Title | Writer(s) | Number |
|---|---|---|
| FINGER ON THE TRIGGER | INDO G & LIL BLUNT SMK | 5455 |
| FLAUGIN | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 8331 |
| FOLLOW MY HEART | TRELLINi DAVIS AND BISHOP "STICK" BURRELL | |
| FOR HOW LONG | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 16469 |
| FOR THOSE WHO LIKE TO DO IT | UNIDENTIFIED (CAMPBELL/ROSS/HOBBS/WONG-WON) | 8341 |
| FRATERNITY JOINT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5267 |
| FRATERNITY RECORD A/K/A FRATER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| FREAK FOR LIFE | LUTHER CAMPBELL | 5299 |
| FREAK THAT GIRL | ANTHONY DURHAM/DAVID HOBBS | |
| FREESTYLE | CHRIS WONG WON | |
| FREAKY BEHAVIOR | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8349 |
| FREAKY BUSINESS | LUTHER CAMPBELL | |
| FREESTYLE JOINT | LUTHER CAMPBELL | 25462 |
| FREESTYLE RAPPIN' | CHRIS WONG WON | 5372 |
| FROM THE BOTTOM TO THE CUFF | MICHAEL JOHNSON/KEVIN JOHNSON | 5363 |
| FROM THE BOTTOM TO THE TOP | CHRIS WONG WON | |
| F-K | H. MCCLARTY/C.MCNEIL | |
| F-K'EM INTRO | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F-K 'EM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| A F...K IS A F...K | R. TAYLOR | |
| F-K NIGGA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8333 |
| F-K OFF | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| THE FUNK SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8346 |
| THE F-K SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| FUGITIVE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5262 |
| FUGITIVE (PC) | RICHARD GRIFFIN/MARCUS EFFINGER*/JIM O'BRIEN*/ANTHON | 8378 |
| F.U.N.K (FROM US NASTY KIDZ) | JEFF THOMPKINS | |
| FUNKY STUFF | M.EFFINGER, S.SIMONIAN,P.MARCELIN, AND J. NIXON | |
| GAME RECOGNIZE GAME | LUTHER CAMPBELL | 5466 |
| GAMES | JEFF THOMPKINS | |
| GANGSTER ROCK | T. BUTLER/D. MOHAMMED | 20481 |
| GENTLE | DAVID ZILMER/MICHAEL PAYNE | 5416 |
| GET A REFILL | MICHAEL STERLING | 5357 |
| GET IT GIRL | PATRICK WATLER/VAN WATLER | |
| GET LOOSE NOW | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5287 |
| GET OFF YOUR A-- AND JAM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5261 |
| | ANQUETTE ALLEN | |
| GET ON THE MIC | INDO G & LIL BLUNT SMK | 5377 |

LJWR0727

| Title | Artist | Number |
|---|---|---|
| GET THE F--K OUT OF MY HOUSE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5265 |
| GET WITH THIS | DERRICK RAHMING | 5386 |
| GHETTO | U-MYND | |
| GHETTO BASS 2 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5274 |
| GHETTO STYLE | LUTHER CAMPBELL | 5409 |
| GIRL YOU SWEET | PATRICK MENDEZ | |
| GIRL WANT MONEY | PATRICK MENDEZ | |
| GOD BLESS AMERIKKKA | RICHARD GRIFFIN | |
| GO RAHMING GO | DERRICK RAHMING | 5383 |
| GOING ALL OUT | JEFF THOMPKINS | |
| GOOD LOVING | U-MYND | |
| GOOD TO THE LAST DROP | LUTHER CAMPBELL | 25469 |
| GOT TO GET SOME WORK DONE | LUTHER CAMPBELL | |
| GRANDMA VANILLA DON'T LIKE LOUD | RICHARD GRIFFIN/ANTHONY MILLS*/ROBERT SCURDY* (50%/50 | 8370 |
| GRAVEYARD | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8337 |
| GROOVE WITH THE PC | JEFF THOMPKINS | 16772 |
| H-TOWN'S COMING TO TOWN | D. CONNOR, S. CONNOR, D. JACKSON | |
| HANGIN OUT | MIKE MCCRAY/LUTHER WONG WON/MARK ROSS | 7829 |
| HANGIN' WITH THE HÓMEBOYS AND | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 20503 |
| HARD TO GET | PATRICK MENDEZ | |
| HARDER | R. ANDERSON | |
| HEAD, BOOTY & COCK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5277 |
| HEAD, HEAD & MORE HEAD | LUTHER CAMPBELL | 16558 |
| HEAD, HEAD & MORE HEAD PT II | LUTHER CAMPBELL | 25453 |
| HEADBANGER | LUTHER CAMPBELL | 25468 |
| HELL, YEAH | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| HERE I COME | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8343 |
| THE HERO | LUTHER CAMPBELL | 25457 |
| HEY JACK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7306 |
| HO HOE HOES | L. CAMPBELL/C WONG WON/L DOBSON/J.THOMPKINS/R ANDERSON | |
| HO' STORIES | JEFF THOMPKINS | 16764 |
| HO' STORIES PT. 2 | JEFF THOMPKINS | |
| HOLD ME DOWN | C.MCNEIL & H. MCCLARTY | |
| HOLIDAY | MICHAEL STERLING | 5339 |
| HOLIDAYS | CHRIS BRINSON | |
| HOME TEAM | PATRICK WATLER/VAN WATLER | |
| HOOCHIE MAMA | L.CAMPBELL/D. HOBBS/M. ROSS/C. WONG WON | |
| THE HOODIE | PATRICK WATLER/VAN WATLER | |

| Title | Writer/Artist | Number |
|---|---|---|
| THE HOP | LUTHER CAMPBELL | 25460 |
| A HOOKER? | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8340 |
| HOP-A-LON | R. TAYLOR | |
| HOT | H.MCCLARTY & C.MCNEIL | |
| HOTEP (INTRO) | M.EFFINGER | |
| THE HOUSE JUMPS | MICHAEL THOMAS/KEITH JORDAN | 5327 |
| I'LL ALWAYS BE TH—**DO NOT USE** | UNIDENTIFIED | 7342 |
| I'LL ALWAYS LOVE YOU | DWAYNE OHARR | 5355 |
| I'M COOL | DAVID HOBBS/DELANO PIGATI | 5420 |
| I'M SO SMOOTH | DERRICK RAHMING | 5390 |
| I'M THAT TYPE OF NIGGA | ANTHONY DURHAM/DAVID HOBBS | 5303 |
| I AINT BULL——TIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5260 |
| I AINT BULL——TIN' PART III | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8355 |
| I AINT BULL——TIN' PART II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS | 16468 |
| I AINT BULL——TIN' PART IV | LUTHER CAMPBELL | 16553 |
| I CAN DO THAT | DERRICK RAHMING | 5388 |
| IF IT'S ALRIGHT WITH YOU | KEITH SWEAT/ERIC MCCAIN | |
| IF YOU BELIEVE IN HAVING SEX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5263 |
| I GOT A F—IN' HEADACHE | LUTHER CAMPBELL | 25449 |
| I HATE HO'S | JEFF THOMPKINS | 16766 |
| I LIKE IT, I LOVE IT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8344 |
| I LIKE IT LOUD | MICHAEL THOMAS/KEITH JORDAN | 5330 |
| I NEED A GOOD MAN | R. ANDERSON | |
| I WANNA BE YOURS QUIET STORM | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| I WANNA BE YOURS | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| I WANT YOU (NEW MIX) | R. ANDERSON | |
| I WAS AT A JAM | FOLANDA JOHNSON & rODNEY PARKER | |
| IN-COG-NEGROW | RICHARD GRIFFIN/ANTHONY MILLS/ROBERT SCURDY* (45%, 45 | 8369 |
| INCOLOR MEN ON RECORDS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7309 |
| IN THE DUST | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| THE INITIATION | LUTHER CAMPBELL/ CHRIS WONG WON/LARRY DOBSON | 16757 |
| INSIDE EDITION | JEFF THOMPKINS | |
| INTERMISSION TIP | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 5403 |
| THE INTERVIEW | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | |
| INTRO INDO G | INDO G & lIL bLUNT SMK | |
| INTRO | UNIDENTIFIED (CAMPBELL/WONG WON/HOBBS/RO | |
| INTRO BUSTDOWN | JOHN BICKHAM, JR. | 16470 |
| INTRO DISCO RICK | R. TAYLOR | |

LJWR0729

| Title | Writer(s) | Number |
|---|---|---|
| INTRO 94 NEW 2LC | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| INTRO PC RUFFTOWN | JEFF THOMPKINS | |
| I STILL FEEL GOOD | LEJUAN BIGGERS/MARK ROSS | 5346 |
| I'LL BE HERE | CHRIS WONG WON | |
| IT'S A BLAX THANX | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5462 |
| IT'S BEEN A LONG TIME | LEJUAN BIGGERS | |
| IT'S YOUR BIRTHDAY | LUTHER CAMPBELL | |
| I WANNA ROCK | LUTHER CAMPBELL/HARRY WAYNE CASEY/RICHARD FINCH | 16550 |
| I WILL ALWAYS BE THERE FOR YOU | MICHAEL STERLING | 5378 |
| JC'S DETAILED CAR WASH | LUTHER CAMPBELL | |
| JAIL SALE | RICHARD GRIFFIN/MARCUS EFFINGER | 8381 |
| JANET RENO | ANQUETTE ALLEN | 5373 |
| JEALOUS B—CH | R. ANDERSON | |
| JEALOUS GIRLS | DAVID HOBBS/DELANO PIGATI | 5369 |
| JEALOUS GIRLS | MARK BOCCACIO | 5419 |
| JERI CURL | PATRICK WATLEY/JEFFREY THOMPKINS/DAVID HOBBS | 5451 |
| JESUS IS BLACK | V. WATLER/P. WATLER | |
| JOCKIN 'ROBIN | LEJUAN BIGGERS/MARK ROSS | 5336 |
| JOEY HATE RAP CALLS THE COPS | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 20226 |
| JOKE'S ON YOU | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| JT'S CONFESSION | JEFF THOMPKINS | 16765 |
| JT'S DREAM | JEFF THOMPKINS | 16756 |
| JT OLE BOY | JEFF THOMPKINS | 16773 |
| JUST FOR THE MOMENT | U-MYND | |
| JUST KICK-N-IT | JOHN BICKHAM, JR. | |
| JUST LOOK AND LISTEN | C.KOOLEY/K.JONES | 5414 |
| JUST ROCK (2 DIS HERE BEAT) | MIKE THOMAS | 5421 |
| JUST SAY GOODNIGHT | DWAYNE OMARR | 5354 |
| JUST WANNA TOUCH YA | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| JUVENILES | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5459 |
| KKK-VS-DOO DOO BROWN | RICHARD GRIFFIN | |
| KAO'S II WIZ"7"DOME | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY (50%, 50%) | 8363 |
| KEEP DANCIN' | ANTHONY DURHAM/DAVID HOBBS | 5293 |
| KID ICE GROOVE | CHRIS WONG WON' | |
| KNOCKIN' BOOTS FOR CHRISTMAS | D. CONNOR. S. CONNOR. D. JACKSON | |
| KNOWLEDGE | R. ANDERSON | |
| KNOW THE FLAVOR | PATRICK WATLER/VAN WATLER | |
| KNOW WHO YOUR ENEMY IS | MICHAEL JOHNSON/KEVIN JOHNSON | 5469 |

LJWR0730

| Title | Writer/Artist | Number |
|---|---|---|
| KOOL | DERRICK RAHMING | 5387 |
| L.L.O.M. | LUTHER CAMPBELL | 25461 |
| LAST ASIATIC DESCIPLES | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5402 |
| THE LATE GREAT BLACK MAN | RICHARD GRIFFIN/ANTHONY MILLS | 8376 |
| THE LEAST WE FORGET | RICHARD GRIFFIN | |
| LET THE RHYTHM RIDE | R. ANDERSON | |
| LET ME LICK YOU GIRL | R. TAYLOR | |
| LET'S GET FU-KED UP | INDO G & LIL bLUNT, smk | |
| LET'S GET SERIOUS | JEFF THOMPKINS | |
| LET'S GO SOME MO' | R. TAYLOR | |
| LET'S PARTY FOR THIS ONE | MICHAEL JOHNSON/KEVIN JOHNSON | 5368 |
| LET'S ROCK & ROLL Y'ALL | ANQUETTE ALLEN | 5376 |
| LET IT GO | DERRICK RAHMING | 5381 |
| LET IT RIP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8334 |
| LET ME TAKE YOU TO THE ROCK HO | ANTHONY DURHAM/DAVID HOBBS | 5300 |
| LIFE AINT NOTHING BUT A B-CH | INDO G & LIL bLUNT SMK | |
| LISTEN | JEFF THOMPKINS | |
| LIVIN' IN THE CITY | JEFF THOMPKINS/AARON NEVILLE'/L. NOCENTELLI'/J.MODELIS' | 16761 |
| LONG D-CK CHINESE | CHRIS WONG WON | |
| LOOKS AND SHAPE | C. MCNEIL & H.MCCLARTY | |
| LOVE COME DOWN | C. MCNEIL & H.MCCLARTY | |
| LOVE ON MY MIND | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| LOVE THY ENEMY | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI | 5397 |
| LOVE YOUR LIFE | MICHAEL JOHNSON/KEVIN JOHNSON | 5470 |
| LOVIN' | PATRICK MENDEZ | |
| LOW LIFE MUTHA F--KA | PATRICK WATLER/JEFFERY THOMPKINS/DAVID HOBBS | 5449 |
| MADBALL BACK | JEFF THOMPKINS | |
| MADD-MIX | CHRIS WONG WON | |
| MAKE IT BOUNCE | INDO G & LIL BLUNT SMK | |
| MAN 'O' MAN (PRELUDE;FEATURING | M. EFFINGER | |
| MAN, NOT A MYTH (SAMPLED, TONIG | RODNEY C TERRY/MIKE MCCRAY/MARK ROSS/CHRIS WONG W/ | 5250 |
| MARY MACK | MICHAEL THOMAS/KEITH JORDAN | 5331 |
| MARY MARY | ANQUETTE ALLEN | 5374 |
| MATERIAL GIRL | ANQUETTE ALLEN | 5375 |
| M.C.SUNDANCE | JEFF THOMPKINS | |
| MEGAMIX LUKE | CAMPBELL/CURTIS/KING/FLIPPIN/SHELTON/WILLIAMS/CORNW | 16563 |
| MEGAMIX FREAK FOR LIFE | LUTHER CAMPBELL | |
| MEGAMIX 94 | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

| Title | Writers | No. |
|---|---|---|
| MEGAMIX | LUTHER CAMPBELL*/BILL CURTIS/JOHNNY KING/JOHNNY FLIPP | 16563 |
| MEGA MIX IV | DAVID HOBBS/RODNEY C TERRY/MICHAEL MCCRAY/CARL DOR | 5247 |
| MEGA MIX HOUSE STYLE | LEJUAN BIGGERS/MARK ROSS | 5349 |
| MEGA MIX V | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8347 |
| MEGA MIXX II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5282 |
| MEGA MIXX III | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5269 |
| MENAGE A TROIS | LUTHER CAMPBELL/GERRY THOMAS/DOUGLAS BIGSON | 16555 |
| MENAGE A TOIS PT II | LUTHER CAMPBELL | 25455 |
| MENTAL GENOCIDE | RICHARD GRIFFIN/ANTHONY MILLS/ROBERT SKARDY*(45%, 10 | 8373 |
| ME SO HORNY | RICARDO WILLIAMS*/LUTHER CAMPBELL/DAVID HOBBS/MARK | 5253 |
| MESSAGE | LUTHER CAMPBELL | 20479 |
| MI PISTOL | PATRICK MENDEZ | |
| MIAMI | J.GREY | 5408 |
| MIAMI DA BOTTOM | CHRIS WONG WON | |
| MIAMI HEAT | MICHAEL JOHNSON/KEVIN JOHNSON | 5367 |
| MIAMI "LIBERY CITY" | R. TAYLOR | |
| MINE ALL MINE | MANUEL DEMETRIUS/JONATHAN BLACK | |
| MOVE SOMETHIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5471 |
| MOVIN' ALONG | LUTHER CAMPBELL | 5273 |
| MR.MIXX ON THE MIX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5291 |
| MR.MIXX TURNTABLE SHOW PART 1 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7780 |
| MR MIXX TURNTABLE SHOW PART 2 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7781 |
| MY HARDCORE RHYMES | LEJAUN BIGGERS/MARK ROSS | 5345 |
| MY IDEOLOGY | RICHARD GRIFFIN/ANTHONY MILLS/MARCUS EFFINGER* (45%, | 8380 |
| MY LADY | PATRICK MENDEZ | |
| MY SEVEN BIZZOS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5264 |
| NASTY B-TCH | JOHN BICKHAM, JR | |
| NEGATIVE FORCE | DERRICK RAHMING | 5385 |
| THE NEIGHBORHOOD HAPS | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5458 |
| NEWS FLASH BRITISH YOUTH | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7300 |
| NEWS FLASH NATION BY STORM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7311 |
| NEWS FLASH PEOPLE IN THE NEWS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7295 |
| NEWS FLASH POLL RESULTS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7304 |
| NEWS FLASH SUPER SNOOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7312 |
| NEWS FLASH 350 MEN | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7297 |
| NIGGA'S COMIN' UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8342 |
| NOBODY | U-MYND | |
| NOBODY GOING TO LOVE YOU | U-MYND | |

CJWR0732

| Title | Writer(s) | Number |
|---|---|---|
| NO BUN | PATRICK MENDEZ | 16774 |
| NO HAPS | JEFF THOMPKINS/EDDIE MILLER | |
| NO RUSH MI | PATRICK MENDEZ | 5341 |
| NO SUCH ANIMAL | MICHAEL STERLING | 5332 |
| NOT JUS' A PRETTY FACE | MICHAEL THOMAS/KEITH JORDAN | |
| NOT YOUR MAMA | | |
| OHHH! | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 16561 |
| ONE BLACK AND A BUNCH OF DIRTY WHITE BOYS | LUTHER CAMPBELL | 5343 |
| ONE MORE CHANCE | MICHAEL STERLING | 5281 |
| ONE ON ONE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| OUT OF CONTROL | LUTHER CAMPBELL | 5297 |
| OUTRO | INDO G LIL BLUNT SMK | |
| PARKAY | ANTHONY DURHAM/DAVID HOBBS | |
| P.W.Y.P. (PRACTICE WHAT YOU PREA | M.EFFINGER | 5396 |
| PASS THE AMMO | RICHARD GRIFFIN(P/K/A-PROFESSOR GRIFF)/SEAN PEACOCK( | |
| PASS THE BUDDAH | PATRICK WATLER/VAN WATLER | |
| PAUSE FOR THE CAUSE | JEFF THOMPKINS | 5404 |
| PAWN'S IN THE GAME | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | |
| PEEPIN' | JEFF THOMPKINS | |
| PERFIDIA | PATRICK MENDEZ, FOXY BROWN | |
| PHUCK THA MEDIA | RICHARD GRIFFIN | |
| PICK IT UP | PATRICK WATLER/VAN WATLER | 25456 |
| PIMPLE ON MY DICK | LUTHER CAMPBELL | |
| PISSIN' RAZOR BLADES | JOHN BICKHAM, JR. | 5351 |
| PLEASE STAY | LEJUAN BIGGERS/MARK ROSS | |
| PLAYERS DON'T FALL | INDO G & LIL BLUNT SMK | 5454 |
| POISON FREESTYLE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | |
| POP THAT CCOCHIE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | 8328 |
| POP THAT P---Y | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| POP THAT THANG | JOHN BICKHAM, JR. | |
| THE POWER (HOMEBOY'S mIX) | SNAP | |
| PRE-GAME ACTIVITY | RICHARD GRIFFIN | |
| PREMASTERBATORIAL | LUTHER CAMPBELL, | 20501 |
| PRETTY GIRLS | STEVIE B | |
| PRETTY WOMAN | ADAPTATION OF ROY ORBISON AND WILLIAM DEES | |
| PROVE MY LOVE | U-MYND | 19796 |
| PSYCHOTIC | JAMES PARKER/ERICH KRAUSE/PHILLIP MUELLER | 5472 |
| PUBLIC RELATIONS EXPRESS | MICHAEL JOHNSON/KEVIN JOHNSON | |

| Title | Credits | Number |
|---|---|---|
| PUMP & GRIND | ANTHONY DURHAM/DAVID HOBBS | 5296 |
| P---Y (REPRISE) FOR THOSE WHO LIK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8360 |
| P---Y AIN'T SH-T | CHRIS WONG WON | |
| P---Y AND D-CK THING | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| PUSSY ASS KID AND HOE ASS PLAY | LUTHER CAMPBELL | 16554 |
| P---Y A-- NIGGA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5276 |
| P---Y HUNT | C.MCNEIL & H.MCCLARTY | |
| THE P---Y CAPER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8357 |
| PU--Y SQUEEZER | PATRICK MENDEZ | |
| PUTCHA' BALLYS ON | JOHN BICKHAM, JR. | |
| PUT HER IN THE BUCK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5254 |
| PUT SH-T PASS NO HO | JEFF THOMPKINS | |
| R.A.P. REAL AFRICAN PEOPLE (PT1) | PROFESSOR GRIFF | 5393 |
| R.A.P. REAL AFRICAN PEOPLE (PT2) | PROFESSOR GRIFF | 5394 |
| R.O.A. | MICHAEL THOMAS/KEITH JORDAN | 5333 |
| THE RAIN | DWAYNE OMARR | 5352 |
| RAMATION | H. MCCLARTY C. MCNEIL | |
| RAP AS AN ART | M.EFFINGER,S.SIMONIAN,P.MARCELIN | |
| RAP TERRORIST | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5405 |
| RAYMOND UP THE ROAD | JEFF THOMPKINS | 16762 |
| REAL AFRICAN PEOPLE "RAP" PT1 | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5460 |
| REAL AFRICAN PEOPLE "RAP" PT2 | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5461 |
| REAL NIGGAZ MAKING NOISE | INDO G & LIL bLUNT SMK | |
| REBEL YELL | MICHAEL JOHNSON/KEVIN JOHNSON | 5362 |
| REBELZ AGAINST THA DEVELZ | RICHARD GRIFFIN | |
| REGGAE JOINT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5266 |
| REMINISCING | PATRICK WATLER/VAN WATLER | |
| REPRESENT | LUTHER CAMPBELL | |
| RESPECT | H.MCCLARTY & C.MCNEIL | |
| RESPECT | O.REDDING/ANQUETTE ALLEN | 5380 |
| RESPECT THA ART-KILL-TECH | RICHARD GRIFFIN | |
| REV | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 8366 |
| ROCKBOTTOM | | |
| ROCK HOUSE (FILM) | VARIOUS | 10495 |
| ROLL CALL | CHRIS WONG WON | |
| ROUGH NIGGA GETTIN' BUSY | JEFF THOMPKINS/NILE RODGERS/BERNARD EDWARDS | 16768 |
| RUFF TOWN BEHAVIOR | JEFF THOMPKINS | |
| RUFF NECK BUSINESS | PATRICK WATLER/VAN WATLER | |

| Title | Artist(s) | Number |
|---|---|---|
| S&M | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5278 |
| SAME OL' THANG | ANTHONY DURHAM/DAVID HOBBS | 5302 |
| SAVIN' MYSELF FOR YOU | DWAYNE OMARR | 5356 |
| SENSE OR SH-T | RICHARD GRIFFIN | |
| SETTING UP | JEFF THOMPKINS | |
| SEX, I LIKE -- I LOVE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7779 |
| SEX ME | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 25427 |
| SEX...SEX | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SHAKE IT (DO THE 61ST) | LUTHER CAMPBELL | 5410 |
| SHAKE WHATCHA MAMA GAVE YOU | JEFF THOMPKINS | 16775 |
| SHE KEEP CALLING ME | U-MYND | |
| SHE PUT ME IN A TRANCE | ANTHONY DURHAM/DAVID HOBBS | 5295 |
| SHERYL & DONNA | K.JONES/C.PUCKETT | 5413 |
| SHINING STAR | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| SHOCK THE HOUSE | MICHAEL THOMAS/KEITH JORDAN | 5335 |
| SHORTY T IN MADBALL'S BASEMENT | JEFF THOMPKINS | 16778 |
| SHOUTOUTS | R. TAYLOR | |
| SHOUT-OUTS (HOLLA' AT ME) | CHRIS WONG WON | |
| SHOW HIM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SHOUT OUTS | JEFF THOMPKINS/SADE ADU/LEROY OSBOURNE/STUART MAT | 16779 |
| SILENT NIGH-T | RICHARD GRIFFIN | |
| SISTA' SISTA | R. ANDERSON | |
| SOLO (BREAK MIX) | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| SOME HOT HEAD | JEFF THOMPKINS | |
| SOME MORE SH-T | LUTHER CAMPBELL | |
| SOME OL' BULLSH-T | JEFF THOMPKINS | |
| SOME SHIT I USED TO KNOW | JEFF THOMPKINS | |
| SOMETHING 4 YOU RAGEDY HO'S | H.MCCLARTY& C. MCNEIL | |
| SON OF A GUN | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| SPASTIC A-- | CHRIS WONG WON | |
| SPLAK IT LIKE YOU LIKE IT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| THE SPLAK SHOP | JEFF THOMPKINS./PATRICK WATLER | |
| SPOILED ROTTEN | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| STAY WIT ME | U-MYND | |
| STOP LOOK LISTEN | INDO g & IIL bLUNT SMK | |
| STRICTLY FOR DA G'S | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SUCK GOOD D-CK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SUCK MY D-CK | | |

LJWR0735

| Title | Writer/Artist | Number |
|---|---|---|
| SUGARHILL STYLE | JEFF THOMPKINS | 8348 |
| SWEET SUZY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 25466 |
| SWINGIN' | PRINCE AKEEM | |
| TAKE IT OFF | LUTHER CAMPBELL | 5358 |
| TAKE IT SLOW | TRELLIN DAVIS AND BISHOP "STICK BURRELL | |
| TAKE OFF YOUR CLOTHES | U-MYND | |
| TALES FROM THE DARKSIDE | MICHAEL JOHNSON/KEVIN JOHNSON | 5338 |
| TASTE YOUR LOVE | U-MYND | 5337 |
| TEARS OF MY PRIDE | MICHAEL STERLING | |
| TEDDY BEAR | MICHAEL STERLING | |
| TELL ME BABY | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TELL ME WHAT YOU KNOW | LUTHER CAMPBELL | 25450 |
| THAT WAS RAM | JEFF THOMPKNS | 16771 |
| THAT'S HOW I FEEL | LUTHER CAMPBELL | |
| THE 90'S ARE MINE (LP MIX 2) | R. ANDERSON | |
| THE F-CK HOUSE | R. TAYLOR | |
| THIS IS HOW IT SHOULD BE DONE | DERRICK RAHMING | 5382 |
| THROW THE D | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5288 |
| THROW THE P | ANQUETTE ALLEN, CHRIS WONG WON | |
| TI'ANT NO B**CH | RICHARD GRIFFIN | |
| TICKET TO HEAVEN | KNOWLEDGE FEAT KENNY BOBJEN | 5359 |
| TIME IS RUNNING OUT | MICHAELJOHNSON/KEVIN JOHNSON | 5298 |
| TIME TO GET MINE | ANTHONY DURHAM/DAVID HOBBS | 16769 |
| THE TIP ON MADBALL | JEFF THOMPKINS | 5251 |
| THIS IS TO LUKE FROM THE POSSE | PATRICK WATLER/RICHARD GRIFFIN | |
| TOGETHER FOREVER | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 5305 |
| TONY ROCK'S THEME | ANTHONY DURHAM/DAVID HOBBS | |
| TOO INQUISITIVE | H.MCCLARTY & C.MCNEIL | |
| THE TRICK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| TRICK DADDY | JOHN BICKHAM, JR. | |
| TRUE 2 ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TRUE PLAYER SPEAKS | JEFF THOMPKINS | 5342 |
| TRY ME | MICHAEL STERLING | |
| A TYPICAL SEX THING | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 5328 |
| U GETTIN' ILL 2 MUCH | MICHAEL THOMAS/KEITH JORDAN | 8338 |
| UGLY AS F–K | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| U SAID U LOVED ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 5361 |
| UNDERWATER | MICHAEL JOHNSON/KEVIN JOHNSON | |

| Title | Artist/Writer | Number |
|---|---|---|
| UNITED STATIC ASSOCIATION | KAVON SHAH | |
| UNTO US | C. BRINSON | |
| UP A GIRL'S A— | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8358 |
| UZI GETS SHOT | JEFF THOMPKINS | |
| VACATE THE PREMISES | KAVAN SHAH | |
| THE V AMENDMENT | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/JIM O'BRIEN(P/K/ | 5463 |
| VERBAL INTERCOURSE | RICHARD GRIFFIN/MARCUS EFFINGER*/ANTHONY MILLS (37.5% | 8382 |
| THE VERDICT | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5395 |
| VIA SATELLITE FROM SATURN | PATRICK WATLER/VAN WATLER | |
| VIDEO NO SOUL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7302 |
| WANNA DO YA | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| WANNA RECORD DEAL | R. TAYLOR | |
| WAS IT WORTH IT | JOHN BICKHAM, JR. | |
| WEAR A RUBBER | LUTHER CAMPBELL | 25465 |
| WE'RE F-CKIN' | LUTHER CAMPBELL | 25447 |
| WE'RE ON A MISSION | MICHAEL JOHNSON/KEVIN JOHNSON | 5365 |
| WE'RE THE WEAVE | LUTHER CAMPBELL | |
| WE BRING YOU JOY, | L. CAMPBELL/S. CONNOR/D. CONNOR/D. JACKSON | |
| WE LIKE TO CHILL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | 5285 |
| WE WANT SOME P—Y!! | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| WE WANT SOME P—Y II | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WEENIE ROAST | LUTHER CAMPBELL | 25454 |
| WELCOME TO THE QUIET STORM | M. EFFINGER | |
| WHAT IS A MAN | BILLY BOX | |
| WHAT IS BLACK | LUTHER CAMPBELL | 25458 |
| WHATEVER | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| WHAT UPS | INDO G & LIL BLUNT SMK | |
| WHERE DEM DOGG'S AT | LUTHER CAMPBELL | |
| WHERE DEM HOES AT | LUTHER CAMPBELL | |
| WHERE'S THE TI..IE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/C. WONG W | 5353 |
| WHO'S DOING WHO | DWAYNE OMARR | |
| WHO'S FIRST | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8359 |
| WHO'S F—KIN' WHO | R.TAYLOR | |
| WHO'S N THE HOUSE | ANTHONY DURHAM/DAVID HOBBS | 5292 |
| WHO'S TONY ROCK | U-MYND | |
| WHY U TRIPPING | R.TAYLOR | 19719 |
| WIGGLE WIGGLE | PATRICK WATLER/VAN WATLER | |
| WILDSTYLE | | |

| Title | Artist/Writer | Number |
|---|---|---|
| WILL YOU BE THERE FOR CHRISTMA | M. HUDSON | |
| WITH YOUR BAD SELF | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5275 |
| WLAD | RICHARD GRIFFIN | |
| WORD II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5279 |
| THE WORD OF G.O.D. GRIFF ON DUT | RICHARD GRIFF (P/K/A PROFESSOR GRIFF BMI) | 5401 |
| WORD FROM A PLAYER | JEFF THOMPKINS | |
| WORK FOR FREE | JEFF THOMPKINS | |
| WORK IT | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WORK IT OUT | LUTHER CAMPBELL | 25446 |
| WORK THAT BODY | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WORK THAT P--Y | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YEA YEA Y'ALL | R. ANDERSON | |
| YEAH, YEAH | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YEAH, YEAH (LUKE DUB) | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YES N'DEED | M. EFFINGER | |
| YES SHE DID | R. TAYLOR | 5406 |
| YOU'RE MY DEVOTION | J.DIAZ/M.ROOFE/D.MONTAIVO | |
| YOU AIN'T HAD NO LOVIN' | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| YOU AND ME | LUTHER CAMPBELL | 16560 |
| YOU ARE VERY ERECT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8352 |
| YOU DONT EVEN KNOW ME KID | INDO G & LIL bLUNT SMK | |
| YOU GETS NOTHING | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5457 |
| YOU GO GIRL | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YOU GOT LARCENY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5371 |
| YOU HAVE BEEN BAD | LUTHER CAMPBELL | |
| YOU TURN ME ON | TONY BURTON/ELLISON KENDRICK | 12371 |
| YOU UNDERSTAND | MICHAEL JOHNSON/KEVIN JOHNSON | 5360 |
| '1-900-STE OREO TYPE | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/JIM O'BRIEN(P/K/ | 5398 |
| 12" LONG | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8350 |
| 15TH AVENUE | LEJUAN BIGGERS/MARK ROSS | 5348 |
| 2 LIVE BLUES | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5259 |
| 2 LIVE IS WHAT WE ARE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5284 |
| 2 LIVE FREESTYLE | LUTHER CAMPBELL/CHRIS WONG WON/ LARRY DOBSON | |
| 2 MINUTE WARNING | RICHARD GRIFFIN | |
| 7 WATTZ OF REALITY | RICHARD GRIFFIN | |
| 43RD NEGATIVE CONFESSION | RICHARD GRIFFIN | |
| 107.POINT LIVE(AT THE SLAVE THEATER)rICHARD GRIFFIN | | |
| 2 LIVE CHRISTMAS | L. CAMPBELL/C.WONG WON/L.DOBSON | |

20'S                                                INDO G & LIL bLUNT SMK

**ALBUM 1 — H-TOWN**

| Track | Credits | No. |
|---|---|---|
| INTRODUCTION | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25424 |
| CAN'T FADE DA H | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25433 |
| TREAT U RIGHT | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25425 |
| FEVER FOR DA FLAVOR | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25426 |
| SEX ME | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25427 |
| H-TOWN BOUNCE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 23820 |
| KEEPIN' MY COMPOSURE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25428 |
| INTERLUDE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25429 |
| LICK U UP | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25430 |
| KNOCKIN' DA BOOTS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 23819 |
| WON'T U COME BACK | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25431 |
| BABY I WANNA | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25432 |

**ALBUM 2 — H-TOWN INTRO 94**

| Track | Credits |
|---|---|
| SEX BOWL | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| ONE NIGHT GIGOLO | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| PRELUDE TO EMOTION | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| EMOTIONS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| CRUISIN' FO' HONEYS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| FULL TIME | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| 1-900-CALL GI | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| TUMBLE & RUMBLE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| MUCH FEELIN' (AND IT TASTES GREA | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BEGGIN' AFTER DARK | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| INDO LOVE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BACK SEAT (WIT NO SHEETS) | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BUSS ONE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BABY I LOVE YA' | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| STICKY LEE PRESLEY | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| ROCKIT STEADY | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| THE LAST RECORD | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |

LJWR0739

RIGHTS FROM SOUNDTRACKS TO INCLUDE FOLLOWING SONGS ON GREATEST HITS ALBUM
PART TIME LOVER FROM ABOVE THE RIM SOUNDTRACK dEATH rOW/INTERSCOPE
IT'S YOUR THING ADDAMS FAMILY VALUES ATLAS/POLYGRAM
A THIN LINE BETWEEN LOVE & HATE ? WARNER BROS.

KTEL EMOTIONS?

LJWR0740



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDCE 709 | DANCE ALL NIGHT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDCE 713 | GET A LIL' STUPID | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDCE 714 | PLAYING YOUR GAME | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDCE 714 | PLAYING YOUR GAME | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 012 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 305 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 267 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 119 | I GOT SHIT ON MY MIN | BOOKLET (OED) | | 6.057 |
| LUKE RECORDS | CDE 119 | I GOT SHIT ON MY MIN | INLAY (OED) | | 8.163 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 012 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 305 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 267 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 120 | I GOT SOMTHIN ON MY | BOOKLET (OED) | | 3.769 |
| LUKE RECORDS | CDE 120 | I GOT SOMTHIN ON MY | INLAY (OED) | | 5.636 |
| LUKE RECORDS | CDE 2000 | LET ME TAKE YOU TO.. | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2001 | POISON CLAM | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2001 | POISON CLAM | LABEL FILM | 199 | 1 |
| LUKE RECORDS | CDE 2001 | POISON CLAM | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 2001 | POISON CLAM | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2002 | POISON CLAM | BOOKLET (OED) | | 7.137 |
| LUKE RECORDS | CDE 2002 | POISON CLAM | INLAY (OED) | | 11.390 |
| LUKE RECORDS | CDE 2002 | PENNY | LABEL FILM | 159 | 1 |
| LUKE RECORDS | CDE 2002 | PENNY | LABEL FILM | 364 | 1 |
| LUKE RECORDS | CDE 2002 | PENNY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2002 | PENNY | BOOKLET (OED) | | 3.598 |
| LUKE RECORDS | CDE 2002 | PENNY | INLAY (OED) | | 3.534 |
| LUKE RECORDS | CDE 2003 | PENNY | LONGBOX (OED) | | 0 |
| LUKE RECORDS | CDE 2003 | LIVE IN CONCERT | LABEL FILM | 320 | 1 |
| LUKE RECORDS | CDE 2003 | LIVE IN CONCERT | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 2003 | LIVE IN CONCERT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2003 | LIVE IN CONCERT | BOOKLET (OED) | | 4.693 |
| LUKE RECORDS | CDE 2003 | LIVE IN CONCERT | INLAY (OED) | | 1.078 |
| LUKE RECORDS | CDE 2004 | LIVE IN CONCERT | LONGBOX (OED) | | 0 |
| LUKE RECORDS | CDE 2005 | KONFLIC OF INTEREST | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2005 | | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 2005 | | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2005 | | BOOKLET (OED) | | 9.929 |
| LUKE RECORDS | CDE 2005 | | INLAY (OED) | | 10.140 |
| LUKE RECORDS | CDE 2006 | | STICKER (OED) | | 9.200 |
| LUKE RECORDS | CDE 2006 | POISONOUS MENTALITY | LABEL FILM | 186 | 1 |
| LUKE RECORDS | CDE 2006 | POISONOUS MENTALITY | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 2006 | POISONOUS MENTALITY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 2006 | POISONOUS MENTALITY | BOOKLET (OED) | | 2.361 |
| LUKE RECORDS | CDE 2006 | POISONOUS MENTALITY | INLAY (OED) | | 3.631 |
| LUKE RECORDS | CDE 2007 | POISONOUS MENTALITY | LABEL FILM | 292 | 1 |
| LUKE RECORDS | CDE 2007 | | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDE 2007 | | MASTER TAPE | U-MATIC | 1 |



06/23/95  13:33:16                     Parts Inventory For Client                  (*LBL/INV00BO)                    PAGE   2

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDE 3007 | CREMLAPOO | BOOKLET (DED) | | 5,782 |
| LUKE RECORDS | CDE 3007 | CREMLAPOO | INLAY (DED) | | 4,882 |
| LUKE RECORDS | CDE 706 | | LABEL TAPE | 300 | |
| LUKE RECORDS | CDE 706 | | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | CDXR 100 | IS WHAT WE ARE | LABEL FILM | BLK | 0 |
| LUKE RECORDS | CDXR 100 | IS WHAT WE ARE | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 100 | IS WHAT WE ARE | BOOKLET (DED) | | 8,591 |
| LUKE RECORDS | CDXR 100 | IS WHAT WE ARE | INLAY (DED) | | 13,644 |
| LUKE RECORDS | CDXR 1005 | COMING CORRECT '88 | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 101 | MOVE SOMETHING | LABEL FILM | PANY | |
| LUKE RECORDS | CDXR 101 | MOVE SOMETHING | LABEL FILM | 354 | |
| LUKE RECORDS | CDXR 101 | MOVE SOMETHING | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 101 | MOVE SOMETHING | BOOKLET (DED) | | 7,269 |
| LUKE RECORDS | CDXR 101 | MOVE SOMETHING | INLAY (DED) | | 10,680 |
| LUKE RECORDS | CDXR 102 | MOVE SOMETHIN-CLEAN | LABEL FILM | PANY | |
| LUKE RECORDS | CDXR 102 | MOVE SOMETHIN-CLEAN | LABEL FILM | 354 | |
| LUKE RECORDS | CDXR 102 | MOVE SOMETHIN-CLEAN | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 102 | MOVE SOMETHIN-CLEAN | BOOKLET (DED) | | 6,082 |
| LUKE RECORDS | CDXR 102 | MOVE SOMETHIN-CLEAN | INLAY (DED) | | 5,912 |
| LUKE RECORDS | CDXR 103 | RESPECT | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 107 | AS NASTY AS THEY WAN | LABEL FILM | BLK | 2,152 |
| LUKE RECORDS | CDXR 107 | AS NASTY AS THEY WAN | LABEL FILM | U-MATIC | 3,597 |
| LUKE RECORDS | CDXR 107 | AS NASTY AS THEY WAN | MASTER TAPE | | |
| LUKE RECORDS | CDXR 108 | AS CLEAN AS THEY WAN | LABEL FILM | PANY | |
| LUKE RECORDS | CDXR 108 | AS CLEAN AS THEY WAN | LABEL FILM | 354 | 6,208 |
| LUKE RECORDS | CDXR 108 | AS CLEAN AS THEY WAN | MASTER TAPE | U-MATIC | 5,955 |
| LUKE RECORDS | CDXR 108 | AS CLEAN AS THEY WAN | BOOKLET (DED) | | 2,500 |
| LUKE RECORDS | CDXR 108 | AS CLEAN AS THEY WAN | INLAY (DED) | | |
| LUKE RECORDS | CDXR 109 | AGAINST ALL ODDS | STICKER (DED) | | |
| LUKE RECORDS | CDXR 110 | DARK SIDE | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 111 | PANIMSOF THE GAME | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 114 | BANNED IN USA-NASTY | MASTER TAPE | 300 | |
| LUKE RECORDS | CDXR 114 | BANNED IN USA-NASTY | LABEL FILM | 185 | |
| LUKE RECORDS | CDXR 114 | BANNED IN USA-NASTY | LABEL FILM | U-MATIC | 2,252 |
| LUKE RECORDS | CDXR 114 | BANNED IN USA-NASTY | MASTER TAPE | | 5,136 |
| LUKE RECORDS | CDXR 115 | BANNED IN USA-CLEAN | BOOKLET (DED) | | |
| LUKE RECORDS | CDXR 115 | BANNED IN USA-CLEAN | INLAY (DED) | 300 | |
| LUKE RECORDS | CDXR 115 | BANNED IN USA-CLEAN | LABEL FILM | 185 | |
| LUKE RECORDS | CDXR 115 | BANNED IN USA-CLEAN | LABEL FILM | U-MATIC | 5,996 |
| LUKE RECORDS | CDXR 115 | BANNED IN USA-CLEAN | MASTER TAPE | | 7,629 |
| LUKE RECORDS | CDXR 116 | SPORTS WEEKEND-NASTY | BOOKLET (DED) | | |
| LUKE RECORDS | CDXR 116 | SPORTS WEEKEND-NASTY | INLAY (DED) | BLK | |
| LUKE RECORDS | CDXR 116 | SPORTS WEEKEND-NASTY | LABEL FILM | 021 | |
| LUKE RECORDS | CDXR 116 | SPORTS WEEKEND-NASTY | LABEL FILM | | |
| LUKE RECORDS | CDXR 116 | SPORTS WEEKEND-NASTY | MASTER TAPE | U-MATIC | 0 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | BOOKLET (DED) | | 5,511 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | LABEL FILM | BLK | |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | LABEL FILM | 021 | 1 |

LJW R0742

06/23/95 13:33:16

Parts Inventory For Client

PAGE   3

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | (*LIBL/INV0080) | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | BOOKLET (QED) | | 5,556 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | INLAY (QED) | | 10,727 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | LABEL FILM | 116 | 1 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | BOOKLET (QED) | | 21,129 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | INLAY (QED) | | 20,064 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | BOOKLET (QED) | | 25,491 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | INLAY (QED) | | 2,144 |
| LUKE RECORDS | CDXR 122 | BEST OF... | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDXR 122 | BEST OF... | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 122 | BEST OF...15 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 122 | BEST OF...15 TRKS | BOOKLET (QED) | | 15,880 |
| LUKE RECORDS | CDXR 122 | BEST OF...15 TRKS | INLAY (QED) | | 1,479 |
| LUKE RECORDS | CDXR 123 | BEST OF...15 TRKS | LABEL FILM | 137 | 1 |
| LUKE RECORDS | CDXR 123 | BEST OF...9 TRS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 123 | BEST OF...9 TRS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 123 | BEST OF...9 TRS | BOOKLET (QED) | | 29,617 |
| LUKE RECORDS | CDXR 123 | BEST OF...9 TRS | INLAY (QED) | | 33,503 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | LABEL FILM | PROY | 1 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | BOOKLET (QED) | | 33,355 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | INLAY (QED) | | 21,454 |
| LUKE RECORDS | CDXR 125 | BODY FINE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 125 | BODY FINE | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDXR 125 | BODY FINE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 125 | BODY FINE | BOOKLET (QED) | | 19,684 |
| LUKE RECORDS | CDXR 125 | BODY FINE | INLAY (QED) | | 25,279 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | WHI | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | 117 | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | INLAY (QED) | | 79,496 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | LABEL FILM | 4665 | 54,226 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | LABEL FILM | 186 | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | BOOKLET (QED) | | 55,027 |
| LUKE RECORDS | CDXR 200 | NASTY IN NUDE | INLAY (QED) | | 54,609 |
| LUKE RECORDS | CDXR 201 | IN THE NUDE-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 201 | IN THE NUDE-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 201 | IN THE NUDE-CLEAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 201 | IN THE NUDE-CLEAN | BOOKLET (QED) | | 16,406 |
| LUKE RECORDS | CDXR 201 | IN THE NUDE-CLEAN | INLAY (QED) | IM | 18,463 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | LABEL FILM | STD BKGD | 1 |



LJWR0743

06/22/95  13:33:16                Parts Inventory For Client          (*LIBL/INV0080)                PAGE  4



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | MASTER TAPE | U-MATIC | 16.612 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | BOOKLET (OED) | INL | 18.890 |
| LUKE RECORDS | CDXR 203 | RUFFTOWN BEHAVIOR | INLAY (OED) | STC | |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | DESIGN | |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | | |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | MASTER TAPE | | 3.485 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | BOOKLET (OED) | | 3.874 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | INLAY (OED) | | |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | E TO E | |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | MASTER TAPE | | 9.915 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | BOOKLET (OED) | BKGD | 12.760 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | INLAY (OED) | TEXT | |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | LABEL FILM | | 14.328 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | MASTER TAPE | | 14.276 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | INLAY (OED) | | 0 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | STICKER (OED) | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | STICKER (OED) | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | MASTER TAPE | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | INLAY (OED) | NO EXPLICIT LYRICS | 0 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | |
| LUKE RECORDS | CDXR 207 | '94 | MASTER TAPE | | 16.130 |
| LUKE RECORDS | CDXR 207 | '94 | BOOKLET (OED) | BKGD | 15.221 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | INLAY (OED) | | |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | MASTER TAPE | | 13.032 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | BOOKLET (OED) | | 11.472 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | INLAY (OED) | | |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | | |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | MASTER TAPE | | 14.915 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | INLAY (OED) | | 15.435 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | TEXT | |
| LUKE RECORDS | CDXR 210 PRO | GHETTO STYLE BASS | LABEL FILM | | 1 |

LJWR0744

FEB-20-96 TUE 17:04   NIMBUS FORCHASTING   FAX NO. 6045852855   P. 09

06/23/95  13:33:16

Parts Inventory For Client   (*LIBL/INV008D)   PAGE 5



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 210 | | BOOKLET (DED) | | 11,595 |
| LUKE RECORDS | CDXR 210 | | INLAY (DED) | | 11,135 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | MASTER TAPE | STD | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOAL | BOOKLET (DED) | | 3,106 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | INLAY (DED) | | 3,683 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 212 | BAD FOAL | BOOKLET (DED) | BKGD W/ KO | 25,082 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | LABEL FILM | TEXT | 23,508 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | LABEL FILM | | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | MASTER TAPE | | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | BOOKLET (DED) | | 0 |
| LUKE RECORDS | CDXR 214 | LOVE ON MIND | INLAY (DED) | | 0 |
| LUKE RECORDS | CDXR 214 | LOVE ON MIND | INLAY (DED) | | 0 |
| LUKE RECORDS | CDXR 5301 | MIAMI BASS WAVES | LABEL FILM | | 0 |
| LUKE RECORDS | CDXR 5301 | MIAMI BASS WAVES | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 5301 | MIAMI BASS WAVES | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | CDXR 5301 | MIAMI BASS WAVES | INLAY (DED) | U-MATIC | 6,707 |
| LUKE RECORDS | CDXR 5302 | LUKE'S HITMAN OF 90S | LABEL FILM | INLAY | 7,832 |
| LUKE RECORDS | CDXR 5302 | LUKE'S HITMAN OF 90S | LABEL FILM | 226 | 0 |
| LUKE RECORDS | CDXR 5302 | LUKE'S HITMAN OF 90S | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 5302 | LUKE'S HITMAN OF 90S | BOOKLET (DED) | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | INLAY (DED) | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | MASTER TAPE | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | BOOKLET (DED) | BKGD | 4,245 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | INLAY (DED) | | 20,815 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | BOOKLET (DED) | BLK | 17,704 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM (DED) | U-MATIC | 17,581 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN 7 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN 7 TRKS | MASTER TAPE | | 1 |

LJWR0745

06/23/95  13:33:16                        Parts Inventory For Client        (**LBL/INV0080)                         PAGE   6

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | GR 452-2 | BREAKDOWN        7 TRKS | BOOKLET (OED) | | 3,933 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN        7 TRKS | INLAY (OED) | | 3,816 |
| LUKE RECORDS | LUKE GEN. |  | WALLET (GEM) | | 2,700 |
| LUKE RECORDS | W 1551 | 'U' TURN ME ON | LABEL FILM | | 1 |
| LUKE RECORDS | W 1551 | 'U' TURN ME ON | MASTER TAPE | | 1 |
| LUKE RECORDS | W 1551 | 'U' TURN ME ON | BOOKLET (OED) | | 9,077 |
| LUKE RECORDS | W 1551 | 'U' TURN ME ON | INLAY (OED) | | 8,706 |
| LUKE RECORDS | W 1551 | 'U' TURN ME ON | STICKER (OED) | | 3,297 |
| LUKE RECORDS | PR CDE 218 | BREAKDOWN-6 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 218 | BREAKDOWN-6 TRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | PR CDE 221 | FREAK 'EM DOWN-2TRKS | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 221 | FREAK 'EM DOWN-2TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 222 | HERE IT COMES-1 TRK | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 222 | HERE IT COMES-1 TRK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 225 | PICK IT UP- 1 TRK | MASTER TAPE | RDAT | 1 |
| LUKE RECORDS | PR CDE 225 | PICK IT UP- 1 TRK | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PR CDE 226 | WIGGLE WIGGLE | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 226 | WIGGLE WIGGLE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 229 | ACTION-3 TRKS | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 229 | ACTION-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 231 | SISTA SISTA | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PR CDE 231 | SISTA SISTA | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 457 | NO RUSH MI/...4 TRKS | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PR CDE 457 | NO RUSH MI/...4 TRKS | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 458 | YOU & ME-3TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 458 | YOU & ME-3TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 459 | I'LL BE THERE-4TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 459 | I'LL BE THERE-4TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE-722 | IN MY NATURE-3 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR CDE-722 | IN MY NATURE-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE-724 | I JUST WANT TO USE U | LABEL FILM | | 1 |
| LUKE RECORDS | PR CDE-724 | I JUST WANT TO USE U | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PROD E-718 | PSYCHOTIC-3 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PROD E-718 | PSYCHOTIC-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PROD N-1300 | U TURN ME ON-4 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PROD N-1300 | U TURN ME ON-4 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PROD 207 | ONE TRACK MIND-4TRKS | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PROD 213 | SHAKE WATCHA MMA... | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PROD 213 | SHAKE WATCHA MMA... | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PROD 214 | 2 DIFFERENT TRKS | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PROD 214 | 2 DIFFERENT TRKS | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR18Z-2 | | MASTER TAPE | BKGO | 1 |
| LUKE RECORDS | PR18Z-2 | | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR18Z-2 | | MASTER TAPE | | 1 |
| LUKE RECORDS | PR460-2 | BACK TO THE BRONX | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR460-2 | BACK TO THE BRONX | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR461-2 | KNOCKIN DA BOOTS-STK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR461-2 | KNOCKIN DA BOOTS-STK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR463-2 | I'LL ALWAYS BE THERE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR463-2 | I'LL ALWAYS BE THERE | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PR464-2 | CAN YOU FEEL IT-6TRK | LABEL FILM | BLK | 1 |

LJWR0746



06/23/95  13.33:16

Parts Inventory For Client

(*LIBL/INV0080)

PAGE   7

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | PR454-2 | CAN YOU FEEL IT-6TRK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR454-2 | CAN YOU FEEL IT-6TRK | VIEWPACK (OKD) | VPK | 0 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | VIEWPACK (OKD) | VPK | 0 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | WHI | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | VIEWPACK (OKD) | | 0 |
| LUKE RECORDS | PR467-2 | PERFIDIA | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR467-2 | PERFIDIA | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | WHI | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR470-2 | DON'T SLEEP OMA HIZZ | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR470-2 | DON'T SLEEP OMA HIZZ | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR470-2 | DON'T SLEEP OMA HIZZ | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | MASTER TAPE | H/T&TEXT | 1 |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | LABEL FILM | STD BKGRD | 1 |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | MASTER TAPE | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | MASTER TAPE | STD BKGD | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | MASTER TAPE | | 1 |
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | LABEL FILM | TEXT | 1 |

LJWR0747



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | (*LBL/INVCOBO) | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 GTRKS | MASTER TAPE | | |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | LABEL FILM | LARGE TEXT | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | MASTER TAPE | | |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | MASTER TAPE | | |
| LUKE RECORDS | PR478-2 | PROVE MY LOVE/..4TRK | LABEL FILM | | |
| LUKE RECORDS | PR478-2 | PROVE MY LOVE/..4TRK | MASTER TAPE | | |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | MASTER TAPE | | |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | LABEL FILM | | |
| LUKE RECORDS | PR483-2 | | MASTER TAPE | | |
| LUKE RECORDS | PR430-2 | | MASTER TAPE | | |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | DESIGN | |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | HALFTONE | |
| LUKE RECORDS | PR482-2 | | MASTER TAPE | LEFT BKGD | |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | SWATCH | |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | HALFTONE | |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | |
| LUKE RECORDS | PR483-2 | IT'S YOUR BIRTHDAY | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR483-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | |
| LUKE RECORDS | PR483-2 | | MASTER TAPE | | |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | ETOE | 1 |
| LUKE RECORDS | PR485-2 | 2 LIVE FREESTYLE | LABEL FILM | | |
| LUKE RECORDS | PR485-2 | 2 LIVE FREESTYLE | LABEL FILM | | |
| LUKE RECORDS | PR485-2 | 2 LIVE FREESTYLE | MASTER TAPE | | |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | | |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR485-2 | INDO & BLUE BLAME | LABEL FILM | | |
| LUKE RECORDS | PR486-2 | INDO & BLUE BLAME | LABEL FILM | | |
| LUKE RECORDS | PR486-2 | INDO & BLUE BLAME | MASTER TAPE | | |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CORE IN | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CORE IN | LABEL FILM | | |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/CORE IN | LABEL FILM | | |
| LUKE RECORDS | PR487-2 | TAKE IT SLOW/CORE IN | LABEL FILM | | |
| LUKE RECORDS | PR487-2 | TAKE IT SLOW/CORE IN | LABEL FILM | STD BKGD | 0 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | LABEL FILM | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | LABEL FILM | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEM... | MASTER TAPE | | |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | STD BKGD | 1 |

06/22/95  13:33:16                          Parts Inventory For Client        (*LIBL/INVO0BQ)                    PAGE    9

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | P3489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | MASTER TAPE | | 1 |
| LUKE RECORDS | PR490-2 | MALIGNANT GRAFFITI | LABEL FILM | | 1 |
| LUKE RECORDS | PR490-2 | MALIGNANT GRAFFITI | MASTER TAPE | | 1 |
| LUKE RECORDS | PR492-2 | EMOTIONS | LABEL FILM | | 1 |
| LUKE RECORDS | XR 100 | IS WHAT WE ARE | LABEL FILM | | 1 |
| LUKE RECORDS | XR-106 | IS WHAT WE ARE | MASTER TAPE | 155 | 1 |
| LUKE RECORDS | L551-2 | U TURN ME ON | BOOKLET (DED) | 355 | 0 |
| LUKE RECORDS | L551-2 | U TURN ME ON | INLAY (DED) | U-MATIC | 0 |
| LUKE RECORDS | 3005-2 | NASTY BITCH CHAPTER | BOOKLET (DED) | INL | 0 |
| LUKE RECORDS | 3005-2 | NASTY BITCH CHAPTER | INLAY (DED) | INL | 0 |

*** E N D  O F  R E P O R T ***

TOTAL PRINT PIECES 1,133,647

# EXHIBIT 40

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

THAT Lil' Joe Records, Inc., a Florida corporation ("Buyer"), pursuant to a Letter of Intent executed by Pac Jam Publishing, Inc., a Florida corporation ("Seller"), dated on or about February 3, 1996, further approved by Court Order Confirming Joint Plan Of Reorganization of the Seller, dated March 22, 1996, in Case Nos 95-11447 BKC RAM and 95-12785 BKC RAM, the US Bankruptcy Court Southern District Of Florida, has acquired all assets of Seller (the "Assets"), which Assets are exempt from tax under any law imposing any stamp or similar tax;

THAT Seller, for and in consideration of the sum of Ten Dollars, in lawful money (and other good and valuable consideration unto it moving) to it paid by Buyer, the receipt of which is hereby acknowledged by Seller, has granted, bargained, sold, transferred, set over and delivered, and by these presents does hereby grant, bargain, sell, transfer, set over and deliver unto Buyer, its successors and assigns, all Assets of Pac Jam Publishing, Inc., including but not limited to those set forth on Exhibit A hereto to the extent such rights Exist

Seller agrees to sign any and all other papers which may be required to effectuate the purpose and intent of this Bill of Sale, and hereby irrevocably authorizes and appoints Richard C. Wolfe Liquidating Trustee, his attorney and representative, in its or his name, as Sellers true and lawful attorney-in-fact to take such action and make, sign, execute, acknowledge and deliver all such documents as may from time to time be necessary to convey to Buyer, its successors and assigns, all rights herein granted.

Now Therefore, for Ten Dollars and good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, said Seller does hereby sell to said Buyer all rights title and interest to the Masters and the right to collect all accrued income not yet collected or to be collected in the future, free and clear of any and all liens, claims, encumbrances, charges, setoffs, or recoupments of any kind, which shall be transferred free and clear of any interest in such Assets of an entity other than Luther Campbell, Debtor and Debtor in Possession, as more particularly described in the aforementioned Letter Of Intent and Order Confirming Plan Of Reorganization which relevant portions have been incorporated herein by reference.

TO HAVE AND TO HOLD the same unto Buyer, its successors and assigns forever.

And Seller, for itself and its successors, hereby covenants to and Buyer, its successors and assigns, that it is the lawful owner of the said Assets, that they are free and clear from all liens and encumbrances, that Seller has good right to sell the same.

LJWR0684

SENT BY:MIAMI.FL.        : 4- 9-96 : 5:43PM :      SEMET, LICKSTEIN→           87-7573456:# 3/ 3

IN WITNESS WHEREOF the Seller has hereunto set its hand and seal as of the date set forth above.

By: Pac Jam Publishing, Inc.          Witness

    By:
    Luther Campbell
    Its: Pres.

The foregoing instrument is joined in and assented to by Richard C. Wolfe Liquidating Trustee of Luther Campbell bankruptcy estate.

    By:
    Richard C. Wolfe Liquidating Trustee
    Luther Campbell Bankruptcy Estate

STATE OF FLORIDA    )
                    )ss:
COUNTY OF DADE      )

The foregoing instrument was acknowledged before me this 9 day of April, 1996, by Luther Campbell, as President of Pac Jam Publishing, Inc., who is personally known to me or who produced _____ as identification, and who did/did not take an oath.

                              Print Name: J L MELLIN
                              Notary Public State of Florida
                                   J.L. MELLIN
                                   COMMISSION # CC 32318
                                   EXPIRES SEP 27, 1997
                                   Atlantic Bonding Co., Inc.
                                   800-732-2245

My Commission Expires:

STATE OF FLORIDA    )
                    )ss:
COUNTY OF DADE      )

The foregoing instrument was acknowledged before me this ____ day of April, 1996, by Richard C. Wolfe Liquidating Trustee on behalf of Luther Campbell Bankruptcy Estate, who is personally known to me or who produced _____ as identification, and who did/did not take an oath.

                              Print Name:
                              Notary Public State of Florida

My Commission Expires:

114924-1

2

LJWR0685

| CPYRT | TITLE | COMPOSER | |
|---|---|---|---|
| | (SAMPLE TAKEN FROM) FUNKY STUF | | |
| | BET $100 | R.BELL/R.BELL/R.WESTFIELD/D.THOMAS | 5379 |
| | | LUTHER CAMPBELL | 25463 |
| | THE 2 LIVE CREW MEGA MIX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| | A BETTER WAY | R. ANDERSON | 16760 |
| | ACTION | PATRICK MÉNDEZ | |
| | ACTION | JEFF THOMPKINS | |
| | AFRAID OF THE FLAVOR | JEFF THOMPKINS | |
| | AGONY | PATRICK MENDEZ | |
| | A.I.D.S. (PRELUDE) | M. EFFINGER | |
| | AIN'T NOBODY BAD LIKE ME | LEJUAN BIGGERS/MARK ROSS | 5344 |
| | AIN'T NO PUSSY LIKE... | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8351 |
| | AIN'T THAT A B-TCH PART 1 | LUTHER CAMPBELL/JOHHN GUITAR WATSON/DOUGLAS BIGSON | 16556 |
| | AIN'T THAT A B-TCH PART II | LUTHER CAMPBELL/JOHNY GUITAR WATSON/ | 16562 |
| | ALLEY BOY | PATRICK WATLER/VAN-WATLER | |
| | ALL MY EX'S | LUTHER CAMPBELL | |
| | ALL NIGHT ALL DAY | T.BUTLER/E.KENDRICK/B.MUHAMMED | 20478 |
| | ALL THEY GOOD 4 ' | JEFF THOMPKINS | 16758 |
| | ALWAYS | DERRICK RAHMING | 5384 |
| | ALWAYS ON MY MIND | U-MYND | |
| | ANAL S-X | LUTHER CAMPBELL | 5340 |
| | ANGEL SIN | MICHAEL STERLING | |
| | ANOTHER JEALOUS B–CH | R. ANDERSON | 5370 |
| | ANOTHER LEVEL | R. ANDERSON | 5246 |
| | ANQUETTE'S GROOVE | DAVID HOBBS | 8362 |
| | ARREST IN EFFECT | LUTHER CAMPBELL/RODNEY C. TERRY/MICHAEL MCCRAY/CAR | 8368 |
| | ASSASSINATION ATTEMPT | RICHARD GRIFFIN/ANTHONYMILLS*/R.SCURDY (50%/50%*) | 5452 |
| | ATTENTION PLEASE | RICHARD GRIFFIN/ANTHONY MILLS/R SCURDY | 5329 |
| | THE B***H THAT I HATE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 8336 |
| | B-L-N-T | MICHAEL THOMAS/KEITH JORDAN | |
| | BABY BABY PLEASE (JUST A LITTLE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| | BABY I NEED YOU | U-MYND | |
| | BACK FROM H-LL | R. TAYLOR | |
| | BACK TO THE BRONX | PATRICK WATLER/VAN WATLER | 5268 |
| | BAD ASS BITCH | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| | BAD BOYS MOVE IN SILENCE | CHRIS WONG WON | |
| | BAD INFLUENCE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5456 |
| | BAD LAND BOOGIE | LUTHER CAMPBELL | 25448 |

LJWR0686

| Title | Writer(s) | Number |
|---|---|---|
| BALLS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8356 |
| BANNED IN THE USA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| BASS 9-1-7 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5243 |
| BEAT BOX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5290 |
| BEAT YOUR LOVER | LUTHER CAMPBELL | |
| BEAT YOUR LOVER REPRISE | LUTHER CAMPBELL | |
| BETCHA HE DONT | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| BIG NOSE | JEFF THOMPKINS | 16776 |
| THE BITCH THAT I HATE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 7782 |
| BLACK IS THE COLOR | R. ANDERSON | |
| BLACKDRAFT | RICHARD GRIFFIN | |
| BLAME IT ON THE FUNK | INDO G & ILL bLUNT SMK | 5399 |
| BLAX THANX | PROFESSOR GRIFF | 8377 |
| BLAX THANX PT 2 | RICHARD GRIFFIN/ANTHONY MILLS | |
| BLAX THANX PT 111 | RICHARD GRIFFIN | |
| BODY FINE | PATRICK MENDEZ | |
| THE BOMB HAS DROPPED | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5283 |
| THE BOTTOM | DERRICK RAHMING | 5392 |
| BOUT TO LOSE MY MIND | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| THE BOY GOT SOME D--K | LUTHER CAMPBELL | 25467 |
| BOYZ WITH DA BASS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| BREAKDOWN | LUTHER CAMPBELL/CALEB ARMSTRONG/RAY ANTHONY SMITH | 16557 |
| BREAK IT ON DOWN | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5258 |
| BRO KEMIT SPLITTING ATOMS IN THE | RICHARD GRIFFIN/MARCUS EFFINGER*/L. NEWTON*/T.TUCKER* | 8379 |
| BROTHER TO BROTHER | MICHAEL JOHNSON/KEVIN JOHNSON | |
| BUCK 'EM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 5366 |
| BURN ONE | JEFF THOMPKINS | |
| BUST A NUT | LUTHER CAMPBELL | 25464 |
| C'MON BABE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5256 |
| CALM DOWN | C.MCNEIL & H.MCCLARTY | |
| CAN'T GO FOR THAT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5464 |
| CAN YOU FEEL IT | R. TAYLOR | |
| CAPER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| CAPT. D-CK AND DOLEMITE | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| CAUGHT IN THE ACT | V.D.BROOMFIELD | 5411 |
| CHECK IT OUT Y'ALL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5286 |
| CHECK OUT THE AVENUE PT 1 | JEFF THOMPKINS | |
| CHECK OUT THE AVENUE PT 2 | JEFF THOMPKINS | |

LJWR0687

| Title | Writer/Artist | Number |
|---|---|---|
| CHESTERFIELD ISLAND | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8354 |
| CHILLIN' | CHRIS WONG WON/ANQUETTE ALLEN | 5371 |
| CHILLIN LIKE A VILLAIN | INDO G & LIL bLUNT SMK | |
| CHRISTMAS FREESTYLE | L. CAMPBELL/C. WONG WON/L. DOBSON | |
| CHRISTMAS F--IN DAY | R. ANDERSON | |
| CHRISTMAS SPLIFF | JEFF THOMPKINS | |
| CHRISTMAS TIME MEGAMIX | M.MCCRAY | 16552 |
| CISCO | LUTHER CAMPBELL | |
| CITY BOY | JEFF THOMPKINS | |
| CITY OF BOOM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5272 |
| CLIP ON CLICKS | LUTHER CAMPBELL | |
| COLOR CONFRONTATION | RICHARD GRIFFIN | |
| COME HOME | U-MYND | |
| COME INSIDE | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| COME ON | LUTHER CAMPBELL | |
| COME ON DOWN | R. ANDERSON | |
| COME QUICK | H.MCCLARTY & C.MCNEIL | |
| COME A SURPRISE, | JEFF THOMPKINS | 5412 |
| COME AND GET IT | A LARKINS II | |
| COMING HOME FOR CHRISTMAS | S. CONNOR. D. CONNOR. D. JACKSON | |
| COMING STRAP | JEFF THOMPKINS | |
| COMMERCIAL INQUIRING MINDS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7298 |
| COMMERCIAL NASTY M.F.S. | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7301 |
| CONDOM COMMERCIAL | R. TAYLOR | |
| COOL (SOME COOL SH-T) | LUTHER CAMPBELL | |
| COOLIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5270 |
| COWARDS IN COMPTON | LUTHER CAMPBELL | 25452 |
| CRAZY BOUT U | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| CRUCIFIED | RICHARD GRIFFIN/ANTHONY MILLS* (50%/50%* | 8375 |
| CRUCIFIED (PROGLOGUE) | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 8365 |
| CUT IT UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5289 |
| CUTNESS SAKE | DERRICK RAHMING | 5391 |
| DANCE ALL NITE (HOUSE MIX) | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5453 |
| DANCE ALL NITE | CHRIS WONG WON | |
| DANCE TO THE RHYTHM | K. FELICIANO | 5417 |
| DANCE WITH ME BAILA BAILA | JOHN BICKHAM, JR. | |
| DEDICATION | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| DEM A TALK | | |

LJWR0688

| Title | Artist/Writer | Number |
|---|---|---|
| DEMON | CHRIS WONG WON | 5255 |
| DICK ALMIGHTY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| DICK 'EM DOWN | CHRIS WONG WON | 5257 |
| DINNER DATE | TRELLINI DAVIS AND BISHP "STICK" BURRELL | |
| DIRTY NURSERY RHYMES | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5364 |
| DISTURB N THA PEACE | RICHARD GRIFFIN | 5418 |
| DJ DESTRO - SCRATCH MILITANT | MICHAEL JOHNSON/KEVIN JOHNSON | |
| DO CRACK TAKE THE RAP | BRIM/HAGER/LAWRENCE/MCGUIRE/RAHMING | |
| DO IT LIKE THAT | U-MYND | |
| DO IT TO YA | U-MYND | 5389 |
| DOGGIE STYLE | DERRICK RAHMING | 5422 |
| DOMINATION | D. SAUNDERS/D. MILLER | |
| DON'T CALL ME BABY | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 5304 |
| DON'T EVEN | D.STINSON, W. KELLUM. C. JANNEST | |
| DON'T GO OUT LIKE A SUCKA | ANTHONY DURHAM/DAVID HOBBS | |
| DON'T NEED U B-T-H | R. TAYLOR | |
| DON'T WANNA SHARE | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | 5415 |
| DOO DOO BROWN , | PATRICK MENDEZ | 5241 |
| DO THAT SHIT | MICHAEL PAYNE | |
| DO THE BART | CHRIS WONG WON/MARK ROSS/RODNEY C. TERRY/MIKE MCC | |
| DO WAH DIDDY | MANFRED MANN | |
| DO YOU BELIEVE | BEAT GOES BANG | 25445 |
| DO YOU HEAR THE LAMBS CALLING | LUTHER CAMPBELL | 7341 |
| DOWNTOWN | UNIDENTIFIED | 25445 |
| DRE'S MOMMA NEEDS A HAIRCUT | LUTHER CAMPBELL | |
| DROP IT OFF YOUR ASS | INDO G & LIL bLUNT SMK | |
| DROP THE BOMB | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/C. WONG WON | |
| DROP YOUR DRAWS | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| DRUGZ BULLSHITTIN' | JEFF THOMPKINS | 16767 |
| EDDIE MILLER | TRELLIN DAVIS AND BISHOP "STICK" BURRELL | |
| EVERYBODY SAY YEAH | LEJUAN BIGGERS/MARK ROSS | 5347 |
| F--K A GANG | LUTHER CAMPBELL/RODNEY C TERRY/JEFFERY THOMPKINS (J | 5252 |
| F--K MARTINEZ | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5239 |
| FACE DOWN, A-- UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5242 |
| FAKIN' LIKE GANGSTERS | LUTHER CAMPBELL/SYLVESTOR ALLEN/HAROLD BROWN/MOR | 16551 |
| FEAT DJ MAN | LEJUAN BIGGERS/MARK ROSS | 5350 |
| FEEL ALL RIGHT Y'ALL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5280 |
| FELLAS IN THE HOOD | JOHN BICKHAM, JR. | |

LJWR0689

| Title | Writer(s)/Performer | Number |
|---|---|---|
| FINGER ON THE TRIGGER | INDO G & LIL BLUNT SMK | 5455 |
| FLAUGIN | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 8331 |
| FOLLOW MY HEART | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 16469 |
| FOR HOW LONG | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8341 |
| FOR THOSE WHO LIKE TO DO IT | UNIDENTIFIED (CAMPBELL/ROSS/HOBBS/WONG-WON) | 5267 |
| FRATERNITY JOINT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| FRATERNITY RECORD A/K/A FRATER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| FREAK FOR LIFE | LUTHER CAMPBELL | |
| FREAK THAT GIRL | ANTHONY DURHAM/DAVID HOBBS | 5299 |
| FREESTYLE | CHRIS WONG WON | |
| FREAKY BEHAVIOR | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8349 |
| FREAKY BUSINESS | LUTHER CAMPBELL | |
| FREESTYLE JOINT | LUTHER CAMPBELL | 25462 |
| FREESTYLE RAPPIN' | CHRIS WONG WON | 5372 |
| FROM THE BOTTOM TO THE CUFF | MICHAEL JOHNSON/KEVIN JOHNSON | 5363 |
| FROM THE BOTTOM TO THE TOP | CHRIS WONG WON | |
| F--K | H. MCCLARTY/C.MCNEIL | |
| F--K 'EM INTRO | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F--K 'EM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F--KEM UP RICK | R. TAYLOR | |
| A F--K IS A F--K | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8333 |
| F--K NIGGA | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| F--K OFF | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8346 |
| THE FUNK SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| THE F--K SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5262 |
| FUGITIVE | RICHARD GRIFFIN/MARCUS EFFINGER*/JIM O'BRIEN**/ANTHON | 8378 |
| FUGITIVE (PC) | JEFF THOMPKINS | |
| F.U.N.K (FROM US NASTY KIDZ) | M.EFFINGER, S.SIMONIAN,P.MARCELIN, AND J. NIXON | 5466 |
| FUNKY STUFF | LUTHER CAMPBELL | |
| GAME RECOGNIZE GAME | JEFF THOMPKINS | |
| GAMES | T. BUTLER/D. MOHAMMED | 20481 |
| GANGSTER ROCK | DAVID ZILMER/MICHAEL PAYNE | 5416 |
| GENTLE | MICHAEL STERLING. | 5357 |
| GET A REFILL | PATRICK WATLER/VAN WATLER | |
| GET IT GIRL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5287 |
| GET LOOSE NOW | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5261 |
| GET OFF YOUR A-- AND JAM | ANQUETTE ALLEN | 5377 |
| GET ON THE MIC | INDO G & LIL BLUNT SMK | |

| Title | Writer/Artist | Number |
|---|---|---|
| GET THE F–K OUT OF MY HOUSE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5265 |
| GET WITH THIS | DERRICK RAHMING | 5386 |
| GHETTO | U-MYND | |
| GHETTO BASS 2 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5274 |
| GHETTO STYLE | LUTHER CAMPBELL | 5409 |
| GIRL YOU SWEET | PATRICK MENDEZ | |
| GIRL WANT MONEY | PATRICK MENDEZ | |
| GOD BLESS AMERIKKKA | RICHARD GRIFFIN | 5383 |
| GO RAHMING GO | DERRICK RAHMING | |
| GOING ALL OUT | JEFF THOMPKINS | |
| GOOD LOVING | U-MYND | |
| GOOD TO THE LAST DROP | LUTHER CAMPBELL | 25469 |
| GOT TO GET SOME WORK DONE | LUTHER CAMPBELL | 8370 |
| GRANDMA VANILLA DONT LIKE LOUD | RICHARD GRIFFIN/ANTHONY MILLS*/ROBERT SCURDY* (50%/50 | 8337 |
| GRAVEYARD | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 16772 |
| GROOVE WITH THE PC | JEFF THOMPKINS | |
| H-TOWN'S COMING TO TOWN | D. CONNOR, S. CONNOR, D. JACKSON | 7829 |
| HANGIN' OUT | MIKE MCCRAY/LUTHER WONG WON/MARK ROSS | 20503 |
| HANGIN' WITH THE HOMEBOYS AND | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| HARD TO GET | PATRICK MENDEZ | |
| HARDER | R. ANDERSON | 5277 |
| HEAD, BOOTY & COCK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 16558 |
| HEAD, HEAD & MORE HEAD | LUTHER CAMPBELL | 25453 |
| HEAD, HEAD & MORE HEAD PT II | LUTHER CAMPBELL | 25468 |
| HEADBANGER | LUTHER CAMPBELL | |
| HELL, YEAH | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 8343 |
| HERE I COME | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 25457 |
| THE HERO | LUTHER CAMPBELL | 7306 |
| HEY JACK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| HO HOE HOES | L. CAMPBELL/C WONG WON/L DOBSON/J.THOMPKINS/R ANDERSON | 16764 |
| HO' STORIES | JEFF THOMPKINS | |
| HO' STORIES PT. 2 | JEFF THOMPKINS | |
| HOLD ME DOWN | C.MCNEIL & H. MCCLARTY | 5339 |
| HOLIDAY | MICHAEL STERLING | |
| HOLIDAYS | CHRIS BRINSON | |
| HOME TEAM | PATRICK WATLER/VAN WATLER | |
| HOOCHIE MAMA | L.CAMPBELL/D. HOBBS/M. ROSS/C. WONG WON | |
| THE HOODIE | PATRICK WATLER/VAN WATLER | |

| Title | Writer | Number |
|---|---|---|
| THE HOP | LUTHER CAMPBELL | 25460 |
| A HOOKER? | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8340 |
| HOP-A-LON | R. TAYLOR | |
| HOT | H.MCCLARTY & C.MCNEIL | |
| HOTEP (INTRO) | M.EFFINGER | |
| THE HOUSE JUMPS | MICHAEL THOMAS/KEITH JORDAN | 5327 |
| I'LL ALWAYS BE TH-- **DO NOT USE** | UNIDENTIFIED | 7342 |
| I'LL ALWAYS LOVE YOU | DWAYNE OHARR | 5355 |
| I'M COOL | DAVID HOBBS/DELANO PIGATI | 5420 |
| I'M SO SMOOTH | DERRICK RAHMING | 5390 |
| I'M THAT TYPE OF NIGGA | ANTHONY DURHAM/DAVID HOBBS | 5303 |
| I AINT BULL----TIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5260 |
| I AINT BULL----TIN'  PART III | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8355 |
| I AINT BULL----TIN'  PART II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS | 16468 |
| I AINT BULL----TIN'  PART IV | LUTHER CAMPBELL | 16553 |
| I CAN DO THAT | DERRICK RAHMING | 5388 |
| IF IT'S ALRIGHT WITH YOU | KEITH SWEAT/ERIC MCCAIN | |
| IF YOU BELIEVE IN HAVING SEX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5263 |
| I GOT A F--IN' HEADACHE | LUTHER CAMPBELL | 25449 |
| I HATE HO'S | JEFF THOMPKINS | 16766 |
| I LIKE IT, I LOVE IT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8344 |
| I LIKE IT LOUD | MICHAEL THOMAS/KEITH JORDAN | 5330 |
| I NEED A GOOD MAN | R. ANDERSON | |
| I WANNA BE YOURS QUIET STORM | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| I WANNA BE YOURS | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| I WANT YOU (NEW MIX) | R. ANDERSON | |
| I WAS AT A JAM | FOLANDA JOHNSON & rODNEY PARKER | |
| IN-COG-NEGROW | RICHARD GRIFFIN/ANTHONY MILLS/ROBERT SCURDY* (45%, 45 | 8369 |
| INCOLOR MEN ON RECORDS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7309 |
| IN THE DUST | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| THE INITIATION | LUTHER CAMPBELL/ CHRIS WONG WON/LARRY DOBSON | |
| INSIDE EDITION | JEFF THOMPKINS | 16757 |
| INTERMISSION TIP | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| THE INTERVIEW | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5403 |
| INTRO INDO G | INDO G & IIL bLUNT SMK | |
| INTRO | UNIDENTIFIED (CAMPBELL/WONG WON/HOBBS/RO | 16470 |
| INTRO BUSTDOWN | JOHN BICKHAM, JR. | |
| INTRO DISCO RICK | R. TAYLOR | |

LJWR0692

| Title | Artist | Number |
|---|---|---|
| INTRO 94 NEW 2LC | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| INTRO PC RUFFTOWN | JEFF THOMPKINS | |
| I STILL FEEL GOOD | LEJUAN BIGGERS/MARK ROSS | 5346 |
| I 'LL BE HERE | CHRIS WONG WON | |
| IT'S A BLAX THANX | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5462 |
| IT'S BEEN A LONG TIME | LEJUAN BIGGERS | |
| IT'S YOUR BIRTHDAY | LUTHER CAMPBELL | |
| I WANNA ROCK | LUTHER CAMPBELL/HARRY WAYNE CASEY/RICHARD FINCH | 16550 |
| I WILL ALWAYS BE THERE FOR YOU | MICHAEL STERLING | 5378 |
| JC'S DETAILED CAR WASH | LUTHER CAMPBELL | |
| JAIL SALE | RICHARD GRIFFIN/MARCUS EFFINGER | 8381 |
| JANET RENO | ANQUETTE ALLEN | 5373 |
| JEALOUS B—CH | R. ANDERSON | |
| JEALOUS GIRLS | DAVID HOBBS/DELANO PIGATI | 5369 |
| JEALOUS GIRL3 | MARK BOCCACIO | 5419 |
| JERI CURL | PATRICK WATLEY/JEFFREY THOMPKINS/DAVID HOBBS | 5451 |
| JESUS IS BLACK | V. WATLER/P.WATLER | |
| JOCKIN ROBIN | LEJUAN BIGGERS/MARK ROSS | 5336 |
| JOEY HATE RAP CALLS THE COPS | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 20226 |
| JOKE'S ON YOU | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| JT'S CONFESSION | JEFF THOMPKINS | 16765 |
| JT'S DREAM | JEFF THOMPKINS | 16756 |
| JT OLE BOY | JEFF THOMPKINS | 16773 |
| JUST FOR THE MOMENT | U-MYND | |
| JUST KICK-N-IT | JOHN BICKHAM, JR. | |
| JUST LOOK AND LISTEN | C.KOOLEYIK.JONES | 5414 |
| JUST ROCK (2 DIS HERE BEAT) | MIKE THOMAS | 5421 |
| JUST SAY GOODNIGHT | DWAYNE OMARR | 5354 |
| JUST WANNA TOUCH YA | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| JUVENILES | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5459 |
| KKK-VS-DOO DOO BROWN | RICHARD GRIFFIN | |
| KAO'S II WIZ"7"DOME | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY (50%, 50%) | 8363 |
| KEEP DANCIN' | ANTHONY DURHAM/DAVID HOBBS | 5293 |
| KID ICE GROOVE | CHRIS WONG WON | |
| KNOCKIN BOOTS FOR CHRISTMAS | D. CONNOR. S. CONNOR. D. JACKSON | |
| KNOWLEDGE | R. ANDERSON | |
| KNOW THE FLAVOR | PATRICK WATLER/VAN WATLER | |
| KNOW WHO YOUR ENEMY IS | MICHAEL JOHNSON/KEVIN JOHNSON | 5469 |

LJWR0693

| | | |
|---|---|---|
| KOOL | DERRICK RAHMING | 5387 |
| L.L.O.M. | LUTHER CAMPBELL | 25461 |
| LAST ASIATIC DESCIPLES | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5402 |
| THE LATE GREAT BLACK MAN | RICHARD GRIFFIN/ANTHONY MILLS | 8376 |
| THE LEAST WE FORGET | RICHARD GRIFFIN | |
| LET THE RHYTHM RIDE | R. ANDERSON | |
| LET ME LICK YOU GIRL | R. TAYLOR | |
| LET'S GET FU-KED UP | INDO G & LIL bLUNT, smk | |
| LET'S GET SERIOUS | JEFF THOMPKINS | |
| LET'S GO SOME MO' | R. TAYLOR | |
| LET'S PARTY FOR THIS ONE | MICHAEL JOHNSON/KEVIN JOHNSON | 5368 |
| LET'S ROCK & ROLL Y'ALL | ANQUETTE ALLEN | 5376 |
| LET IT GO | DERRICK RAHMING | 5381 |
| LET IT RIP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8334 |
| LET ME TAKE YOU TO THE ROCK HO | ANTHONY DURHAM/DAVID HOBBS | 5300 |
| LIFE AINT NOTHING BUT A B-CH | INDO G & LIL bLUNT SMK | |
| LISTEN | JEFF THOMPKINS | |
| LIVIN' IN THE CITY , | JEFF THOMPKINS/AARON NEVILLE*/L. NOCENTELLI*/J.MODELIS | 16761 |
| LONG D-CK CHINESE | CHRIS WONG WON | |
| LOOKS AND SHAPE | C. MCNEIL & H.MCCLARTY | |
| LOVE COME DOWN | C.MCNEIL & H.MCCLARTY | |
| LOVE ON MY MIND | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| LOVE THY ENEMY | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI | 5397 |
| LOVE YOUR LIFE | MICHAEL JOHNSON/KEVIN JOHNSON | 5470 |
| LOVIN' | PATRICK MENDEZ | |
| LOW LIFE MUTHA F--KA | PATRICK WATLER/JEFFERY THOMPKINS/DAVID HOBBS | 5449 |
| MADBALL BACK | JEFF THOMPKINS | |
| MADD-MIX | CHRIS WONG WON | |
| MAKE IT BOUNCE | INDO G & LIL BLUNT SMK | |
| MAN 'O' MAN (PRELUDE;FEATURING | M. EFFINGER | |
| MAN, NOT A MYTH (SAMPLED, TONIG | RODNEY C TERRY/MIKE MCCRAY/MARK ROSS/CHRIS WONG W | 5250 |
| MARY MACK | MICHAEL THOMAS/KEITH JORDAN | 5331 |
| MARY MARY | ANQUETTE ALLEN | 5374 |
| MATERIAL GIRL | ANQUETTE ALLEN ; | 5375 |
| M.C.SUNDANCE | JEFF THOMPKINS | |
| MEGAMIX LUKE | CAMPBELL/CURTIS/KING/FLIPPIN/SHELTON/WILLIAMS/CORNW | 16563 |
| MEGAMIX FREAK FOR LIFE | LUTHER CAMPBELL | |
| MEGAMIX 94 | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

| Title | Credits | Number |
|---|---|---|
| MEGAMIX | LUTHER CAMPBELL*/BILL CURTIS/JOHNNY KING/JOHNNY FLIPP | 16563 |
| MEGA MIX IV | DAVID HOBBS/RODNEY C TERRY/MICHAEL MCCRAY/CARL DOR | 5247 |
| MEGA MIX HOUSE STYLE | LEJUAN BIGGERS/MARK ROSS | 5349 |
| MEGA MIX V | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8347 |
| MEGA MIXX II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5282 |
| MEGA MIXX III | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5269 |
| MENAGE A TROIS | LUTHER CAMPBELL/GERRY THOMAS/DOUGLAS BIGSON | 16555 |
| MENAGE A TOIS PT II | LUTHER CAMPBELL | 25455 |
| MENTAL GENOCIDE | RICHARD GRIFFIN/ANTHONY MILLS/ROBERT SKARDY*(45%, 10 | 8373 |
| ME SO HORNY | RICARDO WILLIAMS*/LUTHER CAMPBELL/DAVID HOBBS/MARK | 5253 |
| MESSAGE | LUTHER CAMPBELL | 20479 |
| MI PISTOL | PATRICK MENDEZ | |
| MIAMI | J.GREY | 5408 |
| MIAMI DA BOTTOM | CHRIS WONG WON | |
| MIAMI HEAT | MICHAEL JOHNSON/KEVIN JOHNSON | 5367 |
| MIAMI "LIBERY CITY" | R.TAYLOR | |
| MINE ALL MINE | MANUEL DEMETRIUS/JONATHAN BLACK | 5471 |
| MOVE SOMETHIN' | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5273 |
| MOVIN' ALONG | LUTHER CAMPBELL | |
| MR.MIXX ON THE MIX | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5291 |
| MR.MIXX TURNTABLE SHOW PART 1 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7780 |
| MR.MIXX TURNTABLE SHOW PART 2 | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7781 |
| MY HARDCORE RHYMES | LEJAUN BIGGERS/MARK ROSS | 5345 |
| MY IDEOLOGY | RICHARD GRIFFIN/ANTHONY MILLS/MARCUS EFFINGER* (45%, | 8380 |
| MY LADY | PATRICK MENDEZ | |
| MY SEVEN BIZZOS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5264 |
| NASTY B-TCH | JOHN BICKHAM, JR | |
| NEGATIVE FORCE | DERRICK RAHMING | 5385 |
| THE NEIGHBORHOOD HAPS | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5458 |
| NEWS FLASH BRITISH YOUTH | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7300 |
| NEWS FLASH NATION BY STORM | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7311 |
| NEWS FLASH PEOPLE IN THE NEWS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7295 |
| NEWS FLASH POLL RESULTS | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7304 |
| NEWS FLASH SUPER SNOOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7312 |
| NEWS FLASH 350 MEN | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7297 |
| NIGGA'S COMIN' UP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8342 |
| NOBODY | U-MYND | |
| NOBODY GOING TO LOVE YOU | U-MYND | |

| Title | Writer/Artist | Number |
|---|---|---|
| NO BUN | PATRICK MENDEZ | 16774 |
| NO HAPS | JEFF THOMPKINS/EDDIE MILLER | |
| NO RUSH MI | PATRICK MENDEZ | 5341 |
| NO SUCH ANIMAL | MICHAEL STERLING | 5332 |
| NOT JUS' A PRETTY FACE | MICHAEL THOMAS/KEITH JORDAN | |
| OHHHI | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 16561 |
| ONE BLACK AND A BUNCH OF DIRTY WHITE BOYS | LUTHER CAMPBELL | 5343 |
| ONE MORE CHANCE | MICHAEL STERLING | 5281 |
| ONE ON ONE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| OUT OF CONTROL | LUTHER CAMPBELL | |
| OUTRO | INDO G LIL BLUNT SMK | 5297 |
| P.W.Y.P. (PRACTICE WHAT YOU PREA | ANTHONY DURHAM/DAVID HOBBS | |
| PARKAY | M.EFFINGER | 5396 |
| PASS THE AMMO | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | |
| PASS THE BUDDAH | PATRICK WATLER/VAN WATLER | |
| PAUSE FOR THE CAUSE | JEFF THOMPKINS | 5404 |
| PAWN'S IN THE GAME | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | |
| PEEPIN' | JEFF THOMPKINS | |
| PERFIDIA | PATRICK MENDEZ, FOXY BROWN | |
| PHUCK THA MEDIA | RICHARD GRIFFIN | |
| PICK IT UP | PATRICK WATLER/VAN WATLER | |
| PIMPLE ON MY DICK | LUTHER CAMPBELL | 25456 |
| PISSIN' RAZOR BLADES | JOHN BICKHAM, JR. | |
| PLEASE STAY | LEJUAN BIGGERS/MARK ROSS | 5351 |
| PLAYER'S DON'T FALL | INDO G & LIL BLUNT SMK | |
| POISON FREESTYLE | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | 5454 |
| POP THAT COOCHIE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| POP THAT P---Y | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8328 |
| POP THAT THANG | JOHN BICKHAM, JR. | |
| THE POWER (HOMEBOYS mIX) | SNAP | |
| PRE-GAME ACTIVITY | RICHARD GRIFFIN | 20501 |
| PREMASTERBATORIAL | LUTHER CAMPBELL, | |
| PRETTY GIRLS | STEVIE B | |
| PRETTY WOMAN | ADAPTATION OF ROY ORBISON AND WILLIAM DEES | |
| PROVE MY LOVE | U-MYND | 19796 |
| PSYCHOTIC | JAMES PARKER/ERICH KRAUSE/PHILLIP MUELLER | 5472 |
| PUBLIC RELATIONS EXFRESS | MICHAEL JOHNSON/KEVIN JOHNSON | |

| Title | Credits | Number |
|---|---|---|
| PUMP & GRIND | ANTHONY DuRHAM/DAVID HOBBS | 5296 |
| P---Y (REPRISE) FOR THOSE WHO LIK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8360 |
| P--Y AIN'T SH-T | CHRIS WONG WON | |
| P--Y AND D-CK THING | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| PUSSY ASS KID AND HOE ASS PLAY | LUTHER CAMPBELL | 16554 |
| P---Y A-- NIGGA | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5276 |
| P---Y HUNT | C.MCNEIL & H.MCCLARTY | |
| THE P---Y CAPER | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8357 |
| PU--Y SQUEEZER | PATRICK MENDEZ | |
| PUTCHA' BALLYS ON | JOHN BICKHAM, JR. | |
| PUT HER IN THE BUCK | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5254 |
| PUT SH-T PASS NO HO | JEFF THOMPKINS | |
| R.A.P. REAL AFRICAN PEOPLE (PT1) | PROFESSOR GRIFF | 5393 |
| R.A.P. REAL AFRICAN PEOPLE (PT2) | PROFESSOR GRIFF | 5394 |
| R.O.A. | MICHAEL THOMAS/KEITH JORDAN. | 5333 |
| THE RAIN | DWAYNE OMARR | 5352 |
| RAMATION | H. MCCLARTY C. MCNEIL | |
| RAP AS AN ART | M.EFFINGER,S.SIMONIAN,P.MARCELIN | |
| RAP TERRORIST | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5405 |
| RAYMOND UP THE ROAD | JEFF THOMPKINS | 16762 |
| REAL AFRICAN PEOPLE "RAP" PT1 | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5460 |
| REAL AFRICAN PEOPLE "RAP" PT2 | RICHARD GRIFFIN (P/K/A PROFESSOR GRIFF BMI) | 5461 |
| REAL NIGGAZ MAKING NOISE | INDO G & LIL bLUNT SMK | |
| REBEL YELL | MICHAEL JOHNSON/KEVIN JOHNSON | 5362 |
| REBELZ AGAINST THA DEVELZ | RICHARD GRIFFIN | |
| REGGAE JOINT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5266 |
| REMINISCING | PATRICK WATLER/VAN WATLER | |
| REPRESENT | LUTHER CAMPBELL | |
| RESPECT | H.MCCLARTY & C.MCNEIL | |
| RESPECT | O.REDDING/ANQUETTE ALLEN | 5380 |
| RESPECT THA ART-KILL-TECH | RICHARD GRIFFIN | |
| REV | RICHARD GRIFFIN/ANTHONY MILLS/R.SCURDY | 8366 |
| ROCKBOTTOM | | |
| ROCK HOUSE (FILM) | VARIOUS | 10495 |
| ROLL CALL | CHRIS WONG WON | |
| ROUGH NIGGA GETTIN' BUSY | JEFF THOMPKINS/NILE RODGERS/BERNARD EDWARDS | |
| RUFF TOWN BEHAVIOR | JEFF THOMPKINS | 16768 |
| RUFF NECK BUSINESS | PATRICK WATLER/VAN WATLER | |

| Title | Credits | Number |
|---|---|---|
| S&M | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5278 |
| SAME OL' THANG | ANTHONY DURHAM/DAVID HOBBS | 5302 |
| SAVIN' MYSELF FOR YOU | DWAYNE OMARR | 5356 |
| SENSE OR SH-T | RICHARD GRIFFIN | |
| SETTING UP | JEFF THOMPKINS | |
| SEX, I LIKE -- I LOVE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7779 |
| SEX ME | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 25427 |
| SEX...SEX | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SHAKE IT (DO THE 61ST) | LUTHER CAMPBELL | 5410 |
| SHAKE WHATCHA MAMA GAVE YOU | JEFF THOMPKINS | 16775 |
| SHE KEEP CALLING ME | U-MYND | |
| SHE PUT ME IN A TRANCE | ANTHONY DURHAM/DAVID HOBBS | 5295 |
| SHERYL & DONNA | K.JONES/C.PUCKETT | 5413 |
| SHINING STAR | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| SHOCK THE HOUSE | MICHAEL THOMAS/KEITH JORDAN | 5335 |
| SHORTY T IN MADBALL'S BASEMENT | JEFF THOMPKINS | 16778 |
| SHOUTOUTS | R. TAYLOR | |
| SHOUT-OUTS (HOLLA' AT ME) | CHRIS WONG WON | |
| SHOW HIM | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SHOUT OUTS | JEFF THOMPKINS/SADE ADU/LEROY OSBOURNE/STUART MAT | 16779 |
| SILENT NIGHT | | |
| SISTA' SISTA | RICHARD GRIFFIN | |
| SOLO (BREAK MIX) | R. ANDERSON | |
| SOME HOT HEAD | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| SOME MORE SH-T | JEFF THOMPKINS | |
| SOME OL' BULLSH-T | LUTHER CAMPBELL | |
| SOME SHIT I USED TO KNOW | JEFF THOMPKINS | |
| SOMETHING 4 YOU RAGEDY HO'S | JEFF THOMPKINS | |
| SON OF A GUN | H.MCCLARTY& C. MCNEIL | |
| SPASTIC A-- | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| SPLAK IT LIKE YOU LIKE IT | CHRIS WONG WON | |
| THE SPLAK SHOP | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | |
| SPOILED ROTTEN | JEFF THOMPKINS./PATRICK WATLER | |
| STAY WIT ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| STOP LOOK LISTEN | U-MYND | |
| STRICTLY FOR DA G'S | INDO g & IIL bLUNT SMK | |
| SUCK GOOD D-CK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| SUCK MY D-CK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |

| Title | Artist | Number |
|---|---|---|
| SUGARHILL STYLE | JEFF THOMPKINS | 8348 |
| SWEET SUZY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 25466 |
| SWINGIN' | PRINCE AKEEM | |
| TAKE IT OFF | LUTHER CAMPBELL | 5358 |
| TAKE IT SLOW | TRELLINI DAVIS AND BISHOP "STICK BURRELL | |
| TAKE OFF YOUR CLOTHES | U-MYND | |
| TALES FROM THE DARKSIDE | MICHAEL JOHNSON/KEVIN JOHNSON | |
| TASTE YOUR LOVE | U-MYND | 5338 |
| TEARS OF MY PRIDE | MICHAEL STERLING | 5337 |
| TEDDY BEAR | MICHAEL STERLING | |
| TELL ME BABY | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | 25450 |
| TELL ME WHAT YOU KNOW | LUTHER CAMPBELL | 16771 |
| THAT WAS RAM | JEFF THOMPKINS | |
| THAT'S HOW I FEEL | LUTHER CAMPBELL | 5382 |
| THE 90'S ARE MINE (LP MIX 2) | R. ANDERSON | 5288 |
| THE F-CK HOUSE | R. TAYLOR | |
| THIS IS HOW IT SHOULD BE DONE | DERRICK RAHMING | |
| THROW THE D | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| THROW THE P | ANQUETTE ALLEN, CHRIS WONG WON | |
| TI'ANT NO B**CH | RICHARD GRIFFIN | 5359 |
| TICKET TO HEAVEN | KNOWLEDGE FEAT KENNY BOBIEN | 5298 |
| TIME IS RUNNING OUT | MICHAELJOHNSON/KEVIN JOHNSON | 16769 |
| TIME TO GET MINE | ANTHONY DURHAM/DAVID HOBBS | 5251 |
| THE TIP ON MADBALL | JEFF THOMPKINS | |
| THIS IS TO LUKE FROM THE POSSE | PATRICK WATLER/RICHARD GRIFFIN | 5305 |
| TOGETHER FOREVER | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TONY ROCK'S THEME | ANTHONY DURHAM/DAVID HOBBS | |
| TOO INQUISITIVE | H.MCCLARTY & C.MCNEIL | |
| THE TRICK | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| TRICK DADDY | JOHN BICKHAM, JR. | |
| TRUE 2 ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| TRUE PLAYER SPEAKS | JEFF THOMPKINS | 5342 |
| TRY ME | MICHAEL STERLING | |
| A TYPICAL SEX THING | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 5328 |
| U GETTIN' ILL 2 MUCH | MICHAEL THOMAS/KEITH JORDAN | 8338 |
| UGLY AS F–K | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5361 |
| U SAID U LOVED ME | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| UNDERWATER | MICHAEL JOHNSON/KEVIN JOHNSON | |

LJWR0699

| Title | Name | Number |
|---|---|---|
| UNITED STATIC ASSOCIATION/KAVON SHAH | | |
| UNTO US | C. BRINSON | 8358 |
| UP A GIRL'S A--- | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| UZI GETS SHOT | JEFF THOMPKINS | |
| VACATE THE PREMISES | KAVAN SHAH | |
| THE V AMENDMENT | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/JIM O'BRIEN(P/K/ | 5463 |
| VERBAL INTERCOURSE | RICHARD GRIFFIN/MARCUS EFFINGER*/ANTHONY MILLS (37.5% | 8382 |
| THE VERDICT | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/SEAN PEACOCK( | 5395 |
| VIA SATELLITE FROM SATURN | PATRICK WATLER/VAN WATLER | |
| VIDEO NO SOUL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 7302 |
| WANNA DO YA | LORENZO SMITH/WENDELL "RICK" SMITH/JODY TORRENCE | |
| WANNA RECORD DEAL | R. TAYLOR | |
| WAS IT WORTH IT | JOHN BICKHAM, JR. | 25465 |
| WEAR A RUBBER | LUTHER CAMPBELL | 25447 |
| WE'RE F-CKIN' | LUTHER CAMPBELL | 5365 |
| WE'RE ON A MISSION | MICHAEL JOHNSON/KEVIN JOHNSON | |
| WE'RE THE WEAVE | LUTHER CAMPBELL | |
| WE BRING YOU JOY, | L. CAMPBELL/S. CONNOR/D. CONNOR/D. JACKSON | |
| WE LIKE TO CHILL | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG W | 5285 |
| WE WANT SOME P---Y!! | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| WE WANT SOME P--Y II | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 25454 |
| WEENIE ROAST | LUTHER CAMPBELL | |
| WELCOME TO THE QUIET STORM | LUTHER CAMPBELL | |
| WHAT IS A MAN | M. EFFINGER | |
| WHAT IS BLACK | BILLY BOX | 25458 |
| WHATEVER | LUTHER CAMPBELL | |
| WHAT UPS | TRELLINI DAVIS AND BISHOP "STICK" BURRELL | |
| WHERE DEM DOGG'S AT | INDO G & LIL BLUNT SMK | |
| WHERE DEM HOES AT | LUTHER CAMPBELL | |
| WHERE'S THE TI.IE | LUTHER CAMPBELL | |
| WHO'S DOING WHO | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/C. WONG W | |
| WHO'S FIRST | DWAYNE OMARR | 5353 |
| WHO'S F--KIN' WHO | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8359 |
| WHO'S N THE HOUSE | R.TAYLOR | |
| WHO'S TONY ROCK | ANTHONY DURHAM/DAVID HOBBS | 5292 |
| WHY U TRIPPING | U-MYND | |
| WIGGLE WIGGLE | R.TAYLOR | 19719 |
| WILDSTYLE | PATRICK WATLER/VAN WATLER | |

| Title | Writer(s) | Number |
|---|---|---|
| WILL YOU BE THERE FOR CHRISTMA | M. HUDSON | 5275 |
| WITH YOUR BAD SELF | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| WLAD | RICHARD GRIFFIN | 5279 |
| WORD II | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5401 |
| THE WORD OF G.O.D. GRIFF ON DUT | RICHARD GRIFF (P/K/A PROFESSOR GRIFF BMI) | |
| WORD FROM A PLAYER | JEFF THOMPKINS | |
| WORK FOR FREE | JEFF THOMPKINS | |
| WORK IT | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 25446 |
| WORK IT OUT | LUTHER CAMPBELL | |
| WORK THAT BODY | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| WORK THAT P–Y | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YEA YEA YALL | R. ANDERSON | |
| YEAH, YEAH | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YEAH, YEAH (LUKE DUB) | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | |
| YES N'DEED | M. EFFINGER | |
| YES SHE DID | R. TAYLOR | |
| YOU'RE MY DEVOTION | J.DIAZ/M.ROOFE/D.MONTAIVO | 5406 |
| YOU AIN'T HAD NO LOVIN' | LORENZO SMITH, WENDELL "RICK" SMITH, JODY TORRENCE | |
| YOU AND ME | LUTHER CAMPBELL | 16560 |
| YOU ARE VERY ERECT | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 8352 |
| YOU DONT EVEN KNOW ME KID | INDO G & LIL bLUNT SMK | |
| YOU GETS NOTHING | PATRICK WATLER/JEFFREY THOMPKINS/DAVID HOBBS | |
| YOU GO GIRL | LUTHER CAMPBELL/CHRIS WONG WON/LARRY DOBSON | 5457 |
| YOU GOT LARCENY | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | |
| YOU HAVE BEEN BAD | LUTHER CAMPBELL | 5371 |
| YOU TURN ME ON | TONY BURTON/ELLISON KENDRICK | |
| YOU UNDERSTAND | MICHAEL JOHNSON/KEVIN JOHNSON | 12371 |
| 1-900-STE OREO TYPE | RICHARD GRIFFIN(P/K/A PROFESSOR GRIFF)/JIM O'BRIEN(P/K/ | 5360 |
| 12" LONG | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5398 |
| 15TH AVENUE | LEJUAN BIGGERS/MARK ROSS | 8350 |
| 2 LIVE BLUES | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5348 |
| 2 LIVE IS WHAT WE ARE | LUTHER CAMPBELL/DAVID HOBBS/MARK ROSS/CHRIS WONG | 5259 |
| 2 LIVE FREESTYLE | LUTHER CAMPBELL/CHRIS WONG WON/ LARRY DOBSON | 5284 |
| 2 MINUTE WARNING | RICHARD GRIFFIN | |
| 7 WATTZ OF REALITY | RICHARD GRIFFIN | |
| 43RD NEGATIVE CONFESSION | RICHARD GRIFFIN | |
| 107.POINT LIVE(AT THE SLAVE THEATER) | RICHARD GRIFFIN | |
| 2 LIVE CHRISTMAS | L. CAMPBELL/C.WONG WON/L.DOBSON | |

20'S

INDO G & LIL bLUNT SMK

## ALBUM 1  H-TOWN

| Track | Writers | Number |
|---|---|---|
| INTRODUCTION | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25424 |
| CAN'T FADE DA H | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25433 |
| TREAT U RIGHT | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25425 |
| FEVER FOR DA FLAVOR | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25426 |
| SEX ME | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25427 |
| H-TOWN BOUNCE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 23820 |
| KEEPIN' MY COMPOSURE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25428 |
| INTERLUDE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25429 |
| LICK U UP | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25430 |
| KNOCKIN' DA BOOTS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 23819 |
| WON'T U COME BACK | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25431 |
| BABY I WANNA | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL | 25432 |

## ALBUM 2  H-TOWN INTRO 94

| Track | Writers |
|---|---|
| SEX BOWL | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| ONE NIGHT GIGOLO | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| PRELUDE TO EMOTION | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| EMOTIONS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| CRUISIN' FO' HONEYS | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| FULL TIME | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| 1-900-CALL GI | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| TUMBLE & RUMBLE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| MUCH FEELIN' (AND IT TASTES GREA | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BEGGIN' AFTER DARK | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| INDO LOVE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BACK SEAT (WIT NO SHEETS) | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BUSS ONE | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| BABY I LOVE YA' | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| STICKY LEE PRESLEY | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| ROCKIT STEADY | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |
| THE LAST RECORD | D. CONNER, S. CONNER, D. JACKSON, B. BURRELL |

LJWR0702

RIGHTS FROM SOUNDTRACKS TO INCLUDE FOLLOWING SONGS ON GREATEST HITS ALBUM

PART TIME LOVER FROM ABOVE THE RIM SOUNDTRACK dEATH rOW/INTERSCOPE

IT'S YOUR THING ADDAMS FAMILY VALUES ATLAS/POLYGRAM

A THIN LINE BETWEEN LOVE & HATE ? WARNER BROS.

KTEL EMOTIONS?

06/23/95  13:13:16

Parts Inventory for Client

(*LIBU/INV0080)

PAGE   1



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDCE 709 | DANCE ALL NIGHT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDCE 713 | GET A LIL' STUPID | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDCE 714 | PLAYING YOUR GAME | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDCE 714 | PLAYING YOUR GAME | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 012 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 305 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | LABEL FILM | 267 | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | BOOKLET (OED) | | 6,057 |
| LUKE RECORDS | CDE 118 | I GOT SHIT ON MY MIN | INLAY (OED) | | 8,163 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 012 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 305 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | LABEL FILM | 267 | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | BOOKLET (OED) | | 3,769 |
| LUKE RECORDS | CDE 119 | I GOT SOMTHIN' ON MY | INLAY (OED) | | 5,636 |
| LUKE RECORDS | CDE 120 | I GOT SOMTHIN' ON MY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3000 | LET ME TAKE YOU TO... | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3001 | POISON CLAN | LABEL FILM | 199 | 1 |
| LUKE RECORDS | CDE 3001 | POISON CLAN | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 3001 | POISON CLAN | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3001 | POISON CLAN | BOOKLET (OED) | | 7,137 |
| LUKE RECORDS | CDE 3001 | POISON CLAN | INLAY (OED) | | 11,390 |
| LUKE RECORDS | CDE 3002 | PENNY | MASTER TAPE | | 1 |
| LUKE RECORDS | CDE 3002 | PENNY | LABEL FILM | 159 | 1 |
| LUKE RECORDS | CDE 3002 | PENNY | LABEL FILM | 364 | 1 |
| LUKE RECORDS | CDE 3002 | PENNY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3002 | PENNY | BOOKLET (OED) | | 3,595 |
| LUKE RECORDS | CDE 3002 | PENNY | INLAY (OED) | | 3,534 |
| LUKE RECORDS | CDE 3002 | PENNY | LONGBOX (OED) | | 0 |
| LUKE RECORDS | CDE 3003 | LIVE IN CONCERT | LABEL FILM | 320 | 1 |
| LUKE RECORDS | CDE 3003 | LIVE IN CONCERT | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 3003 | LIVE IN CONCERT | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3003 | LIVE IN CONCERT | BOOKLET (OED) | | 4,693 |
| LUKE RECORDS | CDE 3003 | LIVE IN CONCERT | INLAY (OED) | | 1,078 |
| LUKE RECORDS | CDE 3003 | LIVE IN CONCERT | LONGBOX (OED) | | 0 |
| LUKE RECORDS | CDE 3004 | KONFLIC OF INTEREST | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3005 | | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 3005 | | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3005 | | BOOKLET (OED) | | 9,929 |
| LUKE RECORDS | CDE 3005 | | INLAY (OED) | | 10,140 |
| LUKE RECORDS | CDE 3005 | | STICKER (OED) | | 9,200 |
| LUKE RECORDS | CDE 3006 | POISONOUS MENTALITY | LABEL FILM | 186 | 1 |
| LUKE RECORDS | CDE 3006 | POISONOUS MENTALITY | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDE 3006 | POISONOUS MENTALITY | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDE 3006 | POISONOUS MENTALITY | BOOKLET (OED) | | 2,361 |
| LUKE RECORDS | CDE 3006 | POISONOUS MENTALITY | INLAY (OED) | | 3,631 |
| LUKE RECORDS | CDE 3007 | | LABEL FILM | 292 | 1 |
| LUKE RECORDS | CDE 3007 | | LABEL FILM | 032 | 1 |
| LUKE RECORDS | CDE 3007 | | MASTER TAPE | U-MATIC | 1 |

LJWR0704

06/23/95  13:33:16                      Parts Inventory For Client                (*LIBL/INV0080)                     PAGE   2

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDE 3007 | CREWLAPOO | BOOKLET (DED) | | 5,782 |
| LUKE RECORDS | CDE 3007 | CREWLAPOO | INLAY (DED) | | 4,882 |
| LUKE RECORDS | CDE 706 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDE 706 | | MASTER TAPE | | |
| LUKE RECORDS | CDR 100 | IS WHAT WE ARE | LABEL FILM | 300 | |
| LUKE RECORDS | CDR 100 | IS WHAT WE ARE | LABEL FILM | U-MATIC | 0 |
| LUKE RECORDS | CDR 100 | IS WHAT WE ARE | MASTER TAPE | BLK | 8,591 |
| LUKE RECORDS | CDR 100 | IS WHAT WE ARE | MASTER TAPE | U-MATIC | 13,644 |
| LUKE RECORDS | CDR 1005 | COMING CORRECT '88 | INLAY (DED) | U-MATIC | |
| LUKE RECORDS | CDR 101 | MOVE SOMETHING | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDR 101 | MOVE SOMETHING | LABEL FILM | PANY | |
| LUKE RECORDS | CDR 101 | MOVE SOMETHING | LABEL FILM | 354 | 7,269 |
| LUKE RECORDS | CDR 101 | MOVE SOMETHING | BOOKLET (DED) | U-MATIC | 10,680 |
| LUKE RECORDS | CDR 101 | MOVE SOMETHING | INLAY (DED) | | 1 |
| LUKE RECORDS | CDR 102 | MOVE SOMETHIN-CLEAN | LABEL FILM | PANY | |
| LUKE RECORDS | CDR 102 | MOVE SOMETHIN-CLEAN | LABEL FILM | 354 | 6,082 |
| LUKE RECORDS | CDR 102 | MOVE SOMETHIN-CLEAN | MASTER TAPE | U-MATIC | 5,912 |
| LUKE RECORDS | CDR 102 | MOVE SOMETHIN-CLEAN | BOOKLET (DED) | | |
| LUKE RECORDS | CDR 103 | RESPECT | INLAY (DED) | | 1 |
| LUKE RECORDS | CDR 107 | AS NASTY AS THEY WAN | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDR 107 | AS NASTY AS THEY WAN | LABEL FILM | BLK | 2,152 |
| LUKE RECORDS | CDR 107 | AS NASTY AS THEY WAN | LABEL FILM | U-MATIC | 3,597 |
| LUKE RECORDS | CDR 108 | AS CLEAN AS THEY WAN | MASTER TAPE | | |
| LUKE RECORDS | CDR 108 | AS CLEAN AS THEY WAN | MASTER TAPE | PANY | 6,208 |
| LUKE RECORDS | CDR 108 | AS CLEAN AS THEY WAN | BOOKLET (DED) | 354 | 5,955 |
| LUKE RECORDS | CDR 108 | AS CLEAN AS THEY WAN | INLAY (DED) | U-MATIC | 2,500 |
| LUKE RECORDS | CDF 109 | AGAINST ALL ODDS | STICKER (DED) | | |
| LUKE RECORDS | CDF 110 | DARK SIDE | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDF 110 | PAWSOF THE GAME | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDR 111 | BANNED IN USA-NASTY | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDR 114 | BANNED IN USA-NASTY | LABEL FILM | 300 | 2,252 |
| LUKE RECORDS | CDR 114 | BANNED IN USA-NASTY | LABEL FILM | 185 | 5,136 |
| LUKE RECORDS | CDR 114 | BANNED IN USA-NASTY | INLAY (DED) | U-MATIC | |
| LUKE RECORDS | CDR 114 | BANNED IN USA-NASTY | BOOKLET (DED) | | |
| LUKE RECORDS | CDR 115 | BANNED IN USA-CLEAN | LABEL FILM | | |
| LUKE RECORDS | CDR 115 | BANNED IN USA-CLEAN | LABEL FILM | 300 | 5,996 |
| LUKE RECORDS | CDR 115 | BANNED IN USA-CLEAN | MASTER TAPE | 185 | 7,529 |
| LUKE RECORDS | CDR 115 | BANNED IN USA-CLEAN | BOOKLET (DED) | U-MATIC | |
| LUKE RECORDS | CDR 116 | SPORTS WEEKEND-NASTY | INLAY (DED) | | |
| LUKE RECORDS | CDR 116 | SPORTS WEEKEND-NASTY | LABEL FILM | BLK | 1 |
| LUKE RECORDS | CDR 116 | SPORTS WEEKEND-NASTY | LABEL FILM | 021 | 0 |
| LUKE RECORDS | CDR 116 | SPORTS WEEKEND-NASTY | MASTER TAPE | | |
| LUKE RECORDS | CDR 116 | SPORTS WEEKEND-NASTY | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDR 117 | SPORTS WEEKEND-CLEAN | INLAY (DED) | | 5,511 |
| LUKE RECORDS | CDR 117 | SPORTS WEEKEND-CLEAN | LABEL FILM | BLK | |
| LUKE RECORDS | CDR 117 | SPORTS WEEKEND-CLEAN | LABEL FILM | 021 | 1 |



06/23/95  13:33:16          Parts Inventory For Client          (*LIBL/INV0080)                              PAGE   3

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | MASTER TAPE | U-MATIC | 5.556 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | BOOKLET (DED) | | 10.727 |
| LUKE RECORDS | CDXR 117 | SPORTS WEEKEND-CLEAN | INLAY (DED) | | |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | LABEL FILM | BLK | 21.129 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | LABEL FILM | 116 | 20.064 |
| LUKE RECORDS | CDXR 120 | VIA SATELLITE-SATURN | BOOKLET (DED) | | |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | INLAY (DED) | 032 | 25.491 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | LABEL FILM | BLK | 32.114 |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | LABEL FILM | U-MATIC | |
| LUKE RECORDS | CDXR 121 | BACK FROM HELL | MASTER TAPE | | |
| LUKE RECORDS | CDXR 122 | BEST OF ... | INLAY (DED) | | |
| LUKE RECORDS | CDXR 122 | BEST OF ...15 TRKS | LABEL FILM | 032 | 15.880 |
| LUKE RECORDS | CDXR 122 | BEST OF ...15 TRKS | LABEL FILM | BLK | 1.479 |
| LUKE RECORDS | CDXR 123 | BEST OF ...15 TRKS | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 123 | BEST OF ...9 TRKS | BOOKLET (DED) | 137 | 29.617 |
| LUKE RECORDS | CDXR 123 | BEST OF ...9 TRKS | LABEL FILM | BLK | 33.503 |
| LUKE RECORDS | CDXR 123 | BEST OF ...9 TRKS | LABEL FILM | U-MATIC | |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | MASTER TAPE | | |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | INLAY (DED) | PROV | 33.358 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | LABEL FILM | BLK | 21.154 |
| LUKE RECORDS | CDXR 124 | DISTURB N THE PIECE | LABEL FILM | U-MATIC | |
| LUKE RECORDS | CDXR 125 | BODY FINE | MASTER TAPE | | |
| LUKE RECORDS | CDXR 125 | BODY FINE | INLAY (DED) | BLK | 19.684 |
| LUKE RECORDS | CDXR 125 | BODY FINE | LABEL FILM | 032 | 25.279 |
| LUKE RECORDS | CDXR 125 | BODY FINE | LABEL FILM | U-MATIC | |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | WHI | 79.496 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | 117 | 54.226 |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | LABEL FILM | BLK | |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 126 | FEVER FOR THE FLAVOR | BOOKLET (DED) | | |
| LUKE RECORDS | CDXR 200 | NASTY IN MODE | LABEL FILM | 4665 | |
| LUKE RECORDS | CDXR 200 | NASTY IN MODE | LABEL FILM | 186 | 55.027 |
| LUKE RECORDS | CDXR 200 | NASTY IN MODE | LABEL FILM | BLK | 54.609 |
| LUKE RECORDS | CDXR 200 | NASTY IN MODE | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 200 | NASTY IN MODE | INLAY (DED) | | |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | LABEL FILM | | 16.406 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | LABEL FILM | | 18.463 |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | LABEL FILM | U-MATIC | |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | MASTER TAPE | | |
| LUKE RECORDS | CDXR 201 | IN THE MODE-CLEAN | BOOKLET (DED) | | |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | LABEL FILM | INL STD BKGD | |

*(handwritten notes in margin: "Moved out" appears at several title groups)*

LJWR0706

06/23/95  13:33:16                    Parts Inventory for Client          (*LIBL/INV0080)                    PAGE    4

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 202 | RUFFTOWN BEHAVIOR | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | CDXR 203 | RUFFTOWN BEHAVIOR | BOOKLET (OED) | INL | 16.612 |
| LUKE RECORDS | CDXR 203 | RUFFTOWN BEHAVIOR | INLAY (OED) | STC | 18.890 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | DESIGN | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | MASTER TAPE | | 3.485 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | BOOKLET (OED) | | 3.874 |
| LUKE RECORDS | CDXR 203 | PROVE MY LOVE | INLAY (OED) | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | E TO E | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | MASTER TAPE | | 9.915 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | BOOKLET (OED) | | 12.760 |
| LUKE RECORDS | CDXR 204 | INDO -ANTIDOTE | INLAY (OED) | | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | MASTER TAPE | | 14.938 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | BOOKLET (OED) | | 14.376 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | INLAY (OED) | | 1 |
| LUKE RECORDS | CDXR 205 | CHRISTMAS '93 9TRKS | STICKER (OED) | NO EXPLICIT LYRICS | 0 |
| LUKE RECORDS | CDXR 206 | CHRISTMAS '93 9TRKS | STICKER (OED) | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | MASTER TAPE | | 0 |
| LUKE RECORDS | CDXR 206 | RAP X-MAS ALBUM 1993 | BOOKLET (OED) | | 0 |
| LUKE RECORDS | CDXR 207 | '94 | INLAY (OED) | | 0 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 207 | '94 | MASTER TAPE | | 16.130 |
| LUKE RECORDS | CDXR 207 | '94 | BOOKLET (OED) | BKGD | 15.221 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | INLAY (OED) | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | MASTER TAPE | | 13.032 |
| LUKE RECORDS | CDXR 208 | '94-CLEAN | BOOKLET (OED) | | 11.472 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | INLAY (OED) | | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | MASTER TAPE | | 14.915 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | BOOKLET (OED) | | 15.435 |
| LUKE RECORDS | CDXR 209 | GHETTO STYLE BASS | INLAY (OED) | TEXT | 1 |
| LUKE RECORDS | CDXR 210 PRO | GHETTO STYLE BASS | LABEL FILM | | 1 |

LJWR0707

06/23/95  13:33:16      Parts Inventory For Client    (*LIBL/INV00BG)    PAGE  5

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | CDXR 210 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 210 | BAD FOR. | MASTER TAPE | | |
| LUKE RECORDS | CDXR 210 | BAD FOR. | BOOKLET (OED) | | 11,595 |
| LUKE RECORDS | CDXR 211 | BAD FOR. | INLAY (OED) | STD | 11,135 |
| LUKE RECORDS | CDXR 211 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOR. | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 211 | BAD FOR. | MASTER TAPE | | |
| LUKE RECORDS | CDXR 211 | BAD FOR. | BOOKLET (OED) | | 3,106 |
| LUKE RECORDS | CDXR 211 | BAD FOR. | INLAY (OED) | | 3,683 |
| LUKE RECORDS | CDXR 212 | | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 212 | | MASTER TAPE | | |
| LUKE RECORDS | CDXR 212 | | BOOKLET (OED) | BKGD W/ KO | 25,082 |
| LUKE RECORDS | CDXR 212 | | INLAY (OED) | TEXT | 23,508 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | MASTER TAPE | | |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | BOOKLET (OED) | | 0 |
| LUKE RECORDS | CDXR 213 | MALIGNANT GRAFFITI | INLAY (OED) | | 0 |
| LUKE RECORDS | CDXR 214 | LOVE ON MIND | BOOKLET (OED) | | 0 |
| LUKE RECORDS | CDXR 214 | LOVE ON MIND | INLAY (OED) | | 0 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | MASTER TAPE | | |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | BOOKLET (OED) | | 0 |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | INLAY (OED) | BLK | |
| LUKE RECORDS | CDXR 5001 | MIAMI BASS WAVES | MASTER TAPE | U-MATIC | |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | LABEL FILM | INLAY | 6,707 |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | MASTER TAPE | 226 | 7,832 |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | INLAY (OED) | U-MATIC | |
| LUKE RECORDS | CDXR 5002 | LUKE'S HITMAN OF 90S | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | MASTER TAPE | | |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | BOOKLET (OED) | | 4,245 |
| LUKE RECORDS | CDXR 6996 | STILL A FREAK FOR... | INLAY (OED) | BKGD | 20,815 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | LABEL FILM | | 1 |
| LUKE RECORDS | CDXR 777 | YES N DEED | BOOKLET (OED) | | |
| LUKE RECORDS | CDXR 777 | YES N DEED | INLAY (OED) | BLK | 17,704 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN  7 TRKS | LABEL FILM | | 17,581 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN  7 TRKS | MASTER TAPE | U-MATIC | 1 |

LJWR0708

06/23/95  13:33:16                                Parts Inventory For Client                    (*LIBL/INV0080)                          PAGE   6

| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | GR 452-2 | BREAKDOWN    7 TRKS | BOOKLET (OED) | | 3,933 |
| LUKE RECORDS | GR 452-2 | BREAKDOWN    7 TRKS | INLAY (OED) | | 3,816 |
| LUKE RECORDS | LUKE GEN. | | WALLET (GEM) | | 2,700 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | LABEL FILM | BLK | 1 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | MASTER TAPE | U-MATIC | 9,077 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | BOOKLET (OED) | | 1 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | INLAY (OED) | | 8,706 |
| LUKE RECORDS | M 1551 | 'U' TURN ME ON | STICKER (OED) | | 3,297 |
| LUKE RECORDS | PR CDE 218 | BREAKDOWN-6 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 218 | BREAKDOWN-6 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 221 | FREAK 'EM DOWN-2TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 221 | FREAK 'EM DOWN-2TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 222 | HERE IT COMES-1 TRK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 222 | HERE IT COMES-1 TRK | MASTER TAPE | RDAT | 1 |
| LUKE RECORDS | PR CDE 225 | PICK IT UP- 1 TRK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 225 | PICK IT UP- 1 TRK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 226 | WIGGLE,WIGGLE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 226 | WIGGLE,WIGGLE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 229 | ACTION-3 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 229 | ACTION-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 231 | SISTA,SISTA | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 231 | SISTA,SISTA | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 457 | NO RUSH MI/...4 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 457 | NO RUSH MI/...4 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 458 | YOU & ME-3TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 458 | YOU & ME-3TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE 459 | I'LL BE THERE-4TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE 459 | I'LL BE THERE-4TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE-722 | IN MY NATURE-3 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE-722 | IN MY NATURE-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR CDE-724 | I JUST WANT TO USE U | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR CDE-724 | I JUST WANT TO USE U | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PROC E-718 | PSYCHOTIC-3 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PROC E-718 | PSYCHOTIC-3 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PROC M-1300 | U TURN ME ON-4 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PROC M-1300 | ONE TRACK MIND-4TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PROC 207 | SHAKE WAT?HA MAMA... | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PROC 213 | SHAKE WAT?HA MAMA... | MASTER TAPE | BKGD | 1 |
| LUKE RECORDS | PROC 213 | 2 DIFFERENT TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PROC 214 | 2 DIFFERENT TRKS | MASTER TAPE | TEXT | 1 |
| LUKE RECORDS | PR182-2 | | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR182-2 | BACK TO THE BRONX | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PR460-2 | BACK TO THE BRONX | LABEL FILM | U-MATIC | 1 |
| LUKE RECORDS | PR460-2 | KNOCKIN DA BOOTS-STK | MASTER TAPE | BLK | 1 |
| LUKE RECORDS | PR461-2 | KNOCKIN DA BOOTS-STK | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR461-2 | I'LL ALWAYS BE THERE | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR463-2 | I'LL ALWAYS BE THERE | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR463-2 | CAN YOU FEEL IT-6TRK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR464-2 | | LABEL FILM | BLK | 1 |

LJWR0709



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | (*LIBL/INV0080) | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | PR464-2 | CAN YOU FEEL IT-6TRK | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR464-2 | CAN YOU FEEL IT-6TRK | MASTER TAPE | VPK | 1 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | MASTER TAPE | U-MATIC | 0 |
| LUKE RECORDS | PR465-2 | BACKDRAFT | VIEWPACK (QED) | VPK | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | WHI | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR466-2 | COWARDS IN COMPTON | VIEWPACK (QED) | VPK | 0 |
| LUKE RECORDS | PR467-2 | PERFIDIA | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR467-2 | PERFIDIA | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR468-2 | WORK IT OUT-9 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | WHI | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | EYEL | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | EMAG | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | CYAN | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | LABEL FILM | BLK | 1 |
| LUKE RECORDS | PR469-2 | LICK YOU UP-4 TRKS | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR470-2 | DON'T SLEEP ONA HIZZ | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR470-2 | DON'T SLEEP ONA HIZZ | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR470-2 | DON'T SLEEP ONA HIZZ | MASTER TAPE | U-MATIC | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | LABEL FILM | H/T&TEXT | 1 |
| LUKE RECORDS | PR471-2 | LICK U UP-6 TRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | LABEL FILM | STD BKGRD | 1 |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR472-2 | STOP, LOOK, LISTEN | MASTER TAPE | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | LABEL FILM | | 1 |
| LUKE RECORDS | PR473-2 | KEEPIN' MY COMPOSURE | MASTER TAPE | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | LABEL FILM | | 1 |
| LUKE RECORDS | PR474-2 | THE HOP | MASTER TAPE | | 1 |
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 6TRKS | LABEL FILM | TEXT | 1 |

06/23/95  13:33:16                    Parts Inventory For Client

PAGE  8



| CLIENT NAME | CATALOG # | TITLE | DESCRIPTION | (*LBL/INVC080) | QUANTITY |
|---|---|---|---|---|---|
| LUKE RECORDS | PR475-2 | CHRISTMAS '93 GTRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | LABEL FILM | | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | LABEL FILM | | 1 |
| LUKE RECORDS | PR476-2 | YEAH, YEAH | MASTER TAPE | | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | LABEL FILM | LARGE TEXT | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR477-2 | CHECK OUT THE AVENUE | MASTER TAPE | | 1 |
| LUKE RECORDS | PR478-2 | PROVE MY LOVE/...4TRK | LABEL FILM | | 1 |
| LUKE RECORDS | PR478-2 | PROVE MY LOVE/...4TRK | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | LABEL FILM | | 1 |
| LUKE RECORDS | PR479-2 | BABY I WANNA- 5 TRKS | MASTER TAPE | | 1 |
| LUKE RECORDS | PR480-2 | | LABEL FILM | TEXT | 1 |
| LUKE RECORDS | PR480-2 | | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR480-2 | | LABEL FILM | DESIGN | 1 |
| LUKE RECORDS | PR481-2 | | MASTER TAPE | HAL-TONE | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | LEFT BKGD | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | SWATCH | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | LABEL FILM | HALFTONE | 1 |
| LUKE RECORDS | PR481-2 | YOU GO GIRL | MASTER TAPE | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | LABEL FILM | | 1 |
| LUKE RECORDS | PR482-2 | IT'S YOUR BIRTHDAY | MASTER TAPE | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | ETOE | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | LABEL FILM | | 1 |
| LUKE RECORDS | PR483-2 | 2 LIVE FREESTYLE | MASTER TAPE | | 1 |
| LUKE RECORDS | PR485-2 | IMOO & BLUE BLAME | LABEL FILM | BKGD | 1 |
| LUKE RECORDS | PR485-2 | IMOO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | IMOO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | IMOO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | IMOO & BLUE BLAME | LABEL FILM | | 1 |
| LUKE RECORDS | PR485-2 | IMOO & BLUE BLAME | MASTER TAPE | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/COME IN | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/COME IN | LABEL FILM | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/COME IN | LABEL FILM | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/COME IN | LABEL FILM | | 1 |
| LUKE RECORDS | PR486-2 | TAKE IT SLOW/COME IN | MASTER TAPE | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEN... | LABEL FILM | STD BKGD | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEN... | LABEL FILM | | 0 |
| LUKE RECORDS | PR487-2 | WHERE THEN... | LABEL FILM | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEN... | LABEL FILM | | 1 |
| LUKE RECORDS | PR487-2 | WHERE THEN... | MASTER TAPE | | 1 |
| LUKE RECORDS | PR489-2 | BACKSEAT | LABEL FILM | STD BKGD | 1 |

LJWR0711

```
06/21/95  13:33:16                    Parts Inventory For Client    (*LIBL/INV008Q)          PAGE  9

CLIENT NAME      CATALOG #    TITLE                  DESCRIPTION                    QUANTITY

LUKE RECORDS     PR489-2      BACKSEAT               LABEL FILM                            1
LUKE RECORDS     PR489-2      BACKSEAT               LABEL FILM                            1
LUKE RECORDS     PR489-2      BACKSEAT               LABEL FILM                            1
LUKE RECORDS     PR489-2      BACKSEAT               MASTER TAPE                           1
LUKE RECORDS     PR490-2      MALIGNANT GRAFFITI     LABEL FILM                            1
LUKE RECORDS     PR490-2      MALIGNANT GRAFFITI     MASTER TAPE                           1
LUKE RECORDS     PR492-2      EMOTIONS               LABEL FILM                            1
LUKE RECORDS     XR 100       IS WHAT WE ARE         LABEL FILM                            1
LUKE RECORDS     XR 100       IS WHAT WE ARE         MASTER TAPE      155                  1
LUKE RECORDS     XR-136                              BOOKLET (OED)    355                  0
LUKE RECORDS     1551-2       U TURN ME ON           BOOKLET (OED)    U-MATIC              0
LUKE RECORDS     1551-2       U TURN ME ON           INLAY (OED)      INL                  0
LUKE RECORDS     3005-2       NASTY BITCH CHAPTER    BOOKLET (OED)                         0
LUKE RECORDS     3005-2       NASTY BITCH CHAPTER    INLAY (OED)      INL                  0

* * *  E N D  O F  R E P O R T  * * *
```

*TOTAL PRINT PIECES 1,133,647* (handwritten)

LJWR0712

# EXHIBIT 41

GENERAL RELEASE

KNOW ALL MEN BY THESE PRESENTS:

THAT, LUTHER R. CAMPBELL, parties of the first part, for and in consideration of the sum of Ten ($10.00) Dollars, and other valuable considerations, from or on behalf of JOSEPH WEINBERGER, LIL' JOE RECORDS, INC., RICHARD C. WOLFE, PETER JONES, FRANK TERZO and GEORGE TAVARES parties of the second part, the receipt where is hereby acknowledged. (Wherever used herein the terms "first party" and "second party" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.)

HEREBY remise, release, acquit, satisfy, and forever discharge the second party, of and from any, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which said first party ever had, now has, or which any personal representative, successor, heir or assign of said first party, hereafter can, shall or may have, against said second party.

IN WITNESS WHEREOF, we have hereunto set our hands and seals this __8__ day of ____April____, 1996.

Signed, sealed and delivered
in the presence of:

Print Name: Joh Campbell

Print Name: Marc J. Sternbaum

By: _____
LUTHER R. CAMPBELL

STATE OF __Fla.__    )
                      ) SS
COUNTY OF __Dade__   )

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State and County aforesaid to take acknowledgements, personally appeared LUTHER R. CAMPBELL to me known to be the person who executed the foregoing instrument and has acknowledged before me that he executed same.

WITNESS my hand and official seal in the County and State last aforesaid this __8th__ day of ____April____, 1996.

_____
NOTARY PUBLIC OF THE STATE OF __Florida__
Print Name: ____Marc J. Sternbaum____

My commission expires:

OFFICIAL NOTARY SEAL
MARC J. STERNBAUM
COMMISSION NUMBER
CC229363
MY COMMISSION EXP.
OCT. 29,1996

LJWR0928

# EXHIBIT 42

GENERAL RELEASE AND HOLD HARMLESS
AND INDEMNIFICATION AGREEMENT

Whereas, Joseph Weinberger and Lil' Joe Records, Inc., a Florida corporation ("Weinberger Parties" or "first parties") pursuant to a Letter of Intent executed by Luther Campbell, Debtor and Debtor in Possession and Luke Records, Inc., Debtor and Debtor in Possession ("second parties") dated on or about February 3, 1996, further approved by Court Order Confirming Joint Plan Of Reorganization of the Assignor dated March 22, 1996, in Case Nos 95-11447 BKC RAM and 95-12785 BKC RAM, the US Bankruptcy Court Southern District Of Florida has acquired certain assets of the second parties which is exempt from tax under any law imposing a stamp or similar tax

KNOW ALL MEN BY THESE PRESENTS:

That I, Frank P. Terzo Liquidating Trustee of the Luke Records, Inc., Bankruptcy Estate, second party, for and in consideration of the sum of TEN DOLLARS ($10.00), or other valuable considerations, given to or on behalf of Joseph Weinberger and Lil' Joe Records, Inc., first party, the receipt whereof is hereby acknowledged.

(Wherever used herein the terms "first party" and "second party" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.)

HEREBY remise, release, acquit, satisfy, and forever discharge the said second party of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which said first party ever had, now has, or which any personal representative, successor, heir or assign of said first party, hereafter can, shall or may have, against said second party, for, upon or by reason of any matter, cause or thing from the beginning of the world to the day of these presents, which arose out of case 95-01914 Dade County Circuit Court and adversarial case and shall waive and relinquish all claims as that term is defined in 11 USC Section 101 (5), in law or in equity, that they have against the Weinberger parties including but not limited to preference actions and other avoidance actions under the Bankruptcy codes out of or in connection with: (the "Conduct") and (ii) any claims by, through, or under first party or any of its agents, employees, or others permitted by first party on said premises or to otherwise participate in the Conduct, for any injuries to person or property, or any other claim of damage occasioned at or on the said premises or in connection with the Conduct. In addition, to the extent any such agents, employees or others so permitted by first party actually pursue any claim against second party, for any of said injuries or damages, then first party shall save and hold second party harmless of and from such claims, and first party shall indemnify second party against all costs and, if litigation commences, attorneys' fees, incurred by second party in defense and response to any such claims. The second parties do not release the Weinberger parties from the promissory notes and related documents of even date herewith.

IN WITNESS WHEREOF, we have hereunto set our hand(s) and seal(s) this __ day of _____, 1996.

LIL' JOE RECORDS, INC.

_____
Joseph Weinberger

By: _____
Joseph Weinberger
President

_____
Frank Terzo, Liquidating
Trustee of Luke Records, Inc.

STATE OF _____ )
                         ) SS:
COUNTY OF _____ )

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and the County aforesaid to take acknowledgements, personally appeared Joseph Weinberger, to me known to be the person described in an who executed the foregoing instrument and he acknowledged before me that he executed the same.

WITNESS my hand and official seal in the County and State last aforesaid this __ day of April, 1996.

_____
FRANK P. TERZO
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

FRANK P TERZO
My Commission CC500735
Expires Oct. 10, 1999

STATE OF Florida )
                 ) SS:
COUNTY OF Dade )

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and the County aforesaid to take acknowledgements, personally appeared Frank Terzo, to me known to be the person described in an who executed the foregoing instrument and he acknowledged before me that he executed the same.

WITNESS my hand and official seal in the County and State last aforesaid this 9th day of April, 1996.

_____
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

6-13-96

OFFICIAL NOTARY SEAL
EMMA LASTRA
COMMISSION NUMBER
CC206439
MY COMMISSION EXP.
JUNE 13,1996

LJWR0901

# EXHIBIT 43

# U.S. Bankruptcy Court

Southern District of Florida (Dade)

- *Bankruptcy Petition #:* 95-12785 *Date filed:* 6/12/95 *Date terminated:* 3/12/99
- *Assigned to:* Judge Robert A. Mark
- Chapter 11, voluntary, asset

| * Parties * | * Attorneys * |
|---|---|
| **LUTHER R. CAMPBELL**<br>7180 N Oakmont Dr<br>Miami, FL 33015<br>*SSN:* 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<br>* Debtor * | **Jay M Gamberg, Esq**<br>4000 Hollywood Blvd #350N<br>Hollywood, FL 33021<br>954-981-4411 |
| | **Frank P Terzo, Esq**<br>201 S Biscayne Blvd #2400<br>Miami, FL 33131<br>305-372-2400 |

## Docket Proceedings

| Date | Doc. No. | Docket Entry |
|---|---|---|
| 6/12/95 | 1 | Voluntary Petition Filed Under Chapter 11 ; missing , documents: All Schedules and Statements Due on 6/27/95 , Disclosure statement due 10/10/95 Chapter 11 Plan due 10/10/95. List of 20 largest creditors filed. (mre) [EOD 06/13/95] [95-12785] |
| 6/12/95 | 3 | Motion By Debtor Luther R. Campbell To Employ Jonathan K Winer, Esq/affidavit attached (mre) [EOD 06/15/95] [95-12785] |
| 6/13/95 | 2 | Notice of Deficiency for Incomplete Filings. [2-1] (mre) [EOD 06/13/95] [95-12785] |
| 6/14/95 | 4 | Order ( 6/13/95) Granting [3-1] Motion To Employ Jonathan K Winer, Esq/affidavit attached by Luther R. Campbell. (EOD 6/15/95) (mre) [EOD 06/15/95] [95-12785] |
| 6/14/95 | 5 | Notice of Appearance And Request For Service Of Notice By James P S Leshaw for Creditor Red Distribution Inc. (mre) [EOD 06/20/95] [95-12785] |

# EXHIBIT 44

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JEFFREY J. THOMPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. |
| | ) | _____ |
| LIL' JOE RECORDS, INC., | ) | |
| LIL' JOE WEIN MUSIC, INC., | ) | |
| JOSEPH WEINBERGER AND | ) | |
| JOHN DOE INDIVIDUALS AND | ) | |
| CORPORATIONS 1-5, | ) | |
| | ) | |
| Defendants. | ) | |

<u>COMPLAINT FOR DAMAGES</u>

COMES NOW Plaintiff, Jeffrey Thompkins, and shows the Court as follows:

<u>PARTIES, JURISDICTION & VENUE</u>

1.)  This lawsuit for damages, declaratory relief, and permanent injunctive relief is brought by Plaintiff, Jeffrey J. Thompkins, pursuant to the Copyright Act and Copyright Revision Act, 17 U.S.C. §§ 101 et seq. (hereinafter "Copyright Act"), and the common law and statutory law of the States of Florida and Georgia.  This action arises out of an ongoing pattern of copyright infringement by the Defendants, willful infringement upon Plaintiff's copyrights by Defendants, and Defendants'

1

7)        PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES

AND CLAIMS IN THIS LAWSUIT.

This ___ day of March, 2002.

RESPECTFULLY SUBMITTED,

By: _____

LEON S. JONES
Georgia Bar No. 003980
COUNSEL FOR PLAINTIFF

By: _____

PHILIP WALDEN, JR.
Georgia Bar No. 730550
COUNSEL FOR PLAINTIFF

**JONES & WALDEN, LLC**
**83 Walton Street, 5th Floor**
**Atlanta, Georgia 30303**
**(404) 954-6605**

19

# EXHIBIT 45

# U.S. Bankruptcy Court

Southern District of Florida (Dade)

- *Bankruptcy Petition #:* 95-11447 *Date filed:* 3/28/95 *Date terminated:* 12/17/98
- *Assigned to:* Judge Robert A. Mark
- Chapter 11, involuntary, asset

| * Parties * | * Attorneys * |
|---|---|
| **LUKE RECORDS, INC.**<br>8400 NE 2 Ave<br>Miami, FL 33138<br>* Debtor * | **Jonathan K Winer, Esq**<br>1 SE 3 Ave #2200<br>Miami, FL 33131<br>305-377-1778 |
| **ASR RECORDING SERVICES OF**<br>CALIFORNIA<br>c/o Ronald G Neiwirth<br>100 SE 2 St 17 Fl<br>Miami, FL 33131<br>* Petitioning Creditor * | **ASR Recording Services of**<br>California<br>PRO SE |
| **NIMBUS MANUFACTURING, INC.**<br>c/o Ronald G Neiwirth<br>100 SE 2 St 17 Fl<br>Miami, FL 33131<br>* Petitioning Creditor * | **Nimbus Manufacturing, Inc.**<br>PRO SE |
| **LFL MUSIC PRODUCTIONS, INC.**<br>c/o Ronald G Neiwirth<br>100 SE 2 St 17 Fl<br>Miami, FL 33131<br>* Petitioning Creditor * | **LFL Music Productions, Inc.**<br>PRO SE |
| **VISTA COLOR CORP**<br>c/o Ronald G Neiwirth<br>100 SE 2 St 17 Fl<br>Miami, FL 33131<br>* Petitioning Creditor * | **Vista Color Corp**<br>PRO SE |
| | **Frank P Terzo, Esq**<br>201 S Biscayne Blvd #2400<br>Miami, FL 33131<br>305-372-2400 |

## Docket Proceedings

| Date | Doc. No. | Docket Entry |
|---|---|---|
| | | |

| 3/28/95 | 1 | Involuntary Petition Filed Under Chapter 7 . (mre) [EOD 03/30/95] [95-11447] |
| 3/29/95 | 2 | One Summons(es) issued on Luke Records, Inc. (mre) [EOD 03/30/95] [95-11447] |
| 4/6/95 | 3 | Notice of Service of Interrogatories by Petitioning Creditor LFL Music Productions, Inc. Petitioning Creditor Nimbus Manufacturing, Inc. Petitioning Creditor ASR Recording Services of California. (mre) [EOD 04/07/95] [95-11447] |
| 4/6/95 | 4 | Summons Served 4/5/95 on Luke Records, Inc. Involuntary Answer due on 4/25/95 for Luke Records, Inc. (mre) [EOD 04/07/95] [95-11447] |
| 4/6/95 | 5 | Motion by Petitioning Creditor LFL Music Productions, Inc. Petitioning Creditor Nimbus Manufacturing, Inc. Petitioning Creditor ASR Recording Services of California To Appoint Interim Trustee (mre) [EOD 04/07/95] [95-11447] |
| 4/10/95 | 6 | Notice of Hearing by Ronald G Neiwirth for Petitioning Creditor LFL Music Productions, Inc., Petitioning Creditor Nimbus Manufacturing, Inc., Petitioning Creditor ASR Recording Services of California RE: [5-1] Motion To Appoint Interim Trustee by ASR Recording Services of California, Nimbus Manufacturing, Inc., LFL Music Productions, Inc. Schd For 1:30 4/11/95 at Room 1406, Miami (jn) [EOD 04/11/95] [95-11447] |
| 4/13/95 | 7 | Notice of Hearing by Ronald G Neiwirth for Petitioning Creditor LFL Music Productions, Inc., Petitioning Creditor Nimbus Manufacturing, Inc., Petitioning Creditor ASR Recording Services of California RE: [5-1] Motion To Appoint Interim Trustee by ASR Recording Services of California, Nimbus Manufacturing, Inc., LFL Music Productions, Inc. Schd For 10:30 4/24/95 at Room 1406, Miami (jn) [EOD 04/14/95] [95-11447] |
| 4/17/95 | 8 | Order ( 4/17/95) Granting Ore Tenus Mtn Shortening Time to Respond To Interrogatories by Petitioning Creds (EOD 4/18/95) (jn) [EOD 04/18/95] [95-11447] |
| 4/20/95 | 9 | Notice of Filing By Petitioning Creditor Vista Color Corp Re: Joining in on the Involuntary Petition (jn) [EOD 04/21/95] [95-11447] |
| 4/24/95 | 10 | Certificate Of Service By Patricia A Redmond for Debtor Luke Records, Inc. Of [7-1] Notice of Hearing by Ronald G Neiwirth Esq . (jn) [EOD 04/24/95] [95-11447] |

| 6/13/95 | 50 | Objection by Creditor Peter Jones to use of cash collateral. (mre) [EOD 06/15/95] [95-11447] |
|---------|----|---------|
| 6/13/95 | 51 | Motion by Debtor Luke Records, Inc. To Convert Case From Chapter 7 to Chapter 11 and Consent to entry of order for relief (mre) [EOD 06/15/95] [95-11447] |
| 6/14/95 | 52 | Notice of Appearance And Request For Service Of Notice By Douglas D Stratton for Creditor Christopher Wong Won. (mre) [EOD 06/15/95] [95-11447] |
| 6/14/95 | 53 | Order ( 6/14/95) Granting [51-1] Motion To Convert Case From Chapter 7 to Chapter 11 and Consent to entry of order for relief by Luke Records, Inc. Missing documents: All Schedules and Statements Due On 6/29/95 Filing Fee Bal Due on 6/15/95 Bal Due: $400.00 ; Chapter 11 Plan Due On 10/12/95 List of 20 Largest Unsecured Creditors Due On 6/16/95. (mre) [EOD 06/16/95] [95-11447] |
| 6/14/95 | 55 | Notice of Hearing by Ronald G Neiwirth for Petitioning Creditor Vista Color Corp, Petitioning Creditor LFL Music Productions, Inc., Petitioning Creditor Nimbus Manufacturing, Inc., Petitioning Creditor ASR Recording Services of California RE: [48-1] Motion To Appoint Trustee by ASR Recording Services of California, Nimbus Manufacturing, Inc., LFL Music Productions, Inc. schd For 2:30 6/22/95 at Room 1406, Miami (mre) [EOD 06/20/95] [95-11447] |
| 6/14/95 | 56 | Emergency Motion by Debtor Luke Records, Inc. for order authorizing Barnett Bank to collect boat loan deficiency from Certificate of Deposit and allowing Debtor to utilize remaining net proceeds of Certificate of Deposit to operate (mre) [EOD 06/20/95] [95-11447] |
| 6/14/95 | 57 | Order ( 6/14/95) Granting [39-1] Motion To Sell Free And Clear of Liens '94 Sea Ray by Luke Records, Inc. (EOD 6/20/95_ (mre) [EOD 06/20/95] [95-11447] |
| 6/14/95 | 58 | Notice of Hearing by Jonathan K Winer for Debtor Luke Records, Inc. RE: [56-1] Motion for order authorizing Barnett Bank to collect boat loan deficiency from Certificate of Deposit and allowing Debtor to utilize remaining net proceeds of Certificate of Deposit to operate by Luke Records, Inc. schd For 10:00 6/15/95 at Room 1406, Miami (mre) [EOD 06/20/95] [95-11447] |
| 6/15/95 | 54 | Order For Relief ( 6/15/95). (mre) [EOD 06/16/95] [95-11447] |
|         |    |         |